UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                      :

UNITED STATES OF AMERICA,       :

               Plaintiff,       :

        - against -       :

                                        :

SIXTY-ONE THOUSAND NINE       :
HUNDRED DOLLARSAND NO CENTS       :
($61,900.00) SEIZED FROM ACCOUNT       :
NUMBER XXXXXX4429 HELD IN THE       :
NAME OF PRP RESTAURANT, INC., AT       :
TD BANK, N.A. LOCATED IN ASTORIA,       :
NEW YORK, AND ALL PROCEEDS       :
TRACEABLE THERETO,       :

                                        :

FIVE HUNDRED EIGHTY-SEVEN       :
THOUSAND FIVE HUNDRED THIRTY-       :
SIX DOLLARS AND FORTY-FIVE CENTS       :
($587,536.45) SEIZED FROM ACCOUNT       :
NUMBER XXX-X7872 HELD IN THE       :
NAME OF PRP RESTAURANT, INC., AT       :
MERRILL LYNCH PIERCE FENNER &       :
SMITH, LOCATED IN NEW YORK, NEW       :
YORK AND ALL PROCEEDS       :
TRACEABLE THERETO, and       :

                                        :

TWO HUNDRED THIRTY THOUSAND       :
FOUR HUNDRED DOLLARS AND NO       :
CENTS ($230,400.00) SEIZED FROM       :
ACCOUNT NUMBER XXX-X7A80       :
HELD IN THE NAME OF ROBERT       :
POTENZA, AT MERRILL LYNCH PIERCE       :
FENNER & SMITH, LOCATED IN NEW       :
YORK, NEW YORK AND ALL PROCEEDS       :
TRACEABLE THERETO,       :

                                        :

                         Defendants.       :
-------------------------------------------------------- X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 18 2011 ★

BROOKLYN OFFICE

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

10 Civ. 1866  (BMC)

**COGAN,** District Judge.

The Government instituted this action to seize funds that were purportedly involved in "structured" transactions. Federal law requires domestic financial institutions to file a currency transaction report ("CTR") for any cash transaction in an amount greater than $10,000. 31 U.S.C. § 5313(a). The law applies to individuals as they may not break up transactions in order to "cause a domestic financial institution to fail to file" a CTR. 31 U.S.C. § 5324(a); see also Ratzlaf v. United States, 510 U.S. 135, 136 (1994). If they do, the funds involved in the transactions become forfeitable. See 31 U.S.C. § 5317(c)(2).

The Government is seeking the forfeiture of $879,836.43. This sum is comprised of $587,536.43 from a Merrill Lynch account in the name of PRP Restaurant, $230,400 from a Merrill Lynch account in the name of Robert Potenza, and $61,900 from a TD Bank account in the name of PRP Restaurant. The Government alleges that a TD Bank account belonging to three owners of PRP Restaurant – one of whom is Potenza, president of PRP and claimant in this action – was involved in structuring activity between September 12, 2008 and November 9, 2009. During this time, claimant made over 100 cash depositions under the CTR-triggering $10,000 amount.

There are three elements to a structuring offense. The Government must show by a preponderance of the evidence that claimant: (1) engaged in structuring, (2) with knowledge of the CTR filing requirement, and (3) with intent to evade this requirement. See United States v. MacPherson, 424 F.3d 183, 189 (2d Cir. 2005). Claimant did not dispute that he made the transactions or that the money seized was traceable to the initial, purportedly structured, deposits.

I held a bench trial on the question of knowledge and intent. The Government advanced three theories to prove these elements: First, it pointed to the sheer number of transactions and

their proximity.  Second, it introduced a letter from claimant's former bank that identified

suspected structuring activity as the reason for terminating that account.  Claimant maintained

that he never received the letter because it was misaddressed.  Third – the theory that consumed

most of the trial – the Government purported to show that claimant was running a "cash

business" that avoided paying taxes and was wary of raising any red flags by triggering CTRs.

At the Final Pretrial Conference, after some probing, the Government finally disclosed the

precise contours of its rather subtle tax evasion theory for inferring intent: claimant injected

*reported* cash "under the IRS radar," as the Government's expert witness later put it, so that CTR

filing requirements would not draw attention to PRP's massive amount of *unreported* cash.

## FINDINGS OF FACT

### I.     PRP Restaurant

PRP Restaurant, also known as Gallagher's 2000, is a strip club located in Long Island

City.  It is organized as an S Corporation with three owners:  Robert Potenza (70 percent

shareholder), his sister, Patricia Potenza (15 percent), and Allen Reale (15 percent).  The

restaurant's profits come from various sources, including sale of alcohol, entrance fees, and

"house fees." The dancers perform on stage and privately, in the "champagne room."  They keep

most of the fees collected from their customers, but PRP retains a share; the "house mom" – who

assists the dancers – keeps the rest.  The club is at its busiest Thursday through Saturday nights

and predictably charges more for admission on those days.  Most of these fees go to the cashier

and are reflected on the register tape.  The club has a healthy revenue stream – hundreds of

patrons come through the club through the week, spending hundreds of dollars on admission,

drinks, and dances in the private room.

## II.    Joseph Johnson

Joseph Johnson is a disgruntled former manager of PRP of about nine years; he worked for Potenza at another topless bar prior to joining PRP.  The Government introduced copies of daily cover and register sheets that Johnson claimed were stored by PRP for about a week and were used to record PRP's cash revenues and expenses, including employee payroll.  He did not copy the relatively small register tapes, which contain a summary of the days' revenue and which, according to Johnson, would have corroborated his cover sheets.  Johnson conceded that the register tapes would in fact be the best evidence of the revenue taken in, and that the sheets he produced depend on the accuracy of what he himself recorded on those days since he did not copy sheets from nights on which he did not work.

When asked who prepared the daily sheets, Johnson testified that "Robert Potenza started it off, Richard Gleeson and then myself most of the time" as Richard Gleeson was the day-time manager and Johnson came to relieve him.  Johnson admitted that he kept these documents as a potential bargaining chip against Potenza:  " I was basically having problems with Robert Potenza, so I just felt I need – might need a little bit security or I might to get back at him one day . . . or to protect myself."

Johnson admitted that the cover sheets are for a period of two months and not every day within those months, only 36 days; that at least two of the sheets are incomplete; that he retained these photocopies after he left PRP; that there are no daily sheets filled out by Ben Schmidt – another general manager at PRP; and that Johnson was not responsible for storing them but that he nevertheless saw Ms. Potenza take them home with her.  He explained that one of his duties was to pay employees, and that the documents presented to the Court show that some of the employees were paid off the books.

Johnson expanded on that testimony by describing PRP's general practice – established by Potenza five or six years ago according to him – to pay employees in cash and partly "off the books" as part of a tax evasion scheme.  When Ms. Potenza first determined the amounts to be taxed from each employee's salary, they struck Johnson as being very low.  She allegedly admitted this tax fraud to Johnson.[1]  According to Johnson, under Ms. Potenza's direction, he credited an employee for working four days – as reflected in the documents Johnson presented to the Court – but that total would be reduced by Ms. Potenza when she calculated the taxes.  Other than the deposition testimony of Richard Gleason, described below, the Government did not introduce testimony of any of PRP's employees or independent contractors to corroborate these allegations.[2]

Johnson's relationship with PRP went beyond his employment; in 2007, during a time of financial distress for him, he borrowed $21,000 from the company.  Johnson still owes about $9,800.  He testified that while he was on a repayment plan, Potenza decided to start taking out more money from his paychecks without his consent.  Johnson suggested that this might have been a result of their souring relationship following President Obama's election.  He claimed that he ultimately left PRP because Potenza was upset because Johnson had determined to pay certain employees an extra $10:  "[Potenza] told me he wanted me to fire those three employees. I said it was not their fault. If you have a problem, you have a problem with me.  He wanted me to fire

---

[1] Q With respect to Ms. Potenza, did you ever have any conversations with her about the payroll of the company?
A Well, we talked about it. She would mention that she would pay a person for one day versus the four days that they were on the books or something like that, yes.
Q Specifically, could you just explain that with a little more clarity? What was the nature of this?
A To pay them half off the books.
Q So, what specifically was your understanding from that conversation?
A That the person was not getting their full taxes taken out.
Q How did you know that? Is that something she said to you?
A Yes, yes. Basically, when the person works four days and they are only going to put them on the books for two days, is what she said.

