```
                                                                    1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

       - - - - - - - - - - - - - - - - X

       UNITED STATES OF AMERICA
                                        :
                   Plaintiff                10-CV-1866 (BMC)
                                        :
          -against-                         U.S. Courthouse
                                        :   Brooklyn, N.Y.
       SIXTY-ONE THOUSAND NINE
       HUNDRED DOLLARS AND NO CENTS    :
       (61,900.00) SEIZED FROM
       ACCOUNT NUMBER XXXXXX4429
       HELD IN NAME OF PRP RESTAURANT
       INC., AT TD BANK, N.A. ET AL.

                   Defendants          :
                                            January 18, 2011
       - - - - - - - - - - - - - - - - X    4:30 p.m.

       BEFORE:

               HONORABLE BRIAN M. COGAN
               United States District Judge


       APPEARANCES:

       For the Plaintiff:      LORETTA E. LYNCH
                               U.S. Attorney
                               271 Cadman Plaza East
                               Brooklyn, New York 11201
                               BY:  BRIAN D. MORRIS


       For the Claimant:       O'SHEA PARTNERS LLP
       Robert Potenza          521 Fifth Avenue
                               25th Floor
                               New York, New York 10175
                               BY:  ANDREW J. SOCKOL


       For Material Witness:   MURRAY E. SINGER
       Joseph Johnson          20 Vanderventer Avenue
                               Suite 106 E
                               Port Washington, New York 11050



                         RONALD E. TOLKIN, RMR
                         OFFICIAL COURT REPORTER
```

U.S.A. v. $61,900                                          2

```
 1  Court Reporter:        RONALD E. TOLKIN, RMR, CRR
                           225 Cadman Plaza East
 2                         Brooklyn, New York 11201
                           718-613-2647
 3

 4
    Proceedings recorded by mechanical stenography, transcript
 5  produced by Computer-Assisted Transcript.

 6                              ***

 7

 8          THE CLERK:  United States versus $61,900.  Docket
 9  number 10-CV-1866.
10          Counsel, please state your appearance, Plaintiff?
11          MR. MORRIS:  For the United States, Brian Morris.
12          Good afternoon, Your Honor.
13          THE COURT:  Good afternoon.
14          MR, MORRIS:  With me today I also have Richard
15  Guerci, a financial investigator for the IRS.
16          MR. SOCKOL:  For the claimant, Robert Potenza,
17  Andrew Sockol.
18          Good afternoon, Your Honor.
19          THE COURT:  Good afternoon.
20          MR. SINGER:  Murray E. Singer, CJA attorney for
21  Joseph Johnson.
22          THE COURT:  Mr. Singer, although I called you in
23  here, this is not really about you.  The real question is
24  whether I should impose a sanction on the claimant's attorney
25  for not having disclosed at the beginning Mr. Singer's client
```

U.S.A. v. $61,900                                         3

1  as person of knowledge.
2          Why was that not done?
3          MR. SOCKOL:  Your Honor, I was not purposely hiding
4  anything from this Court or the government.  When I asked my
5  client about anybody with knowledge of the cash at PRP
6  Restaurant, they didn't think that it was germane to list
7  general managers or cashiers that might handle cash as it
8  comes in on a day-to-day basis.
9          They thought this was more about deposited to the
10 bank accounts.  I questioned counting cash and keeping the
11 books of PRP Restaurant d/b/a Gallaghers.  It was an
12 oversight.
13         THE COURT:  Did it occur to you that there might be
14 an issue as to the amount of cash the business took in, and
15 maybe not the cashier but the general manager wouldn't have
16 knowledge of that?
17         MR. SOCKOL:  Well, it was my understanding that all
18 of the cash was just left for the principals of PRP
19 Restaurant.  They prepared the books and records of PRP.  And
20 they also are the only people, specifically, Robert Potenza,
21 who ever made deposits into a bank account.
22         THE COURT:  Right, but there is an underlying
23 question in this case about the integrity of those records,
24 right?  That's what this is about, was there any cash that was
25 not reported.  So the person who would have knowledge of that,

