```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - X
 3                           :
    UNITED STATES,
 4                                  10-CV-0186
         Plaintiff,
 5
            -against-         :
 6                                  United States Courthouse

 7                                  Brooklyn, New York
    SIXTY-ONE THOUSAND NINE HUNDRED
 8  DOLLARS and NO CENTS
    ($61,900.00)
 9
         Defendant.          :
10                                  July 13, 2011
    - - - - - - - - - - - - - X    9:30  o'clock a.m.
11
                    TRANSCRIPT OF BENCH TRIAL
12                  BEFORE THE HONORABLE BRIAN M. COGAN
                    UNITED STATES DISTRICT JUDGE
13
    APPEARANCES:
14
    For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
15                          271 CADMAN PLAZA EAST, 7TH FLOOR
                            BROOKLYN, NEW YORK 11201
16                          BY:   TANYA HILL
                                  BRIAN D. MORRIS
17                           ASSISTANT U.S. ATTORNEYS

18
    For the Defendant:      O'SHEA PARTNERS LLP
19                          51 FIFTH AVENUE, 25th FLOOR
                            NEW YORK, NY 10175
20                          BY: SEAN F. O'SHEA, ESQ.
                            BY:  ANDREW SOCKOL, ESQ.
21
    Also Present:           MURRAY SINGER, ESQ.
22                          For: Joseph Johnson

23

24  Court Reporter:         Marsha Diamond
                            225 Cadman Plaza East
25                          Brooklyn, New York
                            TEL: (718) 613-2489
```

1                          FAX: (718) 613-2369

2

3          Proceedings recorded by mechanical stenography,
transcript produced by computer.

4          THE CLERK:  Civil cause for trial: United States

5    versus Sixty-One Thousand Nine Hundred Dollars and No Cents.

6          Counsel, will you please state your appearances for

7    the record.

8          MR. MORRIS; for the United States, Brian Morris from

9    the United States Attorney's Office, also joining me is

10   Ms. Tanya Hill and at counsel table this morning, Judge, we

11   also have  Financial Investigator Richard Guerci, Special

12   Agent Brian Westrich, both of the Internal Revenue Service, as

13   well as a paralegal from our office, Nicole Brown.

14         MR. O'SHEA: Good morning, Sean O'Shea and Andrew

15   Sockol, for the claimant.  I also have with me at counsel

16   table my client Mr. Robert Potenza and my other client Ms.

17   Patricia Potenza.

18         THE COURT: All right. Mr. O'Shea, you wanted brief

19   opening statements and I guess the government should go first

20   since it has the burden, so I will hear from the government,

21   unless the government wants to waive opening statement.

22         MR. MORRIS:  No, Your Honor.  The government will

23   proceed with its opening.

24         Good morning, Judge Cogan. As Your Honor knows, this

25   is a forfeiture case based on structuring. The case is about

1    the deposit activity in the bank account of a major strip club

2    in Long Island City called PRP Restaurant, Inc., or

3    Gallagher's. 2000.

4            As Your Honor also knows, in a civil case like this

5    one the government has a low burden of demonstrating only by a

6    preponderance of the evidence that the defendant funds are

7    subject to forfeiture. Here the defendant funds were

8    structured in amounts of below $10,000 so that the bank

9    wouldn't file a currency transaction report or CTR.

10           As Your Honor, is aware CTRs are reports that banks

11   are required to file with the government for all cash

12   transactions in excess of $10,000. Specifically over $897,000

13   was structured into PRP's account at TD Bank through 113 cash

14   transactions. These structured deposits took place three or

15   four times per week over an 11 month period.

16           As Your Honor, will see bank record summaries, the

17   vast majority of these deposits were in amounts of $8,000 even

18   though at all times PRP had well in excess of a $10,000

19   available for deposit. Indeed PRP's own cashbook show that the

20   business kept cash on hand of more than 300, 400 and even

21   $500,000. PRP wanted to stay below the radar for a very simple

22   reason, and that is, because the company's long time

23   proprietor Robert Potenza, who made virtually all of the bank

24   deposits, didn't want the IRS to know about the large volume

25   of unrecorded and therefore, unreported cash receipts and off

1   the books employee payroll.

2           Like any other cash business, not reporting all of

3   its receipts and payroll, the last thing the owners of PRP

4   wanted was to have reports filed with the government that

5   might raise an eyebrow with the IRS.

6           Your Honor will hear from Joseph Johnson who was

7   general manager of the club from when it first opened back in

8   2001 until April of 2010 when he had a falling out with

9   Mr. Potenza. As general manager of PRP, Mr.  Johnson collected

10  cash from different areas of the club, like admission fees

11  from the front door, food and alcohol sales from the

12  registers, house fees from dancers and VIP charges from

13  customers who entered one of the clubs many champagne rooms

14  for a private lap dance. Mr.  Johnson  also paid out cash

15  expenses, including employee cash payroll.

16          As part of his job Mr.  Johnson kept a record of

17  both cash received and paid out using a daily register or

18  tally sheet and at the end of each night that he worked Mr.

19   Johnson would count the daily cash receipts in the upstairs

20  office of the club to make sure that everything balanced.

21  He'd then take the cash, together with the daily tally sheet,

22  and leave them in a box for Mr. Potenza or one of the clubs

23  other owners to pick up early the next morning.

24          About six months after this case was filed, Mr.

25   Johnson came forward with copies of some of the daily sheets

1    that he used while at PRP. Those sheets, when compared with

2    PRP cashbooks, reflect over $4,000 per day of unrecorded and

3    therefore, unreported income. Your Honor will see summaries of

4    that comparison prepared by financial investigator Richard

5    Guerci.

6              Aside from the records, Mr. Johnson will also

7    testify about the company's long-standing practice of paying a

8    large portion of employee payroll off the books, and

9    Your Honor will see summaries prepared by Investigator Guerci

10   comparing the cash payroll reflected on the daily sheets with

11   the payroll reflected on the company's cashbooks. That

12   comparison, Your Honor, reveals over $1700 per day of

13   unrecorded, and therefore, unreported cash payroll.

14             Now, as Your Honor will hear from Mr.  Johnson, he

15   first contacted the IRS and then provided the government with

16   copies of the daily sheets in order to get back at Mr. Potenza

17   after having an unpleasant falling out with him. Regardless of

18   Mr. Johnson's motives for coming forward, however, the Johnson

19   records, Your Honor, largely speak for themselves.

20   Importantly, the Johnson records reveal not only what the

21   principals of PRP were doing -- underreporting the business'

22   revenues -- but how it was that they perpetrated their crime,

23   by pulling cash register tapes and not recording the amount of

24   income reflected on those tapes in the company's cashboxes.

25   Even more significantly, Your Honor, on days where there are

1    normal overages and underages buy a few dollars on a cash

2    register, the revenue figures in PRP cashbooks match to the

3    penny those on the Johnson records less, of course, the pulled

4    cash registered tapes, and the handwriting of Mr. Potenza, the

5    sole claimant in this action appears on certain portions of

6    the Johnson records reflecting the day, date shift and dancer

7    names.

8                Investigator Guerci, as a retired IRS agent with

9    20 years of experience handling bank secrecy act and money

10   laundering cases, will also offer expert testimony about how

11   various factors in this day, like the amount and frequency of

12   PRP cash deposits and hundreds of thousands of dollars in

13   accumulating cash available for deposit, are consistent with

14   classic structuring patterns. So what we have here, Judge

15   Cogan, is a predominantly cash business where deposits were

16   structured to hide underlying unreported income and payroll.

17               After all the evidence is in, we are confident

18   Your Honor will find that the government has easily carried

19   its burden of showing the defendant funds more likely than not

20   were structured and that they are, therefore, forfeitable to

21   the Unite States.

22               Thank you, very much, Your Honor.

23               THE COURT: All right thank you. Mr. Show.

24

25               MR. O'SHEA:  Thank you, Your Honor.

1          Your Honor, on December 10th, 2009 the government

2     went before Magistrate Pollak in this courthouse and obtained

3     a seizure warrant from for almost $880,000 in the bank

4     accounts of PRP Restaurant and Robert Potenza.  Before doing

5     that the IRS agents -- well, there's one IRS agent in this

6     case -- and a private contractor, Mr. Guerci.  They had done

7     very little -- almost no investigation to speak of. All they

8     had done was obtain a sampling of bank records and based on

9     that barest of investigation they went before the Court and

10    they sought to forfeit a citizen's money based on an

11    allegation of structuring.

12         In their affidavit to Judge Pollak they offered

13    sworn testimony about what bank officials had told them. They

14    said they swore before Magistrate Judge Pollak that bank

15    personnel had discussed the content of a warning letter with

16    Robert Potenza, the president of PRP, and they swore that

17    despite the bank informing PRP of the CTR require filing

18    requirement and closing the Chase account that structuring

19    continued. That, Your Honor, was false. It was incorrect, and

20    it was so incorrect that I didn't hear my adversary this

21    morning mention it at all.

22         You will not hear Agent Westrich, you will not hear

23    Investigator Guerci, a private contract employee, testify that

24    any bank official discussed any letter with Mr. Potenza. No

25    one from Chase bank will testify to that, and no one from TD

1   Bank will testify to that.  Indeed, the government won't offer

2   any testimony from the banks in question.

3           In fact, the letter in question was prepared at a

4   remote location out in Texas and sent to the wrong address for

5   PRP, and it was never received, and you won't hear any

6   evidence by the government that that letter that they

7   presented so prominently to Magistrate Pollak was received or

8   that they checked it had been received before going to the

9   Magistrate, and it certainly was never discussed with

10  Robert Potenza.

11          Worse, Your Honor, the facts here will be completely

12  the opposite.  The actual facts are that just a few weeks

13  before the date of the misaddressed warning letter, Mr.

14  Potenza requested and received a letter from his local Chase

15  branch in Astoria, Queens.  A branch that you won't hear

16  either Mr. Guerci or Mr. Westrich ever visited or talked to

17  anyone at. And Mr. Potenza went to that local branch and he

18  asked for and received a letter, and the letter specifically

19  described his banking practices, and it described them as

20  being conducted in a "satisfactory manner." And when I say it

21  specifically described his banking practices, I mean it

22  explicitly set forth that Mr. Potenza had deposit $70,000

23  dollars in cash in a single month -- from June 29th, 2007 to

24  July 27th 20007, less than one month, and that $6,000 was

25  withdrawn in cash for change about once a week.

```
 1              Still worse, Your Honor, the actual facts will show
 2      that two days before the misaddressed letter that Mr. Morris
 3      has now dropped out of the government's case, two days before
 4      that on September 5th, the local branch in Sunnyside, Queens,
 5      another branch that Mr. Potenza sometimes went to, also wrote
 6      a letter, and that letter said that Mr. Potenza in one month
 7      had deposited a $115,000 in cash, and it was deposited from
 8      August 1st, 2007 to September 5th, 2007, and that letter also
 9      specifically described Mr. Potenza's banking practices at
10      Chase as having been:  "Conducted in a satisfactory manner."
11      Both of these letters were properly addressed, and had
12      actually and coincidentally, in fact, been requested by
13      Mr. Potenza.  He had requested them, Your Honor, in connection
14      with a gun permit renewal because he had been held up in the
15      past, going back to when he had a jewelry business, and as a
16      result of those holdups he got -- he applied for and received
17      a gun carry permit from New York City, and in connection with
18      a renewal of that permit because of his deposit of large cash
19      amounts the police department had asked him to go get letters
20      from his local bank, and he had done.  And coincidentally, it
21      was in precisely the same time period that this letter that
22      Mr. Morris didn't tell you anything about, but told a lot to
23      under oath to Magistrate Judge Pollak which you will hear has
24      not been corrected to this day, was the basis of the so-called
25      motive that the government claimed back in December 09.
```

1          The letters demonstrate that far from hiding cash

2     deposit activity Mr. Potenza was calling attention to it. In

3     those letters he demonstrates an absolute lack of intent to

4     evade any CTR filing requirement. He didn't care about CTRs,

5     Your Honor, and you know, I heard Mr. Morris this morning say

6     300, 400, $500,000 was kept on the premises and you know what

7     he left out?  It was all taxed. What he left out, and what the

8     circumstantial evidence is going to show, is that it was all

9     on the cashbooks of PRP that was given to the accountant and

10    taxes were paid on all those monies.

11         Those letters which specifically say that the

12    accounts were conduct would in a satisfactory manner were not

13    shown to Magistrate Judge Pollak. In fact, the Agent Brian

14    Westrich, who had been on the job Your Honor all of 15 months,

15    had not even bothered to visit or talk to anyone at Chase --

16    not out in Texas, not here in New York. They're just going on

17    the bank records.

18         Your Honor, the Chase branch in Astoria, Sunnyside,

19    Queens -- by the way, Mr. Guerci had also not talked to those

20    people, so the misleading and incomplete factual background

21    was presented to the Court and a citizen's money was seized,

22    was forfeited, money on which he paid taxes, money on which

23    Mr. Morris this morning is still going on about 300, 400, five

24    400 and leaving out the inconvenient fact that it was all

25    taxed, and the government has done nothing to this day to

1    correct that misleading affidavit they presented to Magistrate

2    Judge Pollak.

3            Your Honor, this is a gotcha case of the worst sort.

4    The evidence will show you this is not structuring at all. No

5    multiple banks were used. I heard Mr. Morris say classic

6    structuring in his opening.  No multiple banks were used, no

7    multiple branches on the same day, no breaking down of

8    deposits, no subterfuge of any sort was employed.  In fact,

9    the evidence show -- and Mr. Morris also left this out in his

10   opening statement --  CTRs were filed on about three occasions

11   by either Chase or TD Bank.  The evidence will also show that

12   Mr. Potenza -- Robert Potenza never objected, or attempted to

13   interfere with those CTR filings.  He did not refuse in any

14   way. In fact, when they called him -- and by the way,

15   Your Honor, they only called Mr. Potenza up to talk to him

16   after they seized his money.  Not before. Not to get it right

17   beforehand. They seized it and then they called him.

18           Indeed, the CTRs you will hear were filed, were

19   filed by Chase and TD Bank on their own initiative, and

20   sometimes for the same deposit activity CTR was filed and

21   sometimes it wasn't, but one thing is clear, Mr. Potenza had

22   nothing whatever to do with whether a CTR was filed or whether

23   it wasn't, and the evidence will also show he neither knew nor

24   cared whether CTR was filed.

25           The evidence will show that Agent Westrich painted a

1   picture -- a sinister picture for Magistrate Judge Pollak of

2   possible narcotics trafficking, money laundering or tax

3   evasion, and yet there was and is no evidence that. What you

4   heard Mr. Morris admit just a few minutes ago was that Mr. --

5   what they are basing their case on, Mr. Johnson, they didn't

6   learn about him until six months after this seizure. When they

7   went before Magistrate Judge Pollak they didn't know of any

8   narcotics trafficking, any money laundering, or any tax

9   evasion.  Absolutely none.  And yet they painted this sinister

10  picture for the Magistrate Judge so she would sign their

11  forfeiture warrant.

12          The cash deposits, as I said, were all recorded in

13  the cashbooks ever PRP.  Reported -- duly reported to the firm

14  accountants, so that taxes were paid and taxes were paid on

15  all of this cash.

16          So this nonsense I hear Mr. Morris spouting out

17  about, Joe Johnson, which we only just heard the new and

18  improved theory at the pretrial conference last Wednesday,

19  it's all part of a back and fill, Your Honor, to hide the

20  government's error. They blundered in this case. They seized

21  fun ds that were never structured and never intended to be

22  structured and now you hear the case -- the government is

23  saying the case is about tax evasion, but Your Honor, it would

24  be laughable if it weren't just more misdirection by the

25  government. Maybe Agent Westrich can explain why when he was

1   deposed in December of 2010, a full year after the seizure,

2   and I asked him questions about income tax evasion, whether he

3   suspected payroll tax evasion, he said, no, no, no, no, those

4   aren't within the scope of our investigation, that was a year

5   after the seizure, Judge, but last Wednesday, all of sudden

6   they became the focus of this investigation because they're

7   desperate to show some motive where they have none.

8           They say now -- I hear Mr. Morris say last Wednesday

9   and here again this morning, that the motive here is to keep

10  essentially the deposits low so that they're just under the

11  $10,000 reporting requirement  so that we are under the radar,

12  so that it's cash that's not being reported to the IRS doesn't

13  raise a signal I guess to the IRS.

14          The evidence will show, Your Honor, that's nonsense,

15  it is double-speak in an attempt to change the subject. The

16  evidence will show they were sloppy in this case and they made

17  a mistake and they are compounding that error, Judge, by

18  putting Mr. Potenza to the inordinate expense of this trial to

19  get his money back, money on which he has already paid tax.

20          Let me briefly explain what the evidence will show.

21  Mr. Morris is right about one thing, PRP is a topless

22  entertainment -- it adult entertainment establishment in

23  Queens.  For the most part it's a cash business.  It uses a

24  lot of singles for tips -- fives and tens for bar,  bar

25  change, and $20 bills are used on the establishment, too. And

1   what Mr. Morris left out of his presentation is this the $20

2   bills are not part of the deposits that are taken to the bank.

3   Those are 50s and 100s for which the restaurant has really no

4   use, but the 20s do have a use and there's cash machine, an

5   ATM on the premises and when the 20s are withdrawn there's a

6   -- the transactions are reported to the bank as a deposit.  It

7   works something like this.  Mr. Potenza would take the 20s he

8   receives and he would separate them out and he would load the

9   cash machines himself, and when a patron used his banking card

10  to get, say, 200 or $400 out, Mr. Potenza and PRP would profit

11  because they would get a transaction fee, like a $5

12  transaction fee.  Fifty cents would go to the bank and 4.50

13  would go to PRP, but the customer would put his card in and

14  that customer would be debited for his account at the bank,

15  but they were Mr. Potenza's 20s.  So it would result in those

16  20s being taken out and cash essentially being deposited in

17  Mr. Potenza's account, the same account.  He didn't use

18  different accounts for this to hide this activity. The same

19  $20 bills are going to the Chase account and later at the TD

20  Bank account, and they are deposited on a daily basis and

21  Your Honor will see that in the evidence.

22          If you add the ATM cash deposits -- and on most days

23  Mr. Morris, again, left this out, although he knows about it

24  in the evidence -- if you add the ATM cash deposits, the 20s,

25  on most days, in fact we will offer a chart in evidence on the

1    overwhelming majority of the days, the deposits from PRP are

2    well over $10,000.

3             Structuring, as Your Honor knows, involves arranging

4    your affairs to be just under the limits, so CTR won't be

5    filed, but you are going to see in evidence that while

6    Mr. Potenza might deposit three or four or seven or eight -- I

7    think most of the numbers are eight, but it's not all of them

8    -- but he would get 50s and 100s and as he got them a few

9    times a week he would go to the bank and he'd either deposit

10   them or exchange them for singles but the 20s he would deposit

11   into the cash machine, and when he cleared that cash machine

12   every morning that recorded a deposit at his bank.

13            You are going to see in the evidence that those

14   deposits on just about everyday exceed $10,000 which blows a

15   gaping hole in Mr. Morris' new and improved motive claim that

16   this was arranging your affairs to get just under the $10,000

17   limit because you'll see on just about every single day

18   there's a 6 or 7 or $8,000 deposit there's a corresponding ATM

19   deposit that makes it well over $10,000.

20            And Mr. Potenza knew that, and the bank knew that,

21   and Mr. Potenza didn't do anything to alter that resumed.  So

22   most of the deposits we are talking about here are not even

23   outwardly structured because they exceed $10,000 in a single

24   day. As you can see, that's more than a little inconsistent

25   with the government's latest theory that structuring is to

1   avoid scrutiny of a lot of cash because you are going to see

2   these accounts on a daily basis up to 30 or $40,000 in a day

3   reported to -- reported on the bank statements, and guess

4   what, it's also reported to the accountant, it's on the

5   cashbook and it's -- taxes paid on it.  So this idea we are

6   trying to keep under the radar will be blown to smithereens by

7   the evidence.

8           The 50s and 100s, those denomination bills, they are

9   not useful, as I say, for change, so those are the

10  denominations that Mr. Potenza himself physically took to the

11  bank. The only reason he didn't take the 20s is he had another

12  way to deposit those via ATM and he did that several times a

13  week, and he also took those 50s and 100s and just exchange

14  them for singles, which he had more use for in the business.

15          As I told you, Mr. Potenza's been held up over the

16  years, he has a gun carry permit, and in fact, the letters

17  from -- in the very same time period at the misaddressed

18  letter that was presented so prominently under oath to

19  Magistrate Judge Pollak, it was in that same time period he

20  was applying for his gun permit renewal.

21          In fact -- and I didn't hear, again, Mr. Morris

22  mention anything about the CTRs that were filed.  You are

23  going to see some 30 CTRs that were filed and again, no

24  evidence at all that Mr. Potenza interfered or had anything to

25  do with it because he didn't care and why didn't he care?

1    Because all the deposits from all the cash, and Mr. Morris  is

2    trying again, like the government did in front of Magistrate

3    Judge Pollak, make it really sinister, he's got a lot of cash

4    but he leaves out it's all reported to the IRS.

5             THE COURT:  Mr. O'Shea --

6             MR. O'SHEA:  Your Honor, I'm just about done.

7             We are going to offer the testimony of Robert

8    Potenza who will tell you about what he did going to the bank.

9    We are going to offer the testimony of Patricia Potenza who is

10   both a partner in the business, and the bookkeeper who will

11   tell you how cash got record, and we'll also offer you the

12   testimony of Marciano Filippone who is a CPA, who is the firm

13   accountant and who is the only accountant who is going to

14   testify in this case, and the government will not offer anyone

15   with accounting experience.

16            Your Honor, this evidence will show the government

17   got it wrong on this case, and after you have a heard the

18   evidence we are going to ask for the return of the funds, and

19   we are also going to ask under Title 28 Section 2465 not only

20   for the return of the funds but for Mr. Potenza's fees and

21   costs for having been put the through this since the

22   government has blundered so obviously.

23            Thank you.

24            THE COURT: All right. Thank you.

25            The government may call its first witness.

1          MR. O'SHEA:  Your Honor, may I be heard?  I would
2   ask that Mr. Guerci be excluded. The government has two people
3   at its table, Mr. Westrich as I understand is the case agent,
4   Mr. Guerci is a private contractor and so should be excluded
5   until after he's testified.
6          THE COURT:  Are you prepared to exclude one of your
7   clients as well?
8          MR. O'SHEA:  Well, Your Honor, they are both
9   parties.
10         THE COURT:  Are they both parties?  The claimant is
11  PRP, is it not?
12         MR. O'SHEA:  And Robert Potenza?
13         THE COURT:  There are two claimants?
14         MR. O'SHEA:  Yes, Your Honor.
15         THE COURT:  Who has the interest in the fund?  They
16  can't both.
17         MR. O'SHEA:  Well, actually they do because it's an
18  S corporation, Your Honor, and Ms. Potenza owns 15 percent,
19  Mr. Potenza owns 70.  Your Honor, if that is important to the
20  Court in deciding it, we will happily exclude one of them.
21         THE COURT:  Okay. The rule has been invoked.  Each
22  side is entitled to one representative to remain at the table.
23  Anyone else who may be a witness in this case needs to wait
24  outside.
25         MR. MORRIS:  That is fine, Your Honor.

1          May we take up one additional issue before we call

2     our first witness? We filed a letter with Your Honor last

3     night asking to add one additional witness to the government's

4     witness list, and this was, in fact, the witness that the

5     government just deposed yesterday pursuant to the Judge's

6     instruction at the pretrial conference last week.

7          THE COURT: Why don't you just use the deposition?

8          MR. MORRIS:  We would be prepared to do that as

9     well, if that would be acceptable.

10         THE COURT:  Is that deposition of an employee of the

11    plaintiff?

12         MR. MORRIS:  It is, Your Honor.

13         MR. O'SHEA:  Your Honor, the witness is not

14    unavailable.  I believe the witness is going to be offered in

15    rebuttal in our case.  As Your Honor said when we asked about

16    some relief with respect to the Chase bank, it was too little

17    too late.  Now, having gone through the whole process of

18    discovery the government wants the rules rewritten for

19    themselves.

20         THE COURT: No, no, no, they are late because you

21    were you.

22         MR. O'SHEA:

23         THE COURT: You designated the witness late. That is

24    why they took the deposition, and this was a witness, and you

25    will correct me if I am wrong, but my recollection is what I

1   determined was that the government could now delay deposition
2   because you had not disclosed this person as a person with
3   knowledge to support your claims, as should have been done.
4   Had you done that timely, the government could have taken that
5   deposition and then determined to list that witness in the
6   pretrial order. Isn't that what happened?
7           MR. O'SHEA:   No, Your Honor.  I think Your Honor
8   said that the because it was a rebuttal witness that the
9   witness wasn't in support of our claims but was only in -- in
10  rebuttal of Mr. Johnson, and after Mr. Johnson testified at
11  certain procedures our witnesses, which were known to the
12  government since October of last year, well before the start
13  of the discovery period, they didn't elect to take those
14  depositions.  We only offered these witnesses for rebuttal,
15  Your Honor.
16          THE COURT:  Did you offer them in rebuttal or did I
17  reclassify them in rebuttal?
18          MR. O'SHEA:  No, we identified them as rebuttal
19  witnesses, Your Honor.
20          THE COURT:  In the pretrial order?
21          MR. O'SHEA:  Yes, Your Honor.
22          THE COURT:  But of course, as the claimant going
23  second what is it that you anticipate this witness rebutting?
24          MR. O'SHEA:  Well, Your Honor, Mr.  Johnson will
25  testify we believe falsely.  This goes to the whole issue of

1   the records that Mr.  Johnson claims are business records.

2   These witnesses will testify as to the custom and practice of

3   PRP with respect to these worksheets and only that, really,

4   and whatever else Mr. Johnson will falsely testify to because

5   we don't know the full extent of his testimony about the

6   actual custom and practice of cash handling and that sort of

7   thing, but it's only in rebuttal, and in fact if Mr.  Johnson

8   is excluded we don't intend to call him.

9           MR. MORRIS:  Judge, just taking a step back to last

10  week's pretrial conference, the government had propounded an

11  interrogatory in discovery specifically asking the claimant of

12  individuals would had knowledge of the company's cash

13  management practice, and in response to that interrogatory

14  claimants wrote Patricia Potenza and Al Reale  -- basically,

15  essentially, in sum and substance what was stated was that the

16  claimant, Patricia Potenza and Allen Reale were the only

17  employees with knowledge of the corporation's cash management

18  practice, including the receipts, storage, exchange and

19  deposited cash or cash equivalent.

20          THE COURT:  So that was an incomplete answer, was it

21  not?

22          MR. O'SHEA:  No it wasn't.

23          THE COURT:  He has no knowledge, this witness, of

24  the cash management practices of the company. Why would you

25  call him to rebut Mr. Johnson?

1          MR. O'SHEA: Your Honor,  what does cash management

2     mean?

3          THE COURT: I think we know what cash management

4     means.

5          MR. O'SHEA:  Well, Your Honor, basically everyone in

6     PRP, just about, except for Barback perhaps, maybe some

7     security people, handles cash.

8          THE COURT:  Mr. O'Shea

9          MR. O'SHEA:  Let me finish.

10          THE COURT: No, I am not going to let you finish.  I

11     have heard enough.  I will allow the witness in the form that

12     the government wishes. Not both.  You can use the deposition,

13     you can use live testimony.  Not both.

14          MR. MORRIS:  The government calls Mr. Joseph Johnson

15     to the stand, and also, in accordance with Your Honor ruling,

16     I believe Your Honor's ruling was only one representative

17     would be present for either side and I believe Ms. Potenza as

18     well as the plaintiff is still present in the courtroom.

19          MR. O'SHEA:  Yes, Pat Potenza will step out.

20          Your Honor, I believe what the government is doing

21     here is excluding the IRS federal agent in place of the

22     private contracting employee and Mr. Guerci is not the case

23     agent and what we are talking about is a case agent exception

24     to the rule. So I think the government is gaming the rule.

25          THE COURT:  We are talking about rule 615.  So let's

1  look at it. All right. Is the person you are keeping an

2  employee of the government.

3          MR. MORRIS: He's Technically an employee of a

4  contractor who exclusively provides services to the

5  government.

6          MR. O'SHEA:  Your Honor, I took Mr. Guerci's

7  deposition.  He told me he works for ASC Primes which is a

8  contract --

9          THE COURT:  Stop.  I understand the issue. He

10  doesn't fall under subsection 2 of rule 615.

11          MR. MORRIS:  There is subsection three, Your Honor.

12          THE COURT:  Is it your contention that he is

13  essential to the presentation of your case?

14          MR. MORRIS:  Indeed, Your Honor?

15          THE COURT:  And why is that?

16          MR. MORRIS:  Mr. Guerci is a retired IRS agent, 20

17  years of experience involved in virtually every aspect of this

18  investigation?

19          THE COURT:  Is it your position that he is more

20  essential to the presentation of your case than the case

21  agent?

22          MR. MORRIS:  In this case, Your Honor, that's the

23  government's position.

24          THE COURT:  Okay. That's the answer to that.

25          MR. O'SHEA:  Well, Your Honor, it striking to me, I

1   guess I have to take the government at their word on that,

2   that a private contracting employee is more important.

3           THE COURT:  Why does that trouble you?  The

4   government has decided to do this by outsourcing, just like a

5   lot of businesses do.  It seems to me if they want to do that

6   they can do that.

7           All right.  I will allow that witness to stay.

8           MR. MORRIS:   Thank you, very much, Judge.

9           THE COURT:  Please call, Mr.  Johnson.

10          (Murray Singer, Esq. present in the courtroom)

11          THE COURT:  Mr. Singer.

12          MR. SINGER;  good morning Judge.

13          THE COURT: Good morning.  Let's just note for the

14   record that Mr. Singer is here representing the witness

15   Mr.  Johnson.

16          I think you should probably stay where you are on

17   the first bench in the well.

18          MR. SINGER:  That is fine, and if I need to advise

19   him with regard to invoking his Fifth Amendment privilege, how

20   should I do it, Judge? I could do throw things, I could cough,

21   what would you like me to do?

22          THE COURT:  You should stand up or you should say

23   objection.

24          MR. SINGER: All right.

25          THE COURT: I'll say hear the objection at the time

1    you make it.

2              MR. SINGER: Okay.  It won't be an objection to the

3    question so much as informing Mr. Johnson of what he should

4    do.

5              THE COURT:  I understand.  All right.

6              THE CLERK:  The witness please stand here and raise

7    his right hand.

8              J O S E P H    J O H N S O N,

9        having been first duly sworn/affirmed, was examined

10        and testified as follows:

11             THE COURT:  All right. You may inquire.

12   DIRECT EXAMINATION

13   BY MR. MORRIS:

14   Q    Good morning, Mr.  Johnson.

15             Where do you presently live?

16   A    1630 Salem Road, Valley Stream, New York 11580.

17   Q    And about how long have you lived there?

18   A    About 11 years.

19   Q    Mr. Johnson, what is the highest level of education that

20   you achieved?

21   A    I have three years of college.

22   Q    And where did you attend college?

23   A    York College in New York.

24   Q    And at York College what did you study?

25   A    Business.

1   Q      Mr. Johnson, what's your current occupation?

2   A      I currently own a sports bar in Wantagh, New York.

3   Q      And where were you last employed before your involvement

4   in the sports bar?

5   A      Gallagher 2000 PRP Restaurant Corporation.

6   Q      Where is that business located?

7   A      43-19 37th Street, Long Island City, New York.

8   Q      And what kind of business is that?

9   A      It's a strip club topless dancing.

10  Q       As a strip club what kind the goods or services are

11  offered there?

12  A      Alcohol, and topless dancing.

13  Q      And in what capacity were you employed with the business?

14  A      I was general manager.

15  Q      And during what period of time were you the general

16  manager?

17  A      From 2001 to -- 2001 to April of 2010.

18  Q      Where were you employed prior to that period of time,

19  sir?

20  A      With Gallagher's also at another club they had on Queens

21  Boulevard.

22  Q      And what kind of business was that other club?

23  A      Topless dancing.

24  Q      And in what capacity were you employed with the prior

25  club?

```
 1   A      I was manager.

 2   Q      And when were you employed with the prior club?

 3   A      That was, approximately, 1998, or 1999 to 20001.

 4   Q      And prior to 1998 where were you employed?

 5   A      They also had another club called Gallagher's Two that

 6   was in College Point and I started that in 1991?

 7   Q      And in what capacity were you employed by Gallagher's Two

 8   in College Point?

 9   A      I was bouncer for eight years, and I managed on a Sunday

10   night right before the other club.

11   Q      Turning your attention back to the PRP and your time

12   there, who was your boss at PRP?

13   A      Robert Potenza, Pat Potenza -- I'm sorry.

14   Q      You can finish?

15   A      Robert Potenza, Pat Potenza and Al Reale?

16   Q      What was Mr. Potenza's position?

17   A      He was majority owner.

18   Q      And did he hold any titles there?

19   A      He was the owner.

20   Q      And with respect to Ms. Potenza and Mr. Reale, what were

21   their administrative positions?

22   A      Well, Pat was the vice president and I believe

23   Allen Reale, the secretary. I'm sorry.  Robert Potenza was the

24   president.

25   Q      Thank you.
```

1          What was Mr. Johnson's(sic) ownership in the

2   company?

3   A    Mr. Potenza?

4   Q    Yes.

5   A    Seventy percent I believe.

6   Q    And what about with respect to Ms. Potenza's ownership

7   interest?

8   A    Fifteen percent.

9   Q    And what was Mr. Riali's ownership interest?

10  A    Fifteen percent.

11  Q    As general manager of PRP what were your primary

12  responsibilities, Mr. Johnson?

13  A    I was daily operations, I hired staff, trained the staff,

14  also terminated if necessary. I also hired dancers for the

15  club.  Did the daily operations.

16  Q    What were PRPs hours of operation during the time period

17  that you were there?

18  A    Basically, open from is 11:30 a.m. to 4 a.m., the

19  difference being Saturday would be 12 p.m. to 4 a.m, and

20  Sunday 1 p.m. to 4 a.m.

21  Q    And during your tenure with the business what were your

22  work hours?

23  A    7:30 to 4 in the morning.

24  Q    And what shift was that?

25  A    The nightshift.

1  Q     And during your tenure as general manager with PRP, about

2  how many employees would you have were on the payroll during

3  any given month?

4  A     About 35 to 40.

5  Q     And with respect to the management hierarchy of the

6  business, where did you rank?

7  A     I was the number one manager and above me was just

8  owners.

9  Q     And would you please tell us, Mr. Johnson, some of the

10 ways in which the business generated money?

11 A     Alcohol sales, which was calculated at register.  They

12 had champagne room.  There was also lap dances, there was

13 money collected by the DJ, and also front door money.  People

14 walk in the club they would have to pay a door charge.

15 Q     Who was responsible for collecting those monies?

16 A     I collected the money and left it for -- the money for

17 the owner the next day.

18 Q     Were there any fees that any dancers paid to the club?

19 A     Yes, house fees.  I'm sorry.

20 Q     And how was the club laid out in terms of its

21 organization, certain areas that dancers dance in?

22 A     They dance on stage.  They also dance in the champagne

23 room, which is private dancing.  Basically that was it.

24 Q     Were you also involved in the payment of employees?

25 A     Yes.

1    Q     Out of what funds did you pay employees?

2    A     Out of daily receipts.

3    Q     What about hiring decisions, was that something you were

4    involved in?

5    A     Yes.

6    Q     Who made those decisions?

7    A     I basically hired people for the nighttime shift, Richard

8    Gleeson hired for the daytime sheet and Robert Potenza also

9    hired for staff.

10   Q     Who made the firing decisions at the club?

11   A     Robert Potenza, myself and Richard Gleeson.

12   Q     And you mentioned you were involved with payment of

13   employees, how did the business pay its employees?

14   A     In cash.  Sometimes in check if it was some funny money

15   they called it.

16   Q     With respect to the types of revenue at PRP, could you

17   just please explain to us the different streams of revenue

18   that you were involved while you were there?

19   A     Yes.  We had a champagne called -- we would collect

20   champagne money from the champagne room.  Champagne room is

21   where a dancer would go into the champagne room for a half

22   hour and $160 for a half.  Hour, the dancer would get 120, and

23   the house would collect 40.  They also collected house fees

24   for -- the dancers were paid.  Each day they came into work

25   they would have to pay a house fee.  They also have to pay a

1  fee to the DJ because when they came in they also have to pay

2  a fee to the house-moms.  I'm sorry.

3           THE COURT:  The dancers?

4           THE WITNESS:  Yes, they are the dancers.

5  Q    Did the dancer have to pay any other kind of fees or

6  fines or anything like that?

7  A    They have to pay fines, yes.

8  Q    What is a fine?

9  A    Fine is something that Mr. Potenza set up so that if a

10  dancer called in sick she has to pay a fine.  If it was within

11  48 hour period she would have to pay an $80 fine. If the

12  dancer didn't show up to work at all he would charge a $160

13  fine so the dancer would have to pay at least half the next

14  time they came to work.

15  Q    Specifically, with respect to the door or admission fees,

16  if you could please tell us how those work.  Specifically,

17  what times was there a door ir admission fee in effect?

18  A    The admission fee was in the evening starting at 8 p.m.

19  and it would be all night, basically. The door fee was Sunday

20  through Wednesday was $5.  Thursday I believe it was $10, and

21  on Friday and Saturday it was $10 before 11 o'clock and $15

22  after 11 o'clock.

23  Q    And where did those door or admissions fees go, generally

24  speaking?

25  A    The cashier would ring it to the register.  At the end of

1   the night I do a register tape.  Collect the tolls and bring

2   them up to the office and wait for the owner.

3   Q    And with respect to another stream of revenue mentioned,

4   the house fees, what was the amount of the house fee during

5   the daytime hour, sir?

6   A    The house fee was $60 for the daytime dancers.

7   Q    And with respect to the nighttime, was the house fee on

8   Sunday, Monday and Tuesdays?

9   A    Sunday through Wednesday actually was $60.  Thursday it

10  was 70.  Friday and Saturday it was $80.

11  Q    Where did the house fees go?

12  A    The house fees were collected by the champagne host.  He

13  would tally up the amounts and give them to me to check.  I

14  will check them and leave them for the owner for the next day.

15  Q    And the champagne room known by any other name at the

16  club?

17  A    We call it champagne room. It was a private room --

18  sometimes called that.

19  Q    What about the fees that came out of there, what were

20  they known as?

21  A    For the champagne room?

22  Q    Yes.

23  A    Just champagne room fees.

24  Q    What was the cost to visit the champagne room?

25  A    It was a $160 for a hour, 320 for an hour.  Break up was

1    the dancer got 120 for the half hour and the house got $40 for

2    the half hour.

3    Q     And could you just please give us an estimate of about

4    how many customers visited the champagne room on any given

5    night?

6    A     Well, basically, busier nights were Friday and Saturday,

7    Friday being the busiest and we had total of 70, 80 to a 1.  -

8    over 100.

9    Q     You also mentioned something about DJs  how did the DJ

10   work?

11   A     The DJ got paid $10 for dancer.  If the DJ had over 20

12   dancers he would have to kick back to the house, to the club,

13   of $3 per dancer.  So those fees were totalled and wrap it

14   and give it to me for the owner.

15   Q     You also mentioned somebody by the name of a house-mom?

16   A     Yes.

17   Q     Could you just please explain what is a house-mom?

18   A     House mom is someone who takes care of the dancer, they

19   get whatever their needs -- hair spray, underarm deodorant,

20   lipstick, stuff like that.

21   Q     And how did the fees work with respect to that house-mom?

22   A     Basically, the same thing.  They get $10 per girl.  If

23   they had over 20 good dancers they had $3 kickback to the

24   house.

25   Q     And who was responsible for the receiving those fees at

1    the club?

2    A    They totaled up for me.  I collected the money and left

3    it upstairs for the owner.

4    Q    Now, with respect to the fines, how did the fines work?

5    A    Mr. Potenza would fill out what girls owed fines on a

6    yellow piece of paper.  He would then give the paper to me to

7    give to the champagne host.  The champagne host would collect

8    the fines from the dancers, and they would wrap it up and give

9    it to me and I would leave it for the owner.

10   Q    Do you recall what the amount of fines were?

11   A    It varied.

12            It was quite a bit.  Sometimes a girl could owe

13   $300, $200.  There were people who owed him maybe a $1,000,

14   $1500 -- the fines.

15   Q    Specifically, for what offense did the fines apply?

16   A    Oh, for coming to work late, calling in late.  You can

17   have a fine for chewing gum, he had a fine for clothing -- if

18   they didn't wear clothing -- the right dresses.  Whatever he

19   felt, I guess.

20   Q    And for those dancers who don't come into work, what was

21   the charge?

22   A    If they didn't show up and didn't call it was $160.  If

23   they called late it was $80.  He also sometimes doubled the

24   fine as he felt necessary.

25   Q    So with respect to streams of revenue that we have

1   discussed, how did customers generally pay for those services?

2   A    Basically in cash.

3          Every once in a while they would do a credit card

4   charge for the champagne rooms.

5   Q    And how did the company keep track of that cash?

6   A    As far as, again, the champagne host would wrap it up and

7   he's have a piece of paper.  He would write down who went to

8   the champagne room, how much -- what time they went in, how

9   much they paid.  Those totals were wrapped up and given to me

10  so I can leave it for the owner.

11  Q    Now with respect to the cash registers, how did the

12  company track that cash?

13  A    All our sales were run through the cash register.  At the

14  end of the evening there would be a Z report done for each

15  register,and  I would take those register upstairs.  Count

16  them, count the money and leave them for the owner.

17  Q    And would you record that money anywhere?

18  A    Yes, it was on the cover sheet and register sheet.

19  Q    What types of information did you record on this cover

20  sheet or register sheet?

21  A    It was basically the revenues for the evening or the

22  daytime.  It was also the expenses for that day, and the front

23  door charges, front door admissions.

24  Q    After he recorded the information what did you do?

25  A    There was a little tackle box, fishing tackle box.  It

```
 1   was left on the left-hand side of the desk and everything was

 2   all totalled and wrapped up and left for the owner.

 3   Q     Aside from the daily sheets and the -- were there any

 4   other records used in the business data to take a look at the

 5   house fees?

 6   A     Yes. There was a house fee sheet that was totalled up --

 7   how many dancers came in, how much they paid.  Total was

 8   calculated.  I wrapped it up in the same piece of paper and I

 9   left it separately for the owner.

10   Q     And who kept that house fee sheet?

11   A     The champagne host kept it downstairs until I got it.  I

12   took it in the office and left it for owner.

13   Q     And what about the champagne record, who kept that?

14   A     The champagne host kept that also.  He totalled all the

15   champagne that was for that evening, or daytime, and then they

16   would wrap that up.  I would take it upstairs.  Count it.

17   Make sure it was correct and leave it for the owner.

18   Q     You also mentioned, Mr. Johnson, that you weren't

19   responsible for paying employees.  How did the company keep

20   track of payments to employees?

21   A     They were listed on the cover sheet of each day and what

22   the total amounts were being paid.

23   Q     Who listed them there?

24   A     Either myself for the nighttime or -- and Richie Gleeson

25   for the daytime.
```

1   Q     And how did you keep track of the numbers on the sheet?

2   A     It was totalled up at the end of the evening, and they

3   were paid, and then we just left it for the owner.

4   Q     Where did you leave it for owner?

5   A     Again, in the that tackle box with all the revenues for

6   that day.

7              MR. MORRIS:  Your Honor, may I approach the witness

8   with an exhibit binder?

9              THE COURT:  You are using binders in instead of

10  courtroom technology?

11             MR. MORRIS:  I think we have, if I'm not mistaken,

12  we may have discussed just using binders at the pretrial

13  conference.  There's no jury.

14             MR. O'SHEA: That is right. I think  Your Honor said

15  we can forego the technology and use binders.

16             THE COURT: Okay.

17             (Ms. Hill handing to the witness)

18  Q    Okay.  Mr.  Johnson, if you could kindly please turn your

19  binder to tab number 24. What's been previously marked for

20  identification as Government Exhibit 24.

21  A     Yes.

22  Q     Do you recognize -- if you could just take a moment to

23  thumb through the exhibit and look up when you are done,

24  please.

25  A     Okay.

1   Q      Do you recognize the documents in the exhibit?

2   A      Yes.

3   Q      And what are they?

4   A      The register sheets and daily cover sheet and some

5   department of Gallagher's.

6   Q      And who prepared the daily register sheets?

7   A      Robert Potenza started it off, Richard Gleeson and then

8   myself most of the time.

9   Q      And did these sheets in particular look in any way

10  familiar to you?

11  A      Yes.

12  Q      And what way do they look familiar?

13  A      These are the sheets I copied during the course of my

14  working each day.

15  Q      And why did you copy them?

16  A      I copied them because I was basically having problem with

17  Robert Potenza, so I just felt I need a -- might need a little

18  bit security or I might want to get back at him one day.  I

19  don't know.

20  Q      After you copied them what did you do with the records?

21  A      I kept them aside.  I kept them aside for -- until I

22  needed them.

23  Q      What did you do when you needed them?

24  A      I presented them to the IRS.

25         MR. MORRIS:  Your Honor, the government offers

1   Exhibit 24 into evidence.

2            MR. O'SHEA:  May I have voir dire, Your Honor?

3            THE COURT:  Sure.

4   VOIR DIRE EXAMINATION

5   BY MR. O'SHEA:

6   Q    Mr. Johnson, your practice was to -- by the way, these

7   aren't all the sheets from all the days you worked, correct?

8   A    No, it's not.

9   Q    Just about two months; is that fair, sir?

10  A    I am not sure how many.  It was something like that.

11  Q    And is it fair to say it's not all the days of that time

12  period, approximately two months, whatever it is, it is not

13  all the days?

14  A    No, not every single day, no.

15  Q    And your practice, as I think you told us, was to leave

16  the shhets together with the register tapes at the end of the

17  night in a tackle box; is that fair?

18  A    That's correct.

19  Q    And you say that you wanted to get Mr. Potenza in trouble

20  and some other reasons, but one them was you wanted to get

21  back at Mr. Potenza, right?

22  A    Possibly, yes.

23  Q    And you thought these records would be a good record to

24  get Mr. Potenza in trouble?

25  A    Yes.

1   Q     And these sheets, one of them you say is called a cover

2   sheet?

3   A     Yes.

4   Q     And the cover sheet that you claim to have left at the

5   end of the night, you left something else with that cover

6   sheet, didn't you?

7   A     As far as what, in the register sheet?

8   Q     Yes, sir?

9   A     Yes, sir.

10  Q     You didn't produce the registered tapes to the

11  government?

12  A     No.

13  Q     But every night when you wanted to get Mr. Potenza in

14  trouble you copied the sheet, but you didn't copy the complete

15  record, or what you claim is the complete record, did you?

16  A     I am not sure what you mean by that.

17  Q     The complete -- what you claim was the complete record of

18  the night's activities would include the register tape,

19  correct?

20  A     I guess so, yeah.

21  Q     And the register tape that we are talking about is, I

22  think you said, about 12 inches long; is that right?

23  A     I didn't say that, but it could be, yes.

24  Q     Well, you don't recall in your deposition saying that the

25  register tape was about 12 inches long?

1   A      Twelve inches long?

2   Q      Yes.

3   A      Well, it can't be each register tape would be the same.

4   It would depend on how much was run up on each register tape.

5   So, in other words, one girl had more sales, her tape would be

6   longer.

7   Q      Well, sir, do you recall at the deposition you said that

8   the register tape would be a summary of the night's event and

9   that summary was about 12 inches?

10  A      I -- okay, I guess so.

11  Q      Does that refresh your recollection?

12  A      I guess it is.

13  Q      So did you copy those summaries of what the register

14  showed for the evening?

15  A      Well, I didn't copy that, but what I did was the register

16  tape reflects on the register sheet.  Mr. Potenza checked the

17  register tape against the register sheet, so the register

18  sheets were balanced with the register tape.

19  Q      So, in other words, one corroborates or confirms the

20  other;  is that fair?

21  A      Yes.

22  Q      So, if you had produced, copied the register tape, that

23  12 inches or so tape, copied that, that would confirm what you

24  say is on the sheets in Exhibit 24; is that fiar?

25  A      Yes, that's fair.

1   Q     You copied these in the office at PRP; is that fair?

2   A     Yes.

3   Q     The upstairs office?

4   A     Yes.

5   Q     And was a copy machine available for you there?

6   A     Yes.

7   Q     But you didn't copy the register tapes?

8   A     There was a reason for that. The reason why I didn't copy

9   the register tape, it wasn't copying these sheets for income

10  purposes.  I was coming them for the purpose of him not paying

11  the employees the proper way.

12  Q     Fair enough, but you would agree that these sheets, to

13  the extent that they exist, are photocopies of what you claim

14  was written and left at the end of day; is that fair?

15  A     That's correct.

16  Q     And the total of pieces of paper that were left at the

17  end of the day included a register sheet that would

18  corroborate what you claim was in the register; is that fair?

19  A     That's correct, yes.

20  Q     You say that they were left in tackle box at the end of

21  the day?

22  A     Yes.

23  Q     Do you recall in your deposition saying they were left on

24  an I-Beam or pipe?

25  A     Not the daily.  I didn't say about the daily receipt.  I

1    said that was after the -- after Robert Potenza did all the

2    paperwork of figuring each day, he would leave that for

3    Pat Potenza.  Collect at the end of week.  The daily receipts

4    were left in the tackle box.

5    Q    Did you have occasion to have responsibility for the

6    storage of these receipts Exhibit 24?

7    A    Storage of them, no.

8    Q    In fact, you don't know if they were stored or kept in

9    any way, fair?

10   A    You mean Pat Potenza taking them home?

11   Q    Yes.

12   A    No, I just saw her taking them home.

13   Q    Do you know for a fact that Ms. Potenza took these

14   records -- what you claim are the records home?

15   A    Yes.

16   Q    And do you know that for a fact?

17   A    I know that for a fact.

18   Q    How many times?

19   A    It was just about every Friday she would come and pick

20   those papers up, take them and put them in her purse, and she

21   would go home with them.

22   Q    Did you ever go back and refer back to the -- what you

23   claim are records after you turned them in for the night?

24   A    It happened on occasion.  We would some kind of

25   discrepancy or something to figure out, and either

1    Robert Potenza or Pat Potenza would pull it from the beam that

2    they -- that he left it on and --

3    Q    How much sheets were kept on this beam?

4    A    Oh, I would say it would be a week's total at a time.

5    Q    So what you are saying is on occasion when you thought

6    there was a discrepancy there would only be a week's worth of

7    sheets kept on a beam?

8    A    It depends on when he look at them.  Let's say if

9    something happened on Tuesday night, if he looked at it on

10   Wednesday night it would be from Sunday or Monday to Tuesday

11   Wednesday.  That many. If he looked at it on Friday, it would

12   be entire week from Sunday to Friday, depending on how they

13   kept their records.

14   Q    Now, do you know one name Ben Schmidt (ph)?

15   A    Yes.

16   Q    How do you know him?

17   A    He is a one of the -- he's the weekend manager there.

18   Q    He works Sunday, Monday?

19   A    Sunday, Monday.

20   Q    On nightshift?

21   A    Sometimes daytime and nighttime, but nightshift, yeah.

22   Q    But does Exhibit 24 contain any sheets that you claim are

23   sheets for days that Mr. Schmidt worked?

24   A    No.

25   Q    Do you copy any of his tally sheets?

1    A     No.

2    Q     So when you looked, and you said these were stored or

3    kept around, did you bother to, when you were trying to get

4    Mr. Potenza in trouble, to copy any sheets for Sunday, Monday

5    when Mr. Schmidt worked?

6    A     No.

7          Again, the bulk of his paying employees would happen

8    on Friday. So most of the employees were paid on Friday when

9    they were paid on --on the books, half on the books, not on

10   the books.

11   Q     That wasn't quite my question?

12         Is it fair to say, sir, you don't have any record

13   that you claim is the company record of when Mr. Schmidt would

14   have worked during that, roughly, two month period,

15   Exhibit 24, that Mr. Schmidt would have worked and he would

16   fill out a cover sheet.

17   A     No.

18         MR. MORRIS:  The government objects.  This is simply

19   going beyond the scope of voir dire.

20         THE COURT:  Sustained.

21         MR. O'SHEA:  Your Honor, I'm almost through.

22         THE COURT:  I agree.

23         MR. O'SHEA:  May I just a little bit more?

24         THE COURT:  A little bit.

25         MR. O'SHEA:  Thank you.

1  Q    Did you always make copies at the end of the day of these

2  cover sheets?

3  A    Yes.

4  Q    Well, was there ever an occasion when you copied the

5  sheet that you were handed by Mr. Gleeson midday?

6  A    Copy of midday?

7  Q    Yes, sir.

8  A    No.

9  Q    Well, let me ask you to look in your book and look at

10 page 1666, if you would real quick. Do you have that, sir?

11 A    Yes.

12 Q    And then look at 1667. Do you have that, sir?

13 A    Yes.

14 Q    Fair to say,these are cover sheets that you allege are

15 records from the date September 11, 2009?

16 A    Umm-Humm.

17 Q    Same day?

18 A    Same day.

19 Q    Isn't it true that they have different numbers on them,

20 sir?

21        MR. MORRIS:  Objection.  Again, getting into cross

22 examination.

23        THE COURT: Sustained.

24        I will let you do it on cross.

25        MR. O'SHEA:  Well, Your Honor, we object.  They are

1   simply not business records.  They are incomplete they.  Are

2   episodic.  They don't have any sense of a liability

3   authenticity.

4           THE COURT:  Mr. O'Shea, I understand your objection,

5   they are not business records.  I think a sufficient

6   foundation has been made so that they are business records.  I

7   will I overrule the objection.  That's not to say how much

8   weight I think they are entitled to. You may have raised valid

9   points.  You may question even further on cross-examination.

10          MR. O'SHEA:  Thank you.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. MORRIS:

2   Q     Mr.  Johnson, could you please turn in your exhibit book

3   within Government's Exhibit 24 to what's been marked in the

4   lower-right-hand corner with a Bates number, Government's

5   Exhibit 1718 or Government's 1718, please.

6   A     Okay.

7   Q     Do you recognize Government's 1718, Mr.  Johnson?

8   A     Yes.

9   Q     What is it?

10  A     It's a coversheet for that particular day.

11  Q     If you just kindly step us through, and I'm going to

12  direct to you particular portions of the document beginning in

13  the upper-left-hand corner, where it says "Customer count,"

14  and then to the right it says "Day," and then to the right of

15  that it says "Night."

16        Can you explain to us what is the meaning of those

17  fields.

18  A     That is the daytime total of customers that came in, 248,

19  and the nighttime was customers that came into the door on the

20  clicker count, counted by the bouncer as 294.

21  Q     Where would the information come at the club?

22  A     The daytime was counted by the manager, which would be,

23  on this day, Richie, Richard Gleason.

24        The nighttime was counted by a bouncer, security

25  person, at the front door, 294.

1    Q     And how would the information come on a sheet like this?

2    Who would reflect it down here?

3    A     For the night person, the security person would give me

4    the total.  I would put it on a sheet, leave it for Robert

5    Potenza to put on the sheet.

6    Q     Thank you, Mr.  Johnson.

7          Moving to the line just to the right, where it

8    says "Date," and then there's a line next to it and there's

9    some information filled in, can you explain to us what that

10   is.

11   A     That's the date of the sheet, 11-13.

12   Q     How would that information get in there?

13   A     This handwriting is Robert Potenza's.  He would start the

14   sheet off.

15   Q     What was the practice with how it would get started off?

16   A     He would leave the coversheet, and he would write down, I

17   guess, the date, the day and the shift, day or night.  He then

18   also would have the register sheet, which is Exhibit 1719.  He

19   would also do that sheet, and he would also list the dancers

20   on that sheet for that day.

21   Q     We'll take a look at Government's 1719 in a second.

22         Returning your attention back to 1718, where it

23   says "Day," what does the word "Day" mean in the upper

24   right-hand.

25   A     That's the date of this cover sheet.

1   Q    What about to the right of that, it says "Shipped" and a

2   line under it.  What does that information reflect?

3   A    That's a daytime shift and nighttime shift.

4   Q    What is the meaning of that information in a document

5   like this?

6   A    I guess the totals shift revenue for that day, daytime

7   and nighttime.

8   Q    Turn your attention to the column on the left-hand side,

9   Government's Exhibit 1718.  It says "Bartenders," and then

10  there's a column.  Could you please explain to us what the

11  meaning of that column is?

12  A    The "Bartenders" are the bartenders that worked that day.

13  And the register tape is the register for each bartender, how

14  much business they did that day.

15  Q    The column next to "Bartenders," where it

16  says "Reg.Tape," what does that mean?

17  A    That's the register tape.  That's the sales for that day.

18  Q    How does the information get reflected in this portion of

19  the form.  What was the practice?

20  A    It was calculated on the register sheet, which is the

21  next sheet, and the total would be put on this sheet here and

22  put by each bartender's name.

23  Q    Whose practice was it to record this information here?

24  A    Daytime, it was Richard Gleason, and nighttime, it was

25  myself.

1          THE COURT:  One second.

2          We'll take a fifteen-minute break.  Be back here at

3     five to 11:00, please.

4          (Recess taken.)

5          (In open court.)

6          THE COURT:  Let's have the witness back, please.

7          Be seated, please.

8          THE COURT:  Please continue.

9    Q    Just to advise the Court, your Honor, in the interests of

10    efficiency, the government will proceed with the other witness

11    that we talk about by way of deposition.  We'll just introduce

12    the deposition testimony.  Thank you, your Honor.

13          THE COURT:  Okay.

14    BY MR. MORRIS:

15    Q    Mr. Johnson, turning your attention back then to within

16    Government's Exhibit 24, what has been marked in the

17    lower-right-hand corner with Government Bates Number 1718, and

18    focusing on the upper-left-hand corner of the document,

19    there's a column labeled "Bartender" and "Reg.Tape."

20          Do you see to the right of that column, those sets

21    of columns, there's numbers listed down there.

22    A    Yes.

23    Q    Do you have any idea what that number is?

24    A    Yes.  During the course of the night, I would calculate a

25    total of the registers that have already been closed, so this

1  way, at the end of the night, I could close it faster.  That's

2  what the 10,395 represents.

3  Q    Who would indicate that number down there?

4  A    I would.

5  Q    Right beneath the two columns labeled "Bartender"

6  and "Reg.Tape," there is a line and a word below the line that

7  says "Name," and then it says "Door," and then a number and a

8  box.  Could you please just explain to us the meaning of that

9  information as you used use it on this form?

10 A    That's the front-door cashier, and that's the total for

11 the front door for that day, that evening.

12            THE COURT:  I need to understand better how this is

13 working.  Let me ask a couple of questions.

14            So, there's a bartender named Luiso?

15            THE WITNESS:  Yes.

16            THE COURT:  And there's a register that's a cash

17 register at the bar?

18            THE WITNESS:  Yes.

19            THE COURT:  You're saying that while she's on, $898

20 comes into that cash register --

21            THE WITNESS:  Yes.

22            THE COURT:  -- that's reflected in the tape?

23            THE WITNESS:  Yes.

24            THE COURT:  When a new bartender comes on, when Alex

25 comes on next, then is it a new tape is put in, or it starts

1   over again?

2           THE WITNESS:  That's four different registers.

3           THE COURT:  Four different registers?

4           THE WITNESS:  Yes.  For the daytime, it was four

5   registers for the particular day, and for the nighttime, there

6   were four registers.  That's why there were eight bartenders.

7           THE COURT:  Is there a register at the door as well

8   as for the 3180?

9           THE WITNESS:  Yes.

10          THE COURT:  Now, I got it.  Thank you.

11          MR. MORRIS:  Thank you, your Honor.

12  BY MR. MORRIS:

13  Q    With respect to the number in the box that's

14  labeled "Door," where did that number come from?

15  A    It came from on the far right, with a total of what the

16  cashier took in for that night.  So, on the far right, it says

17  "Nicky," it says "1040" was before 11:00 o'clock, and

18  the "2140" was after 11:00 o'clock.  The "400" is the bank

19  total.  So, total is 3580.

20  Q    When you say the "bank total," what are you referring to,

21  sir?

22  A    The bank was $400 when she started, with change for that

23  evening.  So, she had a drawer of $4400, so she could make

24  change.

25  Q    The box that's labeled "Door," there's another set of

1   boxes that says "Total."  One says "Subtotal," the other

2   says "Total."

3           Could you explain to us the information in that area

4   of the form.

5   A    Yes.  The "Total" is the total register -- it

6   says "Tape," but it's the total monies counted for that day at

7   the bottom.  So, for that day, $12,358, and that's including

8   all the registers and the front door.

9   Q    For what shift did that figure apply to?

10  A    Daytime and nighttime.

11  Q    Okay.  Moving to the right of the column that's

12  labeled "Reg.Tape," there's another column labeled with the

13  heading "Party."  What is the significance of that area of the

14  form?

15  A    That was used if we had a bachelor party or birthday

16  party, we would put the totals of the money collected in that

17  column.

18  Q    Turning your attention, sir, to about a third of the way

19  down the form are a number of columns that bear the

20  headings "Expenses" and "Amounts."  Could you please explain

21  to us what the meaning of the information reflected in this

22  area of the form is?

23  A    In the "Expenses" on this would generally be the

24  employees being paid.  It would be listed, the names of the

25  employees, and the amount was the amount that they were being

1    paid for that day, or sometimes it reflected the week, also,

2    totals.

3    Q    Who would reflect this information down here on this

4    form?

5    A    Richard Gleason or myself.

6    Q    And what was the meaning specifically with respect to the

7    names listed in the "Expenses" column?

8    A    That's the employees.  It's a bouncer, a waitress,

9    bartender, bathroom attendant, front-door person, cashier.

10   Q    With respect to the "Amount" column, what does that mean?

11   A    That's what they were getting paid for that day.

12   Q    Who would have paid them?

13   A    Richard Gleason paid the daytime people, and I paid the

14   nighttime employees.

15   Q    What do the amounts represent?

16   A    That's their pay.

17   Q    Do you see to the right of some of the numbers, there are

18   sort of almost somewhat diagonal lines.  Do you have any idea

19   what those mean?

20   A    Those are the checkmarks that they got paid for the day.

21   Q    What was the process with respect to those checkmarks?

22   A    As soon as they were paid, it was checked off to make

23   sure we would pay them, or not pay them at all.

24   Q    Who would be responsible for checking those numbers off?

25   A    Basically, myself or Richard Gleason.

Case 1:10-cv-01866-BMC   Document 66   Filed 03/09/12   Page 56 of 300 PageID #: 1712

1    Q    Do you see, with respect to, Mr.  Johnson, for instance

2    on one of the names, it says in the left column labeled

3    "Expenses," it says "Sophia," and then there's a word "Tax"

4    next to it.

5         Do you have any idea of the meaning of that

6    information as it was used on this form, PRP.

7    A    That was the taxes taken out for the week for each

8    person.  So, for Sophia, she was getting paid $40.  The

9    difference was taken out in taxes.  Taxes were being paid.

10   Q    How would that all work when taxes were taken out for

11   employees?

12   A    At the end of the week, we would take the tax out.  It

13   would be a Thursday or Friday.  And we were given the totals

14   of how much to take out of their pay from Pat Potenza, and we

15   would then take the pay out -- the tax out.

16   Q    How frequently were employees paid?

17   A    They were paid daily, most of the times.  Richard Gleason

18   was paid on a weekly basis, I was paid on a weekly basis, and

19   some other employees were paid on a weekly.  Basically, daily.

20   Q    When were taxes taken out?

21   A    Thursday and Friday.

22   Q    On days when taxes were taken out, how would the number

23   be, the same or different in the "Amount" column?

24   A    We would subtract the amount of taxes from their pay for

25   that day.

1    Q    And that tax amount would apply just to that day, or the

2    whole week?

3    A    For the whole week.

4    Q    Do you see at the -- for instance, there is, in the

5    second "Expenses" column labeled "Marla," there's actually a

6    word there next to the word -- next to "Marla" that

7    says "Tip."  Do you have any idea what that information

8    reflects?

9    A    Yes.  If a customer paid using a credit card, and they

10   put the tip on the credit card, we would pay them the tip from

11   the credit card in cash.  It was listed there.

12   Q    Where would you get that information from?

13   A    That would come off the charge slip.

14   Q    Beneath the three columns that we have just been talking

15   about, that bear the headings "Expenses" and "Amount," there's

16   a box with a number in it, and next to the box is the

17   label "Total expenses."

18          Do you have any idea what the meaning of that

19   information is, "Total expenses," on the form.

20   A    Yes.  That's the expenses column, both the first column

21   and the second total column totaled up, totaling amount 2957.

22   Q    What does the figure in that box represent?

23   A    The total expenses for that day.

24   Q    Directly to the right of the number 2957 is some

25   handwriting, and that handwriting -- can you tell me what the

1   handwriting says?

2   A     It says "Dean," and it's 1,015.

3   Q     Do you have any idea what that information reflects?

4   A     Yes.  Pat Potenza put that in.  That's the --  "Dino" is

5   the person -- security company that they used to supply us

6   with security guards.

7   Q     When would Ms. Potenza put that in?

8   A     That's usually on a Friday.

9   Q     With respect to the bottom quarter of the sheet, there's

10  an area of this document that actually says "Balance sheet,"

11  and then there's some boxes and some labels to the left of the

12  word "Balance sheet."  Could you please explain to us the

13  meaning of each of those portions of the form?

14  A     Yes.

15            The "Start" is the starting bank that Mr. Potenza

16  would leave each day.  This day, he left $19,200.  That was

17  broken down between each register box, each bank, that the

18  bartender had, and the front-door person, and he also left a

19  lot of singles, usually about 10,000 singles, something like

20  that.

21  Q     Beneath the word "Start," there's another line that

22  says "Income."  What does that information reflect?

23  A     The "Income" is the total from the top of sheet where it

24  says "Total Income, 12,358."  That total is brought down here,

25  12,358.  It's then totaled for the subtotal of 31,558.

1    Q    Who would reflect that information down on this form?

2    A    I would.

3    Q    And beneath the subtotal is a box that says "Expenses"

4    and a number in it.  Could you please explain to us what that

5    represents?

6    A    That's the total expenses from the line just above.

7    "Total expenses, 3957," I brought that total down, 2957, to

8    subtract it from the subtotal.

9    Q    Beneath the word "Expenses," there's actually another box

10   that says "NDB" next to it, and has a number in it.

11        Could you please explain to us what that means.

12   A    That's the next-day bank.

13   Q    What is the next-day bank?

14   A    I would take out a certain amount of money for the

15   next-day bartenders.  So, for the -- for the daytime.  That

16   particular one was $3,000.  I would take that amount out.  I

17   would make the boxes for the bartender for the next day, and I

18   would subtract this total from the subtotal, also.

19   Q    Where would you do that process?

20   A    In the office.

21   Q    Where would you leave the money for the next-day bank?

22   A    It would be left on the right-hand side in two banks.

23   Q    Were the banks contained in anything?

24   A    In a tackle box, blue tackle box.

25   Q    Beneath the letters "NDB," there's a word "Total" and

1    then a number next to it.

2             Do you have any idea what that information is.

3    A    Yes.  That's the total for the day.  That would be

4    subtracting the expenses and subtracting the next-day bank,

5    and that would be 25,601.

6    Q    Who would reflect that information down here on the form?

7    A    I would.

8    Q    And to the right, actually, there's another box that's

9    labeled "Cash count."  Could you please explain to us the

10   meaning of the numbers in that box?

11   A    Yes.  That's the total cash that I counted from that

12   evening.  That would be all the money taken in from the

13   registers, all the money left for bank.  I would take all

14   those totals, calculate them, and that total that I have would

15   have to match the total on the right total.

16   Q    Is there any significance -- or, you tell us, sir, Mr.

17    Johnson, what's the significance where it says "One equals,

18   five equals, ten equals."  What do those numbers mean?

19   A    One is singles, 7,371 singles.

20             It was $5 bills, there were 560.

21             $10 bills, there were 920.

22             $20 bills, there was 8,660.

23             $50 bills, there were 1900.

24             And $100 bills, there were 6200.

25   Q    I think you said for the $10 bills, you might have said

1    920?

2    A    910.  I'm sorry.

3    Q    How did you physically count that money up?

4    A    I added it up using the money counter in the office, and

5    I totaled up everything.  I had counted it.

6    Q    Do you see in the box beneath "Cash count," there are the

7    words "I have," and then a box next to it with a number in it.

8    What's the meaning of that information?

9    A    That's the total of what I counted from all the registers

10   and all the cash we had from that day.

11   Q    Is there any particular reason why there's a total number

12   on the left and an "I have" number on the right?

13        What's the meaning of all this.

14   A    They would have to balance each day.  So, the money taken

15   in plus the amount -- the amount the bank left, everything

16   would have to be accounted for.

17        THE COURT:  I have a question.

18        Go back for a minute to the start number, the 19,200

19   number.

20        THE WITNESS:  Okay.

21        THE COURT:  Tell me again where that comes from;

22   that's cash left over from the preceding day that's still in

23   the tackle box?

24        THE WITNESS:  No.  That's the amount that

25   Mr. Potenza would leave for us to start our day.

1          In other words, with -- the four bartenders had a

2    bank that was included.  I believe it was, say, $1200 each

3    bank.  The nighttime would have the same amount, say, $1200

4    each bank.  He would add that up, and that total would be part

5    of the start, but he would also leave singles, because we had

6    to make change during the course of the day.  There was

7    usually about $10,000 in singles left for us during the day.

8          THE COURT:  Why is that amount so much higher than

9    the NDB amount, and that seems to be consistent throughout

10   these sheets?  Shouldn't the NDB amount be the same thing as

11   the start amount?

12         THE WITNESS:  The $10,000 in singles he would add

13   each day.  He would add that himself.  I was just worried

14   about the registers.  He also made the registers for the

15   nighttime, also.

16         THE COURT:  Okay.

17   Q    The start amount, Mr. Johnson, was the start amount the

18   starting of what shift?

19   A    That was left for me for the nighttime, but it also

20   included the daytime.

21   Q    What about the NDB, what shift was that left for?

22   A    For the daytime.

23   Q    What's the -- is there any comparison that you can draw

24   between the amount of the business that the club does in the

25   day versus the night?

1   A    Well, usually, it's busier at night.  We had a pretty

2   good daytime, also.

3   Q    What about the relative size of the banks on the daytime

4   versus the night?

5   A    Well, usually, it was a much more bigger amount at night.

6   Q    Thank you.

7   A    Hmm.

8   Q    Now, turning your attention, Mr.  Johnson, to the next

9   page -- if you could please turn in your binder --

10  Government's 1719, Bates number marked in the lower-right-hand

11  corner.

12       Do you recognize this page.

13  A    Yes.

14  Q    What is it?

15  A    It's the register sheet.  It's the sheet where we total

16  up all the revenue.

17  Q    What's the relation between this document and the

18  document we just looked at, which was identified by

19  Government's 1718?

20  A    We would total up the revenue from the registers on this

21  sheet, and these totals would be brought to the cover sheet.

22  Q    Which of these documents would be used first in your

23  practice versus second?

24  A    The register sheet would have to be completed first,

25  because -- before you put it onto the cover sheet.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1   Q    If we could kindly direct your attention to the top of

2   Government's 1719.  There's a word that says "Date," and a

3   line next could it.  Could you please explain to us what that

4   information reflects?

5   A    That's the date of this document, 11-13-09, and the day

6   is Thursday.

7   Q    What would be the practice with respect to putting that

8   information in?  How would it be done?

9   A    By Robert Potenza.

10  Q    How would Mr. Potenza do it?

11  A    He would write it in, and leave it for us for that day.

12  Q    Where would he leave it?

13  A    On the desk.

14  Q    Where is the desk?

15  A    The desk is in the office upstairs.

16  Q    With respect to the left-hand side of the sheet, where it

17  says "Name," could you please explain to us what that

18  information means?

19  A    Yes.  That's the -- one bartender, her name was Luisa.

20  Right underneath that is the next bartender, Alex.  Right

21  underneath that is the next bartender, and so forth.  The

22  left-hand side represents the daytime bartenders.

23  Q    What about the right-hand side of the sheet?

24  A    That represents the nighttime bartenders.

25  Q    Could you look at some of the individual fields.

1        For example, in the upper left-hand corner under the

2   name Luisa, it says "Reg," then the word "Tape" and a number

3   next to it.  Could you please explain to us what the

4   significance is of that information?

5   A     Yes, sir.  That's the register tape from her register.

6   That's the total sales for the day.

7   Q     Beneath that, there's a word that says "Bank" and has a

8   number next to it.  What's what?

9   A     That's the number, $1200, left from the bank.

10  Q     What does the "Total" represent?

11  A     That's the total of her bank and sales for that day.

12  Q     What was the practice as to who would record this

13  information down?

14  A     For the daytime, Richard Gleason, the daytime totals.

15  So, he totaled -- the right-hand side says "Cash pulled."  He

16  totaled all the money in her bank, and all the money from her

17  bank should total her register tape and her bank total.

18  Q     So, directing your attention, then, to the area that does

19  say "Cash pulled" on sort of the upper left-hand corner of

20  Government's 1719.

21        What's the significance of that information.

22  A     She's marking down what she had in her bank.  X-1 equals

23  singles, 78 --

24        THE COURT:  Hang on a second.

25        Mr. Morris, I known you need to make your record.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    It's starting to be quite obvious what these answers are.  If

2    you can expedite it a little, I would appreciate it.  I

3    understand X-1 are the ones, X-5 are the fives, X-10 are the

4    tens.  I got that.

5    Q    What would the total be, Mr.  Johnson?

6    A    That's a total of money in her bank.

7         THE COURT:  You're not really listening to me, are

8    you?  I understand.  Total is 2098 of all the ones, fives,

9    tens, twenties, fifties and hundreds.

10   Q    Where would the information be carried over to after this

11   form?

12        THE COURT:  To the coversheet.  There's nobody over

13   there.  You've just got one guy over here.  Just remember

14   that.

15        MR. MORRIS:  We'll move forward to the bottom of

16   this form, your Honor.

17   Q    With respect to the portion that's labeled "Dancer's

18   name" -- actually, a little cut off on the left --  "Dancer's

19   name" --

20   A    Yes.

21   Q    -- what do you understand this portion of the form to

22   be?

23   A    That was a list of the dancers for that day.  Mr. Potenza

24   would list the dancers on this sheet who were scheduled to

25   work, and so he had the daytime, and he also had to put the

1  nighttime dancers.

2  Q    And with respect to, for instance, lines 27 and 28, which

3  are blank, and then lines 30 to 38 are blank.  Do you have any

4  idea of the significance of why those blanks exist on the

5  form?

6  A    Yes.  He would leave those blank in case someone else,

7  another daytime dancer, came in or a swing-shift dancer would

8  come in, he left a little space in between the daytime and

9  nighttime.

10  Q    What's a swing-shift dancer?

11  A    A swing-shift dancer is someone who comes in 5:00 o'clock

12  or 4:00 o'clock and they work a swing shift.  They are not

13  there all day, and they are not there all night.  They are in

14  between.

15  Q    Do you see to the right on line number 41, next to the

16  name "Mia," there appears to be a checkmark there.

17          Do you have any idea what that means and how it got

18  there.

19  A    Yes.  I put that checkmark to show that Mia showed up for

20  that day.

21  Q    What was your practice with respect to those checkmarks?

22  A    I would have to check off who showed up, who was

23  scheduled, and who came in for that evening.

24  Q    To your understanding, why was this information reflected

25  on the form here?

1    A    Because Mr. Potenza, also, if a dancer didn't show up, he

2    fined them.  He wanted to know who was in the club that day.

3    Q    For instance, next to Box Number 51, it says "F R I D A,"

4    line number 51, "F R I D A." Looks like there's some text next

5    to that.  Can you make that out?

6    A    That's a no-show.  "NS" means no-show.  That dancer

7    didn't show up for that date.

8    Q    Can you tell who put that down there?

9    A    I did.

10   Q    How would you know to put it there?

11   A    The dancer didn't show up.  That, Mr. Potenza wanted to

12   know, so he could fine them at some point.

13   Q    With respect to the cash handling and the record handling

14   practices at the club, Mr. Johnson, could you please tell us

15   where the various streams of revenue were actually recorded?

16   Like, for instance, the admission for door fees, where were

17   they reflected?

18   A    They were collected and reflected on the coversheet.  The

19   cash registers were reflected on the coversheet, also.  The

20   house fees was wrapped up in a piece of paper with the names

21   of all the dancers on it and totaled and rubberbanded up in a

22   the safe for the owner.  The DJ, house fees were collected and

23   totaled and saved for the owner on a separate piece of paper.

24   The house-mom fees were collected and saved on another

25   separate sheet of paper.  Champagne room was also collected on

1   a separate piece of paper and then saved for the owner.

2   Q     With respect to all of those records, what was the

3   practice with respect to what would happen to them after the

4   records were generated?

5   A     They were totaled up, left in the tackle box in the

6   office for the owner for the next night.

7   Q     With respect to the door, was there a cash register at

8   the door?

9   A     Yes.

10  Q     During what period of time was there a cash register at

11  the door?

12  A     Just about all the time.  It started when we first opened

13  up, we didn't have a cash register.  It started at some point

14  a few years after that, maybe two or three years.

15  Q     Was that cash register always functioning, or was there

16  any problems with it?

17  A     It was always functioning.

18  Q     What record was generated from the cash register at the

19  door?

20  A     A cash-register receipt and tape.

21  Q     Was there a time when it was not generated at the front

22  door, a cash-register tape and receipt?

23  A     There might have been one day, but not many.  Basically,

24  we always had a tape and receipt at the door.

25  Q     Was there any checking done relative to the numbers of

1   people who came in at the club, like any kind of hand counting

2   or anything like that?

3   A    Yes.  There was a clicker given to the bouncer in the

4   daytime -- at nighttime.  And the daytime manager also had a

5   clicker clicking daytime patrons, customers.

6   Q    After the checks were completed on the clicker, what

7   happened to the information on the clicker?

8   A    The clicker was given -- the nighttime, it was given to

9   me by the security person to record on the coversheet.

10  Q    What was your practice with respect to the gathering of

11  the records upstairs in the office?  What did you do?

12  A    I had to put everything together and leave it in the

13  fishing tackle box for the owner to take a look at the next

14  day.

15  Q    Do you know what happened to the cash and the associated

16  records after you left them in the box?

17  A    Yes.  Mr. Potenza would come in roughly around 5:00 or

18  6:00 clock and do all the paperwork, count everything,

19  double-check all the monies to make sure that they balanced

20  out.

21  Q    Did you ever observe anybody other than yourself handling

22  any of the records at the club?  Let me clarify that question?

23       Did you ever observe any of the owners handling any

24  of the records that we just spoke about.

25  A    Yes.  He would generate it, count it, set it up for us;

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    Mr. Potenza, that is.  Al Reale would set that up, count it

2    and take a look at it, and Pat would look at it at the end of

3    the week.

4    Q    Now, in terms of the daily tally sheets, I think you --

5    this was actually on voir dire by Mr. O'Shea, you mentioned

6    something about Ms. Potenza leaving with the records?

7    A    Yes.

8    Q    What did you observe with respect to the daily tally

9    sheets we just looked at and Ms. Potenza?

10   A    Usually, the sheets would be left, totaled and

11   rubberbanded for the entire week on a pipe in the office on

12   the left-hand side in the front.  She would come in on a

13   Friday.  Even if she was working or not working, she would

14   reach up into that pipe, get those papers, and take them and

15   put them in her purse and she would leave.

16   Q    How frequently did you observe this practice?

17   A    That was basically every Friday.

18   Q    Did you ever have any occasions to discuss any of these

19   daily tally sheets with any of the owners of the business?

20   A    Yes, sir.  If we had some kind of discrepancy and they

21   wanted to look back at something, I saw Mr. Potenza go up in

22   the pipe and take it and look at it, and also Pat Potenza

23   would take it down and look at it to solve and problem and if

24   we needed to do something.

25   Q    Turning your attention to the cash received in the

1    business.  After you counted it upstairs in the office and

2    left it in the box for Mr. Potenza, do you have any idea where

3    it was stored at the club, the cash?

4    A    Yes.  There was a refrigerator on the left-hand side of

5    the desk, it wasn't functioning, but the money was stuffed

6    inside the refrigerator.  There was a lot of money stuffed

7    inside the refrigerator.

8    Q    Was that a common place to keep money in?  How frequently

9    was money kept in the refrigerator?

10   A    All the time.

11   Q    And it was not plugged in, or it didn't work?

12   A    No.  It didn't work.

13   Q    Any other place where you know that cash may have been

14   kept in the business?

15   A    There was a pipe on the left-hand side up on the top, a

16   pipe, money kept in the pipe on the left-hand side.

17   Q    Where was this pipe?

18   A    In the office, running across the length of the office.

19   Q    Any other areas that you are aware of where cash might

20   have been kept in the business other than the pipe and the

21   refrigerator?

22   A    There's like a little metal tin cabinet where he kept the

23   singles, but that's about it.

24   Q    Other than the daily records that we looked at in

25   Government's Exhibit 24, did you ever use any other mechanisms

1  to record cash received in the business back to the principals

2  of PRP?

3  A    No.

4  Q    One of the other areas you mentioned, Mr. Johnson, you

5  were involved with was the responsibility for paying

6  employees.  What method of payment does PRP use for its

7  employee payments?

8  A    Basically, cash.

9  Q    What is your understanding, sir, of the meaning of paying

10 employees on the books versus off the books?

11 A    Paying on the books is when they are getting their

12 federal tax taken out.  Off the books is when they are not

13 getting tax taken out.

14 Q    What were PRP's payroll practices during your tenure with

15 the club with regard to payment of its employees?

16 A    No one was paid on the books.  Basically, everyone was

17 paid half on and half off the books.

18 Q    How did PRP pay half on and half off?  Which employees,

19 for instance?

20 A    Security, bartenders, waitresses and bar backs.  They

21 were basically staff, so staff was paid.

22 Q    When did this process occur?

23 A    We did the taxes taken out on Fridays.  Thursday or

24 Friday.

25 Q    During what period were the employees you called staff

Case 1:10-cv-01866-BMC   Document 66   Filed 03/09/12   Page 74 of 300 PageID #: 1730

1   employees, paid half on, half off, during what period of your

2   tenure with the club?

3   A    Basically, all the time, they were not paying tax.  Or

4   they started doing half on and half off, I'd say, about five

5   or six years ago.

6   Q    Who set the practice up?

7   A    Robert Potenza.

8   Q    Was there anyone else involved with that aspect of the

9   business?

10  A    Pat Potenza was giving the half on and half off amounts.

11  Q    When you say that, giving amounts to whom?

12  A    She gave it to myself or Richie Gleason.

13  Q    How did the process work with respect to payroll for a

14  new employee?

15  A    We would have them fill out, I believe it was a W-4.  I'm

16  a little confused, W-4, W-2.  We would have them fill that

17  out, and she had asked me to put down how many days they were

18  working, and she would determine if they were going to be

19  getting taxed for two days, three days, one day or however she

20  did it.

21  Q    So, after you reflected information down on the W-4 or

22  W-2 form, what happened next with respect to Ms. Potenza?

23  A    She took the information.  About maybe a week or two

24  later, she came back with the total of how much taxes to take

25  out for that employee.

1   Q     How would the employee know what they were going to be

2   paid?

3   A     I would inform them of how much.

4   Q     Where would you get the information to put down on the

5   W-4 or W-2 form?

6   A     I would get that information from Pat Potenza.  She had

7   it on a sheet of paper.

8   Q     Initially, when you first gave her the form, did you put

9   any information on the W-2 or W-4?

10  A     Yes, how many days they were working, yes.

11  Q     Where did you get that information?

12  A     Well, I hired them, I gave them their schedule, I knew

13  they were working four days, two days, three days.

14  Q     How much did you pay the employees?

15  A     It was kind of a set amount.  A bouncer generally was

16  paid 120, depending.  The bartenders were paid $40, because

17  they were on a tips kind of payment.  And waitresses were paid

18  $60, I believe it was.  So, the set payments were set by

19  Robert Potenza and the Pat Potenza.

20  Q     What about, with respect to tax, when were taxes

21  withheld?

22  A     Taxes were, again, withheld on Fridays.

23  Q     Did anything strike you about the amount of taxes being

24  withheld?

25  A     They were very low for the amount of time people were

1  working.

2  Q    What makes you say that, sir?

3  A    There would be one gentleman who was security, he would

4  work five days, they took out maybe about $15 in taxes,

5  something like that.  That's kind of low.

6  Q    With respect to that security person, how much was that

7  person being paid gross?

8  A    160 a day.

9  Q    How much was taken out in taxes?

10 A    I believe it was 15.

11 Q    During what period of time?

12 A    For a one-week period.

13 Q    Were those figures consistent with conversations you had

14 with Ms. Potenza?

15 A    Yes.  She set the amount.  So, I knew what the amounts

16 were, yes.

17           MR. O'SHEA:  I object.  Move to strike, foundation,

18 your Honor, conversations.  It also not responsive to the

19 question.

20           THE COURT:  Overruled.

21 Q    With respect to Ms. Potenza, did you ever have any

22 conversations with her about the payroll of the company?

23 A    Well, we talked about it.  She would mention that she

24 would pay a person for one day versus the four days that they

25 were on the books or something like that, yes.

1    Q      Specifically, could you just explain that with a little

2    more clarity?  What was the nature of this?

3    A      To pay them half off the books.

4    Q      So, what specifically was your understanding from that

5    conversation?

6    A      That the person was not getting their full taxes taken

7    out.

8    Q      How did you know that?  Is that something she said to

9    you?

10   A      Yes, yes.  Basically, when the person works four days and

11   they are only going to put them on the books for two days, is

12   what she said.

13   Q      How would that change happen, you would go to Ms. Potenza

14   and tell Ms. Potenza something about when the person was

15   working?

16   A      Yeah.  I put on the sheet that the person was working

17   four days, and she would come back with their total, whether

18   she had them working -- paying taxes for one day, or had them

19   paying taxes for two days, three days, whatever she decided.

20   Q      Who made that decision?

21   A      Pat Potenza.

22   Q      What records were kept of employee payments?

23   A      Just on the coversheet from my end.

24   Q      Those were the daily tally sheets we looked at before?

25   A      Yes.

1    Q     What would happen to those records after you indicated

2    the amounts employees were paid?

3    A     Again, I would total everything up, and I would save it

4    for the owners to take.

5    Q     Mr.  Johnson, what was your financial situation like when

6    you were working at PRP?

7    A     I guess it was okay until 2007.  I had -- I borrowed

8    $21,000 from the company.

9    Q     Why did you have to do that?

10   A     I had a divorce, and I had a situation with a credit

11   card, and in order for me to refinance my house, I needed the

12   help.

13   Q     And how did you get help?

14   A     I first talked to Pat Potenza about my problem, and she

15   said that PRP Restaurant Corp. would help me.

16   Q     What were the circumstances of the loan that you referred

17   to in terms of the days and the amounts of the loan?

18   A     It was 2007, and it's for five years.  So, I guess it's

19   due October of 2012.

20   Q     How much was the loan for?

21   A     $21,000.

22   Q     What's the status of the loan as of today?

23   A     I believe I still owe about 9800.

24   Q     And how were payments made on that loan?

25   A     I was paying Ms. Potenza on a biweekly basis.

1    Q    Were there any other payments besides those that you paid

2    to Mr. Potenza on a biweekly basis?

3    A    Yes.  He started taking out more money from me January

4    2010.  He volunteered -- he just took it from me.  He didn't

5    ask me or discuss taking more money from me.  We had a set

6    amount that I was giving, and he decided he wanted more, so he

7    took more.

8    Q    Did you give him your consent in order for him to do

9    that?

10   A    No.

11   Q    What was your personal relationship like with

12   Mr. Potenza?

13   A    It was fine up until about 2008, when he started

14   harassing me about Barack Obama being the President.  From

15   2008 to April of 2010, it was just downhill all the way.

16   Q    What about President Obama being elected had anything to

17   do with you?

18   A    My feelings were that he sort of blamed me for him being

19   the President, and every day, just about, we argued about any

20   stand that Obama would take.  He left newspaper articles, look

21   what my guy is doing, look what my guy is doing.  He

22   threatened me, being Robert Potenza, about my stand or my

23   position on Barack Obama, and I begged him to stop, and I

24   didn't want to discuss politics with him.

25   Q    When did you leave the employ of the PRP?

1   A      April of 2010.

2   Q      What were the circumstances of your leaving?

3   A      There were three employees that I had paid $10 extra on a

4   Saturday right before that Monday and Tuesday.  I had given

5   then $10 extra on their pay, and he got very upset with me,

6   called me up and said that he was the owner and who was I to

7   do that.  And we went back and forth.  He did call me back I

8   believe later that day or the next day, and told me he wanted

9   me to fire those three employees.  I said it was not their

10  fault.  If you have a problem, you have a problem with me.  He

11  wanted me to fire them, because he was the owner.  So, I went

12  crazy, I went nuts with him, and that was it.

13  Q      What happened after you left the employ of PRP?

14  A      I had given Pat Potenza a call and told her that they had

15  owed me some pay, and she had met with me by my house about

16  three or four days later in Valley Stream, and she gave me the

17  checks and she had begged me to not report them.

18  Q      What do you mean by "not report them"?

19  A      She didn't want me to report them to the IRS.

20  Q      What was your understanding about what she was referring

21  to?

22  A      Their pay practices.

23  Q      How did you leave things with her at that meeting?

24  A      We had agreed -- I said to her, Okay.

25          She talked about how she saved her whole life for

1   what she had and she didn't want to lose it.

2           I liked working with Pat.  I had no problem with

3   Pat, so I said to her, I don't want to start anything, but I

4   can't stand that guy.  I don't know if I'm going to be able to

5   sleep at night.  Every day, I think about what he's done,

6   because that was my career, and he just -- incredible.  I just

7   asked her to pay my health insurance for a couple of months,

8   because I was starting another job.  I asked her would she

9   continue to do that, and she said, Yeah.  And I found out

10  about three or four weeks later that he decided not to do

11  that, and she told me I was on my own.

12  Q    What did you understand Ms. Potenza to be referring to

13  when she asked you to refrain from -- to keep your mouth

14  closed?

15          MR. O'SHEA:  Objection.

16          THE COURT:  Sustained.

17  Q    After you met with Ms. Potenza, what happened next?

18  A    Nothing happened for a while.  Then I guess in September,

19  late August or September, I contacted Vinny at the IRS.

20  Q    When did you first contact the IRS?

21  A    I think it was late August or early September.

22  Q    Of what year, sir?

23  A    I'm sorry.  2010.

24  Q    Why did you contact the IRS?

25  A    It was suggested if I want to get back at Butch, that

1    would be the best way to do it.

2    Q    Why did you want to get -- first off, when you

3    say "Butch," who are you referring to?

4    A    Robert Potenza.

5    Q    Why did you want to get back at Mr. Potenza?

6    A    Because I hated the guy.  I didn't like him.  I didn't

7    like what he had did.  I worked a long time for a career, and

8    the things that happened, I just couldn't stand it.  Couldn't

9    stand him.

10   Q    And after you contacted the IRS, what did the IRS -- what

11   did you tell the IRS?

12   A    I spoke to one of the agents, Vinny.  I gave him the

13   information that I had saved, the register sheets and

14   everything.  I had told him what I had, and he said he would

15   get back to me.

16   Q    Why did you have those records, to begin with?

17   A    I kept them in case I needed them for either to get back

18   at him or to protect myself.

19   Q    After you met with the government, what happened next

20   relative to your relationship with the folks at PRP?

21   A    I guess at some point in December, it was made known to

22   them or something that I was a witness.  Then quickly, a

23   lawsuit was filed against me for the domain name, Gallagher's

24   2000.  I received a subpoena from them I believe it was

25   December 7 from this lawsuit, and one week later, I received a

1  subpoena -- the lawsuit for the Gallagher 2000 domain name, on

2  December 14.

3  Q    Of what year was that, sir?

4  A    2010.

5  Q    Where were you sued in connection with the domain name of

6  Gallagher's?

7  A    It was in federal court, I guess the same building.

8  Q    What's the nature of the allegations that are advanced in

9  that suit?

10 A    It's being said that I stole the domain name Gallagher's

11 2000.

12 Q    What was your response to the suit, sir?

13 A    I deny stealing it.

14 Q    What's the status of that action?

15 A    Right now, it's on hold, because it's running alongside

16 this case.  So, the Judge Azrack, I think it is, she suspended

17 it until after this case is over.

18 Q    Has the government offered you anything today, Mr.

19  Johnson, in exchange for your testimony here?

20 A    No.

21 Q    Has the government offered you immunity of any kind

22 whatsoever?

23 A    No.

24 Q    Is there anything that you are aware of to prevent the

25 government from charging you with any crimes in connection

1   with any of your activities at PRP?

2   A    No.  I just think that after helping them, that it

3   wouldn't be something that they would do.

4            MR. MORRIS:  Thank you very much, Mr.  Johnson.

5            THE COURT:  All right.

6            Cross-examination.

7   CROSS-EXAMINATION

8   BY MR. O'SHEA:

9   Q    I think you said that the government hasn't done anything

10  for you, and you said the government hasn't done anything to

11  you; isn't that right?

12  A    That's correct.

13  Q    At some point, you did ask the government for something,

14  didn't you?

15  A    No, not that I know of.

16  Q    You told them you couldn't afford a lawyer?

17  A    I didn't ask them that.  I told them that I couldn't

18  afford a lawyer.  Actually, the way it happened is, I had told

19  that I got a subpoena from your firm, and I thought that it

20  was unfair what they were asking of me, since I was not on

21  trial.  When I called Mr. Guerci, he said, Hold on a second.

22  Let's see what's going on.  They wanted to get me an attorney

23  to protect my rights.

24  Q    That was Mr. Guerci's idea?

25  A    It was not his idea.  He said he would get back to me.

Johnson - cross - O'Shea                    85

1   Q     Ultimately, you did -- the government provided you access

2   to the lawyer who is representing you?

3   A     Yes.

4   Q     You told them that you couldn't afford your own lawyer;

5   correct?

6   A     Yes.

7   Q     You told them you were unemployed?

8   A     Correct.

9   Q     Were you unemployed?

10  A     Yes.

11  Q     So, it's your testimony under oath that from the time you

12  left Gallagher's in April of 2010 until you started your

13  business, this sports bar you told us about, you have been

14  unemployed?

15  A     Yes.

16          MR. SINGER:  Objection, your Honor.

17          THE COURT:  The answer is out, Mr. Singer.  I think

18  I'll allow you to tell your client that he should wait a

19  minute to see if you want to object to any question before he

20  answers the question.

21          MR. SINGER:  I'll consider him told.

22          THE COURT:  Let's proceed.

23  Q     Now, you told us that the tally sheet, when you went

24  through Government's Exhibit 24, I think at pages 1718 and

25  1719, you told us that those were sheets that were records of

1    the company?

2    A    Yes.

3    Q    And you also told us in your direct testimony that Pat

4    Potenza said, in a conversation you claimed to have had with

5    her, that she was going to pay employees half on the books and

6    half off the books?

7    A    Yes.

8    Q    And did you also say that she took the records every

9    Friday?

10    A    Yes.

11    Q    And you saw her do that?

12    A    Yes.

13    Q    So, you saw her every Friday?

14    A    Well, every Friday, she was working or she stopped by.

15    She might have been on vacation and she didn't do it that

16    Friday.  Generally, most of the time, yes.

17    Q    So, excluding vacation period, it's your testimony you

18    saw Pat Potenza every Friday?

19    A    Well, yes -- I wouldn't say every Friday.  Basically,

20    most Fridays, yes.

21    Q    What time did you come in on a Friday?

22    A    I was there at 7:00 o'clock, 7:30.

23    Q    It's your testimony that Pat Potenza, 7:30 in the

24    evening, 7:30 to 8:00 in the evening, was on the premises

25    every Friday?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1  A    Not 7:30 to 8:00 o'clock.  She sometimes would come in

2  like 9:00, 10:00 or 11:00, something like that.  I'm talking

3  about as a general practice, sir.

4  Q    Is it your testimony that, generally speaking,

5  Ms. Potenza would be there in the evenings on Friday?

6  A    In the evenings on Friday, she would either stop by or

7  she was working on a Friday.

8  Q    Okay.  That's just about every Friday, excluding

9  vacations?

10  A    And something else, yes.  Most of the time.

11  Q    You told us that these door register tapes, that they

12  were always kept?

13  A    Yes.

14  Q    And those door register tapes were always in the register

15  and then printed in ink?

16  A    Yes.

17  Q    Is it your testimony that the door register tape, the

18  door register, always had a tape in it?

19  A    I said most of the time it did, yes.

20  Q    Most of the time?

21  A    Yes.

22  Q    And did that door register tape, the times that it was in

23  the register, did it always print legibly?

24  A    Not always print legibly.  You know what we had to do

25  sometimes, we had to take a pencil and kind of go over the

Johnson - cross - O'Shea                    88

1    numbers if the ribbon wasn't dark enough.  We would take a

2    pencil, so we could get the number.

3    Q    Would you agree with me that the door register tape was

4    not fully operational?

5    A    Fully operational?  Sometimes we had a problem with it,

6    yes.

7    Q    And you would also agree with me that when you presented

8    Government's Exhibit 24, that you were trying to get

9    Mr. Potenza in trouble, you didn't produce any door register

10   tapes that went along with those sheets; correct?

11   A    That's correct.

12   Q    Even though you knew that the door register tapes -- you

13   would agree with me, those are the best evidence of what

14   happened at the door, according to your testimony?

15   A    Yes.  The other one would be that these sheets had to

16   match for him to see, because if these sheets didn't match the

17   totals I left, I wouldn't be there.

18   Q    So, you would agree with me, though, that, going back to

19   my question, that the door register tapes are the best

20   evidence of what actually occurred at the register?  Wouldn't

21   you agree?

22   A    It's one of the ways.  The other one is that I made sure

23   that these records were right, and each day that he checked

24   them, they were right.  And the fact that I was there

25   throughout the day I left means that they were correct.

Johnson - cross - O'Shea                    89

1   Q     You agree with me today that Government's Exhibit 24,

2   what happened on the particular days for which you have

3   produced a so-called record, that we only have your word as to

4   what's on the page; correct?

5   A     That, and the fact that each day, if it was not correct,

6   I would no longer be working there.

7   Q     Again, we have your word for that?

8   A     Yes.

9   Q     You would agree that if you had copied the bar tapes, the

10  register tapes, that that would be confirming evidence of what

11  you say occurred on the days for which you have produced an

12  alleged record that corresponded to Government's Exhibit 24;

13  correct?

14  A     Yes.

15  Q     Okay?

16        Now, you're not the only manager who used these

17  tally sheets; correct?

18  A     That's correct.

19  Q     And you haven't produced, in Government's Exhibit 24, a

20  single sheet on the days when Dennis Schmidt worked, Sundays

21  or Mondays; correct?

22  A     That's correct.

23  Q     Mr. Schmidt, you know, is a retired New York City Police

24  Officer?

25  A     Correct.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Case 1:10-cv-01866-BMC   Document 66   Filed 03/09/12   Page 90 of 300 PageID #: 1746

1    Q    And you never -- when you wanted to get Butch Potenza in

2    trouble, you never bothered to copy one of these sheets from

3    Mr. Schmidt?

4    A    No.

5               (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cv-01866-BMC  Document 66  Filed 03/09/12  Page 91 of 300 PageID #: 1747

1  EXAMINATION CONTINUES

2  BY MR. O'SHEA:

3  Q    Because you couldn't find them?

4  A    No.  I wasn't working that day and, again, my motive for

5  copying sheets were different.

6  Q    Didn't you tell us that those sheets were kept on the

7  pipe for the week?

8  A    I didn't copy them from the pipe.

9  Q    Sir, you would agree that if the -- if the sheets were

10  kept, after Mr. Schmidt worked Sunday and Monday, when you

11  came in on Tuesday, if they were in fact kept by the business

12  you could have copied them, correct?

13  A    Yes, I guess, yes.

14  Q    And you didn't?

15  A    Right.

16  Q    Now, Mr. Gleason, he was the day manager on the days you

17  worked, correct?

18  A    Correct.

19  Q    He was also a retired New York City police officer,

20  correct?

21  A    That is correct.

22  Q    And worked with you pretty much everyday?

23  A    Yes.  He worked the same schedule, Tuesday through

24  Saturday.

25  Q    And going to Exhibit 24 and what we talked about earlier

GR        OCR        CM        CRR        CSR

1    when I had a few questions for you, you said you copied these

2    sheets at the end of the day, correct?

3    A    Yes.

4    Q    Did you ever copy a sheet midday?

5    A    What do you mean by midday?

6    Q    Okay.  Fair enough.

7          Did you ever copy a sheet that Mr. Gleason would

8    give to you at shift change?

9    A    I wasn't copying his sheet.  I was copying the sheet for

10   the nighttime.

11   Q    Fair enough.

12          But I think your testimony -- correct me if I am

13   going wrong here -- your testimony is that the sheet was

14   filled out with some information at the beginning of the day?

15   A    Yes.

16   Q    The night -- the day manager would fill in some

17   information, right?

18   A    Yes.

19   Q    And then hand the same sheet to you on that same day when

20   you came on for the night shift?

21   A    That is correct.

22   Q    Okay.  So did you ever copy that sheet before the end of

23   the night, when the day shift manage, Mr. Gleason, turned it

24   over to you?

25   A    I'll be honest with you, I saw the sheet before so I said

GR        OCR        CM        CRR        CSR

1   no before.  But I guess I did.

2   Q    I guess you did.

3        And you know you did, didn't you?

4   A    No, sir, I didn't know for sure.

5   Q    You didn't know it?

6        You hadn't remembered that at the time when you

7   first -- when I first asked you that question you gave that

8   answer?

9   A    Yes.

10  Q    Okay.  Let's go back to that, sir.

11  A    Okay.

12  Q    Exhibit 24, and it is 1666, and the corresponding --

13  well, withdrawn.

14       The other sheet that's reflective of the same date

15  is 1667, is that right?

16  A    Yes.  I'm sorry.

17  Q    Let me know when you are ready.

18  A    Okay.

19       (Pause.)

20       1666, yes.

21  Q    Okay.  So 1666 and 1667 are from the same day,

22  September 11, 2009, correct?

23  A    Correct.

24  Q    And 1666 does not have as much information on it as 1667,

25  correct?

1    A    Correct.

2    Q    Fair to say, you photocopied this page 1666 at some point

3    before the day was over?

4    A    Yes.

5    Q    You did that on a regular basis?

6    A    No.  Actually, this was probably copied maybe say about

7    2:30, 3:00 o'clock in the morning.  Okay.  So it was probably

8    before I filled in everything else but I -- I decided to wait.

9    It could have been maybe I didn't think I had enough time but

10   I am not sure.

11              But the reason why I know it was copied that late is

12   because I do have all the other security people for the

13   nighttime here.  Nothing to do with Richie Gleason but my name

14   is here, Ivan's name is here, Andre, Jason, these are all

15   nighttime people.

16   Q    You would agree with me, sir, that you have in your

17   possession copies of sheets that you took a copy of before the

18   day was over, correct?

19   A    Yes.

20   Q    And you maintained those in your possession after you

21   left PRP, right?

22   A    Yes.

23   Q    You maintained those in your possession after the day and

24   after you left the employee of PRP, correct?

25   A    Yes.  Whatever I copied I kept.

1    Q     You told us that you hate Butch Potenza, right?

2    A     Yes.

3    Q     You want to get him, don't you?

4    A     Yes.

5    Q     So you had the ability -- withdrawn.

6          You knew and you know today that these are all

7    photocopied documents, correct?

8    A     Correct.

9    Q     And there is nothing to indicate when -- there is no date

10   stamp or anything else on this document?

11         There is just your word for it, correct?

12   A     Correct.

13   Q     And you know because they are photocopies that you could

14   fill in any numbers you wanted in 1666 and make it 1667,

15   correct?

16   A     I guess, yes.  Yes, yes.

17   Q     You could have done it at any time, right?

18   A     Yes.  That particular one, yes.

19   Q     Could have done it after the fact, right?

20   A     Yes.

21   Q     You are acknowledging that you have every motive to do,

22   that correct?

23   A     Yes.

24   Q     And you have acknowledged that you didn't keep the

25   register tapes, right?

Case 1:10-cv-01866-BMC   Document 66   Filed 03/09/12   Page 96 of 300 PageID #: 1752

1    A     Right.

2    Q     You could have done that but you decided not to, correct?

3    A     Correct.

4    Q     And 1672 and 1676, if you look at those two pages of

5    Exhibit 24, if you would?

6          MS. HILL:  I'm sorry.  Could you repeat those

7    numbers, please?

8          MR. O'SHEA:  Sure.  1672 and 1676 within Exhibit 24.

9    Q     Would you agree, sir -- do you have those pages?

10   A     Yes.

11   Q     Okay.  Would you agree, sir, that this is another example

12   of two sheets with different information on it for the same

13   day, September 19th -- well, there is no -- but

14   September 19th, a Saturday, correct?

15   A     Yes.

16   Q     And again, this is another example of a sheet for which

17   you had a copy and could have filled in this information at

18   any time, correct?

19   A     That's way it looks, yes.

20   Q     Well, it's not only the way it looks.  It is correct,

21   isn't it?

22   A     Again, what happened was I probably copied it earlier

23   because the information I needed was already on there and

24   for -- for the purpose of how they were paying people, it's --

25   so -- later on at night I probably just copied the whole

GR      OCR      CM      CRR      CSR

1   sheet.

2   Q    You are not sure?

3   A    It's a lot of sheets.

4   Q    So you are not sure?

5   A    That's probably what happened, yes.

6   Q    But you are not sure?

7   A    I am not sure.

8   Q    Okay.  Sir, you agree that with the -- the same with the

9   earlier page I showed you, that you had every motive to put

10  something on that page without corroboration of a cash

11  register tape in order to get Butch Potenza, correct?

12  A    You say that but the sheet I left him was the proper

13  sheet.  That was this sheet.

14  Q    Can I have the answer to my question?

15  A    Yes.

16  Q    The answer is yes?

17  A    Yes.

18  Q    Now, fair to say that as the general manager it was not

19  part of your duties to keep or look after the books and

20  records of the company?

21  A    That's correct.

22  Q    You don't know if they were kept in a file or hanging

23  files or any method of storage at all?

24  A    No.

25  Q    Would it surprise you to learn that Mr. Schmidt and

Case 1:10-cv-01866-BMC   Document 66   Filed 03/09/12   Page 98 of 300 PageID #: 1754

1    Mr. Gleason say these records were not kept?

2    A     These records here?

3    Q     Yes, sir.

4    A     That would surprise me, yes.

5    Q     Now, you have asserted the Fifth Amendment in response to

6    questions having to do with your salary and payments received

7    by you at PRP, correct?

8    A     Yes.

9    Q     And you took the Fifth on the filing of the accuracy of

10   your own taxes?

11   A     Yes.

12   Q     It is true, sir, that you didn't -- you didn't file your

13   taxes for 2009, correct?

14            MR. SINGER:  Objection.

15            THE COURT:  Okay.  What do you want to do,

16   Mr. Singer?

17            MR. SINGER:  I want to advise my client not to

18   answer that question, to take the Fifth Amendment.

19            THE WITNESS:  I take the Fifth.

20            THE COURT:  Next question.

21   Q     Okay.  And isn't it true that you took the Fifth at your

22   deposition on the employment that you have had since

23   Gallagher's, correct?

24   A     Yes.

25   Q     And you intend to take the Fifth if I ask you questions

GR        OCR        CM        CRR        CSR

1   about that today?

2   A    Yes.

3   Q    You have collected Unemployment since leaving

4   Gallagher's, correct?

5   A    Yes.

6   Q    And you did that despite the fact that you quit, right?

7   A    I didn't quit.  Pat -- me and pat had a conversation and

8   Pat said she fired me.  The conversation went that if -- I had

9   an argument with Butch and she said that you left.  I said I

10  didn't leave.  So then I said to her, if I left, then I'll

11  come back to work.  So then she said that I was fired.

12  Q    Mr. Johnson, you gave a deposition in this case back in

13  February, correct?

14  A    Correct.

15  Q    You were under oath just like today?

16  A    Yes.

17  Q    Do you recall being asked questions about going to the

18  Labor Board about Butch Potenza?

19  A    Yes.

20  Q    Do you recall testifying that you went to the Labor Board

21  about Mr. Potenza the very day after you quit?

22  A    I didn't go -- I had a phone -- made a phone call.

23  Q    Okay.  So the very day after you quit you made a phone

24  call --

25            THE COURT:  Sorry.  One second, please.

1          (Pause.)

2          Okay.  Go ahead.

3          MR. O'SHEA:  Thank you, Your Honor.

4    Q    The very day after you quit you made a call to the Labor

5    Board to report Butch Potenza?

6    A    I wouldn't say quit.  But the day after we parted ways, I

7    made a phone call, yes.

8    Q    Okay.  Well, let me ask you if you were asked this

9    question and gave this answer at your deposition, page 169,

10   line 18 through line 24.

11         Let me know when you have it.

12         MR. SOCKOL:  May I approach?

13   Q    Mr. Johnson, I am handing you your deposition.  My

14   question has to do with page 169 of you are earlier sworn

15   testimony.

16   A    169?

17   Q    Yes, sir.

18   A    Okay.

19   Q    Would you look at line 18 and were you asked this

20   question and did you give this answer at your deposition in

21   February of this year?

22         Question:  You just mentioned that you went to the

23   Labor Board.  Explain that.

24         Answer:  I told the Labor Board --

25         When was this first of all?

GR       OCR       CM       CRR       CSR

1              Answer:  Right after I quit.  One day after I quit.

2         Do you see that?

3    A    Yes, I see that.

4    Q    That's your testimony saying you quit, right?

5    A    Right.

6    Q    Did you quit?

7    A    I was -- it was -- we were -- again, it's a situation

8    where we had a big argument and it was -- I know I couldn't go

9    back to work and he wasn't taking me back to work and when I

10   spoke to Pat Potenza she said I was fired.

11   Q    Well, you are saying that Pat Potenza told you you were

12   fired when?

13   A    That was Wednesday, Wednesday of that day.  I think or

14   Thursday.

15   Q    Was that the time when you say she met you off premises

16   after you left Gallagher's?

17   A    No.  She met me after that.

18   Q    Was that the time when you say that she said -- begged

19   you not to report?

20   A    No.

21            We had a phone conversation before because I -- I

22   told her -- when I called her and told her that she owed me

23   money, she wasn't going to pay me my money.  She wasn't going

24   to give me my check.  I told her that I would come back to

25   work then.  She says no, you can't.  We changed the locks.  So

1  I said that means I'm fired.  So she says no, we are not going

2  to fire you.  And so she thinks -- I said well, I'll come back

3  to work then.  Then she said I was fired.

4  Q    You agree that none of this version was given in response

5  to any question at your deposition, correct?

6  A    I understand.

7  Q    You agree with that, right?

8  A    Yes, I agree with you.

9  Q    Now, you took the Fifth in your deposition about working

10 at a competing club called Starlet's?

11        Do you recall that?

12 A    Yes.

13 Q    Did you work at Starlet's?

14        MR. SINGER:  Objection.

15        THE COURT:  Are you instructing your client?

16 A    I am taking the Fifth.

17        MR. SINGER:  I am advising my client to take the

18 Fifth to that question.

19        THE WITNESS:  I am taking the Fifth.

20 Q    After you left Gallagher's and before you started the

21 sports bar, when you told the agent you couldn't afford a

22 lawyer, isn't it true you were working at Starlet's?

23        MR. SINGER:  Objection.

24 A    I am taking the Fifth.

25 Q    What about Goldfinger Infinity, another club?  After you

GR        OCR        CM        CRR        CSR

Johnson - cross - O'Shea                                    103

1    left Gallagher's 2000, isn't it true you were working at

2    Goldfinger Infinity?

3              MR. SINGER:  Objection.

4    A    I am taking the Fifth.

5    Q    You also took the Fifth on tip income that you received

6    at Gallagher's 2000 at your deposition in February, correct?

7    A    Yes.

8    Q    And did you pay all your taxes on your tips that you

9    received at Gallagher's 2000?

10             MR. SINGER:  Objection.

11   A    Taking the Fifth.

12   Q    Now, you told us that the DJ and the house mom paid a

13   kickback to the house.  I think you called it a kickback.

14             Do you recall that, your earlier testimony?

15   A    Did I say kickback?  Or paid back to the house.

16   Q    Okay.  So fair to say that the -- the DJ paid a certain

17   amount of the tips he received from a dancer to the house?

18             Was that your testimony?

19   A    Yes.

20   Q    And the same thing with the house mom?

21   A    Yes.

22   Q    Isn't it true, sir, that while you were working at

23   Gallagher's 2000, it was your arrangement that you got that

24   money?

25             MR. SINGER:  Objection.

GR        OCR        CM        CRR        CSR

Johnson - cross - O'Shea                    104

1    A    I am taking the Fifth.

2    Q    So you are taking the Fifth on monies that you claim

3    Mr. Potenza and Ms. Potenza and PRP got, you are taking the

4    Fifth on a question about whether you got that money, correct?

5    A    Correct.

6    Q    Do you recall selling liquor bottles at Gallagher's 2000

7    for cash and pocketing that cash?

8            MR. SINGER:  Objection.

9    A    I am taking the Fifth.

10           MR. SINGER:  Could I consult with my client?

11           MR. O'SHEA:  Your Honor, there is a question

12   pending.

13           THE COURT:  He took the Fifth.  He did.  He just

14   answered that way.

15           MR. O'SHEA:  I'm sorry.  I didn't hear.

16           THE COURT:  Ask another question.

17   Q    Now, you were also asked questions at your deposition

18   about the particular sheets, Exhibit 24, where they reflect

19   income to you.

20           Do you recall that?

21   A    Yes.

22   Q    Fair to say that you didn't pay your taxes on that money,

23   correct?

24           MR. SINGER:  Objection.

25   A    Taking the Fifth.

GR        OCR        CM        CRR        CSR

Case 1:10-cv-01866-BMC   Document 66   Filed 03/09/12   Page 105 of 300 PageID #: 1761

1    Q    So fair to say that any question specific to these

2    records as it involves you and the monies you kept, you are

3    going to take the Fifth on?

4    A    Yes.

5    Q    Do you know someone named Tom Palma?

6    A    Yes.

7    Q    Who is he?

8    A    He runs a company called Ad Design.

9    Q    How do you know Mr. Palma?

10   A    I have done business with him as far as placing ads for

11   Gallagher's 2000.

12   Q    Any other -- any other club that you placed ads for with

13   Mr. Palma?

14   A    Yes, a couple of clubs.

15   Q    Which?

16   A    Starlet's.

17   Q    Starlet's?

18   A    Yes.

19   Q    You placed those ads while you were working at Starlet's

20   after you left Gallagher's 2000, correct?

21   A    Taking the Fifth.

22            MR. SINGER:  Your Honor, may I consult with my

23   client?

24            THE COURT:  Yes.

25            (Pause.)

GR        OCR        CM        CRR        CSR

1          MR. SINGER:  Thank you, Your Honor.

2          THE COURT:  All right.

3     EXAMINATION CONTINUES

4     BY MR. O'SHEA:

5          MR. O'SHEA:  May I have the last question read,

6     please?

7          (Record read.)

8     A    I placed those ads for Starlet's after I stopped working

9     for Gallagher's 2000.

10    Q    Okay.  You placed those ads for Starlet's while you were

11    working there, correct?

12         MR. SINGER:  Objection.

13    A    I take the Fifth.

14    Q    You're email address is Gents Web at AOL Dot Com,

15    G E N T S, W E B, at AOL Dot Com?

16    A    That is correct.

17    Q    And I would like you to look at Exhibit D in your book in

18    front of you.

19         MR. SOCKOL:  Your Honor, may I approach the bench?

20         THE COURT:  Yes.

21         MR. SOCKOL:  The witness.

22         THE WITNESS:  Not this book?

23         MR. SOCKOL:  Those are the government exhibits.

24    These are the lettered exhibits.

25    A    Yes.

GR        OCR        CM        CRR        CSR

Johnson - cross - O'Shea                    107

1    Q    Okay.  Now, I think you told us in your direct testimony,

2    you told the Court today, under oath, that you had not worked

3    from the time you left Gallagher's 2000 until you started your

4    sports bar, is that right?

5    A    That's correct.

6    Q    And is that truthful?

7         MR. SINGER:  Objection.

8    A    I take the Fifth.

9    Q    Sir, why don't you look at -- within Exhibit D, Bates

10   number AD-0032.

11        Do you have that, sir?

12   A    Yes, 32, yes.

13   Q    And this is an email from Gents Web at AOL Dot Com to Tom

14   at Ad Design Limited Dot Com, you see that?

15   A    Yes.

16   Q    Did you send the email?

17   A    Yes.

18   Q    It is your email address, right?

19   A    Yes.

20   Q    You sent it on July 26, 2010, a couple of months after

21   you left Gallagher's 2000, correct?

22   A    Correct.

23   Q    It is signed by you?

24   A    Yes.

25   Q    It talks about placing an ad campaign for another club

GR        OCR        CM        CRR        CSR

Johnson - cross - O'Shea                              108

1    called Starlet's?

2    A    That's correct.

3    Q    A club that you were working at at the time?

4         MR. SINGER:  I object.

5    A    Taking the Fifth.

6    Q    Well, the --

7         THE COURT:  Mr. Johnson, don't look at me,

8    Mr. Johnson.  It is between you and your lawyer.

9         THE WITNESS:  Okay.

10        MR. O'SHEA:  Pardon me, judge.

11   Q    Why don't you look at 24, AD-0034?

12   A    0034?

13   Q    Yes.

14        It is an email you sent on or about November 17,

15   2010?

16   A    Yes.

17   Q    And in the body of the email -- well, the subject line

18   says Starlet's ad, correct?

19   A    Yes.

20   Q    And it says:  Hi, Tom.  I'm working with Starlet's now

21   and Tommy D is no longer handling the ads.  We would like to

22   get an ad out this week, Friday, for Daily News and Post.

23        You see that?

24   A    Yes, I see that.

25   Q    Fair to say, you told Mr. Palma that you were working at

GR        OCR        CM        CRR        CSR

1  Starlet's on November 17, 2010, correct?

2  A    No.  It doesn't say I'm working at Starlet's. I was

3  helping them to create the ad.  One of the owners at Starlet's

4  is a friend of mine.  Him being a friend of mine, he knowing

5  that I was good at placing ads, I was trying to place ads for

6  them.  I did place an ad for them and used my credit card on a

7  couple of occasions to try to help them.  At that time I was

8  planning on working at another place which fell through.

9  Q    You used your personal credit card to pay for a club's

10  advertising?

11  A    Yes.

12        They reimbursed me.

13  Q    Were you working with them in any other capacity,

14  Mr. Johnson?

15  A    No.

16  Q    Why don't you look at AD-004 to 005?

17  A    AD-004?  004?

18  Q    Yes, sir.

19  A    Okay.

20  Q    Do you have it?

21  A    Yes.

22  Q    Fair to say, this is an invoice for an ad to Starlet's

23  Gentleman's Club?

24  A    Yes.

25  Q    For $1,350?

1    A    Yes.

2    Q    And the next page, 005, shows that you paid with your

3    credit card?

4    A    Yes.

5    Q    These are documents Mr. Morris has shown you before your

6    testimony here today, correct?

7    A    Yes.

8    Q    And it is your testimony that now you were not working

9    with Starlet's but you were paying their bills after you left

10   Gallagher's 2000?

11   A    I didn't pay their bills because they paid me back.  They

12   wrote me a check to reimburse me for these totals.  I didn't

13   pay their bills.

14   Q    Tell us again why Starlet's couldn't pay it themselves?

15   A    Well, they didn't have a credit card -- that's what they

16   told me -- at the time.  So I -- I put it on mine.

17   Q    Did they have cash or check?

18   A    I don't -- I don't exactly know what they had.  I just

19   placed the ads for them, to try to help them because

20   the -- the Russian agent was very good friend of mine and he

21   wanted to help in getting that place off the ground.  You

22   don't have --

23   Q    I'm sorry?  The Russian -- what was the Russian's name?

24   A    Kasha, I think.

25   Q    Did you tell Kasha, look, Kasha, I am a little short

GR        OCR        CM        CRR        CSR

1    myself to pay $1,350 on my American Express card because I am

2    unemployed?

3    A    I didn't talk to him about it.  But they -- as soon as I

4    placed the ad, I had the check before the bill came.

5    Q    You were collecting Unemployment, right, during this time

6    period?

7    A    Yes.

8    Q    And when did that start?

9    A    I think sometime the first or second week in May.

10   Q    It continued through the rest of the year 2010?

11   A    Yes.

12   Q    It was during the time that you were placing these ads

13   for Starlet's and paying for them?

14   A    Yes.

15   Q    Did anyone from the government ever question you about

16   that?

17   A    They spoke to me about it when they showed me this.  But

18   I explained to them that I was paid by the -- by the club

19   right away.  It wasn't that I paid for it for them.  Like I

20   keep saying.

21   Q    Well, when you left Gallagher's, you were unemployed,

22   right?

23   A    Yes.

24   Q    You have a house, right?

25   A    Yes.

1   Q      Mortgage?

2   A      Yes.

3   Q      Five kids?

4   A      Yes.

5   Q      And you were a little cash strapped?

6   A      Not right away, but yes.

7   Q      Isn't it true that within a month you went out and bought

8   a $10,000 Waverunner?

9   A      Yes.

10  Q      Did Mr. Guerci or Mr. Westrich, who set up your lawyer

11  Mr. Singer here at government expense, did they question you

12  about how you could afford a Waverunner when you were

13  unemployed and say you couldn't afford a lawyer?

14  A      Well, I am not the only one working in my house.  I

15  thought I was getting another job three months later.  So I

16  had a little bit of money saved at that point.  That was

17  in -- in July.  So that was kind of like my -- you know, kind

18  of a present for my girlfriend and myself.

19  Q      Okay.  But did you tell the government that you had other

20  sources of income when you told them you couldn't afford a

21  lawyer?

22  A      What other source of income do I have?

23  Q      Did you say that you -- what did you say, your wife

24  worked?

25  A      No, girlfriend.

Johnson - cross - O'Shea                    113

1   Q    Pardon me.  That your girlfriend worked?  You had other

2   sources of income?

3   A    They never asked.

4   Q    They never asked?

5   A    No.

6   Q    Didn't you have to fill out a form to say what sources of

7   income you had?

8   A    What source of income I had, yes.

9   Q    Did you -- did you say on the form that you had income

10  from other sources, like your girlfriend?

11  A    Well, at the time I didn't have income from the

12  girlfriend.  She takes care of the family stuff.  I mean, I am

13  paying my mortgage and I was paying my -- my other bills the

14  best way I could.

15  Q    Well, do you know a company called JZ Entertainment Group

16  Limited -- LLC?

17  A    Yes.

18  Q    And that is -- that's your company, right?

19  A    Yes.

20  Q    And you formed that in January of 2011?  January of this

21  year?

22  A    Yes.  January or February I think it is.

23  Q    And that's -- well, let me just lock down the date,

24  Judge.

25           Why don't you look at Exhibit J in your book?

GR      OCR      CM      CRR      CSR

1    A    Yes.   January 14th it says here.

2    Q    Okay.   That's on page 5313 of the exhibit on the stamp,

3    right?

4    A    Yes.

5    Q    So this was a couple of weeks before your deposition,

6    right?

7    A    Yes.

8    Q    At your deposition you had Mr. Singer representing you,

9    correct?

10   A    Yes.

11   Q    And you took the Fifth multiple times on your sources of

12   income, right?

13   A    Right.

14   Q    And where did you get the cash to start the bar?

15   A    I had a 401(K) that I had -- was saving and I had my life

16   insurance policy.

17   Q    Did you put that on the form where you applied to get a

18   free lawyer from the government?

19   A    Well, that -- this part wasn't on the form that asked me

20   what I had.   Just asked me my on hand cash.

21   Q    So the answer is no, you didn't put it --

22   A    No, I didn't put that on there.

23   Q    Fair to say, that when you wanted to start the business

24   you easily accessed cash that you had saved in those sources

25   you just told us about?

1   A    Yes.

2   Q    You filed this document for JZ Entertainment -- by the

3   way, what's the d/b/a for JZ Entertainment?

4   A    Behind Bars.

5   Q    Is that the name of the establishment?

6   A    Yes, Behind Bars.

7   Q    Did you tell Mr. Guerci or Mr. Westrich that you were

8   going to do this, that you were going to file this document

9   and start your business?

10  A    No, I didn't.

11  Q    Now, you told us a little bit in direct examination that

12  you met with Pat Potenza after you left Gallagher's 2000 and

13  you told her that you hate Butch Potenza's guts?

14  A    Yes.

15  Q    And she gave you the money that you were owed for working

16  at Gallagher's 2000, right?

17  A    Yes.

18  Q    You say that she begged you not to report Gallagher's?

19  A    Yes.

20  Q    Did you ever -- did you ever send a -- a threatening note

21  to Pat Potenza?

22  A    I guess so, yes.

23  Q    You didn't tell the government about that?

24  A    Well, I did, yes.

25  Q    I didn't hear it in your direct examination.

GR        OCR        CM        CRR        CSR

Johnson - cross - O'Shea                    116

1              Isn't it true, sir, that after you left Gallagher's,

2    you said that if you, PRP, if you don't forgive this loan, I

3    am going to cause you trouble, words or substance?

4    A    Yes.

5    Q    Why don't you look at Exhibit I, please, in your book?

6    A    Yes.

7    Q    On page 5319, if you turn it upside down, the document

8    shows that you faxed this document on May 24, 2010.

9              Do you see that?

10   A    Yes.

11   Q    That was -- this is a document you faxed to Pat Potenza,

12   correct?

13   A    Right.

14   Q    It says:  As per our agreement, this needs to be signed

15   paid in full by May 25, 2010, by you, Robert Potenza.  If not,

16   appropriate actions will be forthcoming, Mr. Joe Johnson.

17             You see that?

18   A    I see that.

19   Q    This is something you sent?

20   A    Yes.

21   Q    The appropriate action will be forthcoming would be that

22   you would do something to report him to whatever authority you

23   could, right?

24   A    Yes.

25   Q    You'd already tried the Labor Board.  What happened with

GR      OCR      CM      CRR      CSR

1    the Labor Board?

2    A    Nothing.

3    Q    Nothing.

4         So you kept at it, right?

5    A    No.

6    Q    You went to Vinny, right?

7    A    About -- I guess four, five months later.

8    Q    Okay.  So four, five months later, you are still pretty

9    steamed at Mr. Potenza, right?

10   A    Yes.

11   Q    And fair to say, that he did not agree to forgive the

12   loan, right?

13   A    Correct.

14   Q    This is a loan that you got from him in order to prevent

15   the foreclosure on your home, correct?

16   A    That is correct.

17   Q    And 5320 and 5321, fair to say, are documentation of that

18   loan, correct?

19   A    Yes.

20   Q    I think you told us that's still outstanding?

21   A    Yes.

22   Q    Do you recall testifying in your deposition back in

23   February that you -- you've never emailed PRP since

24   April 2010?

25   A    April 2010?

1    Q    Yes, sir.

2    A    Yes.

3    Q    Was that true testimony?

4         Was that accurate testimony?

5    A    Well, yes.  I never emailed PRP.

6         If you show me something where I emailed Pat Potenza

7    that's different.  It went to her home address, not her PRP

8    address.

9    Q    Oh, so you are drawing a distinction between her personal

10   address and her home address?

11   A    Yes.

12   Q    Let me ask you to look at page 186 of your deposition

13   from back in February of this year.

14        Do you have the page, sir?

15   A    Yes.

16   Q    Look at line 18.  Were you asked this question and did

17   you give this answer?

18        Question:  At any time over the last -- from when

19   you first said you started getting angry in August of 2009,

20   have you ever used email to correspond with anybody from PRP?

21        Answer:  Since April?

22        Question:  August 2009, when you first said you were

23   having communications with Robert Potenza.

24        Then on to page 187, you say, answer:  No, I have

25   not.

GR        OCR        CM        CRR        CSR

1          Do you see that?

2   A    A hum.

3   Q    That wasn't true, was it?

4   A    I probably mistaken of the time, yes.

5   Q    In fact, you had sent a threatening email to Ms. Potenza,

6   correct?

7   A    Yes.

8   Q    Why don't you look at Exhibit M in your book?

9          THE COURT:  Mr. Shea, are you anywhere near

10  concluding cross?  If not, that's okay.  But if not, find a

11  convenient break time soon for lunch.

12          If you can finish it in the next ten or 15 minutes,

13  we will wait.

14          MR. O'SHEA:  I think I can, Judge.

15          THE COURT:  Okay.  Let's go.

16  Q    Now, Exhibit M, this is an email that you sent to

17  Ms. Potenza on May 24, 2010, correct?

18  A    That is correct.

19  Q    This is, again, your communication with Ms. Potenza after

20  she refused and Mr. Potenza refused to forgive the loan that

21  you had acknowledged that you owed them, right?

22  A    I don't think it's because of that.  It's because of

23  May 24th is when they -- she agreed to continue my health

24  benefits and then canceled that.

25  Q    So it had nothing to do with the loan forgiveness?

1   A     No.

2           That was just an angry moment at the time.  I didn't

3   think -- I didn't know -- he wouldn't do something like, just

4   angry.  This was something because she was supposed to

5   continue my health insurance without letting him know and

6   she -- they canceled it.

7   Q    If you look at the email, sir, it says from Joe Johnson

8   to Pat Potenza, subject:  re:  Here we go. Let's see what

9   happens next.

10          Then in the body it says:  Can't.

11          You see that?

12  A    I see that.

13  Q    Ms. Potenza responds, right?

14  A    Yes.

15  Q    And she says, I don't understand what you're implying.

16          Right?

17  A    Yes.

18  Q    You had attached one of these sheets to the email that

19  you say is a company record, right?

20  A    Correct.

21  Q    And Ms. Potenza's response is, I don't understand, right?

22  A    Right.

23  Q    Now, you were served with a subpoena before your

24  deposition, right?

25  A    Yes.

Johnson - cross - O'Shea                              121

1   Q    And did you produce any documents?

2   A    Yes.

3   Q    What did you produce?

4   A    Records that I have.

5   Q    Isn't it true, sir, that you didn't produce the emails,

6   you didn't produce the threatening fax?

7            Isn't it true you didn't produce the records from

8   ADA advertising?

9            Isn't that true?

10  A    Yes.

11  Q    Even though there was a lawful subpoena issued to you for

12  all of those records, right?

13  A    Correct.

14  Q    While you were at PRP, you knew there was a rule against

15  drinking on the job, correct?

16  A    Yes.

17           But the reason why I didn't submit -- put those

18  records in, because I don't have them.  That's why I didn't.

19  I didn't give those in to the -- to the attorney.  I didn't

20  have those records.

21  Q    Did you understand there was a rule against drinking on

22  the job at PRP?

23  A    Yes.

24  Q    You broke that rule?

25  A    I had a few drinks here and there.

1    Q     A few?

2    A     Yes.

3    Q     Was there a rule against dating the staff?

4    A     Yes.

5    Q     You broke that?

6    A     I think we all did.

7    Q     Isn't it true that Mr. Potenza talked to you often about

8    harassing the women on the staff at PRP?

9    A     He never did.

10   Q     Sir, did you have any involvement in the banking done by

11   PRP restaurant?

12   A     No, I did not.

13          The only thing I did for them, as far as banking

14   was, he asked me to get him singles on a Saturday from my

15   Chase Manhattan Bank.  So I would make a -- he would give me a

16   slip for a hundred dollar deposit and I would then like a

17   thousand, $2,000 of singles every once in a while.

18   Q     Fair to say, you don't know who made the deposits for the

19   company?

20   A     I have a good idea who did, yes.

21   Q     Do you know, sir, who made the deposits?

22   A     Robert Potenza.

23   Q     Do you know that for a fact?

24   A     I know it for a fact.

25   Q     Did you ever go down to the bank with him and see him do

1   that?

2   A    No.

3         But I seen him come back from the bank after making

4   deposits.

5   Q    Did you know how much Mr. Potenza deposited when he

6   deposited?

7   A    No.

8   Q    Have you ever heard the term structuring?

9   A    Just in this case, yes.  Before that, no.

10  Q    Before that, no?

11  A    No.

12  Q    So before you went to Vinny at the IRS, you'd never heard

13  of structuring?

14  A    No.

15  Q    Have you ever heard of something called a CTR or currency

16  transaction report?

17  A    No.

18  Q    In your testimony, your direct testimony, Mr. Morris

19  asked you if the government had offered anything to you.

20        Have you ever -- other than the attorney, obviously,

21  Mr. Singer here, have you ever asked for anything from the

22  government?

23  A    No.

24  Q    Have you ever asked for a -- asked for a reward?

25  A    No.

Johnson - cross - O'Shea                    124

1    Q    And despite having taken the Fifth over and over again

2    about your own personal tax situation, you don't expect to be

3    prosecuted, do you?

4    A    I don't think so, no.

5    Q    You expect that the government is going to let that slide

6    given your testimony, right?

7    A    I think they -- yes, I guess.  I just don't think they

8    are going to do anything with me.  I don't think so.

9              MR. O'SHEA:  Thank you, Judge.

10             I have nothing further.

11             THE COURT:  Well, can you do redirect in ten

12   minutes?

13             MR. MORRIS:  I don't think so, Judge.

14             THE COURT:  Let's break for lunch then.

15             Remember the witness cannot be spoken to.

16             We will be back here, let's say, 1:40.

17             All right.  Have a good lunch.

18             (Luncheon recess taken.)

19

20

21

22

23

24

25

*Johnson - redirect/ Morris*                                      125

1          A F T E R N O O N     S E S S I O N

2              THE COURT: All right.  Be seated please

3                 Let's have the witness back.

4              J O S E P H    J O H N S O N , having been previously

5      duly sworn, resumed the stand and testified further as

6      follows:

7              THE COURT:  All right.  Redirect.

8      REDIRECT EXAMINATION.

9      BY MR. MORRIS:

10     Q    Good afternoon, Mr.  Johnson.

11     A    Good afternoon.

12     Q    I would like to direct your attention, Mr.  Johnson, if

13     you could please look at government exhibit binder to

14     Government Exhibit 24, and a number of documents that you were

15     asked about on cross examination by Mr. O'Shea, specifically

16     what's marked Bates Number Government 1666,  as well as the

17     page directly behind it 1667.

18     A    Yes.

19     Q    Now, I believe you were asked on cross-examination

20     something about the difference between the two documents, 166

21     and 1667?

22     A    Yes.

23     Q    When did you copy each of the documents in your

24     understanding?

25     A    I had put a total here, so it looks like I had my

*Johnson - redirect/ Morris*

1    pre-total up.  So I did this right before doing my register

2    which would be around 2 a.m., 2:30 a.m. in morning.

3    Q     Which document are you looking at, 1666?

4    A     1666, yes.

5    Q     What about with respect to Government 1667?

6    A     Yes, that would be the same thing.  Again, all the totals

7    are done later in the evening or your earlier in the morning

8    around 1:30, 2 o'clock.

9    Q     So you copied on two different occasions then?

10   A     Yes, yes.

11   Q     Okay.

12   A     Well, this one here would be done later at night because

13   the totals at the bottom.  I'm sorry.

14   Q     When you say, "this one," so the cord clear?

15   A     1667, all the totals are in.  So this was done at the end

16   of the night after I counted up all the money.  This would be

17   right before I was leaving for the night.

18   Q     Okay. And with respect to any of the documents that you

19   provided to the government, did they accurately capture the

20   cash flows reflected in the business?

21   A     Yes, they did.

22   Q     And did you make any modifications or changes to any of

23   the documents whatsoever that you provided to the government

24   that might impact or affect the accuracy of the information

25   contained in the document as compared with the actual cash

1    flows of business.

2    A     No, I did not.

3    Q     Now, with respect more broadly to the documents that you

4    provided to the government that you were asked about on cross

5    examination, how did you determine which documents were going

6    to be copied?  What was your practice?  How did you figure out

7    what to copy?

8    A     I basically tried to copy as much as I could, but I

9    didn't always think about it every single time I worked, but I

10   basically wanted to copy the Friday or the Saturday or

11   Thursday, Friday the busier days, and I also wanted to copy a

12   couple of other days to show how the employees were being

13   paid, how often they worked versus how much taxes were being

14   taken out.

15   Q     So at the time that you copied the documents did you have

16   any idea the documents might be relevant to any other problem

17   other than how the employees were paid at the business?

18   A     No, not at all.

19   Q     And at the time that you provided documents to the

20   government, those reflected in Government Exhibit 24, did you

21   have any idea what the documents might be relevant to any

22   other issue, other than how employees were paid at PRP?

23   A     No, not at all.

24   Q     On cross, examination sir, you were asked about your

25   court appointed attorney Mr. Singer, specifically you were

*Johnson - redirect/ Morris*

1   asked about an affidavit that you completed in connection with

2   obtaining Mr. Singer as your court appointed attorney?

3   A    Yes.

4   Q    Where did you turn that affidavit in to?

5   A    In to the Clerk's office downstairs in this building.

6   Q    And at the time that you turned it in you believe the

7   information you provided was accurately reflected in that

8   affidavit?

9   A    Yes.

10  Q    One of the things that you were also asked about on cross

11  examination, Mr. Johnson, were some of the fees in the

12  business, specifically the house-mom and DJ fees, and

13  specifically the line of questioning on cross examination was

14  directed to the kickback of some of those fees to the house.

15  Directing your attention to your testimony in that regard, was

16  the money either from the DJ fee or the house-mom fee that was

17  kicked back to the house, did you receive any of the money

18  that was kicked back to the house personally?

19  A    No, I did not. It was turned in to the owner.

20  Q    Another area that you were asked about, Mr. Johnson, on

21  cross examination involved a company called Air Design.

22  Specifically, I'd like to turn your attention to what's in the

23  Claimant's binder as Exhibit D.

24  A    Yes.

25  Q    Specifically, within Exhibit D, if you could just kindly

*Johnson - redirect/ Morris*

1  turn your attention to the document that you were asked about

2  marked with Bates Number AD 0004, and there's a document

3  behind that marked with Bates Number AD 005?

4  A    Yes .

5  Q    I think you testified on cross examination that these

6  documents related to some Air Design -- related to Air Design,

7  the company?

8  A    Yes.

9  Q    And you also testified that with respect to the credit

10 card receipt on AD 005, you used your credit card to pay for

11 the ads but then were reimbursed even before you received the

12 bill from the company Starlets?

13 A    That's correct.

14 Q    Other than getting reimbursed the amount that you laid

15 out on your credit card to Air Design as reflected in AD005,

16 did you receive any compensation of any kind with respect to

17 this particular ad placement reflected AD004 and 005?

18 A    No, I did not.

19 Q    You did it for free then?

20 A    Yes.  I didn't get paid for it.

21 Q    The folks that you were doing it for were your friends?

22 A    Yes, they are friends.  I was just trying to place the ad

23 for them.  I placed the ad.  I paid for them.  Hopefully, it

24 would work for them and they paid me, they gave me back the

25 money for the ad.

1   Q    If you'd just turn now within the same binder,

2   Plaintiff's Exhibit J, some documents you were asked about on

3   cross examination relating to some articles in the

4   corporation.

5   A    Yes.

6   Q    And specifically, sir, you were asked about the documents

7   that are reflected in the Bates Number 5311, 5312 and 5313

8   that all pertain to pertain to a company called JD

9   Entertainment Group?

10  A    Yes.

11          THE COURT: Mr. Morris, you got to pick it up a

12  little.  It took you liked 45 seconds to say look at the

13  articles in corporation Exhibit D.  Here's the question.  Five

14  seconds, okay.

15          MR. MORRIS:  Yes, Your Honor.

16  Q    Who organized the company?

17  A    I did.

18  Q    And how did you organize it?  Did you go to an attorney?

19  A    No, I did it myself.

20  Q    And at the time that you organized the company were you

21  receiving any revenue or payment in connection with the

22  business?

23  A    No.

24  Q    And subsequent to your organization of the business, had

25  it been profitable?

1    A    No.

2    Q    One of the things that you were also asked about on cross

3    examination, Mr. Johnson, was the alcohol policy at PRP.  You

4    were asked about the consumption of alcohol.  You consumed

5    alcohol from time to time on the premises?

6    A    Yes.

7    Q    Did the consumption of your alcohol or your alcohol

8    consumption on the premises in any way affect the performance

9    of any of your responsibilities or duties while at PRP?

10   A    No, it did not.

11   Q    You were also asked about the policy pertaining to the

12   dating of employees. Who is your current girlfriend?

13   A    Heather.  Her name is Heather.  She was the bartender at

14   Gallagher's at the time.

15   Q    Where did you meet her?

16   A    I met her at Gallagher's.

17   Q    Is she the mother of one of your children?

18   A    Three of my children, yes.

19   Q    Were you previously married?

20   A    Yes.

21   Q    And who were you previously married to?

22   A    Latalia (ph) Johnson was her name.

23   Q    And where did you meet Ms. Johnson?

24   A    At Gallagher's.

25        MR. MORRIS:  Thank you, very much, Mr.  Johnson.

*Johnson - recross/ O'Shea*                    132

1          THE COURT:  Anything else?

2          MR. O'SHEA:  Can I do it from here?  Very brief.

3          THE COURT:  Sure.

4    RECROSS EXAMINATION

5    BY MR. O'SHEA:

6    Q    Mr. Johnson, you were asked about Exhibit D, the ad

7    design ?

8    A    Yes.

9    Q    You said you just did it for friends, do you recall that?

10   A    Yes.

11   Q    Do you know the owners of Starlets?

12   A    Yes.

13   Q    One of them is from Jerry Rouge, right?

14   A    Yes.

15   Q    And isn't it true that after you left Gallagher's you

16   bought a financial interest in Starlets?

17   A    No, I did not. I wanted to, but it never happened.

18   Q    And one of the things you were doing at Starlets was

19   wanting to be part of the ownership there and wanting to be

20   involved in managing the bar, correct?

21   A    I was thinking about it but again, I also thought I had

22   another job someplace else that was a little bit more -- a lot

23   more money so --

24   Q    Pardon me. Are you finished?

25   A    Yes.

1  Q     Pardon me. I didn't mean to step on your answer.

2         Sir, isn't it true that you tried to buy two and a

3  half percent of Starlets for $25,000 from Jerry, isn't that

4  true?

5  A     No,that's not true.  I was trying to buy into the

6  company.  He actually wanted a lot more than that, but I

7  couldn't do it, but I had another job someplace else.

8  Q     After you left Gallagher's?

9  A     Yeah, I was supposed to be trying to work in another

10  place.  It was supposed to open in October, but it never

11  happened.

12        MR. O'SHEA:  Thank you.

13        Nothing further.

14        THE COURT:  All right . Thank you.  You may step

15  down.

16        The government may call its next witness.

17        MS. HILL:  The government calls Ms. Potenza.

18        MR. MORRIS:  Just one other housekeeping matter

19  while we are getting Ms. Potenza to the witness chair and

20  that is, with respect to the exhibits, have all the exhibits

21  been admitted into evidence pursuant to Your Honor's ruling at

22  the pretrial conference.

23        THE COURT: I assumed the parties would work that

24  out.  I have ruled on what's coming in and what isn't coming

25  in, but whether they still need to be formally moved or not,

*Patricia Potenaz - direct/ Hill*                                    134

1   we really didn't discuss.

2          You did move Exhibit 24 and I admitted it.  If the

3   parties will stipulate to the rulings at the pretrial

4   conference continuing, then they need not be removed, but if

5   there's any issue about that, or if you feel uncomfortable

6   about preservation, then you can go on offering them on a one

7   by one basis.

8          MR. O'SHEA:  We will move all our exhibits into

9   evidence.  I assume the government will.

10          MR. MORRIS:  The government moves all of its

11   exhibits that haven't been admitted into evidence into

12   evidence at this time.

13          THE COURT:  Okay. Ms. Potenza.

14          P A T R I C I A   P O T E N Z A ,

15          having been first duly sworn/affirmed, was examined

16          and testified as follows:

17          THE COURT:   Have a seat please and once you sit

18   down, please pull the microphone close to you.

19          MR. O'SHEA:  Before we leave that subject, may I

20   just have my objections preserved.

21          THE COURT: Yes.  All objections made at the pretrial

22   conference continue to be preserved as far as I am concerned.

23          MR. MORRIS:  Thank you, very much.

24   DIRECT EXAMINATION

25   BY MS. HILL:

*Patricia Potenaz - direct/ Hill*                                135

1   Q     Good afternoon.

2   A     Good afternoon.

3   Q     Would you state your name for the record.  I think you

4   may already have.

5   A     I did that.  Patricia Potenza.

6   Q     Are you known by any other name?

7   A     Pat.

8   Q     Where you do you live?

9   A     Live in Maspeth, Queens.

10  Q     Are you currently employed by PRP Restaurant, Inc.?

11  A     Yes, I am.

12  Q     And how long have you been employed there?

13  A     Since it opened in the year 2001.

14  Q     What is your job?

15  A     I'm the bookkeeper and also a corporate officer,

16  15 percent shareholder, I am secretary treasurer.

17  Q     Your brother Robert Potenza is 70 percent shareholder?

18  A     That's correct.

19  Q     And who are the other owners.

20  A     The other owner is Allen Reale.  He is also 15 percent.

21  Q     PRP, that's S corporation?

22  A     Yes, it is.

23  Q     How does that work?

24  A     At the end of the year if there's any profit, it's

25  allocated to the partners.

*Patricia Potenaz - direct/ Hill*

1            THE COURT:  Hang on one second.

2   Q    Ms. Potenza, among your responsibilities at PRP, that

3   includes keeping the books?

4   A    Yes, it does.

5   Q    As a bookkeeper?

6   A    That's correct.

7   Q    And in performing your bookkeeping responsibilities you

8   consult with your accountant.

9   A    Yeah, at various times during the month, during any

10  audits.

11  Q    Various times during the month?

12  A    Correct.

13  Q    During the audits?

14  A    Correct.

15  Q    The accounting firm that's Graf, Repetti & Company?

16  A    That's correct.

17  Q    And it's representative of theirs, Marciano Filippone?

18  A    That's correct.

19  Q    And you consult with him about how often?

20  A    It depends on whether, as I mentioned, we have any audits

21  going on, two to three times per month.

22  Q    When there are no audits going on, two to three times per

23  month?

24  A    That's correct.

25  Q    When there are audits going on it can be as frequently as

1  everyday?

2  A    That's correct, but it's not usually everyday.  It may be

3  two times a week during an audit.

4  Q    The books and records of PRP, included among those would

5  be the cashbooks; is that correct?

6  A    That's correct.

7  Q    And you maintain the cashbook?

8  A    Yes, I do.

9  Q    The cashbooks that reflects cash in and cash out of the

10 business?

11 A    That's correct.

12 Q    Information in the cashbook, you provide those to the

13 accountant?

14 A     Yes, I did.

15 Q    As well as the checkbook stubs, you provide those to the

16 accountant as well?

17 A    Yes, I do.

18 Q    On roughly a weekly basis, a monthly basis?

19 A    Monthly basis with a bank statement.

20 Q    And from these cashbooks and the checkbook stub, the

21 accountant enters the information into an accounting system?

22 A    I believe so.  He has a general ledger and I can't

23 honestly tell you what his system is.

24 Q    I see.

25 A    But it's an automated system,  yes.

*Patricia Potenaz - direct/ Hill*

1      THE COURT:  Counsel, we are not doing discovery

2  here, right?  You should have the points you need to get out

3  of this witness, especially since it's an adversarial witness.

4  Get them on the record and let's go on.

5      MS. HILL: Very well, Your Honor.  Thank you.

6  Q   What I want do to do is turn to Government Exhibit 8.

7      Permission to approach the witness, Your Honor.

8      THE COURT:  Sure.  You all know I don't have an 8,

9  right?

10 Q   I think I turned it to the page -- I want you to look at

11 the part of Government Exhibit 8, that Plaintiff's No.  1526,

12 Bates number 5 at the bottom.  Are you looking at that?

13 A   Yes, I am.

14 Q   Is this a page from the cashbook?

15 A   Yes it.

16 Q   And this is from the month of May 2009?

17 A   That's correct.

18 Q   What I want to do is just go through and identify what

19 the various areas are, where the money represents, okay?

20 A   Okay.

21 Q   What monies are represented on this cashbook.

22      The first column on the far left of the page it says

23 here door?

24 A   Correct.

25 Q   This door is the amount that represents admission charge?

1   A     Correct.

2   Q     Cash that the company received?

3   A     That's correct.

4   Q     The next column that says 5/1, 5/2, you see that one?

5   A     Yes.

6   Q     That represents the day, and the month, right, so that

7   would be May 1st?

8   A     Correct.

9   Q     Door charges?

10          Next column, total income, you see that?

11   A     Yes.

12   Q     Does that represent both the cash register income, and

13   the door income?

14   A     Yes, it does.

15   Q     And the next column, that's house fees, right?

16   A     Correct.

17   Q     Does this column represent the fees paid from dancers --

18   the fees dancers pay to the club for the right to dance there?

19   A     The right to dance there and also any additional fees

20   that they may be paying for cancellations.

21   Q     Okay. So fines are included in here as well?

22   A     Right.  And also, any house-mom, DJ fees.

23   Q     These would be reflected in that column, house fees?

24   A     Yes.

25   Q     What about the VIP admission, or champagne admission?

*Patricia Potenaz - direct/ Hill*                      140

1   A      I'm sorry, that should also be included.

2   Q      Champagne room and VIP room, those are the fees that

3   would be the same?

4   A      That basically we treated as a house fee that was paid by

5   the dancer, an additional house fee to use the champagne room.

6   Q      The dancers -- let's see.

7          MS. HILL: One second Your Honor.

8   Q      (Con't): The next column, the expenses, these are the

9   cash expenses that are paid out?

10  A      Yes.

11  Q      And the column deposit, this represents the cash deposit

12  from the cash receipt of the business?

13  A      That's correct.

14  Q      Does it also include wire transfers?

15  A      It includes the ATM transfers, yes.

16  Q      And the last column, that represents the deposit date?

17  A      That's correct.

18  Q      The total, I guess that would be row 32 on this form.

19  This is where these cash amounts are totaled?

20  A      Yes.

21  Q      And word here going down on column four on row 35 where

22  it says here BEG, letter BEG and then DAL?

23  A      That's the balance of the cash account in the prior

24  month.  That would have been as of April 30th, 2009.

25  Q      And this would be the beginning cash balance from April?

1   A    That's correct.

2   Q    And then net change, or NETCHG represents net change?

3   A    That's correct.

4   Q    This represents what?  Additional total income and the

5   house fee less expenses and deposits?

6   A    That's correct.

7   Q    Row 37 that represents subtotal?

8   A    That's correct.

9   Q    And the row beneath it says payroll?

10  A    Right -- 138 is employee payroll.  That's paid in cash.

11  Q    Final row.  This is the ending cash balance for cash on

12  hand?

13  A    That's correct.

14  Q    And on the far left side of the page here with your it

15  has cc gross tips and net?

16  A    Yes.

17  Q    So what does that represent?

18  A    Those are credit card activity for the month.

19  Q    Just a couple of additional quick questions.  Mr. Johnson

20  was a very trusted employee by you at the time he worked

21  there?

22  A    That's correct.  Absolutely.

23  Q    And the numbers that Mr. Johnson turned in to you, you

24  testified before that they were invariably accurate and

25  correct?

1  A    That is what I believed, yes.

2         MS. HILL:    Thank you.

3         Nothing further, Your Honor.

4         THE COURT:  All right. Cross examination.

5  CROSS-EXAMINATION

6  BY MR. O'SHEA:

7  Q    Okay.  Ms. Potenza, you told us a little bit about your

8  background but tell us, do you have any college background,

9  college education?

10 A    Yes, I have some accounting credits.  I went to Baruch

11 College and also Pace University.

12 Q    You took and studied accounting there?

13 A    Yes, I did it at night.

14 Q    And what was your first job experience?

15 A    My first job experience was with Sears Roebuck & Company

16 as an accounts payable clerk.

17 Q    And how long did you work there?

18 A    Approximately eight months.

19 Q    And where did you go from there?

20 A    I went to Blue Cross and Blue Shield.

21 Q    How long did you work there.

22 A    Fifteen years.

23 Q    Doing what?

24 A    Started as a clerk in the accounting department.  I

25 worked my way up to director of accounting.

1  Q     And did there come a time when you went to work in a

2  family business?

3  A     Yes, it was in 1985.  My father retired and I became a

4  partner in the jewelry business with my bother.

5  Q     What was the name of that business?

6  A     PSP Jewelers.

7  Q     And describe for the Court your duties at PSP Jewelers.

8  A     I was basically an expediter.  I was in charge of the

9  manufacturing section. That would mean getting orders in,

10 pulling the parts to fill the orders and making sure it got to

11 the appropriate department, to finish the manufacturing

12 process.

13 Q     Where was PRP physically located?

14 A     PSP.

15 Q     Pardon me.

16 A     PSP was located in the diamond district at 64 West 48th

17 Street, New York, New York.

18 Q     Did you have a corporate position there?

19 A     I was vice president.

20 Q     Did there come a time when Nicholas Potenza transformed

21 itself into PSP?

22 A     No, Nicholas Potenza was another business.  It was

23 basically doing the polishing of the jewelry that was being

24 manufactured. So they were a separate entity. One was a wholly

25 owned subsidiary of the other. Nicholas Potenza was a wholly

1  owned subsidary of PSP.

2  Q     I see.

3        And was PSP at the same location that you told us

4  Nicholas Potenza was.

5  A     Yes.

6  Q     And how were they different in terms of what they did for

7  business?

8  A     Well, actually PSP -- Nicholas Potenza was the one that

9  did the manufacturing. PSP was strictly used for sales.

10 Q     Were you partners with your brother in PSP?

11 A     PSP and Nicholas Potenza.

12 Q     Did there come a time when you went to work for another

13 type of business, adult entertainment with your brother?

14 A     Yes, I did.

15 Q     When was that?

16 A     I believe it was in 1990 and the business was called

17 College Point Restaurant Corporation doing business name was

18 Gallagher's Two.

19 Q     Were you a partner in that business?

20 A     Yes, I was.

21 Q     What were your --did you have operational duties as well?

22 A     Same as with the current duties of bookkeeper and officer

23 of the corporation.

24 Q     Is that bar still opened?

25 A     No.

1   Q      When did PRP come to be?

2   A      I believe we opened in 2001.  I believe we incorporated

3   probably in the year 2000.

4   Q      Where is it physically located?

5   A      Long Island City, 43-19 37th Street, Long Island City.

6   Q      I think you told us it's a sub S corporation, you

7   received 15 percent of the profits?

8   A      That's correct.

9   Q      Now, would you take us through the -- (perusing).  Other

10  than your bookkeeping duties, do you have any duties for PRP

11  restaurant?

12  A      I usually negotiate with insurers for our policies, work

13  with the advertisers for advertising for the newspapers and

14  radio.

15  Q      Do you pay the bills?

16  A      Yes, that is part of the bookkeeping function.

17  Q      And tell us your normal workday.

18  A      I usually go in, get on my computer, check out bank

19  balances to make sure the ATM money is being wired in

20  properly, pay bills, do any other functions that is needed for

21  the day regarding what I just mentioned.

22  Q      Right.  And I was trying to get at your schedule.

23  A      Oh, my schedule.  I go in about 10 o'clock in the

24  morning, Monday through Thursday and I leave about two o'clock

25  in the afternoon.

1  Q    Everyday?

2  A    Monday to Thursday.

3  Q    What about Friday?

4  A    Friday I work usually at night from 11 p.m. to 4 a.m.,

5  alternating with my other partners.

6  Q    So you would work once every third Friday?

7  A    Well, I work two Fridays and then I'm off.  It's two one,

8  two one, two one.  I work two off one, work two off one.

9  Q    Did you have occasion to talk to Mr. Johnson every single

10 Friday that you worked?

11 A    I generally had some conversation with him, yes.

12 Q    And were you ever involved in the hiring and firing with

13 respect to the business?

14 A    No.

15 Q    Who makes the cash deposit?

16 A    Cash deposits are made by my brother Robert.

17 Q    And you talked a little bit when you were asked questions

18 about, I think it was Exhibit 8, about the ATM activity.  Can

19 you describe for us what the ATM was used for and how it was

20 used?

21 A    The ATM is used for customers who need cash. It would be

22 -- it's owned by us and it's loaded with the money by us.

23 That money after it's dispensed to a customer would be wired

24 into our bank account.

25 Q    And would it essentially be deposited directly into your

1    account?

2    A    Yes.

3    Q    And would that happen automatically or do you have to

4    doing something to the machine?

5    A    You would have to close out the machine at the beginning

6    of the day in the morning and that would take the activity

7    from the previous day and wire it into the account.

8    Q    Prior to this case did you know what a CTR was?

9    A    No.

10   Q    Ever discussed that with your brother?

11   A    No.

12   Q    Ever tried to arrange banking activity at PRP so the CTR

13   wouldn't be filed?

14   A    No, absolutely not.

15   Q    Did you have an understanding about how your brother did

16   his banking?

17   A    Somewhat. I know he was consistent with the amount he was

18   depositing.

19   Q    And how was he consistent?

20   A    He does everything by routine.  He would deposit 8000,

21   8000, 8000.

22   Q    Did you have an understanding that there was a safety

23   concern with respect to his banking deposits?

24   A    Absolutely.

25   Q    And what is that understanding?

1   A    Well, he was robbed or attempted to be robbed several

2   times.

3   Q    Can you tell us when?

4   A    It was while I was working the jewelry business, so it

5   was probably somewhere between 1985 and 1995.

6   Q    Now, in 2001 where did PRP bank?

7   A    2001 we banked at JP Morgan Chase, cash.  Cash activity.

8   Q    For cash activity?

9   A    Right.

10  Q    Was there another account held by PRP?

11  A    Yes Merrill Lynch.

12  Q    And why did you have two accounts, one at Merrill Lynch

13  and one at Chase?

14  A    We had a Merrill Lynch account with the jewelry business

15  and we just continued to using Merrill Lynch for the bar.

16  However, Merrill Lynch does not accept cash, they are not a

17  bank, so being that we are a cash business we had to open up a

18  banking account at the bank that transacts with cash and also

19  for the purposes of making change.

20  Q    And where did the ATM -- what bank account did the ATM

21  deposit, where do they go?

22  A    Initially, it was going to Chase and then subsequent to

23  that it went to TD Bank.

24  Q     I put in front of you Government Exhibit 2, and I've

25  opened it to page 1100. Ms. Potenza, could you have a look at

1    that and tell us who it is?

2    A    Chase Bank statement for the period September 29th to

3    October 31, 2007.

4    Q    Okay.  And do you see up in the address portion PRP

5    Restaurant Inc., DBA. Gallagher's 2000 care of PSP Inc. 64

6    West 48th Street, New York, New York 10036; do you see that?

7    A    That's correct, yes.

8    Q    Was that the mailing address that you received your Chase

9    accounts statement at?

10   A    Yes, it was.

11   Q    Why?

12   A    Because at that point I was working at the jewelry

13   business and mail had a tendency of getting misplaced if it

14   was mailed directly to the bar. So I asked that it be mailed

15   to me at the jewelry business.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

P. Potenza - cross - O'Shea                    150

1    EXAMINATION CONTINUES

2    BY MR. O'SHEA:

3    Q    Was that the address at which -- this address that was on

4    the statements that you received once a month from Chase?

5    A    Yes.

6    Q    Now, if you look at the deposits in the addition section,

7    you see it for the date October 1st?

8    A    Yes.

9    Q    2007?

10   A    Yes, I see it.

11   Q    You see there is a deposit, October 1st, in the amount of

12   $7,000?

13   A    Yes.

14   Q    And are three entries beneath that, 8040, 4740, and 4040;

15   you see those?

16   A    Yes.

17   Q    What are they?

18   A    Those are transactions that are being deposited from the

19   ATM transactions.

20   Q    So those are cash withdrawals which are credited on

21   October 1st to PRP's account at Chase?

22   A    Yes.

23   Q    What about the three entries below that, October 1st, in

24   the amount of 301.50, looks like 166.50 and 153?

25   A    Those are the ATM commissions that we receive.

P. Potenza - cross - O'Shea                    151

1   Q     And those would also be deposited -- do they correspond

2   to each one of the entries just above?

3   A     Yes, they do.

4   Q     So would that reflect that over -- on that day in total

5   something like $23,000 in cash?

6   A     I think it's about 24,000.

7   Q     And this is just an example of an occurrence that

8   happened on many, many occasions, fair?

9   A     Yes.

10  Q     And did you or your brother ever try to do anything so

11  that that many cash deposits would not hit your account?

12  A     No.

13  Q     Did you care?

14  A     No.

15  Q     Was this information that's contained on the bank

16  statement and on many other bank statements given to your

17  accountant?

18  A     Yes.

19  Q     And did you pay taxes on those amounts?

20  A     Absolutely.

21  Q     Did there come a time when the Chase account that we are

22  talking about just now, when it was closed?

23  A     Yes, it was closed.

24  Q     And were you given a reason for that?

25  A     No, we were not.

P. Potenza - cross - O'Shea                    152

1   Q     Why don't you look at Exhibit 4.  I think it's in the

2   same book.

3   A     Okay.  I am looking at it.

4   Q     Tell us if you recognize the document.

5   A     It is a government document Exhibit 4?

6   Q     Yes, ma'am.

7   A     Yes, we do get this document.

8   Q     And do you see the address on it, PRP restaurant d/b/a

9   Gallagher's 2000 care of PSP, et cetera; you see that?

10  A     Yes, I do.

11  Q     Again, that's the address you received mail at, right?

12  A     Yes, it is.

13  Q     This is dated February 11, 2008, correct?

14  A     Yes.

15  Q     Did this document give you any information as to why

16  Chase had elected to close the account?

17  A     No, it does not.

18  Q     Did you ever seek information as the why Chase had closed

19  the account?

20  A     Yes, we did.

21        I believe Robert called Chase and they wouldn't give

22  him any information.  They just told him that they could --

23  they can close the account at any time.

24  Q     If you would look at the document in the book just prior

25  to that, Exhibit 3?

GR      OCR      CM      CRR      CSR

1   A     I have it.

2   Q     Do you recognize the document?

3   A     I recognize it now.  I didn't recognize it when it was

4   first written back in 2007.

5   Q     Did you receive it when it was written purportedly back

6   in 2007?

7   A     No, we did not.

8   Q     Compare the address, if you would, on Exhibit 4 to

9   Exhibit 3.

10  A     Okay.

11  Q     Are they different?

12  A     Yes.

13  Q     How?

14  A     Exhibit 3 doesn't specify PRP Restaurant care of

15  PSP -- I'm sorry -- PRP Restaurant Inc DBA Gallagher's 2000.

16  It just says PRP Restaurant instead of PRP Inc DBA Gallagher's

17  2000 and it also doesn't have care of PSP Incorporated.

18  Q     Did you know this person Shea that apparently -- is on

19  the letter anyway?  Do you know that person?

20  A     No, I do not.

21  Q     Do you know, is there anything on the document to

22  indicate from where the letter emanated physically?

23  A     No, there is not.  There is no address.

24  Q     Now I would like you to compare -- look at Exhibit A and

25  Exhibit B, please.

P. Potenza - cross - O'Shea                    154

1   A    Where would those be?

2        MR. SOCKOL:  The small binder.

3   Q    If you would, just look at Exhibit A and B in the binder

4   I just handed you.

5   A    Yes.  I am familiar with them.

6   Q    Did you receive those two documents?

7   A    Yes, we received those two documents.

8   Q    Do you know how those documents came into being?

9   A    When we closed the jewelry business in -- at the end of

10  2007, my brother had to surrender his pistol -- his gun permit

11  for the jewelry business.  And since he still had a need for a

12  permit because he carries a large amount of cash for the PRP

13  Restaurant, he had to apply for a new permit.  Part of the

14  permit application was to get letters from your bank stating

15  the need and how much cash you would be depositing.

16  Q    The address on these documents is different from on the

17  account statement?

18  A    Yes, it is.

19  Q    What is the address that's born on A and B?

20  A    The address is PRP Restaurant, 43-19 37th Street, Long

21  Island City, New York 11101, which is the physical location of

22  the bar.

23  Q    Did -- withdrawn.

24       Does PRP still have an account at Chase?

25  A    No.

P. Potenza - cross - O'Shea                    155

1    Q    Does another corporation in which you and your brother

2    have an ownership interest still have an account at Chase?

3    A    Yes.

4    Q    What account is that?

5    A    That's Ron Bob Pub Incorporated.

6    Q    Ron, R O N?

7    A    B O B.

8    Q    B O B, Bob?

9    A    Pub, P U B.

10   Q    Okay.

11   A    Incorporated.

12   Q    All right.

13   A    The d/b/a on that is Gallagher's.

14   Q    What is that account used for?

15   A    That account originally was opened for the first club

16   that my brother owned on Queens Boulevard.  Right now we are

17   using that for gift certificates.  These are items that we

18   sell on credit card purchases only.

19   Q    So no cash goes into the Ron Bob Pub account?

20   A    No.

21   Q    Is the Ron Bob Pub account used for any other purpose?

22   A    Yes.

23        My brother uses it to make change and get singles.

24   Q    How often in your understanding does he do that?

25   A    Several times a week.

1  Q     Now, did there come a time after Chase closed the account

2  in February that you engaged a new bank?

3  A     Yes.

4  Q     What bank was that?

5  A     At the time it was Commerce and they subsequently merged

6  with TD Bank.

7  Q     What did you use -- if we can just call it TD?

8  A     Yes.

9  Q     If we can just call it TD Bank, what did you use that

10  account for, you being PRP?

11  A     The same purpose we were using the Chase account for.

12  That would be for cash deposits and for ATM transactions.

13  Q     In your understanding, did your brother change his

14  deposit activity at all?

15  A     Not to my knowledge, no.

16  Q     Did your brother ever tell you that his banking activity

17  at TD had been criticized in any way?

18  A     No.

19  Q     Was TD Bank also used for ATM direct deposits?

20  A     Yes.

21  Q     Why don't you look at Exhibit 5, if you would, in -- I

22  think that's in the binder and page 1269 specifically, please.

23  A     1269?

24  Q     Yes, please.

25  A     Okay.

1  Q     Actually, why don't you look at 1289.  Since I believe

2  the government showed you a document from May of 2009, why

3  don't you look at 1289 which is a TD Bank statement for

4  May 31, 2009.

5  A     Okay, I have it.

6           THE COURT:  I'm sorry, Mr. O'Shea, what's the

7  exhibit?

8           MR. O'SHEA:  It's Exhibit 5, Bates 1289.

9           THE COURT:  Thank you.

10  Q     Now, do you see for May 1st there on this page there is a

11  deposit for $8,000?

12  A     Yes.

13  Q     You see there are three entries beneath that for about

14  200 and change each?

15  A     Yes.

16  Q     And then there are three entries after that reflecting

17  amounts in -- 7,000 and change.  You see that?

18  A     Yes, I do.

19  Q     Are those three amounts there reflective of ATM $20 for

20  different nights deposited and credited on May 4th?

21  A     Yes.

22  Q     Do you see on May 4th, just below that, there is a

23  deposit in the amount of $8,000?

24  A     Yes.

25  Q     Again, the same questions I asked you before.  Did you or

GR      OCR      CM      CRR      CSR

1   your brother ever engage in any kind of conduct to arrange

2   your affairs so that you didn't clear the ATM on a day that

3   Robert would go to the bank and physically deposit cash?

4   A    No.  The ATM was cleared every day.

5   Q    And did -- when -- in your understanding, when your

6   brother went to the bank with cash, do you know what

7   denominations he used to deposit?

8   A    I didn't know at the time but I know now he was using

9   hundreds and fifties.

10  Q    Were fifties and hundreds used in the business for PRP?

11  A    No.

12  Q    Why not?

13  A    We used twenties and singles.  Singles were the tipouts

14  for the dancers.  Twenties were used for the ATM machine and

15  to make change for customers who made -- may give a hundred

16  dollar bill for a sale, and fives and tens were also used for

17  change.

18  Q    You mentioned that PRP had a Merrill Lynch account.

19           Can you tell us what that account was used for?

20  A    That account was used to pay bills from vendors.

21  Q    Did there come a time when paychecks were sent out of

22  that account to the partners?

23  A    Yes.  After -- after -- after TD Bank was closed, we

24  started paying our salaries out of Merrill Lynch.

25  Q    Does the amount of cash that comes into PRP, is it pretty

P. Potenza - cross - O'Shea                159

1   much the same every day?

2   A    No, absolutely not.

3   Q    How does it vary?

4   A    It grows as the week progresses.  On Sunday there is very

5   little and Monday, Tuesday, usually not quite, you know,

6   significant amount.  But when you hit Thursday, Friday,

7   Saturday, the numbers would jump up.

8   Q    How was food and drink paid for and how was it accounted

9   for at PRP?

10  A    Food and drink would be paid either by cash, which is

11  rung into the cash register, or by credit card, which is run

12  as a credit card transaction.

13  Q    Are all the cash registers always in use at PRP?

14  A    No.

15  Q    How does it vary, if you can give us a sense?

16  A    As I mentioned, during the beginning of the week,

17  which -- our week starts on a Sunday -- there is very little

18  business.  So you may be using one or two cash registers.

19  Q    And on a Friday, say?

20  A    You could use four.

21  Q    During the day, are all the cash registers in use?

22  A    No, not on all days, no.

23  Q    Let's say on a Tuesday afternoon, at 3:00 o'clock in the

24  afternoon, would all cash registers be in use?

25  A    It would have varied.  Sometimes we would have had two,

GR        OCR        CM        CRR        CSR

P. Potenza - cross - O'Shea                    160

1    sometimes three.  It depends on what the manager chose to do.

2    If he felt the need to open up another register, he would hire

3    a person and have a third bartender.

4    Q    We heard some testimony earlier this morning about

5    admission fees.

6         Can you tell us your understanding of admission

7    fees, when they were charged and how much and how it varied,

8    if it did?

9    A    Initially we didn't charge admission on Sunday but we

10   started to do that.  I don't honestly recall when that

11   happened.

12        In the earlier part of the week, which would be I

13   think Monday, Tuesday, Wednesday, there is a $5 admission

14   after 8:00 pm.

15        I think Thursday -- Thursday, Friday, Saturday is

16   ten; but on Friday and Saturday after 11:30 is 15.

17   Q    Did that vary, those amounts vary over time?

18   A    Oh, yes, definitely.

19   Q    Did the cash register at the front, the admission fee

20   cash register, if you will, did that always have a working

21   register tape?

22   A    No.

23   Q    Describe what was wrong with it.

24   A    Well, at one point when they would put the register in a

25   report mode, it would just print out symbols and letters.

GR      OCR      CM      CRR      CSR

P. Potenza - cross - O'Shea                    161

1              At that point, you know, there was no -- no need to

2      even get a report out.  I don't know what the managers did,

3      whether they printed it or they didn't print it.

4      Q      How would you keep track of admission fees?

5      A      The money would be counted.  The starting bank would be

6      subtracted and it would be written on a Post-it note with the

7      money.

8      Q      Was there a check on the person who was handling the

9      cash?

10     A      No.

11             We trusted our employees and felt that we were

12     getting the appropriate amounts of money.

13     Q      Did the -- did the bouncer have a hand in keeping track

14     of the people who came in and paid admission fees?

15     A      There was a clicker.  There was a clicker to count people

16     in and out.  It wasn't specifically for admission fees.

17     People went out and had a cigarette and may come back in and

18     be clicked in twice.

19     Q      Were there sometimes people comped for admission who

20     wouldn't pay a fee?

21     A      Yes.

22     Q      Would they still be clicked in?

23     A      That I can't tell you.

24     Q      Okay.  Let me ask you to look at Exhibit H in the smaller

25     book in front of you and ask you if you recognize the

P. Potenza - cross - O'Shea                    162

1    document?

2    A    Yes, I do.

3    Q    What is it?

4    A    It's a receipt from a cash register order that I paid

5    online.

6    Q    Did there come a time when you replaced the defective

7    cash register with a new one?

8    A    Yes, we did.

9    Q    Is that reflective of that fact?

10   A    That reflects the purchase of that cash register, yes.

11   Q    Now let's talk about payroll at PRP.

12        Would it be fair to say that you are the person with

13   primary responsibility for the payroll?

14   A    I am not following the question.

15   Q    Would it -- well, it's inartful.

16        Would it be fair to say that you are the person

17   primarily responsible for keeping track of and recording

18   payroll?

19   A    Yes.

20   Q    What kind of payroll was PRP's?

21   A    It was -- for employees it was a cash payroll.  For

22   officers, we are being paid by check.

23   Q    When you say a cash payroll, was it recorded?

24   A    Yes.

25   Q    How?

P. Potenza - cross - O'Shea                    163

1    A     It's in -- if you look at my cash book sheet, there is an

2    item there that says Payroll.  As a reduction of the cash book

3    that's -- that's the item that reflects the cash payroll.

4    Q     Okay.  We have heard some testimony earlier today about

5    how the cash payroll was handled.

6          Can you tell us if the cash payroll was subject to

7    taxation?

8    A     Absolutely.

9    Q     Always?

10   A     Yes.

11   Q     Was there ever a time when it was half on the books and

12   half off the books?

13   A     Not to my knowledge, no.

14   Q     Well, could something like that be the case without your

15   knowledge?

16   A     It's possible somebody could pay somebody that I don't

17   know about, yes.  It's possible.  But it's not probable.

18   Q     In your experience has -- have you ever been involved in

19   paying people at PRP off the books?

20   A     No.

21   Q     Did employees fill out W-4 forms?

22   A     Yes, they did.

23   Q     Was withholding kept?

24   A     Yes.

25   Q     How?

1   A    The accountants were keeping the payroll records.

2   Withholding taxes that we had to deduct from the employee were

3   given to the general manager who was instructed to deduct it

4   out of the last day of the week that they worked.

5   Q    Before April of 2010, was that Joseph Johnson?

6   A    Yes, it was.

7   Q    Did you have conversations with him about that?

8   A    Just when he added an employee, I would go back and give

9   him the tax figures.

10  Q    Did you ever tell him to withhold only on certain days,

11  only withhold taxes on certain days?

12  A    No.

13  Q    With respect to the DJ at the premises, could you

14  describe how the DJ got compensated?

15  A    The DJ was an independent contractor, just as the

16  entertainers were, and wasn't compensated.  He would get

17  tipped from the entertainers for playing their music.

18  Q    Would any of that money get paid to -- by the DJ, any

19  portion of that money that the DJ received, did that money

20  work its way back to the house?

21  A    Not to the house, no.

22  Q    Where did it go?

23  A    It went to the general manager.

24  Q    That would be Joe Johnson?

25  A    Yes.

1    Q    Did that change after Mr. Joe Johnson left?

2    A    Yes.

3         We no longer give any tips to the current managers.

4    Q    Well, when Dennis Schmidt would work on Sunday and Monday

5    during Mr. Johnson's tenure at PRP, did Mr. Schmidt receive

6    that -- those portion of the tips?

7    A    No.

8    Q    Why not?

9    A    Joe was with us a very long period of time and as a

10   general manager he was compensated -- not compensated.  He was

11   entitled to get the tipouts.

12   Q    But Mr. Schmidt did not?

13   A    No, sir, he did not.

14   Q    Did Mr. Schmidt -- what did Mr. Schmidt do with the money

15   that the DJ, the portion of the -- the tips that the DJ

16   received that went, that did not go -- or that the DJ paid, to

17   whom did the JD pay it?

18   A    I believe he gave it to Mr. Schmidt and I thought that

19   Mr. Johnson was getting it but I found out subsequently that

20   he was not getting those two days, that it was being included

21   in the house fee amounts.

22   Q    Okay.  So that the Sunday and Monday amounts from the DJ

23   would go to the house fees?

24   A    Right.  Which was transparent to me.  There was no way I

25   could see that.

1   Q     What about the house mom, the arrangement with the house

2   mom?

3   A     Exact same setup.

4   Q     What would that exact same setup be?

5   A     That the house mom would tip back to the general manager.

6   Q     With respect to -- specific to Mr. Schmidt, where would

7   the money go?

8   A     It would go up to the -- to the office and it would be

9   included in the house fees.

10  Q     The house fees, would you -- what would you do

11  with -- with the amounts that you learned were house fees?

12  A     I would report it on my cash book as income.

13  Q     Did you ever report -- withdrawn.

14        Did you ever fail to report cash that you had been

15  told had been received by the business in the cash book?

16  A     No.

17  Q     When did you come in on an average day?

18  A     I came in Monday through Thursday, 10:00 o'clock in the

19  morning.

20  Q     When you came in at ten in the morning, what did you do?

21  A     Again, I turned on my computer.  I had my breakfast.

22  Looked at -- at the banking records to make sure things were

23  being transferred properly; paid bills.

24  Q     Did you --

25  A     Excuse me?

1   Q     Did you receive cash?

2   A     No, absolutely not.

3   Q     Cash had been received the night before, right?

4   A     Yes.

5   Q     How did you know what to put in your cash book for that

6   day?

7   A     I was left the -- the cash register tapes and Post-it

8   notes.

9   Q     What would be on the Post-it notes?

10  A     The house fees.

11  Q     Anything else?

12  A     Champagne room fees, VIP room fees.

13  Q     Anything else?

14  A     No.

15  Q     How would the admission fees be counted?

16  A     I'm sorry.  The admission fees were on Post-it notes.

17  Q     What about the registers?

18  A     The registers, I was given register tapes, the paper

19  tapes that come out of the register when the register is

20  closed.

21  Q     What would you do with those figures?

22  A     I would add them up and post them to my cash sheet.

23  Q     In much the same way as Ms. Hill who took you through

24  Exhibit 8, that page on Exhibit 8, you'd do -- walk through

25  that page and fill out what you received?

1   A     Right.

2          The door figure I would put in the door column.

3   Then I would add the door figure plus the cash register tapes

4   with the total income plus anything else that may have come

5   in.

6   Q     You were asked to look by Ms. Hill at Exhibit 8, at page

7   1526.  I wonder if you would open back up to that page,

8   please?

9   A     Yes, I have it.

10  Q     Also open to Exhibit 5 at page 1289.

11  A     Okay.  I have it.

12  Q     If you could, please, for us compare the amounts that are

13  set forth on the cash book for deposits and compare them to

14  the bank statements to see if they match.

15  A     You want me to do this verbally?

16         THE COURT:  No.  Just say yes or no.

17  A     5/1 is yes.

18  Q     You don't -- just go through --

19  A     Go through the whole thing?

20  Q     Insure yourself that they match.

21  A     Okay.

22         (Pause.)

23         Yes, they match.

24  Q     Let's do the same exercise for the ATM deposits.

25         Fair to say that Exhibit 8 at page 1526 reflects on

P. Potenza - cross - O'Shea                    169

1    lines seven, 14, 20 and 28 an addition of -- by week ATM

2    deposits?

3    A    Yes.

4    Q    Would you compare the TD statement in front of you for

5    May to see if they match?

6    A    I would need an adding machine to do that.  There is a

7    week's worth of information here on my cash book and I'd have

8    to add up the week on the bank statement.

9    Q    Well, rather than put you through the math, fair to say

10   that what you would do is make sure that when you closed out

11   the ATM machine, you made sure to record that in the cash

12   book?

13   A    Yes.

14   Q    Did you send -- did you send both your TD statements and

15   your cash book to the accountant at Graf Repetti?

16   A    Yes.

17   Q    Why did you do that?

18   A    Because they recorded into the general ledger.

19   Q    What was the general ledger used for, in your

20   understanding?

21   A    It was used for our income and tax reporting.

22   Q    Tell us about your relationship with Graf Repetti,

23   please.

24   A    They are our accountants.

25   Q    How long had then been your accountants?

1   A    They were accountants prior to me becoming a partner in

2   PRP and College Point Restaurant.  My brother used them when

3   he was with Ron Bob Pub but I was not part of that.  So it

4   goes back to prior to my knowledge.

5   Q    With whom did you work at Graf Repetti?

6   A    Currently I'm working with Steven Battino and Marciano

7   Filippone.  That's changed over time.

8   Q    Okay.  On a day-to-day basis, with whom do you deal?

9   A    I don't really deal with them daily.

10  Q    Who do you deal most --

11  A    Marciano Filippone.

12  Q    You say you provided the cash book and the bank

13  statements.  Is there anything else you provide to

14  Mr. Filippone?

15  A    I give him the check stubs from my checkbooks.

16  Q    Any credit card information?

17  A    The credit card information I summarize on the front of

18  the cash book and it's also included in the Merrill Lynch bank

19  statement.

20  Q    Do you give that to Mr. Filippone?

21  A    Yes.  He gets both.

22  Q    Now I am going to ask to you look, please, at Exhibit 24.

23  A    I only go up to 14.

24  Q    Let me help you out there.

25       (Pause.)

P. Potenza - cross - O'Shea                    171

1           Do you recognize that document or those documents?

2    A    I recognize the form.  I recognize the documents now that

3    it has been shown to me in my deposition.

4    Q    Were these records kept in the usual course of business

5    by PRP?

6    A    No.

7    Q    How were they used, in your understanding?

8    A    They were used by the managers to balance out their

9    information.

10   Q    Were they given to you?

11   A    No.

12   Q    Did there ever come a time when you used the scratch

13   sheet like this?

14   A    No.

15   Q    Were these documents used for the preparation of your

16   cash books?

17   A    No.

18   Q    Or the tax returns?

19   A    No.

20   Q    Were they ever -- withdrawn.

21          There has been testimony in this record that you

22   took these sheets home on Friday.  Is that true?

23   A    No.

24   Q    Did you ever take these documents home?

25   A    No.

P. Potenza - cross - O'Shea                    172

1    Q     Now, let me take you to 2007, the year 2007.

2          Do you recall a time when Joe Johnson came to you

3    and asked for a loan?

4    A     Yes.

5          Well, he didn't ask for a loan.  I had a

6    conversation with him and he sounded very down.  He had been

7    going through a divorce.  And I asked him what was the matter.

8    He said he was having some problems with his credit cards and

9    that they were going to foreclose on his house because he was

10   in default on his credit cards.

11   Q     So what happened?

12   A     He was a little disgusted.  He said he was going to let

13   them take the house.  He didn't care.  I tried to talk to him

14   and say Joe, you can let them take your house.  How much money

15   are you talking about?  And he said it was approximately

16   $10,000.  And I said you know what, you know, maybe I could

17   lend you the money.

18         Subsequent to that, it became -- the ten thousand

19   became 15,000 and then the 15,000 became 20,000.  So I had

20   asked my partner Allan if he wanted to also, you know, be part

21   of the loan, and one -- he said yes.  But then when my brother

22   got wind of it he said we would lend him the money from the

23   company.  It was $21,000 at that point.

24   Q     Okay.  Go to the smaller binder that's in front of you

25   and look at Exhibit G, please.

GR        OCR        CM        CRR        CSR

P. Potenza - cross - O'Shea                    173

1    A    Okay.

2    Q    Page 5168 at the bottom of that exhibit, what is that?

3    A    That's a promissory note that we drew up for Joe Johnson

4    to sign that he was borrowing $21,000.  It was signed by Joe

5    Johnson as the borrower and my brother Robert Potenza as the

6    lender.

7    Q    Did Mr. Johnson repay this loan?

8    A    Partially.

9    Q    Let's talk about Mr. Johnson's departure from PRP.

10        When did that occur?

11   A    April of 2010.

12   Q    What were the circumstances of his departure?

13   A    He had a falling out with my brother regarding some pay

14   increase he had given to certain people.

15   Q    Was he fired?

16   A    No.  Actually, he left.

17   Q    Did there come a time after he left when you met

18   Mr. Johnson?

19   A    Yes.

20        We had owed him an additional day's pay and

21   reimbursement for some gift certificates.

22   Q    What are gift certificates?

23   A    Gift certificates are the credit card transactions that

24   are used for entry into the VIP room.

25   Q    You owed him some money for that?

1    A     Yes.

2    Q     Did you pay him?

3    A     Yes.

4    Q     When you -- where did you meet with him?

5    A     I didn't really want him to come to the premise because,

6    you know, he was a little hot under the collar with my

7    brother.  So I agreed to meet him in Valley Stream, in a

8    parking lot.

9    Q     Did you have a conversation with him?

10   A     I gave him the money and I asked him what he was going to

11   do now.  And he said he had several jobs lined up, that he was

12   going to collect Unemployment.  And I said, you know, why did

13   this happen.  And he said because I hate your brother's guts

14   and I am going to destroy him.

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

GR        OCR        CM        CRR        CSR

1   BY MR. O'SHEA:

2   Q     Did you ever beg him not to report you to any authority?

3   A     No.

4   Q     Did you have any conversation, in words or substance,

5   that could be construed in your understanding as your

6   beseeching him not to report you or PRP to any authority?

7   A     Absolutely not.

8   Q     Were you concerned about being reported to anyone?

9   A     No.

10  Q     Let me ask you to turn to Exhibit I.

11  A     Okay.

12  Q     Do you recognize this document?

13  A     Yes, I do.

14  Q     What is it?

15  A     It's a document that Mr. Johnson faxed over to us on

16  April -- May 24, telling -- it says as "Per our agreement,

17  this needs to be signed 'Paid in full, 5/25 by you, Robert

18  Potenza.  If not, appropriate actions will be" -- it

19  says "frothcoming," I think it meant forthcoming.  Mr. Joseph

20  Johnson," and it was faxed from his home.  The number is

21  516-256-1168.

22  Q     What did you understand Mr. Johnson to be conveying in

23  this communication?

24  A     That he wanted to be released from his loan obligation.

25  Q     Or else what?

1   A    I have no idea.

2   Q    Did you take it as a threat?

3   A    Yes.

4   Q    You didn't know what exactly he was threatening?

5   A    No.

6   Q    Why don't you look at Exhibit M.

7   A    Okay.

8   Q    Do you recognize this document?

9   A    Yes, I do.

10  Q    What is it?

11  A    It was an e-mail that was sent to me from Joe Johnson.

12  Q    This apparently was sent May 24, 2010, according to the

13  document.  And the subject is "Re:  Here we go.  Let's see

14  what happens next."

15       And you respond, "Joe, I don't understand what you

16  are implying," and it goes on.

17       And it attaches one of these cover sheets, at

18  Claimant 5346.  Do you see that.

19  A    Yes.

20  Q    What was going on in this communication, in your

21  understanding?

22  A    I don't know.  That's why I said what he's implying, why

23  he's sending me this sheet, and, number one, why he has copies

24  of it.

25  Q    Were you fearful of his doing something with this

P. Potenza - cross - O'Shea                    177

1   coversheet?

2   A     No.  I think he was just, you know, angry.  But I don't

3   know.  I don't know what he's capable of.

4   Q     Is PRP in litigation with Mr. Johnson?

5   A     Yes, we are.

6   Q     As of when?

7   A     I believe it was December 2010.

8   Q     What is the litigation over?

9   A     It's over our domain name.

10  Q     And in your understanding, what are the allegations?

11  A     The allegations are that he took our domain name.

12  Q     What is the name?

13  A     Gallagher's --

14  Q     What is the name of your domain?

15  A     Gallagher's2000.com.

16  Q     In your understanding, what is Mr. Johnson's position?

17  A     His position is that he owns the domain name.  But he has

18  turned around on that now, and is willing to release the

19  domain name back to us.

20  Q     Do you recall a New York State Department of Labor

21  audit --

22  A     Yes.

23  Q     -- of PRP?

24  A     Yes.

25  Q     When was that?

P. Potenza - cross - O'Shea                    178

1   A    It was in May 2010.

2   Q    And what was the audit over?  What was the subject of the

3   audit?

4   A    I believe the subject of the audit was that there were

5   people that were being paid off the books.

6   Q    And how did it resolve?

7   A    It resolved with us paying $9,000 for a three-year

8   period, which was kind of like a nuisance settlement.

9   Q    When you say it's a nuisance settlement, is it a

10  settlement you discussed with your accountant?

11  A    Yes.  It was recommended by my accountant.

12  Q    Did your accountant say why he recommended it?

13  A    Because it would cost more to litigate it and fight it

14  than it would be to pay the money.

15  Q    Is there any other audit of PRP, either in the past or

16  currently underway?

17  A    There's a sales-tax audit.

18  Q    And what is the subject of that audit?

19  A    Whether we paid the appropriate amount of sales tax.

20  Q    And how was that resolved?

21  A    It's still outstanding.

22  Q    Do you know the subject matter of the audit?

23  A    I'm not following the question.

24  Q    What is New York State auditing?

25  A    They are auditing whether we paid appropriate amounts in

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

P. Potenza - cross - O'Shea                    179

1   sales tax.  They used a methodology where they took out cost

2   of goods sold, factored that up by what they said was a profit

3   percentage, not considering the fact that we have different

4   prices during the day than we do at night, not considering the

5   fact that if you buy a drink in the daytime the lunch is

6   included as, you know, an add-on to the price.  It's three

7   dollars for lunch and a drink.  So, there was a lot of

8   discrepancies in their methodology, and we've been working, my

9   accountants have been working, with them to try and close the

10  gap.

11  Q    Suffice it to say that audit is not resolved and you're

12  still working to explain your position to the New York State

13  tax authorities?

14  A    We had come very close to settling, but the Tax

15  Department asked that we would allow them to expand it to the

16  current period, which we agreed to, and it's still pending.

17  Q    Did any of these audits or any concern over taxation bear

18  on how PRP conducted its deposits into bank accounts?

19  A    No.

20  Q    Ever?

21  A    No.

22            MR. O'SHEA:  Thank you.

23            Nothing further, your Honor.

24            THE COURT:  All right.

25            Redirect?

P. Potenza - redirect - Hill                180

1          MS. HILL:  Can I have a couple of minutes, your

2     Honor?

3          THE COURT:  A couple of minutes?

4          MS. HILL:  Yes.

5          THE COURT:  Are you asking for a break, or do you

6     want to have everyone wait for a couple of minutes?

7          MS. HILL:  Could we have the afternoon break now?

8          Let's reconvene at 3:15.

9          MS. HILL:  Thank you, your Honor.

10         MR. SOCKOL:  May I approach the witness, your Honor

11    in to make the binder --

12         THE COURT:  We're in recess.  You can do whatever

13    you want.

14         (Recess.)

15         (In open court.)

16         THE COURT:  All right.  Be seated, please.

17    REDIRECT EXAMINATION

18    BY MS. HILL:

19    Q    Ms. Potenza, I just wanted to clear up something that was

20    asked of you on cross or direct.  I think you testified that

21    when Mr. Johnson was there, the DJ and house-mom fees went to

22    the general manager and not back to PRP?

23    A    That's correct.

24    Q    Okay.  So, I want you to look again at Government's

25    Exhibit 24, which is Claimant Number -- no.  Government's

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Filippone - direct - Filippone                181

1   Exhibit 8.  I'm sorry.  It is Plaintiff's Bates Number 1526.

2   A    Yes.

3   Q    And that is a page from the cash book, is it not?

4   A    Yes.

5   Q    From May of 2009; correct?

6   A    Yes.

7   Q    And as of May 2009, Mr. Johnson was the general manager

8   at PRP; correct?

9   A    That's correct.

10  Q    So, the house fees represented there at that time would

11  not have included the DJ and the house mom, any money to the

12  house from the DJ and house mom; that is correct?

13  A    On the days that Mr. Johnson worked, which would be

14  Tuesday through Saturday.

15  Q    Tuesday through Saturday, he worked there?

16       So, five days out of the week, at least.

17  A    That's correct.

18  Q    No DJ, no house-mom fees would be included?

19  A    No.

20       MS. HILL:  Thank you.

21       THE COURT:  Anything else?

22       MS. HILL:  No, your Honor.

23       THE COURT:  You may step down.

24       (Witness excused.)

25       THE COURT:  You may call your next witness.

1          MS. HILL:  Our next witness is Marciano Filippone.

2          MR. O'SHEA:  Your Honor, since her testimony is

3   over, may Ms. Potenza stay in the courtroom?

4          THE COURT:  Yes.

5          I assume you are not going to recall her during your

6   case?

7          MR. O'SHEA:  No.  Yes, your assumption is correct.

8   M A R C I A N O    F I L I P P O N E,

9          having been duly sworn, was examined and

10              testified as follows:

11         THE COURT:  Please have a seat.  Pull that

12  microphone closer to you and state your name for the record.

13         THE WITNESS:  Marciano Filippone.

14         THE COURT:  Spell it.

15         THE WITNESS:  First name is M A R C I A N O, last

16  name is F I L I P P O N E.

17         THE COURT:  You may inquire.

18         MS. HILL:  Thank you, your Honor.

19  DIRECT EXAMINATION

20  BY MS. HILL:

21  Q    Mr. Filippone, where do you live?

22  A    I live in South Huntington, New York.

23  Q    Where do you work?

24  A    I work in Plainview, New York.

25  Q    For what company?

Filippone - direct - Filippone                183

1   A      For Graf, G R A F, R E P E T T I, & Company.  I'm an

2   accountant, CPA.

3   Q      What do you do for Graf Repetti & Company?

4   A      I'm a CPA.  I do accounting work for them.

5   Q      How long have you worked for Graf Repetti & Company?

6   A      For Graf Repetti & Company specifically, I have worked

7   for a year and a half.  I was an employee of a company called

8   Zeidman Lackowitz & Prisand, ZLP for short.  That merged with

9   Graf & Repetti a year and a half ago.  I was an employee of

10  Zeidman, Lackowitz & Prisand.

11  Q      So, the total with both Graf Repetti and its predecessor

12  firm was about six years?

13  A      About seven years.

14  Q      About seven years.  Okay?

15         Can you briefly, for the record, describe your

16  duties.

17  A      Well, as a staff accountant, as I'm referred to, I

18  prepare payroll tax returns, I prepare sales tax returns, I

19  prepare income tax returns for corporations, partnerships and

20  individuals.

21         I do this all for clients of the firm.

22  Q      One of the clients of the firm is PRP Restaurant?

23  A      That's correct.

24  Q      Is that one of the accounts that you work on?

25  A      That is.

1   Q     And describe the nature of the services that you

2   specifically provide for PRP.

3   A     I do their -- I used to do, up until a year ago, their

4   payroll tax returns.  Now, a different employee of the firm

5   does that.  I do their sales tax returns, their corporate

6   income tax returns, as well as I get bank statements from them

7   and checks and some other financial information in the form of

8   what we call cash books, the cash activity, and I record all

9   of that into Quick Books for them.  It's generally kind of a

10  bookkeeping function.

11  Q     Most of your interactions at PRP were with Patricia

12  Potenza?

13  A     That's correct.

14  Q     With anyone else?

15  A     Every once in a while, with Robert Potenza, not very

16  often.

17  Q     What records do you use to perform your responsibilities

18  at PRP?

19  A     Generally, on a monthly basis, actually, Pat will send me

20  bank statements, copies of checks and the cash books that I

21  referred to.  Also, you know, sometimes it's just a

22  conversation I might have with her if I have questions.

23  Things like that.

24  Q     Okay?

25        And it's using this information, you prepare general

1   ledgers.

2   A     Correct.  I enter all the information into a program

3   called Quick Books.  Quick Books basically compiles it into

4   some usable data.  The general ledger is a list of all those

5   transactions for a given period, and it's pretty raw data, but

6   it is what is used to prepare things inevitably that we put on

7   the tax returns.

8   Q     Right.  That was going to be my next question.  From this

9   data that Ms. Potenza provides to you, that's the information

10  you use to prepare the tax returns?

11  A     Correct.

12  Q     And how would you characterize the size of PRP?

13  A     I've used the term mom-and-pop shop before.  Generally,

14  you know, they are not a huge, multi-billion dollar company.

15  They have three owners.  They are relatively small in the

16  grand scheme of things.  It's generally the size client that I

17  work with.

18  Q     Would you estimate it has roughly three to five million

19  annually in gross revenues?

20  A     That sounds about right.

21  Q     This estimate is based upon information that is provided

22  to you from Ms. Potenza?

23  A     Yes.

24  Q     Just a couple of questions?

25        About the cash on hand that you are aware of and

1   working with the business, I want you to turn to page --

2   Government's Exhibit 8.  It should be in a binder in front of

3   you.

4   A     Okay.

5   Q     I want you to turn to a page that is Claimant's 1526.  On

6   the bottom-right side of the page, you should see the word and

7   those numbers.

8   A     Okay.

9   Q     Do you see the amount of cash on hand reflected in

10  Government's Exhibit 8 there at Claimant 1526?

11  A     At the end of May 2009, it was 442,229.23.

12  Q     And in your experience as an accountant for small

13  businesses, can you think of a business reason for keeping in

14  excess of $400,000 in cash on hand in that way?

15        MR. O'SHEA:  Objection.

16        THE COURT:  Sustained.

17  Q     Moving on, then.  What documents do you use in preparing

18  payroll records for PRP?

19  A     What Pat generally sends us is the information on the new

20  employee, such as their name, address, ID number and their

21  gross wages, as well as their withholding information, single,

22  married, how many dependents.

23        We come up with a withholding schedule for them

24  using a website called paycheckcity.com, and we provide that

25  on a weekly basis -- we provide that as a weekly figure, I

1   should say, to Pat, and then we track it using Excel and also

2   Quick Books, so that we can prepare the documents quarterly,

3   the payroll tax returns quarterly and also annually.

4   Q    All right?

5        I'm going to show you several exhibits.  I'm not

6   sure if they are in the books in front of you.  Government's

7   Exhibit 13, is that in one of the binders in front of you.

8   A    It is.

9   Q    Now, do you recognize Government's Exhibit 13?

10  A    Yes.

11  Q    Can you identify it?

12  A    This is the information that would be provided to me from

13  Pat.  This one in particular shows the removal of an employee.

14  So, when I receive this, Henry Hernandez here, I would have

15  taken him off of my records and stopped tracking that on a

16  weekly basis.  It also shows any additions and changes.  So, I

17  would have changed Jason's gross income and rerun the figures

18  for them, and I would have added Julio to the payroll.

19  Q    Let's go now to Government's Exhibit 12.

20  A    Okay.

21  Q    Is this a payroll spread sheet?

22  A    This is the spread sheet in Excel that I use to track

23  that payroll.

24  Q    Again, this is all information that you received from Pat

25  Potenza, the withholding information that you provided to her;

1    right?

2    A    Correct.  She provides me the raw data, I look up the

3    withholding information, provide that back to her, and then

4    track it using this spread sheet.

5    Q    Using this information, that you prepare the quarterly

6    tax returns?

7    A    That's correct.

8    Q    And let's go to Government's Exhibit 14.

9    A    Okay.

10   Q    Are these the tax returns that are prepared from that

11   data?

12   A    They are.  The 940 specifically, which was page one, is

13   an annual return.  The other tax returns are done on a

14   quarterly basis.

15   Q    Now, when you prepare the tax returns or payroll

16   information, is any data provided to you relative to the

17   number of days that an employee worked or anything along those

18   lines?

19   A    No.

20   Q    Well, how, again, are you able to prepare payroll

21   services without that kind of information, such as what days

22   someone worked?

23   A    I put in the weekly information into the website, and the

24   withholding is generated based on that.

25   Q    To your knowledge, then, there are no contemporaneous

1    records created in connection with the payroll services?

2    A    Correct.

3              THE COURT:  When you say the weekly payments -- hang

4    on one second -- the "weekly information," what do you mean by

5    the "weekly information"?

6              THE WITNESS:  What Pat gives me is their weekly pay,

7    and I run it through the program.  I don't know how many hours

8    a week or how many days a week they actually worked.  I just

9    know that any given week, they earn X amount.  Based on that

10   amount, the program runs withholding and payroll tax data,

11   basically extrapolating it throughout the whole year.

12             THE COURT:  She's basically giving you for each

13   employee every week?

14             THE WITNESS:  She's giving me, each employee, a

15   weekly amount, that I assume doesn't change unless she informs

16   me otherwise.

17             THE COURT:  When an employee starts, she gives you a

18   weekly amount for that employee, you then back out of that the

19   withholding, essentially?

20             THE WITNESS:  Correct.  I come up with the net

21   amount that she would then pay them.

22             THE COURT:  Okay.  Got it.

23   BY MS. HILL:

24   Q    Sometime in 2008, did you become aware of an issue

25   involving a sales-tax audit by New York State?

1   A    I did.

2   Q    I want you to look at Government's Exhibit 20.  I'm not

3   sure if that's in the books that are before you.

4   A    It should be.  Just give me a second.

5   Q    Okay?

6          (Pause.)

7   A    Okay.

8   Q    Now, 20 is a letter from the sales tax auditor?

9   A    Yes, it is.

10  Q    And this is addressed to you?

11  A    Yes.

12  Q    And Mr. Samuel, is that the author of the letter,

13  Mr. David Samuel?

14  A    It is.  He's a sales tax auditor.

15  Q    And he requested some additional information from you?

16  A    Yes.

17  Q    This is addressed to you; correct?

18  A    It is.

19  Q    When you received Government's Exhibit 20, did you send a

20  copy of it to Pat Potenza in order to obtain answers from her

21  to Mr. Samuel's questions?

22  A    I did.  And I also discussed it with her.

23  Q    And did she provide these answers to you by writing on

24  the document and sending it back?

25  A    It was a combination of what's written here and I'm sure

1   we spoke over the phone about it.

2   Q    Under Item 2, entitled "House fees," the letter

3   asks, "What does that amount represent?," and what did

4   Ms. Potenza tell you?

5   A    It's basically a facility charge.  It's a fee paid by the

6   dancers at the club to PRP, to the house.

7   Q    Okay.  A fee paid by the dancers to the house for the

8   privilege of dancing there?

9   A    Correct.

10  Q    Nothing here indicates that there are VIP charges or

11  champagne room charges that comprise any portion of the house

12  fees?

13  A    Correct.

14  Q    I want you to look at Government's Exhibit 21.

15  A    Okay.

16       THE COURT:  Hang on one second.  Before you get

17  there:  Did you ever have any discussion with Ms. Potenza

18  about champagne room charges or VIP charges?

19       THE WITNESS:  We discussed it after the sales tax

20  auditors brought it up, and I don't remember exactly the

21  context of how they brought it up or when.  It was sometime

22  after this letter.

23       And they asked us about the VIP rooms, and at that

24  point, I started discussing it with Pat.

25       THE COURT:  Okay.  And what did you learn?

1          THE WITNESS:  Basically, that there are VIP rooms,

2     and that the charges that they take in, the amount that they

3     take in, for whatever usage of that VIP room, is also lumped

4     together with the house fees.  They have always considered

5     them all to be house fees.

6          THE COURT:  Okay.  Did you communicate that to the

7     state sales tax authorities?

8          THE WITNESS:  I did.  It may have been verbally.  I

9     don't remember actually writing anything.  But they are aware

10    of it now.

11         THE COURT:  Thank you.  Please continue.

12    BY MS. HILL:

13    Q    I wanted to look at Government's Exhibit 22 and the

14    August 5, 2008 response to the state sales tax body.

15         Did you indicate in this response that the house

16    fees also included VIP charges.

17    A    I did not.

18    Q    That's something that came later?

19    A    Yes.

20    Q    Let's look at, now, Government's Exhibit 22.

21    A    Okay.

22    Q    Government's Exhibit 22 is approximately two years after

23    -- maybe a year and a half or so after Government's Exhibit

24    21?

25    A    Right.  It's March to May of 2010.

Case 1:10-cv-01866-BMC   Document 66   Filed 03/09/12   Page 193 of 300 PageID #: 1849

1   Q     Now, what is Government's Exhibit 22?

2   A     Basically, when we started to discuss with the New York

3   State Department of Taxation about sales tax, they told us

4   that they consider VIP room charges a separate form of

5   admission charge, since it's an admission to a separate room,

6   a separate area of the club.  They don't consider it a house

7   fee.  So, like admission charges, there should be sales tax

8   based upon it.  So, what we started to do, what Pat started to

9   do, on a monthly basis, was track VIP rooms separately from

10  house fees, and what we attempted to do, at the bottom, when

11  you see the percentage, is figure out how much of the house

12  fees was actually VIP room charges.

13  Q     What percentage did you come up with?

14  A     Well, in March, it's 24.76.

15        April is 24.78.

16        And in May, it's 25.06.

17        So, roughly twenty-five percent on average is what I

18  can see here.

19  Q     And then, let's look again at Government's Exhibit 23.

20  Is that another analysis of the percentage of the actual

21  income from house fees?

22  A     It is.

23  Q     Describe that one.

24  A     By this point, one of the things that we were discussing

25  with the New York State auditor was how to apply this figure

1  backwards, since there was no information on VIP room charges

2  ever tracked before.  So, what I came up with was a few months

3  here of the percentage of VIP room charges to house fees.  And

4  the purpose of this was to propose an amount to them or to

5  somehow come to a decision on an amount that we would use as a

6  look-back period, essentially, which, what I circled here, was

7  27.3 percent, and I know I have a separate calculation there

8  for thirty percent just to use a round number.

9            THE COURT:  I take it once you started breaking out

10 the VIP room fees, the house fees went down; right?

11           THE WITNESS:  The true house fees went down.

12           THE COURT:  Okay.

13           What impact did that have on sales tax that would be

14 owed, to put more in into the VIP room and less into the house

15 fees?

16           THE WITNESS:  Well, VIP rooms are subject to sales

17 tax, and house fees are not.

18           THE COURT:  Got it.  Thank you.

19 BY MS. HILL:

20 Q    And again, the New York State auditor sort of returned to

21 you a year and a half after you had given a house -- an

22 explanation of the house fees, and asked you, What about the

23 VIP room?, and that's what led to these calculations?

24 A    Yes.

25           MS. HILL:  Your Honor, nothing further of this

Filippone - cross - O'Shea                    195

1    witness at this time.

2                THE COURT:  All right.

3                Any cross-examination?

4                MR. O'SHEA:  Yes, your Honor, please.

5                THE COURT:  All right.

6    CROSS-EXAMINATION

7    BY MR. O'SHEA:

8    Q     Good afternoon, Mr. Filippone.

9    A     Good afternoon.

10   Q     We've met before; right?

11   A     Yes.

12   Q     And you also met before your testimony with the

13   government; correct?

14   A     We spoke on the phone.

15   Q     And were you cooperative with them?

16   A     Yes.

17   Q     Agreed to answer all their questions?

18   A     Yes.

19   Q     Did anyone from PRP tell you not to do that?

20   A     No.

21   Q     Or suggest that you not do that?

22   A     No.

23   Q     Now, these documents, Exhibits 20 through 23 that you

24   were shown by Ms. Hill, it's fair to say that these are all

25   your back-and-forths with the New York State sales tax

1    authorities to try and get to a number to settle the sales-tax

2    audit; correct?

3    A    It was a back-and-forth with myself and the sales tax

4    auditor and Pat.  The three of us were generally, at that

5    point, involved in this, and it was to get to a settling

6    point; correct?

7    Q    Now, in your discussions with Ms. Potenza, did you learn

8    that there was a litigation, if you will, a case that had held

9    that these fees were not subject to sales tax?

10   A    There was a case that was more specifically about

11   admission charges not being subject to sales tax.  And one of

12   the points they brought up in that case was house fees and VIP

13   room charges in general.  So, we, at one point, were speaking

14   to the auditors about -- there was a point when the case had

15   closed and admission charges were not subject to sales tax,

16   and so we were back and forth with the sales tax auditors

17   about that point, as well.

18   Q    Fair to say that at some point, the law changed as a

19   result of an appeal for the Night Moves case; is that correct?

20   A    I believe that's the name.  It was Night Moves somewhere

21   Upstate New York.  The case had closed, and it subsequently

22   was appealed, and that decision was reversed, and now

23   admission charges are again subject to sales tax.

24   Q    Did that have some effect, in your understanding, about

25   how PRP was tracking its house fees or admissions?

1    A    I'm not sure if it affected how they were tracking the

2    house fees.  We certainly were looking at it, because

3    admission charges are tracked separately.  But it did, like I

4    said, it did mention house fees and VIP room charges, and it

5    was an indication that I had discussed with the sales tax

6    auditor.  I don't remember if that case specifically brought

7    up the VIP room charges the first time, but it was in that

8    realm that they were brought up.

9    Q    In terms of order of magnitude of the sales tax that

10   might be due and owing in some sort of a settlement, what are

11   we talking about here?

12   A    It depends.  Based on what we had come up with, this

13   roughly thirty percent number, I think over a three-year

14   period, additional sales tax due would have been 80 or 90

15   thousand dollars.  That's sheerly off the top of my head.  But

16   somewhere along those lines.

17   Q    So, under $100,000?

18   A    Yes.

19   Q    And that's over a three-year period?

20   A    Yes.

21   Q    Would, in your experience, the New York State sales tax

22   authority often settle for less?

23   A    I can't really comment on that.  This is the first

24   sales-tax audit I've really been a part of to this degree.

25   Q    Fair enough?

Filippone - cross - O'Shea                    198

1          You also testified about payroll that was reported

2     by Ms. Potenza, and I think you said it was reported on a

3     weekly basis; is that fair.

4     A     Yes.

5     Q     And I think you said in your testimony earlier that you

6     worked with a lot of mom-and-pop type shops?

7     A     Yes.

8     Q     Is PRP's reporting of payroll, particularly for a cash

9     business, pretty consistent with the other mom-and-pop

10    clients?

11    A     There's a variance among them all, but it's nothing that

12    I have not seen before, nothing that really stood out to me.

13    Q     Nothing that caused you alarm or concern?

14    A     That's correct.

15    Q     And you were asked, also, about Exhibit 8, in particular

16    page 1526.  Do you recall that?

17    A     I'll have to look at it again.

18    Q     Sure?

19          (Pause.)

20    A     Okay.

21          (Continued on next page.)

22

23

24

25

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   CONTINUED CROSS-EXAMINATION

2   BY MR. O'SHEA:

3   Q    You were asked about the balance on line, I think it's

4   39, 442 -- 442, 229, something, do you see that?

5   A    Yes.

6   Q    Is this figure reported to the IRS?

7   A    It is.

8   Q    And taxes were paid on it?

9   A    Yes.

10  Q    I just want to go back a little bit and without trying

11  not to repeat what Ms. Hill covered, you told us you were a

12  CPA, do you keep current on licensing?

13  A    I do.

14  Q    How often do you do that?

15  A    Every year I'm required to take what they call CP,

16  Continuing Special Education credits, 40 hours worth.  So it

17  is spread throughout the year.  Usually -- usually not during

18  tax season but other than that, annually 40 credits.

19            THE COURT: Forty hours a year?

20            THE WITNESS:  That's correct.

21            THE COURT:  Lawyers have to do that?

22            MR. O'SHEA:   This is every two years.

23            MR. MORRIS:   Twenty-four hours every two years.

24            THE WITNESS:  Some of the lawyers are smiling.

25            MR. O'SHEA:  And we complain every minute.

1   Q     Now, before this Zeiman firm is it fair to say you were

2   working in the accounting field?

3   A     Yes.

4   Q     At various firms?

5   A     Yes.

6   Q     And for how long have you been working as an accountant?

7   A     About nine years in total now.

8   Q     And how long as a CPA, sir?

9   A     About four years.

10  Q     Now, what type of corporate entity is PRP?

11  A     PRP is what we call an S corporation which is a

12  corporation taxed as a partnership, essentially.

13  Q     Is it because it's taxed as a partnership do you prepare

14  and render to the partners, to the shareholders, K 1s?

15  A     I do.

16  Q     And you do that every year?

17  A     Yes.

18  Q     And do you do that based on all the cash flow income and

19  the cash that you see in the bank accounts?

20  A     Yes, based on any and including the bank accounts and the

21  cash flows.

22  Q     Credit card income, any income at all?

23  A     No.

24  Q     Are you aware of a company called Ron Bob Pub?

25  A     I am.

1   Q     What is that company?

2   A     Ron Bob Pub is a corporation, C corporation, that's owned

3   by the same owners as PRP.  What they do is generally they act

4   as an intermediary between the certificate that people could

5   purchase and use at the club, and then basically pay with the

6   certificates, rather than with cash.  Then those certificates

7   would be brought by the dancers to Ron Bob or an officer of

8   Ron Bob in some capacity to exchange that for cash that they

9   can use.

10  Q     What kind corporation is it?

11  A     It's a C corp.

12  Q     Is it fair to say that most of Ron Bob Pub's revenue is

13  in the form of credit card transactions?

14  A     Yes, I think the machine is actually an ATM machine, so

15  that the deposits into Ron Bob are all electronic.

16  Q     Well, as long as you mentioned the ATM machine, were you

17  aware that there was an ATM machine on the premises of PRP?

18  A     I was.

19  Q     And do you know how it worked?

20  A     Well, I know that the ATM machine is also used by PRP

21  basically as an intermediary to make deposits.  They put their

22  own cash from the cash flow into the ATM machine which patrons

23  would then use to pay cash out.  Their bank account then gets

24  credited for whatever money was taken out, and so, through

25  that -- through that method, basically cash went from the cash

*Fillipone - cross/ O'Shea*                                    202

1    books on hand into their bank account.

2    Q    Would it be fair to say that the ATM acted as a medium

3    for cash deposits?

4    A    Yes.

5    Q    For $20 bills, $20 denominations?

6    A    I don't know what the denominations were.

7    Q    Okay. Now, I think you told us that you got the cash

8    books from Ms. Potenza and also, got from Ms. Potenza the bank

9    statements; is that fair?

10   A    That's correct.

11   Q    And did you reconcile those two documents?

12   A    I entered the information into Quick Books. I don't

13   necessarily see if there are -- let me think about this. I

14   don't necessarily -- on the Merrill Lynch statements I'm also

15   receiving the bank stubs.  So, yes, I am reconciling the

16   Merrill Lynch statements, I am reconciling the cashbooks to

17   make sure it ties out at the ended.  The only thing I don't

18   usually see until I get the bank statements on those Chase

19   account and the other smaller account is those actual checks.

20   I make sure what appears on the bank statement is recorded,

21   and in that capacity, is that what you are considering a

22   reconciliation?  I would say, yes.

23   Q    Let me ask you this. The cashbooks you are aware reflect

24   cash deposit activity, correct?

25   A    Yes.

*Fillipone - cross/ O'Shea*                203

1    Q     And when you get --  when you get the bank statements do

2    you compare the cash deposit activity to the cash deposit

3    activity on bank statement?

4    A     I do.  Anything that is considered a cash deposit on

5    cashbooks, I also see that deposit in the bank statement.

6    Q     And do you do that for both physical deposits and ATM

7    deposits?

8    A     Yes.

9    Q     And has there ever been' an occasion in the last, say,

10   three or four years where you've noticed a discrepancy?

11   A     No.

12   Q     I'm going to ask you to look at Exhibit 24, please. Do

13   you recognize those sheets of paper in Exhibit 24?

14   A     I was shown this sheet during my deposition.

15   Q     Before your deposition had you ever seen it?

16   A     No.

17   Q     And had you used it in any way in your accounting for

18   PRP?

19   A     No.

20   Q     And Pat Potenza in your contact with her ever referenced

21   a sheet like that?

22   A     No.

23   Q     Talley sheet, a cover sheet, a work sheet?

24   A     No, I've never used it, no.

25   Q     Now, do you recall in 2010 there was an audit by the New

1    York State Department of Labor?

2    A    Yes.

3    Q    And do you recall the subject matter of the audit?

4    A    They presented -- ultimately they presented us with a

5    list of names that they told me they were informed of that

6    were basically working at PRP restaurant and asked us to

7    produce documentation that they were paid and accounted for

8    legally.

9    Q    And how did it result?

10   A    Some of the names were explainable in that they didn't

11   use their nickname, some of the names were actually there and

12   they were mistaken, and then some names we didn't know where

13   they got them from.  We asked them to produce more information

14   where the name came from ultimately, they said rather than go

15   into all of this, they came up with a figure to settle it,

16   rather than actually go full-blown audit on it, and that's

17   what we tried to do.

18   Q    Did you make a recommendation to that effect to the

19   client?

20   A    We discussed it. I wouldn't say -- well, yeah, I would

21   say I made a recommendation.  It wasn't my decision.  It was

22   their decision ultimately.  It was a cost benefit.

23   Q    And cost benefit in that it would cost more to fight it

24   than to settle it at the amount being offered?

25   A    Yes.

*Fillipone - redirect/ Hill*                                205

1    Q      Do you recall that amount?

2    A      Roughly 12 or 13,000. That, again, is off the top of my

3    head.

4    Q      It could of have been 9,000?

5    A      It could have been.  The 12 or 13 could have included

6    some type of interest.  I know it was ten-ish.  It could have

7    been nine.

8    Q      In your accounting for PRP, had you ever been

9    professionally concerned about any of their accounting

10   practice?

11   A      No.

12           Mr. O'SHEA: Thank you.

13           Nothing further.

14           THE COURT:  All right. Any redirect?

15           MS. HILL: Just a few questions, Your Honor.

16   REDIRECT EXAMINATION.

17   BY MS. HILL:

18   Q      Mr. Filippone, Mr. O'Shea asked you whether the cash

19   figure on Government 8, whether taxes were paid on that cash

20   in hand in cashbooks, do you remember that?

21   A      I remember that.

22   Q      So, if any cash at the business didn't find its way into

23   the cashbook you wouldn't that, right?

24   A      That's correct.

25   Q      No taxes would have been paid on that money, would it?

*Fillipone - recross/ O'Shea*                                        206

1           MR. O'SHEA:  I'm sorry. Objection.

2           THE COURT:  Overruled.

3    A    As far as I know, right, because I wouldn't have known

4    about it.  What I use is the cashbooks to prepare my

5    information.

6    Q    And you never worked at PRP in any official capacity as

7    their accountant; is that correct?

8    A    Correct.

9           As their accountant I do all my work, what I

10   consider in-house.  They send me all the documents.

11   Q    So you never went to PRP and did any sort of an audit of

12   anything?

13   A    Correct.

14   Q    You relied exclusively on documents that were sent to you

15   by Pat Potenza and bank records?

16   A    The bank records, conversations, but it was not an audit

17   or anything in that capacity.

18           MS. HILL:  Thank you.

19           THE COURT: Anything else?

20           MR. O'SHEA:  May I do it from here?

21   RECROSS EXAMINATION

22   BY MR. O'SHEA:

23   Q    Is it fair to say that you also received credit card

24   receipts, account statements from Merrill Lynch?

25   A    Bank statements, I received credit card receipts I had

1   seen because of the sales tax audit, but what I do see on the

2   bank statements is the credit card transaction.  They hit the

3   bank statements as well.

4   Q     So the bank statements, fair to say, reflect many

5   thousands, sometimes hundreds of thousands of dollars, in

6   cash; correct?

7   A     Yes.

8   Q     And they match up in your experience with cashbooks?

9   A     Yes.

10        MR. O'SHEA:  Thank you.

11        Nothing further.

12        THE COURT:  I have a couple of questions.

13        How long have you been reviewing the bank statements

14   for the business?

15        THE WITNESS:  Ever since I've been working on the

16   account, the bank statements, it is one of those things that

17   gets sent to me, along with checks and the cashbooks.

18        THE COURT:  The bank statements, of course, show you

19   each deposit that's made to the account separately, right?

20        THE WITNESS:  They do.

21        I don't always look at that.  Sometimes I just look

22   at a lump sum because it's added up for me.

23        THE COURT:  Right. Are you familiar with the

24   currency report transaction requirements the over $10,000?

25        THE WITNESS:  I have become familiar with it in the

1   course of this case.

2           THE COURT:  Did you know anything about it before

3   this case?

4           THE WITNESS:  I had heard about it.  I knew there

5   was something.

6           THE COURT: All right. Anything else from the

7   parties?

8           MR. O'SHEA:  Nothing further, Your Honor.

9           MS. HILL:   No, Your Honor.

10          THE COURT:  Thank you, very much.

11          You may step down.

12          THE WITNESS:  Thank you.

13          THE COURT:  All right. The government may call its

14   next witness.

15          MR. MORRIS:  The government calls financial

16   investigatory Richard Guerci, Your Honor.

17          THE COURT: All right.

18    R I C H A R D   G U E R C I,

19          having been first duly sworn, was examined

20          and testified as follows:

21   DIRECT EXAMINATION

22   BY MR. MORRIS:

23   Q    Mr. Guerci, where are you currently employed?

24   A    Currently employed by a company called ASRC Primus, which

25   is a company that's located in Maryland.

1    Q      ?  And what does ASRC Primus do?

2    A      Among other things, they provide investigative assistance

3    to the IRS Criminal Investigation Division in the areas of

4    asset forfeiture, includes positions which are deemed to be

5    analyst, as well as financial investigation.

6    Q      And what is your position?

7    A      Currently employed as a financial investigator working

8    for ASRC in the capacity as a contract employee for the IRS

9    Criminal Investigation Division in the New York field office.

10   Q      And approximately, how long have you been employed in

11   that position?

12   A      For just over two years.

13   Q      And what are your responsibilities in that position?

14   A      My primary responsibility is to provide investigative

15   assistance in the area of asset forfeiture, primarily in cases

16   involving bank secrecy act violations, as well as money

17   laundering investigations.

18   Q      And where were you employed prior to your position as a

19   financial investigator for ASRC?

20   A      I was employed as a special agent with the IRS Criminal

21   Investigation Division in Newark, New Jersey field office for

22   approximately 26 years.

23   Q      And what were your responsibilities as a special agent

24   with the IRS?

25   A      My primary responsibility was to investigate violations

1   of the internal revenue laws, as well as violations of the

2   Bank Secrecy Act and the money laundering statutes.

3   Q    And in your capacity as special agent, did you specialize

4   in any particular types of investigations?

5   A    For, approximately, the last 19 or 20 years in my career,

6   I specialized in working in Bank Secrecy Act violations and

7   money laundering investigations.

8   Q    And as a special agent were there any specific positions

9   or titles that you held?

10  A    Yes.  Well, while I was there I was the agency

11  representative at the Drug Enforcement Administration to a

12  task force referred as Organized Drug Information Enforcement

13  Task Force.   I was also a certified expert witness in the

14  area of money laundering and Bank Secrecy Act Violations where

15  I was certified by my agency.

16  Q    And what is the highest level of education that you

17  achieved, Mr. Guerci?

18  A    I am a college graduate.

19  Q    And where did you attend college?

20  A    Glassboro State in New Jersey.

21  Q    And what was your degree in?

22  A    My degree was in law justice, and I had a minor in

23  business administration.

24  Q    Okay.  When did you graduate college?

25  A    I graduated in college 1982.

1  Q    Did you receive any training in the areas of bank secrecy

2  act violations and currency reporting?

3  A    Yes.  During my tenure as a special agent with the IRS I

4  received training specifically in that area, I attended

5  numerous conferences, seminars that dealt specifically with

6  the subject of bank secrecy act and money laundering, as well

7  as asset forfeiture.

8  Q    Have you had occasion to actually provide any training as

9  an instructor in these areas?

10 A    Yes.  During my tenure as a special agent, and also as

11 financial investigator, I provided training not only to IRS

12 special agents but to agents of  other agencies which included

13 federal, state and local law enforcement officers, as well as

14 other professional associations, which included attorneys,

15 accountants and bankers as well.

16 Q    About how much times would you say that you provided

17 training?

18 A    I would say, at least 15 times if not more.

19 Q    And approximately, how many tax, money laundering or

20 currency crimes investigations have you either conducted or

21 participated or overseen or reviewed?

22 A    Over my career I have been involved in hundreds of

23 investigations that dealt with those subject matters.

24 Q    Have you received any reward words in the area of money

25 laundering and bank secrecy acts compliance?

1  A    Yes.  During my tenure I received numerous awards from

2  the IRS, rewards and commendations from not only IRS but other

3  federal agencies, as well as DEA, and United States Attorney's

4  Office in New York, as well as New Jersey.

5  Q    And have you ever testified before as an expert witness

6  in the areas of Bank Secrecy Act, currency reporting and money

7  laundering?

8  A    Yes, I have on a number of occasions.

9  Q    And when or where did you offer testimony?

10  A    I've testified in New York, New Jersey, as well as

11  Connecticut.

12  Q    And approximately, how many times would you say that you

13  have offered testimony as an expert in the areas of bank

14  secrecy act and currency reporting?

15  A    I have testified and been qualified as an expert 13 to 15

16  times.

17          MR. MORRIS: Your Honor, the government tenders

18  Financial Investigator Guerci to the Court as an expert in the

19  area of Bank Secrecy Act violations and currency violations?

20          THE COURT: Any objection?

21          MR. O'SHEA:  Your Honor, I guess I'll hold fire

22  until cross. If we can push this until after that, I'd

23  appreciate the that.

24          THE COURT:  That is fine.  I will certify him as an

25  expert for now.

1        MR. MORRIS:  Thank you, very much, Your Honor.

2   Q    Financial Investigator Guerci, you explain what steps

3   have been taken by the United States government to identify

4   large cash transactions?

5   A    Well, a number of things have been done.  First thing was

6   enactment of the Bank Secrecy Act which was in 1970.  There's

7   been a number of amendments as recently as of March of this

8   year to that act, but it specifically was designed to track

9   large cash that was being put into the banking system or moved

10  in or out of the country.  The primary purpose of this was to

11  track these large cash transactions and try to identify

12  individuals that were involved in illegal activities -- money

13  laundering, tax evasion, to be specific, as well as other

14  illegal activities, and as a result of this act there were a

15  number of currency transaction reports that were generated

16  which were to aid law enforcement or the U.S.  government in

17  identifying and tracking these cash transactions.

18  Q    Mr. Guerci, what is a currency transaction report or CTR?

19  A    A currency transaction report is a form that is required

20  to be filed by a financial institution when they have a

21  customer or individual that engages in a cash transaction in

22  excess of ten thousand dollars that's being deposited,

23  withdrawal, cash exchange or something of the like.

24  Q    And a deposit of funds over what time period would

25  trigger the CTR?

1    A      It would typically be on the same business day.

2    Q      What is the purpose of a CTR, Mr. Guerci?

3    A      The purpose is to actually track cash transactions in

4    excess of $10,000.

5    Q      And who's required to file CTR?

6    A      That would be required to be filed by the financial

7    institution engaged in the transaction with the customer.

8    Q      And what types of information go into a CTR?

9    A      Well, number -- a bit of information.  On the top part of

10   the form, part one, it would be you would identify the person

11   on whose behalf it was being transacted.  More specifically,

12   it would be the account, name, the account that was affected.

13          The second portion of that top portion would be the

14   individual that actually conducted the transaction.

15          Second part of the form they would identify the date

16   of the transaction, the amount of the transaction, and

17   specifically exactly what transpired, whether it be a deposit

18   or withdrawal, or cash exchange.

19          In the bottom portion, the financial institution

20   would be identified that actually filed the form.  They's be

21   identified by name, address, as well as their employee

22   identification number.

23   Q      And with respect to the information that you just

24   testified about, why is this information important?

25   A      Well, it's important so that the U.S. government can

1  track these large transactions.  It is important that the

2  information is accurate.

3  Q    In law enforcement are any assumptions made with regard

4  to information reflected on a CTR?

5  A    Well, we assume that the information that is contained is

6  accurate.  In fact, it is illegal to provide information that

7  is not accurate.

8  Q    And once a CTR is filled out by a financial institution

9  what happens to it next?

10 A    It is actually forwarded to a computer center in Detroit,

11 referred to as Detroit Computing Center, which is something

12 maintained by the IRS.

13 Q    And what happens when the form reaches this computing

14 center in Detroit?

15 A    At that point it is in-put into a very large database,

16 as I said, which is maintained by the IRS and it is available

17 for review not only by the IRS but other law enforcement

18 agencies as well.

19 Q    Are you familiar with the term multiple transactions CTR?

20 A    Yes, I am.

21 Q    And what is a multiple transaction CTR?

22 A    Well, multiple transaction CTR would be a CRT that would

23 be filed by the bank that involves multiple transactions.

24 Typically this would be a form that would be filed without the

25 knowledge of the customer.  It would be something that would

1   be identified typically by the back office as a result of

2   multiple transactions into an account on, in fact, the same

3   business day.

4   Q    And what type of examples might trigger the filing of a

5   multiple transaction CTR?

6   A    Well, if an individual went into a bank on, let's say, a

7   Saturday and conducted a transaction in the amount of less

8   than $10,000 and then walked in a bank on Monday, that would

9   be considered the same business day because Saturday is not

10  for banking purposes considered a business day.

11        Also, if somebody went into a bank and they went to

12  one branch and they made a deposit in the amount of less than

13  $10,000 and then went to this second bank on the same day and

14  made a deposit of less than $10,000, that would also trigger

15  multiple transactions CTR.

16  Q    And now how, if it all, is a multiple transaction CTR

17  different than just a regular CTR?

18  A    Well, as I indicated, it is typically filed without the

19  knowledge of the customer and a lot of the relevant

20  information that would be contained on a regular CTR is not

21  present -- primarily who conducted the transaction, which is a

22  very important piece of information for anybody that is

23  reviewing them, and also, you wouldn't really be able to

24  determine without going to the bank records exactly what

25  transpired.

1   Q     And just to clarify, why is it that this information

2   would not be reflected on a multiple transaction CTR?

3   A     Because the amount of money would be -- wouldn't be

4   broken down.  If it was multiple deposits into an account you

5   will typically see the lump sum figure; not the break down of

6   the deposit.

7   Q     And based upon your experience, have you drawn any

8   conclusions when multiple transactions CTRs are filed on a

9   particular account?

10  A     Typically, the mere existence of multiple transactions

11  CTRs would be deemed suspicious, especially when it's --

12  especially when they demonstrate that individuals were making

13  deposits on consecutive days that trigger the filing to

14  perform.

15  Q     Based upon your experience are individuals who routinely

16  deal in large sums of currency general aware of the existence

17  of CTRs?

18        MR. O'SHEA:  Objection.

19        THE COURT:  Yes, I am going to sustain that.

20  Q     In your experience as an agent of 20 years, or at least

21  20 years in the area of bank secrecy act and money laundering,

22  what are some of the reasons that individuals engage in

23  structuring?

24  A     Well, there's a number of reasons why individuals engage

25  in structuring but the primary reason is to avoid detection by

1   the government. They are typically involved in some form of

2   illegal activity and they want to keep that activity hidden

3   from the government, or more specifically, law enforcement.

4   Q    Are there different reasons why people structure in your

5   experience?

6   A    Yes, there are.

7            Structuring is done for a number of different

8   reasons, as I said. The objective of structuring is to avoid

9   detection, but people involved in different forms of illegal

10  activity would have a different purpose or reason for

11  structuring.  For example, individuals that were involved in

12  money laundering, their primary purpose would be to get the

13  money into the bank system to a void detection to essentially

14  make it look like it came from a legal source where it could

15  be more efficiently moved through the banking system and send

16  it back to the owners of the money.  Specifically, we are

17  talking about narcotics, money laundering organization.

18           Individuals that would be involved in tax evasion,

19  however, they would typically have a different purpose or

20  reason.  What they want to do is actually hide the cash, so

21  what they would typically be doing is conducting transactions

22  which would tend to be structured, so that they again could

23  avoid detection by the government and stay off the IRS radar.

24  Q    Based upon your experience as an agent in this area,

25  Investigator Guerci, why would individuals involved in tax

1  evasion not want to have a CTR filed?

2  A    As I said, they want to hide the cash that they are not

3  reporting to the government, so they don't want to bring

4  attention to themselves to the IRS that are engaging in large

5  cash transactions.

6  Q    Based upon your experience, Investigator Guerci, would an

7  individual involved in tax evasion generally deposit

8  unreported cash into a business bank account?

9  A    No.  Typically, they wouldn't.

10       The first thing that any investigator or auditor

11  would do if they are looking at a business would be request

12  those bank records and look at those bank records, so it is

13  not something that you would typically see.

14  Q    Based upon your experience, would somebody involved in

15  tax evasion have reason to structure reported income?

16  A    Oh, absolutely.

17       As I said, they want to avoid detection at all

18  costs, specifically if they are involved in any form of

19  illegal activity, even if it is tax evasion of funds that are

20  being deposited in the account, they want to stay off the

21  government radar -- the IRS radar.

22            (Continued on next page)

23

24

25

1    EXAMINATION CONTINUES

2    BY  MR. MORRIS:

3    Q     I think you may have touched on this before.  Can you

4    give us an example of some ways in which individuals structure

5    their cash deposits?

6    A     Sure.

7              There are a number of ways people structure

8    deposits.  They may use multiple banks.  They may use multiple

9    branches.  The most common way is they will make deposits of

10   less than $10,000 on consecutive days, just

11   essentially -- just limiting the amount of deposit.  That's

12   probably the most common way.

13             THE COURT:  For that to work doesn't it have to be a

14   situation where the income stream to the taxpayer is highly

15   variable?  Because if the income stream, revenues to the

16   taxpayer is fairly consistent and the taxpayer is structuring,

17   then he's holding on to some cash that he is not putting into

18   the structure and if his revenue stream is regular, the cash

19   is just going to keep building up under his mattress after a

20   while.  So either the nature of the structuring is going to

21   have to change in a situation where revenue is constant, or

22   else he's going to be drowning in cash.

23             Right?

24             THE WITNESS:  Essentially, that is correct.  There

25   would be a drowning in cash.  They would have all this cash

1   that they just don't know what to do with.  It would just

2   build as time goes on.  We see that in all types of illegal

3   activity, a building of cash.

4          THE COURT:  What do they do with the cash?

5          THE WITNESS:  They spend it.  They try to get it

6   into the banking system or invest it in some other way, to

7   avoid -- in a way that they avoid detection.

8          THE COURT:  Either, for example, if they are going

9   to continue to try to structure, they are going to have to do

10  more multiple transactions as time goes on because they are

11  staying below the $10,000 amount, or they are going to have to

12  start buying private jets and yachts or something where they

13  can get rid of the cash, right?

14         THE WITNESS:  Or the cash will just continue to

15  build, yes.

16         THE COURT:  If it just builds and it is not being

17  used for yachts or private jets, and it is not being part of

18  an increasing complex structuring scenario, when we say

19  builds, we literally mean holding on to cash in a room?

20         THE WITNESS:  Essentially, yes.

21         THE COURT:  Okay.  Thank you.

22         (Continued on next page.)

23

24

25

1    EXAMINATION CONTINUES

2    BY  MR. MORRIS:

3    Q     Investigator Guerci, when did you first become involved

4    in an investigation of PRP Restaurant Inc doing business as

5    Gallagher's 2000?

6    A     I believe that was in October of 2009.

7    Q     What did you do when you first became involved in the

8    investigation in or around October of 2009?

9    A     The first thing I did was I requested background

10   information on the business, which was PRP Restaurant or

11   Gallagher's 2000.  I also requested bank documents from the

12   financial institutions that were involved; specifically,

13   TD Bank, JP Morgan Chase and Merrill Lynch.

14   Q     What records did you review?

15   A     I reviewed bank deposit tickets.  I reviewed statements.

16   I reviewed correspondence or letters that were sent from the

17   bank to the customers.  I reviewed checks that were paid from

18   the account as well.

19           I also spoke to individuals at the bank about some

20   of the transactions.

21   Q     Did you draw any conclusions or make any determinations

22   from your review of those records?

23   A     Actually I determined a number of things.

24   Q     What did you determine?

25   A     I determined that the cash deposit activity in both the

1   JP Morgan account as well as the TD Bank account appeared to

2   be consistent with structuring.  I also determined that

3   because all the deposits were kept in an amount of under

4   $10,000, I determined that the only transactions that

5   were -- I'm sorry -- the only CTRs that were in fact filed by

6   TD Bank or JP Morgan were in fact multiple transaction CTRs.

7   There were no CTRs filed for cash transactions over $10,000.

8           I also determined that the JP Morgan account was

9   closed by JP Morgan in or about February of 2008.  I also

10  determined that some of the cash activity with respect to

11  TD Bank and JP Morgan had changed after the closure.  That

12  related more towards the cashing of checks, not so much the

13  deposit activity.

14          I also determined that a lot of the funds that were

15  actually structured into the account at TD Bank were

16  ultimately transferred to Merrill Lynch -- one of two accounts

17  at Merrill Lynch, one in the name of PRP Restaurant and the

18  other one in the name of Robert Potenza.

19  Q    With regards to the records you obtained and reviewed

20  regarding PRP account at JP Morgan Chase, what did you

21  specifically review as part of that aspect of your

22  investigation?

23  A    I reviewed the deposit tickets.  I reviewed the

24  statements.  I reviewed the checks that were negotiated at the

25  bank.  I also reviewed letters that were sent from JP Morgan

1    to the customers.

2    Q    What did you determine from your review of the JP Morgan

3    records?

4    A    First thing I determined was that there was a cash

5    deposit pattern which involved cash deposits in amounts

6    ranging from up to -- up to $9,000, never over ten.  Over this

7    period of time, which spanned from I believe December of 2006

8    through February of 2008, there were approximately 190

9    deposits into that account for over a million dollars,

10   approximately $1.18 million during that period of time.

11          I also determined that there were checks being

12   cashed by the principals which I learned later were for

13   singles, whereby they would actually write out checks in

14   amounts for $6,000, many of which were -- were actually dated

15   the same.  You might see three or four checks dated the same

16   and I noticed that those checks were not being cashed

17   typically at the same time but they were being cashed on

18   multiple days.  So you would see three or four checks written

19   on the same day.  Then you would see a pattern of cashing of

20   those checks over a period of three or four days.

21          There were, I believe, three exceptions to that,

22   where Mr. Potenza had gone to two separate branches of

23   JP Morgan and negotiated these checks and in fact on those

24   three occasions multiple transactions CTRs were filed.

25          I also determined, as I said before, that the only

1   CTRs that were filed were in fact multiple transaction CTRs

2   and those were for Saturday, Monday deposits, which, as I

3   said, would be considered on the same business day and for the

4   cashing of those checks that I just described.

5   Q    Approximately how many multiple transactions CTRs were

6   filed by JP Morgan Chase?

7   A    I believe there were approximately 20.

8   Q    After reviewing the JP Morgan Chase records, did you

9   notice any changes in the deposit activity when PRP moved

10  their account to TD Bank after the closure of the

11  JP Morgan Chase account?

12  A    The deposit activity remained fairly constant.  What did

13  change though was the cashing of the checks.  I did not see

14  checks being cashed in this fashion at TD Bank.

15  Q    Is there any significance to your finding in that regard

16  based upon your experience?

17  A    Well, there was a change of pattern.  The actual thing

18  that JP Morgan had questioned Mr. Potenza about, that's what

19  changed, was the deposit --

20        MR. O'SHEA:  Objection.

21  A    In conjunction --

22        MR. O'SHEA:  Objection.

23        THE COURT:  Hold it.

24        MR. O'SHEA:  Objection.

25        THE COURT:  When there is an objection you have to

1   stop talking.  You have done this before.  You know that.

2              THE WITNESS:  Yes.

3              THE COURT:  What's the objection?

4              MR. O'SHEA:  Out of court hearsay.

5              THE COURT:  I missed that.

6              What's the out of court statement.

7              MR. O'SHEA:  He is relating the conversation he

8   claims to have had with Chase.

9              THE COURT:  Sustained.

10  Q    What did you do next in your investigation, Mr. Guerci?

11  A    After reviewing the JP Morgan documents I reviewed the

12  TD Bank documents as well.

13             THE COURT:  Let me revisit that a minute.

14             He can offer that conversation as the basis for his

15  opinion.  I cannot receive it for the truth of that statement

16  but he can say one of the things that led him to this opinion

17  was a hearsay statement.  So I will take it for that limited

18  purpose.

19             Okay.  Go ahead.

20             MR. MORRIS:  Thank you very much, Judge.

21  EXAMINATION CONTINUES

22  BY  MR. MORRIS:

23  Q    Could you please kindly turn, Mr. Guerci, in your binder

24  to tab number 25, and what has been admitted into evidence as

25  Government Exhibit 25?

Guerci - direct - Morris                        227

1   A    I don't believe I have those documents here.

2        Yes, I do.  I have them right here.

3        Thank you.

4   Q    Just on the prior point, you mentioned that you had some

5   conversations with the bank.

6   A    Yes, I did.

7   Q    JP Morgan Chase?

8   A    Yes, I did.

9   Q    And --

10       THE COURT:  The question is, how did those

11  conversations contribute to your view that structuring had

12  occurred here?

13       THE WITNESS:  I had a conversation with a

14  representative from JP Morgan Chase about a letter that was

15  sent and a subsequent conversation that took place with

16  Mr. Potenza, that particular letter that has already been

17  admitted into evidence, which is a letter I am referring to

18  which I had obtained a copy of, explained the currency

19  transaction reporting requirements and it also indicated to

20  Mr. Potenza or, I should say, PRP as it was addressed that

21  they had concerns about some of the cash activity into that

22  account.

23       It was further relayed to me that there was a

24  subsequent conversation, approximately one week from the

25  sending of this letter, with Mr. Potenza regarding that cash

GR        OCR        CM        CRR        CSR

1    activity.

2          And to answer the question as to how it factored in,

3    it -- it deemed fairly important because there was a letter

4    sent to PRP.  There was a subsequent conversation with

5    Mr. Potenza regarding this activity in the account, where he

6    was essentially put on notice about what he was doing.

7          MR. O'SHEA:  Your Honor, may I have some foundation

8    for this alleged conversation?

9           THE COURT:  Well, I have some of my own questions

10   about this.

11         Mr. Morris, where is the Chase banker?

12         MR. MORRIS:  Well, the Chase banker was deposed.

13   The Chase banker couldn't remember much details about the

14   conversation.

15         There is a log that's in evidence that does reflect

16   a conversation with Mr. Potenza.  Your Honor will have an

17   opportunity to view the log and the statements, I would

18   anticipate, in connection with briefs on the subject.

19         Obviously, that's the log that purports to state

20   what it is in a conversation that took place between someone

21   at Chase and Mr. Potenza.  But we have to remember, Your

22   Honor, this is in relation to prior account activity.  This

23   isn't in relation to the TD account.

24         THE COURT:  I understand that.

25         You are offing it to show intent and the witness is

1   basing his conclusion in part upon this conversation and there

2   were obviously two parties to the conversation.

3           I see your point, Mr. O'Shea.  But I think you might

4   as well just cross on it.

5           MR. O'SHEA:  I will, Judge.

6           But I think Mr. Morris is taking some liberties.

7   The Court should know, the log is in evidence.  Nowhere in the

8   log does it reflect his conversation.  The witness testified

9   she didn't recall a conversation.  Mr. Guerci testified under

10  oath that he didn't have such a conversation.

11          THE COURT:  Then you've got some good cross coming.

12          MR. O'SHEA:  It will be an interesting cross.

13          THE COURT:  I look forward to your cross.

14          Put another question, please.

15  EXAMINATION CONTINUES

16  BY MR. MORRIS:

17  Q    Was this the only factor you considered in your analysis?

18  A    Absolutely not.

19  Q    Okay.  If that factor wasn't considered, if you didn't

20  have that,  would that change your analysis in any way about

21  this account activity?

22  A    It would not.

23  Q    It is just one factor you figured but not dispositive --

24          THE COURT:  I've got it.

25          Go ahead, please.

1   Q    Mr. Guerci, directing your attention, Mr. Guerci, to

2   Government Exhibit 25.

3             MR. O'SHEA:  Your Honor, excuse me.  Sorry to do

4   this, but may I still have the foundation for when he says

5   this conversation occurred?  I think it -- it is -- it is

6   something that's required.

7             THE COURT:  I don't believe it is.  I don't believe

8   it is.

9             He says he had a conversation.  It's a one-on-one

10  conversation.  He can testify that he had this conversation.

11            If you want more particulars, you can get them on

12  cross.

13  Q    Directing your attention to what has been admitted into

14  evidence, Mr. Guerci, as Government Exhibit 25.

15            Do you recognize Government Exhibit 25?

16  A    Yes, I do.

17  Q    What is it?

18  A    This is a summary schedule of the cash deposits into the

19  TD Bank account which was maintained by PRP Restaurant from

20  December 12, 2008, through and including November 9, 2009.

21            MR. MORRIS:  Your Honor, the government -- it's

22  already in evidence.  Excuse me.

23            Strike that.

24  Q    How did you prepare the schedule?

25  A    From a review of the bank records which included the

1  deposit tickets and I cross-referenced that to the statements.

2  Q    Could you just explain what the different columns mean?

3  A    Yes.

4         THE COURT:  I can see that.

5         MR. MORRIS:  Okay.

6  Q    You reviewed documents already in evidence in order to

7  prepare these?

8  A    Yes, I did.

9  Q    Okay.  What was the purpose of your preparation of the

10  schedule?

11  A    The purpose was to identify and to summarize the cash

12  deposits into the TD Bank account.

13  Q    What specifically does the schedule demonstrate?

14  A    It demonstrated that there was cash deposits largely in

15  the amount of $8,000 with a couple of exceptions into the PRP

16  account at TD Bank during this period of time.

17  Q    After examining cash deposits into TD Bank, what did you

18  review?

19  A    Well, after that I reviewed the transfers from the

20  account at TD Bank, which went to Merrill Lynch, one of the

21  two accounts at Merrill Lynch.

22  Q    What did you determine from that review?

23  A    I determined largely that a good portion of the funds

24  that were deposited, the cash that was deposited into this

25  account, was ultimately transferred to one of those two

1   accounts.

2   Q      What did you do next?

3   A      I prepared a schedule demonstrating the deposits and then

4   the corresponding transfers to the one or the other of the

5   Merrill Lynch accounts.

6   Q      Okay.  If you could kindly turn to the next tab in your

7   binder, Mr. Guerci, to what's been admitted into evidence as

8   Government Exhibit 26?

9   A      Yes, sir.

10  Q      Do you recognize this document?

11  A      Yes, I do.

12  Q      What is it?

13  A      This is that schedule of traceable deposits and transfers

14  as I just described.

15  Q      How did you prepare it?  Can you explain that to us?

16  A      Well, as a result of a review of the bank deposits, I had

17  taken that schedule and I also looked at the checks which

18  identified the transfers that went from the TD Bank account

19  into one or the other of the Merrill Lynch accounts.

20  Essentially what I did is I identified by date the date of the

21  transaction.  I put the corresponding deposit made and then

22  moving from left to right on the schedule identified by check

23  number and check amount what checks were ultimately

24  transferred to or deposited into one much the Merrill Lynch

25  accounts.

GR      OCR      CM      CRR      CSR

1          The fifth column over, I maintained a running

2     balance of the deposited funds into the TD account to just be

3     shower that I had enough available funds as it was related to

4     the structure transactions to transfer into one of those two

5     accounts.

6          The fourth and the fifth column represents those

7     transfers to the accounts which corresponds to the checks.

8     And in instances when as you move down the sheet, down around

9     the middle of the page, when you look at like on January 15,

10    2009, you see a check for 180,000.  But at that time I only

11    had $70,710 based on my analysis available for transfer.  So I

12    essentially zeroed out the running balance and only applied

13    that amount.  I just continued throughout until I -- until I

14    completed the job, the -- the analysis.

15    Q    What does the total figure on the bottom of the schedule

16    represent?

17    A    If you turn to page five I determined that in excess of

18    $234,000 was transferred to, as I identified it, Merrill Lynch

19    account number one, which was the account in the name of

20    Robert Potenza, and in excess of 599,000 was essentially

21    transferred to Merrill Lynch account number two, which was the

22    account that was in the name of PRP Restaurant.

23    Q    You relied upon all the bank records already in evidence

24    that you reviewed to make this schedule?

25    A    Yes.

1          That would be the TD Bank records as well as the

2    Merrill Lynch records.

3    Q    What was your purpose in making up the schedule?

4    A    Just to identify the amount of funds that were actually

5    transferred from the TD account into the Merrill Lynch

6    accounts.

7    Q    With respect to the multiple transaction CTRs that you

8    testified about earlier that were filed by TD Bank, did you do

9    anything with them as part of your investigation?

10   A    Yes.

11          I also created a schedule to summarize those

12   transactions.

13   Q    About how many of the multiple transaction CTRs were

14   filed by TD through December 10, 2009, the date of the

15   seizure?

16   A    There were six filed during that period of time.

17   Q    What did they show?

18   A    They demonstrated that someone at TD Bank or, I'm sorry,

19   someone acting on behalf of PRP made deposits and/or cash

20   exchanges that involved their account at TD Bank on

21   consecutive days or the same business day.

22   Q    How complete was the information in the multiple

23   transaction CTRs filed by TD Bank?

24   A    As I indicated before, they did not contain all of the

25   relevant information.  The individual that conducted the

1    transaction was not identified and I essentially had to go to

2    the bank records themselves to get a breakdown of the

3    transactions.  Number one, to determine when the deposits were

4    actually made and additional information relative to those

5    transactions.

6    Q    What did you determine from your review of the bank

7    records about the multiple transaction CTRs?

8    A    That essentially all of the deposits that were conducted

9    were done on Saturday and Monday, which would fall on to the

10   same business day, with one exception, which involved a

11   holiday, which on the very first one that's listed which was

12   posted on September 9, 2009, that Monday was actually Labor

13   Day.  So it actually carried over into Tuesday.

14   Q    After conducting that portion of your review, what did

15   you do?

16   A    At that point I -- I had spoken to yourself and Special

17   Agent Westrich about my analysis and my conclusions.  I

18   recommended that a seizure of these accounts be done.

19   Q    If you can just turn to Government Exhibit 27, please?

20   The next tab over.

21   A    28 or 27?

22   Q    27.

23   A    Okay.

24   Q    What is this schedule?

25   A    This is the schedule of multiple transactions that we

1   just spoke of.

2   Q    This just lays out the information that you just

3   testified about?

4   A    Yes, it does.

5          THE COURT:  May I ask you what, if anything, do you

6   make of the fact that this is the a cash business obviously

7   and the biggest nights that they have in the business are

8   Friday night and Saturday night?  Does that have any impact on

9   your analysis?

10         THE WITNESS:  It certainly does.

11         THE COURT:  What is that?

12         THE WITNESS:  Well, it -- as you looked at and as I

13  analyzed the bank account, there was constant $8,000 deposits.

14  As I said, there were a few exceptions.  That didn't change

15  whether it was on a Monday or Tuesday if in fact it was

16  after -- after a Sunday night or after a weekend which would

17  have included Saturday or if it was on a Saturday morning

18  after a busy Friday night.  So certainly it was something that

19  I took into consideration.

20         THE COURT:  But the multiple CTRs are only triggered

21  for Saturday deposits coming after the busy Friday night and

22  Monday deposits, with the Labor Day exception, coming after

23  the busy Saturday night; right?

24         THE WITNESS:  Yes.

25         THE COURT:  Wouldn't that just suggest that more

1   cash was received by the business on those two nights, Friday

2   and Saturday?

3           THE WITNESS:  Regardless of what day of the week the

4   deposit was made, it was always at a constant amount of

5   $8,000.

6           THE COURT:  Okay.  But I guess what I am saying is,

7   I am not sure I see why the multiple back-to-back deposits is

8   significant here.  Because that could be explicable with

9   regard to the busy activity for the business on Friday nights

10  and Saturday nights.  I see your point, that it is always

11  eight thousand or seven thousand when it is done.  But for

12  there to be a separate structuring conclusion based upon the

13  multiple transactions, that I don't as easily see.

14          THE WITNESS:  My conclusions aren't based solely on

15  this.  This is just something that exists whenever multiple

16  transactions exist, it is something we take into

17  consideration.  It is really just used to demonstrate that in

18  fact the only ones that were ever filed, the only CTRs that

19  were ever filed, despite the amount of money that came into

20  the business, was in fact documenting these types of

21  transactions.  There are only six of them over this period of

22  time span of approximately one year.  So they are not really

23  significant.  Because it clearly didn't happen every Saturday

24  and every Monday.  Otherwise, there would have been one filed

25  every week.

1          THE COURT:  Okay.  Thank you.

2     EXAMINATION CONTINUED

3     BY MR MORRIS:

4     Q    Were you involved in the seizure of funds in this case,

5     Mr. Guerci?

6     A    Yes, I was.

7     Q    When did the seizure occur?

8     A    It was December 10th of 2009.

9     Q    Where were the funds seized from?

10    A    There was approximately $61,900 seized from the account

11    at TD Bank.  There was approximately $230,400 seized from the

12    account at Merrill Lynch in the name of Robert Potenza.  And

13    the additional funds I believe was -- somewhere in the range

14    of 579,000 was seized from the account in the name of PRP at

15    Merrill Lynch.

16    Q    Upon the seizure of funds, what did you do next within

17    this investigation?

18    A    After executing the seizure warrants, Special Agent

19    Westrich and I contacted Mr. Robert Potenza at his business at

20    PRP.

21    Q    What did Mr. Potenza tell you when you contacted him?

22    A    Mr. Potenza indicated a number of things.  He informed us

23    that he did in fact know what structuring was.  He went as far

24    as to describe what it was by giving an explanation that it

25    would be when an individual takes more than $10,000 and breaks

GR        OCR        CM        CRR        CSR

1    it down into increments of less than ten and makes his

2    deposits that way.

3            He also told me that when questioned about why he

4    made all the deposits in an amount of about $8,000, he

5    indicated that it was just a number.  He said it was a number

6    that he felt comfortable going to the bank with.

7            He further informed us that one of the reasons why

8    he kept the amounts under $10,000 was that TD Bank was in fact

9    still in the 18th century and still counted everything by hand

10   and it just took too long to go to the bank and make a large

11   deposit.

12            (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2

3    A    He further indicated that he maintained cash on hand at

4    the business for use in the business.  He needed approximately

5    18, 20 thousand dollars' worth of singles available.  He

6    always maintained two to three thousand dollars or so worth of

7    fives, two to three thousand dollars' worth of the tens on the

8    premises, and he also indicated he put twenties into the ATM

9    machine.  Further said that he made approximately 1.4, 1.5

10   million dollars personally, and he in fact paid all of his

11   taxes on his income, and he also stated that he paid the tax

12   on business income, as well.

13   Q    Was there any mention by Mr. Potenza of CTR's?

14   A    Yes.  He did say there might in fact be some CTR's filed

15   when we questioned him about that.  There were times when he

16   would make Saturday and Monday deposits.

17   Q    Is there any statement as to who made the deposits on the

18   account?

19   A    Yes.  Mr. Potenza indicated that he made ninety-eight to

20   ninety-nine percent of the deposits himself personally.

21   Q    In conjunction with your review, did you have an occasion

22   to take into account the on-premises ATM machine that the PRP

23   company operated for its customers?

24   A    Yes, I did.  That would have been after the discovery

25   phase started and we obtained the records from PRP.

1  Q    What did you determine, based upon those records?

2  A    Well, I reviewed those records to determine a couple of

3  things.  One, I knew it generated a revenue stream for the

4  business.  I wanted to see that it was properly reflected in

5  the records and reported.  I also determined that -- we knew

6  even from Mr. Potenza that he would place money into this ATM

7  machine.  The ATM machine was essentially a vehicle for which

8  his examiners could have access to cash.

9            And from a review of that, I also determined that

10  after customers would take cash out of the account, there

11  would be credits to his bank account, first at J.P. Morgan,

12  and then at TD Bank from a settlement company that would

13  actually be involved, that would actually transfer the money

14  as a result of people taking it out, and their accounts being

15  debited, a credit would be issued to his account at TD Bank or

16  J.P. Morgan, as I said.

17  Q    With regard to on-premises ATM, was the existence of it

18  or the usage of it the same thing as the customer going up to

19  a bank ATM and depositing cash into it for their account?

20            MR. O'SHEA:  Objection.

21            THE COURT:  Sustained.

22  Q    What type of debit or credit activity did you see when

23  you reviewed the records relative to the ATM?

24  A    Well, I would see credits to the account that were

25  reflected on the bank statements from the settlement company

Guerci - direct - Morris                    242

1   that were involved in the transactions.  They were the ones

2   that would actually credit PRP's account after customers'

3   accounts were essentially debited for the amounts that were

4   actually due to them.

5          I saw that in two forms.  One, as a result of a

6   batching of these monies that were taken from the ATM -- from

7   the customers of PRP, and also in the form of the commissions

8   that would have been due PRP as a result of the service charge

9   that the customers would have paid for conducting these

10  transactions.

11  Q    What deposit type or type of deposit was reflected in

12  PRP's account relative to the ATM?

13  A    It would be just --

14          MR. O'SHEA:  Objection.

15          THE COURT:  What's the objection?

16          MR. O'SHEA:  He has no basis of knowledge to make

17  this.  It calls for speculation, your Honor.

18          THE COURT:  I may strike the answer.  I really don't

19  know what the answer is going to be yet.  I don't necessarily

20  think it calls for speculation.  Let me hear the answer.

21  A    It reflected as an ACH credit to the account of PRP at TD

22  Bank or J.P. Morgan as it applied.

23          MR. O'SHEA:  Excuse me.

24          Your Honor, as you pointed out, and as we've been

25  surprised, no bank witness has come in here.  This witness,

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1   who doesn't have any banking experience whatsoever, and indeed

2   no accounting experience whatsoever, is now talking about an

3   ACH deposit from records that he has no expertise on.  This is

4   rank speculation.

5           THE COURT:  I think it goes to weight.  I'm going to

6   allow it.

7   Q    So, what was the transaction or deposit type -- strike

8   that.

9           What was the type of deposit reflected into the TD

10  Bank account relative to the ATM, based upon the records you

11  reviewed and in your experience as an agent?

12          MR. O'SHEA:  Objection.  The same objection.

13          THE COURT:  The same ruling.

14  A    It would be reflected as a credit to the account.  It

15  would not be deemed cash.  It would have absolutely no effect

16  on the filing of the CTR.  It was not directly linked, the ATM

17  itself to the TD Bank account.  It was a settlement company

18  that would essentially issue a credit to the account of PRP at

19  TD Bank or J.P. Morgan as it applied.

20  Q    What is an ACH that you referred to before?

21  A    Just a credit.  It's an automated credit to the account.

22  I've seen this on many, many documents that I reviewed,

23  including my own bank statements.

24  Q    Is a credit like that in any way a cash transaction?

25  A    No, it's absolutely not.

1         MR. O'SHEA:  Objection.

2         THE COURT:  Sustained.

3    Q    Does an ACH credit, like the credits you reviewed on the

4    bank statements, involve a physical deposit or a bringing of

5    physical cash into a financial institution?

6         MR. O'SHEA:  Objection.

7         THE COURT:  He doesn't need to answer that.  I

8    understand how it works.

9         MR. MORRIS:  Thank you, Judge.

10   Q    After the seizure of funds, what happened as the

11   forfeiture case progressed?

12   A    Well, at some point, I met an individual by the name of

13   Joseph Johnson.

14   Q    What was Mr. Johnson's relation to the investigation?

15   A    He came forward with information, and as I learned from

16   Mr. Johnson, he was a general manager at PRP and worked for

17   the principals for approximately nineteen years.

18   Q    And what did you learn from Mr. Johnson that was relevant

19   to this investigation?

20   A    Well, I learned a number of things from Mr. Johnson.

21   First, he explained what his role was as the general manager.

22   He explained to me what the sources of revenue that would come

23   into the business, how the cash was accounted for, how the

24   cash was recorded, how he would accumulate it and leave it for

25   the owners of the business.

Guerci - direct - Morris                     245

1           He explained to me what the payroll practices were,

2    more specifically, that there was people just being paid off

3    the books.  Typically, people were paid half on, half off, or

4    in some instances, it was actually less than that.

5           He also explained to me what other people did, the

6    nature in which he prepared records, accumulated the money,

7    left it for the owners, and at the conclusion of our first

8    meeting, he provided me with documents which essentially he

9    provided, that he had made photocopies of.

10   Q    With respect to these documents, what did you do with

11   them?

12   A    Essentially, what I did was, I took those documents and I

13   compared them to the records that were provided by PRP, and to

14   determine if in fact they were reflective of the same

15   information.

16   Q    From your review of the records produced to you by

17   Mr. Johnson, what did you determine?

18   A    Well, I determined a number of things.  The first thing I

19   determined, that the income that was reflected on the sheets

20   that were provided by Mr. Johnson was substantially higher

21   than the income that was reflected in the cash books and the

22   record of PRP.  I also determined that the payroll figures

23   were also much higher on the records that were provided

24   compared to what was being reflected in the books and records

25   of PRP which ultimately ended up on the tax returns.

1   Q     After this review, what did you do next?

2   A     After that, I prepared schedules which demonstrated or

3   documented my findings.

4   Q     What schedules did you prepare?

5   A     I prepared a number of schedules.  The first one I

6   prepared was an analysis which compared the bar and the door

7   revenue, the bar being revenue from food and liquor sales.

8         The second schedule I prepared was an analysis of

9   the house fees and the VIP room revenue.  That was brought

10  into the business.  I further reviewed a schedule which

11  supported that, which I will explain later.

12        I also prepared a schedule which documented or

13  summarized the DJ and the house-madam fees that were a source

14  of revenue for the business.

15        I also did an analysis of the cash payroll, to

16  determine and document exactly how much cash payroll was not

17  reflected on the records that I had.

18        And then the last thing I did, I essentially just

19  prepared an extrapolation schedule, just taking this

20  information, summarizing on one form to determine essentially

21  how much income was essentially not recorded in the books and

22  records for this relevant period of time.

23  Q     Mr. Guerci, if you could kindly turn in your binder to

24  Tab Number 28 and what's been admitted into evidence as

25  Government's Exhibit 28.

1  A     Yes, sir.

2  Q     Do you recognize this document?

3  A     I do.  That is the schedule that I prepared based on my

4  analysis of the bar and door revenue.

5  Q     Could you please explain to us how it was that you went

6  about preparing this schedule?

7  A     Well, basically, what I did is, I utilized the sheets

8  that I obtained from Mr. Johnson as well as the register tapes

9  and the cash books that I obtained from PRP.

10        What I did on this schedule was, moving from left to

11 right, identified by date, and that date would correspond to

12 any day that I had had a record that I obtained from

13 Mr. Johnson.  From that, I listed the bartender's name or the

14 coat check or the door girl that collected those fees.

15        Then I have a column which identifies the revenue

16 per the daily sheet.  When I say "daily sheet," that would be

17 the records that I obtained from Mr. Johnson.

18        The next column would be the cash register tapes

19 that we essentially had obtained from PRP or from their

20 attorneys in conjunction with the discovery in this case.

21        The next column is nothing more than just totaling

22 up the figure that I had from the cash books or identifying

23 that figure.

24        Then I had a column where I identified the

25 unrecorded food and beverage sales, which was really taking

1   from the Johnson records where I didn't have a cash-register

2   tape, and in all of those instances, I didn't have a register

3   tape that corresponded to the records that I obtained from

4   Mr. Johnson.

5            The next part of the form essentially does the same

6   thing for the door fees.

7            The next column just identifies the door fee per the

8   daily sheet or the records I obtained from Mr. Johnson.  Then

9   I identified the amount that was taken right from the cash

10  books that were prepared as I've heard from Ms. Potenza.

11           Next is just a summary of the amount that was deemed

12  to be unrecorded, based on this analysis.

13           And the final total is just a summary of those two

14  figures, reflecting what would be deemed the unrecorded amount

15  from those two sources for that day, and I just carried that

16  through for each day that I had a record that I obtained from

17  Mr. Johnson.

18  Q    What were you able to determine from the schedule?  Were

19  you able to draw any conclusions from it after you prepared

20  it?

21  A    Well, I determined that during this period of time, as I

22  said, which was based solely on the records I obtained from

23  Mr. Johnson, that there was approximately $72,693 of

24  unrecorded income in the books and records of PRP for that

25  relevant period of time.

Guerci - direct - Morris                    249

1          I took that, based on the number of days, and I
2    calculated it out, and I determined that there was
3    approximately 2,019 per day, based on this analysis, which is
4    just based on the records, as I said.
5    Q    Where is that computation set forth?
6    A    That would actually be the last column in bold, where it
7    says "Total average daily unrecorded revenue."  It's just
8    multiplying the days.
9    Q    And you mentioned something, also, with respect to cash
10   register tapes.  Were you able to draw any conclusions about
11   cash register tapes based upon your analysis of those tapes
12   and the Johnson records?
13   A    Well, I determined two things.
14          One, as you can see from the schedule, and I was
15   going through the register tapes that were supplied to me by
16   the business, there were missing tapes that didn't correspond
17   to the records that I obtained from Mr. Johnson.
18          And the other thing, it certainly appeared, and
19   there are certainly examples in here, when register tapes, as
20   they were pulled, there were times when the registers at the
21   end of the night didn't necessarily reconcile to the amounts
22   that were on the sheets that Mr. Johnson had.  There was
23   somewhat of a discrepancy, and that's obviously not unusual in
24   any type of business that involved the exchange of cash.
25          One thing I determined, that when I looked at the

1    amount of money that was reflected, it seemed to be consistent

2    with what was on the Johnson records, not what was actually on

3    the register tapes.  So, for example --

4    Q    Perhaps you can give us an example?

5    A    Yes.  If you look down at the third entry, which is

6    September 11, we see that as you move down, the register tape

7    reflected $788, but in fact the Johnson record reflected $774.

8    When I took into consideration -- when I removed the register

9    tape that I didn't have, and I added those figures up, that's

10   the amount that matched the cash book, not what was reflected

11   on the register tapes if I added those up.

12   Q    Which amounts specifically were you referring to that

13   matched the cash books?

14   A    The amount that would have been reflected on the records

15   I obtained from Mr. Johnson, not what was on the cash register

16   tapes.

17             THE COURT:  I'm sorry.  I'm not getting that.  The

18   Johnson daily sheets for that day shows 7807; right?

19             THE WITNESS:  Yes.

20             THE COURT:  The cash books shows 6301?

21             THE WITNESS:  Correct.

22             THE COURT:  You just said they match up.

23             THE WITNESS:  No.  I'm sorry.  Maybe I didn't

24   explain myself clearly, your Honor.

25             When I took out the missing cash register tapes,

1   which on that particular day there were two register tapes

2   that I didn't have, if the cash books were prepared based on

3   the register tapes, that figure would have added up based on

4   the register tape figures.  I don't have them totals on this

5   sheet.  If I removed those two amounts, the 6505 and the 901,

6   from the figures that were reflected on the records I obtained

7   from Mr. Johnson, that was the figure that corresponded to

8   what was in fact on the cash book.  Those register tapes don't

9   equal 6301.  They are a different figure.

10          THE COURT:  Okay.

11  Q    You saw that on a number of different examples throughout

12  this schedule?

13  A    Yes.  Anytime in the schedule when there was a difference

14  in the amount that was reflected, every time I checked it, it

15  was always what would have been reflected from the Johnson

16  records, not an adding up of the register tapes themselves.  I

17  know it's a little confusing.

18          THE COURT:  What you are really saying is, the

19  revenue on the cash books would often have a couple of

20  specific items from the Johnson sheets dropped; right?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.

23          THE WITNESS:  Yes.

24  Q    That would be the case, sir, even if you had actually a

25  sum of tapes, for instance the sum of register tapes, if there

1   was a variation of, let's say, $5 from one tape to what was on

2   the Johnson records, you would actually see in the cash books

3   an amount that was reflected on the Johnson record, not the

4   tape?

5   A     That's correct.

6   Q     What did you do next relative to your investigation?

7   A     Well, after that, I did a comparison, and I tried to

8   determine the unrecorded amount of house fees and VIP room

9   revenue that was reflected or brought into the business.  I

10   prepared a schedule that demonstrated that, as well.

11   Q     If you could kind of turn in your binder, Mr. Guerci, to

12   Tab Number 29.

13   A     Yes, sir.

14   Q     Do you recognize what's been admitted into evidence as

15   Government's Exhibit 29?

16   A     Yes.  This is the schedule I prepared to document the

17   unrecorded revenue from those two sources, house fees and VIP

18   room.

19   Q     Could you take us through how you prepared this schedule?

20   A     Yes.  Essentially, again, this corresponds to only the

21   records that I obtained from Mr. Johnson.  Look at the first

22   date, 8-21-2009.  That figure is the figure that I took right

23   from the cash book that was supplied by PRP.  So then, that

24   day, $6300 was deemed to be the house fees and the VIP room

25   fees for that particular day.

1          From that, I subtracted the amount that we

2    determined through Mr. Filippone, which was the amount that

3    was deemed to be the amount that they were attributing to

4    house fees for purposes of the sales-tax audit.  I subtracted

5    that amount to determine what the VIP fees were.  So, I backed

6    that amount out, to be left with what was the house fees

7    amount.

8          And the way we came up with the 27.3, or I did, was

9    based on what Mr. Filippone had told us in his previous

10   testimony and even prior to during his deposition and the

11   documents that I obtained from him as a result of the

12   sales-tax audit.

13         I was left with that house fee per cash books

14   figure.  From that, I determined what the house fees were

15   based on the daily sheets, and there's a supporting schedule

16   that demonstrates how I did that, and that was essentially

17   just based on the amount of money that the girls would pay for

18   the right to dance for a particular night.

19         From that, I just subtracted the amount, and I

20   determined the amount that was unrecorded from the house fees

21   and -- from the house fees, essentially, because that's the

22   figure that we're working with.  I had no other records with

23   respect to the VIP room other than this 27.3 estimate that was

24   calculated.

25   Q    Because you didn't have any VIP records, you just relied

1    upon the company's representation that it made to New York

2    State as to what the VIP percentages were relative to house

3    fees?

4    A    Yes.  The way it applied, it was just a backing out of

5    that figure to be left with what the house fees in fact were.

6    Q    What did you conclude from the schedule?

7    A    Well, essentially, that during this time period, there

8    was approximately $64,621 of unrecorded income from the house

9    fees during that period.  I took that and I actually broke it

10   down to get a daily amount.  Again, I just took that total

11   amount, multiplied it, or, I should say, divided it by the

12   number of days for records, and I deemed that there was

13   approximately $1900 of unrecorded house fees per day, which

14   was a figure that I used in my -- actually, the last schedule

15   that I did.

16   Q    You also mentioned the supporting schedule for

17   Government's Exhibit 29.  If you turn to the next tab, Tab 30

18   and what's been admitted into evidence as Government's

19   Exhibit 30, do you recognize this document?

20   A    Yes, I do.  That's the supporting schedule that I

21   referred to before, to determine on a daily basis what the

22   house fees would have actually totaled up to.

23   Q    Could you take us through how you prepared this schedule?

24   A    Well, using the information that was provided by

25   Mr. Johnson, which has also been confirmed by others, we were

1    working with house fees for either $60, $70 or $80 per day.

2          So, for example, you look at the first day, now, as

3    we understand it, certain days of the week -- well, all of the

4    days, the house fees are $60 during this period of time, and

5    certain nights, the house fees are $60.  So, as you can see on

6    that day, based on the records that I obtained from

7    Mr. Johnson, I determined that there was twenty-seven girls

8    that were there during the day, and they paid a $60 fee to the

9    house.

10          As we move to the right, for that particular day,

11   which would have been a Friday or Saturday night, the fee

12   would have been $80, and based on the count of the number of

13   dancers, I determined that there was seventy-nine dancers that

14   day.  So, it's simple mathematics or multiplication as we move

15   to the right, for that particular day, which would have been a

16   Friday or Saturday night, the fee would have been $80, and

17   based on the count of the number of dancers, I determined that

18   there was seventy-nine dancers that day, so it's simple

19   mathematics or multiplication, seventy-nine dancers at 80,

20   twenty-seven dancers at 60, for a total for that day of

21   $7,940.

22   Q    Once you disputed the daily total, you brought it back to

23   the prior schedule?

24   A    Yes.  I carried these figures over, and they would be

25   reflected on the schedule or Exhibit 29.

1    Q    So, after preparing this supporting schedule and the

2    schedule before, what did you do next in the investigation?

3    A    The next thing, I just did a schedule that documented the

4    DJ and the house-mom fees, and that's reflected in Exhibit 31.

5    Q    Could you take us through how you prepared this schedule?

6    A    Essentially, again, I just took the records that I had

7    for Mr. Johnson.  I was able to determine from those records

8    the number of dancers that were there for a particular day and

9    determined, based on the figure of $3 per day that went back

10   to the house for the DJ and $3 per day from the house mom --

11   again, it was just the number of dancers times six -- which

12   gave me the figure for that day, which was deemed to be

13   unrecorded, because I had no records which suggested that this

14   was reflected anywhere in the record of PRP or on the cash

15   books.

16   Q    What did you conclude after you prepared the schedule?

17   A    Again, during this period of time, based on this date

18   range, I determined that there was approximately $14,874 of

19   unrecorded revenue from this source.  I took that figure and

20   then I broke it out to have a daily figure, and, again, it was

21   just the number of days was divided into this $14,874, to

22   determine that there was approximately $437 per day that was

23   unrecorded from these two sources, actually.

24   Q    And after you drew that conclusion, what did you do next

25   in the investigation?

1  A    Well, the next thing I did, I actually turned to the

2  payroll and went through and analyzed the records that were

3  obtained from Mr. Johnson, and from those daily sheets that

4  were prepared, I took the amount of money that was actually

5  paid out in the form of payroll and reflected on this sheet,

6  and has a corresponding date which totals, as you can see

7  here, $85,923 of payroll paid accumulatively for this date

8  range.

9  Q    You're looking at Government's Exhibit 32?

10 A    I am.

11 Q    That's the schedule you prepared?

12 A    Yes, it is.

13 Q    What comparisons were you able to draw based upon the

14 schedule?

15 A    Well, from that, I took the cash books from PRP for the

16 same months, so I dealt with the same date range -- that would

17 have been August through December -- and I took the total

18 amount that was reflected on the cash books, which represented

19 the cash payroll, which would have been all of the employees.

20       I took that amount, and then down at the bottom of

21 the sheet, I kind of broke this down by day, so I could do an

22 accurate comparison.  As you can see, at the bottom, I

23 determined the average daily payroll per the daily sheets,

24 which I did nothing more than I had thirty-six days for this

25 example that I could work with.  So, I just divided that into

1    the total amount of 85,923, to determine that there was an

2    average of $2,386.75 per day of payroll that was being paid

3    out by PRP for these relevant days.

4              From that, I did the same thing to the cash figure

5    that was reflected or the payroll figure that was reflected on

6    the cash books.  I took that figure, determined the number of

7    days, and, again, came up with a daily amount.  From that, I

8    just subtracted the 655 from the 2388, to determine that based

9    on this analysis, there was an unreported daily payroll of

10   approximately $1730.

11             I took that, took it a step further, projected it

12   out annually, and determined that there would have been, based

13   on this analysis for this date range, there would have been

14   approximately $624,818 of unreported cash payroll by PRP.

15             I used 361 days, not 365, because when I went

16   through the record, I was able to determine that they were in

17   fact closed for four days during that year.  So, obviously,

18   those figures were backed out.

19   Q    After preparing this schedule of cash payroll, what did

20   you do next?

21   A    The next thing I did is, I compiled all of this

22   information, and I prepared a schedule to determine what the

23   total estimated unrecorded revenue for 2009 -- which is

24   essentially our relevant period -- would have been if these

25   were consistent figures and had applied to the whole year.

1  Q     And what level of precision would you accord these

2  figures, in your opinion?

3  A     This is just based on estimates.  It's estimated based on

4  the date range of records that I had to work with compared to

5  the records that corresponded for those particular dates.

6  They are just based on estimates.  It's an extrapolation.

7  Q     With respect to -- so, what conclusions did you draw in

8  terms of the numbers?

9  A     As you can see on Schedule Exhibit 33, which is just a

10  summary of all the different information, I carried the

11  figures from the previous schedules over.  As I said, I

12  identified it would be approximately 2,019 of unrecorded

13  income from the door and the food and beverage register.

14          I reflected that figure, that same $1900 figure,

15  from my analysis of the house fees I carried over, as well as

16  the figure from the DJ and the house-madam fees.

17          I took that and multiplied it out by the number of

18  days that they were open that year, to come up with an

19  estimate of -- based on these figures of what the unrecorded

20  revenue would have been for the year from each of the

21  respective sources, I carried that down, and determined that

22  there would have been, based on this analysis had these

23  figures been 100 percent accurate, approximately $1.573

24  million of unrecorded revenue for PRP for the year 2009.

25  Q     And specifically with respect to the payroll analysis,

1   did your review determine anything else relative to the

2   payroll records provided by PRP or the Graf Repetti accounting

3   firm?

4   A     Yes.  When I reviewed the payroll records, there was no

5   contemporaneous record of the daily payroll.  The only record

6   that I could find was in fact the records that were provided

7   by Mr. Johnson.  Looking at the records that were provided by

8   PRP that were maintained by the principals of PRP, the only

9   thing that I could determine from that was, in fact, the cash

10  books.  It was a figure reflected on the body of the cash

11  books.  The records that Graf Repetti had provided, they were

12  again based on estimates, and they were just summaries based

13  on those estimates.  There was no contemporaneous recording.

14  That's essentially what I determined.

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

*Guerci - direct/ Morris*                                      261

1   BY MR. MORRIS:

2   Q    And based upon your analysis of all the books and records

3   that you looked at did you draw any further conclusions?

4   A    Well, based on analysis of the payroll, as well as the

5   income figures, it appeared that PRP was engaged in a large

6   tax evasion scheme, which involved the evasion of income taxes

7   which would extend to the state, federal and sales tax, as

8   well as payroll tax by paying a number of employees

9   essentially off the books, at least for a portion of their

10  income.

11  Q    As part of your investigation did you have occasion to

12  review the insurance policies of PRP?

13  A    Yes, I did.

14  Q    And did you determine from your review of those policies?

15  A    Well, among other things, the most critical thing I

16  determined that they were only insured for a cash loss of up

17  to $2500.

18  Q    And did you also review the cashbooks and general ledgers

19  to determine the amount of cash on hand?

20  A    Yes, I did.

21  Q    And what did you determine?

22  A    Based on a review of the cashbooks and general ledger as

23  well, I determined that PRP had upwards towards $500,000

24  actually in addition to that at times of cash on hand.

25  Q    And did you draw any conclusions based upon your reveal

1   of the policy and cashbooks?

2   A    Well, it just seemed extremely unusual and it just seemed

3   there was an accumulation of cash that wasn't being deposited

4   in the bank and it was  extremely unusual --

5            MR. O'SHEA:  Objection.  Unusual compared to what?

6            THE COURT: His opinion.

7            MR. O'SHEA:  Unrestricted, I'm bound?

8            THE COURT: That is a good argument.  I'd like to

9   hear from you on that, both during cross and during closing.

10            Continue with your answer.

11  A    (Cont'd): It was just extremely unusual to me that a

12  company would have an insurance policy which only insured them

13  for such a small amount of $2500 in cash, and they were

14  maintaining cash on hand well in excess of $500,000.

15  Q    And were you able to draw any sort of broader

16  conclusions, you know, about your review of the books and

17  records in this regard?

18  A    Well, it clearly indicated to me that there was an

19  evasion of income, as well as payroll taxes.

20  Q    And on what do you base that conclusion?

21  A    Based on my analysis of the records, records that I

22  obtained from Mr. Johnson, as well as the comparison I did and

23  schedules I did when I looked at the books and records PRP.

24            THE COURT:  Anything further?

25            MR. MORRIS:  Just maybe one or two questions,

1   Your Honor.

2         THE COURT: Okay.

3   Q     After you completed all the schedules, did you draw any

4   conclusions that did either support or not support your

5   initial determination from your review of the bank records

6   that there was structuring going on in the account at PRP,

7   including JP Morgan, Chase as well as --

8         THE COURT:  I didn't understand the question.

9         MR. O'SHEA:  Objection.  I think that calls for a

10  conclusion that is really for the Court.

11        THE COURT:  Well, look, yes, it is my conclusion,

12  but an expert can opine on the ultimate issue, and I don't

13  even think I need to hear him say there was structuring;

14  otherwise, he wouldn't be here if he didn't think that.  So

15  you want to ask him the question does he think there was

16  structuring, I would assume he would say yes for the reasons

17  he has previously stated.

18  Q     Were there any other reasons that enabled you putting the

19  whole case together after you had review of both the income

20  figures, payroll figures , as well as the bank deposit

21  information and ultimate conclusion that you drew?

22  A     Yes.  Clearly, based on a review of all of those records,

23  specifically review the bank records, my opinion was that, you

24  know, cash deposit activity into the PRP account at TD bank

25  was consistent with structuring.

1          I draw that conclusion based on the fact that there

2     was a continual pattern of $8,000 deposits, many of which took

3     place on consecutive days; the fact that PRP had cash on hand

4     sometimes in excess of $500,000 and at no point in time ever

5     made a deposit over $10,000; the fact that the cash activity

6     as it related -- not so much to the deposits, but the cashing

7     checks changed when -- after J.P. Morgan had closed down their

8     account and they moved to TD bank, there was somewhat of a

9     change to the pattern; the fact there was missing documents

10    would also lead me to believe there was something illegal

11    going on, as I was able was to determine tax evasion, which

12    would essentially serve as motive for structuring.  As I

13    certainly indicated before, would be a form of illegal

14    activity, just as money laundering would be, which would cause

15    someone to structure.

16          THE COURT: All right.  Anything else?

17          MR. MORRIS:  That should be it, Your Honor.

18          THE COURT:  All right.  We will pick up with cross

19    examination tomorrow morning at 9:30.

20          Let me ask the government first, is this your last

21    witness?

22          MR. MORRIS:  May i have a moment to confer,

23    Your Honor?

24          THE COURT:  Sure.  I am just trying to get some

25    timing. You may step down.

1          MR. MORRIS:  The government doesn't anticipate any

2     other witnesses, but would it be okay if i would advise Your

3     Honor in the morning?

4          THE COURT:  Yes, this is not a binding commitment.

5     As I say, I am trying to assess the timing for scheduling

6     purpose.

7          MR. MORRIS: At this point the government doesn't

8     anticipate any other witnesses after finishing with Mr.

9     Guerci.

10          THE COURT:  And the defendant's case, you think you

11     can finish it tomorrow?

12          MR. O'SHEA:  There's a possibility, Your Honor.  I

13     don't know how long cross is going to go.

14          Robert Potenza, Mr. Westrich, Mr. Gleason, Mr.

15     Schmidt were ten minute witnesses.  I think there's a pretty

16     good chance.  If Your Honor will give us a little bit extra

17     time on the back end we can wrap up tomorrow.

18          THE COURT:  We will give it a try.

19          Thank you all for your hard work today.   We will

20     see you all tomorrow 9:30.

21          (Whereupon, these proceedings were adjourned as

22     above set forth)

23                              oOo

24

25

*Guerci - direct/ Morris*                                                    266

| 1  | J O S E P H   J O H N S O N | 1 | 25  | 8  |
| 2  | DIRECT EXAMINATION | 1 | 25 | 12 |
| 3  | BY MR. MORRIS: | | | |
| 4  | VOIR DIRE EXAMINATION | 1 | 39 | 3 |
| 5  | BY MR. O'SHEA: | | | |
| 6  | CROSS-EXAMINATION | 1 | 84 | 7 |
| 7  | RECROSS EXAMINATION | 1 | 132 | 4 |
| 8  | BY MR. O'SHEA: | | | |
| 9  | P A T R I C I A   P O T E N Z | 1 | 134 | 14 |
| 10 | A | | | |
| 11 | DIRECT EXAMINATION | 1 | 134 | 24 |
| 12 | BY MS. HILL: | | | |
| 13 | CROSS-EXAMINATION | 1 | 142 | 5 |
| 14 | BY MR. O'SHEA: | | | |
| 15 | REDIRECT EXAMINATION | 1 | 180 | 17 |
| 16 | M A R C I A N O   F I L I P | 1 | 182 | 8 |
| 17 | P O N E | | | |
| 18 | DIRECT EXAMINATION | 1 | 182 | 19 |
| 19 | CROSS-EXAMINATION | 1 | 195 | 6 |
| 20 | REDIRECT EXAMINATION. | 1 | 205 | 16 |
| 21 | BY MS. HILL: | | | |
| 22 | RECROSS EXAMINATION | 1 | 206 | 21 |
| 23 | BY MR. O'SHEA: | | | |
| 24 | R I C H A R D   G U E R C I | 1 | 208 | 18 |
| 25 | DIRECT EXAMINATION | 1 | 208 | 21 |

1    BY MR. MORRIS:

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**$**

**$1,000** [1] - 34:13
**$1,350** [2] - 109:25, 111:1
**$1.18** [1] - 224:10
**$1.573** [1] - 259:23
**$10** [8] - 31:20, 31:21, 33:11, 33:22, 60:21, 60:25, 80:3, 80:5
**$10,000** [25] - 3:8, 3:12, 3:18, 13:11, 15:2, 15:14, 15:16, 15:19, 15:23, 62:7, 62:12, 112:8, 172:16, 207:24, 214:4, 216:8, 216:13, 216:14, 220:10, 221:11, 223:4, 223:7, 238:25, 239:8, 264:5
**$100** [1] - 60:24
**$100,000** [1] - 197:17
**$115,000** [1] - 9:7
**$12,358** [1] - 54:7
**$1200** [3] - 62:2, 62:3, 65:9
**$14,874** [2] - 256:18, 256:21
**$15** [2] - 31:21, 76:4
**$1500** [1] - 34:14
**$160** [4] - 30:22, 31:12, 32:25, 34:22
**$1700** [1] - 5:12
**$1730** [1] - 258:10
**$19,200** [1] - 58:16
**$1900** [2] - 254:13, 259:14
**$2,000** [1] - 122:17
**$2,386.75** [1] - 258:2
**$20** [7] - 13:25, 14:1, 14:19, 60:22, 157:19, 202:5
**$200** [1] - 34:13
**$21,000** [4] - 78:1, 78:21, 172:23, 173:4
**$23,000** [1] - 151:5
**$230,400** [1] - 238:11
**$234,000** [1] - 233:18
**$25,000** [1] - 133:3
**$2500** [2] - 261:17, 262:13
**$3,000** [1] - 59:16
**$300** [1] - 34:13
**$4,000** [1] - 5:2
**$40** [3] - 33:1, 56:8, 75:16
**$40,000** [1] - 16:2
**$400** [2] - 14:10, 53:22
**$400,000** [1] - 186:14
**$437** [1] - 256:22
**$4400** [1] - 53:23
**$5** [1] - 31:20
**$50** [1] - 60:23
**$500,000** [5] - 3:21, 10:6, 261:23, 262:14, 264:4
**$6,000** [2] - 8:24, 224:14
**$60** [7] - 32:6, 32:9, 75:18, 255:1, 255:4, 255:5, 255:8
**$61,900** [1] - 238:10
**$61,900.00** [1] - 1:8
**$624,818** [1] - 258:14
**$6300** [1] - 252:24

**$64,621** [1] - 254:8
**$7,000** [1] - 150:12
**$7,940** [1] - 255:21
**$70** [1] - 255:1
**$70,000** [1] - 8:22
**$70,710** [1] - 233:11
**$72,693** [1] - 248:23
**$774** [1] - 250:7
**$788** [1] - 250:7
**$8,000** [9] - 3:17, 15:18, 157:11, 157:23, 231:15, 236:13, 237:5, 239:4, 264:2
**$80** [6] - 31:11, 32:10, 34:23, 255:1, 255:12, 255:16
**$85,923** [1] - 257:7
**$880,000** [1] - 7:3
**$897,000** [1] - 3:12
**$898** [1] - 52:19
**$9,000** [2] - 178:7, 224:6

**'**

**'Paid** [1] - 175:17

**0**

**0004** [1] - 129:2
**0034** [1] - 108:12
**004** [1] - 109:17
**005** [5] - 109:16, 110:2, 129:3, 129:10, 129:17
**09** [1] - 9:25

**1**

**1** [18] - 28:20, 33:7, 266:1, 266:2, 266:4, 266:6, 266:7, 266:9, 266:11, 266:13, 266:15, 266:16, 266:18, 266:19, 266:20, 266:22, 266:24, 266:25
**1,015** [1] - 58:2
**1.4** [1] - 240:9
**1.5** [1] - 240:9
**10** [2] - 145:23, 234:14
**10,000** [1] - 58:19
**10,395** [1] - 52:2
**10-CV-0186** [1] - 1:4
**100** [2] - 33:8, 259:23
**10036** [1] - 149:6
**100s** [4] - 14:3, 15:8, 16:8, 16:13
**10175** [1] - 1:19
**1040** [1] - 53:17
**10:00** [2] - 87:2, 166:18
**10th** [2] - 7:1, 238:8
**11** [9] - 3:15, 25:18, 31:21, 31:22, 46:15, 93:22, 146:4, 152:13, 250:6
**11-13** [1] - 49:11
**11-13-09** [1] - 64:5

**1100** [1] - 148:25
**11101** [1] - 154:21
**11201** [1] - 1:15
**113** [1] - 3:13
**11580** [1] - 25:16
**11:00** [4] - 51:3, 53:17, 53:18, 87:2
**11:30** [2] - 28:18, 160:16
**12** [10] - 28:19, 40:22, 40:25, 41:9, 41:23, 187:19, 205:2, 205:5, 230:20, 266:2
**12,358** [2] - 58:24, 58:25
**120** [1] - 30:22, 33:1, 75:16
**1269** [2] - 156:22, 156:23
**1289** [4] - 157:1, 157:3, 157:8, 168:10
**13** [5] - 1:10, 187:7, 187:9, 205:5, 212:15
**13,000** [1] - 205:2
**132** [1] - 266:7
**134** [2] - 266:9, 266:11
**138** [1] - 141:10
**14** [5] - 83:2, 169:1, 170:23, 188:8, 266:9
**142** [1] - 266:13
**14th** [1] - 114:1
**15** [11] - 10:14, 18:18, 76:10, 119:12, 135:16, 135:20, 145:7, 160:16, 211:18, 212:15, 233:9
**15,000** [2] - 172:19
**1526** [7] - 138:11, 168:7, 168:25, 181:1, 186:5, 186:10, 198:16
**153** [1] - 150:24
**16** [1] - 266:20
**160** [1] - 76:8
**1630** [1] - 25:16
**166** [1] - 125:20
**166.50** [1] - 150:24
**1666** [10] - 46:10, 93:12, 93:20, 93:21, 93:24, 94:2, 95:14, 125:16, 126:3, 126:4
**1667** [9] - 46:12, 93:15, 93:21, 93:24, 95:14, 125:17, 125:21, 126:5, 126:15
**1672** [2] - 96:4, 96:8
**1676** [2] - 96:4, 96:8
**169** [3] - 100:9, 100:14, 100:16
**17** [3] - 108:14, 109:1, 266:15
**1718** [8] - 48:5, 48:7, 49:22, 50:9, 51:17, 63:19, 85:24
**1719** [6] - 49:18, 49:21, 63:10, 64:2, 65:20, 85:25
**18** [5] - 100:10, 100:19, 118:16, 240:5, 266:24
**180** [1] - 266:15
**180,000** [1] - 233:10
**182** [2] - 266:16, 266:18
**186** [1] - 118:12
**187** [1] - 118:24
**18th** [1] - 239:9
**19** [2] - 210:5, 266:18
**19,200** [1] - 61:18

**190** [1] - 224:8
**1900** [1] - 60:23
**195** [1] - 266:19
**1970** [1] - 213:6
**1982** [1] - 210:25
**1985** [2] - 143:3, 148:5
**1990** [1] - 144:16
**1991** [1] - 27:6
**1995** [1] - 148:5
**1998** [2] - 27:3, 27:4
**1999** [1] - 27:3
**19th** [2] - 96:13, 96:14
**1:30** [1] - 126:8
**1:40** [1] - 124:16
**1s** [1] - 200:14
**1st** [7] - 9:8, 139:7, 150:7, 150:11, 150:21, 150:23, 157:10

## 2

**2** [5] - 23:10, 126:2, 126:8, 148:24, 191:2
**2,019** [2] - 249:3, 259:12
**20** [14] - 6:9, 23:16, 33:11, 33:23, 169:1, 190:2, 190:8, 190:19, 195:23, 210:5, 217:20, 217:21, 225:7, 240:5
**20,000** [1] - 172:19
**200** [2] - 14:10, 157:14
**2000** [25] - 3:3, 26:5, 82:24, 83:1, 83:11, 103:1, 103:6, 103:9, 103:23, 104:6, 105:11, 105:20, 106:9, 107:3, 107:21, 110:10, 115:12, 115:16, 145:3, 149:5, 152:9, 153:15, 153:17, 222:5, 222:11
**20001** [1] - 27:3
**20007** [1] - 8:24
**2001** [7] - 4:8, 26:17, 135:13, 145:2, 148:6, 148:7
**2006** [1] - 224:7
**2007** [12] - 8:23, 9:8, 78:7, 78:18, 149:3, 150:9, 153:4, 153:6, 154:10, 172:1
**2008** [8] - 79:13, 79:15, 152:13, 189:24, 192:14, 223:9, 224:8, 230:20
**2009** [22] - 7:1, 46:15, 93:22, 98:13, 118:19, 118:22, 138:16, 140:24, 157:2, 157:4, 181:5, 181:7, 186:11, 222:6, 222:8, 230:20, 233:10, 234:14, 235:12, 238:8, 258:23, 259:24
**2010** [25] - 4:8, 13:1, 26:17, 79:4, 79:15, 80:1, 81:23, 83:4, 85:12, 107:20, 108:15, 109:1, 111:10, 116:8, 116:15, 117:24, 117:25, 119:17, 164:5, 173:11, 176:12, 177:7, 178:1, 192:25, 203:25
**2011** [2] - 1:10, 113:20
**2012** [1] - 78:19
**205** [1] - 266:20
**206** [1] - 266:22
**208** [2] - 266:24, 266:25

**2098** [1] - 66:8
**20s** [7] - 14:4, 14:5, 14:15, 14:16, 14:24, 15:10, 16:11
**21** [4] - 191:14, 192:24, 266:22, 266:25
**2140** [1] - 53:18
**22** [4] - 192:13, 192:20, 192:22, 193:1
**225** [1] - 1:24
**229** [1] - 199:4
**23** [2] - 193:19, 195:23
**2388** [1] - 258:8
**24** [34] - 37:19, 37:20, 39:1, 41:24, 43:6, 44:22, 45:15, 48:3, 51:16, 72:25, 85:24, 88:8, 89:1, 89:12, 89:19, 91:25, 93:12, 96:5, 96:8, 100:10, 104:18, 108:11, 116:8, 119:17, 125:14, 127:20, 134:2, 170:22, 175:16, 176:12, 180:25, 203:12, 203:13, 266:11
**24,000** [1] - 151:6
**24.76** [1] - 193:14
**24.78** [1] - 193:15
**2465** [1] - 17:19
**248** [1] - 48:18
**24th** [1] - 119:23
**25** [8] - 116:15, 226:24, 226:25, 230:2, 230:14, 230:15, 266:1, 266:2
**25,601** [1] - 60:5
**25.06** [1] - 193:16
**25th** [1] - 1:19
**26** [3] - 107:20, 209:22, 232:8
**27** [4] - 67:2, 235:19, 235:21, 235:22
**27.3** [2] - 194:7, 253:8, 253:23
**271** [1] - 1:15
**27th** [1] - 8:24
**28** [6] - 17:19, 67:2, 169:1, 235:21, 246:24, 246:25
**29** [4] - 252:12, 252:15, 254:17, 255:25
**294** [2] - 48:20, 48:25
**2957** [3] - 57:21, 57:24, 59:7
**29th** [2] - 8:23, 149:2
**2:30** [2] - 94:7, 126:2
**2Os** [1] - 14:7

## 3

**3** [8] - 33:13, 33:23, 152:25, 153:9, 153:14, 256:9, 256:10, 266:4
**30** [5] - 16:2, 16:23, 67:3, 254:17, 254:19
**300** [3] - 3:20, 10:6, 10:23
**301.50** [1] - 150:24
**30th** [1] - 140:24
**31** [3] - 149:3, 157:4, 256:4
**31,558** [1] - 58:25
**3180** [1] - 53:8
**32** [3] - 107:12, 140:18, 257:9
**320** [1] - 32:25
**33** [1] - 259:9
**35** [2] - 29:4, 140:21
**3580** [1] - 53:19

**361** [1] - 258:15
**365** [1] - 258:15
**37** [1] - 141:7
**37th** [3] - 26:7, 145:5, 154:20
**38** [1] - 67:3
**39** [2] - 199:4, 266:4
**3957** [1] - 59:7
**3:00** [2] - 94:7, 159:23
**3:15** [1] - 180:8

## 4

**4** [9] - 28:18, 28:19, 28:20, 28:23, 146:4, 152:1, 152:5, 153:8, 266:7
**4.50** [1] - 14:12
**40** [4] - 29:4, 30:23, 199:16, 199:18
**400** [5] - 3:20, 10:6, 10:23, 10:24, 53:18
**401(K** [1] - 114:15
**4040** [1] - 150:14
**41** [1] - 67:15
**43-19** [2] - 26:7, 145:5, 154:20
**442** [2] - 199:4
**442,229.23** [1] - 186:11
**45** [1] - 130:12
**4740** [1] - 150:14
**48** [1] - 31:11
**48th** [2] - 143:16, 149:6
**4:00** [1] - 67:12
**4th** [2] - 157:20, 157:22

## 5

**5** [10] - 14:11, 60:20, 138:12, 156:21, 157:8, 160:13, 168:10, 192:14, 252:1, 266:13
**5/1** [2] - 139:4, 168:17
**5/2** [1] - 139:4
**5/25** [1] - 175:17
**50s** [4] - 14:3, 15:8, 16:8, 16:13
**51** [3] - 1:19, 68:3, 68:4
**516-256-1168** [1] - 175:21
**5168** [1] - 173:2
**5311** [1] - 130:7
**5312** [1] - 130:7
**5313** [2] - 114:2, 130:7
**5319** [1] - 116:7
**5320** [1] - 117:17
**5321** [1] - 117:17
**5346** [1] - 176:18
**560** [1] - 60:20
**579,000** [1] - 238:14
**599,000** [1] - 233:20
**5:00** [2] - 67:11, 70:17
**5th** [2] - 9:4, 9:8

## 6

**6** [2] - 15:18, 266:19
**60** [1] - 255:20
**613-2369** [1] - 2:1
**613-2489** [1] - 1:25
**615** [2] - 22:25, 23:10
**6200** [1] - 60:24
**6301** [2] - 250:20, 251:9
**64** [2] - 143:16, 149:5
**6505** [1] - 251:5
**655** [1] - 258:8
**6:00** [1] - 70:18

## 7

**7** [3] - 15:18, 82:25, 266:6
**7,000** [1] - 157:17
**7,371** [1] - 60:19
**70** [4] - 18:19, 32:10, 33:7, 135:17
**718** [2] - 1:25, 2:1
**78** [1] - 65:23
**7807** [1] - 250:18
**7:00** [1] - 86:22
**7:30** [5] - 28:23, 86:22, 86:23, 86:24, 87:1
**7TH** [1] - 1:15

## 8

**8** [16] - 31:18, 138:6, 138:8, 138:11, 146:18, 167:24, 168:6, 168:25, 181:1, 186:2, 186:10, 198:15, 205:19, 266:1, 266:16
**8,660** [1] - 60:22
**8-21-2009** [1] - 252:22
**80** [3] - 33:7, 197:14, 255:19
**8000** [3] - 147:20, 147:21
**8040** [1] - 150:14
**84** [1] - 266:6
**85,923** [1] - 258:1
**8:00** [3] - 86:24, 87:1, 160:14

## 9

**9** [2] - 230:20, 235:12
**9,000** [1] - 205:4
**90** [1] - 197:14
**901** [1] - 251:5
**910** [1] - 61:2
**920** [2] - 60:21, 61:1
**940** [1] - 188:12
**9800** [1] - 78:23
**9:00** [1] - 87:2
**9:30** [3] - 1:10, 264:19, 265:20

## A

**a.m** [8] - 1:10, 28:18, 28:19, 28:20, 126:2, 146:4
**ability** [1] - 95:5
**able** [11] - 81:4, 188:20, 216:23, 248:18, 248:19, 249:10, 256:7, 257:13, 258:16, 262:15, 264:11
**absolute** [1] - 10:3
**absolutely** [13] - 12:9, 141:22, 147:14, 147:24, 151:20, 159:2, 163:8, 167:2, 175:7, 219:16, 229:18, 243:15, 243:25
**accept** [1] - 148:16
**acceptable** [1] - 19:9
**access** [2] - 85:1, 241:8
**accessed** [1] - 114:24
**accord** [1] - 259:1
**accordance** [1] - 22:15
**according** [2] - 88:14, 176:12
**account** [100] - 3:1, 3:13, 7:18, 14:14, 14:17, 14:19, 14:20, 140:23, 146:24, 147:1, 147:7, 148:10, 148:14, 148:18, 148:20, 150:21, 151:11, 151:21, 152:16, 152:19, 152:23, 154:17, 154:24, 155:2, 155:4, 155:14, 155:15, 155:19, 155:21, 156:1, 156:10, 156:11, 158:18, 158:19, 158:20, 158:22, 201:23, 202:1, 202:19, 206:24, 207:16, 207:19, 214:12, 216:2, 217:4, 217:9, 219:8, 219:20, 222:18, 223:1, 223:8, 223:15, 223:20, 224:9, 225:10, 225:11, 227:22, 228:5, 228:22, 228:23, 229:21, 230:19, 231:12, 231:16, 231:20, 231:25, 232:18, 233:2, 233:19, 233:21, 233:22, 234:5, 234:20, 236:13, 238:10, 238:12, 238:14, 240:18, 240:22, 241:10, 241:11, 241:15, 241:19, 241:24, 242:2, 242:12, 242:21, 243:10, 243:14, 243:17, 243:18, 243:21, 263:6, 263:24, 264:8
**accountant** [19] - 10:9, 16:4, 17:13, 136:8, 137:13, 137:16, 137:21, 151:17, 169:15, 178:10, 178:11, 178:12, 183:2, 183:17, 186:12, 200:6, 206:7, 206:19
**accountants** [7] - 12:14, 164:1, 169:24, 169:25, 170:1, 179:9, 211:15
**accounted** [4] - 61:16, 159:8, 204:7, 244:23
**accounting** [14] - 17:15, 136:15, 137:21, 142:10, 142:12, 142:24, 142:25, 183:4, 200:2, 203:17, 205:8, 205:9, 243:2, 260:2
**accounts** [23] - 7:4, 10:12, 14:18, 16:2, 142:16, 148:12, 149:9, 179:18, 183:24, 200:19, 200:20, 223:16, 231:21, 232:1, 232:5, 232:19, 232:25, 233:5, 233:7, 234:6, 235:18, 241:14, 242:3
**accumulate** [1] - 244:24
**accumulated** [1] - 245:6

**accumulating** [1] - 6:13
**accumulation** [1] - 262:3
**accumulatively** [1] - 257:7
**accuracy** [2] - 98:9, 126:24
**accurate** [7] - 118:4, 141:24, 215:2, 215:6, 215:7, 257:22, 259:23
**accurately** [2] - 126:19, 128:7
**ACH** [4] - 242:21, 243:3, 243:20, 244:3
**achieved** [2] - 25:20, 210:17
**acknowledged** [2] - 95:24, 119:21
**acknowledging** [1] - 95:21
**act** [9] - 6:9, 201:3, 209:16, 211:2, 211:6, 212:14, 213:8, 213:14, 217:21
**Act** [6] - 210:2, 210:6, 210:14, 212:6, 212:19, 213:6
**acted** [1] - 202:2
**acting** [1] - 234:19
**action** [3] - 6:5, 83:14, 116:21
**actions** [2] - 116:16, 175:18
**activities** [4] - 40:18, 84:1, 213:12, 213:14
**activity** [36] - 3:1, 10:2, 11:20, 14:18, 141:18, 146:18, 147:6, 147:12, 148:7, 148:8, 156:14, 156:16, 184:8, 202:24, 203:2, 203:3, 218:2, 218:10, 219:19, 221:3, 222:25, 223:10, 223:13, 225:9, 225:12, 227:21, 228:1, 228:5, 228:22, 229:21, 237:9, 241:22, 263:24, 264:5, 264:14
**acts** [1] - 211:25
**actual** [7] - 8:12, 9:1, 21:6, 126:25, 193:20, 202:19, 225:17
**Ad** [2] - 105:8, 107:14
**ad** [12] - 107:25, 108:18, 108:22, 109:3, 109:6, 109:22, 111:4, 129:17, 129:22, 129:23, 129:25, 132:6
**AD** [3] - 129:2, 129:3, 129:10
**AD-0032** [1] - 107:10
**AD-0034** [1] - 108:11
**AD-004** [2] - 109:16, 109:17
**AD004** [1] - 129:17
**AD005** [1] - 129:15
**ADA** [1] - 121:8
**add** [10] - 14:22, 14:24, 19:3, 62:4, 62:12, 62:13, 167:22, 168:3, 169:8, 179:6
**add-on** [1] - 179:6
**added** [7] - 61:4, 164:8, 187:18, 207:22, 250:9, 250:11, 251:3
**adding** [2] - 169:6, 251:16
**addition** [3] - 150:6, 169:1, 261:24
**additional** [11] - 19:1, 19:3, 139:19, 140:5, 141:4, 141:19, 173:20, 190:15, 197:14, 235:4, 238:13
**additions** [1] - 187:16
**address** [20] - 8:4, 106:14, 107:18, 118:7, 118:8, 118:10, 149:4, 149:8, 150:3, 152:8, 152:11, 153:8, 153:23, 154:16, 154:19, 154:20, 186:20, 214:21
**addressed** [4] - 9:11, 190:10, 190:17,

227:20
**adjourned** [1] - 265:21
**Administration** [1] - 210:11
**administration** [1] - 210:23
**administrative** [1] - 27:21
**admission** [26] - 4:10, 31:15, 31:17, 31:18, 68:16, 138:25, 139:25, 160:5, 160:6, 160:9, 160:13, 160:19, 161:4, 161:14, 161:16, 161:19, 167:15, 167:16, 193:5, 193:7, 196:11, 196:15, 196:23, 197:3
**admissions** [3] - 31:23, 35:23, 196:25
**admit** [1] - 12:4
**admitted** [10] - 133:21, 134:2, 134:11, 226:24, 227:17, 230:13, 232:7, 246:24, 252:14, 254:18
**ads** [11] - 105:10, 105:12, 105:19, 106:8, 106:10, 108:21, 109:5, 110:19, 111:12, 129:11
**adult** [2] - 13:22, 144:13
**advanced** [1] - 83:8
**adversarial** [1] - 138:3
**adversary** [1] - 7:20
**advertisers** [1] - 145:13
**advertising** [3] - 109:10, 112:8, 145:13
**advise** [4] - 24:18, 51:9, 98:17, 265:2
**advising** [1] - 102:17
**affairs** [3] - 15:4, 15:16, 158:2
**affect** [2] - 126:24, 131:8
**affected** [2] - 197:1, 214:12
**affidavit** [5] - 7:12, 11:1, 128:1, 128:4, 128:8
**afford** [7] - 84:16, 84:18, 85:4, 102:21, 112:12, 112:13, 112:20
**afternoon** [10] - 125:10, 125:11, 135:1, 135:2, 145:25, 159:23, 159:24, 180:7, 195:8, 195:9
**agencies** [3] - 211:12, 212:3, 215:18
**agency** [2] - 210:10, 210:15
**Agent** [7] - 2:12, 7:22, 10:13, 11:25, 12:25, 235:17, 238:18
**agent** [19] - 6:8, 7:5, 18:3, 22:21, 22:23, 23:16, 23:21, 102:21, 110:20, 209:20, 209:23, 210:3, 210:8, 211:3, 211:10, 217:20, 218:24, 243:11
**agents** [4] - 7:5, 82:12, 211:12
**ago** [4] - 12:4, 74:5, 183:9, 184:3
**agree** [18] - 42:12, 45:22, 88:3, 88:7, 88:13, 88:18, 88:21, 89:1, 89:9, 91:9, 94:16, 96:9, 96:11, 97:8, 102:4, 102:7, 102:8, 117:11
**agreed** [5] - 80:24, 119:23, 174:7, 179:16, 195:17
**agreement** [2] - 116:14, 175:16
**ahead** [3] - 100:2, 226:19, 229:25
**aid** [1] - 213:16
**Air** [4] - 128:21, 129:6, 129:15
**AI** [3] - 21:14, 27:15, 71:1
**alarm** [1] - 198:13
**alcohol** [8] - 4:11, 26:12, 29:11, 131:3,

131:4, 131:5, 131:7
**Alex** [2] - 52:24, 64:20
**Allan** [1] - 172:20
**allegation** [1] - 7:11
**allegations** [3] - 83:8, 177:10, 177:11
**allege** [1] - 46:14
**alleged** [2] - 89:12, 228:8
**Allen** [3] - 21:16, 27:23, 135:20
**allocated** [1] - 135:25
**allow** [5] - 22:11, 24:7, 85:18, 179:15, 243:6
**almost** [4] - 7:3, 7:7, 45:21, 55:18
**alongside** [1] - 83:15
**alter** [1] - 15:21
**alternating** [1] - 146:5
**Amendment** [3] - 24:19, 98:5, 98:18
**amendments** [1] - 213:7
**American** [1] - 111:1
**amount** [92] - 5:23, 6:11, 32:4, 34:10, 54:25, 56:24, 57:1, 57:21, 59:14, 59:16, 61:15, 61:24, 62:3, 62:8, 62:9, 62:10, 62:11, 62:17, 62:24, 63:5, 75:15, 75:23, 75:25, 76:15, 79:6, 103:17, 129:14, 138:25, 147:17, 150:11, 150:24, 154:12, 157:23, 158:25, 159:6, 178:19, 186:9, 189:9, 189:10, 189:15, 189:18, 189:21, 191:3, 192:2, 194:4, 194:5, 204:24, 205:1, 214:16, 216:7, 216:12, 217:3, 220:11, 221:11, 223:3, 231:15, 232:23, 233:13, 234:4, 237:4, 237:19, 239:4, 248:9, 248:11, 248:14, 250:1, 250:10, 250:14, 251:14, 252:3, 252:8, 253:1, 253:2, 253:3, 253:5, 253:6, 253:7, 253:17, 253:19, 253:20, 254:10, 254:11, 257:4, 257:18, 257:20, 258:1, 258:7, 261:19, 262:13
**Amount** [3] - 55:10, 56:23, 57:15
**amounts** [29] - 3:8, 3:17, 9:19, 32:13, 36:22, 55:15, 74:10, 74:11, 76:15, 78:2, 78:17, 140:19, 151:19, 157:17, 157:19, 160:17, 161:12, 165:21, 165:22, 166:11, 168:12, 178:25, 224:5, 224:14, 239:8, 242:3, 249:21, 250:12, 251:5
**Amounts** [1] - 54:20
**analysis** [22] - 193:20, 229:17, 229:20, 233:11, 233:14, 235:17, 236:9, 246:6, 246:8, 246:15, 247:4, 248:12, 249:3, 249:11, 258:9, 258:13, 259:15, 259:22, 259:25, 261:2, 261:4, 262:21
**analyst** [1] - 209:5
**analyzed** [2] - 236:13, 257:2
**Andre** [1] - 94:14
**ANDREW** [1] - 1:20
**Andrew** [1] - 2:14
**angry** [4] - 118:19, 120:2, 120:4, 177:2
**annual** [1] - 188:13
**annually** [4] - 185:19, 187:3, 199:18, 258:12
**answer** [23] - 21:20, 23:24, 85:17, 93:8, 97:14, 97:16, 98:18, 100:9,

100:20, 100:24, 101:1, 114:21, 118:17, 118:21, 118:24, 133:1, 195:17, 228:2, 242:18, 242:19, 242:20, 244:7, 262:10
**answered** [1] - 104:14
**answers** [4] - 66:1, 85:20, 190:20, 190:23
**anticipate** [4] - 20:23, 228:18, 265:1, 265:8
**anytime** [1] - 251:13
**anyway** [1] - 153:19
**AOL** [3] - 106:14, 106:15, 107:13
**appeal** [1] - 196:19
**appealed** [1] - 196:22
**appearances** [1] - 2:6
**APPEARANCES** [1] - 1:13
**appeared** [3] - 223:1, 249:18, 261:5
**application** [1] - 154:14
**applied** [7] - 9:16, 114:17, 233:12, 242:22, 243:19, 254:4, 258:25
**apply** [5] - 34:15, 54:9, 57:1, 154:13, 193:25
**applying** [1] - 16:20
**appointed** [2] - 127:25, 128:2
**appreciate** [2] - 66:2, 212:23
**approach** [5] - 37:7, 100:12, 106:19, 138:7, 180:10
**appropriate** [7] - 116:16, 116:21, 143:11, 161:12, 175:18, 178:19, 178:25
**April** [14] - 4:8, 26:17, 79:15, 80:1, 85:12, 117:24, 117:25, 118:21, 140:24, 140:25, 164:5, 173:11, 175:16, 193:15
**area** [14] - 54:3, 54:13, 54:22, 58:10, 65:18, 128:20, 193:6, 209:15, 210:14, 211:4, 211:24, 212:19, 217:21, 218:24
**areas** [10] - 4:10, 29:21, 72:19, 73:4, 138:19, 209:3, 211:1, 211:9, 212:6, 212:13
**argued** [1] - 79:19
**argument** [3] - 99:9, 101:8, 262:8
**arrange** [2] - 147:12, 158:1
**arrangement** [2] - 103:23, 166:1
**arranging** [2] - 15:3, 15:16
**articles** [3] - 79:20, 130:3, 130:13
**ASC** [1] - 23:7
**aside** [4] - 5:6, 36:3, 38:21
**aspect** [3] - 23:17, 74:8, 223:21
**ASRC** [4] - 208:24, 209:1, 209:8, 209:19
**asserted** [1] - 98:5
**assess** [1] - 265:5
**asset** [3] - 209:4, 209:15, 211:7
**assistance** [2] - 209:2, 209:15
**ASSISTANT** [1] - 1:17
**associated** [1] - 70:15
**associations** [1] - 211:14
**assume** [5] - 134:9, 182:5, 189:15, 215:5, 263:16
**assumed** [1] - 133:23
**assumption** [1] - 182:7

**assumptions** [1] - 215:3
**Astoria** [2] - 8:15, 10:18
**ATM** [41] - 14:5, 14:22, 14:24, 15:18, 16:12, 140:15, 145:19, 146:18, 146:19, 146:21, 148:20, 150:19, 150:25, 156:12, 156:19, 157:19, 158:2, 158:4, 158:14, 168:24, 169:1, 169:11, 201:14, 201:16, 201:17, 201:20, 201:22, 202:2, 203:6, 240:8, 240:22, 241:6, 241:7, 241:17, 241:19, 241:23, 242:6, 242:12, 243:10, 243:16
**attached** [1] - 120:18
**attaches** [1] - 176:17
**attempt** [1] - 13:15
**attempted** [3] - 11:12, 148:1, 193:10
**attend** [2] - 25:22, 210:19
**attendant** [1] - 55:9
**attended** [1] - 211:4
**attention** [17] - 10:2, 27:11, 49:22, 50:8, 51:15, 54:18, 63:8, 64:1, 65:18, 71:25, 125:12, 128:15, 128:22, 129:1, 219:4, 230:1, 230:13
**attorney** [6] - 84:22, 121:19, 123:20, 127:25, 128:2, 130:18
**Attorney's** [2] - 2:9, 212:3
**attorneys** [2] - 211:14, 247:20
**ATTORNEYS** [2] - 1:14, 1:17
**attributing** [1] - 253:3
**audit** [21] - 137:3, 177:21, 178:2, 178:3, 178:4, 178:15, 178:17, 178:18, 178:22, 179:11, 189:25, 196:2, 197:24, 203:25, 204:3, 204:16, 206:11, 206:16, 207:1, 253:4, 253:12
**auditing** [2] - 178:24, 178:25
**auditor** [7] - 190:8, 190:14, 193:25, 194:20, 196:4, 197:6, 219:10
**auditors** [3] - 191:20, 196:14, 196:16
**audits** [6] - 136:10, 136:13, 136:20, 136:22, 136:25, 179:17
**August** [7] - 9:8, 81:19, 81:21, 118:19, 118:22, 192:14, 257:17
**authenticity** [1] - 47:3
**author** [1] - 190:12
**authorities** [3] - 179:13, 192:7, 196:1
**authority** [4] - 116:22, 175:2, 175:6, 197:22
**automated** [2] - 137:25, 243:21
**automatically** [1] - 147:3
**available** [7] - 3:19, 6:13, 42:5, 215:16, 233:3, 233:11, 240:5
**AVENUE** [1] - 1:19
**average** [5] - 166:17, 193:17, 249:7, 257:23, 258:2
**avoid** [7] - 16:1, 217:25, 218:8, 218:23, 219:17, 221:7
**awards** [1] - 212:1
**aware** [10] - 3:10, 72:19, 83:24, 185:25, 189:24, 192:9, 200:24, 201:17, 202:23, 217:16
**Azrack** [1] - 83:16

**B**

**bachelor** [1] - 54:15
**back-and-forth** [1] - 196:3
**back-and-forths** [1] - 195:25
**back-to-back** [1] - 237:7
**backed** [2] - 253:5, 258:18
**background** [4] - 10:20, 142:8, 222:9
**backing** [1] - 254:4
**backs** [1] - 73:20
**backwards** [1] - 194:1
**Balance** [2] - 58:10, 58:12
**balance** [8] - 61:14, 140:23, 140:25, 141:11, 171:8, 199:3, 233:2, 233:12
**balanced** [4] - 4:20, 41:18, 70:19
**balances** [1] - 145:19
**bank** [132] - 3:1, 3:8, 3:16, 3:23, 6:9, 7:3, 7:8, 7:13, 7:14, 7:17, 7:24, 7:25, 9:20, 10:17, 14:2, 14:6, 14:12, 14:14, 15:9, 15:12, 15:20, 16:3, 16:11, 17:8, 19:16, 53:18, 53:20, 53:22, 58:15, 58:17, 59:12, 59:13, 59:21, 60:4, 60:13, 61:15, 62:2, 62:3, 62:4, 65:9, 65:11, 65:16, 65:17, 65:22, 66:6, 122:25, 123:3, 137:19, 145:18, 146:24, 148:6, 148:17, 148:18, 148:20, 151:15, 151:16, 154:14, 156:2, 156:4, 158:3, 158:6, 161:5, 168:14, 169:8, 170:12, 170:18, 179:18, 184:6, 184:20, 200:19, 200:20, 201:23, 202:1, 202:8, 202:15, 202:18, 202:20, 203:1, 203:3, 203:5, 206:15, 206:16, 206:25, 207:2, 207:3, 207:4, 207:13, 207:16, 207:18, 209:16, 211:1, 211:6, 211:25, 212:13, 215:23, 216:6, 216:8, 216:11, 216:13, 216:24, 217:21, 218:13, 219:8, 219:12, 222:11, 222:15, 222:17, 222:19, 223:25, 227:5, 230:25, 232:16, 233:23, 235:2, 235:6, 236:13, 239:6, 239:10, 241:11, 241:19, 241:25, 242:25, 243:23, 244:4, 262:4, 263:5, 263:20, 263:23, 263:24, 264:8
**Bank** [47] - 3:13, 8:1, 11:11, 11:19, 14:20, 65:7, 122:15, 148:23, 149:2, 156:6, 156:9, 156:19, 157:3, 158:23, 210:2, 210:6, 210:14, 212:6, 212:19, 213:6, 222:13, 223:1, 223:6, 223:11, 223:15, 225:10, 225:14, 226:12, 230:19, 231:12, 231:16, 231:17, 231:20, 232:18, 234:1, 234:8, 234:18, 234:20, 234:23, 238:11, 239:8, 241:12, 241:15, 242:22, 243:10, 243:17, 243:19
**banked** [1] - 148:7
**banker** [3] - 228:11, 228:12, 228:13
**bankers** [1] - 211:15
**banking** [17] - 8:19, 8:21, 9:9, 14:9, 122:10, 122:13, 147:12, 147:16, 147:23, 148:18, 156:16, 166:22, 213:9, 216:10, 218:15, 221:6, 243:1
**banks** [8] - 3:10, 8:2, 11:5, 11:6, 59:22,

59:23, 63:3, 220:8
**bar** [19] - 13:24, 26:2, 26:4, 52:17, 73:20, 85:13, 89:9, 102:21, 107:4, 114:14, 132:20, 144:24, 148:15, 149:14, 154:22, 246:6, 246:7, 247:4
**Barack** [2] - 79:14, 79:23
**Barback** [1] - 22:6
**barest** [1] - 7:9
**Bars** [2] - 115:4, 115:6
**bartender** [11] - 50:13, 52:14, 52:24, 55:9, 58:18, 59:17, 64:19, 64:20, 64:21, 131:13, 160:3
**Bartender** [2] - 50:22, 247:13
**bartender's** [1] - 50:22, 247:13
**Bartenders** [3] - 50:9, 50:12, 50:15
**bartenders** [8] - 50:12, 53:6, 59:15, 62:1, 64:22, 64:24, 73:20, 75:16
**Baruch** [1] - 142:10
**base** [1] - 262:20
**based** [55] - 2:25, 7:8, 7:10, 185:21, 188:24, 189:9, 193:8, 197:12, 200:18, 200:20, 217:7, 217:15, 218:24, 219:6, 219:14, 225:16, 233:11, 237:12, 237:14, 241:1, 243:10, 247:3, 248:12, 248:22, 249:1, 249:3, 249:4, 249:11, 251:2, 251:3, 253:9, 253:15, 253:17, 255:6, 255:12, 255:17, 256:9, 256:17, 257:13, 258:8, 258:12, 259:3, 259:6, 259:19, 259:22, 260:12, 261:2, 261:4, 261:22, 261:25, 262:21, 263:22, 264:1
**basing** [2] - 12:5, 229:1
**basis** [22] - 9:24, 14:20, 16:2, 56:18, 78:25, 79:2, 94:5, 134:7, 137:18, 137:19, 170:8, 184:19, 186:25, 187:16, 188:14, 193:9, 198:3, 226:14, 242:16, 254:21
**batching** [1] - 242:6
**Bates** [11] - 48:4, 51:17, 63:10, 107:9, 125:16, 129:2, 129:3, 130:7, 138:12, 157:8, 181:1
**bathroom** [1] - 55:9
**Battino** [1] - 170:6
**Beam** [1] - 42:24
**beam** [3] - 44:1, 44:3, 44:7
**bear** [3] - 54:19, 57:15, 179:17
**became** [6] - 13:6, 143:3, 172:18, 172:19, 222:7
**become** [3] - 189:24, 207:25, 222:3
**becoming** [1] - 170:1
**been'** [1] - 203:9
**BEFORE** [1] - 1:12
**beforehand** [1] - 11:17
**beg** [1] - 175:2
**BEG** [2] - 140:22
**begged** [4] - 79:23, 80:17, 101:18, 115:18
**begin** [1] - 82:16
**beginning** [5] - 48:12, 92:14, 140:25, 147:5, 159:16
**behalf** [2] - 214:11, 234:19

**behind** [3] - 115:4, 125:17, 129:3

**Behind** [1] - 115:6

**below** [6] - 3:8, 3:21, 52:6, 150:23, 157:22, 221:11

**Ben** [1] - 44:14

**BENCH** [1] - 1:11

**bench** [2] - 24:17, 106:19

**beneath** [11] - 52:5, 57:14, 58:21, 59:3, 59:9, 59:25, 61:6, 65:7, 141:9, 150:14, 157:13

**benefit** [2] - 204:22, 204:23

**benefits** [1] - 119:24

**beseeching** [1] - 175:6

**best** [4] - 82:1, 88:13, 88:19, 113:14

**better** [1] - 52:12

**between** [11] - 58:17, 62:24, 63:17, 67:8, 67:14, 108:8, 118:9, 125:20, 148:5, 201:4, 228:20

**beverage** [2] - 247:25, 259:13

**beyond** [1] - 45:19

**big** [1] - 101:8

**bigger** [1] - 63:5

**biggest** [1] - 236:7

**bill** [3] - 111:4, 129:12, 158:16

**billion** [1] - 185:14

**bills** [19] - 13:25, 14:2, 14:19, 16:8, 60:20, 60:21, 60:22, 60:23, 60:24, 60:25, 110:9, 110:11, 110:13, 113:13, 145:15, 145:20, 158:20, 166:23, 202:5

**binder** [16] - 37:8, 37:19, 63:9, 125:13, 128:23, 130:1, 154:2, 154:3, 156:22, 172:24, 180:11, 186:2, 226:23, 232:7, 246:23, 252:11

**binders** [4] - 37:9, 37:12, 37:15, 187:7

**binding** [1] - 265:4

**birthday** [1] - 54:15

**bit** [12] - 34:12, 38:18, 45:23, 45:24, 112:16, 115:11, 132:22, 142:7, 146:17, 199:10, 214:9, 265:16

**biweekly** [2] - 78:25, 79:2

**blamed** [1] - 79:18

**blank** [3] - 67:3, 67:6

**blanks** [1] - 67:4

**blown** [2] - 16:6, 204:16

**blows** [1] - 15:14

**blue** [1] - 59:24

**Blue** [2] - 142:20

**blundered** [2] - 12:20, 17:22

**Board** [7] - 99:18, 99:20, 100:5, 100:23, 100:24, 116:25, 117:1

**Bob** [11] - 155:5, 155:8, 155:19, 155:21, 170:3, 200:24, 201:2, 201:7, 201:8, 201:12, 201:15

**body** [4] - 108:17, 120:10, 192:14, 260:10

**bold** [1] - 249:6

**book** [25] - 46:9, 48:2, 106:17, 106:22, 113:25, 116:5, 119:8, 152:2, 152:24, 161:25, 163:1, 163:2, 166:12, 166:15, 167:5, 168:13, 169:7, 169:12, 169:15,

170:12, 170:18, 181:3, 250:10, 251:8, 252:23

**bookkeeper** [4] - 17:10, 135:15, 136:5, 144:22

**bookkeeping** [4] - 136:7, 145:10, 145:16, 184:10

**books** [54] - 4:1, 5:8, 45:9, 45:10, 73:10, 73:11, 73:12, 73:16, 73:17, 76:25, 77:3, 77:11, 86:5, 86:6, 97:19, 136:3, 137:4, 163:11, 163:12, 163:19, 171:16, 178:5, 184:8, 184:20, 187:6, 190:3, 202:1, 202:8, 245:3, 245:21, 245:24, 246:21, 247:9, 247:22, 248:10, 248:24, 250:13, 250:20, 251:2, 251:19, 252:2, 253:13, 256:15, 257:15, 257:18, 258:6, 260:10, 260:11, 261:2, 261:9, 262:16, 262:23

**Books** [5] - 184:9, 185:3, 187:2, 202:12

**born** [1] - 154:19

**borrowed** [1] - 78:7

**borrower** [1] - 173:5

**borrowing** [1] - 173:4

**boss** [1] - 27:12

**bother** [2] - 45:3, 143:4

**bothered** [2] - 10:15, 90:2

**bottles** [1] - 104:6

**bottom** [12] - 54:7, 58:9, 66:15, 126:13, 138:12, 173:2, 186:6, 193:10, 214:19, 233:15, 257:20, 257:22

**bottom-right** [1] - 186:6

**bought** [2] - 112:7, 132:16

**Boulevard** [2] - 26:21, 155:16

**bouncer** [7] - 27:9, 48:20, 48:24, 55:8, 70:3, 75:15, 161:13

**bound** [1] - 262:7

**box** [27] - 4:22, 35:25, 37:5, 39:17, 42:20, 43:4, 52:8, 53:13, 53:25, 57:16, 57:22, 58:17, 59:3, 59:9, 59:24, 60:8, 60:10, 61:6, 61:7, 61:23, 69:5, 70:13, 70:16, 72:2

**Box** [1] - 68:3

**boxes** [3] - 54:1, 58:11, 59:17

**branch** [4] - 8:15, 8:17, 9:4, 9:5, 10:18, 216:12

**branches** [3] - 11:7, 220:9, 224:22

**break** [7] - 32:25, 51:2, 119:11, 124:14, 180:5, 180:7, 217:5

**breakdown** [1] - 235:2

**breakfast** [1] - 166:21

**breaking** [2] - 11:7, 194:9

**breaks** [1] - 238:25

**Brian** [3] - 2:8, 2:12, 10:13

**BRIAN** [2] - 1:12, 1:16

**brief** [2] - 2:18, 132:2

**briefly** [2] - 13:20, 183:15

**briefs** [1] - 228:18

**bring** [2] - 32:1, 219:3

**bringing** [1] - 244:4

**broader** [1] - 262:15

**broadly** [1] - 127:3

**broke** [5] - 121:24, 122:5, 254:9, 256:20, 257:21

**broken** [2] - 58:17, 217:4

**Brooklyn** [2] - 1:7, 1:25

**BROOKLYN** [1] - 1:15

**brother** [20] - 135:17, 144:10, 144:13, 146:16, 147:10, 147:15, 151:10, 154:10, 155:1, 155:16, 155:23, 156:13, 156:16, 158:1, 158:6, 170:2, 172:21, 173:5, 173:13, 174:7

**brother's** [1] - 174:13

**brought** [12] - 58:24, 59:7, 63:21, 191:20, 191:21, 196:12, 197:6, 197:8, 201:7, 246:9, 252:9, 255:22

**Brown** [1] - 2:13

**build** [2] - 221:2, 221:15

**building** [4] - 83:7, 128:5, 220:19, 221:3

**builds** [2] - 221:16, 221:19

**bulk** [1] - 45:7

**burden** [3] - 2:20, 3:5, 6:19

**busier** [3] - 33:6, 63:1, 127:11

**busiest** [1] - 33:7

**business** [97] - 3:20, 4:2, 6:15, 9:15, 13:23, 16:14, 17:10, 21:1, 25:25, 26:6, 26:8, 26:13, 26:22, 28:21, 29:6, 29:10, 30:13, 36:4, 47:1, 47:5, 47:6, 50:14, 62:24, 71:19, 72:1, 72:14, 72:20, 73:1, 74:9, 85:13, 91:11, 105:10, 114:23, 115:9, 126:20, 127:1, 127:17, 128:12, 130:22, 130:24, 137:10, 140:12, 143:2, 143:4, 143:5, 143:22, 144:7, 144:13, 144:16, 144:17, 144:19, 146:13, 148:4, 148:14, 148:17, 149:13, 149:15, 154:9, 154:11, 158:10, 159:18, 166:15, 171:4, 186:1, 186:13, 198:9, 205:22, 207:14, 210:23, 214:1, 216:3, 216:9, 216:10, 219:8, 219:11, 222:4, 222:10, 225:3, 234:21, 235:10, 236:6, 236:7, 237:1, 237:9, 237:20, 238:19, 240:4, 240:12, 241:4, 244:23, 244:25, 246:10, 246:14, 249:16, 249:24, 252:9

**business'** [1] - 5:21

**businesses** [2] - 24:5, 186:13

**busy** [4] - 236:18, 236:21, 236:23, 237:9

**Butch** [9] - 81:25, 82:3, 90:1, 95:1, 97:11, 99:9, 99:18, 100:5, 115:13

**buy** [4] - 6:1, 133:2, 133:5, 179:5

**buying** [1] - 221:12

**BY** [41] - 1:16, 1:20, 1:20, 25:13, 39:5, 48:1, 51:14, 53:12, 84:8, 91:2, 106:4, 125:9, 132:5, 134:25, 142:6, 150:2, 175:1, 180:18, 182:20, 189:23, 192:12, 194:19, 195:7, 199:2, 205:17, 206:22, 208:22, 220:2, 222:2, 226:22, 229:16, 238:3, 261:1, 266:3, 266:5, 266:8, 266:12, 266:14, 266:21, 266:23, 267:1

## C

cabinet [1] - 72:22
CADMAN [1] - 1:15
Cadman [1] - 1:24
calculate [2] - 51:24, 60:14
calculated [5] - 29:11, 36:8, 50:20, 249:2, 253:24
calculation [1] - 194:7
calculations [1] - 194:23
campaign [1] - 107:25
canceled [2] - 119:24, 120:6
cancellations [1] - 139:20
cannot [2] - 124:15, 226:15
capable [1] - 177:3
capacity [10] - 26:13, 26:24, 27:7, 109:13, 201:8, 202:21, 206:6, 206:17, 209:8, 210:3
capture [1] - 126:19
card [27] - 14:9, 14:13, 35:3, 57:9, 57:10, 57:11, 78:11, 109:6, 109:9, 110:3, 110:15, 111:1, 129:10, 129:15, 141:18, 155:18, 159:11, 159:12, 170:16, 170:17, 173:23, 200:22, 201:13, 206:23, 206:25, 207:2
cards [2] - 172:8, 172:10
care [11] - 10:4, 16:25, 33:18, 113:12, 149:5, 151:13, 152:9, 153:14, 153:17, 172:13
cared [1] - 11:24
career [4] - 81:6, 82:7, 210:5, 211:22
carried [8] - 6:18, 66:10, 235:13, 248:15, 255:24, 259:10, 259:15, 259:21
carries [1] - 154:12
carry [2] - 9:17, 16:16
case [47] - 2:25, 3:4, 4:24, 7:6, 9:3, 11:3, 12:5, 12:20, 12:22, 12:23, 13:16, 17:14, 17:17, 18:3, 18:23, 19:15, 22:22, 22:23, 23:13, 23:20, 23:22, 67:6, 82:17, 83:16, 83:17, 99:12, 123:9, 147:8, 163:14, 182:6, 196:8, 196:10, 196:12, 196:14, 196:19, 196:21, 197:6, 208:1, 208:3, 238:4, 244:11, 247:20, 251:24, 263:19, 265:10
cases [2] - 6:10, 209:15
Cash [4] - 60:9, 61:6, 65:15, 65:19
cash [269] - 3:11, 3:13, 3:20, 3:25, 4:2, 4:10, 4:14, 4:15, 4:17, 4:19, 4:21, 5:10, 5:13, 5:23, 6:1, 6:4, 6:12, 6:13, 6:15, 8:23, 8:25, 9:7, 9:18, 10:1, 12:12, 12:15, 13:12, 13:23, 14:4, 14:9, 14:16, 14:22, 14:24, 15:11, 16:1, 17:1, 17:3, 17:11, 21:6, 21:12, 21:17, 21:19, 21:24, 22:1, 22:3, 22:7, 30:14, 35:2, 35:5, 35:11, 35:12, 35:13, 52:16, 52:20, 57:11, 60:11, 61:10, 61:22, 68:13, 68:19, 69:7, 69:10, 69:13, 69:15, 69:18, 69:20, 69:22, 70:15, 71:25, 72:3, 72:13, 72:19, 73:1, 73:8, 97:10, 104:7, 110:17,
112:5, 114:14, 114:20, 114:24, 126:20, 126:25, 137:9, 139:2, 139:12, 140:9, 140:11, 140:12, 140:19, 140:23, 140:25, 141:10, 141:11, 146:15, 146:16, 146:21, 148:7, 148:8, 148:16, 148:17, 148:18, 150:20, 151:5, 151:11, 154:12, 154:15, 155:19, 156:12, 158:3, 158:6, 158:25, 159:10, 159:11, 159:13, 159:18, 159:21, 159:24, 160:19, 160:20, 161:9, 162:4, 162:7, 162:10, 162:21, 162:23, 163:1, 163:2, 163:3, 163:5, 163:6, 166:12, 166:14, 166:15, 167:1, 167:3, 167:5, 167:7, 167:22, 168:3, 168:13, 169:7, 169:11, 169:15, 170:12, 170:18, 171:16, 181:3, 184:8, 184:20, 185:25, 186:9, 186:14, 198:8, 200:18, 200:19, 200:21, 201:6, 201:8, 201:22, 201:23, 201:25, 202:3, 202:7, 202:24, 203:2, 203:4, 205:18, 205:19, 205:22, 207:6, 213:4, 213:9, 213:11, 213:17, 213:21, 213:23, 214:3, 214:18, 218:20, 219:2, 219:5, 219:8, 220:5, 220:17, 220:18, 220:22, 220:25, 221:3, 221:4, 221:13, 221:14, 221:19, 222:25, 223:7, 223:10, 224:4, 224:5, 227:21, 227:25, 230:18, 231:11, 231:14, 231:17, 231:24, 234:19, 236:6, 237:1, 240:3, 241:8, 241:10, 241:19, 243:15, 243:24, 244:5, 244:23, 244:24, 245:21, 246:15, 246:16, 247:9, 247:18, 247:22, 248:1, 248:9, 249:9, 249:11, 249:24, 250:10, 250:13, 250:15, 250:20, 250:25, 251:2, 251:8, 251:19, 252:2, 252:23, 253:13, 256:14, 257:15, 257:18, 257:19, 258:4, 258:6, 258:14, 258:19, 260:9, 260:10, 261:16, 261:19, 261:24, 262:3, 262:13, 262:14, 263:24, 264:3, 264:5
cash-register [3] - 69:20, 69:22, 248:1
cashbook [7] - 3:19, 16:5, 137:7, 137:12, 138:14, 138:21, 205:23
cashbooks [18] - 5:1, 5:11, 6:2, 10:9, 12:13, 137:5, 137:9, 137:20, 202:16, 202:23, 203:5, 205:20, 206:4, 207:8, 207:17, 261:18, 261:22, 262:1
cashboxes [1] - 5:24
cashed [4] - 224:12, 224:16, 224:17, 225:14
cashier [4] - 31:25, 52:10, 53:16, 55:9
cashing [5] - 223:12, 224:19, 225:4, 225:13, 264:6
caused [1] - 198:13
cc [1] - 141:15
center [2] - 215:10, 215:14
Center [1] - 215:11
cents [1] - 14:12
Cents [1] - 2:5
CENTS [1] - 1:8
century [1] - 239:9
certain [10] - 6:5, 20:11, 29:21, 59:14,
103:16, 164:10, 164:11, 173:14, 255:3, 255:5
certainly [7] - 8:9, 197:2, 236:10, 236:18, 249:18, 249:19, 264:13
certificate [1] - 201:4
certificates [6] - 155:17, 173:21, 173:22, 173:23, 201:6
certified [2] - 210:13, 210:15
certify [1] - 212:24
cetera [1] - 152:9
chair [1] - 133:19
champagne [31] - 4:13, 29:12, 29:22, 30:19, 30:20, 30:21, 32:12, 32:15, 32:17, 32:21, 32:23, 32:24, 33:4, 34:7, 35:4, 35:6, 35:8, 36:11, 36:13, 36:14, 36:15, 68:25, 139:25, 140:2, 140:5, 167:12, 191:11, 191:18
chance [1] - 265:16
change [26] - 8:25, 13:15, 13:25, 16:9, 53:22, 53:24, 62:6, 77:13, 92:8, 141:2, 148:19, 155:23, 156:13, 157:14, 157:17, 158:15, 158:17, 165:1, 189:15, 220:21, 225:13, 225:17, 229:20, 236:14, 264:9
changed [7] - 101:25, 170:7, 187:17, 196:18, 223:11, 225:19, 264:7
changes [3] - 126:22, 187:16, 225:9
characterize [1] - 185:12
charge [11] - 29:14, 31:12, 34:21, 35:4, 57:13, 138:25, 143:8, 160:9, 191:5, 193:5, 242:8
charged [1] - 160:7
charges [21] - 4:12, 35:23, 139:9, 191:10, 191:11, 191:18, 192:2, 192:16, 193:4, 193:7, 193:12, 194:1, 194:3, 196:11, 196:13, 196:15, 196:23, 197:3, 197:4, 197:7
charging [1] - 83:25
chart [1] - 14:25
Chase [40] - 7:18, 7:25, 8:14, 9:10, 10:15, 10:18, 11:11, 11:19, 14:19, 19:16, 122:15, 148:7, 148:13, 148:22, 149:2, 149:8, 150:4, 150:21, 151:21, 152:16, 152:18, 152:21, 154:24, 155:2, 156:1, 156:11, 202:18, 222:13, 223:20, 225:6, 225:8, 225:11, 226:8, 227:7, 227:14, 228:11, 228:12, 228:13, 228:21, 263:7
check [17] - 30:14, 32:13, 32:14, 67:22, 70:19, 101:24, 110:12, 110:17, 111:4, 145:18, 161:8, 162:22, 170:15, 232:22, 232:23, 233:10, 247:14
checkbook [2] - 137:15, 137:20
checkbooks [1] - 170:15
checked [5] - 8:8, 41:16, 55:22, 88:23, 251:14
checking [2] - 55:24, 69:25
checkmark [2] - 67:16, 67:19
checkmarks [3] - 55:20, 55:21, 67:21
checks [23] - 70:6, 80:17, 184:7,

184:20, 202:19, 207:17, 222:17,
223:12, 223:24, 224:11, 224:13,
224:15, 224:16, 224:18, 224:20,
224:23, 225:4, 225:13, 225:14, 232:17,
232:23, 233:7, 264:7

**chewing** [1] - 34:17
**children** [2] - 131:17, 131:18
**chose** [1] - 160:1
**cigarette** [1] - 161:17
**circled** [1] - 194:6
**circumstances** [3] - 78:16, 80:2,
173:12
**circumstantial** [1] - 10:8
**citizen's** [2] - 7:10, 10:21
**City** [8] - 3:2, 9:17, 26:7, 89:23, 91:19,
145:5, 154:21
**civil** [2] - 2:4, 3:4
**claim** [11] - 15:15, 40:4, 40:15, 40:17,
42:13, 42:18, 43:14, 43:23, 44:22,
45:13, 104:2
**Claimant** [3] - 176:18, 180:25, 186:10
**claimant** [6] - 2:15, 6:5, 18:10, 20:22,
21:11, 21:16
**Claimant's** [2] - 128:23, 186:5
**claimants** [2] - 18:13, 21:14
**claimed** [2] - 9:25, 86:4
**claims** [4] - 20:3, 20:9, 21:1, 226:8
**clarify** [2] - 70:22, 217:1
**clarity** [1] - 77:2
**classic** [2] - 6:14, 11:5
**clear** [4] - 11:21, 126:14, 158:2, 180:19
**cleared** [2] - 15:11, 158:4
**clearly** [4] - 237:23, 250:24, 262:18,
263:22
**CLERK** [2] - 2:4, 25:6
**clerk** [2] - 142:16, 142:24
**Clerk's** [1] - 128:5
**clicked** [2] - 161:18, 161:22
**clicker** [8] - 48:20, 70:3, 70:5, 70:6,
70:7, 70:8, 161:15
**clicking** [1] - 70:5
**client** [10] - 2:16, 85:18, 98:17, 102:15,
102:17, 104:10, 105:23, 185:16, 204:19
**clients** [4] - 18:7, 183:21, 183:22,
198:10
**clock** [1] - 70:18
**close** [7] - 52:1, 134:18, 147:5, 152:16,
152:23, 179:9, 179:14
**closed** [15] - 51:25, 81:14, 151:22,
151:23, 152:18, 154:9, 156:1, 158:23,
167:20, 169:10, 196:15, 196:21, 223:9,
258:17, 264:7
**closer** [1] - 182:12
**closing** [2] - 7:18, 262:9
**closure** [2] - 223:11, 225:10
**clothing** [2] - 34:17, 34:18
**Club** [1] - 109:23
**club** [40] - 3:1, 4:7, 4:10, 4:20, 26:9,
26:10, 26:20, 26:22, 26:25, 27:2, 27:5,
27:10, 28:15, 29:14, 29:18, 29:20,

30:10, 32:16, 33:12, 34:1, 48:21, 62:24,
68:2, 68:14, 70:1, 70:22, 72:3, 73:15,
74:2, 102:10, 102:25, 105:12, 107:25,
108:3, 111:18, 139:18, 155:15, 191:6,
193:6, 201:5
**club's** [1] - 109:9
**clubs** [3] - 4:13, 4:22, 105:14
**coat** [1] - 247:14
**COGAN** [1] - 1:12
**Cogan** [2] - 2:24, 6:15
**coincidentally** [2] - 9:12, 9:20
**collar** [1] - 174:6
**collect** [6] - 30:19, 30:23, 32:1, 34:7,
43:3, 174:12
**collected** [13] - 4:9, 29:13, 29:16,
30:23, 32:12, 34:2, 54:16, 68:18, 68:22,
68:24, 68:25, 99:3, 247:14
**collecting** [2] - 29:15, 111:5
**college** [8] - 25:21, 25:22, 142:8,
142:9, 210:18, 210:19, 210:24, 210:25
**College** [7] - 25:23, 25:24, 27:6, 27:8,
142:11, 144:17, 170:2
**column** [36] - 50:8, 50:10, 50:11,
50:15, 51:19, 51:20, 54:11, 54:12,
54:17, 55:7, 55:10, 56:2, 56:23, 57:5,
57:20, 57:21, 138:22, 139:4, 139:10,
139:15, 139:17, 139:23, 140:8, 140:11,
140:16, 140:21, 168:2, 233:1, 233:6,
247:15, 247:18, 247:21, 247:24, 248:7,
249:6
**columns** [5] - 51:21, 52:5, 54:19,
57:14, 231:2
**Com** [4] - 106:14, 106:15, 107:13,
107:14
**combination** [1] - 190:25
**comfortable** [1] - 239:6
**coming** [8] - 5:18, 34:16, 42:10,
133:24, 229:11, 236:21, 236:22
**commendations** [1] - 212:2
**comment** [1] - 197:23
**Commerce** [1] - 156:5
**commissions** [2] - 150:25, 242:7
**commitment** [1] - 265:4
**common** [3] - 72:8, 220:9, 220:12
**communicate** [1] - 192:6
**communication** [3] - 119:19, 175:23,
176:20
**communications** [1] - 118:23
**company** [37] - 21:24, 28:2, 35:5,
35:12, 36:19, 45:13, 58:5, 76:22, 78:8,
86:1, 97:20, 105:8, 113:15, 113:18,
120:19, 122:19, 128:21, 129:7, 129:12,
130:8, 130:16, 130:20, 133:6, 139:2,
172:23, 182:25, 183:7, 185:14, 200:24,
201:1, 208:24, 208:25, 240:23, 241:12,
241:25, 243:17, 262:12
**Company** [2] - 136:15, 142:15, 183:1,
183:3, 183:5, 183:6
**company's** [6] - 3:22, 5:7, 5:11, 5:24,
21:12, 254:1

**compare** [6] - 153:8, 153:24, 168:12,
168:13, 169:4, 203:2
**compared** [7] - 5:1, 126:25, 245:13,
245:24, 246:6, 259:4, 262:5
**comparing** [1] - 5:10
**comparison** [6] - 5:4, 5:12, 62:23,
252:7, 257:22, 262:22
**comparisons** [1] - 257:13
**comped** [1] - 161:19
**compensated** [4] - 164:14, 164:16,
165:10
**compensation** [1] - 129:16
**competing** [1] - 102:10
**compiled** [1] - 258:21
**compiles** [1] - 185:3
**complain** [1] - 199:25
**complete** [5] - 40:14, 40:15, 40:17,
234:22
**completed** [5] - 63:24, 70:6, 128:1,
233:14, 263:3
**completely** [1] - 8:11
**complex** [1] - 221:18
**compliance** [1] - 211:25
**compounding** [1] - 13:17
**comprise** [1] - 191:11
**computation** [1] - 249:5
**computer** [4] - 2:3, 145:18, 166:21,
215:10
**Computing** [1] - 215:11
**computing** [1] - 215:13
**con't** [1] - 140:8
**concern** [3] - 147:23, 179:17, 198:13
**concerned** [3] - 134:22, 175:8, 205:9
**concerns** [1] - 227:21
**conclude** [2] - 254:6, 256:16
**concluding** [1] - 119:10
**conclusion** [9] - 229:1, 237:12, 245:7,
256:24, 262:20, 263:10, 263:11,
263:21, 264:1
**conclusions** [11] - 217:8, 222:21,
235:17, 237:14, 248:19, 249:10, 259:7,
261:3, 261:25, 262:16, 263:4
**conduct** [2] - 10:12, 158:1
**conducted** [9] - 8:20, 9:10, 179:18,
211:20, 214:14, 216:7, 216:21, 234:25,
235:8
**conducting** [3] - 218:21, 235:14, 242:9
**confer** [1] - 264:22
**conference** [7] - 12:18, 19:6, 21:10,
37:13, 133:22, 134:4, 134:22
**conferences** [1] - 211:5
**confident** [1] - 6:17
**confirm** [1] - 41:23
**confirmed** [1] - 254:25
**confirming** [1] - 89:10
**confirms** [1] - 41:19
**confused** [1] - 74:16
**confusing** [1] - 251:17
**conjunction** [3] - 225:21, 240:21,

247:20
  Connecticut [1] - 212:11
  connection [8] - 9:13, 9:17, 83:5,
83:25, 128:1, 130:21, 189:1, 228:18
  consecutive [4] - 217:13, 220:10,
234:21, 264:3
  consent [1] - 79:8
  consider [4] - 85:21, 193:4, 193:6,
206:10
  consideration [3] - 236:19, 237:17,
250:8
  considered [7] - 192:4, 203:4, 216:9,
216:10, 225:3, 229:17, 229:19
  considering [3] - 179:3, 179:4, 202:21
  consistent [11] - 6:13, 62:9, 76:13,
147:17, 147:19, 198:9, 220:16, 223:2,
250:1, 258:25, 263:25
  constant [4] - 220:21, 225:12, 236:13,
237:4
  construed [1] - 175:5
  consult [4] - 104:10, 105:22, 136:8,
136:19
  consumed [1] - 131:4
  consumption [3] - 131:4, 131:7, 131:8
  Cont'd [1] - 262:11
  contact [3] - 81:20, 81:24, 203:20
  contacted [5] - 5:15, 81:19, 82:10,
238:19, 238:21
  contain [2] - 44:22, 234:24
  contained [5] - 59:23, 126:25, 151:15,
215:5, 216:20
  contemporaneous [3] - 188:25, 260:5,
260:13
  content [1] - 7:15
  contention [1] - 23:12
  context [1] - 191:21
  continual [1] - 264:2
  continue [9] - 51:8, 81:9, 119:23,
120:5, 134:22, 192:11, 221:9, 221:14,
262:10
  continued [10] - 7:19, 47:11, 90:5,
111:10, 148:15, 149:16, 198:21,
219:22, 233:13, 260:15
  CONTINUED [2] - 199:1, 238:2
  Continued [3] - 174:15, 221:22,
239:12
  CONTINUES [7] - 91:1, 106:3, 150:1,
220:1, 222:1, 226:21, 229:15
  continuing [1] - 134:4
  Continuing [2] - 199:16, 240:1
  contract [3] - 7:23, 23:8, 209:8
  contracting [2] - 22:22, 24:2
  contractor [4] - 7:6, 18:4, 23:4, 164:15
  contribute [1] - 227:11
  convenient [1] - 119:11
  conversation [29] - 77:5, 86:4, 99:7,
99:8, 101:21, 146:11, 172:6, 174:9,
175:4, 184:22, 226:7, 226:14, 227:13,
227:15, 227:24, 228:4, 228:8, 228:14,
228:16, 228:20, 229:1, 229:2, 229:8,

229:9, 229:10, 230:5, 230:9, 230:10
  conversations [7] - 76:13, 76:18,
76:22, 164:7, 206:16, 227:5, 227:11
  conveying [1] - 175:22
  cooperative [1] - 195:15
  copied [19] - 38:13, 38:16, 38:20,
40:14, 41:22, 41:23, 42:1, 46:4, 89:9,
91:12, 92:1, 94:6, 94:11, 94:25, 96:22,
96:25, 126:9, 127:6, 127:15
  copies [6] - 4:25, 5:16, 46:1, 94:17,
176:23, 184:20
  copy [24] - 38:15, 40:14, 41:13, 41:15,
42:5, 42:7, 42:8, 44:25, 45:4, 46:6,
90:2, 91:8, 92:4, 92:7, 92:22, 94:17,
96:17, 125:23, 127:7, 127:8, 127:10,
127:11, 190:20, 227:18
  copying [4] - 42:9, 91:5, 92:9
  cord [1] - 126:14
  corner [7] - 48:4, 48:13, 51:17, 51:18,
63:11, 65:1, 65:19
  corp [1] - 201:11
  Corp [1] - 78:15
  corporate [4] - 135:15, 143:18, 184:5,
200:10
  Corporation [2] - 26:5, 144:17
  corporation [12] - 18:18, 130:4,
130:13, 135:21, 144:23, 145:6, 155:1,
200:11, 200:12, 201:2, 201:10
  corporation's [1] - 21:17
  corporations [1] - 183:19
  correct [147] - 11:1, 19:25, 36:17, 39:7,
39:18, 40:19, 42:15, 42:19, 84:12, 85:5,
85:8, 88:10, 88:11, 88:25, 89:4, 89:5,
89:13, 89:17, 89:18, 89:21, 89:22,
89:25, 91:12, 91:17, 91:18, 91:20,
91:21, 92:2, 92:12, 92:21, 93:22, 93:23,
93:25, 94:1, 94:18, 94:24, 95:7, 95:8,
95:11, 95:12, 95:15, 95:22, 96:2, 96:3,
96:14, 96:18, 96:20, 97:11, 97:21, 98:7,
98:13, 98:23, 99:4, 99:13, 99:14, 102:5,
103:6, 104:4, 104:5, 104:23, 105:20,
106:11, 106:16, 107:5, 107:21, 107:22,
108:2, 108:18, 109:1, 110:6, 114:9,
116:12, 117:13, 117:15, 117:16,
117:18, 119:6, 119:17, 119:18, 120:20,
121:13, 121:15, 129:13, 132:20,
135:18, 136:6, 136:12, 136:14, 136:16,
136:18, 136:24, 137:2, 137:5, 137:6,
137:11, 138:17, 138:24, 139:1, 139:3,
139:8, 139:16, 140:13, 140:17, 141:1,
141:3, 141:6, 141:8, 141:13, 141:22,
141:25, 145:8, 149:7, 152:13, 180:23,
181:5, 181:8, 181:9, 181:12, 181:17,
182:7, 183:23, 184:13, 185:2, 185:11,
188:2, 188:7, 189:2, 189:20, 190:17,
191:9, 191:13, 195:13, 196:2, 196:6,
196:19, 198:14, 199:20, 202:10,
202:24, 205:24, 206:7, 206:8, 206:13,
207:6, 220:24, 250:21, 252:5
  corrected [1] - 9:24

  correspond [4] - 118:20, 151:1,
247:11, 249:16
  corresponded [4] - 89:12, 248:3,
251:7, 259:5
  correspondence [1] - 222:16
  corresponding [5] - 15:18, 93:12,
232:4, 232:21, 257:6
  corresponds [2] - 233:7, 252:20
  corroborate [1] - 42:18
  corroborates [1] - 41:19
  corroboration [1] - 97:10
  cost [6] - 32:24, 178:13, 179:1, 204:22,
204:23
  costs [2] - 17:21, 219:18
  cough [1] - 24:20
  counsel [4] - 2:6, 2:10, 2:15, 138:1
  count [15] - 4:19, 35:15, 35:16, 36:16,
48:13, 48:20, 60:9, 61:3, 61:6, 70:18,
70:25, 71:1, 161:15, 255:12, 255:17
  counted [12] - 48:20, 48:22, 48:24,
54:6, 60:11, 61:5, 61:9, 72:1, 126:16,
161:5, 167:15, 239:9
  counter [1] - 61:4
  counting [1] - 70:1
  country [1] - 213:10
  couple [5] - 52:13, 81:7, 105:14,
107:20, 109:7, 114:5, 127:12, 141:19,
180:1, 180:3, 180:6, 185:24, 207:12,
231:15, 241:2, 251:19
  course [8] - 6:3, 20:22, 38:13, 51:24,
62:6, 171:4, 207:18, 208:1
  court [7] - 51:5, 83:7, 127:25, 128:2,
180:15, 226:4, 226:6
  Court [10] - 1:24, 7:9, 10:21, 18:20,
51:9, 107:2, 143:7, 212:18, 229:7,
263:10
  COURT [192] - 1:1, 2:18, 6:23, 17:5,
17:24, 18:6, 18:10, 18:13, 18:15, 18:21,
19:7, 19:10, 19:20, 19:23, 20:16, 20:20,
20:22, 21:20, 21:23, 22:3, 22:8, 22:10,
22:25, 23:9, 23:12, 23:15, 23:19, 23:24,
24:3, 24:9, 24:11, 24:13, 24:22, 24:25,
25:5, 25:11, 31:3, 37:9, 37:16, 39:3,
45:20, 45:22, 45:24, 46:23, 47:4, 51:1,
51:6, 51:8, 51:13, 52:12, 52:16, 52:19,
52:22, 52:24, 53:3, 53:7, 53:10, 61:17,
61:21, 62:8, 62:16, 65:24, 66:7, 66:12,
76:20, 81:16, 84:5, 85:17, 85:22, 98:15,
98:20, 99:25, 102:15, 104:13, 104:16,
105:24, 106:2, 106:20, 108:7, 119:9,
119:15, 124:11, 124:14, 125:2, 125:7,
130:11, 132:1, 132:3, 133:14, 133:23,
134:13, 134:17, 134:21, 136:1, 138:1,
138:8, 142:4, 157:6, 157:9, 168:16,
179:24, 180:3, 180:5, 180:12, 180:16,
181:21, 181:23, 181:25, 182:4, 182:11,
182:14, 182:17, 186:16, 189:3, 189:12,
189:17, 189:22, 191:16, 191:25, 192:6,
192:11, 194:9, 194:12, 194:18, 195:2,
195:5, 199:19, 199:21, 205:14, 206:2,

206:19, 207:12, 207:18, 207:23, 208:2, 208:6, 208:10, 208:13, 208:17, 212:20, 212:24, 217:19, 220:13, 221:4, 221:8, 221:16, 221:21, 225:23, 225:25, 226:3, 226:5, 226:9, 226:13, 227:10, 228:9, 228:24, 229:11, 229:13, 229:24, 230:7, 231:4, 236:5, 236:11, 236:20, 236:25, 237:6, 238:1, 241:21, 242:15, 242:18, 243:5, 243:13, 244:2, 244:7, 250:17, 250:20, 250:22, 251:10, 251:18, 251:22, 262:6, 262:8, 262:24, 263:2, 263:8, 263:11, 264:16, 264:18, 264:24, 265:4, 265:10, 265:18

**courthouse** [1] - 7:2
**Courthouse** [1] - 1:6
**courtroom** [4] - 22:18, 24:10, 37:10, 182:3
**cover** [15] - 35:18, 35:19, 36:21, 38:4, 40:1, 40:4, 40:5, 45:16, 46:2, 46:14, 49:25, 63:21, 63:25, 176:17, 203:23
**covered** [1] - 199:11
**coversheet** [8] - 48:10, 49:16, 66:12, 68:18, 68:19, 70:9, 77:23, 177:1
**CP** [1] - 199:15
**CPA** [5] - 17:12, 183:2, 183:4, 199:12, 200:8
**crazy** [1] - 80:12
**create** [1] - 109:3
**created** [2] - 189:1, 234:11
**credit** [36] - 35:3, 57:9, 57:10, 57:11, 78:10, 109:6, 109:9, 110:3, 110:15, 129:9, 129:10, 129:15, 141:18, 155:18, 159:11, 159:12, 170:16, 170:17, 172:8, 172:10, 173:23, 200:22, 201:13, 206:23, 206:25, 207:2, 241:15, 241:22, 242:2, 242:21, 243:14, 243:18, 243:21, 243:24, 244:3
**credited** [3] - 150:20, 157:20, 201:24
**credits** [6] - 142:10, 199:16, 199:18, 241:11, 241:24, 244:3
**crime** [1] - 5:22
**crimes** [2] - 83:25, 211:20
**Criminal** [3] - 209:3, 209:9, 209:20
**critical** [1] - 261:15
**criticized** [1] - 156:17
**cross** [28] - 46:21, 46:24, 47:9, 84:6, 119:10, 125:15, 125:19, 127:4, 127:24, 128:10, 128:13, 128:21, 129:5, 130:3, 131:2, 142:4, 180:20, 195:3, 212:22, 229:4, 229:11, 229:12, 229:13, 230:12, 231:1, 262:9, 264:18, 265:13
**Cross** [1] - 142:20
**CROSS** [7] - 84:7, 142:5, 195:6, 199:1, 266:6, 266:13, 266:19
**cross-examination** [4] - 47:9, 84:6, 125:19, 195:3
**CROSS-EXAMINATION** [7] - 84:7, 142:5, 195:6, 199:1, 266:6, 266:13, 266:19
**cross-referenced** [1] - 231:1

**CRT** [1] - 215:22
**CTR** [29] - 3:9, 7:17, 10:4, 11:13, 11:20, 11:22, 11:24, 15:4, 123:15, 147:8, 147:12, 213:18, 213:25, 214:2, 214:5, 214:8, 215:4, 215:8, 215:19, 215:21, 215:22, 216:5, 216:15, 216:16, 216:17, 216:20, 217:2, 219:1, 243:16
**CTR's** [2] - 240:13, 240:14
**CTRs** [22] - 3:10, 10:4, 11:10, 11:18, 16:22, 16:23, 217:8, 217:11, 217:17, 223:5, 223:6, 223:7, 224:24, 225:1, 225:5, 234:7, 234:13, 234:23, 235:7, 236:20, 237:18
**currency** [13] - 3:9, 123:15, 207:24, 211:2, 211:20, 212:6, 212:14, 212:19, 213:15, 213:18, 213:19, 217:16, 227:18
**current** [6] - 26:1, 131:12, 144:22, 165:3, 179:16, 199:12
**custom** [2] - 21:2, 21:6
**customer** [9] - 14:13, 14:14, 57:9, 146:23, 213:21, 214:7, 215:25, 216:19, 241:18
**Customer** [1] - 48:13
**customers** [14] - 4:13, 33:4, 35:1, 48:18, 48:19, 70:5, 146:21, 158:15, 222:17, 224:1, 240:23, 241:10, 242:7, 242:9
**customers'** [1] - 242:2
**cut** [1] - 66:18

**D**

**d/b/a** [3] - 115:3, 152:8, 155:13
**Daily** [1] - 108:22
**daily** [41] - 4:17, 4:19, 4:21, 4:25, 5:10, 5:16, 14:20, 16:2, 28:13, 28:15, 30:2, 36:3, 38:4, 38:6, 42:25, 43:3, 56:17, 56:19, 71:4, 71:8, 71:19, 72:24, 77:24, 170:9, 247:16, 248:8, 249:7, 250:18, 253:15, 254:10, 254:21, 255:22, 256:20, 257:3, 257:23, 258:7, 258:9, 260:5
**DAL** [1] - 140:22
**dance** [7] - 4:14, 29:21, 29:22, 139:18, 139:19, 253:18
**dancer** [20] - 6:6, 30:21, 30:22, 31:5, 31:10, 31:12, 31:13, 33:1, 33:11, 33:13, 33:18, 67:7, 67:10, 67:11, 68:1, 68:6, 68:11, 103:17, 140:5
**Dancer's** [2] - 66:17, 66:18
**dancers** [33] - 4:12, 28:14, 29:18, 29:21, 30:24, 31:3, 31:4, 32:6, 33:12, 33:23, 34:8, 34:20, 36:7, 49:19, 66:23, 66:24, 67:1, 68:21, 139:17, 139:18, 140:6, 158:14, 191:6, 191:7, 201:7, 255:13, 255:17, 255:18, 255:19, 255:20, 256:8, 256:11
**dances** [1] - 29:12
**dancing** [5] - 26:9, 26:12, 26:23,

29:23, 191:8
**dark** [1] - 88:1
**data** [8] - 36:4, 185:4, 185:5, 185:9, 188:2, 188:11, 188:16, 189:10
**database** [1] - 215:15
**date** [26] - 6:6, 8:13, 46:15, 49:11, 49:17, 49:25, 64:5, 68:7, 93:14, 95:9, 113:23, 140:16, 150:7, 214:15, 232:20, 234:14, 247:11, 252:22, 256:17, 257:6, 257:7, 257:16, 258:13, 259:4
**Date** [2] - 49:8, 64:2
**dated** [3] - 152:13, 224:14, 224:15
**dates** [1] - 259:5
**dating** [2] - 122:3, 131:12
**David** [1] - 190:13
**day's** [1] - 173:20
**day-to-day** [1] - 170:8
**days** [60] - 5:25, 9:2, 9:3, 14:22, 14:25, 15:1, 39:7, 39:11, 39:13, 44:23, 56:22, 74:17, 74:19, 75:10, 75:13, 76:4, 76:24, 77:10, 77:11, 77:17, 77:19, 78:17, 80:16, 89:2, 89:11, 89:20, 91:16, 127:11, 127:12, 159:22, 164:10, 164:11, 165:20, 181:13, 181:16, 188:17, 188:21, 189:8, 217:13, 220:10, 224:18, 224:20, 234:21, 249:1, 249:8, 254:12, 255:3, 255:4, 256:21, 257:24, 258:3, 258:7, 258:15, 258:17, 259:18, 264:3
**daytime** [30] - 30:8, 32:5, 32:6, 35:22, 36:15, 36:25, 44:21, 48:18, 48:22, 50:3, 50:6, 50:24, 53:4, 54:10, 55:13, 59:15, 62:20, 62:22, 63:2, 63:3, 64:22, 65:14, 66:25, 67:7, 67:8, 70:4, 70:5, 179:5
**DBA** [3] - 149:5, 153:15, 153:16
**DEA** [1] - 212:3
**deal** [4] - 170:8, 170:9, 170:10, 217:16
**dealt** [3] - 211:5, 211:23, 257:16
**Dean** [1] - 58:2
**debit** [1] - 241:22
**debited** [3] - 14:14, 241:15, 242:3
**December** [12] - 7:1, 9:25, 13:1, 82:21, 82:25, 83:2, 177:7, 224:7, 230:20, 234:14, 238:8, 257:17
**decided** [6] - 24:4, 77:19, 79:6, 81:10, 94:8, 96:2
**deciding** [1] - 18:20
**decision** [5] - 77:20, 194:5, 196:22, 204:21, 204:22
**decisions** [3] - 30:3, 30:6, 30:10
**deduct** [2] - 164:2, 164:3
**deemed** [10] - 209:4, 217:11, 228:3, 243:15, 248:11, 248:14, 252:24, 253:3, 254:12, 256:12
**default** [1] - 172:10
**defective** [1] - 162:6
**defendant** [3] - 3:6, 3:7, 6:19
**Defendant** [2] - 1:9, 1:18
**defendant's** [1] - 265:10
**definitely** [1] - 160:18

**degree** [3] - 197:24, 210:21, 210:22
**delay** [1] - 20:1
**demonstrate** [4] - 10:1, 217:12, 231:13, 237:17
**demonstrated** [4] - 231:14, 234:18, 246:2, 252:10
**demonstrates** [2] - 10:3, 253:16
**demonstrating** [2] - 3:5, 232:3
**Dennis** [2] - 89:20, 165:4
**denomination** [1] - 16:8
**denominations** [4] - 16:10, 158:7, 202:5, 202:6
**deny** [1] - 83:13
**deodorant** [1] - 33:19
**Department** [4] - 177:20, 179:15, 193:3, 204:1
**department** [4] - 9:19, 38:5, 142:24, 143:11
**departure** [2] - 173:9, 173:12
**dependents** [1] - 186:22
**deposed** [3] - 13:1, 19:5, 228:12
**deposit** [62] - 3:1, 3:19, 6:13, 8:22, 9:18, 10:2, 11:20, 14:6, 15:6, 15:9, 15:10, 15:12, 15:18, 15:19, 16:12, 122:16, 140:11, 140:16, 146:15, 147:20, 148:21, 150:11, 156:14, 157:11, 157:23, 158:3, 158:7, 202:24, 203:2, 203:4, 203:5, 207:19, 213:24, 214:17, 216:12, 216:14, 217:6, 219:7, 220:11, 222:15, 222:25, 223:13, 223:23, 224:5, 225:9, 225:12, 225:19, 231:1, 232:21, 237:4, 239:11, 242:11, 243:3, 243:7, 243:9, 244:4, 263:20, 263:24, 264:5
**deposited** [18] - 9:7, 14:16, 14:20, 21:19, 123:5, 123:6, 146:25, 150:18, 151:1, 157:20, 213:22, 219:20, 231:24, 232:24, 233:2, 262:3
**depositing** [3] - 147:18, 154:15, 241:19
**deposition** [30] - 19:7, 19:10, 19:24, 20:1, 20:5, 22:12, 23:7, 40:24, 41:7, 42:23, 51:11, 51:12, 98:22, 99:12, 100:9, 100:13, 100:20, 102:5, 102:9, 103:6, 104:17, 114:5, 114:8, 117:22, 118:12, 120:24, 171:3, 203:14, 203:15, 253:10
**depositions** [1] - 20:14
**deposits** [64] - 3:14, 3:17, 3:24, 6:12, 6:15, 11:8, 12:12, 13:10, 14:2, 14:22, 14:24, 15:1, 15:14, 15:22, 17:1, 122:18, 122:21, 123:4, 141:5, 146:16, 147:23, 150:6, 151:11, 156:12, 156:19, 168:13, 168:24, 169:2, 179:18, 201:15, 201:21, 202:3, 203:6, 203:7, 217:4, 217:13, 220:5, 220:8, 220:9, 223:3, 224:5, 224:9, 225:2, 230:18, 231:12, 231:14, 231:17, 232:3, 232:13, 232:16, 234:19, 235:3, 235:8, 236:13, 236:21, 236:22, 237:7, 239:2, 239:4, 240:16, 240:17,
240:20, 264:2, 264:6
**describe** [8] - 143:7, 146:19, 160:23, 164:14, 183:15, 184:1, 193:23, 238:24
**described** [6] - 8:19, 8:21, 9:9, 225:4, 232:14
**Design** [2] - 105:8, 107:14, 128:21, 129:6, 129:15
**design** [1] - 132:7
**designated** [1] - 19:23
**designed** [1] - 213:8
**desk** [5] - 36:1, 64:13, 64:14, 64:15, 72:5
**desperate** [1] - 13:7
**despite** [4] - 7:17, 99:6, 124:1, 237:19
**destroy** [1] - 174:14
**details** [1] - 228:13
**detection** [6] - 217:25, 218:9, 218:13, 218:23, 219:17, 221:7
**determination** [1] - 263:5
**determinations** [1] - 222:21
**determine** [54] - 74:18, 127:5, 216:24, 222:24, 224:2, 231:22, 235:3, 235:6, 241:1, 241:2, 245:14, 245:17, 246:16, 246:20, 248:18, 252:8, 253:5, 254:21, 256:7, 256:22, 258:1, 258:8, 258:16, 258:22, 260:1, 260:9, 261:14, 261:19, 261:21, 264:11
**determined** [38] - 20:1, 20:5, 222:23, 222:25, 223:2, 223:4, 223:8, 223:10, 223:14, 224:4, 224:11, 224:25, 231:23, 233:17, 241:5, 241:9, 245:18, 245:19, 245:22, 248:21, 249:2, 249:13, 249:25, 253:2, 253:14, 253:20, 255:7, 255:13, 255:17, 256:9, 256:18, 257:23, 258:6, 258:12, 259:21, 260:14, 261:16, 261:23
**Detroit** [3] - 150:11, 215:11, 215:14
**diagonal** [1] - 55:18
**diamond** [1] - 143:16
**Diamond** [1] - 1:24
**difference** [4] - 28:19, 56:9, 125:20, 251:13
**different** [27] - 4:10, 14:18, 30:17, 46:19, 53:2, 53:3, 56:23, 91:5, 96:12, 118:7, 126:9, 144:6, 153:11, 154:16, 157:20, 179:3, 184:4, 216:17, 218:4, 218:7, 218:9, 218:10, 218:19, 231:2, 251:9, 251:11, 259:10
**Dino** [1] - 58:4
**dire** [3] - 39:2, 45:19, 71:5
**DIRE** [2] - 39:4, 266:4
**direct** [10] - 48:12, 64:1, 86:3, 107:1, 115:11, 115:25, 123:18, 125:12, 156:19, 180:20
**DIRECT** [8] - 25:12, 134:24, 182:19, 208:21, 266:2, 266:11, 266:18, 266:25
**directed** [1] - 128:14
**directing** [4] - 65:18, 128:15, 230:1, 230:13
**directly** [5] - 57:24, 125:17, 146:25, 149:14, 243:16
**director** [1] - 142:25
**disclosed** [1] - 20:2
**discovery** [6] - 19:18, 20:13, 21:11, 138:1, 240:24, 247:20
**discrepancies** [1] - 179:8
**discrepancy** [5] - 43:25, 44:6, 71:20, 203:10, 249:23
**discuss** [5] - 71:18, 79:5, 79:24, 134:1, 193:2
**discussed** [11] - 7:15, 7:24, 8:9, 35:1, 37:12, 147:10, 178:10, 190:22, 191:19, 197:5, 204:20
**discussing** [2] - 191:24, 193:24
**discussion** [1] - 191:17
**discussions** [1] - 196:7
**disgusted** [1] - 172:12
**dispensed** [1] - 146:23
**dispositive** [1] - 229:23
**disputed** [1] - 255:22
**distinction** [1] - 118:9
**district** [1] - 143:16
**DISTRICT** [3] - 1:1, 1:1, 1:12
**divided** [3] - 254:11, 256:21, 257:25
**Division** [3] - 209:3, 209:9, 209:21
**divorce** [2] - 78:10, 172:7
**DJ** [28] - 29:13, 31:1, 33:9, 33:11, 68:22, 103:12, 103:16, 128:12, 128:16, 139:22, 164:13, 164:14, 164:15, 164:18, 164:19, 165:15, 165:16, 165:22, 180:21, 181:11, 181:12, 181:18, 246:13, 256:4, 256:10, 259:16
**DJs** [1] - 33:9
**document** [37] - 48:12, 50:4, 51:18, 58:10, 63:17, 63:18, 64:5, 95:10, 115:2, 115:8, 116:7, 116:8, 116:11, 126:3, 126:25, 129:1, 129:2, 152:4, 152:5, 152:7, 152:15, 152:24, 153:2, 153:21, 157:2, 162:1, 171:1, 175:12, 175:15, 176:8, 176:13, 190:24, 232:10, 246:16, 247:2, 252:16, 254:19
**documentation** [2] - 117:17, 204:7
**documented** [3] - 246:3, 246:12, 256:3
**documenting** [1] - 237:20
**documents** [44] - 38:1, 63:22, 95:7, 110:5, 121:1, 125:14, 125:20, 125:23, 126:18, 126:23, 127:3, 127:5, 127:15, 127:16, 127:19, 127:21, 129:6, 130:2, 130:6, 154:6, 154:7, 154:8, 154:16, 171:1, 171:2, 171:15, 171:24, 186:17, 187:2, 195:23, 202:11, 206:10, 206:14, 222:11, 226:11, 226:12, 227:1, 231:6, 243:22, 245:8, 245:10, 245:12, 253:11, 264:9
**dollar** [3] - 122:16, 158:16, 185:14
**DOLLARS** [1] - 1:8
**Dollars** [1] - 2:5
**dollars** [10] - 6:1, 6:12, 8:23, 179:7, 197:15, 207:5, 213:22, 224:9, 240:6, 240:10
**dollars'** [2] - 240:5, 240:7

**domain** [9] - 82:23, 83:1, 83:5, 83:10, 177:9, 177:11, 177:14, 177:17, 177:19
**done** [29] - 7:6, 7:8, 9:20, 10:25, 17:6, 20:3, 20:4, 35:14, 37:23, 64:8, 69:25, 81:5, 84:9, 84:10, 95:17, 95:19, 96:2, 105:10, 122:10, 126:7, 126:12, 126:15, 188:13, 213:5, 218:7, 226:1, 235:9, 235:18, 237:11
**door** [47] - 4:11, 29:13, 29:14, 31:15, 31:17, 31:19, 31:23, 35:23, 48:19, 48:25, 52:10, 52:11, 53:7, 54:8, 55:9, 58:18, 68:16, 69:7, 69:8, 69:11, 69:19, 69:22, 69:24, 87:11, 87:14, 87:17, 87:18, 87:22, 88:3, 88:9, 88:12, 88:14, 88:19, 138:23, 138:25, 139:9, 139:13, 168:2, 168:3, 246:6, 247:4, 247:14, 248:6, 248:7, 259:13
**Door** [3] - 52:7, 53:14, 53:25
**Dot** [4] - 106:14, 106:15, 107:13, 107:14
**double** [2] - 13:15, 70:19
**double-check** [1] - 70:19
**double-speak** [1] - 13:15
**doubled** [1] - 34:23
**down** [44] - 11:7, 35:7, 49:2, 49:16, 51:21, 52:3, 54:19, 55:3, 58:17, 58:24, 59:1, 59:7, 60:6, 65:13, 65:22, 68:8, 71:23, 74:17, 74:21, 75:4, 113:23, 116:7, 122:25, 133:15, 134:18, 140:21, 172:6, 181:23, 194:10, 194:11, 208:11, 217:4, 217:5, 233:8, 239:1, 250:5, 250:6, 254:10, 257:20, 257:21, 259:21, 264:7, 264:25
**downhill** [1] - 79:15
**downstairs** [2] - 36:11, 128:5
**draw** [11] - 62:23, 222:21, 248:19, 249:10, 257:13, 259:7, 261:3, 261:25, 262:15, 263:3, 264:1
**drawer** [1] - 53:23
**drawing** [1] - 118:9
**drawn** [1] - 217:7
**dresses** [1] - 34:18
**drew** [3] - 173:3, 256:24, 263:21
**drink** [4] - 159:8, 159:10, 179:5, 179:7
**drinking** [2] - 121:15, 121:21
**drinks** [1] - 121:25
**dropped** [2] - 9:3, 251:20
**drowning** [2] - 220:22, 220:25
**Drug** [2] - 210:11, 210:12
**ds** [1] - 12:21
**due** [5] - 78:19, 197:10, 197:14, 242:4, 242:8
**duly** [6] - 12:13, 25:9, 125:5, 134:15, 182:9, 208:19
**during** [46] - 26:15, 28:16, 28:21, 29:1, 29:2, 32:4, 38:13, 45:14, 51:24, 62:6, 62:7, 69:10, 73:14, 73:25, 74:1, 76:11, 111:5, 111:12, 136:9, 136:11, 136:13, 137:3, 159:16, 159:21, 165:5, 179:4, 182:5, 199:17, 203:14, 211:3, 211:10,

212:1, 224:10, 231:16, 234:16, 248:21, 253:10, 254:7, 254:9, 255:4, 255:8, 256:17, 258:17, 262:9
**duties** [8] - 97:19, 131:9, 143:7, 144:21, 144:22, 145:10, 183:16

---

# E

**e-mail** [1] - 176:11
**early** [2] - 4:23, 81:21
**earn** [1] - 189:9
**easily** [3] - 6:18, 114:24, 237:13
**East** [1] - 1:24
**EAST** [1] - 1:15
**EASTERN** [1] - 1:1
**education** [3] - 25:19, 142:9, 210:16
**Education** [1] - 199:16
**effect** [4] - 31:17, 196:24, 204:18, 243:15
**efficiency** [1] - 51:10
**efficiently** [1] - 218:15
**eight** [7] - 15:6, 15:7, 27:9, 53:6, 142:18, 237:11, 240:19
**either** [16] - 8:16, 11:11, 15:9, 22:17, 36:24, 43:25, 82:17, 87:6, 128:16, 159:10, 178:15, 211:20, 220:20, 221:8, 255:1, 263:4
**elect** [1] - 20:13
**elected** [2] - 79:16, 152:16
**electronic** [1] - 201:15
**email** [11] - 106:14, 107:13, 107:16, 107:18, 108:14, 108:17, 118:20, 119:5, 119:16, 120:7, 120:18
**emailed** [3] - 117:23, 118:5, 118:6
**emails** [1] - 121:5
**emanated** [1] - 153:22
**employ** [2] - 79:25, 80:13
**employed** [16] - 11:8, 26:3, 26:13, 26:18, 26:24, 27:2, 27:4, 27:7, 135:10, 135:12, 208:23, 208:24, 209:7, 209:10, 209:18, 209:20
**employee** [31] - 4:1, 4:15, 5:8, 7:23, 19:10, 22:22, 23:2, 23:3, 24:2, 73:7, 74:14, 74:25, 75:1, 77:22, 94:24, 141:10, 141:20, 164:2, 164:8, 183:7, 183:9, 184:4, 186:20, 187:13, 188:17, 189:13, 189:14, 189:17, 189:18, 209:8, 214:21
**employees** [38] - 21:17, 29:2, 29:24, 30:1, 30:13, 36:19, 36:20, 42:11, 45:7, 45:8, 54:24, 54:25, 55:8, 55:14, 56:11, 56:16, 56:19, 73:6, 73:10, 73:15, 73:18, 73:25, 74:1, 75:14, 78:2, 80:3, 80:9, 86:5, 127:12, 127:17, 127:22, 131:12, 161:11, 162:21, 163:21, 257:19, 261:8
**employment** [1] - 98:22
**enabled** [1] - 263:18
**enactment** [1] - 213:6
**end** [23] - 4:18, 31:25, 35:14, 37:2,

39:16, 40:5, 42:14, 42:17, 42:20, 43:3, 46:1, 52:1, 56:12, 71:2, 77:23, 92:2, 92:22, 126:15, 135:24, 154:9, 186:11, 249:21, 265:17
**ended** [2] - 202:17, 245:25
**ending** [1] - 141:11
**Enforcement** [2] - 210:11, 210:12
**enforcement** [5] - 211:13, 213:16, 215:3, 215:17, 218:3
**engage** [3] - 158:1, 217:22, 217:24
**engaged** [3] - 156:2, 214:7, 261:5
**engages** [1] - 213:21
**engaging** [1] - 219:4
**enter** [1] - 185:2
**entered** [2] - 4:13, 202:12
**enters** [1] - 137:21
**entertainers** [2] - 164:16, 164:17
**Entertainment** [4] - 113:15, 115:2, 115:3, 130:9
**entertainment** [3] - 13:22, 144:13
**entire** [2] - 44:12, 71:11
**entitled** [4] - 18:22, 47:8, 165:11, 191:2
**entity** [2] - 143:24, 200:10
**entries** [5] - 150:14, 150:23, 151:2, 157:13, 157:16
**entry** [2] - 173:24, 250:5
**episodic** [1] - 47:2
**equal** [1] - 251:9
**equals** [4] - 60:17, 60:18, 65:22
**equivalent** [1] - 21:19
**error** [2] - 12:20, 13:17
**especially** [3] - 138:3, 217:11, 217:12
**ESQ** [3] - 1:20, 1:20, 1:21
**Esq** [1] - 24:10
**essential** [2] - 23:13, 23:20
**essentially** [36] - 13:10, 14:16, 21:15, 146:25, 189:19, 194:6, 200:12, 218:13, 220:11, 220:24, 221:20, 228:6, 232:20, 233:12, 233:20, 235:1, 235:8, 241:7, 242:3, 243:18, 245:8, 245:12, 246:18, 246:20, 246:21, 247:19, 248:5, 252:20, 253:16, 253:21, 254:7, 256:6, 258:24, 260:14, 261:9, 264:12
**establishment** [3] - 13:22, 13:25, 115:5
**estimate** [5] - 33:3, 185:18, 185:21, 253:23, 259:19
**estimated** [2] - 258:23, 259:3
**estimates** [4] - 259:3, 259:6, 260:12, 260:13
**et** [1] - 152:9
**evade** [1] - 10:4
**evasion** [15] - 12:3, 12:9, 12:23, 13:2, 13:3, 213:13, 218:18, 219:1, 219:7, 219:15, 219:19, 261:6, 262:19, 264:11
**evening** [13] - 31:18, 35:14, 35:21, 36:15, 37:2, 41:14, 52:11, 53:23, 60:12, 67:23, 86:24, 126:7
**evenings** [2] - 87:5, 87:6

**event** [1] - 41:8
**everyday** [5] - 15:14, 91:22, 137:1, 137:2, 146:1
**evidence** [42] - 3:6, 6:17, 8:6, 10:8, 11:4, 11:9, 11:11, 11:23, 11:25, 12:3, 13:14, 13:16, 13:20, 14:21, 14:24, 14:25, 15:5, 15:13, 16:7, 16:24, 17:16, 17:18, 39:1, 88:13, 88:20, 89:10, 133:21, 134:9, 134:11, 134:12, 226:24, 227:17, 228:15, 229:7, 230:14, 230:22, 231:6, 232:7, 233:23, 246:24, 252:14, 254:18
**exact** [2] - 166:3, 166:4
**exactly** [6] - 110:18, 176:4, 191:20, 214:17, 216:24, 246:16
**EXAMINATION** [34] - 25:12, 39:4, 84:7, 91:1, 106:3, 125:8, 132:4, 134:24, 142:5, 150:1, 180:17, 182:19, 195:6, 199:1, 205:16, 206:21, 208:21, 220:1, 222:1, 226:21, 229:15, 238:2, 266:2, 266:4, 266:6, 266:7, 266:11, 266:13, 266:15, 266:18, 266:19, 266:20, 266:22, 266:25
**examination** [18] - 46:22, 47:9, 84:6, 115:11, 115:25, 125:15, 125:19, 127:5, 127:24, 128:11, 128:13, 128:21, 129:5, 130:3, 131:3, 142:4, 195:3, 264:19
**examined** [4] - 25:9, 134:15, 182:9, 208:19
**examiners** [1] - 241:8
**examining** [1] - 231:17
**example** [11] - 65:1, 96:11, 96:16, 151:7, 218:11, 220:4, 221:8, 250:3, 250:4, 255:2, 257:25
**examples** [3] - 216:4, 249:19, 251:11
**exceed** [2] - 15:14, 15:23
**Excel** [2] - 187:1, 187:22
**except** [1] - 22:6
**exception** [3] - 22:23, 235:10, 236:22
**exceptions** [3] - 224:21, 231:15, 236:14
**excess** [9] - 3:12, 3:18, 186:14, 213:22, 214:4, 233:17, 233:20, 262:14, 264:4
**exchange** [8] - 15:10, 16:13, 21:18, 83:19, 201:8, 213:23, 214:18, 249:24
**exchanges** [1] - 234:20
**exclude** [2] - 18:6, 18:20
**excluded** [3] - 18:2, 18:4, 21:8
**excluding** [3] - 22:21, 86:17, 87:8
**exclusively** [2] - 23:4, 206:14
**excuse** [4] - 166:25, 230:3, 230:22, 242:23
**excused** [1] - 181:24
**executing** [1] - 238:18
**exercise** [1] - 168:24
**exhibit** [8] - 37:8, 37:23, 38:1, 48:2, 114:2, 125:13, 157:7, 173:2
**Exhibit** [95] - 37:20, 39:1, 41:24, 43:6, 44:22, 45:15, 48:3, 48:5, 49:18, 50:9,

51:16, 72:25, 85:24, 88:8, 89:1, 89:12, 89:19, 91:25, 93:12, 96:5, 96:8, 104:18, 106:17, 107:9, 113:25, 116:5, 119:8, 119:16, 125:14, 127:20, 128:23, 128:25, 130:2, 130:13, 132:6, 134:2, 138:6, 138:11, 146:18, 148:24, 152:1, 152:5, 152:25, 153:8, 153:9, 153:14, 153:24, 153:25, 154:3, 156:21, 157:8, 161:24, 167:24, 168:6, 168:10, 168:25, 170:22, 172:25, 175:10, 176:6, 180:25, 181:1, 186:2, 186:10, 187:7, 187:9, 187:19, 188:8, 190:2, 190:19, 191:14, 192:13, 192:20, 192:22, 192:23, 193:1, 193:19, 198:15, 203:12, 203:13, 226:25, 230:2, 230:14, 230:15, 232:8, 235:19, 246:25, 252:15, 254:17, 254:19, 255:25, 256:4, 257:9, 259:9
**exhibits** [7] - 106:23, 106:24, 133:20, 134:8, 134:11, 187:5
**Exhibits** [1] - 195:23
**exist** [3] - 42:13, 67:4, 237:16
**existence** [3] - 217:10, 217:16, 241:17
**exists** [1] - 237:15
**expand** [1] - 179:15
**expect** [2] - 124:2, 124:5
**expedite** [1] - 66:2
**expediter** [1] - 143:8
**expense** [2] - 13:18, 112:11
**Expenses** [8] - 54:20, 54:23, 55:7, 56:3, 57:5, 57:15, 59:3, 59:9
**expenses** [12] - 4:15, 35:22, 57:17, 57:19, 57:20, 57:23, 59:6, 59:7, 60:4, 140:8, 140:9, 141:5
**experience** [20] - 6:9, 17:15, 23:17, 142:14, 142:15, 163:18, 186:12, 197:21, 207:8, 217:7, 217:15, 217:20, 218:5, 218:24, 219:6, 219:14, 225:16, 243:1, 243:2, 243:11
**expert** [6] - 6:10, 210:13, 212:5, 212:13, 212:15, 212:18, 212:25, 263:12
**expertise** [1] - 243:3
**explain** [26] - 12:25, 13:20, 30:17, 33:17, 48:16, 49:9, 50:10, 52:8, 54:3, 54:20, 58:12, 59:4, 59:11, 60:9, 64:3, 64:17, 65:3, 77:1, 100:23, 179:12, 213:2, 231:2, 232:15, 246:11, 247:5, 250:24
**explainable** [1] - 204:10
**explained** [6] - 111:18, 227:18, 244:21, 244:22, 245:1, 245:5
**explanation** [2] - 194:22, 238:24
**explicable** [1] - 237:8
**explicitly** [1] - 8:22
**Express** [1] - 111:1
**extend** [1] - 261:7
**extent** [2] - 21:5, 42:13
**extra** [3] - 80:3, 80:5, 265:16
**extrapolating** [1] - 189:11
**extrapolation** [2] - 246:19, 259:6
**extremely** [3] - 262:2, 262:4, 262:11

**eyebrow** [1] - 4:5

**facility** [1] - 191:5
**fact** [51] - 8:3, 9:12, 10:13, 10:24, 11:8, 11:14, 14:25, 16:16, 16:21, 19:4, 21:7, 43:8, 43:13, 43:16, 43:17, 88:24, 89:5, 91:11, 95:19, 99:6, 119:5, 122:23, 122:24, 162:9, 179:3, 179:5, 215:6, 216:2, 223:5, 223:6, 224:23, 225:1, 236:6, 236:15, 237:18, 237:20, 238:23, 239:8, 240:10, 240:14, 245:14, 250:7, 251:8, 254:5, 258:17, 260:6, 260:9, 264:1, 264:3, 264:5, 264:9
**factor** [3] - 229:17, 229:19, 229:23
**factored** [2] - 179:2, 228:2
**factors** [1] - 6:11
**facts** [3] - 8:11, 8:12, 9:1
**factual** [1] - 10:20
**fail** [1] - 166:14
**fair** [40] - 39:9, 39:11, 39:17, 41:20, 41:25, 42:1, 42:12, 42:14, 42:18, 43:9, 45:12, 46:14, 92:6, 92:11, 94:2, 97:18, 103:16, 104:22, 105:1, 108:25, 109:22, 114:23, 117:11, 117:17, 122:18, 151:8, 162:12, 162:16, 168:25, 169:9, 195:24, 196:18, 197:25, 198:3, 200:1, 201:12, 202:2, 202:9, 206:23, 207:4
**fairly** [3] - 220:16, 225:12, 228:3
**fall** [2] - 23:10, 235:9
**falling** [3] - 4:8, 5:17, 173:13
**false** [1] - 7:19
**falsely** [2] - 20:25, 21:4
**familiar** [6] - 38:10, 38:12, 154:5, 207:23, 207:25, 215:19
**family** [2] - 113:12, 143:2
**far** [12] - 10:1, 35:6, 40:7, 53:15, 53:16, 105:10, 122:13, 134:22, 138:22, 141:14, 206:3, 238:23
**fashion** [1] - 225:14
**faster** [1] - 52:1
**father** [1] - 143:3
**fault** [1] - 80:10
**fax** [1] - 121:6
**FAX** [1] - 2:1
**faxed** [4] - 116:8, 116:11, 175:15, 175:20
**fearful** [1] - 176:25
**February** [10] - 99:13, 100:21, 103:6, 113:22, 117:23, 118:13, 152:13, 156:2, 223:9, 224:8
**federal** [6] - 22:21, 73:12, 83:7, 211:13, 212:3, 261:7
**fee** [29] - 14:11, 14:12, 30:25, 31:1, 31:2, 31:17, 31:18, 31:19, 32:4, 32:6, 32:7, 36:6, 36:10, 128:16, 140:4, 140:5, 141:5, 160:19, 161:20, 165:21, 191:5, 191:7, 193:7, 248:7, 253:13, 255:8,

255:11, 255:16
  **feelings** [1] - 79:18
  **fees** [94] - 4:10, 4:12, 17:20, 29:18,
29:19, 30:23, 31:5, 31:15, 31:23, 32:4,
32:11, 32:12, 32:19, 32:23, 33:13,
33:21, 33:25, 36:5, 68:16, 68:20, 68:22,
68:24, 128:11, 128:12, 128:14, 139:15,
139:17, 139:18, 139:19, 139:22,
139:23, 140:2, 160:5, 160:7, 161:4,
161:14, 161:16, 165:23, 166:9, 166:10,
166:11, 167:10, 167:12, 167:15,
167:16, 180:21, 181:10, 181:18, 191:2,
191:12, 192:4, 192:5, 192:16, 193:10,
193:12, 193:21, 194:3, 194:10, 194:11,
194:15, 194:17, 194:22, 196:9, 196:12,
196:25, 197:2, 197:4, 246:9, 246:13,
247:14, 248:6, 252:8, 252:17, 252:24,
252:25, 253:4, 253:5, 253:6, 253:14,
253:20, 253:21, 254:3, 254:5, 254:9,
254:13, 254:22, 255:1, 255:4, 255:5,
256:4, 259:15, 259:16
  **fell** [1] - 109:8
  **felt** [6] - 34:19, 34:24, 38:17, 160:2,
161:11, 239:6
  **few** [11] - 6:1, 8:12, 12:4, 15:8, 69:14,
92:1, 121:25, 122:1, 194:2, 205:15,
236:14
  **fiar** [1] - 41:24
  **field** [3] - 200:2, 209:9, 209:21
  **fields** [2] - 48:17, 64:25
  **fifteen** [4] - 28:8, 28:10, 51:2, 142:22
  **fifteen-minute** [1] - 51:2
  **Fifth** [28] - 24:19, 98:5, 98:9, 98:18,
98:19, 98:21, 98:25, 102:9, 102:16,
102:18, 102:19, 102:24, 103:4, 103:5,
103:11, 104:1, 104:2, 104:4, 104:9,
104:13, 104:25, 105:3, 105:21, 106:13,
107:8, 108:5, 114:11, 124:1
  **FIFTH** [1] - 1:19
  **fifth** [2] - 233:1, 233:6
  **fifties** [3] - 66:9, 158:9, 158:10
  **fifty** [1] - 14:12
  **fight** [2] - 178:13, 204:23
  **figure** [36] - 43:25, 54:9, 57:22, 127:6,
168:2, 168:3, 186:25, 193:11, 193:25,
199:6, 204:15, 205:19, 217:5, 233:15,
247:22, 247:23, 251:3, 251:7, 251:9,
252:22, 253:14, 253:22, 254:5, 254:14,
256:9, 256:12, 256:19, 256:20, 258:4,
258:5, 258:6, 259:14, 259:16, 260:10
  **figured** [1] - 229:23
  **figures** [20] - 6:2, 76:13, 164:9,
167:21, 187:17, 245:22, 248:14, 250:9,
251:4, 251:6, 255:24, 258:18, 258:25,
259:2, 259:11, 259:19, 259:23, 261:5,
263:20
  **figuring** [1] - 43:2
  **file** [6] - 3:9, 3:11, 97:22, 98:12, 115:8,
214:5
  **filed** [36] - 4:4, 4:24, 11:10, 11:18,

11:19, 11:20, 11:22, 11:24, 15:5, 16:22,
16:23, 19:2, 82:23, 115:2, 147:13,
213:20, 214:6, 214:20, 215:23, 215:24,
216:18, 217:8, 219:1, 223:5, 223:7,
224:24, 225:1, 225:6, 234:8, 234:14,
234:16, 234:23, 237:18, 237:19,
237:24, 240:14
  **files** [1] - 97:23
  **filing** [6] - 7:17, 10:4, 98:9, 216:4,
217:13, 243:16
  **filings** [1] - 11:13
  **Filippone** [13] - 17:12, 136:17, 170:7,
170:11, 170:14, 170:20, 182:1, 182:13,
182:21, 195:8, 205:18, 253:2, 253:9
  **fill** [11] - 12:19, 34:5, 45:16, 74:15,
74:16, 92:16, 95:14, 113:6, 143:10,
163:21, 167:25
  **filled** [5] - 49:9, 92:14, 94:8, 96:17,
215:8
  **final** [2] - 141:11, 248:13
  **financial** [16] - 5:4, 78:5, 132:16,
184:7, 208:15, 209:5, 209:7, 209:19,
211:11, 213:2, 213:20, 214:6, 214:19,
215:8, 222:12, 244:5
  **Financial** [2] - 2:11, 212:18
  **findings** [1] - 246:3
  **fine** [13] - 18:25, 24:18, 31:8, 31:9,
31:10, 31:11, 31:13, 34:17, 34:24,
68:12, 79:13, 212:24
  **fined** [1] - 68:2
  **fines** [10] - 31:6, 31:7, 34:4, 34:5, 34:8,
34:10, 34:14, 34:15, 139:21
  **finish** [6] - 22:9, 22:10, 27:14, 119:12,
143:11, 265:11
  **finished** [1] - 132:24
  **finishing** [1] - 265:8
  **fire** [4] - 80:9, 80:11, 102:2, 212:21
  **fired** [7] - 99:8, 99:11, 101:10, 101:12,
102:1, 102:3, 173:15
  **firing** [2] - 30:10, 146:12
  **firm** [10] - 12:13, 17:12, 84:19, 136:15,
183:12, 183:21, 183:22, 184:4, 200:1,
260:3
  **firms** [1] - 200:4
  **first** [46] - 2:19, 4:7, 5:15, 17:25, 19:2,
24:17, 25:9, 57:20, 63:22, 63:24, 69:12,
75:8, 78:14, 81:20, 82:2, 93:7, 100:25,
111:9, 118:19, 118:22, 134:15, 138:22,
142:14, 142:15, 153:4, 155:15, 182:15,
197:7, 197:23, 208:19, 213:5, 219:10,
222:3, 222:7, 222:9, 224:4, 235:11,
241:11, 244:21, 245:7, 245:18, 246:5,
252:21, 255:2, 264:20
  **fishing** [2] - 35:25, 70:13
  **five** [14] - 10:23, 51:3, 60:18, 74:4,
76:4, 78:18, 112:3, 117:7, 117:8,
130:13, 181:16, 185:18, 193:17, 233:17
  **fives** [1] - 13:24, 66:3, 66:8, 158:16,
240:7
  **FLOOR** [2] - 1:15, 1:19

**flow** [2] - 200:18, 201:22
  **flows** [3] - 126:20, 127:1, 200:21
  **focus** [1] - 13:6
  **focusing** [1] - 51:18
  **folks** [2] - 82:20, 129:21
  **following** [2] - 162:14, 178:23
  **follows** [5] - 25:10, 125:6, 134:16,
182:10, 208:20
  **food** [6] - 4:11, 159:8, 159:10, 246:7,
247:25, 259:13
  **force** [1] - 210:12
  **Force** [1] - 210:13
  **foreclose** [1] - 172:9
  **foreclosure** [1] - 117:15
  **forego** [1] - 37:15
  **forfeit** [1] - 7:10
  **forfeitable** [1] - 6:20
  **forfeited** [1] - 10:22
  **forfeiture** [7] - 2:25, 3:7, 12:11, 209:4,
209:15, 211:7, 244:11
  **forgive** [3] - 116:2, 117:11, 119:20
  **forgiveness** [1] - 119:25
  **form** [43] - 22:11, 50:19, 52:9, 54:4,
54:14, 54:19, 54:22, 55:4, 56:6, 57:19,
58:13, 59:1, 60:6, 66:11, 66:16, 66:21,
67:5, 67:25, 74:22, 75:5, 75:8, 113:6,
113:9, 114:17, 114:19, 140:18, 171:2,
184:7, 193:4, 201:13, 213:19, 214:10,
214:15, 214:20, 215:13, 215:24, 218:1,
219:18, 242:7, 246:20, 248:5, 257:5,
264:13
  **formally** [1] - 133:25
  **formed** [1] - 113:20
  **forms** [3] - 163:21, 218:9, 242:5
  **forth** [8] - 8:22, 64:21, 80:7, 168:13,
196:3, 196:16, 249:5, 265:22
  **forthcoming** [3] - 116:16, 116:21,
175:19
  **forths** [1] - 195:25
  **forty** [1] - 199:19
  **forward** [5] - 4:25, 5:18, 66:15, 229:13,
244:15
  **forwarded** [1] - 215:10
  **foundation** [4] - 47:6, 76:17, 228:7,
230:4
  **four** [24] - 3:15, 15:6, 53:2, 53:3, 53:4,
53:6, 62:1, 75:13, 76:24, 77:10, 77:17,
80:16, 81:10, 117:7, 117:8, 140:21,
159:20, 199:23, 200:9, 203:10, 224:15,
224:18, 224:20, 258:17
  **fourth** [1] - 233:6
  **free** [2] - 114:18, 129:19
  **frequency** [1] - 119:19
  **frequently** [4] - 56:16, 71:16, 72:8,
136:25
  **Friday** [46] - 31:21, 32:10, 33:6, 33:7,
43:19, 44:11, 44:12, 45:8, 56:13, 56:21,
58:8, 71:13, 71:17, 73:24, 86:9, 86:13,
86:14, 86:16, 86:18, 86:19, 86:21,
86:25, 87:5, 87:6, 87:7, 87:8, 108:22,

127:10, 127:11, 146:3, 146:4, 146:6, 146:10, 159:6, 159:19, 160:15, 160:16, 171:22, 236:8, 236:18, 236:21, 237:1, 237:9, 255:11, 255:16

**Fridays** [4] - 73:23, 75:22, 86:20, 146:7

**friend** [3] - 109:4, 110:20

**friends** [3] - 129:21, 129:22, 132:9

**front** [23] - 4:11, 17:2, 29:13, 35:22, 35:23, 48:25, 52:10, 52:11, 54:8, 55:9, 58:18, 69:21, 71:12, 106:18, 148:24, 160:19, 161:25, 169:4, 170:17, 172:24, 186:2, 187:6, 187:7

**front-door** [3] - 52:10, 55:9, 58:18

**frothcoming** [1] - 175:19

**full** [6] - 13:1, 21:5, 77:6, 116:15, 175:17, 204:16

**full-blown** [1] - 204:16

**fully** [2] - 88:4, 88:5

**fun** [1] - 12:21

**function** [2] - 145:16, 184:10

**functioning** [3] - 69:15, 69:17, 72:5

**functions** [1] - 145:20

**fund** [1] - 18:15

**funds** [18] - 3:6, 3:7, 6:19, 17:18, 17:20, 30:1, 213:24, 219:19, 223:14, 231:23, 233:2, 233:3, 234:4, 238:4, 238:9, 238:13, 238:16, 244:10

**funny** [1] - 30:14

## G

**Gallagher** [2] - 26:5, 83:1

**Gallagher's** [43] - 3:3, 26:20, 27:5, 27:7, 38:5, 82:23, 83:6, 83:10, 85:12, 98:23, 99:4, 101:16, 102:20, 103:1, 103:6, 103:9, 103:23, 104:6, 105:11, 105:20, 106:9, 107:3, 107:21, 110:10, 111:21, 115:12, 115:16, 115:18, 116:1, 131:14, 131:16, 131:24, 132:15, 133:8, 144:18, 149:5, 152:9, 153:15, 153:16, 155:13, 177:13, 222:5, 222:11

**Gallagher's2000.com** [1] - 177:15

**gaming** [1] - 22:24

**gap** [1] - 179:10

**gaping** [1] - 15:15

**gathering** [1] - 70:10

**general** [25] - 4:7, 4:9, 26:14, 26:15, 28:11, 29:1, 87:3, 97:18, 137:22, 164:3, 164:23, 165:10, 166:5, 169:18, 169:19, 180:22, 181:7, 184:25, 185:4, 196:13, 217:16, 244:16, 244:21, 261:18, 261:22

**generally** [15] - 31:23, 35:1, 54:23, 75:15, 86:16, 87:4, 146:11, 184:9, 184:19, 185:13, 185:16, 186:19, 196:4, 201:3, 219:7

**generate** [1] - 70:25

**generated** [7] - 29:10, 69:4, 69:18, 69:21, 188:24, 213:15, 241:3

**gentleman** [1] - 76:3

**Gentleman's** [1] - 109:23

**Gents** [2] - 106:14, 107:13

**gift** [4] - 155:17, 173:21, 173:22, 173:23

**girl** [4] - 33:22, 34:12, 41:5, 247:14

**girlfriend** [6] - 112:18, 112:25, 113:1, 113:10, 113:12, 131:12

**girls** [3] - 34:5, 253:17, 255:7

**given** [21] - 10:9, 29:3, 33:4, 35:9, 56:13, 70:3, 70:8, 80:4, 80:14, 102:4, 124:6, 151:16, 151:24, 164:3, 167:18, 171:10, 173:14, 185:5, 189:9, 194:21

**Glassboro** [1] - 210:20

**Gleason** [14] - 48:23, 50:24, 55:5, 55:13, 55:25, 56:17, 65:14, 74:12, 91:16, 92:7, 92:23, 94:13, 98:1, 265:14

**Gleeson** [5] - 30:8, 30:11, 36:24, 38:7, 46:5

**Goldfinger** [2] - 102:25, 103:2

**goods** [2] - 26:10, 179:2

**gotcha** [1] - 11:3

**Government** [16] - 37:20, 51:17, 125:14, 125:16, 126:5, 127:20, 138:6, 138:11, 148:24, 205:19, 226:25, 230:2, 230:14, 230:15, 232:8, 235:19

**government** [84] - 2:19, 2:20, 2:21, 2:22, 3:5, 3:11, 4:4, 5:15, 6:18, 7:1, 8:1, 8:6, 9:25, 10:25, 12:22, 12:25, 17:2, 17:14, 17:16, 17:22, 17:25, 18:2, 19:5, 19:18, 20:1, 20:4, 20:12, 21:10, 22:12, 22:14, 22:20, 22:24, 23:2, 23:5, 24:1, 24:4, 38:25, 40:11, 45:18, 51:10, 82:19, 83:18, 83:21, 83:25, 84:9, 84:10, 84:13, 85:1, 106:23, 111:15, 112:11, 112:19, 114:18, 115:23, 123:19, 123:22, 124:5, 125:13, 126:19, 126:23, 127:4, 127:20, 133:16, 133:17, 134:9, 134:10, 152:5, 157:2, 195:13, 208:13, 208:15, 212:17, 213:3, 213:16, 214:25, 218:1, 218:3, 218:23, 219:3, 219:21, 230:21, 264:20, 265:1, 265:7

**government's** [5] - 9:3, 12:20, 15:25, 19:3, 23:23

**Government's** [39] - 48:3, 48:4, 48:5, 48:7, 49:21, 50:9, 51:16, 63:10, 63:19, 64:2, 65:20, 72:25, 85:24, 88:8, 89:1, 89:12, 89:19, 180:24, 180:25, 186:2, 186:10, 187:6, 187:9, 187:19, 188:8, 190:2, 190:19, 191:14, 192:13, 192:20, 192:22, 192:23, 193:1, 193:19, 246:25, 252:15, 254:17, 254:18, 257:9

**graduate** [2] - 210:18, 210:24

**graduated** [1] - 210:25

**Graf** [12] - 136:15, 169:15, 169:22, 170:5, 183:1, 183:3, 183:5, 183:6, 183:9, 183:11, 260:2, 260:11

**grand** [1] - 185:16

**gross** [5] - 76:7, 141:15, 185:19, 186:21, 187:17

**ground** [1] - 110:21

**Group** [2] - 113:15, 130:9

**grows** [1] - 159:4

**guards** [1] - 58:6

**guerci** [1] - 7:6

**Guerci** [35] - 2:11, 5:5, 5:9, 6:8, 7:23, 8:16, 10:19, 18:2, 18:4, 22:22, 23:16, 84:21, 112:10, 115:7, 208:16, 208:23, 210:17, 212:18, 213:2, 213:18, 214:2, 218:25, 219:6, 222:3, 226:10, 226:23, 229:9, 230:1, 230:14, 232:7, 238:5, 246:23, 252:11, 265:9

**Guerci's** [2] - 23:6, 84:24

**guess** [25] - 2:19, 13:13, 16:3, 24:1, 34:19, 40:20, 41:10, 41:12, 49:17, 50:6, 78:7, 78:18, 81:18, 82:21, 83:7, 91:13, 93:1, 93:2, 95:16, 115:22, 117:7, 124:7, 140:18, 212:21, 237:6

**gun** [6] - 9:14, 9:17, 16:16, 16:20, 34:17, 154:10

**guts** [2] - 115:13, 174:13

**guy** [5] - 66:13, 79:21, 81:4, 82:6

## H

**hair** [1] - 33:19

**half** [28] - 30:21, 30:22, 31:13, 33:1, 33:2, 45:9, 73:17, 73:18, 74:1, 74:4, 74:10, 77:3, 86:5, 86:6, 133:3, 163:11, 163:12, 183:7, 183:9, 192:23, 194:21, 245:3

**hand** [37] - 3:20, 25:7, 36:1, 48:4, 48:13, 49:24, 50:8, 51:17, 51:18, 59:22, 63:10, 64:16, 64:22, 64:23, 65:1, 65:15, 65:19, 70:1, 71:12, 72:4, 72:15, 72:16, 92:19, 114:20, 141:12, 161:13, 185:25, 186:9, 186:14, 202:1, 205:20, 239:9, 240:3, 261:19, 261:24, 262:14, 264:3

**handed** [2] - 46:5, 154:4

**handing** [2] - 37:17, 100:13

**handled** [1] - 163:5

**handles** [1] - 22:7

**handling** [8] - 6:9, 21:6, 68:13, 70:21, 70:23, 108:21, 161:8

**handwriting** [5] - 6:4, 49:13, 57:25, 58:1

**hang** [4] - 65:24, 136:1, 189:3, 191:16

**hanging** [1] - 97:22

**happily** [1] - 18:20

**harassing** [2] - 79:14, 122:8

**hard** [1] - 265:19

**hate** [3] - 95:1, 115:13, 174:13

**hated** [1] - 82:6

**head** [2] - 197:15, 205:3

**heading** [1] - 54:13

**headings** [2] - 54:20, 57:15

**health** [3] - 81:7, 119:23, 120:5

**hear** [20] - 2:20, 4:6, 5:14, 7:20, 7:22, 8:5, 8:15, 9:23, 11:18, 12:16, 12:22,

13:8, 16:21, 24:25, 104:15, 115:25, 242:20, 262:9, 263:13

**heard** [14] - 10:5, 11:5, 12:4, 12:17, 17:17, 18:1, 22:11, 123:8, 123:12, 123:15, 160:4, 163:4, 208:4, 248:10

**hearsay** [2] - 226:4, 226:17

**Heather** [2] - 131:13

**held** [5] - 9:14, 16:15, 148:10, 196:8, 210:9

**help** [7] - 78:12, 78:13, 78:15, 109:7, 110:19, 110:21, 170:24

**helping** [2] - 84:2, 109:3

**Henry** [1] - 187:14

**Hernandez** [1] - 187:14

**hi** [1] - 108:20

**hidden** [1] - 218:2

**hide** [5] - 6:16, 12:19, 14:18, 218:20, 219:2

**hiding** [1] - 10:1

**hierarchy** [1] - 29:5

**higher** [3] - 62:8, 245:20, 245:23

**highest** [2] - 25:19, 210:16

**highly** [1] - 220:14

**Hill** [1] - 2:10

**HILL** [27] - 1:16, 96:6, 133:17, 134:25, 138:5, 140:7, 142:2, 180:1, 180:4, 180:7, 180:9, 180:18, 181:20, 181:22, 182:1, 182:18, 182:20, 189:23, 192:12, 194:19, 194:25, 205:15, 205:17, 206:18, 208:9, 266:12, 266:21

**hill** [5] - 37:17, 167:23, 168:6, 195:24, 199:11

**himself** [4] - 14:9, 16:10, 62:13, 240:20

**hire** [1] - 160:2

**hired** [6] - 28:13, 28:14, 30:7, 30:8, 30:9, 75:12

**hiring** [2] - 30:3, 146:12

**hit** [3] - 151:11, 159:6, 207:2

**hmm** [1] - 63:7

**hold** [4] - 27:18, 83:15, 212:21, 225:23

**Hold** [1] - 84:21

**holding** [2] - 220:17, 221:19

**holdups** [1] - 9:16

**hole** [1] - 15:15

**holiday** [1] - 235:11

**home** [10] - 43:10, 43:12, 43:14, 43:21, 117:15, 118:7, 118:10, 171:22, 171:24, 175:20

**honest** [1] - 92:25

**honestly** [2] - 137:23, 160:10

**Honor** [109] - 2:22, 2:24, 3:4, 3:10, 3:16, 4:6, 5:3, 5:9, 5:12, 5:14, 5:19, 5:25, 6:18, 6:22, 6:25, 7:1, 7:19, 8:11, 9:1, 9:13, 10:5, 10:14, 10:18, 11:3, 11:15, 12:19, 12:23, 13:14, 14:21, 15:3, 17:6, 17:16, 18:1, 18:8, 18:14, 18:18, 18:19, 18:25, 19:2, 19:12, 19:13, 19:15, 20:7, 20:15, 20:19, 20:21, 20:24, 22:1, 22:5, 22:15, 22:20, 23:6, 23:11, 23:14,

23:22, 23:25, 37:7, 37:14, 38:25, 39:2, 45:21, 46:25, 51:9, 51:12, 53:11, 66:16, 76:18, 85:16, 100:3, 104:11, 105:22, 106:1, 106:19, 130:15, 138:5, 138:7, 140:7, 142:3, 179:23, 180:2, 180:9, 180:10, 181:22, 182:2, 182:18, 194:25, 195:4, 205:15, 208:8, 208:9, 208:16, 212:17, 212:21, 213:1, 228:7, 228:16, 228:22, 230:3, 230:21, 242:17, 242:24, 250:24, 263:1, 264:17, 264:23, 265:3, 265:12, 265:16

**Honor's** [2] - 22:16, 133:21

**HONORABLE** [1] - 1:12

**hopefully** [1] - 129:23

**host** [6] - 32:12, 34:7, 35:6, 36:11, 36:14

**hot** [1] - 174:6

**hour** [8] - 30:22, 31:11, 32:5, 32:25, 33:1, 33:2

**hours** [6] - 28:16, 28:22, 189:7, 199:16, 199:19, 199:23

**house** [112] - 4:12, 29:19, 30:23, 30:25, 31:2, 32:4, 32:6, 32:7, 32:11, 32:12, 33:1, 33:12, 33:15, 33:17, 33:18, 33:21, 33:24, 36:5, 36:6, 36:10, 68:20, 68:22, 68:24, 78:11, 80:15, 103:12, 103:13, 103:15, 103:17, 103:20, 111:24, 112:14, 128:12, 128:14, 128:16, 128:17, 128:18, 139:15, 139:22, 139:23, 140:4, 140:5, 141:5, 164:20, 164:21, 165:21, 165:23, 166:1, 166:5, 166:9, 166:10, 166:11, 167:10, 172:9, 172:13, 172:14, 180:21, 181:10, 181:11, 181:12, 181:18, 191:6, 191:7, 191:11, 192:4, 192:5, 192:15, 193:6, 193:10, 193:11, 193:21, 194:3, 194:10, 194:11, 194:14, 194:17, 194:21, 194:22, 196:12, 196:25, 197:2, 197:4, 206:10, 246:9, 246:13, 252:8, 252:17, 252:24, 253:4, 253:6, 253:13, 253:14, 253:20, 253:21, 254:2, 254:5, 254:8, 254:13, 254:22, 255:1, 255:4, 255:5, 255:9, 256:4, 256:10, 259:15, 259:16

**House** [1] - 191:2

**house-madam** [2] - 246:13, 259:16

**house-mom** [10] - 33:15, 33:17, 33:21, 68:24, 128:12, 128:16, 139:22, 180:21, 181:18, 256:4

**house-moms** [1] - 31:2

**housekeeping** [1] - 133:18

**huge** [1] - 185:14

**hum** [1] - 119:2

**Humm** [1] - 46:16

**HUNDRED** [1] - 1:7

**hundred** [2] - 122:16, 158:15

**Hundred** [1] - 2:5

**hundreds** [6] - 6:12, 66:9, 158:9, 158:10, 207:5, 211:22

**Huntington** [1] - 182:22

**I**

**I-Beam** [1] - 42:24

**ID** [1] - 186:20

**idea** [17] - 16:5, 51:23, 55:18, 56:5, 57:7, 57:18, 58:3, 60:2, 67:4, 67:17, 72:2, 84:24, 84:25, 122:20, 127:16, 127:21, 176:1

**identification** [2] - 37:20, 214:22

**identified** [14] - 20:18, 63:18, 214:20, 214:21, 216:1, 232:18, 232:20, 232:22, 233:18, 235:1, 247:11, 247:24, 248:9, 259:12

**identifies** [2] - 247:15, 248:7

**identify** [8] - 138:18, 187:11, 213:3, 213:11, 214:10, 214:15, 231:11, 234:4

**identifying** [2] - 213:17, 247:22

**illegal** [9] - 213:12, 213:14, 215:6, 218:2, 218:9, 219:19, 221:2, 264:10, 264:13

**immunity** [1] - 83:21

**impact** [3] - 126:24, 194:13, 236:8

**implying** [3] - 120:15, 176:16, 176:22

**important** [7] - 18:19, 24:2, 214:24, 214:25, 215:1, 216:22, 228:3

**importantly** [1] - 5:20

**improved** [2] - 12:18, 15:15

**in-house** [1] - 206:10

**in-put** [1] - 215:15

**inartful** [1] - 162:15

**Inc** [7] - 3:2, 135:10, 149:5, 153:15, 153:16, 222:4

**inches** [5] - 40:22, 40:25, 41:1, 41:9, 41:23

**include** [2] - 40:18, 140:14

**included** [18] - 42:17, 62:2, 62:20, 137:4, 139:21, 140:1, 165:20, 166:9, 170:18, 179:6, 181:11, 181:18, 192:16, 205:5, 211:12, 211:14, 230:25, 236:17

**includes** [3] - 136:3, 140:15, 209:4

**including** [7] - 4:15, 21:18, 54:7, 200:20, 230:20, 243:23, 263:7

**Income** [3] - 58:22, 58:23, 58:24

**income** [45] - 5:3, 5:24, 6:16, 13:2, 42:9, 103:5, 104:19, 112:20, 112:22, 113:2, 113:7, 113:8, 113:9, 113:11, 114:12, 139:10, 139:12, 139:13, 141:4, 166:12, 168:4, 169:21, 183:19, 184:6, 187:17, 193:21, 200:18, 200:22, 219:15, 220:14, 220:15, 240:11, 240:12, 245:19, 245:21, 246:21, 248:24, 254:8, 259:13, 261:5, 261:6, 261:10, 262:19, 263:19

**incomplete** [3] - 10:20, 21:20, 47:1

**inconsistent** [1] - 15:24

**inconvenient** [1] - 10:24

**Incorporated** [2] - 153:17, 155:5

**incorporated** [2] - 145:2, 155:11

**incorrect** [2] - 7:19, 7:20

**increase** [1] - 173:14
**increasing** [1] - 221:18
**incredible** [1] - 81:6
**increments** [1] - 239:1
**indeed** [5] - 3:19, 8:1, 11:18, 23:14, 243:1
**independent** [1] - 164:15
**indicate** [4] - 52:3, 95:9, 153:22, 192:15
**indicated** [11] - 78:1, 216:18, 227:19, 234:24, 238:22, 239:5, 240:3, 240:8, 240:19, 262:18, 264:13
**indicates** [1] - 191:10
**indication** [1] - 197:5
**individual** [8] - 64:25, 213:21, 214:14, 216:6, 219:7, 234:25, 238:25, 244:12
**individuals** [12] - 21:12, 183:20, 213:12, 217:12, 217:15, 217:22, 217:24, 218:11, 218:18, 218:25, 220:4, 222:19
**inevitably** [1] - 185:6
**Infinity** [2] - 102:25, 103:2
**inform** [1] - 75:3
**information** [103] - 35:19, 35:24, 48:21, 49:1, 49:9, 49:12, 50:2, 50:4, 50:18, 50:23, 52:9, 54:3, 54:21, 55:3, 56:6, 57:7, 57:12, 57:19, 58:3, 58:22, 59:1, 60:2, 60:6, 61:8, 64:4, 64:8, 64:18, 65:4, 65:13, 65:21, 66:10, 67:24, 70:7, 74:21, 74:23, 75:4, 75:6, 75:9, 75:11, 82:13, 92:14, 92:17, 93:24, 96:12, 96:17, 96:23, 126:24, 128:7, 137:12, 137:21, 151:15, 152:15, 152:18, 152:22, 169:7, 170:16, 170:17, 171:9, 184:7, 184:25, 185:2, 185:9, 185:21, 186:19, 186:21, 187:12, 187:24, 187:25, 188:3, 188:5, 188:16, 188:21, 188:23, 189:4, 189:5, 190:15, 194:1, 202:12, 204:13, 206:5, 214:8, 214:9, 214:23, 214:24, 215:2, 215:4, 215:5, 215:6, 216:20, 216:22, 217:1, 222:10, 234:22, 234:25, 235:4, 236:2, 244:15, 245:15, 246:20, 254:24, 258:22, 259:10, 263:21
**Information** [1] - 210:12
**informed** [3] - 204:5, 238:22, 239:7
**informing** [2] - 7:17, 25:3
**informs** [1] - 189:15
**initial** [1] - 263:5
**initiative** [1] - 11:19
**ink** [1] - 87:15
**inordinate** [1] - 13:18
**inquire** [2] - 25:11, 182:17
**inside** [2] - 72:6, 72:7
**instance** [7] - 56:1, 57:4, 67:2, 68:3, 68:16, 73:19, 251:25
**instances** [3] - 233:8, 245:4, 248:2
**instead** [2] - 37:9, 153:16
**institution** [5] - 213:20, 214:7, 214:19, 215:8, 244:5

**institutions** [1] - 222:12
**instructed** [1] - 164:3
**instructing** [1] - 102:15
**instruction** [1] - 19:6
**instructor** [1] - 211:9
**insurance** [5] - 81:7, 114:16, 120:5, 261:12, 262:12
**insure** [1] - 168:20
**insured** [2] - 261:16, 262:12
**insurers** [1] - 145:12
**intend** [2] - 21:8, 98:25
**intended** [1] - 12:21
**intent** [2] - 10:3, 228:25
**interactions** [1] - 184:11
**interest** [6] - 18:15, 28:7, 28:9, 132:16, 155:2, 205:6
**interesting** [1] - 229:12
**interests** [1] - 51:9
**interfere** [1] - 11:13
**interfered** [1] - 16:24
**intermediary** [2] - 201:4, 201:21
**Internal** [2] - 2:12
**internal** [1] - 210:1
**interrogatory** [2] - 21:11, 21:13
**introduce** [1] - 51:11
**invariably** [1] - 141:24
**invest** [1] - 221:6
**investigate** [1] - 209:25
**investigation** [18] - 7:7, 7:9, 13:4, 13:6, 23:18, 209:5, 222:4, 222:8, 223:22, 226:10, 234:9, 238:17, 244:14, 244:19, 252:6, 256:2, 256:25, 261:11
**Investigation** [3] - 209:3, 209:9, 209:21
**investigations** [5] - 209:17, 210:4, 210:7, 211:20, 211:23
**investigative** [2] - 209:2, 209:14
**Investigator** [9] - 2:11, 5:9, 6:8, 7:23, 212:18, 213:2, 218:25, 219:6, 222:3
**investigator** [5] - 5:4, 209:7, 209:19, 211:11, 219:10
**investigatory** [1] - 208:16
**invoice** [1] - 109:22
**invoked** [1] - 18:21
**invoking** [1] - 24:19
**involve** [1] - 244:4
**involved** [33] - 23:17, 29:24, 30:4, 30:12, 30:18, 73:5, 74:8, 128:21, 132:20, 146:12, 163:18, 196:5, 211:22, 213:12, 218:1, 218:9, 218:11, 218:18, 218:25, 219:7, 219:14, 219:18, 222:3, 222:7, 222:12, 224:5, 234:20, 235:10, 238:4, 241:13, 242:1, 249:24, 261:6
**involvement** [2] - 26:3, 122:10
**involves** [3] - 15:3, 105:2, 215:23
**involving** [2] - 189:25, 209:16
**ir** [1] - 31:17
**IRS** [35] - 3:24, 4:5, 5:15, 6:8, 7:5, 13:12, 13:13, 17:4, 22:21, 23:16, 38:24,

80:19, 81:19, 81:20, 81:24, 82:10, 82:11, 123:12, 199:6, 209:3, 209:8, 209:20, 209:24, 211:3, 211:11, 212:2, 215:12, 215:16, 215:17, 218:23, 219:4, 219:21
**ish** [1] - 205:6
**Island** [5] - 3:2, 26:7, 145:5, 154:21
**issue** [8] - 19:1, 20:25, 23:9, 127:22, 134:5, 189:24, 243:18, 263:12
**issued** [2] - 121:11, 241:15
**item** [2] - 163:2, 163:3
**Item** [1] - 191:2
**items** [2] - 155:17, 251:20
**itself** [2] - 143:21, 243:17
**Ivan's** [1] - 94:14

---

## J

**J.P** [5] - 241:11, 241:16, 242:22, 243:19, 264:7
**January** [6] - 79:3, 113:20, 113:22, 114:1, 233:9
**Jason** [1] - 94:14
**Jason's** [1] - 187:17
**JD** [2] - 130:8, 165:17
**Jerry** [2] - 132:13, 133:3
**Jersey** [4] - 209:21, 210:20, 212:4, 212:10
**jets** [2] - 221:12, 221:17
**Jewelers** [2] - 143:6, 143:7
**jewelry** [9] - 9:15, 143:4, 143:23, 148:4, 148:14, 149:12, 149:15, 154:9, 154:11
**job** [12] - 4:16, 10:14, 81:8, 112:15, 121:15, 121:22, 132:22, 133:7, 135:14, 142:14, 142:15, 233:14
**jobs** [1] - 174:11
**Joe** [12] - 12:17, 116:16, 120:7, 164:24, 165:1, 165:9, 172:2, 172:14, 173:3, 173:4, 176:11, 176:15
**Johnson** [117] - 1:22, 4:6, 4:9, 4:14, 4:16, 4:19, 4:25, 5:6, 5:14, 5:18, 5:20, 6:3, 6:6, 12:5, 12:17, 20:10, 20:24, 21:1, 21:4, 21:7, 21:25, 22:14, 24:9, 24:15, 25:3, 25:14, 25:19, 26:1, 28:12, 29:9, 36:18, 37:18, 39:6, 48:2, 48:7, 49:6, 51:15, 60:17, 62:17, 63:8, 66:5, 68:14, 73:4, 78:5, 83:19, 84:4, 99:12, 100:13, 108:7, 108:8, 109:14, 116:16, 120:7, 125:10, 125:12, 128:11, 128:20, 131:3, 131:22, 131:23, 131:25, 132:6, 141:19, 141:23, 146:9, 164:5, 164:24, 165:1, 165:19, 172:2, 173:3, 173:5, 173:7, 173:18, 175:15, 175:20, 175:22, 176:11, 177:4, 180:21, 181:7, 181:13, 244:13, 244:16, 244:18, 244:20, 245:17, 245:20, 247:8, 247:13, 247:17, 248:1, 248:4, 248:8, 248:17, 248:23, 249:12, 249:17, 249:22, 250:2,

250:7, 250:15, 250:18, 251:7, 251:15, 251:20, 252:2, 252:3, 252:21, 254:25, 255:7, 256:7, 257:3, 260:7, 262:22

**Johnson's** [5] - 5:18, 165:5, 173:9, 177:16, 244:14

**Johnson's(sic** [1] - 28:1

**joining** [1] - 2:9

**Joseph** [6] - 1:22, 4:6, 22:14, 164:5, 175:19, 244:13

**JP** [19] - 148:7, 222:13, 223:1, 223:6, 223:8, 223:9, 223:11, 223:20, 223:25, 224:2, 224:23, 225:6, 225:8, 225:11, 225:18, 226:11, 227:7, 227:14, 263:7

**JUDGE** [1] - 1:12

**Judge** [27] - 2:10, 2:24, 6:14, 7:12, 7:14, 9:23, 10:13, 11:2, 12:1, 12:7, 12:10, 13:5, 13:17, 16:19, 17:3, 21:9, 24:8, 24:12, 24:20, 83:16, 113:24, 119:14, 124:9, 124:13, 226:20, 229:5, 244:9

**judge** [1] - 108:10

**Judge's** [1] - 19:5

**Julio** [1] - 187:18

**July** [4] - 1:10, 8:24, 107:20, 112:17

**jump** [1] - 159:7

**June** [1] - 8:23

**jury** [1] - 37:13

**justice** [1] - 210:22

**JZ** [3] - 113:15, 115:2, 115:3

## K

**Kasha** [3] - 110:24, 110:25

**keep** [14] - 13:9, 16:6, 35:5, 36:19, 37:1, 72:8, 81:13, 95:24, 97:19, 111:20, 161:4, 199:12, 218:2, 220:19

**keeping** [6] - 23:1, 136:3, 161:13, 162:17, 164:1, 186:13

**kept** [34] - 3:20, 4:16, 10:6, 36:10, 36:11, 36:13, 36:14, 38:21, 43:8, 44:3, 44:7, 44:13, 45:3, 72:9, 72:14, 72:16, 72:20, 72:22, 77:22, 82:17, 87:12, 91:6, 91:10, 91:11, 94:25, 97:22, 98:1, 105:2, 117:4, 163:23, 171:4, 223:3, 239:8

**kick** [1] - 33:12

**kickback** [5] - 33:23, 103:13, 103:15, 128:14

**kicked** [2] - 128:17, 128:18

**kids** [1] - 112:3

**kind** [23] - 26:8, 26:10, 26:22, 31:5, 43:24, 70:1, 71:20, 75:15, 75:17, 76:5, 83:21, 87:25, 112:17, 129:16, 158:1, 162:20, 178:8, 184:9, 188:21, 201:10, 252:11, 257:21

**kindly** [7] - 37:18, 48:11, 64:1, 128:25, 226:23, 232:6, 246:23

**knowing** [1] - 109:4

**knowledge** [12] - 20:3, 21:12, 21:17, 21:23, 156:15, 163:13, 163:15, 170:4,

188:25, 215:25, 216:19, 242:16

**known** [7] - 20:11, 32:15, 32:20, 65:25, 82:21, 135:6, 206:3

**knows** [4] - 2:24, 3:4, 14:23, 15:3

## L

**label** [1] - 57:17

**labeled** [10] - 51:19, 52:5, 53:14, 53:25, 54:12, 56:2, 57:5, 60:9, 66:17

**labels** [1] - 58:11

**Labor** [11] - 99:18, 99:20, 100:4, 100:23, 100:24, 116:25, 117:1, 177:20, 204:1, 235:12, 236:22

**lack** [1] - 10:3

**Lackowitz** [2] - 183:8, 183:10

**laid** [2] - 29:20, 129:14

**lap** [2] - 4:14, 29:12

**large** [13] - 3:24, 5:8, 9:18, 154:12, 213:4, 213:9, 213:11, 215:1, 215:15, 217:16, 219:4, 239:10, 261:5

**largely** [3] - 5:19, 231:14, 231:23

**last** [20] - 4:3, 12:18, 13:5, 13:8, 19:2, 19:6, 20:12, 21:9, 26:3, 106:5, 118:18, 140:16, 164:4, 182:15, 203:9, 210:5, 246:18, 249:6, 254:14, 264:20

**Latalia** [1] - 131:22

**late** [9] - 19:17, 19:20, 19:23, 34:16, 34:23, 81:19, 81:21, 94:11

**latest** [1] - 15:25

**laughable** [1] - 12:24

**laundering** [16] - 6:10, 12:2, 12:8, 209:17, 210:2, 210:7, 210:14, 211:6, 211:19, 211:25, 212:7, 213:13, 217:21, 218:12, 218:17, 264:14

**law** [7] - 196:18, 210:22, 211:13, 213:16, 215:3, 215:17, 218:3

**lawful** [1] - 121:11

**laws** [1] - 210:1

**lawsuit** [3] - 82:23, 82:25, 83:1

**lawyer** [10] - 84:16, 84:18, 85:2, 85:4, 102:22, 108:8, 112:10, 112:13, 112:21, 114:18

**lawyers** [2] - 199:21, 199:24

**lays** [1] - 236:2

**lead** [1] - 264:10

**learn** [12] - 12:6, 97:25, 191:25, 196:7, 244:18

**learned** [4] - 166:11, 224:12, 244:15, 244:20

**least** [5] - 31:13, 181:16, 211:18, 217:20, 261:9

**leave** [26] - 4:22, 32:14, 34:9, 35:10, 35:16, 36:17, 37:4, 39:15, 43:2, 49:4, 49:16, 58:16, 59:21, 61:25, 62:5, 64:11, 64:12, 67:6, 70:12, 71:15, 79:25, 80:23, 99:10, 134:19, 145:24, 244:24

**leaves** [1] - 17:4

**leaving** [5] - 10:24, 71:6, 80:2, 99:3,

126:17

**led** [2] - 194:23, 226:16

**ledger** [5] - 137:22, 169:18, 169:19, 185:4, 261:22

**ledgers** [2] - 185:1, 261:18

**left** [85] - 10:7, 11:9, 14:1, 14:23, 29:16, 34:2, 36:1, 36:2, 36:9, 36:12, 37:3, 40:4, 40:5, 42:14, 42:16, 42:20, 42:23, 43:4, 44:2, 48:13, 50:8, 51:18, 56:2, 58:11, 58:16, 58:18, 59:22, 60:13, 61:12, 61:15, 61:22, 62:7, 62:19, 62:21, 64:16, 64:22, 65:1, 65:9, 65:19, 66:18, 67:8, 69:5, 70:16, 71:10, 71:12, 72:2, 72:4, 72:15, 72:16, 79:20, 80:13, 85:12, 88:17, 88:25, 94:21, 94:24, 97:12, 99:9, 99:10, 101:16, 102:20, 103:1, 105:20, 107:3, 107:21, 110:9, 111:21, 115:12, 116:1, 132:15, 133:8, 138:22, 141:14, 165:1, 167:7, 173:16, 173:17, 232:22, 245:7, 247:10, 253:6, 253:13, 254:5

**left-hand** [10] - 36:1, 50:8, 64:16, 64:22, 65:1, 65:19, 71:12, 72:4, 72:15, 72:16

**legal** [1] - 218:14

**legally** [1] - 204:8

**legibly** [2] - 87:23, 87:24

**lend** [2] - 172:17, 172:22

**lender** [1] - 173:6

**length** [1] - 72:18

**less** [11] - 6:3, 8:24, 141:5, 194:14, 197:22, 216:7, 216:12, 216:14, 220:10, 239:1, 245:4

**letter** [27] - 7:15, 7:24, 8:3, 8:6, 8:13, 8:14, 8:18, 9:2, 9:6, 9:8, 9:21, 16:18, 19:2, 140:22, 153:19, 153:22, 190:8, 190:12, 191:2, 191:22, 227:14, 227:16, 227:17, 227:25, 228:3

**lettered** [1] - 106:24

**letters** [11] - 9:11, 9:19, 10:1, 10:3, 10:11, 16:16, 59:25, 154:14, 160:25, 222:16, 223:25

**letting** [1] - 120:5

**level** [3] - 25:19, 210:16, 259:1

**liability** [1] - 47:2

**liberties** [1] - 229:6

**licensing** [1] - 199:12

**life** [2] - 80:25, 114:15

**likely** [1] - 6:19

**limit** [1] - 15:17

**Limited** [2] - 107:14, 113:16

**limited** [1] - 226:17

**limiting** [1] - 220:11

**limits** [1] - 15:4

**line** [17] - 49:7, 49:8, 50:2, 52:6, 58:21, 59:6, 64:3, 67:15, 68:4, 100:10, 100:19, 108:17, 118:16, 128:13, 199:3

**lined** [1] - 174:11

**lines** [6] - 55:18, 67:2, 67:3, 169:1, 188:18, 197:16

**linked** [1] - 243:16

**lipstick** [1] - 33:20
**liquor** [2] - 104:6, 246:7
**list** [7] - 19:4, 20:5, 49:19, 66:23, 66:24, 185:4, 204:5
**listed** [8] - 36:21, 36:23, 51:21, 54:24, 55:7, 57:11, 235:11, 247:13
**listening** [1] - 66:7
**literally** [1] - 221:19
**litigate** [1] - 178:13
**litigation** [3] - 177:4, 177:8, 196:8
**live** [6] - 22:13, 25:15, 135:8, 135:9, 182:21, 182:22
**lived** [1] - 25:17
**LLC** [1] - 113:16
**LLP** [1] - 1:18
**load** [1] - 14:8
**loaded** [1] - 146:22
**loan** [16] - 78:16, 78:17, 78:20, 78:22, 78:24, 116:2, 117:12, 117:14, 117:18, 119:20, 119:25, 172:3, 172:5, 172:21, 173:7, 175:24
**local** [5] - 8:14, 8:17, 9:4, 9:20, 211:13
**located** [5] - 26:6, 143:13, 143:16, 145:4, 208:25
**location** [3] - 8:4, 144:3, 154:21
**lock** [1] - 113:23
**locks** [1] - 101:25
**log** [5] - 228:15, 228:17, 228:19, 229:7, 229:8
**long-standing** [1] - 5:7
**look** [72] - 23:1, 36:4, 37:23, 38:9, 38:12, 44:8, 46:9, 46:12, 49:21, 64:25, 70:13, 71:2, 71:21, 71:22, 71:23, 79:20, 79:21, 96:4, 97:19, 100:19, 106:17, 107:9, 108:7, 108:11, 109:16, 110:25, 113:25, 116:5, 118:12, 118:16, 119:8, 120:7, 125:13, 130:12, 138:10, 148:25, 150:6, 152:1, 152:24, 153:24, 154:3, 156:21, 157:1, 157:3, 161:24, 163:1, 168:6, 170:22, 172:25, 176:6, 180:24, 188:2, 190:2, 191:14, 192:13, 192:20, 193:19, 194:6, 198:17, 203:12, 207:21, 218:14, 219:12, 229:13, 233:9, 250:5, 252:21, 255:2, 263:11
**look-back** [1] - 194:6
**looked** [13] - 44:9, 44:11, 45:2, 63:18, 71:9, 72:24, 77:24, 166:22, 232:17, 236:12, 249:25, 261:3, 262:23
**looking** [7] - 126:3, 138:12, 152:3, 197:2, 219:11, 257:9, 260:7
**looks** [5] - 68:4, 96:19, 96:20, 125:25, 150:24
**lose** [1] - 81:1
**loss** [1] - 261:16
**low** [4] - 3:5, 13:10, 75:25, 76:5
**lower** [3] - 48:4, 51:17, 63:10
**lower-right-hand** [3] - 48:4, 51:17, 63:10
**Luisa** [2] - 64:19, 65:2
**Luiso** [1] - 52:14

**lump** [2] - 207:22, 217:5
**lumped** [1] - 192:3
**lunch** [5] - 119:11, 124:14, 124:17, 179:5, 179:7
**luncheon** [1] - 124:18
**Lynch** [25] - 148:11, 148:12, 148:14, 148:15, 148:16, 158:18, 158:24, 170:18, 202:14, 202:16, 206:24, 222:13, 223:16, 223:17, 231:20, 231:21, 232:5, 232:19, 232:24, 233:18, 233:21, 234:2, 234:5, 238:12, 238:15

## M

**ma'am** [1] - 152:6
**machine** [19] - 14:4, 15:11, 42:5, 147:4, 147:5, 158:14, 169:6, 169:11, 201:14, 201:16, 201:17, 201:20, 201:22, 240:9, 240:22, 241:7
**machines** [1] - 14:9
**madam** [2] - 246:13, 259:16
**Magistrate** [12] - 7:2, 7:14, 8:7, 8:9, 9:23, 10:13, 11:1, 12:1, 12:7, 12:10, 16:19, 17:2
**magnitude** [1] - 197:9
**mail** [3] - 149:13, 152:11, 176:11
**mailed** [2] - 149:14
**mailing** [1] - 149:8
**maintain** [1] - 137:7
**maintained** [9] - 94:20, 94:23, 215:12, 215:16, 230:19, 233:1, 240:3, 240:6, 260:8
**maintaining** [1] - 262:14
**major** [1] - 3:1
**majority** [3] - 3:17, 15:1, 27:17
**manage** [1] - 92:23
**managed** [1] - 27:9
**management** [6] - 21:13, 21:17, 21:24, 22:1, 22:3, 29:5
**manager** [24] - 4:7, 4:9, 26:14, 26:16, 27:1, 28:11, 29:1, 29:7, 44:17, 48:22, 70:4, 89:16, 91:16, 92:16, 97:18, 160:1, 164:3, 164:23, 165:10, 166:5, 180:22, 181:7, 244:16, 244:21
**managers** [3] - 161:2, 165:3, 171:8
**managing** [1] - 132:20
**Manhattan** [1] - 122:15
**manner** [3] - 8:20, 9:10, 10:12
**manufactured** [1] - 143:24
**manufacturing** [3] - 143:9, 143:11, 144:9
**March** [3] - 192:25, 193:14, 213:7
**Marciano** [6] - 17:12, 136:17, 170:6, 170:11, 182:1, 182:13
**marked** [7] - 37:19, 48:3, 51:16, 63:10, 125:16, 129:2, 129:3
**marking** [1] - 65:22
**Marla** [2] - 57:5, 57:6
**married** [3] - 131:19, 131:21, 186:22

**Marsha** [1] - 1:24
**Maryland** [1] - 208:25
**Maspeth** [1] - 135:9
**match** [6] - 6:2, 60:15, 88:16, 168:14, 168:20, 168:23, 169:5, 207:8, 250:22
**matched** [2] - 250:10, 250:13
**math** [1] - 169:9
**mathematics** [2] - 255:14, 255:19
**matter** [4] - 133:18, 172:7, 178:22, 204:3
**matters** [1] - 211:23
**mattress** [1] - 220:19
**mean** [17] - 8:21, 22:2, 40:16, 43:10, 49:23, 50:16, 55:10, 55:19, 60:18, 80:18, 92:5, 113:12, 133:1, 143:9, 189:4, 221:19, 231:2
**meaning** [13] - 48:16, 50:4, 50:11, 52:8, 54:21, 55:6, 56:5, 57:18, 58:13, 60:10, 61:8, 61:13, 73:9
**means** [7] - 22:4, 59:11, 64:18, 67:17, 68:6, 88:25, 102:1
**meant** [1] - 175:19
**mechanical** [1] - 2:2
**mechanisms** [1] - 72:25
**medium** [1] - 202:2
**meet** [4] - 131:15, 131:23, 174:4, 174:7
**meeting** [2] - 80:23, 245:8
**mention** [5] - 7:21, 16:22, 76:23, 197:4, 240:13
**mentioned** [16] - 30:12, 32:3, 33:9, 33:15, 36:18, 71:5, 73:4, 100:22, 136:20, 145:21, 158:18, 159:16, 201:16, 227:4, 249:9, 254:16
**mere** [1] - 217:10
**merged** [2] - 156:5, 183:8
**Merrill** [25] - 148:11, 148:12, 148:14, 148:15, 148:16, 158:18, 158:24, 170:18, 202:14, 202:16, 206:24, 222:13, 223:16, 223:17, 231:20, 231:21, 232:5, 232:19, 232:24, 233:18, 233:21, 234:2, 234:5, 238:12, 238:15
**met** [11] - 80:15, 81:17, 82:19, 101:15, 101:17, 115:12, 131:16, 173:17, 195:10, 195:12, 244:12
**metal** [1] - 72:22
**method** [3] - 73:6, 97:23, 201:25
**methodology** [2] - 179:1, 179:8
**Mia** [2] - 67:16, 67:19
**microphone** [2] - 134:18, 182:12
**midday** [4] - 46:5, 46:6, 92:4, 92:5
**middle** [1] - 233:9
**might** [17] - 4:5, 15:6, 38:17, 38:18, 60:25, 69:23, 72:19, 86:15, 126:24, 127:16, 127:21, 184:22, 197:10, 216:4, 224:15, 229:3, 240:14
**mine** [4] - 109:4, 110:16, 110:20
**minor** [1] - 210:22
**minute** [6] - 51:2, 61:18, 85:19,

199:25, 226:13, 265:15

**minutes** [6] - 12:4, 119:12, 124:12, 180:1, 180:3, 180:6

**misaddressed** [3] - 8:13, 9:2, 16:17

**misdirection** [1] - 12:24

**misleading** [2] - 10:20, 11:1

**misplaced** [1] - 149:13

**missed** [1] - 226:5

**missing** [3] - 249:16, 250:25, 264:9

**mistake** [1] - 13:17

**mistaken** [3] - 37:11, 119:4, 204:12

**mode** [1] - 160:25

**modifications** [1] - 126:22

**mom** [22] - 33:15, 33:17, 33:18, 33:21, 68:24, 103:12, 103:20, 128:12, 128:16, 139:22, 166:1, 166:2, 166:5, 180:21, 181:11, 181:12, 181:18, 185:13, 198:6, 198:9, 256:4, 256:10

**mom-and-pop** [3] - 185:13, 198:6, 198:9

**moment** [3] - 37:22, 120:2, 264:22

**moms** [1] - 31:2

**Monday** [22] - 32:8, 44:10, 44:18, 44:19, 45:4, 80:4, 91:10, 145:24, 146:2, 159:5, 160:13, 165:4, 165:22, 166:18, 216:8, 225:2, 235:9, 235:12, 236:15, 236:22, 237:24, 240:16

**Mondays** [1] - 89:21

**money** [94] - 6:9, 7:10, 10:21, 10:22, 11:16, 12:2, 12:8, 13:19, 29:10, 29:13, 29:16, 30:14, 30:20, 34:2, 35:16, 35:17, 54:16, 59:14, 59:21, 60:12, 60:13, 61:3, 61:4, 61:14, 65:16, 66:6, 72:5, 72:6, 72:8, 72:9, 72:16, 79:3, 79:5, 101:23, 103:24, 104:4, 104:22, 112:16, 115:15, 126:16, 128:16, 128:17, 129:25, 132:23, 138:19, 145:19, 146:22, 146:23, 161:5, 161:7, 161:12, 164:18, 164:19, 165:14, 166:7, 172:14, 172:17, 172:22, 173:25, 174:10, 178:14, 181:11, 201:24, 205:25, 209:16, 210:2, 210:7, 210:14, 211:6, 211:19, 211:24, 212:6, 213:12, 217:3, 217:21, 218:12, 218:13, 218:16, 218:17, 237:19, 241:6, 241:13, 245:6, 250:1, 253:17, 257:4, 264:14

**monies** [8] - 10:10, 29:15, 54:6, 70:19, 104:2, 105:2, 138:21, 242:6

**month** [16] - 3:15, 8:23, 8:24, 9:6, 29:3, 45:14, 112:7, 136:9, 136:11, 136:21, 136:23, 138:16, 139:6, 140:24, 141:18, 150:4

**monthly** [4] - 137:18, 137:19, 184:19, 193:9

**months** [13] - 4:24, 10:14, 12:6, 39:9, 39:12, 81:7, 107:20, 112:15, 117:7, 117:8, 142:18, 194:2, 257:16

**Morgan** [24] - 148:7, 222:13, 223:1, 223:6, 223:8, 223:9, 223:11, 223:20, 223:25, 224:2, 224:23, 225:6, 225:8,

225:11, 225:18, 226:11, 227:7, 227:14, 241:11, 241:16, 242:22, 243:19, 263:7, 264:7

**morning** [24] - 2:10, 2:14, 2:24, 4:23, 7:21, 10:5, 10:23, 13:9, 15:12, 24:12, 24:13, 25:14, 28:23, 94:7, 126:2, 126:7, 145:24, 147:6, 160:4, 166:19, 166:20, 236:17, 264:19, 265:3

**morris** [1] - 229:6

**MORRIS** [56] - 1:16, 2:8, 2:22, 18:25, 19:8, 19:12, 21:9, 22:14, 23:3, 23:11, 23:14, 23:16, 23:22, 24:8, 25:13, 37:7, 37:11, 38:25, 45:18, 46:21, 48:1, 51:14, 53:11, 53:12, 66:15, 84:4, 124:13, 125:9, 130:15, 131:25, 133:18, 134:10, 134:23, 199:23, 208:15, 208:22, 212:17, 213:1, 220:2, 222:2, 226:20, 226:22, 228:12, 229:16, 230:21, 231:5, 238:3, 244:9, 261:1, 262:25, 264:17, 264:22, 265:1, 265:7, 266:3, 267:1

**Morris** [20] - 2:8, 9:2, 9:22, 10:5, 10:23, 11:5, 11:9, 12:4, 12:16, 13:8, 13:21, 14:1, 14:23, 16:21, 17:1, 65:25, 110:5, 123:18, 130:11, 228:11

**Morris'** [1] - 15:15

**mortgage** [2] - 112:1, 113:13

**most** [19] - 13:23, 14:22, 14:25, 15:7, 15:22, 38:8, 45:8, 56:17, 86:16, 86:20, 87:10, 87:19, 87:20, 170:10, 184:11, 201:12, 220:9, 220:12, 261:15

**mother** [1] - 131:17

**motive** [8] - 9:25, 13:7, 13:9, 15:15, 91:4, 95:21, 97:9, 264:12

**motives** [1] - 5:18

**mouth** [1] - 81:13

**move** [8] - 66:15, 76:17, 134:2, 134:8, 233:8, 250:6, 255:10, 255:14

**moved** [5] - 133:25, 213:9, 218:15, 225:9, 264:8

**Moves** [2] - 196:19, 196:20

**moves** [1] - 134:10

**moving** [5] - 49:7, 54:11, 186:17, 232:22, 247:10

**MR** [174] - 2:8, 2:14, 2:22, 6:25, 17:6, 18:1, 18:8, 18:12, 18:14, 18:17, 18:25, 19:8, 19:12, 19:13, 19:22, 20:7, 20:18, 20:21, 20:24, 21:9, 21:22, 22:1, 22:5, 22:9, 22:14, 22:19, 23:3, 23:6, 23:11, 23:14, 23:16, 23:22, 23:25, 24:8, 24:12, 24:18, 24:24, 25:2, 25:13, 37:7, 37:11, 37:14, 38:25, 39:2, 39:5, 45:18, 45:21, 45:23, 45:25, 46:21, 46:25, 47:10, 48:1, 51:14, 53:11, 53:12, 66:15, 76:17, 81:15, 84:4, 84:8, 85:16, 85:21, 91:2, 96:8, 98:14, 98:17, 100:3, 100:12, 102:14, 102:17, 102:23, 103:3, 103:10, 103:25, 104:8, 104:10, 104:11, 104:15, 104:24, 105:22, 106:1, 106:4, 106:5, 106:12, 106:19, 106:21, 106:23, 107:7, 108:4, 108:10, 119:14, 124:9, 124:13,

125:9, 130:15, 131:25, 132:2, 132:5, 133:12, 133:18, 134:8, 134:10, 134:19, 134:23, 142:6, 150:2, 154:2, 157:8, 175:1, 179:22, 180:10, 182:2, 182:7, 186:15, 195:4, 195:7, 199:2, 199:22, 199:23, 199:25, 206:1, 206:20, 206:22, 207:10, 208:8, 208:15, 208:22, 212:17, 212:21, 213:1, 217:18, 220:2, 222:2, 225:20, 225:22, 225:24, 226:4, 226:7, 226:20, 226:22, 228:7, 228:12, 229:5, 229:12, 229:16, 230:3, 230:21, 231:5, 238:3, 241:20, 242:14, 242:16, 242:23, 243:12, 244:1, 244:6, 244:9, 261:1, 262:5, 262:7, 262:25, 263:9, 264:17, 264:22, 265:1, 265:7, 265:12, 266:3, 266:5, 266:8, 266:14, 266:23, 267:1

**MS** [26] - 96:6, 133:17, 134:25, 138:5, 140:7, 142:2, 180:1, 180:4, 180:7, 180:9, 180:18, 181:20, 181:22, 182:1, 182:18, 182:20, 189:23, 192:12, 194:19, 194:25, 205:15, 205:17, 206:18, 208:9, 266:12, 266:21

**multi** [1] - 185:14

**multi-billion** [1] - 185:14

**multiple** [33] - 11:5, 11:6, 11:7, 114:11, 215:19, 215:21, 215:22, 215:23, 216:2, 216:5, 216:15, 216:16, 217:2, 217:4, 217:8, 217:10, 220:8, 221:10, 223:6, 224:18, 224:24, 225:1, 225:5, 234:7, 234:13, 234:22, 235:7, 235:25, 236:20, 237:7, 237:13, 237:15

**multiplication** [2] - 255:14, 255:19

**multiplied** [2] - 254:11, 259:17

**multiplying** [1] - 249:8

**Murray** [1] - 24:10

**MURRAY** [1] - 1:21

**music** [1] - 164:17

# N

**name** [45] - 32:15, 33:15, 44:14, 50:22, 64:19, 65:2, 66:18, 66:19, 67:16, 82:23, 83:1, 83:5, 83:10, 94:13, 94:14, 110:23, 115:5, 131:13, 131:22, 135:3, 135:6, 143:5, 144:17, 177:9, 177:11, 177:12, 177:14, 177:17, 177:19, 182:12, 182:15, 182:16, 186:20, 196:20, 204:14, 214:12, 214:21, 223:17, 231:18, 233:19, 233:22, 238:12, 238:14, 244:12, 247:13

**Name** [2] - 52:7, 64:17

**named** [2] - 52:14, 105:5

**names** [9] - 6:7, 54:24, 55:7, 56:2, 68:20, 204:5, 204:10, 204:11, 204:12

**narcotics** [3] - 12:2, 12:8, 218:17

**nature** [5] - 77:2, 83:8, 184:1, 220:20, 245:6

**NDB** [5] - 59:10, 59:25, 62:9, 62:10, 62:21

**near** [1] - 119:9
**necessarily** [4] - 202:13, 202:14, 242:19, 249:21
**necessary** [2] - 28:14, 34:24
**need** [16] - 24:18, 38:17, 52:12, 65:25, 133:25, 134:4, 138:2, 146:21, 154:11, 154:15, 160:2, 161:1, 169:6, 244:7, 263:13
**needed** [8] - 38:22, 38:23, 71:24, 78:11, 82:17, 96:23, 145:20, 240:4
**needs** [4] - 18:23, 33:19, 116:14, 175:17
**negotiate** [1] - 145:12
**negotiated** [2] - 223:24, 224:23
**net** [4] - 141:2, 141:15, 189:20
**NETCHG** [1] - 141:2
**never** [19] - 8:5, 8:9, 11:12, 12:21, 90:1, 90:2, 113:3, 113:4, 117:23, 118:5, 122:9, 123:12, 132:17, 133:10, 203:24, 206:6, 206:11, 224:6
**NEW** [3] - 1:1, 1:15, 1:19
**new** [9] - 12:17, 15:15, 52:24, 52:25, 74:14, 154:13, 156:2, 162:7, 186:19
**New** [36] - 1:7, 1:25, 9:17, 10:16, 25:16, 25:23, 26:2, 26:7, 89:23, 91:19, 143:17, 149:6, 154:21, 177:20, 178:24, 179:12, 182:22, 182:24, 189:25, 193:2, 193:25, 194:20, 195:25, 196:21, 197:21, 203:25, 209:9, 209:21, 210:20, 212:4, 212:10, 254:1
**Newark** [1] - 209:21
**News** [1] - 108:22
**newspaper** [1] - 79:20
**newspapers** [1] - 145:13
**next** [79] - 4:23, 29:17, 31:13, 32:14, 47:11, 49:8, 50:15, 50:21, 52:25, 56:4, 57:6, 57:16, 59:10, 59:12, 59:13, 59:15, 59:17, 59:21, 60:1, 60:4, 61:7, 63:8, 64:3, 64:20, 64:21, 65:3, 65:8, 67:15, 68:3, 68:4, 69:6, 70:13, 74:22, 80:8, 81:17, 82:19, 90:5, 98:20, 110:2, 119:12, 120:9, 133:16, 139:4, 139:10, 139:15, 140:8, 149:16, 174:15, 176:14, 181:25, 182:1, 185:8, 198:21, 208:14, 215:9, 219:22, 221:22, 226:10, 232:2, 232:6, 235:20, 238:16, 239:12, 246:1, 247:18, 247:21, 248:5, 248:7, 248:11, 252:6, 254:17, 256:2, 256:3, 256:24, 257:1, 258:20, 258:21, 260:15
**next-day** [5] - 59:12, 59:13, 59:15, 59:21, 60:4
**Nicholas** [6] - 143:20, 143:22, 143:25, 144:4, 144:8, 144:11
**nickname** [1] - 204:11
**Nicky** [1] - 53:17
**Nicole** [1] - 2:13
**Night** [3] - 48:15, 196:19, 196:20
**night** [45] - 4:18, 19:3, 27:10, 31:19, 32:1, 33:5, 39:17, 40:5, 40:13, 43:23, 44:9, 44:10, 49:3, 49:17, 51:24, 52:1,

53:16, 62:25, 63:1, 63:4, 63:5, 67:13, 69:6, 81:5, 92:16, 92:20, 92:23, 96:25, 126:12, 126:16, 126:17, 142:13, 146:4, 167:3, 179:4, 236:8, 236:16, 236:18, 236:21, 236:23, 249:21, 253:18, 255:11, 255:16
**night's** [2] - 40:18, 41:8
**nights** [7] - 33:6, 157:20, 236:7, 237:1, 237:9, 237:10, 255:5
**nightshift** [3] - 28:25, 44:20, 44:21
**nighttime** [23] - 30:7, 32:7, 36:24, 44:21, 48:19, 48:24, 50:3, 50:7, 50:24, 53:5, 54:10, 55:14, 62:3, 62:15, 62:19, 64:24, 67:1, 67:9, 70:4, 70:8, 92:10, 94:13, 94:15
**Nine** [1] - 2:5
**nine** [6] - 200:7, 205:7, 240:20, 255:13, 255:18, 255:19
**NINE** [1] - 1:7
**nineteen** [1] - 244:17
**ninety** [2] - 240:19, 240:20
**ninety-eight** [1] - 240:19
**ninety-nine** [1] - 240:20
**NO** [1] - 1:8
**no,that's** [1] - 133:5
**no-show** [2] - 68:6
**nobody** [1] - 66:12
**none** [3] - 12:17, 13:7, 102:4
**nonsense** [2] - 12:16, 13:14
**normal** [2] - 6:1, 145:17
**note** [4] - 24:13, 115:20, 161:6, 173:3
**notes** [3] - 167:8, 167:9, 167:16
**nothing** [22] - 10:25, 11:22, 81:18, 94:13, 95:9, 117:2, 117:3, 119:25, 124:10, 133:13, 142:3, 179:23, 191:10, 194:25, 198:11, 198:12, 198:13, 205:13, 207:11, 208:8, 247:21, 257:24
**notice** [2] - 225:9, 228:6
**noticed** [2] - 203:10, 224:16
**November** [3] - 108:14, 109:1, 230:20
**nowhere** [1] - 229:7
**NS** [1] - 68:6
**nuisance** [2] - 178:8, 178:9
**number** [69] - 29:7, 37:19, 48:4, 51:23, 52:3, 52:7, 53:13, 53:14, 54:19, 56:22, 57:16, 57:24, 59:4, 59:10, 60:1, 61:7, 61:11, 61:12, 61:18, 61:19, 63:10, 65:2, 65:8, 65:9, 67:15, 68:4, 88:2, 107:10, 125:14, 138:12, 175:20, 176:23, 186:20, 188:17, 194:8, 196:1, 197:13, 212:8, 213:5, 213:7, 213:15, 214:9, 214:22, 217:24, 218:7, 220:7, 222:23, 226:24, 232:23, 233:19, 233:21, 235:3, 238:22, 239:5, 244:20, 245:18, 246:5, 249:1, 251:11, 254:12, 255:12, 255:17, 256:8, 256:11, 256:21, 258:6, 259:17, 261:8
**Number** [10] - 51:17, 68:3, 125:16, 129:2, 129:3, 130:7, 180:25, 181:1, 246:24, 252:12

**numbers** [16] - 15:7, 37:1, 46:19, 51:21, 55:17, 55:24, 60:10, 60:18, 69:25, 88:1, 95:14, 96:7, 141:23, 159:7, 186:7, 259:8
**numerous** [2] - 211:5, 212:1
**nuts** [1] - 80:12
**NY** [1] - 1:19

## O

**o'clock** [15] - 1:10, 31:21, 31:22, 53:17, 53:18, 67:11, 67:12, 86:22, 87:1, 94:7, 126:8, 145:23, 145:24, 159:23, 166:18
**o'SHEA** [2] - 199:2, 205:12
**O'SHEA** [92] - 1:18, 1:20, 2:14, 6:25, 17:6, 18:1, 18:8, 18:12, 18:14, 18:17, 19:13, 19:22, 20:7, 20:18, 20:21, 20:24, 21:22, 22:1, 22:5, 22:9, 22:19, 23:6, 23:25, 37:14, 39:2, 39:5, 45:21, 45:23, 45:25, 46:25, 47:10, 76:17, 81:15, 84:8, 91:2, 96:8, 100:3, 104:11, 104:15, 106:4, 106:5, 108:10, 119:14, 124:9, 132:2, 132:5, 133:12, 134:8, 134:19, 142:6, 150:2, 157:8, 175:1, 179:22, 182:2, 182:7, 186:15, 195:4, 195:7, 199:22, 199:25, 206:1, 206:20, 206:22, 207:10, 208:8, 212:21, 217:18, 225:20, 225:22, 225:24, 226:4, 226:7, 228:7, 229:5, 229:12, 230:3, 241:20, 242:14, 242:16, 242:23, 243:12, 244:1, 244:6, 262:5, 262:7, 263:9, 265:12, 266:5, 266:8, 266:14, 266:23
**O'Shea** [10] - 2:14, 2:18, 17:5, 22:8, 47:4, 71:5, 125:15, 157:6, 205:18, 229:3
**oath** [6] - 9:23, 16:18, 85:11, 99:15, 107:2, 229:10
**Obama** [4] - 79:14, 79:16, 79:20, 79:23
**object** [4] - 46:25, 76:17, 85:19, 108:4
**objected** [1] - 11:12
**objection** [35] - 24:23, 24:25, 25:2, 46:21, 47:4, 47:7, 81:15, 98:14, 102:14, 102:23, 103:3, 103:10, 103:25, 104:8, 104:24, 106:12, 107:7, 186:15, 206:1, 212:20, 217:18, 225:20, 225:22, 225:24, 225:25, 226:3, 241:20, 242:14, 242:15, 243:12, 244:1, 244:6, 262:5, 263:9
**Objection** [1] - 85:16
**objections** [2] - 134:20, 134:21
**objective** [1] - 218:8
**objects** [1] - 45:18
**obligation** [1] - 175:24
**observe** [4] - 70:21, 70:23, 71:8, 71:16
**obtain** [2] - 7:8, 190:20
**obtained** [21] - 7:2, 223:19, 227:18, 240:25, 247:8, 247:9, 247:12, 247:17, 247:19, 248:3, 248:8, 248:16, 248:22,

249:17, 250:15, 251:6, 252:21, 253:11,
255:6, 257:3, 262:22
  **obtaining** [1] - 128:2
  **obvious** [1] - 66:1
  **obviously** [7] - 17:22, 123:20, 228:19,
229:2, 236:6, 249:23, 258:17
  **occasion** [9] - 43:5, 43:24, 44:5, 46:4,
146:9, 203:9, 211:8, 240:21, 261:11
  **occasions** [7] - 11:10, 71:18, 109:7,
126:9, 151:8, 212:8, 224:24
  **occupation** [1] - 26:1
  **occur** [3] - 73:22, 173:10, 238:7
  **occurred** [4] - 88:20, 89:11, 227:12,
230:5
  **occurrence** [1] - 151:7
  **October** [10] - 20:12, 78:19, 133:10,
149:3, 150:7, 150:11, 150:21, 150:23,
222:6, 222:8
  **OF** [2] - 1:1, 1:11
  **offense** [1] - 34:15
  **offer** [10] - 6:10, 8:1, 14:25, 17:7, 17:9,
17:11, 17:14, 20:16, 212:9, 226:14
  **offered** [9] - 7:12, 19:14, 20:14, 26:11,
83:18, 83:21, 123:19, 204:24, 212:13
  **offering** [1] - 134:6
  **offers** [1] - 38:25
  **Office** [2] - 2:9, 212:4
  **office** [20] - 2:13, 4:20, 32:2, 36:12,
42:1, 42:3, 59:20, 61:4, 64:15, 69:6,
70:11, 71:11, 72:1, 72:18, 128:5, 166:8,
209:9, 209:21, 216:1
  **OFFICE** [1] - 1:14
  **Officer** [1] - 89:24
  **officer** [4] - 91:19, 135:15, 144:22,
201:7
  **officers** [2] - 162:22, 211:13
  **official** [2] - 7:24, 206:6
  **officials** [1] - 7:13
  **offing** [1] - 228:25
  **often** [8] - 122:7, 127:13, 136:19,
155:24, 184:16, 197:22, 199:14, 251:19
  **on-premises** [2] - 240:22, 241:17
  **once** [10] - 8:25, 35:3, 122:17, 134:17,
146:6, 150:4, 184:15, 194:9, 215:8,
255:22
  **ONE** [1] - 1:7
  **one** [123] - 3:5, 4:13, 4:22, 7:5, 7:25,
8:24, 9:6, 11:21, 13:21, 18:6, 18:20,
18:22, 19:1, 19:3, 22:16, 29:7, 38:18,
39:20, 40:1, 41:5, 41:19, 44:14, 44:17,
51:1, 54:1, 56:2, 59:16, 60:19, 64:19,
66:13, 69:23, 73:4, 73:16, 74:19, 76:3,
76:12, 76:24, 77:18, 82:12, 82:25,
88:15, 88:22, 90:2, 95:18, 99:25, 101:1,
109:3, 112:14, 120:18, 126:12, 126:14,
128:10, 131:2, 131:17, 132:13, 132:18,
133:18, 134:6, 134:7, 136:1, 139:4,
140:7, 143:24, 144:8, 146:7, 146:8,
148:12, 148:13, 151:2, 159:18, 160:24,
162:7, 172:21, 176:17, 176:23, 183:22,

183:24, 187:7, 187:13, 188:12, 189:4,
191:16, 193:23, 193:24, 196:11,
196:13, 207:16, 214:10, 216:12,
223:16, 223:17, 223:18, 226:16,
227:24, 229:23, 230:9, 231:20, 231:25,
232:4, 232:19, 232:24, 233:4, 233:19,
235:3, 235:10, 235:11, 237:22, 237:24,
239:7, 241:3, 242:5, 246:5, 246:20,
249:14, 249:25, 252:1, 262:25
  **One** [2] - 2:5, 60:17
  **one-on-one** [1] - 230:9
  **one-week** [1] - 76:12
  **ones** [4] - 66:3, 66:8, 237:18, 242:1
  **online** [1] - 162:5
  **oOo** [1] - 265:23
  **open** [9] - 28:18, 51:5, 133:10, 148:17,
160:2, 168:7, 168:10, 180:15, 259:18
  **opened** [7] - 4:7, 69:12, 135:13,
144:24, 145:2, 148:25, 155:15
  **opening** [5] - 2:19, 2:21, 2:23, 11:6,
11:10
  **operated** [1] - 240:23
  **operation** [1] - 28:16
  **operational** [3] - 88:4, 88:5, 144:21
  **operations** [2] - 28:13, 28:15
  **opine** [1] - 263:12
  **opinion** [5] - 226:15, 226:16, 259:2,
262:6, 263:23
  **opportunity** [1] - 228:17
  **opposite** [1] - 8:12
  **order** [11] - 5:16, 20:6, 20:20, 78:11,
79:8, 97:11, 117:14, 162:4, 190:20,
197:9, 231:6
  **orders** [2] - 143:9, 143:10
  **organization** [3] - 29:21, 130:24,
218:17
  **organize** [1] - 130:18
  **Organized** [1] - 210:12
  **organized** [2] - 130:16, 130:20
  **originally** [1] - 155:15
  **otherwise** [3] - 189:16, 237:24, 263:14
  **outside** [1] - 18:24
  **outsourcing** [1] - 24:4
  **outstanding** [2] - 117:20, 178:21
  **outwardly** [1] - 15:23
  **overages** [1] - 6:1
  **overrule** [1] - 47:7
  **overruled** [1] - 76:20
  **Overruled** [1] - 206:2
  **overseen** [1] - 211:21
  **overwhelming** [1] - 15:1
  **owe** [2] - 34:12, 78:23
  **owed** [9] - 34:5, 34:13, 80:15, 101:22,
115:15, 119:21, 173:20, 173:25, 194:14
  **owing** [1] - 197:10
  **own** [10] - 3:19, 11:19, 26:2, 81:11,
85:4, 98:10, 124:2, 201:22, 228:9,
243:23
  **owned** [5] - 143:25, 144:1, 146:22,
155:16, 201:2

  **owner** [25] - 27:17, 27:19, 29:17, 32:2,
32:14, 33:14, 34:3, 34:9, 35:10, 35:16,
36:2, 36:9, 36:12, 36:17, 37:3, 37:4,
68:22, 68:23, 69:1, 69:6, 70:13, 80:6,
80:11, 128:19, 135:20
  **owners** [14] - 4:3, 4:23, 29:8, 70:23,
71:19, 78:4, 109:3, 132:11, 135:19,
185:15, 201:3, 218:16, 244:25, 245:7
  **ownership** [5] - 28:1, 28:6, 28:9,
132:19, 155:2
  **owns** [3] - 18:18, 18:19, 177:17


# P

  **p.m** [4] - 28:19, 28:20, 31:18, 146:4
  **Pace** [1] - 142:11
  **page** [47] - 46:10, 47:11, 63:9, 63:12,
89:4, 90:5, 94:2, 97:9, 97:10, 100:9,
100:14, 110:2, 114:2, 116:7, 118:12,
118:14, 118:24, 125:17, 138:10,
138:14, 138:22, 141:14, 148:25,
149:16, 156:22, 157:10, 167:24,
167:25, 168:6, 168:7, 168:10, 168:25,
173:2, 174:15, 181:3, 186:1, 186:5,
186:6, 188:12, 198:16, 198:21, 219:22,
221:22, 233:9, 233:17, 239:12, 260:15
  **pages** [5] - 85:24, 96:4, 96:9
  **paid** [90] - 4:14, 4:17, 10:10, 10:22,
12:14, 13:19, 16:5, 29:18, 30:24, 33:11,
35:9, 36:7, 36:22, 37:3, 45:8, 45:9,
54:24, 55:1, 55:11, 55:12, 55:13, 55:20,
55:22, 56:8, 56:9, 56:16, 56:17, 56:18,
56:19, 57:9, 73:16, 73:17, 73:21, 74:1,
75:2, 75:16, 75:17, 76:7, 78:2, 79:1,
80:3, 103:12, 103:15, 103:16, 110:2,
110:11, 111:18, 111:19, 116:15,
127:13, 127:17, 127:22, 129:20,
129:23, 129:24, 139:17, 140:4, 140:9,
141:10, 159:8, 159:10, 161:14, 162:4,
162:22, 164:18, 165:16, 166:23, 178:5,
178:19, 178:25, 191:5, 191:7, 199:8,
204:7, 205:19, 205:25, 222:17, 240:10,
240:11, 242:9, 245:2, 245:3, 255:8,
257:5, 257:7, 258:2
  **painted** [2] - 11:25, 12:9
  **Palma** [4] - 105:5, 105:9, 105:13,
108:25
  **paper** [12] - 34:6, 35:7, 36:8, 42:16,
68:20, 68:23, 68:25, 69:1, 75:7, 167:18,
203:13
  **papers** [2] - 43:20, 71:14
  **paperwork** [2] - 43:2, 70:18
  **paralegal** [1] - 2:13
  **pardon** [5] - 108:10, 113:1, 132:24,
133:1, 143:15
  **parking** [1] - 174:8
  **part** [24] - 4:16, 12:19, 13:23, 14:2,
62:4, 97:19, 114:19, 132:19, 138:11,
145:16, 154:13, 160:12, 170:3, 172:20,

197:24, 214:9, 214:10, 214:15, 221:17, 223:21, 229:1, 234:9, 248:5, 261:11

**parted** [1] - 100:6

**partially** [1] - 173:8

**participated** [1] - 211:21

**particular** [22] - 38:9, 48:10, 48:12, 53:5, 59:16, 61:11, 89:2, 95:18, 104:18, 129:17, 187:13, 198:15, 210:4, 217:9, 227:16, 251:1, 252:25, 253:18, 255:10, 255:15, 256:8, 259:5

**particularly** [1] - 198:8

**particulars** [1] - 230:11

**parties** [6] - 18:9, 18:10, 133:23, 134:3, 208:7, 229:2

**partner** [5] - 17:10, 143:4, 144:19, 170:1, 172:20

**partners** [5] - 135:25, 144:10, 146:5, 158:22, 200:14

**PARTNERS** [1] - 1:18

**partnership** [2] - 200:12, 200:13

**partnerships** [1] - 183:19

**parts** [1] - 143:10

**Party** [1] - 54:13

**party** [2] - 54:15, 54:16

**past** [2] - 9:15, 178:15

**pat** [3] - 58:4, 99:7

**Pat** [42] - 22:19, 27:13, 27:15, 27:22, 43:3, 43:10, 44:1, 56:14, 71:2, 71:22, 74:10, 75:6, 75:19, 77:21, 78:14, 80:14, 81:2, 81:3, 86:3, 86:18, 86:23, 99:8, 101:10, 101:11, 115:12, 115:21, 116:11, 118:6, 120:8, 135:7, 184:19, 186:19, 187:1, 187:13, 187:24, 189:6, 190:20, 191:24, 193:8, 196:4, 203:20, 206:15

**Patricia** [6] - 2:17, 17:9, 21:14, 21:16, 135:5, 184:11

**patron** [1] - 14:9

**patrons** [2] - 70:5, 201:22

**pattern** [5] - 224:5, 224:19, 225:17, 264:2, 264:9

**patterns** [1] - 6:14

**Pause** [2] - 190:6, 198:19

**pause** [5] - 93:19, 100:1, 105:25, 168:22, 170:25

**pay** [54] - 29:14, 30:1, 30:13, 30:25, 31:1, 31:5, 31:7, 31:10, 31:11, 31:13, 35:1, 55:16, 55:23, 56:14, 56:15, 56:24, 57:10, 73:18, 75:14, 76:24, 77:3, 80:5, 80:15, 80:22, 81:7, 86:5, 101:23, 103:8, 104:22, 109:9, 110:11, 110:13, 110:14, 111:1, 129:10, 139:18, 145:15, 145:20, 151:19, 158:20, 161:20, 163:16, 165:17, 173:13, 173:20, 174:2, 178:14, 189:6, 189:21, 201:5, 201:23, 253:17

**payable** [1] - 142:16

**paycheckcity.com** [1] - 186:24

**paychecks** [1] - 158:21

**paying** [21] - 5:7, 36:19, 42:10, 45:7, 73:5, 73:9, 73:11, 74:3, 77:18, 77:19,

78:25, 96:24, 110:9, 111:13, 113:13, 139:20, 158:24, 163:19, 178:7, 261:8

**payment** [6] - 29:24, 30:12, 73:6, 73:15, 75:17, 130:21

**payments** [8] - 36:20, 73:7, 75:18, 77:22, 78:24, 79:1, 98:6, 189:3

**payroll** [60] - 4:1, 4:3, 4:15, 5:8, 5:10, 5:11, 5:13, 6:16, 13:3, 29:2, 73:14, 74:13, 76:22, 141:9, 141:10, 162:11, 162:13, 162:18, 162:20, 162:21, 162:23, 163:3, 163:5, 163:6, 164:1, 183:18, 184:4, 186:18, 187:3, 187:18, 187:21, 187:23, 188:15, 188:20, 189:1, 189:10, 198:1, 198:8, 245:1, 245:22, 246:15, 246:16, 257:2, 257:5, 257:7, 257:19, 257:23, 258:2, 258:5, 258:9, 258:14, 258:19, 259:25, 260:2, 260:4, 260:5, 261:4, 261:8, 262:19, 263:20

**Payroll** [1] - 163:2

**pencil** [2] - 87:25, 88:2

**pending** [2] - 104:12, 179:16

**penny** [1] - 6:3

**people** [27] - 10:20, 18:2, 22:7, 29:13, 30:7, 34:13, 55:13, 70:1, 75:25, 94:12, 94:15, 96:24, 161:14, 161:15, 161:17, 161:19, 163:19, 173:14, 178:5, 201:4, 218:4, 218:9, 220:7, 241:14, 245:2, 245:3, 245:5

**Per** [1] - 175:16

**per** [19] - 3:15, 5:2, 5:12, 33:13, 33:22, 116:14, 136:21, 136:22, 247:16, 248:7, 249:3, 253:13, 254:13, 255:1, 256:9, 256:10, 256:22, 257:23, 258:2

**percent** [15] - 18:18, 28:5, 28:8, 28:10, 133:3, 135:16, 135:17, 135:20, 145:7, 193:17, 194:7, 194:8, 197:13, 240:20, 259:23

**percentage** [5] - 179:3, 193:11, 193:13, 193:20, 194:3

**percentages** [1] - 254:2

**perform** [2] - 184:17, 217:14

**performance** [1] - 131:8

**performing** [1] - 136:7

**perhaps** [2] - 22:6, 250:4

**period** [41] - 3:15, 9:21, 16:17, 16:19, 20:13, 26:15, 26:18, 28:16, 31:11, 39:12, 45:14, 69:10, 73:25, 74:1, 76:11, 76:12, 86:17, 111:6, 149:2, 165:9, 178:8, 179:16, 185:5, 194:6, 197:14, 197:19, 213:24, 224:7, 224:10, 224:20, 231:16, 234:16, 237:21, 246:22, 248:21, 248:25, 254:7, 254:9, 255:4, 256:17, 258:24

**permission** [1] - 138:7

**permit** [9] - 9:14, 9:17, 9:18, 16:16, 16:20, 154:10, 154:12, 154:13, 154:14

**perpetrated** [1] - 5:22

**person** [25] - 20:2, 23:1, 48:25, 49:3, 55:9, 56:8, 58:5, 58:18, 70:9, 76:6, 76:7, 76:24, 77:6, 77:10, 77:14, 77:16,

153:18, 153:19, 160:3, 161:8, 162:12, 162:16, 214:10

**personal** [4] - 79:11, 109:9, 118:9, 124:2

**personally** [3] - 128:18, 240:10, 240:20

**personnel** [1] - 7:15

**pertain** [2] - 130:8

**pertaining** [1] - 131:11

**perusing)** [1] - 145:9

**ph** [2] - 44:14, 131:22

**phase** [1] - 240:25

**phone** [7] - 99:22, 99:23, 100:7, 101:21, 191:1, 191:14, 195:14

**photocopied** [1] - 94:2, 95:7

**photocopies** [3] - 42:13, 95:13, 245:9

**physical** [4] - 154:21, 203:6, 244:4, 244:5

**physically** [6] - 16:10, 61:3, 143:13, 145:4, 153:22, 158:3

**pick** [4] - 4:23, 43:19, 130:11, 264:18

**picture** [3] - 12:1, 12:10

**piece** [7] - 34:6, 35:7, 36:8, 68:20, 68:23, 69:1, 216:22

**pieces** [1] - 42:16

**pipe** [11] - 42:24, 71:11, 71:14, 71:22, 72:15, 72:16, 72:17, 72:20, 91:7, 91:8

**pistol** [1] - 154:10

**place** [14] - 3:14, 22:21, 72:8, 72:13, 109:5, 109:6, 109:8, 110:21, 129:22, 133:10, 227:15, 228:20, 241:6, 264:3

**placed** [7] - 105:12, 105:19, 106:8, 106:10, 110:19, 111:4, 129:23

**placement** [1] - 129:17

**placing** [4] - 105:10, 107:25, 109:5, 111:12

**plaintiff** [2] - 19:11, 22:18

**Plaintiff** [2] - 1:4, 1:14

**Plaintiff's** [3] - 130:2, 138:11, 181:1

**Plainview** [1] - 182:24

**planning** [1] - 109:8

**playing** [1] - 164:17

**Plaza** [1] - 1:24

**PLAZA** [1] - 1:15

**plugged** [1] - 72:11

**plus** [3] - 61:15, 168:3, 168:4

**pm** [1] - 160:14

**pocketing** [1] - 104:7

**point** [26] - 68:12, 69:13, 82:21, 84:13, 94:2, 112:16, 149:12, 160:24, 161:1, 172:23, 191:24, 193:24, 196:5, 196:6, 196:13, 196:14, 196:17, 196:18, 215:15, 227:4, 229:3, 235:16, 237:10, 244:12, 264:4, 265:7

**Point** [4] - 27:6, 27:8, 144:17, 170:2

**pointed** [1] - 242:24

**points** [3] - 47:9, 138:2, 196:12

**Police** [1] - 89:23

**police** [2] - 9:19, 91:19

policies [3] - 145:12, 261:12, 261:14
policy [5] - 114:16, 131:3, 131:11, 262:1, 262:12
polishing [1] - 143:23
politics [1] - 79:24
Pollak [11] - 7:2, 7:12, 7:14, 8:7, 9:23, 10:13, 11:2, 12:1, 12:7, 16:19, 17:3
pop [3] - 185:13, 198:6, 198:9
portion [15] - 5:8, 50:18, 66:17, 66:21, 149:4, 164:19, 165:6, 165:15, 191:11, 214:13, 214:19, 231:23, 235:14, 261:9
portions [3] - 6:5, 48:12, 58:13
position [12] - 23:19, 23:23, 27:16, 79:23, 143:18, 177:16, 177:17, 179:12, 209:6, 209:11, 209:13, 209:18
positions [3] - 27:21, 209:4, 210:8
possession [3] - 94:17, 94:20, 94:23
possibility [1] - 265:12
possible [3] - 12:2, 163:16, 163:17
possibly [1] - 39:22
post [1] - 167:22
Post [5] - 108:22, 161:6, 167:7, 167:9, 167:16
Post-it [4] - 161:6, 167:7, 167:9, 167:16
posted [1] - 235:12
Potenza [185] - 2:16, 2:17, 3:23, 4:9, 4:22, 5:16, 6:4, 7:4, 7:16, 7:24, 8:10, 8:14, 8:17, 8:22, 9:5, 9:6, 9:13, 10:2, 11:12, 11:15, 11:21, 13:18, 14:7, 14:10, 15:6, 15:20, 15:21, 16:10, 16:24, 17:8, 17:9, 18:12, 18:18, 18:19, 21:14, 21:16, 22:17, 22:19, 27:13, 27:15, 27:20, 27:23, 28:3, 30:8, 30:11, 31:9, 34:5, 38:7, 38:17, 39:19, 39:21, 39:24, 40:13, 41:16, 43:1, 43:3, 43:10, 43:13, 44:1, 45:4, 49:5, 56:14, 58:4, 58:7, 58:15, 61:25, 64:9, 64:10, 66:23, 68:1, 68:11, 70:17, 71:1, 71:6, 71:9, 71:21, 71:22, 72:2, 74:7, 74:10, 74:22, 75:6, 75:19, 76:14, 76:21, 77:13, 77:14, 77:21, 78:14, 78:25, 79:2, 79:12, 79:22, 80:14, 81:12, 81:17, 82:4, 82:5, 86:4, 86:18, 86:23, 87:5, 88:9, 90:1, 95:1, 97:11, 99:18, 99:21, 100:5, 101:10, 101:11, 104:3, 115:12, 115:21, 116:11, 116:15, 117:9, 118:6, 118:23, 119:5, 119:17, 119:19, 119:20, 120:8, 120:13, 122:7, 122:22, 123:5, 133:17, 133:19, 134:13, 135:5, 135:17, 136:2, 142:7, 143:20, 143:22, 143:25, 144:4, 144:8, 144:11, 148:25, 173:5, 175:18, 180:19, 182:3, 184:12, 184:15, 185:9, 185:22, 187:25, 190:20, 191:4, 191:17, 196:7, 198:2, 202:8, 203:20, 206:15, 223:18, 224:22, 225:18, 227:16, 227:20, 227:25, 228:5, 228:16, 228:21, 233:20, 238:12, 238:19, 238:21, 238:22, 240:13, 240:19, 241:6, 248:10, 265:14
Potenza's [10] - 9:9, 14:15, 14:17,

16:15, 17:20, 27:16, 28:6, 49:13, 115:13, 120:21
practice [21] - 5:7, 21:2, 21:6, 21:13, 21:18, 39:6, 39:15, 49:15, 50:19, 50:23, 63:23, 64:7, 65:12, 67:21, 69:3, 70:10, 71:16, 74:6, 87:3, 127:6, 205:10
practices [8] - 8:19, 8:21, 9:9, 21:24, 68:14, 73:14, 80:22, 245:1
pre [1] - 126:1
pre-total [1] - 126:1
preceding [1] - 61:22
precisely [1] - 9:21
precision [1] - 259:1
predecessor [1] - 183:11
predominantly [1] - 6:15
premise [1] - 174:5
premises [11] - 10:6, 14:5, 86:24, 101:15, 131:5, 131:8, 164:13, 201:17, 240:8, 240:22, 241:17
preparation [2] - 171:15, 231:9
prepare [7] - 183:18, 183:19, 184:25, 185:6, 185:10, 187:2, 188:5, 188:15, 188:20, 200:13, 206:4, 230:24, 231:7, 232:15, 246:4
prepared [28] - 5:4, 5:9, 8:3, 18:6, 19:8, 38:6, 188:10, 232:3, 245:6, 246:2, 246:5, 246:6, 246:8, 246:12, 246:19, 247:3, 248:10, 248:19, 251:2, 252:10, 252:16, 252:19, 254:23, 256:5, 256:16, 257:4, 257:11, 258:22
preparing [4] - 186:17, 247:6, 256:1, 258:19
preponderance [1] - 3:6
present [5] - 22:17, 22:18, 24:10, 112:18, 216:21
Present [1] - 1:21
presentation [3] - 14:1, 23:13, 23:20
presented [8] - 8:7, 10:21, 11:1, 16:18, 38:24, 88:7, 204:4
presently [1] - 25:15
preservation [1] - 134:6
preserved [2] - 134:20, 134:22
president [4] - 7:16, 27:22, 27:24, 143:19
President [3] - 79:14, 79:16, 79:19
pretrial [9] - 12:18, 19:6, 20:6, 20:20, 21:10, 37:12, 133:22, 134:3, 134:21
pretty [7] - 63:1, 91:22, 117:8, 158:25, 185:5, 198:9, 265:15
prevent [2] - 83:24, 117:14
previous [3] - 147:7, 253:9, 259:11
previously [5] - 37:19, 125:4, 131:19, 131:21, 263:17
price [1] - 179:6
prices [1] - 179:4
primarily [2] - 162:17, 209:15, 216:21
primary [7] - 28:11, 162:13, 209:14, 209:25, 213:10, 217:25, 218:12
Primes [1] - 23:7
Primus [2] - 208:24, 209:1

principals [5] - 5:21, 73:1, 224:12, 244:17, 260:8
print [4] - 87:23, 87:24, 160:25, 161:3
printed [2] - 87:15, 161:3
Prisand [2] - 183:8, 183:10
private [10] - 4:14, 7:6, 7:23, 18:4, 22:22, 24:2, 29:23, 32:17, 221:12, 221:17
privilege [2] - 24:19, 191:8
probable [1] - 163:17
problem [8] - 38:16, 71:23, 78:14, 80:10, 81:2, 88:5, 127:16
problems [2] - 69:16, 172:8
procedures [1] - 20:11
proceed [3] - 2:23, 51:10, 85:22
Proceedings [1] - 2:2
proceedings [1] - 265:21
process [6] - 19:17, 55:21, 59:19, 73:22, 74:13, 143:12
produce [9] - 40:10, 88:9, 121:1, 121:3, 121:5, 121:6, 121:7, 204:7, 204:13
produced [6] - 2:3, 41:22, 89:3, 89:11, 89:19, 245:16
professional [1] - 211:14
professionally [1] - 205:9
profit [3] - 14:10, 135:24, 179:2
profitable [1] - 130:25
profits [1] - 145:7
program [3] - 185:2, 189:7, 189:10
progressed [1] - 244:11
progresses [1] - 159:4
projected [1] - 258:11
prominently [2] - 8:7, 16:18
promissory [1] - 173:3
proper [2] - 42:11, 97:12
properly [4] - 9:11, 145:20, 166:23, 241:4
propose [1] - 194:4
propounded [1] - 21:10
proprietor [1] - 3:23
prosecuted [1] - 124:3
protect [2] - 82:18, 84:23
provide [12] - 137:12, 137:15, 170:13, 184:2, 186:24, 186:25, 188:3, 190:23, 209:2, 209:14, 211:8, 215:6
provided [24] - 5:15, 85:1, 126:19, 126:23, 127:4, 127:19, 128:7, 170:12, 185:21, 187:12, 187:25, 188:16, 211:11, 211:16, 245:8, 245:9, 245:13, 245:20, 245:23, 254:24, 260:2, 260:6, 260:7, 260:11
provides [3] - 23:4, 185:9, 188:2
PRP [155] - 3:2, 3:18, 3:21, 4:3, 4:9, 5:1, 5:2, 5:21, 6:2, 6:12, 7:4, 7:16, 7:17, 8:5, 10:9, 12:13, 13:21, 14:10, 14:13, 15:1, 18:11, 21:3, 22:6, 26:5, 27:11, 27:12, 28:11, 29:1, 30:16, 42:1, 56:6, 73:2, 73:6, 73:18, 78:6, 78:15, 79:25, 80:13, 82:20, 84:1, 94:21, 94:24, 98:7,

104:3, 116:2, 117:23, 118:5, 118:7,
118:20, 121:14, 121:22, 122:8, 122:11,
127:22, 131:3, 131:9, 135:10, 135:21,
136:2, 137:4, 143:13, 145:1, 145:10,
147:12, 148:6, 148:10, 149:4, 152:8,
153:14, 153:15, 153:16, 154:12,
154:20, 154:24, 156:10, 158:10,
158:18, 158:25, 159:9, 159:13, 162:11,
163:19, 165:5, 170:2, 171:5, 173:9,
175:6, 177:4, 177:23, 178:15, 179:18,
180:22, 181:8, 183:22, 184:2, 184:11,
184:18, 185:12, 186:18, 191:6, 195:19,
196:25, 200:10, 200:11, 201:3, 201:17,
201:20, 203:18, 204:6, 205:8, 206:6,
206:11, 222:4, 222:10, 223:17, 223:20,
225:9, 227:20, 228:4, 230:19, 231:15,
233:22, 234:19, 238:14, 238:20,
240:22, 240:25, 242:7, 242:8, 242:21,
243:18, 244:16, 245:13, 245:22,
245:25, 247:9, 247:19, 248:24, 252:23,
256:14, 257:15, 258:3, 258:14, 259:24,
260:2, 260:8, 261:5, 261:12, 261:23,
262:23, 263:6, 263:24, 264:3
   **PRP's** [8] - 3:13, 3:19, 73:14, 150:21,
162:20, 198:8, 242:2, 242:12
   **PRPs** [1] - 28:16
   **PSP** [15] - 143:6, 143:7, 143:14,
143:16, 143:21, 144:1, 144:3, 144:8,
144:9, 144:10, 144:11, 149:5, 152:9,
153:15, 153:17
   **Pub** [6] - 155:5, 155:19, 155:21, 170:3,
200:24, 201:2
   **pub** [1] - 155:9
   **Pub's** [1] - 201:12
   **pull** [3] - 44:1, 134:18, 182:11
   **pulled** [4] - 6:3, 65:15, 65:19, 249:20
   **pulling** [2] - 5:23, 143:10
   **purchase** [2] - 162:10, 201:5
   **purchases** [1] - 155:18
   **purportedly** [1] - 153:5
   **purports** [1] - 228:19
   **purpose** [16] - 42:10, 96:24, 155:21,
156:11, 194:4, 213:10, 214:2, 214:3,
218:10, 218:12, 218:19, 226:18, 231:9,
231:11, 234:3, 265:6
   **purposes** [4] - 42:10, 148:19, 216:10,
253:4
   **purse** [2] - 43:20, 71:15
   **pursuant** [2] - 19:5, 133:21
   **push** [1] - 212:22
   **put** [46] - 14:13, 17:21, 43:20, 49:4,
49:5, 50:21, 50:22, 52:25, 54:16, 57:10,
58:4, 58:7, 63:25, 66:25, 67:19, 68:8,
68:10, 70:12, 71:15, 74:17, 75:4, 75:8,
77:11, 77:16, 97:9, 110:16, 114:17,
114:21, 114:22, 121:17, 125:25,
148:24, 160:24, 167:5, 168:2, 169:9,
185:6, 188:23, 194:14, 201:21, 213:9,
215:15, 228:6, 229:14, 232:21, 240:8
   **putting** [4] - 13:18, 64:7, 220:17,

263:18

**Q**

   **qualified** [1] - 212:15
   **quarter** [1] - 58:9
   **quarterly** [4] - 187:2, 187:3, 188:5,
188:14
   **Queens** [7] - 8:15, 9:4, 10:19, 13:23,
26:20, 135:9, 155:16
   **questioned** [3] - 225:18, 239:3, 240:15
   **questioning** [1] - 128:13
   **questions** [18] - 13:2, 52:13, 92:1,
98:6, 98:25, 99:17, 104:17, 141:19,
146:17, 157:25, 184:22, 185:24,
190:21, 195:17, 205:15, 207:12, 228:9,
262:25
   **Quick** [5] - 184:9, 185:3, 187:2, 202:12
   **quick** [2] - 46:10, 141:19
   **quickly** [1] - 82:22
   **quit** [10] - 99:6, 99:7, 99:21, 99:23,
100:4, 100:6, 101:1, 101:4, 101:6
   **quite** [4] - 34:12, 45:11, 66:1, 159:5

**R**

   **radar** [6] - 3:21, 13:11, 16:6, 218:23,
219:21
   **radio** [1] - 145:14
   **raise** [3] - 4:5, 13:13, 25:6
   **raised** [1] - 47:8
   **range** [6] - 238:13, 256:18, 257:8,
257:16, 258:13, 259:4
   **ranging** [1] - 224:6
   **rank** [2] - 29:6, 243:4
   **rather** [4] - 169:9, 201:6, 204:14,
204:16
   **raw** [2] - 185:5, 188:2
   **re** [1] - 120:8
   **Re** [1] - 176:13
   **reach** [1] - 71:14
   **reaches** [1] - 215:13
   **read** [2] - 106:5, 106:7
   **ready** [1] - 93:17
   **real** [1] - 46:10
   **Reale** [7] - 21:14, 21:16, 27:15, 27:20,
27:23, 71:1, 135:20
   **really** [11] - 14:3, 17:3, 21:3, 66:7,
134:1, 170:9, 174:5, 197:23, 197:24,
198:12, 216:23, 237:17, 237:22,
242:18, 247:25, 251:18, 263:10
   **realm** [1] - 197:8
   **reason** [13] - 3:22, 16:11, 42:8, 61:11,
94:11, 121:17, 151:24, 186:13, 217:25,
218:10, 218:20, 219:15
   **reasons** [8] - 39:20, 217:22, 217:24,
218:4, 218:8, 239:7, 263:16, 263:18
   **rebut** [1] - 21:25

   **rebuttal** [8] - 19:15, 20:8, 20:10, 20:14,
20:16, 20:17, 20:18, 21:7
   **rebutting** [1] - 20:23
   **receipt** [7] - 42:25, 69:20, 69:22,
69:24, 129:10, 140:12, 162:4
   **receipts** [9] - 3:25, 4:3, 4:19, 21:18,
30:2, 43:3, 43:6, 206:24, 206:25
   **receive** [10] - 128:17, 129:16, 150:25,
153:5, 154:6, 165:5, 167:1, 187:14,
211:1, 226:15
   **received** [35] - 4:17, 8:5, 8:7, 8:8, 8:14,
8:18, 9:16, 71:25, 73:1, 82:24, 82:25,
98:6, 103:5, 103:9, 103:17, 129:11,
139:2, 145:7, 149:8, 150:4, 152:11,
154:7, 164:19, 165:16, 166:15, 167:3,
167:25, 187:24, 190:19, 206:23,
206:25, 211:4, 211:24, 212:1, 237:1
   **receives** [1] - 14:8
   **receiving** [3] - 33:25, 130:21, 202:15
   **recently** [1] - 213:7
   **recess** [4] - 51:4, 124:18, 180:12,
180:14
   **reclassify** [1] - 20:17
   **recognize** [21] - 37:22, 38:1, 48:7,
63:12, 152:4, 153:2, 153:3, 161:25,
171:1, 171:2, 175:12, 176:8, 187:9,
203:13, 230:15, 232:10, 247:2, 252:14,
254:19
   **recollection** [2] - 19:25, 41:11
   **recommendation** [2] - 204:18, 204:21
   **recommended** [3] - 178:11, 178:12,
235:18
   **reconcile** [2] - 202:11, 249:21
   **reconciliation** [1] - 202:22
   **reconciling** [2] - 202:15, 202:16
   **reconvene** [1] - 180:8
   **record** [40] - 2:7, 3:16, 4:16, 17:11,
24:14, 35:17, 35:19, 36:13, 39:23,
40:15, 40:17, 45:12, 45:13, 50:23,
65:12, 65:25, 68:13, 69:18, 70:9, 73:1,
89:3, 89:12, 120:19, 135:3, 138:4,
169:11, 171:21, 182:12, 183:15, 184:8,
245:22, 247:12, 248:16, 250:7, 252:3,
256:14, 258:16, 260:5
   **Record** [1] - 106:7
   **recorded** [10] - 2:2, 12:12, 15:12,
35:24, 68:15, 162:23, 169:18, 202:20,
244:24, 246:21
   **recording** [3] - 5:23, 162:17, 260:13
   **records** [119] - 5:6, 5:19, 5:20, 6:3, 6:6,
7:8, 10:17, 21:1, 36:4, 38:20, 39:23,
43:14, 43:23, 44:13, 46:15, 47:1, 47:5,
47:6, 69:2, 69:4, 70:11, 70:16, 70:22,
70:24, 71:6, 72:24, 77:22, 78:1, 82:16,
85:25, 86:8, 88:23, 97:20, 98:1, 98:2,
105:2, 121:4, 121:7, 121:12, 121:18,
121:20, 137:4, 164:1, 166:22, 171:4,
184:17, 186:18, 187:15, 189:1, 206:15,
206:16, 216:24, 219:12, 222:14,
222:22, 223:19, 224:3, 225:8, 230:25,

233:23, 234:1, 234:2, 235:2, 235:7, 240:25, 241:1, 241:2, 241:5, 241:23, 243:3, 243:10, 245:6, 245:13, 245:16, 245:23, 245:24, 246:17, 246:22, 247:17, 248:1, 248:3, 248:8, 248:22, 248:24, 249:4, 249:12, 249:17, 250:2, 250:14, 251:6, 251:16, 252:2, 252:21, 253:22, 253:25, 254:12, 255:6, 256:6, 256:7, 256:13, 257:2, 259:4, 259:5, 260:2, 260:4, 260:6, 260:7, 260:11, 261:2, 262:17, 262:21, 262:23, 263:5, 263:22, 263:23

**RECROSS** [4] - 132:4, 206:21, 266:7, 266:22

redirect [5] - 124:11, 125:7, 125:8, 179:25, 205:14

**REDIRECT** [4] - 180:17, 205:16, 266:15, 266:20

reduction [1] - 163:2

refer [1] - 43:22

referenced [2] - 203:20, 231:1

referred [7] - 78:16, 183:17, 184:21, 210:12, 215:11, 243:20, 254:21

referring [6] - 53:20, 80:20, 81:12, 82:3, 227:17, 250:12

refinance [1] - 78:11

reflect [13] - 5:2, 49:2, 50:2, 55:3, 58:22, 59:1, 60:6, 104:18, 151:4, 202:23, 207:4, 228:15, 229:8

reflected [51] - 5:10, 5:11, 5:24, 50:18, 52:22, 54:21, 55:1, 67:24, 68:17, 68:18, 68:19, 74:21, 126:20, 127:20, 128:7, 129:15, 129:17, 130:7, 139:23, 186:9, 215:4, 217:2, 241:4, 241:25, 242:11, 242:21, 243:9, 243:14, 245:19, 245:21, 245:24, 246:17, 250:1, 250:7, 250:10, 250:14, 251:6, 251:14, 251:15, 252:3, 252:9, 255:25, 256:4, 256:14, 257:5, 257:18, 258:5, 259:14, 260:10

reflecting [3] - 6:6, 157:16, 248:14

reflective [4] - 93:14, 157:19, 162:9, 245:14

reflects [8] - 41:16, 57:8, 58:3, 64:4, 137:9, 162:10, 163:3, 168:25

refrain [1] - 81:13

refresh [1] - 41:11

refrigerator [5] - 72:4, 72:6, 72:7, 72:9, 72:21

refuse [1] - 11:13

refused [2] - 119:20

Reg [1] - 65:2

Reg.Tape [4] - 50:16, 51:19, 52:6, 54:12

regard [8] - 24:19, 73:15, 128:15, 215:3, 225:15, 237:9, 241:17, 262:17

regarding [5] - 145:21, 173:13, 223:20, 227:25, 228:5

regardless [2] - 5:17, 237:3

regards [1] - 223:19

register [108] - 4:17, 5:23, 6:2, 29:11,

31:25, 32:1, 35:13, 35:15, 35:18, 35:20, 38:4, 38:6, 39:16, 40:7, 40:18, 40:21, 40:25, 41:3, 41:4, 41:8, 41:13, 41:15, 41:16, 41:17, 41:18, 41:22, 42:7, 42:9, 42:17, 42:18, 49:18, 50:13, 50:17, 50:20, 52:16, 52:17, 52:20, 53:7, 54:5, 58:17, 63:15, 63:24, 65:5, 65:17, 69:7, 69:10, 69:13, 69:15, 69:18, 69:20, 69:22, 82:13, 87:11, 87:14, 87:17, 87:18, 87:22, 87:23, 88:3, 88:9, 88:12, 88:19, 88:20, 89:10, 95:25, 97:11, 126:1, 139:12, 159:11, 160:2, 160:19, 160:20, 160:21, 160:24, 162:4, 162:7, 162:10, 167:7, 167:18, 167:19, 168:3, 247:8, 247:18, 248:1, 248:2, 249:10, 249:11, 249:15, 249:19, 250:3, 250:6, 250:8, 250:11, 250:15, 250:25, 251:1, 251:3, 251:4, 251:8, 251:16, 251:25, 259:13

register,and [1] - 35:15

registered [2] - 6:4, 40:10

registers [21] - 4:12, 35:11, 51:25, 53:2, 53:3, 53:5, 53:6, 54:8, 60:13, 61:9, 62:14, 63:20, 68:19, 159:13, 159:18, 159:21, 159:24, 167:17, 167:18, 249:20

regular [4] - 94:5, 216:17, 216:20, 220:18

reimburse [1] - 110:12

reimbursed [3] - 109:12, 129:11, 129:14

reimbursement [1] - 173:21

related [5] - 129:6, 223:12, 233:3, 264:6

relating [2] - 130:3, 226:7

relation [4] - 63:17, 228:22, 228:23, 244:14

relationship [3] - 79:11, 82:20, 169:22

relative [11] - 63:3, 69:25, 82:20, 188:16, 235:4, 241:23, 242:12, 243:10, 252:6, 254:2, 260:1

relatively [1] - 185:15

relayed [1] - 227:23

release [1] - 177:18

released [1] - 175:24

relevant [9] - 127:16, 127:21, 216:19, 234:25, 244:18, 246:22, 248:25, 258:3, 258:24

relied [3] - 206:14, 233:23, 253:25

relief [1] - 19:16

remain - 18:22

remained [1] - 225:12

remember [9] - 66:13, 124:15, 191:20, 192:9, 197:6, 205:20, 205:21, 228:13, 228:21

remembered [1] - 93:6

remote [1] - 8:4

removal [1] - 187:13

removed [3] - 134:4, 250:8, 251:5

render [1] - 200:14

renewal [3] - 9:14, 9:18, 16:20

repay [1] - 173:7

repeat [2] - 96:6, 199:11

Repetti [11] - 136:15, 169:15, 169:22, 170:5, 183:3, 183:5, 183:6, 183:9, 183:11, 260:2, 260:11

replaced [1] - 162:6

report [20] - 3:9, 35:14, 80:17, 80:18, 80:19, 100:5, 101:19, 115:18, 116:22, 123:16, 160:25, 161:2, 166:12, 166:13, 166:14, 175:2, 175:6, 207:24, 213:18, 213:19

reported [14] - 12:13, 13:12, 14:6, 16:3, 16:4, 17:4, 175:8, 198:1, 198:2, 199:6, 219:15, 241:5

Reporter [1] - 1:24

reporting [9] - 4:2, 3:11, 169:21, 198:8, 211:2, 212:6, 212:14, 219:3, 227:19

reports [3] - 3:10, 4:4, 213:15

represent [8] - 55:15, 57:22, 65:10, 139:12, 139:17, 141:17, 191:3, 233:16

representation - 254:1

representative [5] - 18:22, 22:16, 136:17, 210:11, 227:14

represented [3] - 138:21, 181:10, 257:18

representing [3] - 24:14, 85:2, 114:8

represents [13] - 52:2, 59:5, 64:22, 64:24, 138:19, 138:25, 139:6, 140:11, 140:16, 141:2, 141:4, 141:7, 233:6

request [1] - 219:11

requested [6] - 8:14, 9:12, 9:13, 190:15, 222:9, 222:11

require [1] - 7:17

required [6] - 3:11, 199:15, 213:19, 214:5, 214:6, 230:6

requirement [3] - 7:18, 10:4, 13:11

requirements [2] - 207:24, 227:19

rerun [1] - 187:17

resolve [1] - 178:6

resolved [3] - 178:7, 178:20, 179:11

respect [53] - 19:16, 21:3, 27:20, 28:6, 29:5, 30:16, 31:15, 32:3, 32:7, 33:21, 34:4, 34:25, 35:11, 53:13, 55:6, 55:10, 55:21, 56:1, 58:9, 64:7, 64:16, 66:17, 67:2, 67:21, 68:13, 69:2, 69:3, 69:7, 70:10, 71:8, 74:13, 74:22, 75:20, 76:6, 76:21, 126:5, 126:18, 127:3, 129:9, 129:16, 133:20, 146:13, 147:23, 164:13, 166:6, 214:23, 223:10, 234:7, 245:10, 249:9, 253:23, 259:7, 259:25

respective [1] - 259:21

respond [1] - 176:15

responds [1] - 120:13

response [7] - 21:13, 83:12, 98:5, 102:4, 120:21, 192:14, 192:15

responsibilities [7] - 28:12, 131:9, 136:2, 136:7, 184:17, 209:13, 209:23

responsibility [5] - 43:5, 73:5, 162:13,

209:14, 209:25
**responsible** [5] - 29:15, 33:25, 36:19, 55:24, 162:17
**responsive** [1] - 76:18
**rest** [1] - 111:10
**Restaurant** [19] - 3:2, 7:4, 26:5, 78:15, 135:10, 144:17, 149:5, 153:14, 153:15, 153:16, 154:13, 154:20, 170:2, 183:22, 222:4, 222:10, 223:17, 230:19, 233:22
**restaurant** [5] - 14:3, 122:11, 145:11, 152:8, 204:6
**result** [11] - 9:16, 14:15, 196:19, 204:9, 213:14, 216:1, 232:16, 241:14, 242:5, 242:8, 253:11
**resumed** [2] - 15:21, 125:5
**retired** [5] - 6:8, 23:16, 89:23, 91:19, 143:3
**return** [3] - 17:18, 17:20, 188:13
**returned** [1] - 194:20
**returning** [1] - 49:22
**returns** [15] - 171:18, 183:18, 183:19, 184:4, 184:5, 184:6, 185:7, 185:10, 187:3, 188:6, 188:10, 188:13, 188:15, 245:25
**reveal** [2] - 5:20, 261:25
**reveals** [1] - 5:12
**Revenue** [1] - 2:12
**revenue** [30] - 6:2, 30:16, 30:17, 32:3, 34:25, 50:6, 63:16, 63:20, 68:15, 130:21, 201:12, 210:1, 220:18, 220:21, 241:3, 244:22, 246:7, 246:9, 246:14, 247:4, 247:15, 249:7, 251:19, 252:9, 252:17, 256:19, 258:23, 259:20, 259:24
**revenues** [5] - 5:22, 35:21, 37:5, 185:19, 220:15
**reversed** [1] - 196:22
**review** [25] - 215:17, 222:14, 222:22, 223:21, 224:2, 230:25, 231:18, 231:22, 232:16, 235:6, 235:14, 240:21, 241:9, 245:16, 246:1, 260:1, 261:12, 261:14, 261:18, 261:22, 262:16, 263:5, 263:19, 263:22, 263:23
**reviewed** [21] - 211:21, 222:15, 222:16, 222:17, 223:19, 223:23, 223:24, 223:25, 226:11, 231:6, 231:19, 233:24, 241:2, 241:23, 243:11, 243:22, 244:3, 246:10, 260:4
**reviewing** [4] - 207:13, 216:23, 225:8, 226:11
**revisit** [1] - 226:13
**reward** [2] - 123:24, 211:24
**rewards** [1] - 212:2
**rewritten** [1] - 19:18
**Riali's** [1] - 28:9
**ribbon** [1] - 88:1
**Richard** [13] - 2:11, 5:4, 30:7, 30:11, 38:7, 48:23, 50:24, 55:5, 55:13, 55:25, 56:17, 65:14, 208:16
**Richie** [4] - 36:24, 48:23, 74:12, 94:13
**rid** [1] - 221:13

**right-hand** [4] - 49:24, 59:22, 64:23, 65:15
**rights** [1] - 84:23
**ring** [1] - 31:25
**Road** [1] - 25:16
**robbed** [2] - 148:1
**Robert** [39] - 2:16, 3:23, 7:4, 7:16, 8:10, 11:12, 17:7, 18:12, 27:13, 27:15, 27:23, 30:8, 30:11, 38:7, 38:17, 43:1, 44:1, 49:4, 49:13, 64:9, 74:7, 75:19, 79:22, 82:4, 116:15, 118:23, 122:22, 135:17, 146:16, 152:21, 158:3, 173:5, 175:17, 184:15, 223:18, 233:20, 238:12, 238:19, 265:14
**Roebuck** [1] - 142:15
**role** [1] - 244:21
**Ron** [11] - 155:5, 155:6, 155:19, 155:21, 170:3, 200:24, 201:2, 201:7, 201:8, 201:12, 201:15
**room** [40] - 29:12, 29:23, 30:20, 30:21, 32:15, 32:17, 32:21, 32:23, 32:24, 33:4, 35:8, 68:25, 140:2, 140:5, 167:12, 173:24, 191:11, 191:18, 192:3, 193:4, 193:5, 193:12, 194:1, 194:3, 194:10, 194:14, 194:23, 196:13, 197:4, 197:7, 221:19, 246:9, 252:8, 252:18, 252:24, 253:23
**rooms** [6] - 4:13, 35:4, 191:23, 192:1, 193:9, 194:16
**Rouge** [1] - 132:13
**roughly** [7] - 45:14, 70:17, 137:18, 185:18, 193:17, 197:13, 205:2
**round** [1] - 194:8
**routine** [1] - 147:20
**routinely** [1] - 217:15
**row** [5] - 140:18, 140:21, 141:7, 141:9, 141:11
**rubberbanded** [2] - 68:21, 71:11
**rule** [9] - 18:21, 22:24, 22:25, 23:10, 121:14, 121:21, 121:24, 122:3
**ruled** [1] - 133:24
**rules** [1] - 19:18
**ruling** [4] - 22:15, 22:16, 133:21, 243:13
**rulings** [1] - 134:3
**run** [4] - 35:13, 41:4, 159:11, 189:7
**rung** [1] - 159:11
**running** [4] - 72:18, 83:15, 233:1, 233:12
**runs** [2] - 105:8, 189:10
**Russian** [2] - 110:20, 110:23
**Russian's** [1] - 110:23

---

# S

**safe** [1] - 68:22
**safety** [1] - 147:22
**salaries** [1] - 158:24
**salary** [1] - 98:6

**sale** [1] - 158:16
**Salem** [1] - 25:16
**sales** [42] - 4:11, 29:11, 35:13, 41:5, 50:17, 65:6, 65:11, 144:9, 178:17, 178:19, 179:1, 183:18, 184:5, 189:25, 190:8, 190:14, 191:19, 192:7, 192:14, 193:3, 193:7, 194:13, 194:16, 195:25, 196:1, 196:3, 196:9, 196:11, 196:15, 196:16, 196:23, 197:5, 197:9, 197:14, 197:21, 197:24, 207:1, 246:7, 247:25, 253:4, 253:12, 261:7
**sales-tax** [6] - 178:17, 189:25, 196:1, 197:24, 253:4, 253:12
**sampling** [1] - 7:8
**Samuel** [2] - 190:12, 190:13
**Samuel's** [1] - 190:21
**satisfactory** [3] - 8:20, 9:10, 10:12
**Saturday** [29] - 28:19, 31:21, 32:10, 33:6, 80:4, 91:24, 96:14, 122:14, 127:10, 159:7, 160:15, 160:16, 181:14, 181:15, 216:7, 216:9, 222:2, 235:9, 236:8, 236:17, 236:21, 236:23, 237:2, 237:10, 237:23, 240:16, 255:11, 255:16
**save** [1] - 78:3
**saved** [7] - 68:23, 68:24, 69:1, 80:25, 82:13, 112:16, 114:24
**saving** [1] - 114:15
**saw** [8] - 43:12, 71:21, 86:11, 86:13, 86:18, 92:25, 242:5, 251:11
**say,these** [1] - 46:14
**scenario** [1] - 221:18
**Schedule** [1] - 259:9
**schedule** [50] - 75:12, 91:23, 145:22, 145:23, 186:23, 230:18, 230:24, 231:10, 231:13, 232:3, 232:13, 232:17, 232:22, 233:15, 233:24, 234:3, 234:11, 235:24, 235:25, 246:8, 246:10, 246:12, 246:19, 247:3, 247:6, 247:10, 248:18, 249:14, 251:12, 251:13, 252:10, 252:16, 252:19, 253:15, 254:6, 254:14, 254:16, 254:20, 254:23, 255:23, 255:25, 256:1, 256:2, 256:3, 256:5, 256:16, 257:11, 257:14, 258:19, 258:22
**scheduled** [2] - 66:24, 67:23
**schedules** [6] - 246:2, 246:4, 246:5, 259:11, 262:23, 263:3
**scheduling** [1] - 265:5
**scheme** [2] - 185:16, 261:6
**Schmidt** [18] - 44:14, 44:23, 45:5, 45:13, 45:15, 89:20, 89:23, 90:3, 91:10, 97:25, 165:4, 165:5, 165:12, 165:14, 165:18, 166:6, 265:15
**scope** [2] - 13:4, 45:19
**scratch** [1] - 171:12
**scrutiny** [1] - 16:1
**SEAN** [1] - 1:20
**Sean** [1] - 2:14
**Sears** [1] - 142:15
**season** [1] - 199:18
**seat** [2] - 134:17, 182:11

**seated** [3] - 51:7, 125:2, 180:16
**second** [19] - 20:23, 49:21, 51:1, 57:5, 57:21, 63:23, 65:24, 84:21, 99:25, 111:9, 136:1, 140:7, 189:4, 190:4, 191:16, 214:13, 214:15, 216:13, 246:8
**seconds** [2] - 130:12, 130:14
**secrecy** [7] - 6:9, 209:16, 211:1, 211:6, 211:25, 212:14, 217:21
**Secrecy** [6] - 210:2, 210:6, 210:14, 212:6, 212:19, 213:6
**secretary** [2] - 27:23, 135:16
**Section** [1] - 17:19
**section** [2] - 143:9, 150:6
**security** [11] - 22:7, 38:18, 48:24, 49:3, 58:5, 58:6, 70:9, 73:20, 76:3, 76:6, 94:12
**see** [88] - 3:16, 5:3, 5:9, 14:21, 15:5, 15:13, 15:17, 15:24, 16:1, 16:23, 51:20, 55:17, 56:1, 57:4, 61:6, 67:15, 84:22, 85:19, 88:16, 101:2, 101:3, 107:14, 108:23, 108:24, 116:9, 116:17, 116:18, 119:1, 120:8, 120:11, 120:12, 122:25, 137:24, 139:4, 139:10, 140:6, 144:2, 149:4, 149:6, 150:7, 150:10, 150:11, 150:15, 152:8, 152:9, 157:10, 157:13, 157:17, 157:22, 165:25, 168:14, 169:5, 176:13, 176:18, 186:6, 186:9, 193:11, 193:18, 199:4, 200:19, 202:13, 202:18, 203:5, 207:1, 217:5, 219:13, 221:2, 224:15, 224:18, 224:19, 225:13, 229:3, 231:4, 233:10, 237:7, 237:10, 237:13, 241:4, 241:22, 241:24, 249:14, 250:6, 252:2, 255:5, 257:6, 257:22, 259:9, 265:20
**seek** [1] - 152:18
**seized** [8] - 10:21, 11:16, 11:17, 12:20, 238:9, 238:10, 238:11, 238:14
**seizure** [11] - 7:3, 12:6, 13:1, 13:5, 234:15, 235:18, 238:4, 238:7, 238:16, 238:18, 244:10
**sell** [1] - 155:18
**selling** [1] - 104:6
**seminars** [1] - 211:5
**send** [8] - 107:16, 115:20, 169:14, 184:19, 190:19, 206:10, 218:15
**sending** [3] - 176:23, 190:24, 227:25
**sends** [1] - 186:19
**sense** [2] - 47:2, 159:15
**sent** [15] - 8:4, 107:20, 108:14, 116:19, 119:5, 119:16, 158:21, 176:11, 176:12, 206:14, 207:17, 222:16, 223:25, 227:15, 228:4
**separate** [14] - 14:8, 68:23, 68:25, 69:1, 143:24, 193:4, 193:5, 193:6, 194:7, 224:22, 237:12
**separately** [4] - 36:9, 193:9, 197:3, 207:19
**September** [12] - 9:4, 9:8, 46:15, 81:18, 81:19, 81:21, 93:22, 96:13, 96:14, 149:2, 235:12, 250:6

**serve** [1] - 264:12
**served** [1] - 120:23
**service** [1] - 242:8
**Service** [1] - 2:12
**services** [6] - 23:4, 26:10, 35:1, 184:1, 188:21, 189:1
**set** [15] - 8:22, 31:9, 53:25, 70:25, 71:1, 74:6, 75:15, 75:18, 76:15, 79:5, 112:10, 168:13, 249:5, 265:22
**sets** [1] - 51:20
**settle** [4] - 196:1, 197:22, 204:15, 204:24
**settlement** [7] - 178:8, 178:9, 178:10, 197:10, 241:12, 241:25, 243:17
**settling** [2] - 179:14, 196:5
**setup** [2] - 166:3, 166:4
**seven** [7] - 15:6, 169:1, 183:13, 183:14, 237:11, 255:7, 255:20
**seventy** [4] - 28:5, 255:13, 255:18, 255:19
**seventy-nine** [3] - 255:13, 255:18, 255:19
**several** [5] - 16:12, 148:1, 155:25, 174:11, 187:5
**shareholder** [2] - 135:16, 135:17
**shareholders** [1] - 200:14
**Shea** [2] - 119:9, 153:18
**sheerly** [1] - 197:15
**sheet** [85] - 4:18, 4:21, 30:8, 35:18, 35:20, 36:6, 36:10, 36:21, 37:1, 38:4, 40:2, 40:4, 40:6, 40:7, 40:14, 41:16, 41:17, 42:17, 45:16, 46:5, 49:1, 49:4, 49:5, 49:11, 49:14, 49:18, 49:19, 49:20, 49:25, 50:20, 50:21, 58:9, 58:10, 58:12, 58:23, 63:15, 63:21, 63:24, 63:25, 64:16, 64:23, 66:24, 68:25, 75:7, 77:16, 85:23, 89:20, 92:4, 92:7, 92:9, 92:13, 92:19, 92:22, 92:25, 93:14, 96:16, 97:1, 97:12, 97:13, 163:1, 167:22, 171:13, 176:23, 187:21, 187:22, 188:4, 203:14, 203:21, 203:23, 233:8, 247:16, 248:8, 251:5, 257:5, 257:21
**sheets** [56] - 4:25, 5:1, 5:10, 5:16, 36:3, 38:4, 38:6, 38:9, 38:13, 39:7, 40:1, 41:18, 41:24, 42:9, 42:12, 44:3, 44:7, 44:22, 44:23, 44:25, 45:4, 46:2, 46:14, 62:10, 71:4, 71:9, 71:10, 71:19, 77:24, 82:13, 85:25, 88:10, 88:15, 88:16, 89:17, 90:2, 91:5, 91:6, 91:9, 92:2, 94:17, 96:12, 97:3, 104:18, 120:18, 171:22, 176:17, 203:13, 245:19, 247:7, 249:22, 250:18, 251:20, 253:15, 257:3, 257:23
**shhets** [1] - 39:16
**Shield** [1] - 142:20
**shift** [17] - 6:6, 28:24, 30:7, 49:17, 50:3, 50:6, 54:9, 62:18, 62:21, 67:7, 67:10, 67:11, 67:12, 92:8, 92:20, 92:23
**Shipped** [1] - 50:1
**shop** [1] - 185:13

**shops** [1] - 198:6
**short** [2] - 110:25, 183:8
**show** [28] - 3:19, 6:23, 9:1, 10:8, 11:4, 11:9, 11:11, 11:23, 11:25, 13:7, 13:14, 13:16, 13:20, 17:16, 31:12, 34:22, 67:19, 68:1, 68:6, 68:7, 68:11, 118:6, 127:12, 187:5, 207:18, 228:25, 234:17
**showed** [6] - 41:14, 67:19, 67:22, 97:9, 111:17, 157:2
**shower** [1] - 233:3
**showing** [1] - 6:19
**shown** [5] - 10:13, 110:5, 171:3, 195:24, 203:14
**shows** [6] - 110:2, 116:8, 187:13, 187:16, 250:18, 250:20
**sick** [1] - 31:10
**side** [15] - 18:22, 22:17, 36:1, 50:8, 59:22, 64:16, 64:22, 64:23, 65:15, 71:12, 72:4, 72:15, 72:16, 141:14, 186:6
**sign** [2] - 12:10, 173:4
**signal** [1] - 13:13
**signed** [4] - 107:23, 116:14, 173:4, 175:17
**significance** [7] - 54:13, 60:16, 60:17, 65:4, 65:21, 67:4, 225:15
**significant** [3] - 159:6, 237:8, 237:23
**significantly** [1] - 5:25
**simple** [3] - 3:21, 255:14, 255:18
**simply** [2] - 45:18, 47:1
**Singer** [7] - 24:10, 24:14, 85:17, 98:16, 123:21, 127:25, 128:2
**SINGER** [23] - 1:21, 24:12, 24:18, 24:24, 25:2, 85:16, 85:21, 98:14, 98:17, 102:14, 102:17, 102:23, 103:3, 103:10, 103:25, 104:8, 104:10, 104:24, 105:22, 106:1, 106:12, 107:7, 108:4
**singer** [3] - 24:11, 112:11, 114:8
**single** [8] - 8:23, 15:17, 15:23, 39:14, 89:20, 127:9, 146:9, 186:21
**singles** [19] - 13:24, 15:10, 16:14, 58:19, 60:19, 62:5, 62:7, 62:12, 65:23, 72:23, 122:14, 122:17, 155:23, 158:13, 224:13, 240:5
**sinister** [3] - 12:1, 12:9, 17:3
**sit** [1] - 134:17
**situation** [6] - 78:5, 78:10, 101:7, 124:2, 220:14, 220:21
**six** [8] - 4:24, 12:6, 74:5, 183:12, 234:16, 237:21, 256:11, 257:24
**SIXTY** [1] - 1:7
**Sixty** [1] - 2:5
**SIXTY-ONE** [1] - 1:7
**Sixty-One** [1] - 2:5
**size** [3] - 63:3, 185:12, 185:16
**sleep** [1] - 81:5
**slide** [1] - 124:5
**slip** [2] - 57:13, 122:16
**sloppy** [1] - 13:16
**small** [4] - 154:2, 185:15, 186:12,

262:13
**smaller** [3] - 161:24, 172:24, 202:19
**smiling** [1] - 199:24
**smithereens** [1] - 16:6
**so-called** [2] - 9:24, 89:3
**Sockol** [1] - 2:15
**SOCKOL** [7] - 1:20, 100:12, 106:19, 106:21, 106:23, 154:2, 180:10
**sold** [1] - 179:2
**sole** [1] - 6:5
**solely** [2] - 237:14, 248:22
**solve** [1] - 71:23
**someone** [9] - 33:18, 67:6, 67:11, 105:5, 188:22, 228:20, 234:18, 234:19, 264:15
**someplace** [2] - 132:22, 133:7
**sometime** [3] - 111:9, 189:24, 191:21
**sometimes** [19] - 9:5, 11:20, 11:21, 30:14, 32:18, 34:12, 34:23, 44:21, 55:1, 87:1, 87:25, 88:5, 159:25, 160:1, 161:19, 184:21, 207:5, 207:21, 264:4
**somewhat** [4] - 55:18, 147:17, 249:23, 264:8
**somewhere** [4] - 148:5, 196:20, 197:16, 238:13
**soon** [3] - 55:22, 111:3, 119:11
**Sophia** [2] - 56:3, 56:8
**sorry** [23] - 27:13, 27:23, 29:19, 31:2, 61:2, 81:23, 93:16, 96:6, 99:25, 104:15, 110:23, 126:13, 140:1, 153:15, 157:6, 167:16, 181:1, 206:1, 223:5, 230:3, 234:18, 250:17, 250:23
**sort** [10] - 11:3, 11:8, 21:6, 55:18, 65:19, 79:18, 194:20, 197:10, 206:11, 262:15
**sought** [1] - 7:10
**sounded** [1] - 172:6
**sounds** [1] - 185:20
**source** [5] - 112:22, 113:8, 218:14, 246:13, 256:19
**sources** [11] - 112:20, 113:2, 113:6, 113:10, 114:11, 114:24, 244:22, 248:15, 252:17, 256:23, 259:21
**South** [1] - 182:22
**space** [1] - 67:8
**span** [1] - 237:22
**spanned** [1] - 224:7
**speaking** [18] - 31:24, 87:4, 196:13
**special** [7] - 209:20, 209:23, 210:3, 210:8, 211:3, 211:10, 211:12
**Special** [4] - 2:11, 199:16, 235:16, 238:18
**specialize** [1] - 210:3
**specialized** [1] - 210:6
**specific** [5] - 105:1, 166:6, 210:8, 213:13, 251:20
**specifically** [41] - 3:12, 8:18, 8:21, 9:9, 10:11, 21:11, 31:15, 31:16, 34:15, 55:6, 77:1, 77:4, 125:15, 127:25, 128:12, 128:13, 128:22, 128:25, 130:6, 156:22,

161:16, 183:6, 184:2, 188:12, 196:10, 197:6, 211:4, 211:5, 213:8, 214:11, 214:17, 218:3, 218:16, 219:18, 222:12, 223:21, 231:13, 245:2, 250:12, 259:25, 263:23
**specify** [1] - 153:14
**speculation** [3] - 242:17, 242:20, 243:4
**spell** [1] - 182:14
**spend** [1] - 221:5
**spoken** [2] - 124:15, 235:16
**sports** [5] - 26:2, 26:4, 85:13, 102:21, 107:4
**spouting** [1] - 12:16
**spray** [1] - 33:19
**spread** [4] - 187:21, 187:22, 188:4, 199:17
**staff** [9] - 28:13, 30:9, 73:21, 73:25, 122:3, 122:8, 183:17
**stage** [1] - 29:22
**stamp** [2] - 95:10, 114:2
**stand** [9] - 22:15, 24:22, 25:6, 79:20, 79:22, 81:4, 82:8, 82:9, 125:5
**standing** [1] - 5:7
**Starlet's** [18] - 102:10, 102:13, 102:22, 105:16, 105:17, 105:19, 106:8, 106:10, 108:1, 108:18, 108:20, 109:1, 109:2, 109:3, 109:22, 110:9, 110:14, 111:13
**Starlets** [5] - 129:12, 132:11, 132:16, 132:18, 133:3
**start** [14] - 20:12, 49:13, 61:18, 61:25, 62:5, 62:11, 62:17, 81:3, 111:8, 114:14, 114:23, 115:9, 221:12
**Start** [2] - 58:15, 58:21
**started** [22] - 27:6, 38:7, 49:15, 53:22, 69:12, 69:13, 74:4, 79:3, 79:13, 85:12, 102:20, 107:3, 118:19, 142:24, 158:24, 160:10, 191:24, 193:2, 193:8, 194:9, 240:25
**starting** [6] - 31:18, 58:15, 62:18, 66:1, 81:8, 161:5
**starts** [3] - 52:25, 159:17, 189:17
**State** [12] - 177:20, 178:24, 179:12, 189:25, 193:3, 193:25, 194:20, 195:25, 197:21, 204:1, 210:20, 254:2
**state** [8] - 2:6, 135:3, 182:12, 192:7, 192:14, 211:13, 228:19, 261:7
**statement** [18] - 2:21, 11:10, 137:19, 149:2, 149:9, 151:16, 154:17, 157:3, 169:4, 169:8, 170:19, 202:20, 203:3, 203:5, 226:6, 226:15, 226:17, 240:17
**statements** [29] - 2:19, 16:3, 150:4, 151:16, 168:14, 169:14, 170:13, 184:6, 184:20, 202:9, 202:14, 202:16, 202:18, 203:1, 206:24, 206:25, 207:2, 207:3, 207:4, 207:13, 207:16, 212:5, 223:24, 228:17, 231:1, 241:25, 243:23, 244:4
**STATES** [4] - 1:1, 1:3, 1:12, 1:14
**States** [7] - 1:6, 2:4, 2:8, 2:9, 6:21,

212:3, 213:3
**stating** [1] - 154:14
**status** [2] - 78:22, 83:14
**statutes** [1] - 210:2
**stay** [6] - 3:21, 24:7, 24:16, 182:3, 218:23, 219:20
**staying** [1] - 221:11
**stealing** [1] - 83:13
**steamed** [1] - 117:9
**stenography** [1] - 2:2
**step** [9] - 21:9, 22:19, 48:11, 133:1, 133:14, 181:23, 208:11, 258:11, 264:25
**steps** [1] - 213:2
**Steven** [1] - 170:6
**still** [19] - 9:1, 10:23, 22:18, 61:22, 78:23, 117:8, 117:20, 133:25, 144:24, 154:11, 154:24, 155:2, 161:22, 178:21, 179:12, 179:16, 230:4, 239:9
**stipulate** [1] - 134:3
**stole** [1] - 83:10
**stood** [1] - 198:12
**stop** [4] - 23:9, 79:23, 87:6, 226:1
**stopped** [3] - 86:14, 106:8, 187:15
**storage** [4] - 21:18, 43:6, 43:7, 97:23
**stored** [3] - 43:8, 45:2, 72:3
**strapped** [1] - 112:5
**Stream** [3] - 25:16, 80:16, 174:7
**stream** [5] - 32:3, 220:14, 220:15, 220:18, 241:3
**streams** [3] - 30:17, 34:25, 68:15
**Street** [5] - 26:7, 143:17, 145:5, 149:6, 154:20
**strictly** [1] - 144:9
**strike** [5] - 75:23, 76:17, 230:23, 242:18, 243:7
**striking** [1] - 23:25
**strip** [3] - 3:1, 26:9, 26:10
**structure** [8] - 218:4, 219:15, 220:4, 220:7, 220:18, 221:9, 233:4, 264:15
**structured** [10] - 3:8, 3:13, 3:14, 6:16, 6:20, 12:21, 12:22, 15:23, 218:22, 223:15
**structuring** [27] - 2:25, 6:14, 7:11, 7:18, 11:4, 11:6, 15:3, 15:25, 123:8, 123:13, 217:23, 217:25, 218:7, 218:8, 218:11, 220:16, 220:20, 221:18, 223:2, 227:11, 237:12, 238:23, 263:6, 263:13, 263:16, 263:25, 264:12
**stub** [1] - 137:20
**stubs** [3] - 137:15, 170:15, 202:15
**studied** [1] - 142:12
**study** [1] - 25:24
**stuff** [2] - 33:20, 113:12
**stuffed** [2] - 72:5, 72:6
**sub** [1] - 145:6
**subject** [20] - 3:7, 13:15, 108:17, 120:8, 134:19, 163:6, 176:13, 178:2, 178:4, 178:18, 178:22, 194:16, 196:9, 196:11, 196:15, 196:23, 204:3, 211:6, 211:23, 228:18

**submit** [1] - 121:17
**subpoena** [5] - 82:24, 83:1, 84:19, 120:23, 121:11
**subsection** [2] - 23:10, 23:11
**subsequent** [6] - 130:24, 148:22, 172:18, 227:15, 227:24, 228:4
**subsequently** [3] - 156:5, 165:19, 196:21
**subsidiary** [2] - 143:25, 144:1
**substance** [3] - 21:15, 116:3, 175:4
**substantially** [1] - 245:20
**subterfuge** [1] - 11:8
**Subtotal** [1] - 54:1
**subtotal** [5] - 58:25, 59:3, 59:8, 59:18, 141:7
**subtract** [3] - 56:24, 59:8, 59:18
**subtracted** [5] - 161:6, 253:1, 253:4, 253:19, 258:8
**subtracting** [2] - 60:4
**sudden** [1] - 13:5
**sued** [1] - 83:5
**suffice** [1] - 179:11
**sufficient** [1] - 47:5
**suggest** [2] - 195:21, 236:25
**suggested** [2] - 81:25, 256:13
**suit** [2] - 83:9, 83:12
**sum** [5] - 21:15, 207:22, 217:5, 251:25
**summaries** [5] - 3:16, 5:3, 5:9, 4:11:3, 260:12
**summarize** [3] - 170:17, 231:11, 234:11
**summarized** [1] - 246:13
**summarizing** [1] - 246:20
**summary** [6] - 41:8, 41:9, 230:18, 248:11, 248:13, 259:10
**sums** [1] - 217:16
**Sunday** [17] - 27:9, 28:20, 31:19, 32:8, 32:9, 44:10, 44:12, 44:18, 44:19, 45:4, 91:10, 159:4, 159:17, 160:9, 165:4, 165:22, 236:16
**Sundays** [1] - 89:20
**Sunnyside** [2] - 9:4, 10:18
**supplied** [2] - 249:15, 252:23
**supply** [1] - 58:5
**support** [4] - 20:3, 20:9, 263:4
**supported** [1] - 246:11
**supporting** [4] - 253:15, 254:16, 254:20, 256:1
**supposed** [3] - 120:4, 133:9, 133:10
**surprise** [2] - 97:25, 98:4
**surprised** [1] - 242:25
**surrender** [1] - 154:10
**suspected** [1] - 13:3
**suspended** [1] - 83:16
**suspicious** [1] - 217:11
**sustain** [1] - 217:19
**sustained** [3] - 81:16, 226:9, 241:21
**Sustained** [4] - 45:20, 46:23, 186:16, 244:2

**swing** [4] - 67:7, 67:10, 67:11, 67:12
**swing-shift** [3] - 67:7, 67:10, 67:11
**swore** [2] - 7:14, 7:16
**sworn** [5] - 7:13, 100:14, 125:5, 182:9, 208:19
**sworn/affirmed** [2] - 25:9, 134:15
**symbols** [1] - 160:25
**system** [7] - 137:21, 137:23, 137:25, 213:9, 218:13, 218:15, 221:6

## T

**tab** [5] - 37:19, 226:24, 232:6, 235:20, 254:17
**Tab** [3] - 246:24, 252:12, 254:17
**table** [4] - 2:10, 2:16, 18:3, 18:22
**tackle** [11] - 35:25, 37:5, 39:17, 42:20, 43:4, 59:24, 61:23, 69:5, 70:13
**talks** [1] - 107:25
**talley** [1] - 203:23
**tally** [10] - 4:18, 4:21, 32:13, 44:25, 71:4, 71:8, 71:19, 77:24, 85:23, 89:17
**TANYA** [1] - 1:16
**tanya** [1] - 2:10
**tape** [32] - 32:1, 40:18, 40:21, 40:25, 41:3, 41:4, 41:5, 41:8, 41:16, 41:17, 41:18, 41:22, 41:23, 42:9, 50:13, 50:17, 52:22, 52:25, 65:5, 65:17, 69:20, 69:22, 69:24, 87:17, 87:18, 87:22, 88:3, 97:11, 160:21, 248:2, 248:3, 250:6, 250:9, 251:4, 252:1, 252:4
**Tape** [2] - 54:6, 65:2
**tapes** [36] - 5:23, 5:24, 6:4, 39:16, 40:10, 42:7, 87:11, 87:14, 88:10, 88:12, 88:19, 89:9, 89:10, 95:25, 167:7, 167:18, 167:19, 168:3, 247:8, 247:18, 249:10, 249:11, 249:15, 249:16, 249:19, 250:3, 250:11, 250:16, 250:25, 251:1, 251:3, 251:8, 251:16, 251:25
**task** [1] - 210:12
**Task** [1] - 210:13
**tax** [75] - 12:2, 12:8, 12:23, 13:2, 13:3, 13:19, 56:12, 56:15, 57:1, 73:12, 73:13, 74:3, 75:20, 124:2, 164:9, 169:21, 171:18, 178:17, 178:19, 179:1, 179:13, 183:18, 183:19, 184:4, 184:5, 184:6, 185:7, 185:10, 187:3, 188:6, 188:10, 188:13, 188:15, 189:10, 189:25, 190:8, 190:14, 191:19, 192:7, 192:14, 193:3, 193:7, 194:13, 194:17, 195:25, 196:1, 196:3, 196:9, 196:11, 196:15, 196:16, 196:23, 197:5, 197:9, 197:14, 197:21, 197:24, 199:18, 207:1, 211:19, 213:13, 218:18, 218:25, 219:7, 219:15, 219:19, 240:11, 245:25, 253:4, 253:12, 261:6, 261:7, 261:8, 264:11
**Tax** [2] - 56:3, 179:14
**Taxation** [1] - 193:3
**taxation** [2] - 163:7, 179:17

**taxed** [5] - 10:7, 10:25, 74:19, 200:12, 200:13
**taxes** [36] - 10:10, 10:22, 12:14, 16:5, 56:7, 56:9, 56:10, 56:20, 56:22, 56:24, 73:23, 74:24, 75:20, 75:22, 75:23, 76:4, 76:9, 77:6, 77:18, 77:19, 98:10, 98:13, 103:8, 104:22, 127:13, 151:19, 164:2, 164:11, 199:8, 205:19, 205:25, 240:11, 261:6, 262:19
**taxpayer** [2] - 220:14, 220:16
**TD** [48] - 3:13, 7:25, 11:11, 11:19, 14:19, 148:23, 156:6, 156:7, 156:9, 156:17, 156:19, 157:3, 158:23, 169:4, 169:14, 222:13, 223:1, 223:6, 223:11, 223:15, 225:10, 225:14, 226:12, 228:23, 230:19, 231:12, 231:16, 231:17, 231:20, 232:18, 233:2, 234:1, 234:5, 234:8, 234:14, 234:18, 234:20, 234:23, 238:11, 239:8, 241:12, 241:15, 242:21, 243:9, 243:17, 243:19, 263:24, 264:8
**Technically** [1] - 23:3
**technology** [2] - 37:10, 37:15
**TEL** [1] - 1:25
**ten** [11] - 60:18, 119:12, 124:11, 160:16, 166:20, 172:18, 205:6, 213:22, 224:6, 239:1, 265:15
**ten-ish** [1] - 205:6
**tend** [1] - 218:22
**tendency** [1] - 149:13
**tenders** [1] - 212:17
**tens** [5] - 13:24, 66:4, 66:9, 158:16, 240:7
**tenure** [8] - 28:21, 29:1, 73:14, 74:2, 165:5, 211:3, 211:10, 212:1
**term** [3] - 123:8, 185:13, 215:19
**terminated** [1] - 28:14
**terms** [6] - 29:20, 71:4, 78:17, 144:6, 197:9, 259:8
**testified** [20] - 18:5, 20:10, 25:10, 125:5, 129:5, 129:9, 134:16, 141:24, 180:20, 182:10, 198:1, 208:20, 212:5, 212:10, 212:15, 214:24, 229:8, 229:9, 234:8, 236:3
**testify** [9] - 5:7, 7:23, 7:25, 8:1, 17:14, 20:25, 21:2, 21:4, 230:10
**testifying** [2] - 99:20, 117:22
**testimony** [41] - 6:10, 7:13, 8:2, 17:7, 17:9, 17:12, 21:5, 22:13, 51:12, 83:19, 85:11, 86:3, 86:17, 86:23, 87:4, 87:17, 88:14, 92:12, 92:13, 100:15, 101:4, 103:14, 103:18, 107:1, 110:6, 110:8, 118:3, 118:4, 123:18, 124:6, 128:15, 160:4, 163:4, 171:21, 182:2, 195:12, 198:5, 212:9, 212:13, 253:10
**Texas** [2] - 8:4, 10:16
**text** [1] - 68:4
**THE** [240] - 1:12, 2:4, 2:18, 6:23, 17:5, 17:24, 18:6, 18:10, 18:13, 18:15, 18:21, 19:7, 19:10, 19:20, 19:23, 20:16, 20:20,

20:22, 21:20, 21:23, 22:3, 22:8, 22:10, 22:25, 23:9, 23:12, 23:15, 23:19, 23:24, 24:3, 24:9, 24:11, 24:13, 24:22, 24:25, 25:5, 25:6, 25:11, 31:3, 31:4, 37:9, 37:16, 39:3, 45:20, 45:22, 45:24, 46:23, 47:4, 51:1, 51:6, 51:8, 51:13, 52:12, 52:15, 52:16, 52:18, 52:19, 52:21, 52:22, 52:23, 52:24, 53:2, 53:3, 53:4, 53:7, 53:9, 53:10, 61:17, 61:20, 61:21, 61:24, 62:8, 62:12, 62:16, 65:24, 66:7, 66:12, 76:20, 81:16, 84:5, 85:17, 85:22, 98:15, 98:19, 98:20, 99:25, 102:15, 102:19, 104:13, 104:16, 105:24, 106:2, 106:20, 106:22, 108:7, 108:9, 119:9, 119:15, 124:11, 124:14, 125:7, 130:11, 132:1, 132:3, 133:14, 133:23, 134:13, 134:21, 136:1, 138:1, 138:8, 142:4, 157:6, 157:9, 168:16, 179:24, 180:3, 180:5, 180:12, 180:16, 181:21, 181:23, 181:25, 182:4, 182:11, 182:13, 182:14, 182:15, 182:17, 186:16, 189:3, 189:6, 189:12, 189:14, 189:17, 189:20, 189:22, 191:16, 191:19, 191:25, 192:1, 192:6, 192:8, 192:11, 194:9, 194:11, 194:12, 194:16, 194:18, 195:2, 195:5, 199:19, 199:20, 199:21, 199:24, 205:14, 206:2, 206:19, 207:12, 207:15, 207:18, 207:20, 207:23, 207:25, 208:2, 208:4, 208:6, 208:10, 208:12, 208:13, 208:17, 212:20, 212:24, 217:19, 220:13, 220:24, 221:4, 221:5, 221:8, 221:14, 221:16, 221:20, 221:21, 225:23, 225:25, 226:2, 226:3, 226:5, 226:9, 226:13, 227:10, 227:13, 228:9, 228:24, 229:11, 229:13, 229:24, 230:7, 231:4, 236:5, 236:10, 236:11, 236:12, 236:20, 236:24, 236:25, 237:3, 237:6, 237:14, 238:1, 241:21, 242:15, 242:18, 243:5, 243:13, 244:2, 244:7, 250:17, 250:19, 250:20, 250:21, 250:22, 250:23, 251:10, 251:18, 251:21, 251:22, 251:23, 262:6, 262:8, 262:24, 263:2, 263:8, 263:11, 264:16, 264:18, 264:24, 265:4, 265:10, 265:18

**theirs** [1] - 136:17

**themselves** [6] - 5:19, 19:19, 110:14, 219:4, 235:2, 251:16

**theory** [2] - 12:18, 15:25

**therefore** [4] - 3:25, 5:3, 5:13, 6:20

**they's** [1] - 214:20

**thinking** [1] - 132:21

**thinks** [1] - 102:2

**third** [4] - 54:18, 146:6, 160:3, 250:5

**thirty** [3] - 194:8, 197:13, 257:24

**thirty-six** [1] - 257:24

**thousand** [9] - 122:17, 172:18, 197:15, 213:22, 237:11, 240:5, 240:6, 240:7

**THOUSAND** [1] - 1:7

**Thousand** [1] - 2:5

**thousands** [3] - 6:12, 207:5

**threat** [1] - 176:2

**threatened** [1] - 79:22

**threatening** [4] - 115:20, 119:5, 121:6, 176:4

**three** [39] - 3:14, 11:10, 15:6, 23:11, 25:21, 57:14, 69:14, 74:19, 75:13, 77:19, 80:3, 80:9, 80:16, 81:10, 112:15, 131:18, 136:21, 136:22, 150:14, 150:23, 157:13, 157:16, 157:19, 160:1, 178:7, 179:6, 185:15, 185:18, 196:4, 197:13, 197:19, 203:10, 224:15, 224:18, 224:20, 224:21, 224:24, 240:6, 240:7

**three-year** [3] - 178:7, 197:13, 197:19

**throughout** [6] - 62:9, 88:25, 189:11, 199:17, 233:13, 251:11

**throw** [1] - 24:20

**thumb** [1] - 37:23

**Thursday** [14] - 31:20, 32:9, 56:13, 56:21, 64:6, 73:23, 101:14, 127:11, 145:24, 146:2, 159:6, 160:15, 166:18

**tickets** [3] - 222:15, 223:23, 231:1

**ties** [1] - 202:17

**timely** [1] - 20:4

**timing** [2] - 264:25, 265:5

**tin** [1] - 72:22

**Tip** [1] - 57:7

**tip** [4] - 57:10, 103:5, 166:5

**tipouts** [2] - 158:13, 165:11

**tipped** [1] - 164:17

**tips** [8] - 13:24, 75:17, 103:8, 103:17, 141:15, 165:3, 165:6, 165:15

**Title** [1] - 17:19

**titles** [2] - 27:18, 210:9

**today** [10] - 78:22, 83:18, 89:1, 95:6, 99:1, 99:15, 107:2, 110:6, 163:4, 265:19

**together** [5] - 4:21, 39:16, 70:12, 192:4, 263:19

**tolls** [1] - 32:1

**Tom** [3] - 105:5, 107:13, 108:20

**Tommy** [1] - 108:21

**tomorrow** [4] - 264:19, 265:11, 265:17, 265:20

**took** [48] - 3:14, 16:10, 16:13, 19:24, 23:6, 36:12, 43:13, 53:16, 74:23, 76:4, 79:4, 79:7, 86:8, 94:17, 98:9, 98:21, 102:9, 103:5, 104:13, 114:11, 130:12, 142:12, 167:23, 171:22, 177:11, 179:1, 227:15, 228:20, 236:19, 239:10, 245:12, 249:1, 250:8, 250:25, 252:22, 254:9, 254:10, 256:6, 256:19, 257:4, 257:15, 257:17, 257:20, 258:6, 258:11, 259:17, 264:2

**top** [7] - 58:23, 64:1, 72:15, 197:15, 205:2, 214:9, 214:13

**topless** [4] - 13:21, 26:9, 26:12, 26:23

**total** [60] - 33:7, 36:7, 36:22, 42:16, 44:4, 48:18, 49:4, 50:21, 51:25, 52:10, 53:15, 53:19, 53:20, 54:5, 54:6, 57:21,

57:23, 58:23, 58:24, 59:6, 59:7, 59:18, 60:3, 60:11, 60:14, 60:15, 61:9, 61:11, 62:4, 63:15, 63:20, 65:6, 65:11, 65:17, 66:5, 66:6, 66:8, 74:24, 77:17, 78:3, 125:25, 126:1, 139:10, 140:18, 141:4, 151:4, 168:4, 183:11, 200:7, 233:15, 248:13, 254:10, 255:20, 255:22, 257:17, 258:1, 258:23

**Total** [10] - 54:1, 54:2, 54:5, 57:17, 57:19, 58:24, 59:7, 59:25, 65:10, 249:7

**totaled** [11] - 34:2, 57:21, 58:25, 61:5, 65:15, 65:16, 68:21, 68:23, 69:5, 71:10, 254:22

**totaling** [2] - 57:21, 247:21

**totalled** [6] - 33:13, 36:2, 36:6, 36:14, 37:2, 140:19

**totals** [15] - 35:9, 50:6, 54:16, 55:2, 56:13, 60:14, 63:21, 65:14, 88:17, 110:12, 126:6, 126:13, 126:15, 251:4, 257:6

**touched** [1] - 220:3

**towards** [2] - 223:12, 261:23

**traceable** [1] - 232:13

**track** [15] - 35:5, 35:12, 36:20, 37:1, 161:4, 161:13, 162:17, 187:1, 187:22, 188:4, 193:9, 213:8, 213:11, 214:3, 215:1

**tracked** [2] - 194:2, 197:3

**tracking** [4] - 187:15, 196:25, 197:1, 213:17

**trafficking** [2] - 12:2, 12:8

**trained** [1] - 28:13

**training** [5] - 211:1, 211:4, 211:8, 211:11, 211:17

**transacted** [1] - 214:11

**transaction** [33] - 3:9, 14:11, 14:12, 123:16, 159:12, 207:2, 207:24, 213:15, 213:18, 213:19, 213:21, 214:7, 214:14, 214:16, 215:21, 215:22, 216:5, 216:7, 216:16, 216:21, 217:2, 223:6, 225:1, 227:19, 232:21, 234:7, 234:13, 234:23, 235:1, 235:7, 243:7, 243:24

**transactions** [38] - 3:12, 3:14, 14:6, 150:18, 150:19, 156:12, 173:23, 185:5, 201:13, 213:4, 213:11, 213:17, 214:3, 215:1, 215:19, 215:23, 216:2, 216:15, 217:8, 217:10, 218:21, 219:5, 221:10, 222:20, 223:4, 223:7, 224:24, 225:5, 233:4, 234:12, 235:3, 235:5, 235:25, 237:13, 237:16, 237:21, 242:1, 242:10

**transacts** [1] - 148:18

**transcript** [1] - 2:3

**TRANSCRIPT** [1] - 1:11

**transfer** [3] - 233:4, 233:11, 241:13

**transferred** [7] - 166:23, 223:16, 231:25, 232:24, 233:18, 233:21, 234:5

**transfers** [7] - 140:14, 140:15, 231:19, 232:4, 232:13, 232:18, 233:7

**transformed** [1] - 143:20

**transparent** [1] - 165:24

**transpired** [2] - 214:17, 216:25
**treasurer** [1] - 135:16
**treated** [1] - 140:4
**TRIAL** [1] - 1:11
**trial** [3] - 2:4, 13:18, 84:21
**tried** [7] - 116:25, 127:8, 133:2, 147:12, 172:13, 204:17, 252:7
**trigger** [4] - 213:25, 216:4, 216:14, 217:13
**triggered** [1] - 236:20
**trouble** [8] - 24:3, 39:19, 39:24, 40:14, 45:4, 88:9, 90:2, 116:3
**true** [20] - 46:19, 98:12, 98:21, 102:22, 103:1, 103:22, 112:7, 116:1, 118:3, 119:3, 121:5, 121:7, 121:9, 122:7, 132:15, 133:2, 133:4, 133:5, 171:22, 194:11
**trusted** [2] - 141:20, 161:11
**truth** [1] - 226:15
**truthful** [1] - 107:6
**try** [9] - 109:7, 110:19, 151:10, 179:9, 196:1, 213:11, 221:5, 221:9, 265:18
**trying** [12] - 16:6, 17:2, 45:3, 88:8, 109:5, 129:22, 133:5, 133:9, 145:22, 199:10, 264:24, 265:5
**Tuesday** [12] - 44:9, 44:10, 80:4, 91:11, 91:23, 159:5, 159:23, 160:13, 181:14, 181:15, 235:13, 236:15
**Tuesdays** [1] - 32:8
**turn** [20] - 37:18, 48:2, 50:8, 63:9, 116:7, 128:4, 128:22, 129:1, 130:1, 138:6, 175:10, 186:1, 186:5, 226:23, 232:6, 233:17, 235:19, 246:23, 252:11, 254:17
**turned** [9] - 43:23, 92:23, 128:6, 128:19, 138:10, 141:23, 166:21, 177:18, 257:1
**turning** [5] - 27:11, 51:15, 54:18, 63:8, 71:25
**twelve** [1] - 41:1
**Twenties** [1] - 158:14
**twenties** [3] - 66:9, 158:13, 240:8
**twenty** [4] - 193:17, 199:23, 255:7, 255:20
**twenty-five** [1] - 193:17
**twenty-four** [1] - 199:23
**twenty-seven** [2] - 255:7, 255:20
**twice** [1] - 161:18
**Two** [3] - 27:5, 27:7, 144:18
**two** [60] - 9:2, 9:3, 18:2, 18:13, 39:9, 39:12, 45:14, 52:5, 59:22, 69:14, 74:19, 74:23, 75:13, 77:11, 77:19, 96:4, 96:12, 125:20, 126:9, 133:2, 136:21, 136:22, 137:3, 145:24, 146:7, 146:8, 148:12, 154:6, 154:7, 159:18, 159:25, 165:20, 192:22, 199:22, 199:23, 202:11, 209:12, 223:16, 224:22, 229:2, 231:21, 231:25, 233:4, 233:21, 237:1, 240:6, 240:7, 242:5, 248:13, 248:15, 249:13, 251:1, 251:5, 252:17, 256:23, 262:25

**type** [11] - 144:13, 198:6, 200:10, 205:6, 216:4, 241:22, 242:11, 243:7, 243:9, 249:24
**types** [6] - 30:16, 35:19, 210:4, 214:8, 221:2, 237:20
**typically** [12] - 214:1, 215:24, 216:1, 216:18, 217:5, 217:10, 218:1, 218:19, 218:21, 219:9, 219:13, 224:17, 245:3

## U

**U.S** [3] - 1:17, 213:16, 214:25
**ultimate** [2] - 263:12, 263:21
**ultimately** [8] - 85:1, 204:4, 204:14, 204:22, 223:16, 231:25, 232:23, 245:25
**Umm** [1] - 46:16
**Umm-Humm** [1] - 46:16
**unavailable** [1] - 19:14
**uncomfortable** [1] - 134:5
**under** [21] - 9:23, 13:10, 13:11, 15:4, 15:16, 16:6, 16:18, 17:19, 23:10, 50:2, 65:1, 85:11, 99:15, 107:2, 174:6, 191:2, 197:17, 220:19, 223:3, 229:9, 239:8
**underages** [1] - 6:1
**underarm** [1] - 33:19
**underlying** [1] - 6:16
**underneath** [2] - 64:20, 64:21
**underreporting** [1] - 5:21
**underway** [1] - 178:16
**unemployed** [6] - 85:7, 85:9, 85:14, 111:2, 111:21, 112:13
**Unemployment** [3] - 99:3, 111:5, 174:12
**unfair** [1] - 84:20
**Unite** [1] - 6:21
**UNITED** [2] - 1:1, 1:12
**united** [3] - 1:3, 1:14, 2:4
**United** [5] - 1:6, 2:8, 2:9, 212:3, 213:3
**University** [1] - 142:11
**unless** [2] - 2:21, 189:15
**unpleasant** [1] - 5:17
**unrecorded** [20] - 3:25, 5:2, 5:13, 247:25, 248:12, 248:14, 248:24, 249:7, 252:8, 252:17, 253:20, 254:8, 254:13, 256:13, 256:19, 256:23, 258:23, 259:12, 259:19, 259:24
**unreported** [7] - 3:25, 5:3, 5:13, 6:16, 219:8, 258:9, 258:14
**unrestricted** [1] - 262:7
**unusual** [5] - 249:23, 262:2, 262:4, 262:5, 262:11
**up** [102] - 4:23, 9:14, 11:15, 16:2, 16:15, 19:1, 24:22, 31:9, 31:12, 32:2, 32:13, 32:25, 34:2, 34:8, 34:22, 35:6, 35:9, 36:2, 36:6, 36:8, 36:16, 37:2, 37:23, 41:4, 43:20, 57:21, 61:3, 61:4, 61:5, 62:4, 63:16, 63:20, 67:19, 67:22, 68:1, 68:7, 68:11, 68:20, 68:21, 69:5, 69:13, 70:25, 71:1, 71:14, 71:21, 72:15,

74:6, 78:3, 79:13, 80:6, 112:10, 126:1, 126:16, 130:11, 142:25, 148:17, 149:4, 159:7, 160:2, 166:8, 167:22, 168:7, 169:8, 170:23, 173:3, 174:11, 179:2, 180:19, 184:3, 186:23, 188:2, 189:20, 191:20, 191:21, 193:13, 194:2, 196:12, 197:7, 197:8, 197:12, 204:15, 207:8, 207:22, 220:19, 224:6, 234:3, 241:18, 245:25, 247:22, 250:9, 250:11, 250:22, 251:3, 251:16, 253:8, 254:22, 258:7, 259:18, 261:16, 264:18, 265:17
**upper** [2] - 48:13, 49:23, 51:18, 65:1, 65:19
**upper-left-hand** [2] - 48:13, 51:18
**upset** [1] - 80:5
**upside** [1] - 116:7
**upstairs** [8] - 4:19, 34:3, 35:15, 36:16, 42:3, 64:15, 70:11, 72:1
**Upstate** [1] - 196:21
**upwards** [1] - 261:23
**usable** [1] - 185:4
**usage** [2] - 192:3, 241:18
**useful** [1] - 16:9
**uses** [2] - 13:23, 155:23
**usual** [1] - 171:4
**utilized** [1] - 247:7

## V

**vacation** [2] - 86:15, 86:17
**vacations** [1] - 87:9
**valid** [1] - 47:8
**Valley** [3] - 25:16, 80:16, 174:7
**variable** [1] - 220:15
**variance** [1] - 198:11
**variation** [1] - 252:1
**varied** [3] - 34:11, 159:25, 160:7
**various** [6] - 6:11, 68:15, 136:9, 136:11, 138:19, 200:4
**vary** [4] - 159:3, 159:15, 160:17
**vast** [1] - 3:17
**vehicle** [1] - 241:7
**vendors** [1] - 158:20
**verbally** [2] - 168:15, 192:8
**version** [1] - 102:4
**versus** [7] - 2:5, 62:25, 63:4, 63:23, 73:10, 76:24, 127:13
**via** [1] - 16:12
**vice** [2] - 27:22, 143:19
**view** [2] - 227:11, 228:17
**Vinny** [4] - 81:19, 82:12, 117:6, 123:12
**Violations** [1] - 210:14
**violations** [7] - 209:16, 209:25, 210:1, 210:6, 211:2, 212:19
**VIP** [31] - 4:12, 139:25, 140:2, 167:12, 173:24, 191:10, 191:18, 191:23, 192:1, 192:3, 192:16, 193:4, 193:9, 193:12, 194:1, 194:3, 194:10, 194:14, 194:16, 194:23, 196:12, 197:4, 197:7, 246:9,

252:8, 252:17, 252:24, 253:5, 253:23,
253:25, 254:2
**virtually** [2] - 3:23, 23:17
**visit** [2] - 10:15, 32:24
**visited** [2] - 8:16, 33:4
**void** [1] - 218:13
**voir** [3] - 39:2, 45:19, 71:5
**VOIR** [2] - 39:4, 266:4
**volume** [1] - 3:24
**volunteered** [1] - 79:4

# W

**W-2** [4] - 74:16, 74:22, 75:5, 75:9
**W-4** [6] - 74:15, 74:16, 74:21, 75:5,
75:9, 163:21
**wages** [1] - 186:21
**wait** [6] - 18:23, 32:2, 85:18, 94:8,
119:13, 180:6
**waitress** [1] - 55:8
**waitresses** [2] - 73:20, 75:17
**waive** [1] - 2:21
**walk** [2] - 29:14, 167:24
**walked** [1] - 216:8
**Wantagh** [1] - 26:2
**wants** [2] - 2:21, 19:18
**warning** [2] - 7:15, 8:13
**warrant** [2] - 7:3, 12:11
**warrants** [1] - 238:18
**Waverunner** [2] - 112:8, 112:12
**ways** [5] - 29:10, 88:22, 100:6, 220:4,
220:7
**wear** [1] - 34:18
**Web** [2] - 106:14, 107:13
**website** [2] - 186:24, 188:23
**Wednesday** [10] - 12:18, 13:5, 13:8,
31:20, 32:9, 44:10, 44:11, 101:13,
160:13
**week** [38] - 3:15, 8:25, 15:9, 16:13,
19:6, 43:3, 44:12, 55:1, 56:7, 56:12,
57:2, 57:3, 71:3, 71:11, 74:23, 76:12,
82:25, 91:7, 108:22, 111:9, 137:3,
155:25, 159:4, 159:16, 159:17, 160:12,
164:4, 169:1, 169:8, 181:16, 189:8,
189:9, 189:13, 227:24, 237:3, 237:25,
255:3
**week's** [4] - 21:10, 44:4, 44:6, 169:7
**weekend** [2] - 44:17, 236:16
**weekly** [15] - 56:18, 56:19, 137:18,
186:25, 187:16, 188:23, 189:3, 189:4,
189:5, 189:6, 189:15, 189:18, 198:3
**weeks** [3] - 8:12, 81:10, 114:5
**weight** [2] - 47:8, 243:5
**West** [2] - 143:16, 149:6
**westrich** [2] - 18:3, 265:14
**Westrich** [10] - 2:12, 7:22, 8:16, 10:14,
11:25, 12:25, 112:10, 115:7, 235:17,
238:19
**whatsoever** [4] - 83:22, 126:23, 243:1,

243:2
**whereby** [1] - 224:13
**whole** [10] - 19:17, 20:25, 57:2, 57:3,
80:25, 96:25, 168:19, 189:11, 258:25,
263:19
**wholly** [2] - 143:24, 143:25
**wife** [1] - 112:23
**willing** [1] - 177:18
**wind** [1] - 172:22
**wire** [2] - 140:14, 147:7
**wired** [2] - 145:19, 146:23
**wishes** [1] - 22:12
**withdrawal** [2] - 213:23, 214:18
**withdrawals** [1] - 150:20
**withdrawn** [7] - 8:25, 14:5, 93:13,
95:5, 154:23, 166:13, 171:20
**withheld** [3] - 75:21, 75:22, 75:24
**withhold** [2] - 164:10, 164:11
**withholding** [9] - 163:23, 164:2,
186:21, 186:23, 187:25, 188:3, 188:24,
189:10, 189:19
**witness** [45] - 17:25, 18:23, 19:2, 19:3,
19:4, 19:13, 19:14, 19:23, 19:24, 20:5,
20:8, 20:9, 20:23, 21:23, 22:11, 24:7,
24:14, 25:6, 37:7, 37:17, 51:6, 51:10,
82:22, 106:21, 124:15, 125:3, 133:16,
133:19, 138:3, 138:7, 180:10, 181:24,
181:25, 182:1, 195:1, 208:14, 210:13,
212:5, 228:25, 229:8, 242:25, 264:21
**WITNESS** [48] - 31:4, 52:15, 52:18,
52:21, 52:23, 53:2, 53:4, 53:9, 61:20,
61:24, 62:12, 98:19, 102:19, 106:22,
108:9, 182:13, 182:15, 189:6, 189:14,
189:20, 191:19, 192:1, 192:8, 194:11,
194:16, 199:20, 199:24, 207:15,
207:20, 207:25, 208:4, 208:12, 220:24,
221:5, 221:14, 221:20, 226:2, 227:13,
236:10, 236:12, 236:24, 237:3, 237:14,
250:19, 250:21, 250:23, 251:21, 251:23
**witnesses** [7] - 20:11, 20:14, 20:19,
21:2, 265:2, 265:8, 265:15
**women** [1] - 122:8
**wonder** [1] - 168:7
**word** [18] - 24:1, 49:23, 52:6, 56:3,
57:6, 58:12, 58:21, 59:9, 59:25, 64:2,
65:2, 65:7, 89:3, 89:7, 95:11, 140:21,
186:6
**words** [7] - 41:5, 41:19, 61:7, 62:1,
116:3, 175:4, 211:24
**workday** [1] - 145:17
**works** [5] - 14:7, 23:7, 44:18, 77:10,
244:8
**worksheets** [1] - 21:3
**worried** [1] - 62:13
**worse** [2] - 8:11, 9:1
**worst** [1] - 11:3
**worth** [6] - 44:6, 169:7, 199:16, 240:5,
240:6, 240:7
**wrap** [5] - 33:13, 34:8, 35:6, 36:16,
265:17

**wrapped** [4] - 35:9, 36:2, 36:8, 68:20
**write** [4] - 35:7, 49:16, 64:11, 224:13
**writing** [2] - 190:23, 192:9
**written** [6] - 42:14, 153:4, 153:5,
161:6, 190:25, 224:18
**wrote** [3] - 9:5, 21:14, 110:12

# X

**X-1** [2] - 65:22, 66:3
**X-10** [1] - 66:3
**X-5** [1] - 66:3

# Y

**yachts** [2] - 221:12, 221:17
**year** [33] - 13:1, 13:4, 20:12, 81:22,
83:3, 100:21, 111:10, 113:21, 118:13,
135:13, 135:24, 145:3, 172:1, 178:7,
183:7, 183:9, 184:3, 189:11, 192:23,
194:21, 197:13, 197:19, 199:15,
199:17, 199:19, 200:16, 213:8, 237:22,
258:17, 258:25, 259:18, 259:20, 259:24
**years** [26] - 6:9, 16:16, 23:17, 25:18,
25:21, 27:9, 69:14, 74:5, 78:18, 142:22,
183:12, 183:13, 183:14, 192:22,
199:22, 199:23, 200:7, 200:9, 203:10,
209:12, 209:22, 210:5, 217:20, 217:21,
244:17
**yellow** [1] - 34:6
**yesterday** [1] - 19:5
**YORK** [3] - 1:1, 1:15, 1:19
**York** [34] - 1:7, 1:25, 9:17, 10:16,
25:16, 25:23, 25:24, 26:2, 26:7, 89:23,
91:19, 143:17, 149:6, 154:21, 177:20,
178:24, 179:12, 182:22, 182:24,
189:25, 193:2, 193:25, 194:20, 195:25,
196:21, 197:21, 204:1, 209:9, 212:4,
212:10, 254:1
**yourself** [3] - 70:21, 168:20, 235:16

# Z

**Zeidman** [2] - 183:8, 183:10
**Zeiman** [1] - 200:1
**zeroed** [1] - 233:12
**ZLP** [1] - 183:8