[2] According to Potenza and his sister, the dancers and the DJ were considered independent contractors.

them, because he was the owner. So, I went crazy, I went nuts with him, and that was it."[3]
Although he "had no problem" with Ms. Potenza, he "couldn't stand" her husband. In fact,
following the confrontation with her brother, Johnson claimed that he met with Ms. Potenza at
his house, and that she allegedly "begged me to not report them . . . [about their] pay practices."
As it turned out, he did not accept her pleas and reported PRP to the New York Department of
Labor soon after.[4]

But despite professing not to have problems with Ms Potenza and despite testifying at his
deposition that he did not email PRP, Johnson admitted to sending her an email conveying his
threat of whistleblowing. The email stated: "Here we go, lets [sic] see what happens next." To
this email, Johnson attached one of the daily sheets that the Government has produced at trial.
Ms. Potenza expressed surprise in her emailed reply: "I don't understand what you are implying.
You where [sic] treated well while you worked here. We been [sic] told you where [sic]
planning this move for a long time and you should move on with your new business venture."
Johnson responded with a one word response: "Can't." He faxed another document to Potenza,
demanding that the loan to him be forgiven or "appropriate action would be froth [sic] coming."[5]
Potenza would not forgive the loan and a few months later – months after the New York
Department of Labor did "nothing" according to Johnson – he contacted the IRS.

During his deposition, as well as at trial, Johnson was represented by counsel. He
described how he retained counsel. According to Johnson, the Government's investigator on the

---

[3] Johnson admitted on cross-examination that he violated company policy by dating dancers, but asserted that all the managers did that.

[4] Although he testified in his deposition that he "quit" his job and that he reported PRP to the New York Department of Labor "one day after I quit," perhaps realizing since his deposition that one is not eligible for unemployment insurance after voluntarily leaving work, and that it would be an admission of yet another lie on the stand, he supplemented his story at trial. He explained that he first quit, but then spoke with Ms. Potenza and she fired him.

[5] Johnson admitted that he did not produce either of the documents before his deposition in response to a subpoena.

case, Richard Guerci, initiated the process, and the Government helped him receive free representation.[6]  Guerci confirmed this account.[7]  On the advice of counsel, Johnson repeatedly invoked the Fifth Amendment at his deposition and on cross-examination at trial, including in response to questions about his taxes and employment at the time he advised the Government that he could not afford an attorney.  He did admit, however, that he purchased a $10,000 recreational water vehicle despite signing an affidavit stating that he lacked the means to retain an attorney:  "that was kind of like – you know, kind of a present for my girlfriend and myself."  He also admitted that he had sufficient savings to start his own company but did not disclose that to the Government.[8]  Finally, although he testified that the Government had not promised him

---

[6] Q You told [the Government] you couldn't afford a lawyer?
A I didn't ask them that. I told them that I couldn't afford a lawyer. Actually, the way it happened is, I had told that I got a subpoena from your firm, and I thought that it was unfair what they were asking of me, since I was not on trial. When I called Mr. Guerci, he said, Hold on a second. Let's see what's going on. They wanted to get me an attorney to protect my rights.
Q That was Mr. Guerci's idea?
A It was not his idea. He said he would get back to me. Q Ultimately, you did -- the government provided you access to the lawyer who is representing you?
A Yes.
Q You told them that you couldn't afford your own lawyer; correct?
A Yes.
Q You told them you were unemployed?
A Correct.

[7] Q Fair to say when he came to you, he told you that he was unemployed?
A Yes.
Q He asked you to arrange a lawyer for him?
A Well, he didn't ask me. That was what resulted in our conversation.
Q In other words, he told you in words or substance I'm unemployed and you responded I'll get you a lawyer?
A No, that wasn't how it went at all.
Q How did it work?
A He contacted me, I believe a Saturday morning after being served with a subpoena requesting certain documents as a result of his involvement in this case, as a government witness, and as a result of him informing me of that, based on my experiences, if you can't afford it, I know some of my experiences in criminal cases I've been involved in, attorneys were appointed by the court to represent witnesses in the case. I told him that I would inquire with the U.S. Attorney's Office if in fact that was applicable or available to him and I would get back to him. I subsequently discussed it with the U.S. Attorney's Office. They informed me he could come in, fill out a financial disclosure or financial affidavit and if the court felt it was appropriate, they would in fact assign him an attorney.

[8] Q And where did you get the cash to start the bar?
A I had a 401(K) that I had -- was saving and I had my life insurance policy.
Q Did you put that on the form where you applied to get a free lawyer from the government?
A Well, that -- this part wasn't on the form that asked me what I had.  Just asked me my on hand cash.

anything in return for his testimony, Johnson admitted that he expects the Government will not prosecute him for tax evasion.[9]

Johnson was not a convincing witness, and I do not credit his testimony and his many allegations against PRP. If he did not admit to perjury at trial, he came close; certainly, he was misleading to the Government and to the Magistrate Judge when the Government retained counsel for him. He also admitted that he had a vendetta against Potenza – indeed that he hated him; that he tried to blackmail Ms. Potenza; that he had a motive to get back at PRP, which fired him, has sued him, cancelled his insurance, and is attempting to collect on a loan; and that he has a reason to testify favorably for the Government as he has an expectation – whether or not reasonable – that the Government will be forgiving when it comes to prosecuting him.

This is all to say nothing of his repeated invocation of the Fifth Amendment, which undoubtedly was meant to protect not only his credibility, but limited his testimony about PRP's revenue.[10] For all of these reasons, to the extent that his testimony is challenged by other witnesses, I reject it. And to the extent that the sheets he photocopied are not corroborated by the

---

Q So the answer is no, you didn't put it –
A No, I didn't put that on there.
Q Fair to say, that when you wanted to start the business you easily accessed cash that you had saved in those sources you just told us about?
A Yes.

[9] Q And despite having taken the Fifth over and over again about your own personal tax situation, you don't expect to be prosecuted, do you?
A I don't think so, no.
Q You expect that the government is going to let that slide given your testimony, right?
A I think they – yes, I guess. I just don't think they are going to do anything with me. I don't think so.

[10] For instance, Johnson invoked the Fifth when asked if he lied in his direct testimony by stating that he collected the DJ's and house mom's gratuities and simply "left it upstairs for the owner:"
    Q Isn't it true, sir, that while you were working at Gallagher's 2000, it was your arrangement that you got that money?
    A I am taking the Fifth.
    Q So you are taking the Fifth on monies that you claim Mr. Potenza and Ms. Potenza and PRP got, you are taking the Fifth on a question about whether you got that money, correct?
    A Correct.

register tapes, they are not reliable. Johnson had the motive and the opportunity to amend or supplement them to get back at Potenza and PRP.