RONALD E. TOLKIN, RMR, CRR
OFFICIAL COURT REPORTER

U.S.A. v. $61,900                                                4

1  it seems to me, is a pretty obvious witness for the
2  government.
3          Now, look, I take what you told me, that you didn't
4  intentionally mislead anybody, but I don't think you did as
5  much investigation as you might have.  Obviously your clients
6  are going to identify the witnesses that they want deposed.
7  They're going to identify the people who they think will back
8  them up.
9          It's your job to make sure that the plaintiff's --
10 or the claimant's discovery obligations are fulfilled.  So
11 you've got to dig a little deeper.  So I am telling you for
12 future reference, don't let this happen again.
13         All right?
14         MR. SOCKOL:  Yes, Your Honor.
15         THE COURT:  Now, Mr. Singer, when can we have your
16 client's deposition taken?
17         MR. SINGER:  Judge, I know that the claimant wants
18 the subpoena for documents, of return those documents returned
19 before the deposition.  I do intend to put in a request to
20 quash them.  In our view, this is simply a fishing expedition,
21 but it's not in any way -- my client's personal financial
22 records are not in any way related to this.
23         So I intended -- at this point, I intend to put that
24 in.  At the time of my letter, I had not yet met with my
25 client, with Mr. Johnson.  But having met with him and having

1  been briefed a bit on what this case is about, I do intend to
2  put that in.  So I don't know if that will delay things.
3           THE COURT:  Well, no, because we're going to deal
4  with it right now.  It will not delay anything.
5           Let me hear the government's rationale for getting
6  the personal records of Mr. Johnson.
7           MR. SINGER:  Actually, it's the claimant's request.
8  It's their subpoena, not the government's.
9           THE COURT:  That's even harder for me to understand.
10 Explain to me how that will help you out.
11          MR. SOCKOL:  Your Honor, the government's contention
12 appears to be that some documents produced to the government
13 by Mr. Johnson that he kept, allegedly in his duties as
14 general manager, reports income that does not match up to the
15 income officially recorded by PRP.
16          THE COURT:  I'm sorry, he kept income?
17          MR. SOCKOL:  No.  He kept a tally of income.
18          THE COURT:  To the business?
19          MR. SOCKOL:  To the business, that doesn't match up
20 with the official accounting records and tax records of PRP.
21 That's my understanding of the government's position.
22          Our position is, first of all, that these records
23 are authenticated only by Mr. Johnson himself.  Also, if there
24 was income kept -- if there was income coming into the
25 business that was not recorded on PRP's records, it's just --

1  the theory is that Mr. Johnson could have as easily embezzled
2  money just as easily as PRP could have.  So I think it goes to
3  motive on behalf of PRP and motive on Mr. Johnson's behalf.
4              THE COURT:  Does the government have any comment on
5  that?
6              MR. MORRIS:  Well, just to put the pending motion
7  now before Your Honor in perspective:  In connection with the
8  government's investigation, the government has, through
9  Mr. Johnson, uncovered the proverbial second set of records.
10             Those records simply reflect several thousand
11 dollars a day of cash received over approximately a 30-day
12 period between the summer of 2009 and the end of 2009,
13 certainly providing a strong motive for the underlying
14 structuring allegation.
15             However, the motive is actually twofold, Your Honor.
16 One is the income tax evasion of unreported income.  And the
17 second, of course, is a payroll tax evasion scheme.  Because
18 as the government has learned from Mr. Johnson, during his
19 approximately ten-year tenure with the business beginning in
20 2000 and concluding in April of 2010, it was the company's
21 long standing practice to pay employees in cash and off the
22 books; half on the books and half off the books.
23             THE COURT:  Okay. So is it the claimant's view that
24 if there was any extra money, the claimant didn't know about
25 it either and, therefore, Mr. Johnson must have stolen it, and

U.S.A. v. $61,900                                            7

1  they want to see his personal records to see if they can test
2  that?
3              MR. SOCKOL:  The claimant's view is that they are
4  unaware of any money coming into the business that was not
5  accurately recorded, both coming into the business through
6  their tax returns or going out of the business through
7  payroll.
8              Mr. Johnson told the government, and we have seen no
9  evidence to support Mr. Johnson's contention, that payroll
10 went out off the books.  We've also seen no evidence of
11 Mr. Johnson's contention that more money came into the
12 business than was reported to the IRS, other than these
13 documents that Mr. Johnson produced to the government and
14 they're not kept in PRP's books and records.
15             THE COURT:  I understand, but I'm trying to tie that
16 to the personal records you're asking from Mr. Johnson.  I'm
17 not seeing the connection there, other than you're effectively
18 saying that if there was extra money then he must have stolen
19 it.  And then what?  It would show up where?
20             MR. SOCKOL:  Well, we have reason to believe that
21 Mr. Johnson, at the same -- it goes to the credibility, Your
22 Honor.  We have reason to believe that Mr. Johnson, at the
23 same time as being employed by another club, was either
24 collecting unemployment and/or not recording income earned at
25 the other club fund that he was employed at post PRP.