### III.   Patricia Potenza

Unlike Johnson, I found Ms. Potenza to be a credible witness. Ms. Potenza, who is a shareholder, bookkeeper, corporate officer, and secretary treasurer of PRP, acknowledged that Johnson was "absolutely" a trusted employee. In conducting her bookkeeping, she consults with PRP's independent accountant, Marciano Filippone almost weekly. She maintains PRP's cashbooks to reflect the business' cash flow and regularly turns them over to the accountant along with checkbook stubs and bank statements. The cashbooks reflect all of PRP's incoming revenue, from house fees to admission charges to the cash register income. She compiles them by referring to the register tapes and sometimes "Post It" notes, which also refer to various other fees collected by the bar.

Ms. Potenza described the ATM that is owned by PRP and maintained on its premises for the convenience of its customers and as another source of revenue. PRP loads the ATM with its own cash – there is no bank or service that supplies the cash. When a customer withdraws a sum, a corresponding sum is wired to PRP's TD bank account the next morning when the machine is "closed out" or cleared – the same account into which the Government alleges claimant structured cash deposits. PRP is also credited with part of the service charge paid by the customer for using the ATM. Interpreting one of the Government's exhibits, Ms. Potenza identified deposits made by her brother and wire transfers from the ATM withdrawals. At times, these would occur on the same day and exceed $10,000. When she was pointed to specific days, she confirmed that the deposits identified in PRP's cashbook matched those reflected in the bank statements.

Credits from the ATM deposits were previously made to PRP's JP Morgan Chase account before that account was closed.  Chase bank statements indicate individual transmissions of under $10,000 that would sometimes aggregate to more than $10,000 per day.  The Government alleged that the Chase account was closed because of structuring activity as explained in a warning letter purportedly sent to PRP.  Ms. Potenza credibly testified that this letter was misaddressed, and that the only letter they received informed them that the account was closed without providing an explanation.  Both documents were admitted into evidence. The letter that Ms. Potenza received was addressed to "PRP Restaurant INC; DBA Gallaghers 2000; C O PSP INC," while the misaddressed letter did not provide anything other than "PRP Restaurant Inc."[11]  Ms. Potenza explained that she and her brother tried to find out why the Chase account was closed but could not get answers from Chase; Potenza confirmed this account in his testimony, recounted below.  After Chase closed PRP's account, PRP opened the TD Bank account.

Ms. Potenza credibly testified that prior to this case she did not know what a CTR was, much less discuss it with her brother.  Although she was not involved with Potenza's banking activity, she understood him to have a routine – that he would deposit even sums of about $8,000 into the bank.  Part of this routine, she explained, stemmed from the times he had been robbed and became concerned about carrying too much cash.  She also credibly testified that neither she nor her brother try to avoid these under-$10,000 transfers or care that they occurred.  The sum would be even because he would deposit $50 and $100 bills as they were the least useful for

---

[11] Chase bank statements were sent to the fully addressed PSP location; other correspondence was sometimes sent to PRP's address in Long Island City.  Ms. Potenza explained the reason for sending PRP mail to her jewelry business: "Because at that point I was working at the [PSP] jewelry business and mail had a tendency of getting misplaced if it was mailed directly to the bar.  So I asked that it be mailed to me at the jewelry business."

business – only $20 bills were used for the ATM machine and smaller bills could be used for change and tips.

Employees and independent contractors, save for officers, were paid in cash, Ms. Potenza explained, and their incomes were recorded in her cashbook. She rejected Johnson's allegations that she paid employees half on the book and half off.[12]  General managers, including Johnson, were instructed, she testified, to deduct appropriate taxes. Again contradicting Johnson, Ms. Potenza denied ever telling him to withhold taxes from employees for certain days only.

As for the copies of the daily sheets described by Johnson, Ms. Potenza testified that although she recognized the form, these documents were not kept in the usual course of business. Instead, she understood them to be used by the general managers for their own convenience, "to balance out their information." They were never given to her, nor did she ever use them to prepare the cashbook. She denied Johnson's testimony that she ever took these sheets home.

She also denied pleading with Johnson, or even being concerned about, his reporting PRP to the authorities.[13]  She did not know what to make of his fax or email, what it was that he was threatening.

Ms. Potenza admitted that PRP was audited in May 2010 to investigate whether it was paying employees off the books. The resolution was what she termed a "nuisance settlement" –

---

[12] Q Was there ever a time when it was half on the books and half off the books?
A Not to my knowledge, no.
Q Well, could something like that be the case without your knowledge?
A It's possible somebody could pay somebody that I don't know about, yes. It's possible. But it's not probable.
Q In your experience has -- have you ever been involved in paying people at PRP off the books?
A No.

[13] Q Did you ever beg him not to report you to any authority?
A No.
Q Did you have any conversation, in words or substance, that could be construed in your understanding as your beseeching him not to report you or PRP to any authority?
A Absolutely not.
Q Were you concerned about being reported to anyone?
A No.

$9,000 to be paid over a three-year period.  PRP accepted it, she explained, partly on the recommendation of her accountant because it would have cost more to contest.  PRP has also been the subject of a sales-tax audit in a dispute over the allocation of its revenue.

## IV.    Marciano Filippone

Filippone confirmed Ms. Potenza's testimony, describing his role as an independent accountant for PRP.  For the relevant time period, Filippone reviewed the company's income, sales, and corporate tax returns based on the financial information provided by Ms. Potenza.  He estimated PRP to have gross annual revenue of about three to five million dollars.  Filippone explained that the number of days an employee worked was not important to his calculation of the proper amount to be withheld; he instead relied on Ms. Potenza's information about each employee's weekly gross pay.  He also confirmed Ms Potenza's description of how the ATM machine worked, that PRP would load it with its own cash and that customer withdrawals would in effect be considered wire transfers into PRP's account.  Filippone explained that he compared the bank statements with the cash deposits listed in Ms. Potenza's cashbook, and that he never noticed discrepancies.  He did not use or even see the kind of daily sheets that Johnson copied and the Government presented to the Court.

Filippone also described PRP's audits.  The New York Department of Labor, contrary to what Johnson suggested, did more than "nothing;" it asked PRP to produce documents to show that certain employees were accounted for and properly taxed.  Filippone worked with PRP to provide the information, but ultimately, he explained, PRP decided to settle the matter based on a cost-benefit analysis of going through a full audit.[14]  The New York State Department of

---

[14] A: Some of the names were explainable in that they didn't use their nickname, some of the names were actually there and they were mistaken, and then some names we didn't know where they got them from. We asked them to produce more information where the name came from ultimately, they said rather than go into all of this, they came up with a figure to settle it, rather than actually go full-blown audit on it, and that's

Taxation also disagreed with PRP and found that VIP room charges should not be lumped with other house fees, and that like admission fees, a sales tax should have been placed on them. As Filippone explained, this was a relatively new interpretation by the Department of the sales tax law, based on a recent case that overturned a lower court decision. In any event, PRP adjusted its practice accordingly.

Finally, with regard to CTR filing requirements, he answered that prior to this litigation, he "had heard about it" and "knew there was something."

Although this Government witness did not add much to Ms. Potenza's testimony, as he prepared PRP's taxes based on the cashbooks she provided, it also did nothing to advance its claim. I found Filippone to be a credible witness and no hint in this testimony that he knew or was complicit in any tax evasion or CTR-evading scheme.

## V.    Richard Guerci

Financial Investigator Guerci testified as a fact and expert witness for the Government.[15] Guerci works for a private company that was retained by the IRS' Criminal Investigation

---

what we tried to do.
Q Did you make a recommendation to that effect to the client?
A We discussed it. I wouldn't say -- well, yeah, I would say I made a recommendation. It wasn't my decision. It was their decision ultimately. It was a cost benefit.
Q And cost benefit in that it would cost more to fight it than to settle it at the amount being offered?
A Yes.