U.S.A. v. $61,900                                                8

1  Therefore, his tax returns are certainly germane to his intent
2  here.
3          We also have record of a $21,000 loan that was given
4  to Mr. Johnson to pay off his home mortgage which he claimed
5  to our clients that he didn't have the money to pay.  This
6  $21,000 loan was made to Mr. Johnson, which he did not repay
7  in full.  We also have reason to believe that our client's
8  failure to forgive this loan in its entirety is part of
9  Mr. Johnson's motive here in trying to drive this action.
10         THE COURT:  That's all fine, I don't mind you
11 attacking his credibility in any legitimate way.  But getting
12 someone's tax returns are clearly an invasive way of attacking
13 credibility.  And generally speaking, you need to show a clear
14 connection and a reasonable expectation that something in
15 those tax returns will back up the credibility challenge.
16         It seems to me that if you're talking about somebody
17 stealing money, the odds of them declaring the money they've
18 stolen is beyond speculation.  If you can give me a better
19 rationale for why the tax returns would get you where you want
20 to go, other than, obviously you cross examine any witness on
21 the stand, you'd like to see their tax return because you
22 never know what you're going to find in there, right.
23         But if you can't show me some kind of relationship
24 here, some reason to believe there's something in the tax
25 returns themselves that will help you that goes beyond mere

U.S.A. v. $61,900      9

1 speculation, I'll not delay this case so that we can fight
2 over documents and get you documents that are, at best,
3 speculative.
4      What I will do is, you want to ask him questions for
5 which you think you have a good faith basis, during his
6 deposition, ask the questions. If he tells you he was
7 skimming, we'll talk about documents again.
8      If he says absolutely not. And you ask him
9 questions like, where'd you get the money to pay off the
10 $20,000, and he says my wife's income, for example, you know,
11 I'm not going to see grounds for producing the tax returns.
12      So I will quash the subpoena to that extent at this
13 point.
14      Now, Mr. Singer, when can your client be deposed?
15      MR. SINGER: Well, I'm not done with the document
16 subpoena.
17      THE COURT: There's more?
18      MR. SINGER: Well, they requested all bank accounts
19 that my client owns or has any interest in.
20      THE COURT: Okay. That's quashed. And it's quashed
21 and it's getting real close to Rule 11.
22      MR. SINGER: They requested the personal tax returns
23 of 2005 to the present, which you ruled on that.
24      They requested all sources of income from 2005 to
25 the present including unemployment income. I assume that's

RONALD E. TOLKIN, RMR, CRR
OFFICIAL COURT REPORTER

1  quashed with the tax returns?
2          THE COURT:  Yes, it is.
3          MR. SINGER:  They requested documents reflecting all
4  credit or debts of any kind 2005 to the present.
5          THE COURT:  That is quashed.
6          Is there anything else in that subpoena?
7          MR. SINGER:  No, Your Honor.
8          MR. SOCKOL:  Your Honor, I respectfully disagree
9  with Mr. Singer's characterization.  We understand that the
10 financial information is quashed, but the subpoena starts off,
11 and at least 50 percent of what we ask for are all documents
12 and communications to/from or regarding PRP Restaurant,
13 Gallagher's, Gallagher's 2000, which are the three
14 reiterations of the club that existed while Mr. Johnson was
15 employed, communications with Robert Potenza, Patricia Potenza
16 or Alan Riale.  That's the first two items of the subpoena for
17 four lines total.
18         You quashed the second two lines, which we
19 understand and respect.  The first two lines, communications
20 with the three principals of PRP, we feel are certainly
21 germane to this action.
22         MR. SINGER:  Any documents or communications.  I'm
23 not sure if there were oral communications.
24         THE COURT:  Well, if they're oral, you have no
25 documents to produce.