[15] Prior to trial, claimant objected to Guerci's qualification as an expert. Because this is a bench trial, I admitted Guerci subject to a full Daubert analysis in deciding the weight to accord his testimony. See Joseph S. v. Hogan, No. 06 Civ. 1042, 2011 U.S. Dist. LEXIS 76762, at *6-11 (E.D.N.Y. July 15, 2011) ("in a bench trial, the risk is with exclusion of expert testimony rather than with its admission"). I find Guerci qualified and his testimony, except to the extent noted below, reliable. See United States v. Monaco, No. 98-1386, 1999 U.S. App. LEXIS 26869 (2d Cir. Oct. 21, 1999) (affirming the admission of expert testimony from a special agent of the IRS investigative regarding type money laundering techniques); United States v. Nektalov, 03-CR-828, 2004 U.S. Dist. LEXIS 12014, at *6-7 (S.D.N.Y. June 29, 2004) ("The Second Circuit has routinely upheld the admission of expert testimony offered by the government to explain the workings of criminal transactions and enterprises -- such as narcotics trafficking, organized crime, and money laundering – that, without explanation, would be esoteric or otherwise beyond the understanding of the average juror."); United States v. All Funds on Deposit in Any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith, 801 F. Supp. 984, 997-98 (E.D.N.Y. 1992) (Weinstein, J.) ("Sophisticated drug money-laundering activities, such as those relied upon by claimants, are a proper subject for expert testimony.").

Division for the purposes of this investigation. Guerci specializes in cases involving Bank Secrecy Act violations and money laundering investigations. This was also his expertise at the IRS, where he had worked for about twenty years. He has lectured and trained other agents in these areas and over his career has been involved in hundreds of investigations. It was not Guerci's first time testifying as an expert witness in Court – he estimated that he had testified on thirteen to fifteen other occasions.

Guerci described the background of the Bank Secrecy Act, which he explained was passed to monitor the injection of large amounts of cash into the banking system in order to identify illegal activity such as money laundering and tax evasion. This was the reason for the CTR filing requirements, Guerci explained. When a CTR is filed by a financial institution, it is forwarded to a computer center maintained by the IRS, where it is inputted into a database and available for review. A "multiple transactions CTR" is a CTR that is filed by a bank based on multiple transactions, such as when a deposit is made on a Saturday and another on a Monday or if a customer goes to two different branches of the same bank to make his deposits. These deposits would be combined for filing purposes and typically, Guerci explained, filed without the customer's knowledge. According to Guerci, multiple transactions CTRs are therefore often indicative of illegal activity.

Describing common modes of structuring, Guerci explained that individuals who typically structure are ones who are engaging in illicit activity, most notably narcotics or money laundering but also individuals who are involved in tax evasion. Tax evaders would not deposit unreported cash, Guerci testified: "The first thing that any investigator or auditor would do if they are looking at a business would be [to] request those bank records and look at those bank records, so it is not something that you would typically see." But reported income, he explained,

is sometimes structured to "stay off the government radar – the IRS radar."  Structuring can be done in multiple ways – using different banks, different branches, or simply breaking down the deposits to get under the $10,000 triggering amount.  Those who choose the latter method and have a steady revenue stream would have to engage in many transactions to avoid drowning in cash, Guerci explained.

Guerci testified about his investigation into PRP.  He reviewed PRP's activity in its former Chase account and its TD Bank account, concluding that it was "consistent with structuring."  The only CTRs that were filed during the relevant period, according to Guerci, were multiple transaction CTRs.  He admitted, however, that a few dozen CTRs were filed going back to 2006.  The TD Bank account saw different activity after the Chase account was closed, which "related more towards the cashing of checks, not so much the deposit activity [which] . . . remained fairly constant."[16]  This new activity was the PRP's depositing of checks for $6,000 to be cashed for singles but never on the same day.

Crucial to Guerci's conclusion were deposit amounts, which would never exceed $10,000 for the period he examined, when over $1 million dollars had been deposited.  Most, but not all, of the deposits were for $8,000.  The Government introduced a summary of these deposits that Guerci prepared based on his review of the bank records that had been introduced as evidence.  Guerci's other summary showed how money deposited into the TD Bank account was then transferred in larger sums into the Merrill Lynch accounts.  Guerci explained that only multiple transactions CTRs were filed based on the deposits, and that these transactions occurred on a weekend or a holiday and the next business day.   Guerci also reviewed the insurance policies of PRP and found that it was insured for a cash loss of only $2,500 despite having, by Guerci's

---

[16] On cross-examination Guerci admitted that the TD Bank account appeared to see more steady deposits of $8,000 increments than the Chase account that had more variation of even-numbered deposits.

account, about $500,000 of cash on hand.  This accumulation of cash seemed unusual to Guerci and indicative of tax evasion.

In reaching his opinion, Guerci considered PRP's ATM that held $20,000 and that, like Ms. Potenza described, wired money into PRP's Chase and TD Bank accounts.  He understood that customers pay service charges for using the ATM, and PRP would receive commissions from the settlement company by way of separate transfers into the same accounts.  These transfers were reflected as credits on the bank statements and could be distinguished from the cash deposits.  Guerci clarified that this kind of arrangement with the ATM service company was different from others, where the cash is supplied not by the business, but by the ATM company. Looking at the bank statements, Guerci admitted that amounts totaling more than $10,000 were credited on the same day from the ATM.  Significantly, however, Guerci explained that the ATM credits were not counted for purposes of the CTR filing requirements.  This means, for example, that PRP could deposit $8000 cash into its bank account on a given day, and if customers drew another $4000 out of the ATM on that day, the settlement company would credit PRP's bank account with that $4000 (plus a portion of fees collected); even though $12,000+ would be deposited that day, no CTR would be generated.

Guerci also based his opinion on the conversation he had with a Chase representative about the letter that Ms. Potenza claimed and Guerci conceded had an incomplete address.  The representative, Debra Miranda, after referring to her case file notes, told him that another Chase employee, Shay Cavanaugh, a compliance officer, spoke with Potenza regarding the bank activity about a week after sending the letter.  Miranda could not find any receipt confirming delivery of this letter.  Guerci's conversation with the representative was "fairly important" – albeit not determinative – in forming his opinion that PRP structured transactions, because from

it, he concluded that the letter and Potenza's subsequent conversation with the Chase employee "essentially put [Potenza] on notice about what he was doing."

When deposed, Cavanaugh (the Chase compliance officer) testified that she had no recollection (separate from her notes) of talking to Potenza.[17]  Claimant offered the case file notes into evidence, which seemed to reflect a conversation with Potenza where he explained to the representative the reason for the steady cash deposits.[18]

Guerci testified about these notes as they related to the affidavit he prepared that was used to obtain a seizure order for the funds at issue.  Although Guerci admitted that nothing in Cavanaugh's case file notes seemed to suggest that a Chase representative had spoken with Potenza specifically about the warning letter, he would not retract any part of the affidavit that he submitted with Special Agent Westrich[19] to Magistrate Judge Pollack.  The affidavit affirmed

---

[17]Both sides offered portions of Cavanaugh's deposition into evidence to which neither objected.  Aside from the fact that she is indeed from the South (she works in Texas) and aside from the testimony described above (that she does not remember having a conversation with Potenza or anyone at PRP), none of her testimony is particularly elucidating. Cavanaugh could only assume that her notes were based on a conversation she had with Potenza, but did not testify – because she does not appear to have been asked – whether it was her standard practice to follow up with a phone call to clients after sending these letters or whether she waited for them to contact her.

[18] "The checks are being cashed at [redacted] based on business need and not an [sic] attempt to avoid filing the CTR . . . . He also stated that he doesn't not [sic] like to have a lot of cash on hand or to keep the same pattern due to the threat of being held up."