1   MR. SINGER:  If the letters are e-mails that my
2   client has with regard to communications -- again, this is
3   very broad.  It's pertaining to any topic and any subject
4   matter.
5   THE COURT:  Well, yeah, but it's only between him
6   and the claimant.
7   MR. SINGER:  Yes.
8   THE COURT:  Not between him and the world.
9   MR. SINGER:  Simply between him and the claimant.
10  THE COURT:  I think they're entitled to use that to
11  see if there's any indication what might or might not be
12  credible.  So you can produce those.
13  MR. SINGER:  Okay.
14  THE COURT:  Was anything else in the subpoena we
15  haven't covered?
16  MR. SINGER:  No, Your Honor.
17  THE COURT:  Now, Mr. Singer, when can you have those
18  documents to the claimant and proceed with the deposition?
19  MR. SINGER:  I do not know if there are any such
20  documents, but I will have an answer to that within the next
21  couple of days.  And we will -- can we just talk off the
22  record for a moment here to try to work out a date?
23  THE COURT:  Sure.  But as you talk off the record,
24  please make it a prompt date.
25  MR. SINGER:  Yes, Your Honor.

1           (Off the record discussion.)
2           MR. SINGER:  Judge, I believe the deposition, if
3   it's agreeable to the Court, will be February 2nd.
4           THE COURT:  That's good.
5           Now, in addition to the Mr. Johnson problem, the
6   rest of the discovery has been completed?
7           MR. MORRIS:  Your Honor, we have completed all fact
8   depositions in the case with the exception, of course, of
9   Mr. Johnson's deposition.
10          With respect to documents, there's one additional
11  small production the government is still waiting for.  That
12  will be produced this week.
13          MR. SOCKOL:  They asked for PRP's insurance
14  policies, which has gone through the process and it will be in
15  the government's hands this week.
16          THE COURT:  Anything else?
17          MR. MORRIS:  I guess the remaining housekeeping
18  matter, Your Honor, will be expert discovery.  The parties
19  have conferred about potential deadlines for expert discovery.
20  The Court previously set an expert discovery deadline of the
21  end of this month.
22          In light of Mr. Johnson's deposition taking place,
23  the parties respectfully request with respect to all experts
24  except one, a period of 30 days from Mr. Johnson's deposition
25  to complete production of expert reports as well as rebuttal

U.S.A. v. $61,900     13

1 reports.

2      THE COURT: You're going to have a mutual exchange
3 of reports 30 days after Johnson's deposition?

4      MR. SOCKOL: Yes.

5      THE COURT: That's fine.

6      MR. MORRIS: There's just one additional expert
7 report, and this actually relates to a handwriting exemplar
8 that was taken just last week, Your Honor. The IRS
9 laboratory, I've been advised by Mr. Guerci, is actually
10 packed up and moving locations.

11      So that 30-day period, while sufficient for another
12 expert report is insufficient for the IRS to be able to
13 produce its expert report. So the government would
14 respectfully request an additional 30 days simply on that --

15      THE COURT: That's really long. That's really long.
16 Is there really an issue about whether the signature is
17 authentic?

18      MR. MORRIS: In this particular case, the government
19 understands that these documents, the proverbial second set of
20 records were really -- for instance, with respect to the
21 claimant, the claimant is claiming in his deposition that he
22 had never seen the document in its completed form at any time
23 prior to meeting with his attorney a day or two before the
24 deposition.

25      However, the government has information that not

1  only has Mr. Johnson actually -- excuse me, not only has
2  Claimant seen the record, but Claimant's handwriting would be
3  part and parcel for some of the information filled in on the
4  record.  The claimant disputes that.
5          So in addition to the fact witness that the
6  government has, Mr. Johnson has testified that it's his boss'
7  handwriting, the government wishes to proffer an expert
8  witness to corroborate Mr. Johnson's testimony with respect to
9  the existence of the claimant's handwriting on the proverbial
10 second set of books.
11         THE COURT:  This is a bench trial?
12         MR. SOCKOL:  It was noticed for a jury trial, Your
13 Honor?
14         THE COURT:  Is there a jury trial ready in a
15 forfeiture case?
16         MR. MORRIS:  I believe if requested, sir.
17         THE COURT:  Does the government have to use the IRS
18 laboratory for its handwriting expert?  It can't go out and
19 retain a private handwriting expert?
20         MR. MORRIS:  Well, I think the government could
21 potentially look to an outside expert.  However, there is an
22 existing process, at least with respect to the Internal
23 Revenue Services where there is an in-house laboratory that
24 handles these matters at no cost to the taxpayer.
25         So the government's first choice would be to use its