[19] Although Westrich signed the affidavit, Guerci admitted to preparing it:
  Q Is this be an affidavit that you prepared?
  A I prepared a draft of this affidavit, yes.
  Q And did you prepare it for Agent Westrich?
  A I prepared it in conjunction with Agent Westrich, yes.
  Q Did you have the primary role or did Mr. Westrich?
  A In the preparation of the direct affidavit, I did.
  Q Did Mr. -- excuse me -- did Agent Westrich make any changes to your knowledge?
  A Not to the best of my knowledge.
  Q So would it be fair to say that you had the primary role in drafting it?
  A Drafting the draft copy of the affidavit, yes.
  Q Okay. But did the draft differ substantially from the final version that was submitted to the Court?
  A Substantially, no.
  Q And if Mr. Westrich said that you prepared the affidavit that would be consistent with your recollection, fair?
  A Most certainly.

that the "bank personnel discussed the contents of the letter with Robert Potenza," and that the account was later closed.  Guerci explained that the affidavit was based on Miranda's representation to him rather than a review of Chase's case file notes.

After executing the warrants and seizing the funds, Guerci, together with Special Agent Westrich, interviewed Potenza.  He found Potenza to be cooperative.  In fact, Potenza gave unsolicited statements to Guerci and Westrich about the existence of another account, the Merrill Lynch account, which Potenza explained did not accept cash deposits.  Guerci testified that he only asked generally about any Chase letters that Potenza might have received rather than ask pointedly about the letter that Potenza claims was misaddressed and the only letter that mentioned structuring.[20]

According to Guerci, Potenza indicated that he knew what structuring meant,[21] that he expected that some CTRs had been generated, that he knew about the $10,000 triggering amount,

---

Q Why didn't you sign the affidavit?
A I am no longer a sworn law enforcement, so as a contract employee I don't have the authority to sign affidavits.

[20] Q Sir, I'm going to ask you something and I want an answer. Did you discuss the September 7th, 2007, letter that is Exhibit 3 in evidence on December 10th, 2009, with Mr. Potenza?
A No, our question was do you recall getting a letter from J.P. Morgan Chase and I indicated what he informed us of. I recall getting a letter –
Q Any letter –
A He recalled getting a letter but he does not remember the context of the letter or the contents. Those are his exact words or – not verbatim, but in summary.
Q Sir, you spent 26 years as an IRS agent, right?
A Yes.
Q You know how to elicit admissions, right?
A I believe I do, yes.
Q On December 10th, you had already seized the money. You were looking for admissions from Robert Potenza?
A Yes.
Q It's your testimony that even though you're looking for admissions, you say did you ever get a letter and he said yeah, I got a letter, but you didn't say I'm talking about a specific letter. On September 7th, 2007, and it warned you that you could be engaged in CTR evasion, words or substance, you didn't bring that up, did you?
A I don't recall getting into that amount of specificity, no.

[21] "We didn't explain to him the requirements. We were more asking him if he knew what structuring was. He indicated that he did. In fact, he said he believes he read about it in the newspaper. He explained to us what he believed it to be, which was breaking down of deposits in amount of less than $10,000 or making cash deposits. We

and explained his $8,000 deposits as just a matter of routine, just a "number that he felt

comfortable going to the bank with," partly because TD Bank had to count the cash by hand.

The number was always round because he deposited $50 and $100 bills for which he had no

business use (as opposed to singles and twenties). Potenza explained to Guerci the reason for

PRP maintaining cash on hand and assured him that he paid all his taxes.

Guerci met with Johnson after this action had already been instituted, and Johnson

explained PRP's operation, and its purported policy of paying employees partly off-the-books.

Guerci compared Johnson's daily sheets with PRP's cashbooks and, when the fees were not

reflected in the cashbooks (such as VIP room fees), Guerci looked to the documents PRP

presented to the New York Department of Taxation. He found the revenue and house fees

reflected in the daily sheets to exceed the reported amounts. Guerci then summarized Johnson's

sheets and compared them with the register tapes. For the register tapes that were available, he

testified, save for infrequent discrepancies, the amounts matched. Guerci also concluded, based

on Johnson's sheets, that PRP had a substantial amount of income that was not recorded in its

cashbooks. The figure in the cashbooks, he explained, was not random; rather, for the revenue

that was noted in Johnson's sheets, it indicated that specific items were missing in the cashbooks.

Guerci performed a similar analysis with respect to the payroll, comparing Johnson's

daily sheets with the cashbooks, although it does not appear that these parts of the Johnson

records were or could have been corroborated. From a sample of 36 days, Guerci estimated that

PRP had about $624,818 of unreported cash payroll in 2009.

Ultimately, Guerci concluded that "PRP was engaged in a large tax evasion scheme,

which involved the evasion of income taxes, which would extend to the state, federal and sales

---

asked him about CTRs. He went on to say, as I said, he believed there may have been some filed because he would
make deposits on Saturdays as well as Mondays on occasion."

tax, as well as payroll tax by paying a number of employees essentially off the books, at least for a portion of their income." Based in part on this conclusion, Guerci opined that PRP was engaged in structuring.[22]

As a fact witness, Guerci was credible. His opinion that PRP had unreported revenue, however, rested on Johnson's daily sheets, which as I explain, I do not credit because they contain additional, unverified entries. Guerci and the Government suggest that these sheets are corroborated by the register tapes. On the surface, this appears to be true with regard to the Bar/Door Revenue Daily Sheets. But these documents reveal additional employees, collecting additional revenue for those days; subtracting those numbers from the daily sheets – in other words, discounting those additional entries – produces the amount noted in the cashbooks. That Guerci and the Government credited these entries without any apparent concern is troubling; I do not share their confidence in the accuracy of Johnson's reporting.

## VI.   Richard Gleason and Dennis Schmidt

Gleason and Schmidt were claimant's first witnesses and I found both to be credible. Gleason is one of PRP's current general managers. When Johnson was employed by PRP as a night time manager, Gleason worked the day shift. Reviewing Johnson's daily sheets, Gleason credibly testified that these are "balance sheets" or "scratch sheets" that he sometimes uses to add all the money from the registers.[23] When Johnson worked at PRP, at the end of his shift,

---

[22] Claimant offered into evidence additional deposition testimony of Guerci. The Government objects to most of it as cumulative, and I sustain its objection as Guerci's deposition testimony repeats his trial testimony nearly verbatim. Claimant also introduced deposition testimony of IRS Special Agent Westrich. Much of this testimony echoes Guerci's responses at trial and relates more to the meticulousness (or carelessness) of the Government's investigation before seizing the funds. As I expressed to counsel at trial, this has little bearing on the issue at hand – claimant's knowledge and intent of avoiding CTR filing requirements. Cf. United States v. Saldarriaga, 204 F.3d 50, 53 (2d Cir. 2000) (district court properly charged the jury to ignore the Government's investigative techniques as "the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged").

[23] Q Do you always use this sheet?

Gleason would hand them over to him.  Gleason continues to use these sheets today but discards them after he is done because he transfers the information onto Post It notes to indicate how much money came from each revenue source.

Schmidt described his position as a "person in charge" at PRP who clears the registers on nights that he closes the restaurant.  He is also responsible for paying employees, who he testified are not paid off the books at PRP.  Like Gleason, he referred to a Johnson daily sheet as a "scratch sheet" that he sometimes uses "if it is there."  Again echoing Gleason, Schmidt testified that he discards the sheets after he is done with them because he copies the information to Post It notes.  He denied that these sheets were ever stored at the end of a day.

## VII.    Robert Potenza

Potenza took the stand last.  While his sister handles the accounting aspect of the business, Potenza explained, he handles the banking.  Like the others, he denied Johnson's allegation that employees are paid off the books.