1  laboratory in-house, if that would meet with Your Honor's
2  scheduling of the case.
3          THE COURT:  It is longer than I want, but I can see
4  the reason why you want to use an in-house expert.
5          March 31st.
6          MR. MORRIS:  Thank you, Your Honor.
7          MR. SINGER:  Thank you, Your Honor.
8          THE COURT:  Plan on trying the case in -- well, let
9  me ask this:  Is either side contemplating a summary judgment
10 motion?
11         MR. MORRIS:  Not from the government.
12         THE COURT:  It sounds like there's a lot of disputed
13 facts.
14         MR. MORRIS:  Indeed, Your Honor.
15         THE COURT:  All right.  Well, then plan on trying
16 the case in early April.  I'm not going to give you a trial
17 date yet.  I will give you a possible trial date of April
18 11th, possible.
19         MR. SOCKOL:  Just to clarify one issue, Your Honor.
20         THE COURT:  Yes.
21         MR. SOCKOL:  Your Honor said we have 30 days after
22 the deposition of Mr. Johnson to exchange expert reports.  Do
23 we have 14 days after that was initially scheduled for the
24 rebuttal reports?
25         THE COURT:  That's why I asked you if you were going

U.S.A. v. $61,900                                                  16

1  to do everything at the same time.  You don't have to do
2  rebuttal reports, all right.  You can work it out between you
3  however you want.  If you want 14 days to do rebuttal reports,
4  that's fine.  You can do that on the 16th.
5              The experts you have are unrelated to the delayed
6  IRS handwriting expert, right?
7              MR. MORRIS:  Yes.
8              MR. SOCKOL:  Yes.
9              THE COURT:  So you can do the initial expert reports
10 by the 2nd of March.  You can do rebuttal reports by the 16th.
11             And then are you all interested in taking the
12 expert's depositions?
13             MR. SOCKOL:  Yes, Your Honor.
14             THE COURT:  Okay.  Do that by the end of March,
15 March 31st.  On that day you'll have the IRS report and you
16 will take that deposition the following week.
17             Okay?
18             MR. SOCKOL:  Thank you, Your Honor.
19             THE COURT:  Anything else we need to talk about?
20             MR. SINGER:  One other thing I need to clarify.
21             THE COURT:  Sure.
22             MR. SINGER:  With regard to the documents that
23 Mr. Johnson is to provide the claimant, there is no time frame
24 around this subpoena.  Can we have some narrowing of the time
25 frame?

1   THE COURT: How far back does the alleged second set
2   of books and records go?
3   MR. MORRIS: As far as the government has in its
4   possession, the earliest date occurs in August of 2009.
5   However, it's the government's understanding based on
6   information received from Mr. Johnson is that the records were
7   really kept for a period of years prior to that. These were
8   simply the only records or copies of which Mr. Johnson chose
9   to obtain personally as opposed to turning into the principal
10  of PRP for use in the business.
11  THE COURT: I think 2005, January, forward.
12  MR. SINGER: All right. Thank you, Your Honor.
13  THE COURT: Let me say one more thing to you,
14  Mr. Sockol. Obviously I have no view in this case whether or
15  not the government's theory is right or wrong. I'm not
16  finding any facts here. I don't know how the case is going to
17  turn out at trial, particularly since it's a jury trial.
18  But based on your client's lack of appreciation that
19  Mr. Johnson would be a necessary and important witness in this
20  case, I feel that I'm compelled to point out that you need to
21  have a long talk with your clients.
22  Because sometimes it happens in these cases that
23  clients have an unrealistic expectation about their ability to
24  prosecute a claim in an in rem case, and they think they can
25  do it with a fair amount of insulation and get their story out

```
                          U.S.A. v. $61,900                          18
```

1  and it will stop there.  They don't understand that sometimes
2  by throwing their hat in the ring, things can go very south
3  for them in ways they did not even anticipate.
4           Like I said, I have no feeling at all as to whether
5  that's what's happening here.  But I have seen it happen
6  enough before where the failure to identify the general
7  manager suggests to me is a conversation you may want to have
8  with your client.
9           MR. SOCKOL:  Yes, Your Honor.
10          THE COURT:  All right.  Thank you all.
11          (Matter concluded.)