Describing his day, Potenza explained that he tends to the ATM in the morning, retrieving a "journal" from it with the summary of the money that went in the day before.  This is how the ATM is "cleared" and the prior day's withdrawals transferred to PRP's bank account.  He never delays these transfers; the only time there is a delay, he testified, is when the ATM is cleared on a weekend night as the credits are not registered in the bank account until the following Monday.  The ATM is not only a source of revenue, Potenza explained, but a matter of convenience.  Comparing it to direct cash deposits, Potenza explained:  "I felt they were almost

---

A No.
Q What causes you to use it or not use it?
A Well, depends on if it is there, not there. If I'm down stairs the scratch papers is more readily available to me, then I use that.
Q So would it be fair so then, if you don't use this form you will use any piece of paper to keep track of money that's coming in?
A Yes.

like the same thing. It was – it helped me to not have to go to the bank all the time. The cash would go from the machine into the Chase or the TD Bank. And there – I wouldn't have to go make a deposit because it's very dangerous."

Next, he counts the money left from the previous night's person in charge or general manager and compares it with the breakdown of the revenue listed on the Post It notes. He separates the different bills for the day time employees and the ATM, taking the $50 and $100 with him to the bank if he needs change. Potenza used to have an arrangement with one of the banks to have $6,000 of singles ready each time he came, which was about three times a week. He explained that when he needed to get a gun license by showing that he carried a lot of money with him, he would write checks to the bank to receive the singles instead so that the exchange would have a paper trail to show the NYPD.

Confirming Ms. Potenza's testimony, he testified that the warning letter from Chase alluding to potential structuring activity did not have a complete address on it, and that PRP never received it. He learned that the account was closed when he went to the teller to pick up his $6,000 of singles. The teller could not explain why the account was closed, so he asked his sister to find out. They could not get an answer and their main concern became getting the substantial sum of money (about $85,000) back from that account. That is when they opened their TD Bank account, which they immediately connected to the ATM. Before his Chase account was terminated, Potenza recalls receiving a call from a female Chase employee about his "banking practices." Potenza explained how his business operates and the reasons for his activity, and the employee "seemed ok with it."[24] No one else called from Chase. Asked if he

---

[24] "Everything was okay then. Because I explained to her what, you know, what I was doing with the singles and, you know, I guess the – maybe she was concerned about the fifties and hundreds being deposited and I don't know what exactly her reasoning was for calling but she seemed okay and that – I never heard from her again."

ever considered wiring the ATM transfers into an account different from the one he uses for the deposits, Potenza explained that he saw no need – "it helped me to not have to go to the bank all the time."

Potenza described how general managers would close out for the night, checking the registers and storing the tape registers together with Post It notes for him to review. Looking at Johnson's daily sheets, Potenza testified that general managers use "form[s] like this . . . to balance out the registers." Potenza uses them too when he closes for the night; other times he just uses a blank piece of paper.[25]

Potenza explained that the business keeps a large amount of cash on hand – in the vicinity of $300,000 to $400,000 – but claimed that it was all reported to the accountant and the IRS. He never thought about insuring most of the cash in part because the business has an alarm system. Potenza echoed his sister's testimony about making regular cash deposits when their $50 and $100 bills accumulate to a certain number – this is a matter of routine for him, and one to which he has adhered going back as far as the 1970s with his other businesses.[26]

Recounting the interview with Guerci and Westrich, he confirmed Guerci's testimony that he answered all their questions despite their having just notified him that they seized funds in his account. They asked Potenza whether he knew about structuring. He told them what he "thought money laundering was[.] I said I thought it was if I was selling drugs and I put money through a business and took it out as income or whatever. And then structuring, I really didn't

---

[25] "Sometimes I would just use a blank piece of paper and – or I wouldn't even use a piece of paper because I'm pretty quick with numbers and what I would just do is, I would just count the money and add it up on the register, singles, fives, tens, twenties and fifties and then look at the tape and see was it the same for the tape. It would be fine. I wouldn't even have to write it down."

[26] Structuring by individuals did not become illegal until the Money Laundering Control Act of 1986. See Ratzlaf, 510 U.S. at 139.

know. I said that I might have read things about, you know, money laundering, structuring, you know, because I read the paper all the time but I am not that familiar with it." Although he admitted that he knew about the $10,000 triggering amount for CTR filing purposes, Potenza assured them that he was not structuring and gave the same business reasons for his banking activity that he gave at trial.

Potenza did not remember whether either Guerci or Westrich asked about a specific letter from Chase, but he told them about a conversation he had with a "lady . . . from down South" who called him and asked him about his business. He informed them that Chase never gave him a reason as to why his account was closed.

I found Potenza credible and the Government's attempt to impeach him did little to shake his credibility. His testimony was largely consistent with that of every other witness, including the Government's witnesses, save for Johnson.[27]

## CONCLUSIONS OF LAW

As an initial matter, I note that Johnson's daily sheets fit within the business records exception despite claimant's insistence that they are not stored or regularly used. See Fed. R. Evid. 803(6). Unless it is untrustworthy, a business record is admitted under the Rule if it is made in "the course of regularly conducted business activity." Id. "The purpose of the rule is to ensure that documents were not created for personal purposes or in anticipation of any litigation." United States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010) (citation and quotation

---

[27] The inconsistencies that the Government adduced on cross-examination were minor, especially compared to Johnson's troubling testimony. Potenza had previously sworn on an affidavit that he had never been arrested, but admitted at trial that he had been charged with a violation, which was dismissed hours later. He also admitted to signing checks on behalf of PRP despite giving a contrary answer at his deposition. Potenza conceded that he verified a complaint filed by PRP but denied at his deposition being involved in civil litigation other in one unrelated matter. Most notably, reviewing one of Johnson's sheets, he admitted that when deposed, he denied ever seeing this type of document in his business; at trial, he clarified that he meant that these sheets were discarded.

marks omitted). The Second Circuit "favors the admission of evidence [under Rule 803(6)] rather than its exclusion if it has any probative value at all." Id.

I have already rejected Johnson's claim that these sheets are stored or invariably used by PRP. But even claimant concedes that the form is used to facilitate bookkeeping. Not just "miscellaneous jottings," when general managers choose to use them, the forms are filled completely, with a specific business purpose. See id. at 575 ("A business record need not be mechanically generated to be part of a 'regular practice.'").

Their trustworthiness, however, is a different story. Because this was a bench trial where Johnson was one of the witnesses, I admitted the documents. See id. at 576 ("[T]he degree of reliability necessary for admission is greatly reduced where . . . the declarant is testifying and is available for cross-examination, thereby satisfying the central concern of the hearsay rule.") (citation and quotation marks omitted). And in deciding how much weight to accord them, I do not intend to revisit that ruling. See id. ("Residual doubts on the question of trustworthiness . . . go to the weight of the evidence, not its admissibility.") (citation and quotation marks omitted).[28]

The Government argues that the Johnson documents are corroborated by other evidence and that they should be credited even if his testimony is not. As I explained above, Guerci's reliance on what claimant calls "phantom entries" – additional entries on Johnson's sheets that when discounted produce the amount listed in the cashbook – is unfounded. These entries could have easily been added by Johnson any time during or after he completed the sheets, copied them

---

[28] I do decline, however, the Government's invitation to find that PRP's "destruction" of daily sheets not produced by Johnson was "done in an effort to conceal tax evasion." The Government has produced no evidence to support the argument that PRP's failure to keep these scratch sheets was part of a devious scheme. It relies exclusively on Gleason's deposition testimony where he testified that after telling Ms. Potenza that he threw away these scratch sheets when he was done with them, Ms. Potenza told him that Johnson was not doing the same "like he was supposed to." The Government focuses on the "supposed to" phrase that it takes out of context. Asked why he thought managers were "supposed to" throw away the daily sheets, Gleason responded that the owners told them that the sheets are for personal use, that if they do not want to use them, they do not have to, as long as they balanced out the registers.

to get back at Potenza, maintained them for blackmail, or before his interview with the Government (after this action had already been instituted).

The Government rejects this explanation, arguing that some of the missing entries are interspersed between others rather than just being tacked on to the end of the lists and appear in the daytime portion of the sheets, which a daytime manager must have recorded. The former, of course, refutes only one potential method of falsification by Johnson – adding information after having been terminated by PRP. In other words, if the original sheets reflected accurate information, it would have been impossible for Johnson to add "phantom" entries unless there were unexpected gaps in the lists. But that assumes initial accuracy, which is an assumption I reject given Johnson's admitted motivation for photocopying the sheets in the first place.

The Government's second observation is more persuasive. Yet remarkably, despite taking the daytime manager's deposition on the eve of trial, the Government asked Richard Gleason about the recorded figures for only two of the day time bartenders, neither of which, the Government concedes, were "pulled" from the cashbook. The Government did not confirm with Gleason at the deposition or at trial that the entries for the daytime bartenders that are missing in the cashbooks were also recorded by him. Like its investigative techniques, the Government's litigation strategy is not on trial here, but failure to pin down crucial evidence time and time again leaves it short of meeting its burden.

The Government contends that Johnson's records are also confirmed by the insignificant discrepancies of a few dollars between the cash register tapes and the cashbooks; in these instances, the Government claims, the cashbook amount corresponds with Johnson's daily sheets, not with the cash registers. As Guerci admitted, this is not evidence of tax evasion,[29] and

---

[29] "There was somewhat of a discrepancy, and that's obviously not unusual in any type of business that involved the exchange of cash."

I reject that this has any probative value in corroborating Johnson's documents.  Clearly, not all of the numbers on his sheets are made up – most are not.  The critical question, not addressed by this evidence, is about the phantom entries, from which Guerci and the Government extrapolate from 36 days of income to find a massive tax evasion scheme.  Gleason's and Schmidt's testimony is consistent with the notion that any minor differences between the cashbooks and the daily sheets would reflect the non-phantom entries on the daily sheets rather than the register tapes; they testified that they would transfer information from the daily sheets (not register tapes) onto the Post It notes, which Ms. Potenza would then use for the cashbooks.[30]

I also reject other evidence that Guerci submitted as indicative of tax evasion, such as the rather low insurance policy for a business that kept so much cash.  PRP's family business, with its Post It notes and daily sheets, lacks the sophistication one might expect from such a profitable establishment.  But it is the lack of sophistication and Potenza's confidence in his alarm system that more readily explains the insurance policy than massive tax evasion that apparently the IRS and the New York State Department of Labor has not been able to find.

The Government also submits Gleason's testimony – not from the trial (the Government chose not to cross examine him or introduce him as its own witness) – but from his deposition, where he stated that his salary as a person-in-charge at PRP was $900 per week.  The Government points to his 2008 W-2 Form that shows income of $23,400, which, the Government explains, is exactly half of a salary of someone receiving $900 per week for 52

---

[30] The Government has submitted demonstrative exhibits with their post-trial briefs even though the Court kept the record open until only the morning after trial.  One of the exhibits demonstrates this purported corroboration.  More useful than submitting untimely exhibits without the Court's leave would have been cross-examination of Ms. Potenza about the discrepancies between the cashbooks and the register tapes.  Without testimony to the contrary, the logical inference is that she recorded the numbers specified in the Post-it notes, which were in turn transferred from the daily sheets.

weeks. This in turn supports Johnson's claim, according to the Government, that employees were paid half off the books.

Although perhaps the Government's strongest evidence of tax evasion, the failure to develop it prevents me from according it much weight. First, the Government's argument rests on the assumption that Gleason worked every week of the year or that he had vacation time. Yet it failed to ask him that at the deposition or trial. Second, according to PRP's records from its independent account, Gleason received a raise in 2008, further undermining the Government's neat calculation. With the burden of proof resting squarely on the Government, I find this evidence, together with other evidence recounted above, insufficient to show tax evasion.

But even though it consumed most of the trial, evidence of tax evasion is not required to establish knowledge or intent of the CTR filing requirements.[31] See, MacPherson, 424 F.3d at 190. Claimant admitted to making over 100 transactions, most just under the $10,000 CTR-triggering amount and in close proximity to each other. MacPherson would allow me to infer knowledge and intent from that fact alone. Indeed, the number of transactions and the money deposited dwarf the 32 transactions totaling $258,000 that the Second Circuit in MacPherson found sufficient for the jury to make the same inference.

Potenza, however, provided a credible and logical explanation for his banking activity. A creature of habit and someone who had been robbed, Potenza made regular trips to the bank with an amount he felt comfortable, usually $8,000. Since he supplied his ATM with $20 bills, Potenza also explained that he had limited use for $50 and $100 bills, which in turn explains the

---

[31] Claimant's colorful metaphors of the Government caught with its "pants down" or its "pants around its ankles" notwithstanding, the late addition of the tax evasion theory for motive is at least partly claimant's fault. It was claimant's counsel who in response to an interrogatory did not think that as a general manager, Johnson was an individual with knowledge of PRP's cash management practices. But in any event, the Government seized the funds relying on other theories for knowledge and intent – over 100 sub-$10,000 transactions and a letter sent from a bank to PRP warning it about potential structuring activity.

round-numbered deposits.  The Government did nothing to refute these explanations.[32]  The permissible inference of structuring is therefore not a logical one to make in this case; there is no evidence of Potenza's "willingness to sacrifice efficiency and convenience" in making these deposits.  Id. at 191 (noting that claimant traveled to three different banks on the same day to make identical deposits).  Quite the contrary, efficiency and convenience, the evidence suggests, were the reasons for his broken-up deposits.  Cf. United States v. Dollar Bank Money Market Account No. 1591768456, 980 F.2d 233, 240-41 (3d Cir. 1992) ("[t]he government cannot prevail on summary judgment if the claimant offers a reasonable and legitimate explanation for the organizing of transactions in amounts under $ 10,000, and the explanation is verified by facts and circumstances").

With the Government failing to establish evidence of tax evasion and the Court having credited claimant's innocent explanation for the cash deposits, the Government's evidence of intent rests solely on the warning letter sent by Chase.  The letter contained the correct address, but the addressee, "PRP Restaurant Inc." was not located there; it was the site of another of Potenza's businesses, PSP Jewelers'.  That is why, Ms. Potenza explained, the rest of the care of field, including "C O PSP INC," was important for the letter to be deliverable.  Again, the Government did nothing to refute Potenza's and his sister's testimony, and the Chase representative could not find receipts showing that the letter was mailed or received – receipts that Guerci admitted are normally requested.

---

[32]In the second of the impermissibly submitted exhibits with its post-trial brief, the Government offers a schedule of the company's cash deposits compared to its cash flow, which, according to the Government, undercuts any innocent explanation.  As noted above, however, Potenza explained that he based his deposits on the accumulation of $50 and $100 bills rather than total net cash flow.  Moreover, Potenza did not suggest that his routine was exclusively tied to the cash build up; he was also wary of carrying too much money.  It is not – contrary to what the Government submits in its reply brief – unexpected then that the size of the cash deposits did not vary by the day of the week despite the weekend nights' higher volume of business.

The Government submits that the Chase case file notes show that Potenza called Chase after receiving the letter. But Potenza credibly testified that it was a Chase employee that contacted him. The Government did nothing to disprove that either; the "lady from down South" (Shay Cavanaugh), who works out of Chase's Texas office, could not remember her conversation with Potenza or how it took place. She appears not to have been asked about her standard practice; that is, whether she follows up the letter with an investigative phone call or waits for the customer to contact her. The Court is therefore left with two competing inferences to draw from Cavanaugh's notes about the conversation: (1) based on the letter's invitation to call, that Potenza received the letter and called Cavanaugh, or (2) based on the investigative questions that she apparently asked regarding Potenza's banking practices, that it was Cavanaugh who reached out to Potenza. With Potenza's credible testimony asserting the latter and with nothing to show otherwise, I make the second inference.

The Government argues that this conclusion defies logic and common sense. I disagree. What strains logic is the suggestion that Potenza received the warning letter, called Chase in an attempt, as the Government puts it, to convince Chase that he was not structuring in his account; that Chase did not find his explanations convincing and closed his account; and that Potenza simply opened another account and, as Guerci admitted, continued substantially the same pattern of cash deposits, undaunted by the apparent red flags raised by his steady, just-under-$10,000 deposits at Chase.[33] If Potenza knew the jig was up and Chase had caught him, I do not see why in the world he continued to make $8000 deposits, when it would have been but a minor inconvenience to deposit $6200 one day, $9150 the next, $7350 the next, $8400 the next, throw

---

[33] The Government makes much of the difference between Chase and TD Bank account activity. Its own witness, however, admitted that the cash deposits remained substantially same even if the deposits with TD Bank seemed more consistently to be for $8,000. If anything, this tends to show disregard for raising red flags rather than an intent to stay under the radar. As for the "cash checking activity," Potenza gave credible testimony and produced other evidence to show that there was a period when he needed a paper trail to receive a firearm license.

in a $3300 deposit one day, and indeed an $11,900 or other varying deposits over $10,000,

allowing a CTR to be generated, every few months.  It would not take a computer to design a

complex algorithm to obscure that which Chase thought it had noticed.  Surely, on the

Government's view, the stakes were high enough to warrant a little effort on Potenza's part if he

was trying to do what the Government says he was trying to do.

      The Government also points to Cavanaugh's file notes, which, when describing the

conversation with Potenza, refer specifically to CTR requirements.  The more logical conclusion

from these notes is that Cavanaugh asked questions about Potenza's banking activity, and when

he gave her the same explanation that he offered at trial, in an attempt to be concise, she referred

specifically to the CTR requirements.

      To be sure, as the Government correctly points out, Potenza admitted on the stand that he

knew (if vaguely) about CTRs and their triggering amount.  This knowledge, however, is

insufficient to find intent.[34]  Indeed, even if I were to find that Potenza received the warning

letter and that PRP is involved in a tax evasion scheme so that it had motive to structure its

deposits in order to "stay under the radar," I would still find that the Government has not

satisfied the third element of a structuring offense – intent.  See, e.g., United States v. Simpson,

950 F.2d 1519, 1525 (10th Cir. 1991) ("Intent and motive should never be confused.  Motive is

what prompts a person to act or fail to act.  Intent refers only to the state of mind with which the

act is done or omitted."); see also United States v. MacPherson, 424 F.3d 183, 185 n.2 (2d Cir.

2005) ("We recognize, of course, that evidence of motive, or the lack thereof, is a factor that a

---

[34] The analysis thus far, like claimant's brief and most discussions of knowledge and intent in this context, treats the
two elements together.  The two should not be confused.  I recognize that the bar for the knowledge element of the
statute is quite low and may well have been satisfied by Potenza's own description of his interview with the
investigators.  That is because the government no longer has to prove that claimant acted with knowledge that his
conduct was unlawful, i.e., that structuring is unlawful, see Ratzlaf v. United States, 510 U.S. 135, 138 (1994) (old
interpretation), and has to only show that claimant knew that financial institutions were legally obligated to report
currency transactions over $10,000.  See MacPherson, 424 F.3d at 189.  The dispositive issue here is intent.

jury may weigh in considering whether the totality of the circumstances permits it to infer guilty knowledge and intent . . . . [H]owever, we conclude that the evidence in this case was sufficient, even without proof of motive, to support a jury finding that MacPherson structured the charged cash transactions with the knowledge and intent required to support conviction.").

To find that Potenza acted intentionally to evade the CTR filing requirement, I would have to credit Potenza with a highly nuanced understanding of the law while at the same time find him to have at least one large blind spot and virtually no appreciation for the practical aspect of how potential structuring is monitored.  Potenza would have to have known that while his cash deposits "counted" towards the CTR filing requirements, his deposits into the ATM and the subsequent transfers when those deposits are "cleared" did not;[35] that while his cash deposits counted, he would have to have known that the individual transfers from TD Bank into the Merrill Lynch accounts that far exceeded $10,000 did not; and that while appreciating these fine distinctions, Potenza did not know, I would have to find, about the more intuitive Multiple Transactions CTRs that were triggered when he made deposits on business days immediately following a holiday or a weekend deposit.  Adding to this unusual mix of sophistication and naïveté, the Government's position would also have me find that Potenza believed that depositing a mostly consistent $8,000 sum would help him evade detection by the banks.[36]

This is a much more elaborate dance than the one the jury accepted in United States v. Botti, No. 08-cr-230, 2010 U.S. Dist. LEXIS 4927 (D. Conn. Jan. 22, 2010) (denying motion for

---

[35] In reaching this conclusion, I do not rely on the demonstrative summary submitted by claimant to which the Government objects, as the Court's own review coupled with Guerci's admission, easily shows that the ATM machine was frequently "cleared" on the same days that cash deposits were made, which resulted in total deposits into the TD Bank account on those days of more than $10,000.

[36] In its reply brief, the Government spends substantial time explaining why PRP's ATM transactions are treated differently under the law than its cash deposits; that is, why a customer's withdrawal of PRP's cash that results in a wire transfer the next day, when Potenza "clears" the machine, is not a "currency" transaction within the meaning of 31 C.F.R. § 1010.311.  The complexity of this explanation only shows the subtlety of the understanding of the CTR filing requirements with which Potenza must be charged to infer intent.

a new trial and judgment for acquittal), a case the Government finds analogous.  In <u>Botti</u>, the defendant urged the Court to reject the jury's finding of intent because he testified that he knew that multiple transactions under $10,000 could still result in filings by his bank.  The Court dismissed his argument for a number of reasons, but the one the Government finds most useful here is the Court's observation that knowledge of potential detection does not necessarily undercut a finding of intent.

That, of course, is self-evident.  The obstacle for the Government in the present case – one which it has not overcome and one it did not face in <u>Botti</u> – is to show that claimant had either an unbalanced level of knowledge or that he acted irrationally; unlike the defendant in <u>Botti</u>, the claimant here could not be said to have just taken a measured chance that his activity would go undetected.  <u>See</u> <u>id.</u> at *13 ("In truth, the fact that an individual may be aware that there is some chance that his structuring will be detected even though he keeps his deposits below $10,000 does not preclude his having acted with the intent to evade the CTR requirement that applies to deposits in excess of $10,000.").  In any event, the Court in <u>Botti</u> was reviewing a jury verdict, albeit in a criminal case.  Although I find that the Government has failed to carry its burden of persuasion on the element of intent, this conclusion says nothing about its burden of production, which claimant has not tested in this action.  Set against Potenza's credible and logical explanations, the Government's theory of intent is easily dismissed.

## CONCLUSION

For the foregoing reasons, the Clerk of the Court is directed to enter judgment dismissing the complaint and ordering the Government to return the seized funds forthwith in addition to

any interest paid to United States on those funds as well as imputed interest within the meaning

of 28 U.S.C. § 2465.  Claimant may move separately for attorneys' fees and costs.

**SO ORDERED.**

/s/(BMC)

_____
U.S.D.J.

Dated: Brooklyn, New York
       August 15, 2011