```
 1     UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
 2
       - - - - - - - - - - - - - - X
 3                                 :
       UNITED STATES,
 4                                          10-CV-01866
            Plaintiff,
 5
                  -against-         :
 6                                          United States Courthouse

 7                                          Brooklyn, New York
       SIXTY-ONE THOUSAND NINE HUNDRED
 8     DOLLARS and NO CENTS
       ($61,900.00)
 9
            Defendant.             :
10                                          July 14, 2011
       - - - - - - - - - - - - - - X        9:30 o'clock a.m.
11
                          TRANSCRIPT OF BENCH TRIAL
12                        BEFORE THE HONORABLE BRIAN M. COGAN
                          UNITED STATES DISTRICT JUDGE
13
       APPEARANCES:
14
       For the Plaintiff:        UNITED STATES ATTORNEYS OFFICE
15                               271 CADMAN PLAZA EAST, 7TH FLOOR
                                 BROOKLYN, NEW YORK 11201
16                               BY:   TANYA HILL
                                       BRIAN D. MORRIS
17                                ASSISTANT U.S. ATTORNEYS

18
       For the Defendant:        O'SHEA PARTNERS LLP
19                               51 FIFTH AVENUE, 25th FLOOR
                                 NEW YORK, NY 10175
20                               BY: SEAN F. O'SHEA, ESQ.
                                 BY:  ANDREW SOCKOL, ESQ.
21
       Court Reporter:           Marsha Diamond
22                               225 Cadman Plaza East
                                 Brooklyn, New York
23                               TEL: (718) 613-2489
                                 FAX: (718) 613-2369
24

25        Proceedings recorded by mechanical stenography,
       transcript produced by computer.
```

*MARSHA DIAMOND, CSR*
*OFFICIAL COURT REPORTER*

1          THE COURT: Good morning be seated please.

2          Let's have the witness back on the stand.

3   R I C H A R D     G U E R C I ,   having been previously duly

4   sworn, resumed the stand and testified further as follows:

5          MR. MORRIS: We have one preliminary matter, Judge.

6   We received an Exhibit from opposing counsel yesterday

7   morning, it wasn't on the pretrial order at all, and we just

8   wanted to preserve our object ions for the record.

9          THE COURT: Why don't you wait until he offers it and

10  we will see.  He handed it to you.  It is not in the record,

11  so don't worry about it.

12          All right. Cross-examination.

13  CROSS-EXAMINATION

14  BY MR. O'SHEA:

15  Q    Mr. Guerci, I think you told us yesterday you're employed

16  at ASRC Primus?

17  A    Yes, that's correct.

18  Q    And that they have a contract with the Internal Revenue

19  Service; is that correct?

20  A    Yes, they do.

21  Q    And does that contract provide that they will provide

22  personnel to assist in cases of forfeiture?

23  A    Yes, that is part of the provisions of their contract,

24  yes.

25  Q    And is there anything else that you do for the IRS

1   besides forfeiture?

2   A    My position as a financial investigator is to provide

3   assistance in the area of asset forfeiture as it specifically

4   relates to bank secrecy act cases and violations of the money

5   laundering statute.

6   Q    So your charge doesn't go beyond what you just explained

7   to you us?

8   A    It does not.

9   Q    You don't do other types of cases?

10  A    At this point in time, no, I do not.

11  Q    I know you told you us yesterday about your long previous

12  experience with the IRS.  Back then you did other kinds of

13  case; is that fair?

14  A    Yes, my role as a financial investigator was certainly

15  different than my role when I was a special agent.

16  Q    And your role today is much more of a confined role, if

17  you will; fair?

18  A    Yes, that would be fair and accurate.

19  Q    Your focussed one particular violation?

20  A    Well, not one violation.  There's a numerous violations

21  that would fall into the area of asset forfeiture.

22  Q    One particular type of follow violation, correct, and the

23  various statutes that govern?

24  A    Yeah, which would be the statutes that fall under Title

25  31 and/or Title 18.  It would be more than just one statute.

1  Q    Now, there was an affidavit submitted in December of 2009

2  in this courthouse to effectuate the seizure; is that correct?

3  A    Yes, there was.

4  Q    And let me ask you to look at Exhibit N, N Nancy.

5       (Mr. Sockol handing to the witness)

6  A    Thank you.

7       Yes, sir.

8  Q    Is this be an affidavit that you prepared?

9  A    I prepared a draft of this affidavit, yes.

10  Q    And did you prepare it for Agent Westrich?

11  A    I prepared it in conjunction with Agent Westrich, yes.

12  Q    Did you have the primary role or did Mr. Westrich?

13  A    In the preparation of the direct affidavit, I did.

14  Q    Did Mr. -- excuse me -- did Agent Westrich make any

15  changes to your knowledge?

16  A    Not to the best of my knowledge.

17  Q    So would it be fair to say that you had the primary role

18  in drafting it?

19  A    Drafting the draft copy of the affidavit, yes.

20  Q    Okay. But did the draft differ substantially from the

21  final version that was submitted to the Court?

22  A    Substantially, no.

23  Q    And if Mr. Westrich said that you prepared the affidavit

24  that would be consistent with your recollection, fair?

25  A    Most certainly.

*Guerci - cross/ O'Shea*

1  Q    Why didn't you sign the affidavit?

2  A    I am no longer a sworn law enforcement, so as a contract

3  employee I don't have the authority to sign affidavits.

4  Q    So in connection with your duties for ADS -- ASRC Primus,

5  as a contract employee you don't swear an oath?

6  A    I do not.

7  Q    So you're here today and you conducted this investigation

8  without having sworn the oath to uphold the Constitution and

9  all the other elements of the oath that you had as an IRS

10  agent; is that fair?

11  A    As I think we have defined, my role is certainly

12  different.

13  Q    Really wasn't quite my question, sir.

14       You haven't sworn the same oath, for example, Agent

15  Westrich swears, correct?

16  A    That's correct.

17  Q    In fact, you have sworn no oath, correct?

18  A    That's correct.

19  Q    And I think you told us that you work on a structuring

20  task force?

21  A    I don't believe I told you that.

22  Q    Do you work on a structuring task force?

23  A    I work on number of task forces, yes.

24  Q    Is one of them a structuring task force?

25       MR. MORRIS: Actually, Your Honor, I'm going to

1   object.

2           THE COURT: And what is the objection?

3           MR. MORRIS: Certainly aspects relating to the task

4   force itself might reveal the existence of a privileged

5   matter.

6           THE COURT: You have another witness who's cross

7   examination is blocked by privilege?

8           MR. MORRIS: It's --

9           THE COURT:  Well, I believe your position that the

10  answer to this question is privileged?

11          MR. MORRIS:  The answer to the question may call for

12  the -- to reveal a privileged matter, and it relates to the

13  same type of privilege that the government made to Your Honor

14  under seal at the beginning of this case.

15          THE COURT: Well, I certainly have no recollection of

16  that, believe me, but the question was simply whether he's on

17  a structuring task force.  Is it your position that the answer

18  to that question calls for the disclosure of privileged

19  information?

20          MR. MORRIS: I think that question is okay, Your

21  Honor.

22          THE COURT:  Well, then let's wait for one that is

23  not okay. The objection is overruled.  Please continue.

24  Q    The answer to that Mr. Guerci?

25  A    Could you please repeat the question so I completely

1    understand exactly what you are asking me.

2    Q    Do you work on a structuring task force, sir?

3    A    I work on a task force that I am assigned to out of he

4    Eastern District of New York U.S. Attorney Office.

5    Q    And is part of your duties to forfeit funds that are

6    alleged to have been structured in bank accounts?

7    A    Well, I participate -- I wouldn't personally forfeit

8    them, but I would participate in -- attempting obtaining

9    warrants that would forfeit such funds, yes.

10   Q    It would be fair to say that the majority of what

11   comprises your duties?

12   A    Well, to further identify criminal violations that would

13   result in cases for the IRS Criminal Investigation Division.

14   Q    But in conjunction with that, that would flow from what

15   you do, for the most part, which is examine bank records to

16   see if structuring occurs, fair?

17   A    Yes, that would be part of my role.

18   Q    In fact, it is the predominant part of your role?

19   A    I spend a fair amount of time doing that.

20   Q    Despite the fact that you have not sworn an oath, did you

21   think that in the carrying out your role in this investigation

22   it was important to be fair?

23   A    Absolutely.

24   Q    And did you think it was important to look at evidence

25   that might indicate that structuring had not occurred?

1  A    Most certainly.

2  Q    Did you do that?

3  A    I looked at the facts that were available to me and I

4  drew the conclusions that I drew.

5  Q    Well, not quite what I asked, sir.

6       Did you do that, did you look at evidence that might

7  be exculpatory in nature with the same vigor that you did for

8  evidence that might indicate structuring?

9  A    At the time that I evaluated this investigation up to the

10  seizure of the funds, I looked at factors that were available

11  to me.

12  Q    Sir would you please answer my question?  Did you look at

13  this case and facts with the same vigor in terms of whether

14  evidence might be exculpatory at to whether it might indicate

15  that structuring had occurred?

16  A    Certainly, I looked at all of the factors.  I looked for

17  reasons why I believed structuring occurred and I looked for

18  reasons why I thought they may not have occurred so, yes, I

19  think did do that.

20  Q    And prior to seizure warrants, you went to see the

21  Magistrate, Magistrate Judge Pollak in this courthouse in

22  December 9th; is that right?

23  A    I believe it was December 10th.

24  Q    Well, that was the date that the warrant was issued,

25  wasn't it?

1    A    Yes.

2    Q    And it was issued on the same day that you sought it?

3    A    Yes, it was.

4    Q    And is it fair to say that your investigation prior to

5    the warrant was limited to bank record analysis?

6    A    Bank record analysis and other information that I

7    obtained from bank employees.

8    Q    And what information was that?

9    A    Well, information that I described yesterday about a

10   letter that was sent, other information that pertained to

11   specific characteristics of some of the deposits that took

12   place in the account.

13   Q    Well, the characteristics about what occurred in the

14   account, that was based on the bank records that you had,

15   fair?

16   A    And information I obtained from employee from the -- with

17   respect to the financial institution as well.

18   Q    Okay. In other words, you went to employees and you

19   didn't just ask them for records, you asked them for other

20   information?

21   A    I asked certain questions that enabled me to obtain

22   certain information I was looking to determine, yes.

23   Q    Well, were those questions directed to getting documents

24   or were they directed to substance of the bank activity?

25   A    They were actually both.

*Guerci - cross/ O'Shea*

1  Q    Okay. And just give us the names of the people who you

2  talked to, other than just gathering records from them?

3  A    Well, prior to obtaining the seizure warrant from JP

4  Morgan I spoke to an individual by the name of Debra Miranda

5  and I also spoke to Jessica Guiterrez.  From TD Bank I spoke

6  to an individual by the name of Tish O'Neil, as well as Robert

7  Phelan, and from Merrill Lynch where I also obtained documents

8  I also spoke to Kate Valleau and I spoke to an individual by

9  the name of Greg Rose.

10 Q    During your deposition do you recall giving testimony

11 that your investigation was limited to bank record analysis

12 before you went to see the Magistrate?

13 A    I believe I expanded that answer to say and information

14 obtained from bank employees.  I think that would be more

15 accurate.

16 Q    But you are not backing off your deposition testimony?

17 A    No.

18 Q    Okay. Now, you say that prior to going to Magistrate

19 Judge Pollak you talked to Ms. Miranda?

20 A    I did on a number of occasions.

21 Q    And Ms. Miranda told you in that conversation that you

22 had with her that she had had no direct interactions with

23 Mr. Potenza, correct?

24 A    That's correct.

25 Q    She told you that she'd never talked to Mr. Potenza?

1   A      Not her personally, no.

2   Q      And you testified in your deposition that you had reached

3   out to Ms. Miranda to get documents, fair?

4   A      I did, and I also sought other information as well, yes.

5   Q      And do you recall testifying in your deposition that

6   Ms. Miranda was just a contact person for you?

7   A      Yes, she was a point of contact for me, yes, at JP

8   Morgan.

9   Q      Do you recall saying she was just a point of contact?

10  A      She was a point of contact, yes, that I obtained

11  information from.  Certainly remember that.

12  Q      Do you recall being asked this question and giving this

13  answer at page 12 of your deposition --

14  A      Which I don't have before me.

15  Q      Given on December 7, 2010.  We will correct that for you.

16           At line 22 page 12 -- we will give you a minute to

17  get that.

18  A      Okay. Thank you.

19           (Mr. Sockol handing to the witness)

20  Q      Do you see at line 22 you are were asked this question:

21           Question: Okay. Was Ms. Miranda just a contact

22  person at JP Morgan Chase?

23           Answer:  Yes, she was.

24  A      Yeah.

25  Q      And now you're saying here today, or actually yesterday,

1   that Ms.  Miranda is something more than just a contact

2   person; is that right?

3   A    No.  I believe that I expanded on that answer further in

4   a deposition, and I spoke of other conversations I had with

5   her.

6   Q    Did you tell -- did you testify in your deposition that

7   you had a substantive conversation with Ms. Miranda?

8   A    I certainly did.

9   Q    Why don't you tell us what the substantive conversation

10  you had with Ms. Miranda.

11  A    That conversation was with respect to a letter that was

12  sent on September 7, 2007 which was addressed to the PRP

13  Restaurant at the address for which they received their bank

14  statements. I asked her if there was, in fact, a letter sent.

15  She confirmed that there was. We talked about the substance of

16  the conversation that Shay Cavanaugh had had with Mr. Potenza

17  in regard to the sending of that letter, which was

18  approximately one week later, on September 14th.

19  Q    Did she tell you -- and she made clear to you I didn't

20  have this conversation, right?

21  A    Most certainly.

22  Q    And she made clear to you that Shay Cavanaugh had the

23  conversation, right?

24  A    Yes, she did.

25  Q    But you never asked to speak to Shay Cavanaugh, did you?

1    A     I asked her if she was available, Shay was not available,

2    so she related the conversation to me from her case file from

3    her case log.

4    Q     When did you first talk to Ms. Miranda?

5    A     That would have been -- the first time I talked to her

6    would have been October or November of 2009.

7    Q     Okay.  So in October or November, a month or two before

8    you went to the Magistrate Judge with your affidavit,

9    Ms. Cavanaugh, was unavailable believe the entire two months?

10   A     No, I didn't say that.  The day we spoke of this letter

11   she was not available, so I didn't have an opportunity to

12   speak to her.

13   Q     Did you follow up?

14   A     I did not follow up.  The only time I spoke to Shay was

15   at your office, the day of her deposition.

16   Q     After we subpoenaed her, right?

17   A     Yes.

18   Q     And Ms. Cavanaugh said at her deposition that she had no

19   recollection of talking to Mr. Potenza about a letter, right?

20   A     She did make that statement, yes.

21   Q     Now, when Ms. Miranda was talking to you in that

22   October-November time period, did she tell you that she was

23   looking at notes as she talked to you?

24   A     Yes, she was referring to her case file, yes.

25   Q     And did she say as she referred to her case file that

1    somewhere in the case file it specifically said that a letter

2    was sent and then discussed with Mr. Potenza?

3    A    She said that the case file indicated that on

4    September 7, 2007 a letter was sent, and she further indicated

5    that on September 2007 there was notes relative to a

6    conversation that took place by Shay Cavanaugh.

7    Q    Did she read you those notes?

8    A    Read them verbatim them, no.  She just summarized what

9    they stated.

10   Q    Well, did you she say that those notes reflected a

11   conversation with Mr. Potenza about the contents of the

12   letter?

13   A    She -- when I questioned her as to whether there was any

14   follow-up conversations with Mr. Potenza, she indicated that

15   there was.

16   Q    Not quite my question, sir.

17              Did she say to you the notes indicate that the

18   letter was specifically discussed with Mr. Potenza, yes or no?

19   A    That specific, no.

20   Q    In fact, she didn't tell you at all that there was any

21   indication in her log or case file that there was a discussion

22   about the letter with Mr. Potenza, did she?

23   A    The context of the conversation was to talk about this

24   conversation that took place so --

25   Q    Pardon me.  I am not talking about the context.  I am

1    talking about specifically what Ms. Miranda said?

2              Did Ms. Miranda tell you that the log that she was

3    looking at, the case notes that she was looking at, reflected

4    specifically that there was a conversation with Mr. Potenza

5    about the contents of a letter that had been sent, yes or no?

6    A    Not in the way that you put it, no.

7    Q    Now, you were at Ms. Cavanaugh's deposition, right?

8    A    Yes, I was.

9    Q    She testified that the information on contacts with

10   customers were typed into a database, do you remember that ?

11   A    Yes, I do.

12   Q    She said only approved users have access?

13   A    I believe that is what she said, yes.

14   Q    And she said that it was stressed that the logs that were

15   kept by these approved users be entered, do you remember that?

16   A    Yeah, something to that effect, yes.

17   Q    And she testified that the September 14, 2007 entry was

18   made by her, do you remember that?

19   A    She did say that, yes.

20   Q    And is it your testimony that it was the September 14th

21   entry that Ms. Miranda read and discussed with you?

22   A    I had to assume that's what she was referring to when we

23   reiterated what the context of the conversation was.

24   Q    Well, you've looked at the log, the Chase log, since this

25   case got underway, right?

1    A    I certainly have, yes.

2    Q    And fair to say that you never tried yourself before

3    seizing the money from Mr. Potenza and PRP restaurant, you

4    never tried to get yourself that log, fair?

5    A    I did not obtain the log. I asked her if that would be

6    made available, and she said it could be made available to

7    provide it, so at that point I didn't pursue it any further.

8    Q    Well, when the case was underway did you subpoena it?

9    A    Specifically, no.

10   Q    And you understood that we subpoenaed it from our side,

11   right?

12   A    Yes.

13   Q    And then you had a chance to look at it, right?

14   A    I did, yes.

15   Q    And is it your testimony here today, having looked at it,

16   that there's something in that log that says specifically a

17   letter was sent and specifically discussed with Mr. Potenza?

18   A    Not by name, no. That's not my testimony?

19   Q    Not quite my question, sir.

20        Is there anything in that log that says the letter

21   was -- there was a conversation with Mr. Potenza or anyone

22   else at PRP about the content of the letter.

23   A    There was certainly a summary of the conversation that

24   took place on September 14th of 2007 which was consistent with

25   what Ms. Miranda had told me when I spoke to her had prior.

```
 1   Q     I am going to have you look at Exhibit C?

 2   A     Okay.

 3   Q     Look at page 5323 of Exhibit C.

 4   A     Okay.

 5   Q     Fair to say this is the log that we've been talking about

 6   that led up to this question, right?

 7   A     Yes, certainly appears.

 8   Q     This is the log that you didn't get until the case was

 9   instituted, correct?

10   A     That's correct.

11   Q     And you talked about a September 14th entry, right?

12   A     Yes.

13   Q     You said in your last answer that this entry was

14   consistent with what Ms. Miranda told you in your

15   October-November conversation, fair?

16   A     Yes.

17   Q     Okay. Let's read it together.

18         September 14th, 2007, do you see that?

19   A     I certainly do.

20   Q     It says here:  Kevin O'Shea?

21   A     Right.

22   Q     And then at the top it says:  Account closure equal no,

23   right?

24   A     That's above in the -- appears to be 9/7/2007 entry, but

25   I see what you are referring to.
```

1  Q     Fair enough?

2         You are reading that as part of the entry from 9/7;

3  is that is fair.

4  A     Yes.

5  Q     Fair enough.

6         Then it says here:  Cash is being used to fill ATM

7  machine, and also, takes singles for his adult establishment

8  to tip the dancers; do you see that?

9  A     I do.

10 Q     Fair to say there's nothing in the letter of

11 September 7th that bears on that statement, right?

12 A     Not specifically, no.

13 Q     Well, not even generally, right?

14        There's nothing to go with the letter that was

15 supposedly sent on September 7th, right?

16 A     Okay. Well, no, that's not what I said. When I talked

17 with the context of my conversation with Ms.  Miranda and we

18 talked correspondence sent to her she indicated to me there

19 was. In fact it took place on September 7th. I said was there

20 follow up conversation or interaction with Mr. Potenza or

21 someone else at PRP.  She said, yes, there was.  That took

22 place on September 14th. She went on to tell me the context of

23 that conversation that took place with Shay Cavanaugh .

24 Q     Do you recall the affidavit that you prepared and was

25 submitted in this courthouse to Judge Pollak said that around

1    that time -- that time referring to the letter that was

2    supposedly sent -- bank personnel discussed the contents of

3    the letter with Robert Potenza, President of PRP, do you

4    recall putting that in the affidavit?

5    A    I do.

6    Q    And fair to say that the logged entry you are looking at

7    right now, would you say that statement -- sworn statement to

8    the Court was based on -- contains nothing about the content

9    of the September 7th letter, correct?

10   A    What I put in the affidavit was based on my conversation

11   with Ms. Miranda; not a review of this log.

12   Q    So what you told us a few questions earlier is not quite

13   the whole story, that is it?

14   A    I don't think my story has changed.  I think I'm being

15   accurate with my testimony.

16   Q    So Ms. Miranda went beyond what was in the log when she

17   talked to you?

18   A    All I can do is reiterate to you the conversation I had

19   with Ms. Miranda. She told me she was referring to this case

20   log when we spoke.  I don't know what she was referring to,

21   other than what she had told me.

22   Q    Well, doesn't it -- by the way, that statement I just

23   read to you about the cash machines and singles, that was

24   consistent with what Mr. Potenza told you when you interviewed

25   him after you seize his money, right?

1   A     Yes, it was.

2   Q     The next statement says the ATM holds 20K; do you see

3   that?

4   A      Yes, I do.

5   Q     And did Ms. Miranda tell that you in October?

6   A     Yes.

7   Q     So you knew there was a cash machine that holds $20,000

8   on the premises?

9   A     Yes, I did.

10  Q     And it then goes on to say his bank days are Tuesday,

11  Wednesday and Thursday.  He goes to two/three branches to get

12  enough singles on occasion, since branches don't hold enough

13  singles; do you see that?

14  A     Yes, I do.

15  Q     Consistent with what Mr. Potenza told you after you'd

16  seized his money, right?

17  A     Yes, it is.

18  Q     And the next line says:  The checks are being cashed

19  based on business need and not an attempt to avoid filing CTR;

20  do you see that?

21  A     I certainly do.

22  Q     Something Ms. Miranda told you when you talked to her in

23  October and November, right?

24  A     Yes, she did.

25  Q     Now, you've looked at this log, all the entries on this

1    log, before your testimony here today, right?

2    A    I'm sorry?

3    Q    You've looked at this document Exhibit C before your

4    testimony here today?

5    A    Yes.

6    Q    And is there anywhere you'd like to point the Court where

7    there's a recordation of any kind that the letter was

8    discussed with Mr. Potenza?

9    A    It say nothing in here to suggest that.  Like I told you,

10   what I put in the affidavit was based on my conversation with

11   Ms. Miranda.

12   Q    Well, not quite.

13        I mean isn't it true that you've just told us that

14   all this information that Ms. Miranda told you was not in the

15   affidavit; is that right?

16   A    All of that information, no.

17        I summarized that the fact that a letter was sent

18   and that there was subsequently a conversation with

19   Mr. Potenza.  I didn't go into any more specific detail.

20   Q    Do you think what is in your affidavit to the Court is a

21   fair summary of this entry from September 14th, 2007?

22   A    I didn't summarize the context of the conversation.  I

23   summarized the fact that a letter was, in fact -- it was

24   indicated to me that a letter was, in fact, sent, which I had

25   a copy of, and that there was a subsequent conversation with

1    Mr. Potenza.  That's all I stated. That is fair and accurate.

2    Q    Sir, is it fair to say that none of the info -- well, is

3    it fair to say that this information here on September 14th

4    could be viewed as exculpatory, right?

5    A    It could be.

6    Q    And in fairness, you didn't include any of that in the

7    affidavit to Magistrate Judge Pollak, did you?

8    A    It was not included in the affidavit, no.

9    Q    But things that were not in the log were put in the

10   affidavit, right?

11   A    Yeah, of course.

12   Q    Of course. Like a letter was discussed, the contents of a

13   letter was discussed, but nothing in that log indicated any

14   letter being discussed; right?

15   A    Based on looking at the log, I would agree with that, but

16   as I said, my references were in regard to conversations that

17   I had with Ms. Miranda relative to the sending of a letter

18   having subsequent conversation.

19   Q    Now, sticking with Exhibit N for a minute and going to

20   paragraph 13 of Exhibit N, this is the affidavit that you and

21   Mr. Westrich prepared and submitted to the Court.  By the way,

22   did any of the government lawyers have a hand in preparing

23   this affidavit?

24   A    Certainly.  Upon providing -- doing a draft of the

25   affidavit, I forwarded it to Special Assistant U.S.  Attorney

1   Brian Morris.

2   Q    Now, it says in the last sentence:  Despite the bank

3   informing PRP about the CTR filing requirement and closing the

4   JP MC account as a result of structuring activity, subsequent

5   structuring activity continued in the TD account a set forth

6   below; do you see that?

7   A    I certainly do.

8   Q    So fair to say that you're suggesting to the Court that

9   Mr. Potenza was engaged in contemptuous activity, right?

10  A    What that statement is designed to show is that he had

11  knowledge of the reporting requirement and that after being

12  notified of such he continued to -- continued a pattern --

13  what happened to be structuring activity.

14  Q    And you would agree with me that this was your prime

15  evidence of motive that you submitted to the Court on

16  December 10th, right?

17  A    That wouldn't be motive.  That would be establishing that

18  he had knowledge of a reporting requirement that we need to be

19  able to show.

20  Q    And your prime evidence of knowledge and intent, right?

21  A    Prime evidence of his knowledge of the reporting

22  requirement.

23  Q    And his intent to evade it to, be contemptuous of it,

24  right?

25  A    I need to establish for purposes of this that he had

1    knowledge of a reporting requirement, which is exactly what

2    this letter tends to demonstrate.

3    Q    And fair to say that paragraph 13 was an important

4    representation to Magistrate Judge Pollak, right?

5    A    It was a contributing factor.  As I just stated, it was

6    designed to demonstrate knowledge of a reporting requirement.

7    That was the purpose.

8    Q    You also told us that you spoke to Jessica Guiterrez at

9    JP Morgan Chase?

10   A    I did.

11   Q    And she was someone you just spoke to, to get a record;

12   fair?

13   A    Yes.  We had no substantive conversations other than to

14   get records from her.

15   Q    No one else in Chase?

16   A    No, not as of the filing of this.  I have had subsequent

17   conversations with other employees, but at the time of this

18   filing the only two I spoke to were those two individuals.

19   Q    Fair to say that in all the people you have had a chance

20   to talk to since the day you seized the money, no one -- not

21   Ms. Cavanaugh, not Ms. Guiterrez, no one has told you that

22   they had a conversation with Robert Potenza and told him that

23   your conduct could be seen as structuring, and you'd better

24   stop it in words or substance?

25   A    That not one told me that, that's accurate.

1  Q    And would it be fair that you did not visit the branches

2  where Mr. Potenza banked?

3  A    I personally did not, no.

4  Q    Well, did you do it in some other fashion besides

5  personally?

6  A    No.

7  Q    Mr. Westrich didn't, to your knowledge?

8  A    To the best of my knowledge, no.

9  Q    You knew what those branches were?

10  A    I did.  They were all identified.

11  Q    You didn't speak to anyone at either Astoria branch or

12  the Sunnyside branch, right?

13  A    I personally did not.

14  Q    Did anyone else on your team, to your knowledge?

15  A    No.

16  Q    And I think you've told us you never bothered to call

17  back and search out Shay Cavanaugh before seizing the money to

18  see what she had to say about the conversation that you swore

19  was had with Mr. Potenza, fair?

20  A    I think I made it clear I did not speak to Shay

21  Cavanaugh.

22  Q    Now, did you have knowledge before December 10th that

23  CTRs were, in fact, filed?

24  A    That multiple transaction CTRs were filed, yes.

25  Q    Did you have knowledge of -- how many did you know about?

1   A      I knew about them all.

2   Q      And when you got them did you notice anything in

3   particular about them?

4   A      Yes, I did.

5   Q      Did you conduct any further investigation?

6   A      Yes, I did.

7   Q      And did that investigation take you to the banks to ask

8   about people with knowledge?

9   A      My review of the CTRs took me to the bank records to

10  determine exactly what transactions took place in order to

11  result in a filing of those CTRs -- those multiple transaction

12  CTRs.  That was the purpose of the investigation.

13  Q      So the further investigation involved taking the CTRs and

14  then doing bank record analysis?

15  A      Yes.  As I explained yesterday, they were income.  The

16  individual that conducted the transaction was not identified;

17  nor from the face of the CTR itself was I able to determine

18  exactly what transpired to trigger the filing of the form, so

19  I needed to do further investigation, which is what I did.

20  Q      I think you told us you also spoke with Mr. Phelan and

21  Ms. O'Neil at TD Bank?

22  A      Yes, I did.

23  Q      And were any of those contacts substantive in nature?

24  A      Substantive?  Not to the same extent of some of my

25  conversations with JP Morgan, but I did obtain some

1   information from them that I believe was substantive, yes.

2   Q     By, "substantive," and perhaps that was a little

3   unartful, did either Mr.  Phelan or Ms. O'Neil tell you they

4   had knowledge -- personal knowledge of Mr Potenza's banking

5   activity or any warning given to him?

6   A     No, they didn't tell me that.

7   Q     In fact, you learned that TD Bank had never sent any

8   warning or conveyed any warning to Mr. Potenza about his

9   banking, correct?

10  A     That's correct.

11  Q     And TD did not tell you that they sent any letter to

12  Mr. Potenza?

13  A     They did not.

14  Q     And TD -- you were aware from bank records Mr. Potenza

15  and PRP had been banking at TD from February 2008 up until the

16  date when you went before the Magistrate Judge, correct?

17  A     Yes.

18  Q     And all during that time they didn't voice any complaint

19  to Mr. Potenza that they told you about, right?

20  A     That's correct.

21  Q     And you saw that they had filed CTRs on occasion?

22  A     Yes, there were six filed by TD Bank.

23  Q     Were they consistent in their filing CTRs?

24  A     Were they consistent?  You mean were they compliant with

25  what I believed to be their obligation to file them?

1   Q     Yes, sir.

2   A     Yes.

3   Q     And in every occasion?

4   A     Based on what I reviewed.  Every occasion?  I am not

5   certain as to, you know, all of what TDs practices are and

6   whether they have encountered any problems, but with respect

7   to these transaction they were consistent.

8   Q     Prepared fair to say that you did not go to the TD

9   branches or the branch that Mr. Potenza banked at, right?

10  A     I did not.

11  Q     And you didn't talk to any personnel with direct

12  knowledge of what Mr. Potenza was doing at the bank?

13  A     I did not. Only people I spoke to are the ones I already

14  referred to.

15  Q     Now, why don't we look back at the affidavit.

16  A     Okay.

17  Q     Did anyone from TD Bank tell you that they thought

18  Mr. Potenza's banking activity was structuring?

19  A     Did they tell me that, no.

20  Q     Why don't you look at paragraph 17 of the affidavit you

21  prepared at page 1429 of Exhibit N.

22  A     Okay.

23  Q     Do you see there where you say according to the bank

24  records and personnel structured cash deposit to TD account

25  consisted primarily of 50 and $100 bills, do you see that?

1    A    Yes.

2    Q    Isn't it true, sir, that no personnel told you or

3    suggested to you that cash deposits were structured?

4    A    No, but what I am referring to there is I inquired

5    further about the nature of the bills that were being

6    deposited and I was informed that they were primarily 50s and

7    100s.

8    Q    But the sentence says more than that, doesn't it?

9    A    That's exactly what I indicated, and that's what I was

10   referring to.

11   Q    But it's clear today that no one from TD Bank ever said

12   or suggested that any of these deposits were structured,

13   right?

14   A    The structuring activity, it wasn't their job to

15   determine that.  That would be my conclusion or the conclusion

16   of the government. The information that they supplied to me

17   were the records that supported my opinion, and as I, said

18   when I further inquired as to the nature of the bills that

19   were being deposited, that was what I was told.

20           THE COURT: Mr. O'Shea, I don't want to curtail your

21   cross.  It is a perfectly valid cross, but I do feel compelled

22   to note that ultimately I've got to make a determination as to

23   whether structuring occurred, and whether or not this witness

24   or any witness was careful enough in reaching their own

25   determination as to whether it occurred is not going to have

1   much impact on me I don't think. You know what I mean.  The

2   facts are the facts, and if he should have done more, should

3   have been more precise in his language, even giving you the

4   benefit of all that, he was wildly reckless and made all these

5   allegations, it doesn't really change what I have got to do to

6   resolve the case.

7              MR. O'SHEA:  I take Your Honor's point.  However,

8   this witness has been proffered as an expert by the

9   government. A guru, if you will, of structuring.

10             THE COURT: I know but it's a bench trial, so I am

11  going take his opinion and compare it to my own evaluation of

12  the facts, and frankly, the latter is going to be much more

13  important.

14             MR. O'SHEA:  I take the point, Your Honor.

15             THE COURT: But I am not curtailing you in any way.

16  If you want to continue, like I say, it's a perfectly valid

17  cross.

18             MR. O'SHEA:  Okay.

19  Q    Now, we talked a minute ago about the CTRs that were

20  filed.  Mr.  Guerci, if you would look at Exhibit 7 in the

21  book in front of you please.

22  A    Give me one second, please. Yes, sir.

23  Q    These are the 30 CTRs that were filed from November 12.

24  Fair to say that the CTRs were filed going back to 2006?

25  A    Back to what?

1   Q     2006.

2   A     Yes, they are.

3   Q     And there are some 30 of them?

4   A     I didn't count them.  As I sit here today I could.  They

5   were all the ones that were filed that I was -- I became aware

6   of.

7   Q     Okay. If we take out of the equation the conversation you

8   had with Ms. Miranda --

9   A     -- okay --

10  Q     -- what is your direct evidence that Mr. Potenza sought

11  to evade the CTR filing requirement?

12  A     As it relates to these documents that he -- I'm sorry?

13  Q     No, sir, as it relates to anything?  If you take

14  Ms. Miranda out of your conversation you claim to have had

15  with Ms. Miranda, take that out of the equation?

16  A     Okay.

17  Q     What is your direct evidence -- direct evidence that

18  Mr. Potenza knew of only and had the intent to evade CTR

19  filing requirement?

20  A     Well, the characteristic and clear pattern of what appear

21  to be consistent with structuring deposits; the fact that

22  every deposit that was made with a few exceptions into the TD

23  account was for an amount of $8,000, regardless of what day of

24  the week it was; the fact that I knew that Gallagher's or PRP

25  was a large or a very substantial cash business.  It really

1   relied on the fact that the deposit activity demonstrated a

2   pattern of which appeared to be structuring.

3           I also reviewed these multiple transactions CTRs,

4   ,and I was able to determine that, in fact, during this period

5   of time not one CTR was filed for a cash transaction over

6   $10,000 --  whether it be the cashing of a check or a deposit.

7           It further demonstrated that the CTRs that were, in

8   fact, filed if, in fact, they were, were based on transactions

9   that took place on consecutive days.

10          All of those factors was what determined my

11  conclusion with the exception of what Ms. Miranda told me

12  about that letter in the conversation.

13  Q    Okay.  Would it be fair to say that everything you've

14  told us just now in your answer is circumstantial evidence

15  based on you see the circumstances you draw a conclusion,

16  fair?

17  A    It is all based on the evidence I reviewed and my

18  experience.  That is what I relied on.  Things I have seen in

19  the past.

20  Q    You said there was never an amount over $10,000; is it

21  your understanding of the law that a citizen has to accumulate

22  cash in an amount over $10,000 before making a deposit?

23  A    No.

24  Q    So a citizen can deposit cash as he or she receives it in

25  anyway they want, fair?

1   A     Fair.

2   Q     And if they decide that they want to go to the bank three

3   times a week there's no law that prevents that, right?

4   A     Not specifically, no.  Not in a vacuum, no.

5   Q     And they don't have to wait, let's say they have $8,000

6   in 50s and 100s and then three days later 8,000 in 50s and

7   100s and three days later 4,000 in 50s and 100s, they don't

8   have to wait until the end of the week and go there with

9   $20,000 so the CTR can be filed?

10  A     Not based  on that specific set of facts and

11  circumstances that you just demonstrated, no.  If that's all

12  the money they have coming in and if we are going the deal

13  with that set of facts in a vacuum, I would agree with that.

14  Q     Well, you just said something, that is, it's your

15  understanding and belief of the law that a citizen has to

16  deposit all or most of the money coming in, in order to be

17  compliant with CTR law?

18  A     No, that is not what I said.

19  Q     Okay.  So you agree with me then that a citizen has the

20  right to accumulate cash in a business and stick it under the

21  mattress, if he wants, right?

22  A     If he chooses to do that, yes.

23  Q     As long as he pays taxes on it, right?

24  A     Well, that would be part of the equation, yes.

25  Q     Fair enough.

```
 1              Now, you said that there were some of those CTRs

 2    that were before you in Exhibit 7 were filed by TD Bank,

 3    right?

 4    A     Yes, I believe six were.

 5    Q     Six.

 6              So no one from TD Bank told you -- well, let's

 7    broaden it.  Of those 30 there are sox -- well, I will say 30

 8    -- I am not binding to my account.  So those roughly 30 that

 9    are in Exhibit 7, six are TD and the other 24 or so are

10    checks, right?

11    A     Yes, the balance are from checks.

12    Q     You never spoke to anyone at TD Bank or Chase Bank who

13    told you in words or substance that, you know what, I filed

14    this despite Mr. Potenza's best effort to prevent it?

15    A     No, these were back office filed.  I think I explained

16    the method in which these would have been filed by the bank

17    yesterday.  So to answer your question, no, no one told me

18    that.

19    Q     Thank you.

20              Why we don't we look at Exhibit 3 in your book, sir.

21    A     Certainly. Yes, sir.

22    Q     This is September 7, 2007 letter that Chase had in its

23    files respecting of PRP?

24    A     Yes, it is.  This is the one I obtained.

25    Q     Did you obtain it before or after the seizure?
```

1   A     Before.

2   Q     So before the seizure you had a chance to review this

3   letter?

4   A     Yes, I did.

5   Q     And who did you get it from?

6   A     I got it from as a result of my request through Debra

7   Miranda.  I don't specifically remember if she forwarded it to

8   me or Jessica Guiterrez, but one of those two.

9   Q     Did you ask Debra Miranda or Jessica Guiterrez, I want

10  all the letters sent to PRP?

11  A     I asked specifically about this letter which was not --

12  it was not a part of the original production.  This was a

13  follow-up request when I inquired as to whether or not any

14  letters were sent.

15  Q     So the answer to my question is no?

16  A     Yes.  That is what I think I made clear.

17  Q     So you did not say I don't want just the one letter, I

18  want any letters having to do with the banking activity of

19  PRP, you didn't ask that, did you?

20  A     I asked for the letter specifically.

21  Q     Okay. Now, did you go to the premises PRP before you

22  conducted this seizure?

23  A     The PRP Restaurant, no, I did not.

24  Q     Well, your colleague Agent Westrich did, right?

25  A     Yes, he did.

1   Q      He didn't go inside, did he?

2   A      No, he did not.

3   Q      So you and Agent Westrich had no idea about how the ATM

4   machine worked?

5   A      Like I said, Mr. Westrich nor myself was inside.  I mean

6   how specifically it worked there?  Other than my review of the

7   bank records, I knew there was an ATM on the premises. How it

8   worked?  I mean I assumed it worked like every other ATM

9   machine.

10  Q      Okay.  Well, did you know prior to the seizure that ATM

11  machine was being filled using PRP's cash and then being

12  deposited into a bank account?

13  A      Well, I knew there was an ATM machine on the premises. I

14  knew from the conversation that was reiterated to me by

15  Ms. Miranda that, in fact, there was a machine, and that Mr.

16  Potenza or someone from PRP would fill that machine.  I was

17  aware of that.  I reviewed the bank records and I saw the

18  automated credits to the account.  So it was something I was

19  fully aware of.

20  Q      That was later right -- well?

21  A      No, that was before.

22  Q      Withdrawn.

23          Did you know that the credits you saw on the bank

24  statements for the ATM -- did you know that those were as a

25  result of Mr. Potenza filling that with points and getting

1   credited for deposits to his account, did you know that before

2   you went to Magistrate Judge Pollak?

3   A    What I knew about that was that there an ATM on the

4   premises, and that, in fact, it was credited to his account

5   when people went into the bank -- not with respect to what Mr.

6   Potenza or someone from PRP put into it, but with respect to

7   what people took out of it.  That's when the automated credit

8   would be generated and credited back to his account, but I was

9   aware that 20s were being put in based on my conversation with

10  Ms. Miranda.

11            THE COURT: Can I ask a question. If you don't know

12  the answer to this -- - aren't there some ATM contracts, and

13  you may not be qualified to answer this -- where the cash is

14  not supplied by the business but it is supplied by the company

15  that supplies the ATM?

16            THE WITNESS:  Yes, I do know that as a fact.  That

17  is true.

18            THE COURT: That does happen?

19            THE WITNESS:  That does happen.

20            THE COURT:  So I guess the question to you is did

21  you know which kind of contract this ATM had?

22            THE WITNESS:  Only to the extent that it was

23  explained to me that there was an ATM on the premises, and it

24  was based on the conversation that Shay Cavanaugh had which

25  was reiterated to me by Debra Miranda.  That was the basis of

1   my knowledge at that point in time.

2   Q     Left me see if we can drill down, Mr. Guerci. Fair to

3   say that Ms. Miranda only read to you what was on the log,

4   right?

5   A     Yes, I think we've gone through that.

6   Q     That is a what I am trying to nail down.

7         So on September 14th she said ATM on the premises,

8   right?

9   A     Yes.

10  Q     And Judge Cogan just asked you if you knew specifically

11  if that was a method of depositing -- in other words, a method

12  of depositing 20s for PRP or was it some commercial ATM

13  machine.  Was the answer to that yes or no, did you know?

14  A     I knew what was told to me which was that Mr. Potenza

15  indicated to Shay Cavanaugh that he had an ATM on his premises

16  which held up to $20,000.  That is what I knew.

17  Q     And that's all?

18  A     At that point that's all.  I know additional information

19  about those transactions now, but at that point that was the

20  basis of my knowledge.

21  Q     Okay. And the point we are talking about is before you

22  went to the Magistrate?

23  A     Yes.

24  Q     So before you went to the Magistrate Judge, you did not

25  know that the ATM machine was being filled by PRP with its own

1   cash and then it was serving as a medium of the deposits,

2   right?

3   A    I think I made it clear that I didn't know that.  It was

4   -- I understood the way it worked.  I reviewed the records,

5   and I had a basis of knowledge from my conversation with

6   Ms. Miranda.  It was -- up to that point that was the basis of

7   my knowledge.

8   Q    Sir, let me try it again. Ms. Miranda never told you in

9   words or substance that the ATM machine was hooked in as a

10  method of deposit to the Chase account, did she?

11  A    We didn't get into that specificity about it, no.

12  Q    So when you went to the Magistrate you did not know that

13  the ATM machine on the premises was a medium for deposit of

14  20s, yes or no, did you know?

15  A    It was just like any other ATM machine.  It was a vehicle

16  for which the customers of PRP could obtain cash and then, as

17  a result of them taking money out, as I said, I reviewed the

18  bank records and I saw is the automated credits to the

19  account, it would not be deemed a cash deposit by JP Morgan,

20  TD Bank or any other financial institution.

21  Q    Sir, see if you can listen to the question.  You just

22  said it was like any other ATM machine after having knowledge

23  that there are different types, so see if you can listen to

24  the question.

25  A    Okay.

1    Q    Did you know -- withdrawn.

2            Do you remember when you spoke after the seizure to

3    Mr. Potenza?

4    A    I do.

5    Q    Do you remember asking him about foreign wire transfers

6    into his account?

7    A    Foreign wire transfers?

8    Q    Yes.

9    A    We did not talk about foreign wire transfers.

10   Q    Did you ask him about --

11   A    When you say "foreign" do you mean from outside the

12   country.

13   Q    Yes, sir.

14   A    No.

15   Q    Do you recall asking him, in words or substance, about

16   the RBS link or world link transfers into Chase account?

17   A    We talked about the ATM machine.  He indicated that he

18   would fill it with 20s and he also went on, and listed the

19   amount of money that was taken out of the ATM machine for the

20   last, I believe it was, eight or ten days. That was the

21   context of that conversation.

22   Q    Did you know before Mr. Potenza told you, after the

23   seizure, that the ATM machine was of the type that was filled

24   by PRP, yes or no?

25   A    I was aware of it from JP Morgan.  I was aware from the

1    conversation I had about the ATM machine.

2    Q    So is it your testimony that Ms. Miranda told you the

3    type of ATM machine it was?

4    A    We didn't get into that specificity.  I drew that

5    conclusion based on our conversation and my review of the bank

6    records.  I saw the automated credits going into the account

7    -- the JP account and then subsequently the TD account.

8    Q    So it's your testimony you knew what those accounts were

9    for?

10   A    I knew what those credits represented.

11   Q    So you knew before you went to Magistrate Judge Pollak

12   that these credits that were in the -- on the account

13   statements, you knew that they were from an ATM machine?

14   A    I knew they were a result of ATM transactions.  I further

15   reviewed Merrill Lynch records which further determined that

16   credit card transactions which were negotiated at the business

17   were credited to that account.  Not the other accounts.  They

18   were primarily or exclusively used for the ATM transactions,

19   the credit as a result of the ATM transactions.  I knew that

20   before I went to the Judge.

21   Q    Did you know before you went to Magistrate Judge Pollak

22   that the ATM was being filled with 20s?

23   A    Yes, sir, I believe I did.

24   Q    Okay.  So it is fair to say that nowhere in the affidavit

25   does it mention the ATM or the fact that $20 bills are being

1    put into ATM and being credited to his account as a deposit?

2    A    No. That wasn't the facts.

3    Q    Isn't it true that the ATM credits are set forth in the

4    deposit section of every one of those banking statements?

5    A    Yes.

6    Q    And you are not pretending -- withdrawn.

7         You are not pretending -- withdrawn.

8         You are not proffering yourself as an expert on

9    banking, are you.

10   A    I am certainly not.

11   Q    It is fair to say you have no experience in banking?

12   A    In banking specifically, no.  I am familiar with banking

13   procedures and certain aspects of banking, but no, I do not

14   have expertise in banking.

15   Q    Okay.  Now getting back to this letter.

16   A    Okay.

17   Q    Exhibit 3.

18   A    Yes, sir.

19   Q    When Mr. Westrich visited the premise of Gallagher's 2000

20   PRP Restaurant, did you have a conversation after that visit

21   with him?

22   A    I did, yes.

23   Q    And what did he tell you?

24   A    He went there to, number one, to determine that, in fact,

25   the business was located at the address he identified it at

1  and gave a physical description of what the building looked

2  like, in addition to the parking lot area which is directly

3  adjacent to the building.

4  Q    So Mr. -- withdrawn?

5       Agent Westrich did not go to 64 West 48th Street,

6  New York?

7  A    No, he went to the business location of PRP on 37th

8  Street in Long Island City.

9  Q    Did that cause you concern that this letter that you

10  obtained from the JP Morgan Chase had a different address on

11  it than the physical address that Agent Westrich visited?

12  A    No.  This was the address for which they received all

13  these bank statements.

14       (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    EXAMINATION CONTINUES

2    BY MR. O'SHEA:

3    Q      Did you check that?

4    A      Did I check that?

5    Q      Before you went to the magistrate, did you check it?

6    A      I checked it based on my review of the records and I saw

7    that every -- all of the records that I had, all of the bank

8    statements, were mailed to that specific address.

9           I also knew that that's where PSP was located, which

10   was another business that was owned and operated by

11   Mr. Potenza as well as others.

12   Q      So you were careful in checking the address, to make sure

13   it was accurate?

14   A      Yes.

15          I knew it was the same address.  I identified that

16   when I came -- obtained the letter.

17   Q      Why don't you look at Exhibit 4?

18   A      Okay.

19   Q      Is that the same address as what's on Exhibit 3?

20   A      Physical address?

21   Q      Yes.

22          Well, is it the same mailing address, sir?

23   A      The physical address of the location is the same.  What

24   is different is the top portion.

25   Q      The care of?

Guerci - cross - O'Shea                    311

1   A    The care of is missing from that letter, yes.

2   Q    In your experience -- you spent 26 years as an IRS agent.

3   You've had opportunities to have to prove mailings in mail

4   fraud cases, right?

5   A    I have never really specifically worked mail fraud.  That

6   was outside my scope.

7   Q    You've had to prove mailings?

8   A    Sure.

9   Q    You are aware that if there is a care of that's missing

10  in an address, a letter can -- can result in not being

11  delivered, right?

12  A    It's certainly a possibility.

13        As I said, the physical address was correct but I

14  did identify that there was a difference in the top.

15        THE COURT:  Where were the bank statements sent

16  again?  Did they have the mailing address on Exhibit 4 or

17  Exhibit 3?

18        THE WITNESS:  They were all addressed as they are on

19  Exhibit 4 with the care of.  That's how the bank statements

20  were addressed.  The physical address was the same but the top

21  portion was in fact different.  As I said, four is consistent

22  with what was on the bank statements.

23  Q    Let's look at Exhibit A, please.

24  A    Bear with me one second, please.

25  Q    It should be in the smaller book.

1   A     Yes, I have it.

2   Q     By the way, I think you told us you were at Shay

3   Cavanaugh's deposition?

4   A     I was.

5   Q     Do you recall Shay Cavanaugh said it is the practice of

6   Chase to send such letters by return receipt requested?

7   A     Yes, I do.

8   Q     You understand return receipt requested indicates

9   that -- from your long experience as an IRS agent -- that that

10  means that there is a receipt that comes back with a signature

11  on it indicating delivery, right?

12  A     I am fully aware of that, yes.

13  Q     Did you follow up with Chase bank to get that receipt?

14  A     Yes, we did.

15  Q     Where is it?

16  A     Shay indicated that she no longer had it, could not find

17  it.

18  Q     Well, did Shay indicate that she no longer had it or did

19  she indicate that she couldn't find it?

20  A     She said she could not find it.

21  Q     Now let's look at Exhibit A, please.

22  A     Okay.

23  Q     You see this letter is dated July 27, 2007, and it is

24  from the JP Morgan Chase Bank at Astoria, Queens, correct?

25  A     Yes, I see this.

1  Q    It is actually addressed to Mr. Potenza and addressed to

2  the physical address of PRP, right?

3  A    Yes.

4  Q    You know for a fact that that is an accurate address?

5  A    That is the address that -- where PRP is located, yes.

6  Q    Have you ever talked to Dolly Merns-Ross?

7  A    I have not personally, no.

8  Q    What about anyone else in your team?

9  A    No, not that I am aware of.

10 Q    Just so we are clear, when I ask you, if you would just

11 be good enough to -- I am asking you in a general sense.

12        You, Agent Westrich or anyone else on your team.

13 Okay?

14 A    Okay.

15 Q    Now, this is not a letter that you asked for before you

16 went to the Magistrate Judge, correct?

17 A    This is not a letter that I had obtained, no.  I had

18 asked for any other letters.  I did not have this letter.  The

19 first I saw of it was when it was produced by your firm.

20 Q    Didn't you say that you asked only specifically for the

21 letter that you say you spoke about with Ms. Miranda?

22        Did you just say that a little while ago?

23 A    We were talking about those letters or that letter and

24 that's what I was specific about.  I had not seen this letter

25 prior to.

GR      OCR      CM      CRR      CSR

1   Q     Listen to my question, Mr. Guerci.

2         Did you ask Chase before going to the magistrate, I

3   want to see all the letters bearing on the banking

4   relationship between PRP and Chase, in words or substance?

5         Did you ask that --

6   A     My --

7   Q     -- of Ms. Guitterez or Ms. Miranda or anyone else in

8   Chase?

9   A     My original request asked for any and all correspondence.

10  I later learned of the structuring letter and/or the other

11  letter and I was very specific to ask for that letter.  So I

12  had asked for it.  The only one that I had obtained was the

13  one that I referred to from September 7th.

14  Q     When you followed up, you didn't get -- initially you

15  didn't get the September 7th letter, did you say look, I know

16  this letter exists.  You didn't turn it over.  I want you to

17  redouble your efforts and make sure I have all the

18  correspondence.  I want to be fair here, words or substance?

19  A     I don't recall specifically asking for that, no; or in

20  that context, no.

21  Q     Okay.  Fair to say, this letter is addressed to

22  Mr. Potenza and indicates from its face that Mr. Potenza had

23  made a request to the bank?

24  A     Yes.

25  Q     That request called for a recitation, if you will, of his

GR      OCR      CM      CRR      CSR

1   banking activity in a particular month?

2   A    Yes.

3   Q    Would you say that this letter calls attention to that

4   banking activity?

5   A    Yes.

6   Q    And certainly is not indicative, in your experience, of

7   someone who is trying to hide that banking activity, right?

8   A    I had seen this letter which was attached to an

9   application that was made by Mr. Potenza.  I have subsequently

10  spoken to individuals at JP Morgan and I was informed, not by

11  Dolly Rosa (sic), by someone else, that these requests were

12  made, these letters were issued, and they were a part of a

13  permit application by Mr. Potenza.

14  Q    You learned that after we subpoenaed them from the bank,

15  right?

16  A    Yes.

17          After I saw them and they were made a part of the

18  firearms application by Mr. Potenza to New York City.

19  Q    Okay.  That's good to know.  But let's get back to my

20  question.

21  A    Okay.

22  Q    Fair to say, in your experience this letter is calling

23  attention to Mr. Potenza's banking activity?

24  A    Yes.

25          This letter was a part of that application, which

1   requested -- the application requested that he basically

2   demonstrate that he was carrying large amounts of cash, which

3   would be a factor in them issuing the firearms carry permit.

4   This was something that was requested by the branch location

5   which was in Astoria.

6   Q    It certainly in no way reflects an attempt to hide

7   anything about the cash deposits being conducted by PRP in

8   that time period reflected in the letter, correct?

9   A    No.

10        It summarizes -- we have already gone through the

11  account activity for that specific period of time.

12  Q    I said correct and then you said no.  I am going to have

13  to ask it again.

14  A    Okay.

15  Q    This letter, fair to say, shows no signs of evasion or

16  subterfuge with respect to the request to Chase Bank, right?

17  A    No, it does not.

18  Q    It shows that Mr. Potenza is in fact saying, look it, I

19  want you to look at my banking and tell me what it is, examine

20  it, scrutinize it and tell me in a letter what it is, right?

21  A    As I said, this letter was requested by Mr. Potenza to

22  demonstrate that he was involved in carrying large amounts of

23  cash.  It was a request that he made.  This letter was issued

24  after he requested that an employee of Astoria, the Astoria

25  branch review his account activity and give him the letter

Guerci - cross - O'Shea                    317

1    which he made a part of his permit application.

2    Q    Not just carrying cash, depositing; right?

3    A    Well, the -- the application for the firearms permit was

4    to demonstrate that he in fact was carrying cash.  He would

5    carry it from his business to the bank.

6    Q    To deposit?

7    A    To deposit it, yes.

8    Q    Okay.  So fair to say, this letter is inconsistent with

9    someone who is attempting to fly under the radar with respect

10   to his cash deposits, correct?

11   A    This draws no conclusions about the specific activity.

12   It talks about how much -- what his deposits were for this

13   relative period of time.  In sum it doesn't break down and

14   identify what in fact the pattern of the deposits was.  It

15   just was to serve a particular purpose.  That's what it did.

16   Q    Sir, you are testifying here as an expert, right?

17   A    Yes.

18   Q    In your expert opinion, is this letter more consistent

19   with someone who is attempting to hide his banking activity or

20   to call attention to it?

21   A    This letter served a particular purpose.  I did

22   not -- this would have no bearing on any of my conclusions.

23   My conclusions or opinions would be based on a total review of

24   the evidence.  This is one piece of -- one document that has

25   no bearing on that whatsoever.  It wouldn't change my opinion

1    today.  It wouldn't have changed my opinion now.

2    Q    You look at this letter and say this has nothing to do

3    with what this Court should consider about whether Mr. Potenza

4    was trying to fly under the radar with respect to his banking,

5    has nothing to do with it?

6         That's your testimony?

7    A    This letter summarizes his account activity.  It has

8    nothing to do with any opinions that I might draw.  As I said,

9    I have gone through what I based my opinions on.

10   Q    You are being absolutely fair and objective in giving

11   that opinion, right?

12   A    Yes.

13   Q    Let's look at Exhibit B.

14   A    Okay.

15   Q    Actually, let's stay with this a minute.

16   A    Okay.

17   Q    You just mentioned something that it doesn't -- the

18   letter itself doesn't talk about the account activity.  Let's

19   look at the account activity.

20        Why don't you pull out Exhibit 2, if you would?

21   A    Okay.

22   Q    If you look at page 1063 to start within that exhibit.

23   A    Okay.

24   Q    And going through to 1072.

25        Would you agree with me that this is the account

1    activity set forth on the deposit statement for the period set

2    forth in Exhibit A, the letter dated July 27, 2007?

3    A    Yes.  It appears to encompass that period of time, yes.

4    Q    Now let's look at page 1063.

5         You see under the deposits and additions section?

6    A    I do.

7    Q    The top of the page?

8    A    Yes.

9    Q    You see 6/29, deposit, $4,000; you see that?

10   A    I do.

11   Q    This is one of those places where it's not $8,000, right?

12   A    No.  This is relating to the Chase account.

13   Q    Okay.

14   A    So, yes, it was not an $8,000 deposit.  It was a $4,000

15   deposit.

16   Q    Fair to say, that while there are many $8,000 deposits,

17   there are many others that are in lesser amounts, right?

18   A    Well, when I refer to the $8,000 increments, that's more

19   specific to the TD account which was the basis for the

20   affidavit.  The JP Morgan account, as I testified yesterday,

21   had even dollar amount deposits up to $9,000.  But there was

22   not that same consistent pattern of $8,000.  They were amongst

23   other deposits, eight thousand, nine thousand, seven thousand,

24   six, four and so forth.

25   Q    Fair enough.

1          Okay.  Look now at page 1070 of Exhibit 2, please.

2     A    1070?

3     Q    1070, yes, the Bates number 1070, please.

4     A    Yes, sir.

5     Q    Do you see there under the deposits and additions

6     section?

7     A    I do.

8     Q    And do you see it sets forth a deposit on July 2 $5000,

9     July 3 $3000, July 9 $8000, July 9 $5000?

10         You see that?

11    A    I do.

12    Q    Fair to say, that the July 9th deposits are -- are a

13    deposit that would have been made on a week day, right?

14    A    No.  July 9th was -- from looking at this statement, all

15    I can determine is that these two deposits posted on July 9th.

16    I would have to go back and actually get further information

17    to determine if in fact -- if I remember correctly, July 9th

18    was a Monday.  So I went back and I was able to determine, and

19    if I recollect, the July 9th, the first deposit, for eight

20    thousand -- eight thousand was actually made on a Saturday.

21    Q    Fair enough.

22    A    All I can tell from the statement is the date it posted.

23    I have to go to the backup documents to determine the physical

24    day or the actual calendar day the deposits took place.

25    Q    You have to go to both a calendar and to the actual

1   deposit slip?

2   A    That is correct.

3   Q    I guess I was engaging in a little bit of a shortcut

4   there.

5            You know for a fact that one deposit was made on a

6   weekend and one was made on a Monday.  They were both credited

7   on a Monday, fair?

8   A    Based on my recollection, I'd have to look at the

9   multiple transaction CTRs or, as important, or more

10  importantly, the actual deposit tickets themselves.

11  Q    Okay.  So also fair to say that, for example, on

12  July 9th, you've got two deposit credits for RBS Lynk for

13  $6400 and $5160, credited to the account on the same day,

14  right?

15  A    Yes.

16  Q    And if you look on page 1072, you have got another one at

17  the top, 4340; right?

18  A    Yes.

19  Q    So a lot of cash is going in to the account, all credited

20  on the same day, right?

21  A    I wouldn't categorize those as cash.  The deposits,

22  again, you can't determine from a statement what type of

23  deposit it was as it relates to what is denoted as a deposit.

24  The RBS Lynk I know was an automated credit to the account.

25  So I wouldn't categorize those as cash.

GR      OCR      CM      CRR      CSR

Guerci - cross - O'Shea                    322

1           The other deposits I learned from a review of the

2    deposit tickets that they were in fact cash deposits.   I

3    would -- I think we need to make a distinction as to what is

4    cash and what is an automated credit.

5    Q    So that we don't have to argue about it, the nomenclature

6    and all the rest of it, you would agree with me that those

7    deposits are from a clearing of the cash machine in which

8    Mr. Potenza or somebody else at PRP loaded the machine,

9    someone took cash out and that reflected a deposit credit to

10   his account?

11   A    Yes.  As a result of the removal of the money by the

12   customer, yes, I would agree with that.

13   Q    Okay.  If you look down the rest of this page, there is a

14   deposit on July 11th for $3,000, the 17th $7,000,

15   the 18th $3,000, the 20th $5,000, the 23rd $5,000, and

16   the 26th $7,000, and the 27th $8,000.

17           You see that?

18   A    Yes, I do.

19   Q    This is the time period that Mr. Potenza is asking the

20   bank to scrutinize in the letter, Exhibit A, right?

21   A    Well, scrutinize?  This is the period of time that he

22   asked for a summary of the account activity.

23   Q    Are you aware of whether a CTR was filed in this time

24   period?

25   A    I do believe that there was, multiple transactions CTR.

1  I'd have to look at the documents.  I believe that there may

2  have been one filed on July 9th.  Without going through this

3  in particular detail, but if I -- if you allowed me to refer

4  to the multiple transaction CTRs, I could be more certain

5  about that answer.

6  Q    Sure.

7          Exhibit 7, I may have a cite for you.  I think it's

8  1817, the exact page.

9          (Pause.)

10  A   I am flipping through to see if there are any others.

11          (Pause continues.)

12          It appears that the only one that relates to

13  deposits during that period of time is exhibit -- Government

14  Exhibit 1817.  There is another one filed but it relates to

15  the cashing of checks.  It appears the only one is that one.

16  Q    Okay.  Exhibit 7 at page 1817, right?

17  A    Yes.

18  Q    Okay.  Now, would you agree that some of these other

19  deposits, Chase could have filed a CTR on?

20  A    Could have filed?

21  Q    Yes.

22  A    No.

23  Q    So they couldn't have filed it because they weren't

24  structured?

25  A    No.

Guerci - cross - O'Shea                    324

1        They couldn't have filed it because they didn't

2   exceed the $10,000 reporting requirement on the same business

3   day.

4   Q    Isn't it -- isn't it the practice of banks if they see a

5   deposit of $8,000 on one day and 7,000 on the other, for an

6   example, isn't it the practice of banks to often say well,

7   that's close enough in time.  We are going to file a CTR to be

8   safe.

9   A    Not unless it falls on the same business day.

10  Q    That's your -- your -- withdrawn.

11       That's based on your knowledge of banking practices?

12  A    That's based on my knowledge of the CTR filing

13  requirements and the bank Secrecy Act.

14  Q    So it is your belief that a bank could not file a CTR in

15  its judgment about deposits made on different days in

16  different amounts but totalling $10,000 in a couple of

17  different -- couple of different time periods?

18       Withdrawn.

19       A bank could not file a CTR in its judgment if on

20  one day there was an amount and the second day an amount that

21  pushed the first amount over $10,000?

22  A    Unless it somehow fell on the same business day.  If, for

23  example, I went into the bank on Monday after 3:00 o'clock,

24  let's say their closing time was three, I conducted the

25  transaction at 4:00 o'clock for $7,000.  I went back the next

1    morning at 9:00 o'clock, and I conducted a transaction for

2    $8,000.  That in fact would trigger the filing of a CTR

3    because it took place on the same business day.  The business

4    day typically ends at most financial institutions at 3:00

5    o'clock.  Anything after that would carry over to the next

6    business day.  That would cause the filing of a CTR.

7              Same thing would apply if it was a Saturday.  If you

8    conducted the transaction on Saturday, it would carry over

9    because Saturday is not identified as a business or a banking

10   day.  It would carry to Monday.  That's what we demonstrated

11   from some of these other multiple transaction CTRs.

12   Q    Would you agree, sir, that if a bank files a CTR, it

13   doesn't necessarily indicate structuring has occurred?

14   A    No, that's correct.

15   Q    In fact, a person can go and deposit several times an

16   amount innocently and a CTR could be filed and no structuring

17   could have occurred at all?

18   A    Yes.

19             I think we have explained, or I have clearly

20   explained, what would cause the filing of a CTR.  But, yes, I

21   would agree with that.

22   Q    Is there anything inherently -- as you looked at this one

23   month account statement, is there anything inherently

24   suspicious, inherently suspicious, about the account activity

25   you see on that page?

1   A     Limited to looking at that statement?

2   Q     Yes, sir.

3   A     There are -- like I said, this -- one multiple

4   transaction.  I would have to look at all of the -- just

5   looking at this statement, no.  I'd have to look at all of the

6   documents, look at the cash deposit activity.  It wouldn't be

7   based on one month's worth of activity.  It would typically be

8   based on a much broader span, which is what was done in this

9   case.

10  Q     Okay.  Now going back to Exhibit A.  You see in the

11  letter where it says the second paragraph from Ms. Merns-Ross,

12  Vice President in Business Banking at Chase, the account has

13  been conducted in a satisfactory manner?

14  A     I do.

15  Q     Do you believe as an expert here that that is

16  inconsistent with the message contained on the letter sent on

17  September 7th?

18  A     It's inconsistent with certainly my review of the

19  documents.  But this was limited to this period of time.  I am

20  talking about the case in its totality.  I would say it's

21  inconsistent.  But based on her evaluation and that was her

22  opinion on what she reviewed and what she summarized.

23  Q     Okay.  She is an officer of Chase Bank, right?

24  A     She is.

25  Q     Pretty sophisticated financial institution?

Guerci - cross - O'Shea                    327

1    A    Yes, it is.

2    Q    Okay.  But just looking at the body of the letter,

3    Exhibit A, and comparing it to Exhibit 3, this letter dated

4    September 7th, would you agree, just based on the body of the

5    letters and the message conveyed within it, that the message

6    conveyed in Exhibit A is inconsistent with the message

7    contained in Exhibit 3?

8    A    Okay.  Let me just make sure I am looking at the right

9    documents.

10            Exhibit 3?

11   Q    Yes.  That's the September 7th letter.

12   A    Okay.  Yes.  The -- the September 7th letter is not

13   talking about this period of time specifically.  It is talking

14   about a much broader span and a further analysis of the

15   account.

16            I think we have gone through why this letter was

17   issued.  It says what it says.  There is a summary of the

18   account.  It served a purpose for Mr. Potenza and it

19   summarizes the activity and there are statements in there that

20   based on Ms. Rosa (sic) that the account activity that she

21   reviewed was done in a satisfactory manner.  It says what it

22   says.

23            THE COURT:  Mr. O'Shea, I think I've got your point.

24   I am going to invoke the dead horse principle.

25            MR. O'SHEA:  Well, as you can see, I've got a

Guerci - cross - O'Shea                              328

1    witness who is --

2             THE COURT:  But we are arguing now over what the two

3    letters mean.  You can argue to me without doing it through

4    the witness.

5             MR. O'SHEA:  Your Honor, I take your point.

6    However, he has been proffered as an expert.

7             THE COURT:  That's why I have let you go on for

8    quite a bit.  But now I have your point about the argument.  I

9    understand you think he is being evasive and not recognizing

10   the obvious.  I know that's your position.

11            Then I will determine in deciding the case whether

12   you are right or not.  You don't need to keep doing that.

13            MR. O'SHEA:  Thank you.

14            I will move on.

15            THE COURT:  Fine.

16   EXAMINATION CONTINUES

17   BY MR. O'SHEA:

18   Q    Let's look at Exhibit B, sir.

19   A    Yes, sir.

20   Q    Fair to say, that -- do you have it?

21   A    I do.

22   Q    Okay.  Fair to say, that this is a letter dated just two

23   days before Exhibit 3, this letter?

24   A    Yes, it is.

25   Q    Also says the account has been conducted in a

1    satisfactory manner?

2    A    It does.

3    Q    And also written by a different person at Chase Bank,

4    right?

5    A    Yes.

6              In fact, at a different branch as well.

7    Q    By the way, did you ever see in your investigation of

8    this case Mr. Potenza or anyone else at PRP breaking down

9    deposits and depositing in different branches?

10   A    Did I see that?

11   Q    Yes, sir.

12   A    Based on my review?

13   Q    Yes, sir.

14   A    No.

15   Q    You know from your long experience with structuring, that

16   that's a tactic, an evasive tactic that's used in structuring

17   cases?

18   A    I have seen it done at times, yes.

19   Q    Okay.  You have seen people use different bank accounts

20   to deposit more than $10,000 in a particular day?

21   A    I have seen structuring done in a variety of ways, yes.

22   Q    That is one of them?

23   A    Yes.

24   Q    Okay.  You saw none of that, right?

25   A    No.  I think I explained yesterday what I saw was the

Guerci - cross - O'Shea                     330

1   limiting of the deposit and a pattern that demonstrated as it

2   related to the TD account $8,000 deposits.

3   Q     Have you ever seen in your long experience a case where

4   someone had been engaged in structuring and went to the bank

5   and asked for letters like Exhibit A and B?

6   A     In my experience?

7   Q     Yes, sir.

8   A     Seen that happen?

9           No, not that I can recall.

10  Q     Ever seen a case where large cash ATM credits were

11  deposited into the same bank account in the amounts like this,

12  where structuring had occurred?

13  A     I have seen ATM credits to an account where structuring

14  has occurred before, yes, or credit card credits, yes.  I

15  treat them as one and the same.

16  Q     In the amounts of his -- like this case?

17  A     Like this case?  Yes.  Similar to this, similar to this

18  case.

19          I have seen this type of activity before,

20  structuring contained within an account where there was other

21  credits that were being deposited or even checks that were

22  being deposited.

23  Q     Not my question, sir.

24          Any case where you have seen where -- let me put it

25  more -- a more specific question.

GR       OCR       CM       CRR       CSR

1       A business is -- has got an ATM on the premises

2  which is wired in, if you will, to their account, and they are

3  depositing it into the same account that they are also

4  depositing cash and trying to engage in structuring.  Have you

5  ever seen a case like that?

6  A    Yes, yes.

7  Q    What's the name of the case?

8  A    I don't remember the name of the case.  I have -- I have

9  been involved in hundreds of cases, either as a case agent or

10 asked to consult or advise on a case.  I have certainly seen

11 businesses that were engaged in structuring that had other

12 credits going into the account, whether it be as a result of

13 an ATM that was on the premises or credit card transactions

14 also.  It all went into the same account.

15       As I know, that wasn't the way PRP was set up.

16 Their credit card credits went elsewhere.  They went to

17 Merrill Lynch.

18 Q    Let's talk about the interview that you conducted with

19 Mr. Potenza on December 10th.

20 A    Okay.

21 Q    Fair to say, that you had already seized his money by the

22 time you interviewed him?

23 A    That's correct.

24 Q    You were trying to be as fair as you could, I think you

25 told us earlier, but you didn't want to get his side of the

1  story before taking his money?

2  A    Well, I don't know that I made an investigative decision

3  to seize the account before we interviewed Mr. Potenza.  Our

4  concern in a situation like this is that money could be moved.

5  So we seized the account and then I did a subsequent in

6  conjunction with Special Agent Westrich to interview

7  Mr. Potenza.

8  Q    Have you ever used the tactic in your experience where

9  you write a letter to the bank asking them to put a hold on

10  money pending an investigation?

11  A    Yes.  We have done that at times, yes.

12  Q    You didn't do it here, right?

13  A    Did not.

14  Q    That technique was available to you in this case?

15  A    It's always something that's available.

16        But typically we would do something like that when

17  there are other mitigating circumstances, which didn't exist

18  here.

19  Q    Fair to say that when you spoke to Mr. Potenza, he was

20  cooperative?

21  A    Yes, I would categorize him as cooperative.

22  Q    Answered all your questions?

23  A    He did.

24  Q    Didn't refuse to answer any questions?

25  A    Did not.

Guerci - cross - O'Shea                    333

1   Q     When you asked him, he said he was not structuring,

2   right?

3   A     Well, he -- he indicated -- he gave reasons as to why he

4   did things.  He didn't specifically say I was not structuring

5   but he certainly answered and he was responsive to our

6   questions.  I inquired as to why he was conducting the

7   deposits in the nature in which he did, being specific to the

8   $8,000 pattern, and he gave me explanations.

9   Q     If Agent Westrich testified that in that call Mr. Potenza

10  denied structuring, would you disagree with that?

11  A     Well, I mean, we could certainly infer based on the

12  answers he gave that that was his justification as to what he

13  was doing and why.  So, I mean, his answer was basically

14  indicating that I was not structuring for these reasons.  But

15  those exact words did not come out of his mouth.

16  Q     Did you ask Mr. Potenza or was there a discussion about

17  why he carried large amounts of cash?

18  A     Well, we knew that he had a large cash business.

19  Specifically why he carried large amounts of cash?

20  Q     Yes.

21  A     We knew that he had a business that generated large

22  amounts of cash.  Our questions were more specific to the

23  deposit pattern.

24  Q     Did he tell you that the deposit pattern was in part

25  because of his concerns for security?

1   A     Yes, he did.

2   Q     And that he didn't want to go to the bank with

3   inordinately large amounts of cash?

4   A     He did state that, yes.

5   Q     He did tell you that the number that he used was the

6   fifties and hundreds he had on hand and it was just a number?

7   A     He did say that eight thousand was just a number, yes.

8   Q     He told you that there were the -- that he deposited

9   fifties and hundreds as he gets them, right?

10  A     He said he had really no use for them in the business and

11  that's why he deposited the fifties and the hundreds and he

12  went on to explain they had a use for the other denomination

13  of bills.

14  Q     He told you about the on premises cash machine?

15  A     He did.

16  Q     And he told you that he loaded it with twenties?

17  A     He did.

18  Q     So that he had use for the twenties, right?

19  A     Most certainly.

20  Q     And that use resulted in a deposit into his account,

21  right?

22  A     Ultimately would result in a deposit after customers took

23  money out, yes.

24  Q     Okay.  But he told you that his use of the ATM machine

25  resulted in a recordation of that cash, right, that cash

1  deposit?

2  A    I don't know if we got into that specificity.  I was

3  aware that that in fact happened.  We talked about the ATM

4  machine.

5         As I said before, he actually went -- he had asked,

6  I believe it was, Ms. Potenza, what the last eight or 10 days

7  worth of withdrawals from the ATM machine in fact were.  He

8  actually gave us those figures very specifically.  So we spent

9  a decent amount of time talking about the ATM but more as it

10 related to what was taken out of it and what he actually used

11 to fund it, which was the twenty-dollar bills.

12 Q    Would you agree that having an ATM on the premises that

13 you load yourself with cash and withdrawals end up being a

14 deposit to your account, leaves a paper trail?

15 A    Yes.

16 Q    Would you agree that the IRS when they are doing tax

17 evasion investigations, one of the first things they look at

18 is bank account activity?

19 A    No doubt.

20 Q    Would you agree that the twenty-dollar bills that are

21 accumulated into a credit in the deposit section of those bank

22 account statements, that that leaves a clear trail which would

23 be one of the first things if you are looking at evasion that

24 an IRS agent would look for?

25 A    I would agree that it would demonstrate a deposit

1    activity into the account.

2    Q    An obvious deposit activity, right?

3    A    Yes.

4         It would be a credit to the account based on money

5    that was deposited into the ATM machine.  I mean, there

6    is -- we are talking about the ATM machine.  We are talking

7    the method in which the credits were issued to the account.

8    Understanding that some of those twenty-dollar bills certainly

9    recirculate themselves through the business.  It wasn't as if

10   Mr. Potenza would deposit the money into the account -- I'm

11   sorry -- into the ATM machine and that would reflect a

12   deposit.

13        The deposits occurred in one of two forms.  When

14   individuals took money out he would be credited as a result of

15   their accounts being debited.  Plus he was also credited or

16   PRP was credited for the commissions that were charged.  So it

17   was actually credited in two ways.  That's clearly broken out

18   on the statements which I have corresponded to the other

19   records that kind of substantiate the amounts.

20   Q    A clear paper trail in the amount of hundreds of

21   thousands of dollars, right?

22   A    Yes.  There is a paper trail as to what was credited as a

23   result of his ATM machine, yes.  I would agree with that.

24   Q    Having an ATM machine of the type we are talking about

25   here, PRP, is not a good thing to have if you don't want to

GR      OCR      CM      CRR      CSR

1   leave a paper trail, right?

2   A    It's a vehicle for which his customers can obtain cash.

3   Q    That's not quite my question, sir.

4        Fair to say, it leaves an unmistakable paper trail

5   of all the cash that's taken out of the machine, right?

6   A    Yes.

7        It demonstrates -- it demonstrates the credits to

8   the account.  It would demonstrate a revenue or stream of

9   revenue.

10  Q    And it's not flying under the radar, is it?

11  A    Not with respect to those transactions, no.  It would not

12  be.

13  Q    Mr. Potenza also told you that he used tens and fives in

14  making up banks for bartenders and change?

15  A    He did.

16  Q    He told you that he went to the bank a couple of times,

17  three times a week, to get change?

18  A    Specifically singles.

19  Q    Okay?

20  A    For tipping out the dancers.

21  Q    Specifically singles and what, he would trade fifties and

22  hundreds?

23  A    I don't know that he went that specific.  We talked about

24  him going and exchanging larger bills for singles.

25  Q    Did he tell you that he paid vendors, some vendors in

GR        OCR        CM        CRR        CSR

1  cash?

2  A    He did; approximately $10,000 a month, I believe he told

3  me.

4  Q    Sorry?

5  A    I believe he told me that his cash -- his vendors he paid

6  for his beer and food, I guess his beer distributor and his

7  food, about 10,000 a month that he paid out in cash.

8  Q    Did he tell you he had a cash payroll?

9  A    He did.

10  Q    He didn't try to hide any of that from you, right?

11  A    As I said, he answered our questions.  Those were the

12  responses he gave.

13  Q    You asked him about his tax status?

14  A    I did.

15  Q    He told you that his accountant had passed away?

16  A    He did tell me.

17        That was part of the conversation about his taxes

18  and whether he in fact had even filed I guess it was the 2009

19  return.

20  Q    He told you that his -- although his accountant had

21  passed away, he was current with his taxes?

22        He had been making his tax payments, right?

23  A    Yes.  I believe he told me or told Brian or Special Agent

24  Westrich and I that he was on extension and he had made tax

25  payments to cover any liability he might have.  I believe that

1  was what he had informed us of.

2  Q    Did you ask him why he had a Merrill Lynch account?

3  A    I believe we talked about the Merrill Lynch but I believe

4  it was an unsolicited response.  He indicated that he also had

5  a Merrill Lynch account which I was obviously fully aware of.

6  Q    Okay.  He told you that the Merrill Lynch account did not

7  accept cash, right?

8  A    He did.

9  Q    You just said he had -- it was unsolicited.

10         Isn't it true that much of the information that

11  Mr. Potenza relayed to you was volunteered?

12  A    Well, it was in response to our questions.  He answered

13  our questions.

14  Q    But you asked specific questions and Mr. Potenza was not

15  evasive.  He was more than forthcoming, right?

16  A    As I said, he answered our questions and he was

17  cooperative in that regard, absolutely.

18         THE COURT:  Mr. O'Shea, are you near wrapping up?

19         MR. O'SHEA:  I'm sorry, Judge?

20         THE COURT:  Are you near wrapping up?

21         MR. O'SHEA:  I have a couple of more areas, Your

22  Honor.

23         THE COURT:  Why don't we take a morning break.  We

24  will reconvene in ten minutes, at 11:20.

25         (Recess taken.)

1          THE COURT:   You may continue.

2   CONTINUED CROSS EXAMINATION

3   BY MR. O'SHEA:

4   Q    Mr. Guerci, did Mr. Potenza volunteer to give you his tax

5   returns on December 10th, 2009?

6   A    At that point we didn't discuss that, but at a subsequent

7   date he did sign a form that enabled us to get copies of his

8   tax returns, yes.

9          THE COURT:   If it helps you, I'm prepared to find

10  as a fact right now Mr. Potenza was more than fully

11  cooperative when he was approached by these people.

12         MR. O'SHEA:   Thank you.

13         THE COURT:   I got that point.

14  Q    After you seized the funds, you received the PRP cash

15  books in this case?

16  A    That would have been subsequent to when the discovery

17  phase started, I believe in September of 2010, yes.

18  Q    You also obtained the general ledgers?

19  A    Yes, I did.

20  Q    You obtain those from Graph Repetti?

21  A    Those were produced as a result of the discovery request.

22  They came from the production by your firm which came from the

23  request from PRP.  I didn't get them directly from Graph

24  Repetti, I got them as a result of the discovery of the

25  request from PRP.

1  Q    You had an occasion after you received the cash flows and

2  the ledgers to compare those to the bank account statements,

3  right?

4  A    Yes.

5  Q    Fair to say that they all matched?

6  A    Yes, the entries that were denoted on the cash books were

7  also consistent with what was in the bank statements, yes.

8  Q    The charts that you went through with us yesterday that

9  you offered were based on the information provided by Joseph

10 Johnson, correct?

11 A    In part.

12 Q    What other?

13 A    Also the records, the cash books, specifically comparison

14 from the cash books and the records I obtained from

15 Mr. Johnson, some other factors as it related to the V I P

16 room fees, 27.3 percent Mr. Fillipone spoke about, variables.

17 For all intents and purposes, it was about the cash books and

18 those records from Mr. Johnson.

19 Q    Is it fair to say your conclusion there was evasion was

20 based on the testimony and records of Mr. Johnson, those

21 photocopies that Mr. Johnson gave you, correct?

22 A    Based on those records, that was what I drew my

23 conclusions based on the analysis I did, yes.

24 Q    You didn't do any other sort of --  withdrawn.

25        You're aware of something called net worth analysis?

1   A    Certainly am.

2   Q    You spent 26 years as an IRS agent, must have done that

3   on many cases?

4   A    Many years ago I did, yes.

5   Q    Net worth case, fair to say, is an examination of the

6   expenditures of a target, targeted individual to see if he's

7   spending more money than he's actually declaring, right?

8   A    Well, something along those lines.  That would be a fair

9   analysis of it, yes.

10  Q    You didn't do anything like that with respect to

11  Mr. Potenza's life style or anything like that?

12  A    No.

13  Q    Just Joseph Johnson.  Then you compared Joseph Johnson's

14  information and then you put those together with the cash

15  books, compared them, created those charts, fair?

16  A    That's the basis of my analysis, yes.

17  Q    You said yesterday that you testified that you looked at

18  the insurance policies of PRP; do you recall that?

19  A    I did.

20  Q    Did you in connection with that inquire into, do an

21  investigation into the cost of insurance?

22  A    Specifically I saw what Mr. Potenza was paying or PRP was

23  paying but no, not specific to that, no.

24  Q    Have you ever run a business yourself?

25  A    Small business.

1   Q    What business was that?

2   A    Contracting business.

3   Q    How long ago was that?

4   A    I actually abolished the business two years ago.

5   Q    Then went back to work --

6   A    It was a small business I operated was during my tenure

7   as a special agent.  Once I retired as a special agent, that

8   business essentially was closed down and I'm just doing this

9   now.  I ran a small business.

10  Q    Fair enough.  Did you look into whether the premises had

11  an alarm?

12  A    I was aware they did have an alarm.

13  Q    Video?

14  A    I was aware of video cameras.

15  Q    A safe?

16  A    No, there was no safe as I understood it on the premises.

17  Q    Is that as a result of the investigation or you're just

18  guessing?

19  A    I asked Mr. Johnson if in fact there was a safe on the

20  premises.  He said there was not as far as he was aware.

21  Q    Did you do any investigation to corroborate Joe Johnson's

22  allegations?

23  A    Mr. Johnson didn't essentially make any allegations other

24  than to come in when we first met.  He reported the payroll

25  practices of the business which essentially indicated there

1   was people being paid off the books.  As far as anything else

2   goes, when we talked about the evasion of taxes, that's not

3   something he was specifically alleging that was going on.  He

4   didn't know anything about how the income streams were being

5   handled after he accumulated them and gave them over.

6   Q    That was your conclusion?

7   A    That was my conclusion based on the review of the

8   documents, yes.

9   Q    Mr. Johnson was giving you factual allegations, right?

10  A    He was giving me facts.  These allegations were only with

11  respect to what was going on with the payroll itself.  As far

12  as the other areas that we covered, it was really just him

13  being responsive to my questions about the income streams,

14  what some of the fields represented in terms of how much money

15  was being paid by dancers and so forth, how income streams

16  were handled, essentially coming into the business.  There

17  were no allegations he was making in regards to that.

18  Q    Let's take allegations out of the question.  Mr. Johnson

19  gave you what he alleged to be facts, right?

20  A    He gave me facts, yes.

21  Q    Did you do anything to corroborate what he alleged to be

22  facts?

23  A    Corroborate?  I took the records which appeared to be

24  reliable to me, then I did a comparison to the records that I

25  had available from PRP.

1   Q     Did you interview any other employees at PRP about its

2   business practices?

3   A     During what periods?  I attended a couple of depositions

4   that related to other employees but did I interview outside

5   the scope of that?  No.

6   Q     You attended the disposition of Ms. Schmidt, Mr. Gleason?

7   A     Yes.

8   Q     Both were former employees?

9   A     Yes.

10  Q     Both of them gave a different version of the facts that

11  Mr. Johnson was alleging than Mr. Johnson, correct?

12  A     They corroborated certain things Mr. Johnson had told us

13  me.  Then there was a somewhat different version of some of

14  the facts, yes.

15  Q     That caused you any concern?

16  A     No.

17  Q     When Mr. Johnson testified yesterday --  withdrawn.  You

18  heard you were at Mr. Johnson's deposition in February?

19  A     Yes.

20  Q     Heard Mr. Johnson take the Fifth over and over again in

21  that deposition, right?

22  A     With respect to certain questions he took the Fifth, yes.

23  Q     Questions having to do with income he received?

24  A     Yes.

25  Q     Questions having to do with tipping income he received?

1   A     Yes.

2   Q     You heard him take the Fifth yesterday about selling

3   liquor, pocketing cash yesterday?

4   A     I did.

5   Q     You heard him take the Fifth when I asked him if the

6   money from the house mom and the DJ that he said was going to

7   the house in fact went to him, right?

8   A     I heard that answer but then I also heard him clarify

9   something with respect to how those fees were actually

10  handled, as it related to the money that went back to the

11  house or to principals of PRP.

12  Q     Sir, would you agree that your Exhibit 31, that chart on

13  DJ and house revenue is based entirely on Mr. Johnson saying

14  that the house got revenue that was unreported, right?

15  A     No, Mr. Johnson never alleged it was unreported.  He

16  explained to me --  I don't have that exhibit, I don't

17  believe.  He explained to me how the process worked.

18  Q     We'll get it for you.

19        (Pause.)

20  Q     He explained how the process worked.

21  A     I do have it here.

22  Q     Sorry about that.

23  A     I apologize, too many binders.

24  Q     He explained how the process worked.  He explained the

25  process was that the house got money, I think his words were

1   kickback to the house from the DJ and house mom, right?

2   A     Yes, I think those were his words, yes.

3   Q     When I asked him yesterday if he got that money, he took

4   the Fifth, right?

5   A     He did take the Fifth with respect to a question you

6   asked about that, yes.

7   Q     Did that cause you any concern that he might not be

8   telling you the truth before offering Exhibit 31?

9   A     Not after he clarified his answer as a result of a

10  question asked by Mr. Morris, no.

11  Q     You knew Mr. Johnson hated Potenza, right?

12  A     Yes.

13  Q     Told you that over and over again?

14  A     I wouldn't say over and over, he certainly indicated that

15  to me.

16  Q     Did that cause you concern he might have an improper

17  motive?

18  A     I understand that to be his motive why he came forward in

19  the first place.  I evaluated the information based on its

20  face value, not what his motive was.

21  Q     Is it fair to say you did nothing to interview anybody

22  else to determine the operations of PRP in terms of how the

23  cash operated, all the rest of it, you only relied on Joe

24  Johnson, right?

25  A     Yes, because during the period of time as he clearly

1    explained that he was there, he was the night manager from

2    Tuesday through Saturday night and the practice was that he in

3    fact collected the receipts, bundled it up with the sheets

4    that were prepared by the respective --  documenting

5    respective sources, left it for the owners.  We went through

6    that.  To answer your question, no, I did not interview

7    anybody else with respect to that.

8    Q    As an agent who has --  a person who spent a lot of time

9    as an IRS agent, you understand the importance of

10   corroboration?

11   A    Certainly do.

12   Q    You understand that in one of your charts that certain

13   numbers that are part of cash receipts, cash register receipts

14   are in one document and not in the other?

15   A    Cash register receipts?

16   Q    Yes, sir.

17   A    I'm not sure I understand your question.  You're

18   referring to another document?

19   Q    Mr. Johnson's document, Exhibit 24, have numbers on it

20   that are different from cash books, right?

21   A    Yes.

22   Q    In some cases, that number, I think you said corresponds

23   to certain cash register receipts that Mr. Johnson said were

24   there on his sheet but not on the cash books, right?

25   A    Mr. Johnson didn't say that.  I drew that from my

1   analysis when I compared the register tapes and the cash books

2   to the figures that were reflected on the records that came

3   from Mr. Johnson.

4   Q    You agree with me that you had no corroboration from

5   Mr. Johnson because he didn't make copies of the underlying

6   cash register receipts, right?

7   A    He did not.  He indicated when he came forward, his

8   purpose was with respect to the payroll practices.  He did not

9   and I asked him about what some of the practices were with

10  respect to the income and he clearly indicated to me he didn't

11  know what happened to any of that after he turned it into the

12  principals.  There was no way for him to corroborate that.

13  Q    It's true there was a way to corroborate that if he made

14  copies of the cash register tapes, that would have been other

15  evidence not in his hand that would have corroborated what he

16  said about what the cash register tape showed, right?

17  A    It would have.  He did not make copies of those register

18  tapes he provided me, anyway.

19  Q    Fair to say when he came to you, he told you that he was

20  unemployed?

21  A    Yes.

22  Q    He asked you to arrange a lawyer for him?

23  A    Well, he didn't ask me.  That was what resulted in our

24  conversation.

25  Q    In other words, he told you in words or substance I'm

1  unemployed and you responded I'll get you a lawyer?

2  A    No, that wasn't how it went at all.

3  Q    How did it work?

4  A    He contacted me, I believe a Saturday morning after being

5  served with a subpoena requesting certain documents as a

6  result of his involvement in this case, as a government

7  witness, and as a result of him informing me of that, based on

8  my experiences, if you can't afford it, I know some of my

9  experiences in criminal cases I've been involved in, attorneys

10 were appointed by the court to represent witnesses in the

11 case.  I told him that I would inquire with the U.S.

12 Attorney's Office if in fact that was applicable or available

13 to him and I would get back to him.  I subsequently discussed

14 it with the U.S. Attorney's Office.  They informed me he could

15 come in, fill out a financial disclosure or financial

16 affidavit and if the court felt it was appropriate, they would

17 in fact assign him an attorney.

18 Q    Did you have any concern after hearing his testimony at

19 deposition and again yesterday here that he might have not

20 been truthful in that application for an attorney?

21 A    He said he filled out the application --

22 Q    I don't want a recitation what he said.  I'm talking

23 about what you were concerned with, that he might not have

24 been truthful.  Yes or no, were you concerned?

25 A    He made representations that might contradict some of

Case 1:10-cv-01866-BMC   Document 67   Filed 03/12/12   Page 85 of 223 PageID #: 2041

1    that, yes.

2    Q     You were concerned?

3    A     Concerned.  It was something I certainly became aware of.

4    Q     Well, you saw yesterday in the questioning of Mr. Johnson

5    that there were certain communications to PRP about that loan

6    and he hasn't told you about that, has he?

7    A     I was aware of the loan.  I did not see those e-mails or

8    that correspondence until it was actually produced by your

9    firm.

10   Q     Did he tell you he's starting a new business before his

11   disposition?

12   A     I knew he was in the process of attempting to do that,

13   yes.

14   Q     Did you ask him where he was getting the money?

15   A     No.

16   Q     Even though you knew he was getting a free attorney from

17   the government?

18   A     No, I did not ask him.

19   Q     Do you recall Mr. Johnson at his deposition taking the

20   Fifth over and over again about his own income, filing his own

21   tax returns?

22   A     I do recall that, yes.

23   Q     Do you recall in your deposition saying that you were in

24   the process of checking that out?

25   A     I do.

1  Q    What do you know?

2  A    Me personally?  It wouldn't be something I would be

3  responsible for.  I've indicated who Mr. Johnson was to others

4  and I don't know exactly what they've done or didn't do.

5  Q    I'll show you what we've marked as Plaintiff's Exhibit R.

6  A    I believe I have it here.

7  Q    I'm not going to ask you, Mr. Guerci, to go through all

8  the records, but this is a comparison of your government

9  exhibit --  is it 25?

10         MR. SOKOL:   25, correct.

11  Q    Your Government Exhibit 25.  Would you open to that,

12  please?

13  A    Sure.  I have it.

14  Q    Sir, you see you had a list of dates of deposit and the

15  day of deposit and the amount of deposit and I think you said

16  you got those from the bank records; is that fair?

17  A    I do.

18  Q    Look at Exhibit R for the time period of December 12th,

19  2008, to November 9th, 2009.  Fair to say in the third column

20  over, the amount, the PRP deposit is reflected?

21         MR. MORRIS:   Objection, your Honor.  This is the

22  exhibit that the government mentioned they had an objection.

23         THE COURT:   This one is not in evidence.

24         MR. O'SHEA:   No, your Honor.

25         THE COURT:   How are you going to use it the way

SS     OCR     CM     CRR     CSR

1    you're using it now?

2            MR. O'SHEA:   Let me make a proffer.  This is

3    demonstrative.  I will represent and that's why I gave it to

4    counsel a couple of days ago.  It references the amount of the

5    ATM deposits off of Government Exhibit 25 but adds in the

6    fourth column the amount of the ATM deposits on the same day

7    and in the fifth column has the exhibit and Bates number.

8    Then adds those two figures into cumulative deposit in the

9    final column all the way to the right.  It's based on records

10   already in evidence.

11           THE COURT:   The amount of the ATM deposits, that's

12   all reflected in Government Exhibit 1274 through --

13           MR. O'SHEA:   Exhibit 5, the Bates number,

14   Exhibit 5, where it says government, 1285, that would be the

15   page.

16           THE COURT:   I guess my question is why are you just

17   using it as a demonstrative instead of offering it as a

18   summary?

19           MR. O'SHEA:   I offer it as a demonstrative and a

20   summary.

21           THE COURT:   Why would I not receive it?  It seems

22   helpful to me.

23           MR. MORRIS:   First off, the government only

24   received this yesterday.  There was ample time for pretrial

25   disclosure in advance.  Moreover, there needs to be a summary

1   witness who can actually attest to the accuracy, the

2   truthfulness.

3           THE COURT:   Mr. Morris, do you want me to sit down

4   with these books and go through every one of the entries and

5   check this out to make sure it's accurate?

6           MR. MORRIS:   Not you.

7           THE COURT:   Who should do that?

8           MR. MORRIS:   A witness for the claimant.

9           THE COURT:   Why do I need a witness?  It's a

10  summary.  The evidence is before me.  It's an adding exercise.

11          MR. MORRIS:   I guess the witness had never seen

12  this document before.

13          THE COURT:  Whether he can be examined on it is

14  something else.  This is obviously helpful to the court.

15  Obviously I'm going to give you a chance to check the math

16  yourself if you would like to.  It's perfectly proper summary

17  of voluminous records already in evidence, have been in the

18  government's position for some time.  You say you got it

19  yesterday because he gave it to you two days ago.  Don't

20  worry, I'll give you a reasonable amount of time to tell me he

21  added wrong, but if that's all it is, I don't see a reason to

22  keep it out.

23          I'm going to admit Exhibit R subject to any math

24  errors or other objections based on the underlying documents

25  that Mr. Morris identifies to me by the middle of next week.

1          (So marked.)

2          MR. O'SHEA:   May I have a moment, your Honor?

3          THE COURT:   Yes.

4          (Pause.)

5    Q    Sir, when did the structuring statute become effective?

6    A    Structuring statute, the Bank Secrecy Act was passed in

7    1970.

8    Q    The specific regulation prohibiting structuring, when did

9    that come to be?

10   A    The initial phase I believe was as a part of the Bank

11   Secrecy Act.  There have been a number of amendments.

12          THE COURT:   Do you know when it became illegal to

13   intentionally deposit less than $10,000 for the purpose of

14   avoiding the reporting requirement?

15          THE WITNESS:   I believe in conjunction with the Bank

16   Secrecy Act.  There were changes and certainly a case that

17   actually affected that which was, I'm not certain, I believe

18   the late '80s or early '90s.

19   Q    Sir, is it not your belief it was in 1988 that

20   structuring became illegal?

21   A    1988?

22   Q    I don't know.  You're the expert.  Tell us.  When did it

23   become effective?

24   A    As part of the Bank Secrecy Act which was in 1970, then a

25   money laundering act passed in 1986 but that was more specific

1   to the money laundering statutes.

2   Q    You're aware of the charge in this case.  When did the

3   conduct and the charge in this case come into being?  First of

4   all, when did the statute come into being, become effective,

5   when was that?

6   A    The date specific, I'm not certain.

7   Q    Give me a year.

8   A    As I said, it was in fact in conjunction with the passing

9   of the Bank Secrecy Act.

10  Q    Fair to say you're not sure?

11  A    What I said, I'm not sure.

12  Q    Fair enough.  Did you check in your investigation to

13  determine whether Mr. Potenza was doing banking and

14  depositing, making his deposits in round numbers several times

15  a week even before the statute became effective?  Did you ever

16  do any investigation on that?

17  A    My investigation didn't go any further back than the

18  records I have which I believe was December of 2006.

19  Q    I think you're telling us, sir, Mr. Potenza was

20  cooperative in your discussions with him on December 10th,

21  right?

22  A    Yes.

23  Q    In fact, I think he said even old stuff you didn't ask?

24  A    To some extent, yes.

25  Q    Did you ask him, hey, Mr. Potenza, how long you've been

Guerci-redirect-Morris                                    357

1    doing depositing like this?

2    A    Specifically I don't recall asking him that, no.

3    Q    Would you agree with me that if a person is engaging in

4    the same conduct before the effective date of the statute of

5    prohibition and continued that conduct after the enactment of

6    the prohibition, that that may indicated a lack of intent on

7    his part?

8    A    You have to look at all the factors.  Again, after the

9    enactment, the changing of the law, something he was aware of,

10   as we discussed earlier in my testimony, yes, it would in fact

11   impact on that.

12   Q    But he told you on December 10th that he wasn't

13   structuring, right?

14   A    He gave those explanations why he did certain things.

15   Q    It was your conclusion he was telling you I'm not

16   structuring, right?

17   A    That was the essence what he was telling us, yes.

18   Q    Have you seen Mr. Westrich's deposition testimony?

19   A    Yes.

20   Q    You've seen where, Mr. Westrich testified, Agent Westrich

21   testified that Mr. Potenza said I'm not structuring, in words

22   or substance?

23   A    In substance, yes.

24        MR. O'SHEA:   I have nothing further at this time.

25        THE COURT:   Redirect?

SS      OCR      CM      CRR      CSR

Case 1:10-cv-01866-BMC  Document 67  Filed 03/12/12  Page 92 of 223 PageID #: 2048

1   REDIRECT EXAMINATION

2   BY MR. MORRIS:

3   Q     On cross-examination, Mr. Guerci, you were asked about a

4   post-seizure interview you conducted of Mr. Potenza in

5   conjunction with Special Agent Westrich.  During that

6   interview, did Mr. Potenza tell you anything about receiving

7   any correspondence from the bank?

8   A     Yes, he indicated that he recalls receiving a letter from

9   the bank but he doesn't remember the context or contents of

10  the letter.

11  Q     Was that with respect to any particular account?

12  A     With respect to his account at J.P. Morgan.

13  Q     Also with respect to that interview, did Mr. Potenza tell

14  you anything about how much cash he kept on hand in the

15  business?

16  A     Yes, he did.

17  Q     What did he tell you in that regard?

18  A     He indicated that he kept between 18 and $20,000 worth of

19  singles on hand.  He kept between 2 to $3,000 worth of 5s, two

20  to $3,000 worth of 10s, also kept 20s which he used to stock

21  the ATM.

22  Q     Did your subsequent investigation indicate, reveal

23  anything further with regard to Mr. Potenza's statement in

24  that regard?

25  A     Based on my review of the records, I determined there was

1    in many instances well in excess of three, four, even $500,000

2    of cash on hand which is inconsistent with the figures

3    represent to me by Mr. Potenza.

4    Q    Did Mr. Potenza also tell you anything about how much

5    cash he took in on the business in conjunction with the

6    post-seizure interview?

7    A    Yes.

8    Q    What, if anything, did he tell you?

9    A    He indicated he ran an adult entertainment club, the

10   business took in up to $15,000 per day.

11   Q    Did anything in your subsequent investigation have any

12   bearing or impact on the statement of Mr. Potenza?

13   A    Certainly.

14   Q    What was that?

15   A    Based on the review, I was able to determine in fact the

16   business did take in tens of thousands of dollars per day,

17   also that there was cash on hand which was well in excess of

18   the figures he provided.

19   Q    One other area you were asked about on cross-examination

20   was the letters provided by J.P. Morgan Chase to Mr. Potenza

21   in conjunction with the gun permit.  Those were Exhibits B

22   and C.  We don't necessarily have to refer to them.  You

23   recall what letters I'm speaking of?

24   A    I do, yes.

25   Q    To your knowledge, what level of person within the

1  hierarchy of the bank was responsible for issuing those

2  letters?

3  A    That was a representative from the branch, whether it was

4  Sunnyside or Astoria, it was someone no higher than a branch

5  manager, as I understood it.

6  Q    Turning your attention to another area you talked about,

7  you discussed on cross-examination which was Government

8  Exhibit 3, you don't have to turn to it, but the letter from

9  J.P. Morgan Chase, the September letter, you know which letter

10  we're talking about?

11  A    I do.

12  Q    To the extent that you know, what level of person at the

13  bank was responsible for the drafting and issuance of that

14  letter?

15  A    It was someone that worked in the compliance department.

16  Q    In your understanding, are there any differences about

17  the scope of responsibility for persons that issued the letter

18  at the local branch versus persons that issued the letter in

19  the Compliance Department?

20  A    Yes, most certainly.

21  Q    What's your understanding of that differentiation, if

22  any?

23  A    An individual that worked at the branch would be involved

24  with the day-to-day operations of the branch.  Someone that

25  worked in the Compliance Department would be someone that

1   would be involved --

2            MR. O'SHEA:   Objection.

3            THE COURT:   You're too late.

4            MR. O'SHEA:   The answer is not all the way out.

5            THE COURT:   I was waiting for your objection.  I'll

6   sustain the objection.

7            MR. O'SHEA:   Move to strike.

8            THE COURT:   It's stricken.

9   Q    From the letters themselves, any conversations that you

10  had with J.P. Morgan Chase in claimant's Exhibits B and C,

11  with respect to those letters, sir, do you have any

12  understanding as to what the scope that the letters relate to,

13  any understanding what they relate to?

14           MR. O'SHEA:   Objection.

15           THE COURT:  Sustained.

16  Q    One other area you were asked about on cross-examination

17  related to ATM credits, credits from the ATM provider.  With

18  respect to that area, generally speaking, when you see credits

19  like that into a particular account from an ATM provider such

20  as those that existed in this case, would those result in the

21  filing at any point in time of a Currency Transaction Report?

22  A    No, they would not, does not involve cash.

23           THE COURT:   Let me ask about that.  If you have a

24  cash business and the owner of the cash business feeds $30,000

25  a day into the cash machine and it is all drawn out each day

SS        OCR        CM        CRR        CSR

Guerci-recross-O'Shea                    362

1    and the settling company, Bank of Scotland, for example, then

2    issues a credit into the bank account of $30,000, that does

3    not trigger a CTR?

4            THE WITNESS:  No.

5    Q    Your understanding of the Bank Secrecy Act provisions,

6    why wouldn't --

7            THE COURT:  He said it's not cash.  It seems like a

8    hole in the law to me, but it is what it is.

9    Q    Is there anything in the Bank Secrecy Act to your

10   knowledge that really governs the conduct of these ATM

11   settlement companies as compared with financial institutions?

12   A    With respect to the ATM, no.

13           MR. MORRIS:   Nothing further.

14           THE COURT:   Anything else?

15   RE-CROSS EXAMINATION

16   BY MR. O'SHEA:

17   Q    Sir, did I hear you just say that you asked Mr. Potenza

18   questions on December 10th, 2009 that would have elicited an

19   answer of how much cash in total he has on hand in the

20   business?

21   A    We talked about his cash on hand, yes.

22   Q    You were deposed in this case?

23   A    I was.

24   Q    December 10th -- December 7th, 2010?

25   A    I believe that was the date.

1   Q    You were asked questions, searching questions, about

2   everything discussed, correct?

3   A    Yes.

4   Q    Did you mention anything about that, sir?

5   A    I don't specifically recall, but if I refer to my

6   deposition, I could be more certain.

7   Q    We'll offer your deposition in evidence, sir.  Sir,

8   during your direct examination, did you mention anything about

9   a question that would have elicited a response about how much

10  cash PRP had on hand on December 10th, 2009?

11  A    Specifically how much they had on hand?

12  Q    Yes, sir.

13  A    On that particular date?

14  Q    Yes, sir.

15  A    No, it was in response --  he indicated he typically

16  maintained this much cash in his business.

17  Q    Sir, you just mentioned that you discussed a letter on

18  December 10th, 2009 with Mr. Potenza, right, just now with

19  Mr. Morris?

20  A    On December 10th?

21  Q    Yes, sir.

22  A    I asked him if he recalled getting a letter from J.P.

23  Morgan Chase, yes.

24  Q    Did you mention that in the searching questions you were

25  asked in your deposition, sir?

Guerci-recross-O'Shea                                    364

1   A    I don't recall if I specifically discussed that.

2   Q    Did you discuss it on direct, sir?

3   A    No.

4   Q    Sir, I'm going to ask you something and I want an answer.

5   Did you discuss the September 7th, 2007, letter that is

6   Exhibit 3 in evidence on December 10th, 2009, with

7   Mr. Potenza?

8   A    No, our question was do you recall getting a letter from

9   J.P. Morgan Chase and I indicated what he informed us of.  I

10  recall getting a letter --

11  Q    Any letter --

12  A    He recalled getting a letter but he does not remember the

13  context of the letter or the contents.  Those are his exact

14  words or --  not verbatim, but in summary.

15  Q    Sir, you spent 26 years as an IRS agent, right?

16  A    Yes.

17  Q    You know how to elicit admissions, right?

18  A    I believe I do, yes.

19  Q    On December 10th, you had already seized the money.  You

20  were looking for admissions from Robert Potenza?

21  A    Yes.

22  Q    It's your testimony that even though you're looking for

23  admissions, you say did you ever get a letter and he said

24  yeah, I got a letter, but you didn't say I'm talking about a

25  specific letter.  On September 7th, 2007, and it warned you

SS      OCR      CM      CRR      CSR

1  that you could be engaged in CTR evasion, words or substance,

2  you didn't bring that up, did you?

3  A    I don't recall getting into that amount of specificity,

4  no.

5  Q    What your testimony is, you asked him, hey, have you ever

6  received a letter from Chase?  He said yeah, I think I might

7  have gotten a letter.  That was it?

8  A    Well, I don't know if it was as you propose it to be.

9  That was the substance of it.  We were talking about a letter

10  and I think I indicated what his response was.

11  Q    In other words, sir --

12       THE COURT:   Mr. O'Shea, I got it, really.

13  Q    In other words, sir, fair to say that your question that

14  you say you asked Mr. Potenza, as far as he was concerned,

15  could have been talking about Exhibit A or B, right?

16       THE COURT:   Nobody is listening to me.  It's okay.

17  A    I think I described the context of our conversation and

18  to answer your question, yes, he was referring to a letter.  I

19  don't know that I was that specific as to what date and

20  exactly what the details of the letter were.

21  Q    You just testified that the letters were written by

22  low level branch personnel?

23  A    I didn't say low level.  I said individuals that worked

24  at the specific branches no higher than a branch manager.

25  Q    You knew from looking at Exhibit A that Dolly Merns Ross

1   was a vice-president of Chase, right?

2   A    I think it said bank representative.  I have to pull it

3   out.

4   A    Yes, says vice-president, business banker.  Yes, I do see

5   that.

6   Q    Officer of the bank?

7   A    Yes, she had a title of vice-president, yes.

8   Q    You testified a minute ago in response to a question from

9   Mr. Morris that there are no CTR's on ATM deposits, right?

10  A    Well, not as they relate to these types of transactions.

11  If you were to walk up to a bank, make a cash deposit into

12  your account, which would be a direct credit and involved

13  cash, then in fact it would possibly trigger the filing of a

14  CTR if it was in part more than 10,000 or if it involved cash

15  on the same business day that, coupled with another

16  transaction, exceeded that amount.  I think I need to make

17  that distinction.

18  Q    Good distinction, goes right to my question.  Have you

19  gone to RBS or RBS Lynk or any other company that was the

20  service with respect to the ATM and asked them if they filed

21  CTRs?

22  A    No, there was no CTRs filed.  Did I go and ask?  No.

23  When I reviewed the database, there would be no record of that

24  because in fact they would not recognize when they put the

25  money into the ATM, anyone else for that matter.  What they

1   recognize when the money comes out, that's when the credits

2   are actually issued.

3   Q     You neither asked --  you never asked Mr. Potenza about

4   whether he knew whether an ATM deposit would result in a CTR?

5   A     No, specifically did not.

6   Q     What about generally?

7   A     No.

8   Q     Never any question that would elicit that kind of

9   response, right?

10  A     Nothing in that regard, no.

11  Q     As far as you knew, as far as you know today, sitting

12  here, Mr. Potenza could think it could be filed?

13  A     I don't know what Mr. Potenza would think.

14  Q     When you asked him on December 10th you're looking for

15  admissions, did you say you know, gee, were you trying to

16  evade the CTR requirement by doing this ATM machine?

17  A     Specifically, no, I did not ask that question.

18  Q     You would agree with me that the records show upwards of

19  $30,000 or more on a single day or days of cash transactions

20  that resulted in ATM machine and the physical cash deposits,

21  right?

22  A     If I would agree there were credits to the account which

23  were sometimes in excess of $20,000, maybe upwards towards 30,

24  were credited as a result of people taking money out of the

25  ATM machine, that's what I would agree with.

368

1    Q    They leave a clear paper trail that the IRS could easily

2    trace, right?

3    A    At least the paper trail as to what was credited to his

4    account.  That's what it represents, leaves a paper trail for.

5    Q    The IRS --

6              THE COURT:   Mr. O'Shea, it's recross.  That's

7    enough.

8              MR. O'SHEA:   Just that one question?

9              THE COURT:   Yes.

10   A    That an IRS agent or anyone else could look at the bank

11   account, see there's a credit to the account for those

12   transactions which were a result of what I already described.

13   Q    Could be easily traced?

14   A    Sure, they could be documented very easily.

15             MR. O'SHEA:   Thank you, your Honor.

16             THE COURT:   I have a couple of questions.  Was the

17   agent with you, was Agent Westrich with you when you

18   interviewed Mr. Potenza?

19             THE WITNESS:   Telephonic interview in the same

20   conference room.  We were on the phone with Mr. Potenza.

21             THE COURT:   Was there some reason you didn't ask

22   him whether he heard about this thing having to do with bank

23   filing, a report for cash transactions in excess of $10,000?

24             THE WITNESS:   We discussed with him what structuring

25   was.  We explained even by example what it was.  We asked him

SS      OCR      CM      CRR      CSR

1    about CTRs.  He responded by saying there may be some filed

2    because at times he would make a deposit on Saturday and

3    Monday and it may, because of the banking regulations, may

4    trigger the filing of a CTR.

5              THE COURT:   You explained to him what the

6    requirements are, is that right?

7              THE WITNESS:  We didn't explain to him the

8    requirements.  We were more asking him if he knew what

9    structuring was.  He indicated that he did.  In fact, he said

10   he believes he read about it in the newspaper.  He explained

11   to us what he believed it to be, which was breaking down of

12   deposits in amount of less than $10,000 or making cash

13   deposits.  We asked him about CTRs.  He went on to say, as I

14   said, he believed there may have been some filed because he

15   would make deposits on Saturdays as well as Mondays on

16   occasion.

17             THE COURT:   Anything else?

18             MR. O'SHEA:   No.

19             MR. MORRIS:   Nothing, your Honor.

20             MR. O'SHEA:   Actually, I'm sensing your Honor's

21   impatience, somewhat shorten my cross.  I would like to offer

22   his deposition testimony in evidence as a supplement to that.

23             THE COURT:   I don't see how it gets in.

24             MR. O'SHEA:   Sworn statement.

25             THE COURT:   Usable for impeachment, certainly, but

1   I don't know how it's admissible under the rules.  I guess if

2   he's deemed a party, it's admissible but even if I were to

3   allow it, I want you to put the whole thing on the record.

4   You have to submit a bracketed version showing what portions

5   you want in the record because I'm sure there are things in

6   there that are not of relevance.  You can't say I want the

7   deposition and even if it is a party.  So, there are two

8   issues.  Number one, the first issue, is the government

9   objecting?

10          MR. MORRIS:   Might I have a moment to confer?

11          THE COURT:   Just a moment.

12          (Pause.)

13          MR. MORRIS:   The government objects.  The witness

14   is not unavailable.

15          THE COURT:   I understand.  Then the question

16   becomes is it an admission by a party, the statements in the

17   deposition?  He's not an employee of the government.  On the

18   other hand, I think he's probably an agent of the government

19   under 801.

20          MR. O'SHEA:   If I could add, the government offered

21   the testimony of Ms. Schmidt who is not a party.  She's

22   available.  Mr. Gleason who is not a party is available.

23          THE COURT:   First of all, I don't do the goose and

24   gander rule.  Even if they did, I thought Gleason wasn't an

25   employee of PRP.  That's why they got it in.  If you were an

1  employee, we wouldn't be talking about it.  The question is --

2  let me look at the rules.

3        MR. O'SHEA:  I'll look at it, too.  This may apply

4  in terms of moving this along.  I may be willing to offer

5  Mr. Westrich's --  he is an agent of the government, his

6  testimony.  It might move things along if we used his

7  deposition testimony.  I don't know what position you have on

8  that, Mr. Morris.

9        THE COURT:  I assume you're not calling Agent

10  Westrich, are you?

11        MR. MORRIS:  We weren't planning.

12        MR. O'SHEA:  I was.

13        THE COURT:  That's going to be in your case.

14        Let me do this.  First of all, the government is

15  resting, right?

16        MR. MORRIS:  Yes, your Honor.

17        THE COURT:  Let's have the witness step down.

18        THE WITNESS:  Thank you.

19        (Witness excused.)

20        THE COURT:  I think this witness is a person

21  authorized by the parties to make a statement concerning the

22  subject.  It does qualify as an admission.  The only question

23  I have, should I take the whole thing in?  What I said about

24  the Gleason testimony, in lieu of calling him, that's fine.

25  Depositions of a party are admissible as long as it's relevant

1    and not cumulative.  Considering you examined him for a couple

2    of hours, it's hard for me to believe there aren't going to be

3    portions of his deposition that are not cumulative, right?  I

4    will allow you to put in those portions of his deposition that

5    are non-cumulative.

6             MR. O'SHEA:   Some of that would be in the realm of

7    impeachment or inconsistency.

8             THE COURT:   That's okay, as long as they're not

9    repetitive of the impeachment you already did while he was

10   here on the stand.

11            MR. O'SHEA:   We could do that.

12            THE COURT:   Take the exhibit, you're up to S,

13   I believe, call it Plaintiff's S.  Then draw brackets in the

14   margins for the portions you want admitted; give a copy to the

15   government.  They can object to specific portions as

16   cumulative or irrelevant and then I'll issue a ruling as to

17   what portions I'll accept.

18            MR. O'SHEA:   Okay.

19            As long as we're on the subject, there's the issue

20   of Agent Westrich.

21            THE COURT:   Same thing with his deposition except

22   we won't have the cumulative problem because he didn't

23   testify.

24            MR. O'SHEA:   Okay.

25            MR. MORRIS:   On that point, may the government

SS        OCR        CM        CRR        CSR

1    simply cross-designate any section of the deposition?

2         THE COURT:   Absolutely.  Both witnesses can be

3    cross-designated for purposes of the rule of completeness.

4         I suppose if he's going to offer the Westrich

5    deposition beyond mere completeness, if there's something not

6    addressed in the deposition by Westrich that you feel needs to

7    be addressed, then you can call Westrich as a rebuttal witness

8    once you see what's being designated.

9         MR. O'SHEA:   I can cross?

10        THE COURT:   If they call him as rebuttal witness.

11        There's the testimony of Shay Cavanaugh.  Your Honor

12   may remember from the other day, we had a little bit of back

13   and forth on this.  Both sides have designated portions of her

14   transcript for submission to the court as the court directed.

15   Shall we mark that?

16        THE COURT:   Is that being offered jointly or by one

17   party with cross designations from the other?

18        Who is the party that really wants that in?

19        MR. O'SHEA:   We were the party that really wanted

20   it in.  I don't mind cross designating.

21        MR. MORRIS:   Already cross-designated, have it

22   highlighted.

23        THE COURT:   You want it to be acknowledged as a

24   proponent of the document or simply responding with additional

25   portion to the defendant's offer?

1           MR. MORRIS:   The latter, simply responding.

2           THE COURT:   Mr. Westrich's is Exhibit T, then this

3    will be Exhibit U.

4           MR. O'SHEA:   We conferred with our adversary.  We

5    have agreement on the designations, cross designations.  U is

6    squared away.

7           THE COURT:   Are we ready for defendant's first

8    witness?  I suppose we'll do it after lunch.

9           Let's meet back at 1:15.  We'll have the defendant's

10   case then.

11          (Luncheon recess.)

12          (Continues on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O N   S E S S I O N

2              THE COURT: Be seated, please.

3              The claimant may call its first witness.

4    R I C H A R D   G L E A S O N,

5         having been first duly sworn, was examined

6         and testified as follows:

7    DIRECT EXAMINATION

8    BY MR. O'SHEA:

9    Q    How are employed?

10   A    Currently by employe PRP Restaurant, Gallagher's 2000.

11   Q    How long have you employed by PRP?

12   A    Six years?

13   Q    And can you tell us your work history just in general

14   terms prior to going to work at PRP?

15   A    Before I went to PRP I worked in a bar in Brooklyn called

16   the Wawa (ph) West and before that I was a New York City

17   Police Officer for 15 years.

18   Q    And when you were a New York City Police Officer for

19   15 years where were you stationed in?

20   A    Eighty Fourth Precinct, downtown Brooklyn.

21   Q    And are you now retired?

22   A    I resigned.

23   Q    How did you get hired at PRP?

24   A    Just in a phone conversation back and forth with Robert

25   Potenza.

1    Q    And what is your current position?

2    A    Now, I'm general manager.

3    Q    Tell us the days that you work and the time?

4    A    I work Tuesday through Saturday from, approximately, 6;30

5    until 4:30 in the morning.

6    Q    Okay. And how long have you been working those days and

7    times?

8    A    Since April of 2010.

9    Q    And before April 2010 what were your hours of employment

10   an days?

11   A    I worked daytime.  I was called the person in charge for

12   daytime.  I worked from 11:30 to 7: 30.

13            THE COURT:  Mr. Gleason, pull your microphone a

14   little closer to you, please.

15            THE WITNESS:  Sure.  Sorry.

16   Q    And when you were working as the daytime person in charge

17   did you have interaction with Joseph Johnson?

18   A    Yes, briefly as we turned over the shift.

19   Q    So you would work the daytime and he would come in at

20   7:30 or so and you would hand over, if you will, to him?

21   A    Yes.

22   Q    Tell us right now as the general manager what your

23   responsibilities are?

24   A    Just overseeing the general running of the bar, hiring

25   and firing, supervising everybody.

*Gleason - direct/ O'Shea*

1   Q     Do you have occasion to handle money?

2   A     Yes, I do.

3   Q     And do you have occasion to track money that comes into

4   the business?

5   A     Yes.

6   Q     And can you tell us by category, if you will, what kinds

7   of money you receive in an average day and how you track it?

8   A     Okay. Well, the money behind the bar comes through the

9   registers.

10          That's for food and drink.  I have a door register

11   for people who pay admission to come into the bar.  We have

12   what is called a house fee for the dancers to pay to work at

13   the bar, and we have what's called a champagne room and

14   customers pay to take a dancer into the champagne room.

15   Q     Now, prior to the summer of 2010 was the cash register in

16   the same condition it is today?

17   A     Behind the bar?

18   Q     Pardon me. The cash register at the door?

19   A     No, now is a new register.

20   Q     Did the old register print tapes?

21   A     Yes, it printed tapes.

22   Q     Were they legible?

23   A     No.

24   Q     Has that been corrected?

25   A     Yes, it has.

1    Q     As of when?

2    A     I believe we got the register July or August of 2010.

3    Q     I want you to open the book in front of you.

4          Now, are you open to the page Exhibit 24?

5    A     Yes.

6    Q     Do you recognize not the particular -- the specific

7    numbers on the sheet, but do you recognize the form of the

8    sheet?

9    A     Yes.

10   Q     And is it a form that you've seen before?

11   A     Yes.

12   Q     And is it a form that you saw during the time you were

13   the person in charge during the day?

14   A     Yes.

15   Q     And have you seen it since the time you have been general

16   manager?

17   A     Yes.

18   Q     Could you tell the Court if you use this kind of form?

19   A     Yes, I do.  It's a balance sheet.

20   Q     And prior to April of 2010 tell us how you used it and

21   what you did with it at the end of your shift?

22   A     Well, what I would do is the registers, and the

23   bartender, I would just list down the monies from their

24   register so I would make sure the register was correct as to

25   how much they took in, make sure it balanced out.

1            I would just indicate numbers down here so that I

2   could -- it's easier to add it up that way, and then when I

3   was done I would just hand it over to Joe Johnson.

4   Q    Did you ever see it again?

5   A    No.

6   Q    Did you ever have occasion to go back and look for the

7   sheet?

8   A    No.

9   Q    After a particular day?

10  A    No.

11  Q    Why is that?

12  A    It was just like I said, a scratch sheet just for me to,

13  you know, basically just to balance my registers.

14  Q    Did you have an understanding about what happened to it

15  after --

16  A    -- no --

17  Q    -- after your shift?

18  A    No.

19  Q    What about today as general manager, do you use such

20  scratch sheets?

21  A    Yes, I do.

22           Like I said, I balance the registers again.

23  Q    And what do you do with it when you are done with?

24  A    Now it is discarded.

25  Q    Is there ever a time when you -- well, when you say it is

1   discarded, what's done with the information that's contained

2   on it?

3   A    It 's really written on the post-it notes, little two by

4   two yellow papers, like totals and just put into the cashbox.

5   Q    And explain that process for us, if you will?

6   A    Well, each register the money comes up, I break down the

7   register, the denominations, I list it on the sheet so I can

8   balance them out, and then the register receipts and money is

9   put into our cashbox.

10  Q    And you mentioned post-it notes, what kind of information

11  do you put on the post-it notes?

12  A    Well, house fee money gets put on there, champagne room

13  money gets put on there.  You know, it gets wrapped up with

14  those monies and put into the cash box.

15  Q    Wrapped up with a rubber band?

16  A    Yes.

17  Q    And is there anything done with respect to leaving the

18  cash and the register tapes with the scratch sheets that are

19  Exhibit 24, an example of which is Exhibit 24?

20  A    What do you mean?

21  Q    Is there anything you do -- do you leave this scratch

22  sheet anywhere?

23  A    No, I throw it in the garbage.

24       The garbage is right next to the desk. I throw it

25  out.

*Schmidt - direct/ O'Shea*                                    381

1   Q    So you never go back to it and use it as a form of record

2   for reference?

3   A    No.

4   Q    Fair to say you don't have any responsibilities having to

5   do with banking?

6   A    No.

7   Q    Or bookkeeping?

8   A    No.

9           MR. O'SHEA:  Thank you.

10          Nothing further.

11          THE COURT:  Any cross?

12          MR. MORRIS: Nothing from the government.

13          THE COURT: Thank you.

14          You may step down.

15          Claimant may call its next witness.

16          MR. O'SHEA:  The claimant calls Dennis Schmidt.

17    D E N N I S   S C H M I D T,

18          having been first duly sworn, was examined

19          and testified as follows:

20          THE CLERK:  Please state and spell your name for the

21   record.

22          THE WITNESS:  Dennis Schmidt middle.

23          THE CLERK:  You may be seated.

24   DIRECT EXAMINATION

25   BY MR. O'SHEA:

1   Q    Mr. Schmidt, would you be good enough to spell your last

2   name for the court reporter please.

3   A    S-C-H-M-I-D-T.

4   Q    How are you employed?

5   A    By Ron Bob Pub as a person in charge.

6   Q    And do you work at Gallagher's 2000?

7   A    Yes, I do.

8   Q    Prior to working at Gallagher's 2000, tell us your work

9   history.

10  A    I was with New York City Police Department and prior to

11  that I worked as a furniture installer for Dancker & Sewle.

12  Q    When did you start with the police department?

13  A    April 25, 1990.

14  Q    How long were you on the job?

15  A    Twelve years one month six days.

16  Q    Where were you -- what precinct were you located?

17  A    Forest Hills, Queens, 112 Precinct.

18  Q    What were the circumstances of your leaving the force?

19  A    Accidental disability.

20  Q    When did you go to work for Gallagher's 2000?

21  A    2006.

22  Q    What was your first position there?

23  A    Bouncer.

24  Q    And how long were you a bouncer?

25  A    Short period of time.  Month, two months.

1    Q      And did there come a time after that where you came into

2    your current position?

3    A      Yes.

4    Q      What is your current position?

5    A      Person in charge.

6    Q      And what are your days of -- what days do you work?

7    A      Sunday, Monday.

8    Q      From what hours?

9    A      7:30 p.m. to 4 a.m.

10   Q      So would it be fair to say on those nights you close down

11   the restaurant?

12   A      Yes.

13   Q      Tell us your responsibilities for handling cash.

14   A      Prior to the opening -- well, my -- 7:30 I would bring

15   down the evening bartender's banks.  I would oversee the front

16   door, bring the money to the front door.  At the end of the

17   night I would actually close out the registers and bring it

18   upstairs to the office as well as the font door.

19   Q      Now, when you took over the day shift during the time

20   period up to November 2009 did a DJ or house-mom work during

21   the day?

22   A      No.

23   Q      And can you tell us how the restaurant generated cash and

24   how you tracked it?

25   A      It would come from the cash registers.  There's a VIP

1    room -- this is the evening of course -- the house-mom, and

2    DJ.

3    Q      Anything else?

4    A      Cancellation fees.

5    Q      Sometimes dancers paid to dance?

6    A      The house fees, yes.

7    Q      And were there other elements, the house fees?

8    A      VIP room, the cash registers, the front door.  Pretty

9    much it.

10   Q      Were there sometimes fines assessed of various sorts to

11   the dancers?

12   A      Excuse me?  If you could rephrase that please?

13   Q      Fines?

14   A      Cancellation fees.

15   Q      Cancellation fees?

16   A      Yes.

17   Q      And were those also included in house fees?

18   A      Well, it was separate.

19   Q      Did you ever have occasion to pay employees?

20   A      Yes.

21   Q      And are employees paid off the books at PRP?

22   A      No.

23   Q      Have they ever been paid off the books?

24   A      No.

25   Q      Have they ever been paid at least partially off the

1   books?

2   A    No.

3   Q    And how do you know that?

4   A    Well, to my knowledge I was given a set salary and taxed,

5   times are taken tax out by Patricia Potenza.

6   Q    And in your position as person in charge on Sunday and

7   Monday do you have occasion to pay employees?

8   A    Yes.

9   Q    And to your knowledge are those employees -- are their

10  wages subject to taxation?

11  A    Yes, to my knowledge.

12  Q    In total?

13  A    In total as per day.

14  Q    In other words, is there any portion of their

15  compensation that to your knowledge is not taxed?

16  A    No.

17  Q    Now, I'd like you to look at Exhibit 24 that's in front

18  of you in your book. You see that form of document there?

19  A    Yes.

20  Q    It says here on page 1662 register sheet?

21  A    Yes.

22  Q    Is that a form of document you've seen before?

23  A    Well, it's a scratch sheet I may have used before. I

24  never seen this one before but I've used this before.

25  Q    And how do you use it?

1  A    Well, initially when I open up -- well, my time at 7:30

2  this list is left upstairs sometimes with some of the dancers'

3  names.

4  Q    Do you always use this sheet?

5  A    No.

6  Q    What causes you to use it or not use it?

7  A    Well, depends on if it is there, not there.  If I'm down

8  stairs the scratch papers is more readily available to me,

9  then I use that.

10 Q    So would it be fair so then, if you don't use this form

11 you will use any piece of paper to keep track of money that's

12 coming in?

13 A    Yes.

14 Q    And what do you do with the scratch sheet, whether this

15 form or some other form that you use during the day?

16 A    Well, when I no longer need it, I dispose of it.

17 Q    And how do you know when you no longer need it?

18 A    When I complete my total banks at the end of the day.

19 Q    And what do you do with the information that you've put

20 onto a scratch sheet?

21 A    Well from the scratch sheet I transferred onto post-tis.

22 Put the post-its with the money and wrap it with a rubber band

23 and put it in a book.

24 Q    And what about the bar registers, do you do anything with

25 the register tapes?

1  A    I would fold the register tapes, put a paper club clip

2  and put it in the box as well.

3  Q    Let me ask you about the register at the front of the

4  door. In the time period before the summer of 2010 did that

5  register have an operational register tape?

6  A    No.

7  Q    And what was not operational it?

8  A    It -- it wasn't legible.  There was nothing on the tape.

9  Q    You are sure of that?

10 A    Yes.

11 Q    How did you keep track of admissions?

12 A    There's a counter, the bouncer at the door, he counts

13 every person that comes inside and register is used to hold

14 the money and from the money I subtract the counter and I add

15 it up.

16 Q    Either this form of scratch sheet or some other piece of

17 paper that you use, is there ever an occasion where you would

18 store it someplace and use it as a record of the company?

19 A    No.

20        MR. O'SHEA:  Thank you.

21        Nothing further.

22        THE COURT:   Any cross.

23 CROSS EXAMINATION.

24 BY MR. MORRIS:

25 Q    Good afternoon, Mr. Schmidt.

1            On direct examination and you just testified about

2    some of PRP's payroll practice, in connection with your

3    responsibilities of the company, you don't actually have

4    occasion to ever have reviewed any of the payroll books or

5    records of the company, have you.

6    A    No.

7    Q    And just directing your attention to one other document

8    that you were asked about, that's Government Exhibit 24, I

9    believe it may still be open in front of you marked with Bates

10   number in the bottom right-hand corner of Government

11   Exhibit 1663, you were asked some questions about this -- this

12   sheet, and you never actually observed how other managers at

13   the club would handle this type of sheet, did you?

14   A    No.

15           MR. MORRIS: No further questions, Your Honor.

16           THE COURT:  Any redirect?

17           MR. O'SHEA:  Yes.  Can I do it from here?

18           THE COURT: Sure.

19   REDIRECT EXAMINATION.

20   BY MR. O'SHEA:

21   Q    Did you ever have occasion to see any scratch sheet of

22   any kind like Exhibit 24 stored in any way on the /PREPL

23   premises of PRP?

24   A    No.

25   Q    To your knowledge were those scratch sheets kept after a

1   shift was over?

2   A     No.

3                  MR. O'SHEA:  Thank you.

4                  Nothing further.

5                  THE COURT:  You may step down.

6                  Claimant may call their next witness.

7                  MR. O'SHEA:  Claimant calls Robert Potenza.

8    R O B E R T    P O T E N Z A ,

9           having been first duly sworn, was examined

10          and testified as follows:

11                 THE CLERK:  Please state your name for the reporter.

12                 THE WITNESS:  Robert Potenza.

13  DIRECT EXAMINATION

14  BY MR. O'SHEA:

15  Q     Spell your last name, please.

16  A     P-O-T-E-N-Z-A.

17  Q     Where do you live, Mr. Potenza?

18  A     672 Fisherman's Road, Baldwin, New York 11510.

19  Q     How long have you lived there?

20  A     Thirteen years.

21  Q     And what did you pay for that residence?

22  A     One hundred ninety thousand.

23  Q     And you've lived there continuously over the last

24  12,13 years?

25  A     Thirteen years approximately.

1    Q    And prior to that where did you live?

2    A    15-36 39th Street, Long Island, New York 11101.

3    Q    And what kind of car do you drive?

4    A    I have a few cars.  I have a Ford Fusion Hybrid and a

5    Ford Escape Hybrid.

6    Q    Pat Potenza is your sister?

7    A    Yes.

8    Q    Does she work with you?

9    A    Yes, she does.

10   Q    Is she your partner?

11   A    Yes.

12   Q    Tell us your educational background?

13   A    High school graduate.

14   Q    Do you hold business licenses?

15   A    Yes.  We have a cabaret license for PRP Restaurant, we

16   have a liquor license, we have a license to operate a

17   restaurant, and also I have the business -- a full carry

18   license -- pistol license.

19   Q    When did you first receive your pistol carry permit?

20   A    In 1977.

21   Q    And tell us the circumstances of your application for

22   that gun carry gun?

23   A    I was working with in Manhattan, 48th Street in the

24   jewelry business.  I had a contracting Nicholas Potenza,

25   Incorporated, contracting for jewelry firms and in 1976

*Robert Potenza - direct/ O'Shea*                    391

1   Mr. Robert Siegel (ph) came in with us and we started to do

2   manufacturing, and I used to, you know, go to the post office,

3   and with hundreds of thousands dollars worth of diamonds and

4   sometimes pick up a lot of jewelry -- diamond rings and stuff,

5   so I applied for a pistol license from the NYPD.

6   Q     Did you receive it?

7   A     Yes.

8   Q     Have you held that pistol carry permit continuously since

9   then?

10  A     I held that permit until 2007 and at that time I applied

11  for one with PRP Restaurant, and the day I received one for

12  PRP I had to turn in the one for Nicholas Potenza.

13  Q     Okay. Let's talk about Nicholas Potenza for a few

14  minutes, when was that opened?

15  A     I believe it was in the 50s sometime.

16  Q     That was your dad's business?

17  A     Yes.

18  Q     And you told us it was located 64 West 48th Street?

19  A     Yes.

20  Q     And tell us what you did in that business?

21  A     Well, I used to come in after school. I used to go to

22  high school in Long Island City and I'd take the Number 7 or F

23  train in Manhattan and help my dad out after school, and when

24  I graduated I started to work with my father in the jewelry

25  business.

*Robert Potenza - direct/ O'Shea*                              392

1   Q     Did there come a time when you started a company called

2   PSP Jewelry?

3   A     Yes. It was around June or July of 1976.  My father's

4   friend was Robert Seigel and he worked for a ring company

5   called Porella (ph) Ring Company and we had discussed going in

6   partnership -- three-way partnership, start manufacturing, and

7   that's when we opened it up that.

8   Q     So has is PSP different from Nicholas Potenza?

9   A     Well, Nicholas Potenza, we did contracting for jewelry

10  companies. We took rings and finished them off and gave them

11  back to them. PSP, we manufactured our own rings and sold them

12  to stores and to chains -- different chains.

13  Q     Is PSP still in business?

14  A     No, it's not.

15  Q     When did it close?

16  A     We shipped out our last order, I believe it was,

17  Christmas of 2007.

18  Q     Okay.  Let's talk about other business ventures that you

19  had.  Did there come a time when you opened a restaurant -- a

20  club -- adult entertainment club called Gallagher's?

21  A     Yes, I opened it up in ask -- I incorporated in 1977 and

22  we had up, I believe, it was around March of 1978.

23  Q     And what was the corporate name of that first

24  establishment?

25  A     It was Ron Bob Pub, Inc.

1   Q     That was the corporate name?

2   A     DBA Gallagher's 2000.

3   Q     And where was it located?

4   A     30-33 Queens Boulevard.

5   Q     In Sunnyside?

6   A     Yes.

7   Q     How long did that establishment stay opened?

8   A     We stayed open until December 13, 2001.  Thursday we

9   closed down.

10  Q     What was the reason you closed down?

11  A     That same night we opened Gallagher's 2000, so 7:30 we

12  closed Gallagher's and then Gallagher's 2000 opened at 7:30.

13  Q     And what was the cause of the change of the location?

14  A     Mayor Giuliani had a -- did an adult entertainment

15  rezoned the adult entertainment industry, and the address I

16  had on Queens Boulevard was no longer fully zoned for adult

17  entertainment.

18  Q     And the new location, did that have a new corporate name?

19  A     Yes, that was PRP Restaurant, Inc. DBA Gallagher's 2000.

20  Q     And that is the current location of your current

21  business?

22  A     Yes, it is.

23  Q     Tell us the physical address?

24  A     It 43-19 37th  Street, Long Island city, New York 11101.

25  Q     Tell us the corporate structure and percentage ownership?

1  A    I am the president.  I own 70 percent of the stock.  My

2  sister Patricia is the bookkeeper, secretary treasurer and she

3  owns 15 percent and Alan Reale is the vice president, and I

4  believe he owns 15 percent also.

5  Q    And what sort of corporation is it?

6  A    It's an S corporation.

7  Q    What is your understanding of the ramifications of that

8  structure?

9  A    Well, at the end of the year if you have a profit you get

10  paid by the shares you have, percentage.

11  Q    Let's talk about PRP business. Fair to say it's  adult

12  entertain topless dancing type establishment?

13  A    Yes, it is.

14  Q    Do you serve food and liquor?

15  A    Yes, we do.

16  Q    During the relevant time period September of 08 to

17  November 2009 what were the hours of operation?

18  A    We opened at 11:30 a.m. to 4 a.m. Monday through Friday,

19  Saturday and Sunday I believe it was twelve noon to 4 a.m.

20  Q    How many employees were employed by the business?

21  A    At that time the, approximately, 30, maybe 32.

22  Q    Is has that number grown?

23  A    About 35, 40 now.

24  Q    Are they all full-time?

25  A    No.

*Robert Potenza - direct/ O'Shea*

1    Q    How many would you say part-time, how many are full-time?

2    A    I would say probably about 12 25, 30 percent are

3    full-time and then the other ones are part-time.

4    Q    Give me an idea of the categories for employee type?

5    A    Okay.  You would have -- I have cooks, barbacks,

6    bartenders, we have security people, and then we have a person

7    at the door at night.

8    Q    How are they paid?

9    A    They are paid by cash.

10   Q    And are they -- you said in your testimony here, you sat

11   through Mr. Johnson's testimony, are any of them paid off the

12   books?

13   A    No.

14   Q    Are all the monies that are used to compensate employees

15   reported to the New York State payroll authorities and federal

16   payroll authority?

17   A    Yes.

18   Q    Who is the current general manager?

19   A    Richard Gleason.

20   Q    And prior to that?

21   A    Joe Johnson.

22   Q    Tell us about your responsibilities and what your average

23   workday is like.

24   A    Well, I usually get up around quarter to 4:00, 4 o'clock

25   and I take a shower, get dressed, I drive into the city from

*Robert Potenza - direct/ O'Shea*                              396

1   Baldwin about 27 miles.  It takes me anywhere from 35 to

2   40 minutes because there's very little traffic in the morning.

3   I leave my house around five to ten after five.  I go to

4   Alfred Donuts and I have breakfast.

5           THE COURT:  I think we are getting a little too much

6   detail here. Tell us what you do when you get to the club.

7           THE WITNESS:  Oh, when I get to the club, okay.

8   A     I get to the club about 5, 6:30.  I usually turn the

9   alarm on, sometimes my partner might be there.  Sometimes not.

10  Then I would go upstairs. First I would turn on lights,

11  obviously. Turn the alarm off, and I would turn on the lights

12  in the main room. I would do the ATM and then while it was

13  recording I would use the bathroom.

14  Q     Let me stop you there. First you said in your answer you

15  said you turned on the alarm, then you said you turned off the

16  alarm. When you came to the premises in the morning was the

17  alarm on?

18  A     No, I think I said I turned the alarm off and I turned on

19  the lights.

20  Q     Okay.  Fair enough.  Was the alarm on overnight?

21  A     Yes.

22  Q     And when you get there in the morning you generally turn

23  it off?

24  A     Yes, it's right near the door.  About five feet from the

25  door.

1  Q     And then you said that what one of the things you do has

2  to do with the cash machine.  Could you tell us in more detail

3  what do you with the cash machine?

4  A     Well, we have an ATM on the premises, and the first thing

5  I would do is get a journal from it -- a short journal that

6  will give me the amount of people that used it.  Like this

7  morning it was 44 people, and I believe it was because 5 or

8  $6,000.  Then I would get a long journal and that would give

9  me each person's -- 44 people that used it and anybody else

10 that used it but did not receive any money, it would show

11 amount, cash for amount dispensed.  And I would then roll role

12 all up, put it together, put the date on it, and also -- that

13 would be yesterday's date, and I'd also put down the amount of

14 bills that were left from the machine that showed me.  It was

15 387 bills this morning.

16 Q     And what do you do with that information?

17 A     I would bring it up to the office. I record it.  I have a

18 little daily -- it says daily book, you know, for the whole

19 year.

20 Q     Is there something you could do with the cash machine,

21 ATM machine, that would cause it to actually report the

22 figures that you just told us about, the number of people who

23 took money out, and total amount to a banking institution?

24 A     That's what happens when do I it in the morning.  When  I

25 get the short piece of paper the machine automatically

1    transfers that money to our bank account.

2    Q    Do you ever do anything either to delay that process if

3    you are going to the bank to make a physical deposit of cash

4    ever?

5    A    No. The only time that there is a delay in the ATM is on

6    Saturday when we clear it, and Sunday, they won't go in until

7    Monday.  It goes in all on the same day.

8    Q    So, in other words, on the weekend if you clear it and

9    add more cash you won't see the credit for that deposit until

10   the following Monday?

11   A    Right.  I get the slip, a short slip, with the amount of

12   people, and the amount of money that was dispensed, but then

13   it won't show up.  It won't go in until Monday.

14   Q    Tell us your other responsibilities.

15   A    At that time I would go upstairs and I would count the

16   money that was let.

17   Q    Count what money?

18   A    The money that was left from the person in charge or the

19   manager or general manager.  I would count that money.  Make

20   sure it's -- it's usually they leave a post-it note on the

21   side with the amounts.  I make sure the amount, the singles,

22   fives, tens, 20s, and 100s and 50s, that it corresponds to the

23   amount that I have there -- I'm supposed to have.

24   Q    And then what do you do?

25   A    Then I would make bank within the daytime.  I would take

1    five and tens.  I will break the banks down, put singles in

2    there, into the banks, and then I would, you know, just close

3    all the banks up, two banks, three banks, whatever I needed.

4    I put it on the side there, little tackle box.  They are all

5    the same in the office.

6    Q    When you say, "banks," do you mean making a change

7    drawer for cash register?

8    A    Yes.  That is correct.

9    Q    So you make a couple of those up.  Why are you making

10   those up?

11   A    Yes, because the daytime banks would be made up by the

12   night person and I would be making the daytime banks for the

13   people that are going to be working there at night -- I mean

14   the nighttime banks.  The daytime banks are made up by the

15   night person.  I would make up the nighttime banks.

16   Q    Okay. What do you do with the rest of the cash?

17   A    Then I would take the five and tens and I have a drawer

18   there. I would put them in there. I'd leave a stack about

19   three inches high in case the change -- they need change

20   during the day, bartenders run out of fives and tens.  A

21   person could come up and pull out $100 bill there, whatever,

22   20,s take out fives and tens.  I would take the 20s.  I would

23   separate the tattered 20s with the good 20s.

24   Q    Whether why you separate the tattered 20s from the

25   non-tattered 20s?

*Robert Potenza - direct/ O'Shea*

1   A    I'd leave the tattered 20s for the house-mom in order for

2   her to retrieve singles from the dancers.  I make up two -- I

3   guess you could call them banks for her, and they are  $1200

4   each and we would give her one at a time and then when she

5   came back with 1200 singles we would give her another one, and

6   if she needed a third one they would have money in the box

7   there.  They would use that.  The good 20s I usually count,

8   and I put them between two pieces of cardboard with rubber

9   band around them until I'm ready to put them in the ATM

10  machine downstairs.  I put a number on them.  Today I think it

11  was 327 or something -- 307.

12  Q    Does all the cash get recorded?

13  A    Well, I give -- well, cash I keep.  I bring any 50s, 100s

14  I would either -- if I needed to go to -- on Tuesday,

15  Wednesday or Thursday if I needed to go to the bank and pick

16  up singles I would use those, the 50s and 100s to do that or

17  to deposit in the bank, and the 20s -- if I had extra 20s I

18  didn't need I would put them downstairs in the office.

19  Q    Now, you say you went to the bank and exchanged the 50s

20  and 100s for singles, was there a time when you were writing a

21  check to get singles?

22  A    Yes.  About the time I was switching my pistol license

23  from PSP Jewelry, Inc., to PRP Restaurant, Inc., I was still

24  doing the same procedure.  I was picking up singles Tuesday,

25  Wednesdays and Thursdays and I was giving the bank 50s and

1   100s ans I was getting $6,000 in singles, and the NYPD wanted

2   to see how much deposits I was making a day.  So what I did

3   then is I deposited the money in the bank, and I wrote out a

4   check to pick up the singles at that time.

5   Q    Why did you do that?

6   A    Because it wouldn't show you on my bank deposit on my

7   statement that I was depositing.  It was more like an exchange

8   and they would charge me the same amount of money that they

9   charge for change, but it wouldn't show as a deposit

10  withdrawal on the bank statement.

11  Q    And that is because you wanted to show that you had to go

12  to the bank for --

13  A    To substantiate that I was making that deposit and

14  withdrawal besides the regular deposits and withdrawals.

15  Q    And did you have an understanding why the New York City

16  Police Department wanted that information?

17  A    Well, they wanted to see how much cash you handled a week

18  or daily, weekly basis, and if they have parameters, I believe

19  it is like 8 or $10,000 there's a -- my lawyer told me that

20  you have to show at lease 8 or 10,000 that you are using a

21  week depositing and picking it up, you know, pick up change,

22  and depositing in the bank.

23  Q    Okay. Did part of your duties involve interaction with

24  vendors to PRP?

25  A    Yes, I would deal with liquor vendors, I would deal with

1   the beer company, Restaurant Depot, also I would sometimes

2   pick up stuff at Pathmark, Waldbaums, Shop-Rite.  If they had

3   a sale on something like Turkey breasts  99 cents I would pay

4   two dollars and change in the Restaurant Depot and pick up a

5   couple of hundred pounds of Turkey breasts.  So I would be

6   doing all this stuff -- shopping and stuff.

7   Q     All during the day?

8   A     Yes.

9   Q     Were you involved in booking dancers?

10  A     Yes.  I start booking and Wednesday, and usually it takes

11  me about an hour, an hour 15 minutes.  I would book whatever

12  girls wanted to book that day.  Then on Thursday and Friday I

13  would finish them.  They needed to have their book done by

14  4 o'clock on Friday afternoon.

15  Q     Let's talk about your banking practices for a few

16  minutes. Where did PRP Restaurant bank prior to February 2000?

17  A     I believe we were banking at Chase Manhattan.

18  Q     Which branch or branches did you use?

19  A     I would the branch on 48 Street and Queens Boulevard and

20  on Steinway and Broadway in Astoria.

21  Q     So the 48th Street would be Sunnyside?

22  A     Yes.

23  Q     And the other one is Astoria?

24  A     Yes.

25  Q     Did you ever make a deposit at both of those branches in

1   a single day?

2   A     No. One time I did.  I don't know if this is a deposit,

3   but I -- I'd pick up singles on Tuesday, Wednesday and

4   Thursday and for some reason the bank didn't have my singles

5   on Tuesday, so I picked up a double amount on one day.  So I

6   picked up singles at one branch and about ten, 15 minutes

7   later I went to the other branch to pick them up.  So I had

8   like a double single pick up that day because they didn't have

9   it one day.  I am not sure what day it was.

10  Q     I just want to have you quickly turn to Exhibit 2 in the

11  book in front of you, and just take you through a bank

12  statement from Chase, for example.  You have that?

13  A     Not in front of me.  I got it here.  Number two?

14  Q     Okay. Just look at page 1100 in the lower right-hand

15  corner, please.

16  A     I got it. I see it lower right-hand corner.

17  Q     Page 1100, you have it?

18  A     I'm on it, yes.

19  Q     Okay. Fair to say this is an example of one of your

20  account statements at Chase PRP for the period September 29,

21  2007 through October 31, 2007?

22  A     I think I'm on the wrong one here.  It says 10/1 to 10/9

23  on mine.

24        THE COURT:  Mine, too. Page 1100.

25        THE WITNESS:  I have the wrong book.

1          THE COURT:  No, you are in the right book.

2          THE WITNESS:  Maybe you're in the wrong book.

3          THE COURT:  Mr. O'Shea, are you sure it's 1100?

4          MR. O'SHEA:  I am looking at 1100, Your Honor.

5          THE WITNESS:  I am in Government Exhibit binder one

6    to six.  Am I in the wrong one.

7          THE COURT: No.  Just wait. The Bates number is a

8    little bit obscured because it's stamped over the URL, but it

9    does look like 1100 covers 10/1 to 10/9.

10          MR. O'SHEA:  We have a bit of a conundrum, Judge.

11   We are looking at 1100.

12          (Mr. O'Shea and Ms. Hill and Mr. Morris conferred)

13          I think I have the answer Your Honor.

14          THE COURT:  Okay.

15   Q    On page 1100, Mr. Potenza, you see that the first deposit

16   in addition -- in the deposits in addition section is

17   October 1st; is that right?

18   A    Yes, it is.

19   Q    Okay.  But in the upper right-hand corner is it fair to

20   say that the date of the statements from September 29th

21   through October 31st, 2007?

22   A    That's correct.

23   Q    I think we are in the same place. You see the address PRP

24   Restaurant, DBA Gallagher, 2000, care of PSP Inc., do you see

25   that?

1   A    Yes, I do.

2   Q    Is that the address that you gave to the bank to send

3   your statements to?

4   A    My sister had them send the statements to PSP, Inc. 64

5   West 48th Street because she always had a problem with --

6   sometimes she didn't get the mail right away, so she wanted to

7   do it there -- to get it there, so she mailed the Gallagher's

8   2000 statements care of PSP and that was the address that they

9   send them to -- the bank.

10  Q    And would it be fair to say that your sister handled the

11  accounting aspect of the business more than you did?

12  A    She handled all of it.

13  Q    Is it fair to say that this is a document that you are

14  looking at that you are not unfamiliar with?

15  A    I have seen it but not until recently.

16  Q    But if you look at October 1st, that the first deposit in

17  addition?

18  A    Yes.

19  Q    That reflects a $7,000 figure, do you see that?

20  A    Yes.

21  Q    And then there are three entries below that all for

22  October 1st in varying amounts -- one 8,040; one 4740 and one

23  4040, do you see that?

24  A    Yes, I do.

25  Q    Do you know what those reflect?

1   A    That would be the Friday night probably ATM, the Saturday

2   night, and the Sunday night ATM.1.

3   Q    And there are three figures below that, that  also have

4   next to it RPS link and they are for smaller amounts -- three

5   hundred and one fifty, one sixty-six fifty and one

6   fifty-three, do you see those?

7   A    Yes, I do.

8   Q    What are those?

9   A    For every person that used the ATM we would charge them a

10  $5 surcharge and we would get 4.50 out of as our fee and

11  processor would collect fifty cents.

12  Q    And it was your understanding when the ATM was cleared

13  every single time that it would be recorded?

14  A    Yes.

15  Q    And did that matter to you?

16  A    No.

17  Q    And were these figures given to your sister?

18  A    She got them.  I never even -- I would see never see

19  this.

20  Q    Did you have an understanding that she was giving all

21  this information to your accountant?

22  A    Yes.

23  Q    Did you care about that?

24  A    No.

25  Q    Now, in making the deposits, physical cash deposits, what

*Robert Potenza - direct/ O'Shea*

1  were the denominations you primarily used?

2  A    I would almost always use 50s and 100s.

3  Q    Why?

4  A    I had no use for them at the bar.

5  Q    And in what amounts would you make your deposit?

6  A    I would almost always make them even amounts 7, 8,000.

7  Q    And going back in time, when did you start making cash

8  deposits -- physical cash deposits -- for your business?

9  A    Probably in the 70s when I first opened my first place.

10  Q    And from the 70s on were you practicing your physical

11  cash deposits in essentially the same manner?

12  A    Yes, for some reason I always make an even amount, like

13  either 3,000; 4,0005; six.  I would never put like $2073.  It

14  would always be, you know, even amount.  Even before I had an

15  ATM in the 70s I would still deposit in even amounts.

16  Q    When did you get the ATM?

17  A    The first ATM we got was in, I believe, it was

18  Gallagher's 2 in College Point, and this place we go it as

19  soon as we opened.  Probably in 2001 or 2002 because we opened

20  in December.  It might have been a couple of weeks later.

21  Q    So there were Gallagher's establishments that preceded

22  Gallagher's 2?

23  A    Yes.

24  Q    And Gallagher's, was it the first?

25  A    We had the original one was the one we opened in '77.

*Robert Potenza - direct/ O'Shea* 408

1   Actually, we opened it -- it was incorporated in '77.  Opened

2   in '78.  That was just plain Gallagher's. Gallagher's 2 we

3   opened around 1990, 1991 and that was in College Point, and

4   then Gallagher's 2000 we opened in December 13, 2001, and that

5   was on 37th Street in Sunnyside.

6   Q    So going all the way back to the late 70s you were

7   conducting your physical cash deposits essentially in the same

8   manner, would that be fair?

9   A    Yes.

10          THE COURT: Let me ask a question out of turn,

11   Mr. O'Shea, I assume that whatever business records he has

12   don't go back that far;  is that right? I guess what I am

13   really interested in are there any pre 1988 business records

14   showing the same kind of deposits we have here, just to cut

15   for it.

16          MR. O'SHEA:   Before I speak, let me consult with

17   the authority.

18          (Pause)

19          The farthest it goes back to is 1992.

20          THE COURT:  Okay.

21   Q    Either with respect to the denominations that you took to

22   the bank or the amounts, did that have anything to do with any

23   law or regulation?

24   A    No.

25   Q    Or to avoid any law or regulation?

1   A    No.

2   Q    Now, I think you told us you have a gun carry permit.

3   Did you ever have occasion to actually use your gun?

4   A    I had to use it one time and I had to pull it out a few

5   times.

6   Q    And when you used it the one time, when you did it use

7   it, did you report that event?

8   A    Yes, immediately.

9   Q    To the New York City Police Department?

10  A    Yes.

11  Q    Do you sometimes go to different branches in order to get

12  the change that you told us about?

13  A    Yes, I found out that by using one branch many times I

14  couldn't get the 18,000 or more singles or more I needed a

15  week.  Sometimes I would pick up an extra 6,000 a week.  The

16  teller tells me he has extra singles I would come back on

17  Friday to the pick them up.  So what I did is I was using the

18  48th Street branch three days a week at one time, and then, I

19  somehow I went into the branch on Steinway to make a deposit

20  one time because I was in Astoria and I just happened to ask

21  the teller if she could, you know, get me singles once a week.

22  And she said no problem.  You have an account here.  I said

23  yes.  And I said could I pick them up on Wednesday -- every

24  Wednesday.  And she said that's we will have a standing order

25  of 6,000 and at that time I reduced the singles on the 48th

1   Street branch by 6,000 so it would be -- and I always get my

2   singles.

3   Q    So you would get, generally, $18,000 in singles every

4   week?

5   A    Minimum 18,000.

6   Q    For your business?

7   A    Yes.

8   Q    Was there any other reason that you went to get those

9   singles?

10  A    Just the use of business.

11  Q    And was there any reason to evade any law regulation that

12  you would trade in your 50s, 100s for singles?

13  A    I don't think anybody would want singles instead of 50s

14  and 100s.

15  Q    Why -- withdrawn. How much space does 6,000 singles take

16  up?

17  A    It's a special bag, a triple black back.  I pulled five

18  this way and one on the side.  The reason I only pick up 6,000

19  is because they are heavy and that's about all I can carry.

20  Q    So just judging by your hand, maybe two and a half feet

21  by?

22  A    Yes, maybe the size of a bill.  Maybe about six, eight

23  inches high.  Then I have to put one on the side because it

24  doesn't fit in the bag.

25  Q    So just a small duffle bag, maybe?

1   A     Like a shopping bag, big shopping bag.

2   Q     And you would put the singles in that bag?

3   A     I would pull them around my arm this way (indicating)

4   because one time when I got robbed I had them loose in my

5   hand.  That is he when he grabbed the bag out of my hand. So

6   I'd always have it on my forearm here and my keys in this

7   hand, so I could get in my car.

8   Q     Did there come a time that your Chase account was closed?

9   A     Yes.

10   Q     When was that?

11   A     I believe it was around 2008.  Around 2008.

12   Q     Do you know why it was closed?

13   A     I was just going to the teller to pick up my regular

14   singles, I am not sure what day it was, and I gave her my

15   account number, and she said because you have to give me the

16   account number when you pick up change, they charge you for

17   the change, she said the account has been closed.  I said can

18   you check again.  She checked it two or three times, and she

19   kept on telling me, no, your account is closed.

20   Q     Did she tell you why?

21   A     She didn't have any idea, and  I kept telling her it is

22   impossible. So then I called my sister up, and I said, Pat,

23   something's wrong, our account is closed.  Give me the Ron

24   Bob.  I thought maybe see if I could use that account number.

25   So it was 110 36956.  Even I give that account number I have

*Robert Potenza - direct/ O'Shea*                    412

1    it memorized now. I use it three times as week.  I got that

2    account number. I got my singles and then I start to use that

3    account number and then we had to find out why it was closed.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. Potenza - direct - O'Shea                413

1    EXAMINATION CONTINUES

2    BY MR. O'SHEA:

3    Q     How did you go about finding out what had happened?

4    A     Well, the next day I believe my sister made some calls

5    and then I went down to the branch on 49th Street, 50th Street

6    and Sixth Avenue.  I was going into the jewelry business for

7    so many hours a day to work.  And then they couldn't give me

8    any reason.  They just -- I believe they had about 45,000,

9    quite bit of money in there.  They just wouldn't give us a

10   reason why it was closed.  They said it was closed.  They even

11   made calls to, I guess, the -- the headquarters or something.

12   And no one would ever give us a reason.

13           So I tried to get my money out of there.  They

14   wouldn't release it right away.  But, in the meantime, our ATM

15   kept going in there.

16   Q     Did you ultimately get your money back?

17   A     Yes.

18           By the time we -- we were able to switch our ATM to

19   another provider, because we wanted to be able to use it so we

20   left it like that.  It was about $85,000 in the account.  I

21   believe it was like two or three weeks later we got our money

22   back.  Maybe a longer.  I am sure exactly how long.

23   Q     Is that when you began your banking relationship with TD?

24   A     Yes.

25   Q     Let me ask you to look at Exhibit 3 in your book.  It is

GR      OCR      CM      CRR      CSR

R. Potenza - direct - O'Shea                    414

1   in front of you.

2            Do you have that?

3   A    Yes.

4   Q    Do you recognize the document?

5   A    Yes, I do.

6   Q    Did you receive it on or about September 7, 2007?

7   A    No, I did not.

8   Q    When did you first learn of the existence of this

9   document?

10  A    When this case came to light.

11  Q    That address that's on the document, is that the proper

12  mailing address for PRP Restaurant?

13  A    No, it is not.

14  Q    Now let me have you look at Exhibit 4.

15           Is that a document you recognize?

16  A    Yes.

17  Q    Is the address on that document the proper mailing

18  address for PRP Restaurant?

19  A    Yes.

20  Q    At that time period?

21  A    Yes, it is.

22  Q    Let me have you look at Exhibit A.

23           Do you recognize that document?

24  A    Yes.

25  Q    The address on that document is the physical address,

R. Potenza - direct - O'Shea                    415

1   correct?

2   A     Yes.

3   Q     Can you tell us the circumstances of your obtaining this

4   letter?

5   A     When I was applying -- I had my full carry license from

6   PSP Jewelry since 1977 and we were discussing closing the

7   jewelry business because we were kind of slow and I told my

8   sister I would like to get the pistol license transferred over

9   to, you know, PRP Restaurant.  And we contacted an attorney,

10  Mr. Chambers, and he told us what we would have to do to do

11  it.

12          One of the things is to get a letter from the

13  branch, both branches that we deal with, and letting us know,

14  you know, the -- the way we bank, the deposits we make per

15  month, and any change we take out, things like that, and how

16  our account is handled.

17  Q     Did you go to Chase and ask for this letter?

18  A     Yes.

19          I went to both branches and asked for a letter.  For

20  some reason one branch had to do some kind of checking so I

21  didn't get both at the same time.  I had to wait about a month

22  or so to get the second one.

23  Q     If you look at the letter, in the second paragraph it

24  says:  The account was opened on December 7, 2001, with a year

25  to date average balance of 31,865.  You see that?

GR      OCR      CM      CRR      CSR

R. Potenza - direct - O'Shea                    416

1    A    Yes, I do.

2    Q    Then it says the account has been conducted in a

3    satisfactory manner.

4         Did you actually ask that the letter deal with the

5    entire time that the account had been opened?

6    A    I believe the attorney asked for something like that.  I

7    relayed that information to the bank, or they might have just

8    put it in.  I am not sure exactly how that worked.

9    Q    Okay.

10   A    I needed a letter from them.

11   Q    Okay.  Did your attorney give you elements that needed to

12   be contained within the letter?

13   A    Yes.

14        That, you know, the -- the deposits that were made

15   into the account, you know, the balance.  If it's in

16   satisfactory, you know, things like that.  About the singles

17   that are taken out every week.

18   Q    Okay.  And that's in that last sentence of the third

19   paragraph:  In addition to deposits, about six thousand is

20   withdrawn for change at least once per week.

21        You see that?

22   A    Yes.

23   Q    Exhibit B, do you recognize that one?

24   A    That's the letter from the Chase branch in Sunnyside.

25   Q    Okay.  So you went to the Sunnyside branch and

GR        OCR        CM        CRR        CSR

R. Potenza - direct - O'Shea                    417

1   essentially asked for the same thing, is that right?

2   A    Yes, yes, I did.

3   Q    Fair to say that this talks about cash deposit activity

4   in the amount of $115,000?

5   A    Yes.

6   Q    Did you tell them, give any instruction to either bank

7   branch to not reveal all your cash deposit activity?

8   A    No, no.

9   Q    Did you understand by going and asking for this letter

10  that they would look into your cash deposit activity?

11  A    That's what I wanted to do, to give me a letter to that

12  effect.

13  Q    Were you at all fearful that it would reveal anything

14  improper about what you had done?

15  A    No.

16  Q    In the last sentence of third paragraph of Exhibit B it

17  says:  In addition to the deposits, about 12,000 is withdrawn

18  for change at least once per week.

19             Is that strictly accurate?

20  A    At least 12,000.  And then, like I said, sometimes I

21  would get an extra six thousand or could be four thousand if

22  the bank had extra money.  They would tell me and I would come

23  in the next day usually, Friday, I would have come in.

24  Q    Did anyone at Chase during the time you were banking

25  there from 2001 forward, did anyone ever tell you you have to

GR      OCR      CM      CRR      CSR

R. Potenza - direct - O'Shea                    418

1   file a CTR?

2   A     No.

3   Q     Did you care if they did file a CTR?

4   A     No.

5   Q     Why not?

6   A     It didn't matter to me.  If I had to do it, I would have

7   did it.

8   Q     Going back to the gun application, what was the result of

9   that?

10  A     It was approved.

11  Q     Let me show you, or have you look at Government

12  Exhibit -- withdrawn -- Exhibit L, at page 5347.

13  A     I got it.

14  Q     Specifically, if you would look at, within the document,

15  5351.

16  A     I got it.

17  Q     Do you recognize 5351, page 5351?

18  A     Yes.

19        This is the -- the investigator Omar, he was the

20  investigator for the pistol license.  It is just basically a

21  letter acknowledging the receipt of phone call and giving me

22  things that I needed, I guess, self-employed, student, copy of

23  Social Security card.  All the things I needed to -- it says

24  number 37 it looks like it's --

25  Q     Okay.  Fair to say, this is a check list, right?

GR        OCR        CM        CRR        CSR

R. Potenza - direct - O'Shea                419

1   A    Yes, check list.

2   Q    Of requirements for your pistol permit, right?

3   A    That's correct.

4   Q    It is dated September -- pardon me -- July 14, 2007?

5   A    Yes.

6   Q    Just look a couple of pages in, at 5353, page 5353, item

7   37.  Just read that aloud, please.

8   A    I need a letter from bank supporting cash deposits and

9   cash payrolls and who they are familiar with that handles bank

10  transactions for your business.

11  Q    Okay.  Is that the reason why you asked for Exhibit A and

12  B to be prepared?

13  A    Yes, it is.

14  Q    If you look at 5361 within Exhibit L, can you tell us

15  what that reflects?

16  A    This says notice of application approval.

17  Q    That's dated November 26, 2007?

18  A    That's correct.

19  Q    Now, let me take to you the fall of 2007.

20       Do you recall having a telephone conversation with

21  someone from Chase?

22  A    Yes; some lady from Chase called me up.

23  Q    Did you know her?

24  A    No, I never had spoke to her before.

25  Q    Was she your usual banker?

R. Potenza - direct - O'Shea          420

1    A     No.

2    Q     Was she from New York?

3    A     I believe she was from down South.  She had a little bit

4    of an accent.

5    Q     Tell us the discussion that you had.

6    A     I had to explain to her about the -- the type of business

7    I had, that I was in adult entertainment.

8    Q     Before you do that, what did she say to you was the

9    purpose of the call?

10   A     Just about my banking practices.  I am not sure exactly

11   with she said.  But when she started to talk to me, I -- I

12   gave her a rundown of everything that I do and how I do it.

13   Q     Did you tell her about your practice of going to the bank

14   for singles?

15   A     Yes, I did, three times a week.

16   Q     Did you tell her that -- what you did for a living?

17   A     Yes.

18         I told her we had adult entertainment and we used

19   the singles at the bar and I told her we make deposits in the

20   bank.

21   Q     Did you tell her why you make deposits the way you do?

22   A     Yes.

23         Because I said that we used -- I think I told her

24   about the twenties for the ATM that we have on the premises.

25   We use the twenties for that and also to collect singles from

GR        OCR        CM        CRR        CSR

R. Potenza - direct - O'Shea                421

1    the girls.

2    Q     Did you tell her you had an ATM on the premises?

3    A     I believe I did, yes.

4    Q     How did the conversation resolve?

5    A     She seemed okay with it.  Everything was okay then.

6    Because I explained to her what, you know, what I was doing

7    with the singles and, you know, I guess the -- maybe she was

8    concerned about the fifties and hundreds being deposited and I

9    don't know what exactly her reasoning was for calling but she

10   seemed okay and that -- I never heard from her again.

11   Q     Did she at any time -- was that the one and only time you

12   spoke to this person?

13   A     Yes.

14   Q     Do you recall her name?

15   A     No.

16   Q     Did either she or anyone else from Chase ever call you

17   about the letter we showed you dated November -- pardon me --

18   September 7, 2007, and marked in evidence as Exhibit 3?

19   A     Let me go back and look at that and make sure.

20         What was question again?

21   Q     Did anyone from Chase, either this person you talked to

22   in the fall of 2007 or anyone else, ever call you and discuss

23   this letter marked in evidence as Exhibit 3 in any way, shape

24   or form?

25   A     No.

GR       OCR       CM       CRR       CSR

R. Potenza - direct - O'Shea                    422

1   Q      Did anyone ever call you from Chase, and letter to one

2   side, say hey, you know your bank activity could be construed

3   as structuring?

4   A      No.

5   Q      Did anyone ever say that in person when you went to the

6   bank?

7   A      No.

8   Q      When your account was shut down in February of 2008, was

9   that a total surprise to you?

10  A      Yes.

11  Q      Now, you mentioned that the account that you were able to

12  access in February 2008 was the Ron Bob Pub account?

13  A      Yes, that's correct.

14  Q      And is that account still open?

15  A      Yes, it is.

16  Q      What's it used for?

17  A      We use that for the gift certificates for the bar.

18  Q      Tell us what the gift -- how those gift certificates are

19  purchased and how they are used?

20  A      If a customer comes in and he doesn't have any cash, he

21  has the option of using the ATM machine.  If he can't use the

22  ATM machine and he wants to use his credit card, we will use

23  the Ron Bob account, sell him gift certificates, either to use

24  for dances, for $20 dances, for tips, or to use the champagne

25  room.  There is a $20 -- a 20 percent surcharge on -- so if he

R. Potenza - direct - O'Shea                    423

1   gets $200, we would charge him 240.

2   Q    Is that account, the proceeds that are -- that go through

3   that account, are they reported to your accountant?

4   A    Yes.

5   Q    Is tax paid?

6   A    Yes.

7   Q    Let's talk about TD Bank.

8          Did you change your banking practice in any way when

9   you went to TD?

10  A    No.

11  Q    Did they ever ask you, anyone at TD, to file a CTR?

12  A    No.

13  Q    Did anyone warn you at TD that hey, your banking

14  practices are out of line, or that you at to change them, in

15  any way?

16  A    No.

17  Q    Did you care if TD Bank filed a CTR?

18  A    No.

19  Q    Were your cash deposits conducted in pretty much the same

20  manner you had done at Chase?

21  A    Yes.

22  Q    Tell us, the ATM, once the Chase account was shut down,

23  what did you do with the ATM deposits that were wired or

24  credited to your account?

25  A    My sister, she handles the -- the banking and everything.

R. Potenza - direct - O'Shea                424

1   She switched over that I believe to the -- to TD Bank.

2   Q    Did you ever consider using a separate account for the

3   ATM deposits as opposed to the physical cash deposits?

4   A    No.

5        Because I felt they were almost like the same thing.

6   It was -- it helped me to not have to go to the bank all the

7   time.  The cash would go from the machine into the Chase or

8   the TD Bank.  And there -- I wouldn't have to go make a

9   deposit because it's very dangerous.

10  Q    PRP also maintains an account at Merrill Lynch?

11  A    Yes, we do.

12  Q    Why?

13  A    That was more my sister's idea, I believe.  She wanted to

14  pay a separate bank to pay vendors and stuff like that and

15  it -- I think she liked the way they had their thing set up,

16  their account set up.  It was more or less transparent what

17  they were doing with different things.  I -- it was her idea.

18  She does that.  I don't get involved with the bookkeeping.

19  Q    Do you have an account yourself at Merrill Lynch?

20  A    I have a couple of accounts with Merrill Lynch.

21  Q    Why do you keep your personal account at Merrill Lynch?

22  A    I just always did.  I have accounts there for years,

23  maybe 20, 30 years.  I don't know how long.

24  Q    Is that an account where you receive your paycheck?

25  A    Yes.

GR       OCR       CM       CRR       CSR

R. Potenza - direct - O'Shea                    425

1        Actually, I -- I don't touch the check.  My sister

2   fills it out, signs it and she deposits it into the account.

3   Q    Let's talk a little bit about the cash income at PRP.

4        How much cash comes in every day?

5   A    It varies.  On a Sunday and Monday, it would be a lot

6   less.  It could be like seven, eight thousand, nine thousand.

7        On -- then it progressively -- like Tuesday,

8   Wednesday, usually about the same.

9        Thursdays and Friday, Saturday, are the busiest

10  days.

11  Q    Is there seasonal variation?

12  A    Yes.

13       Usually like -- like in the fall, around the -- the

14  holidays we usually get pretty busy unless there is a bad

15  snowstorm or something like that.  So I would say we -- it's

16  pretty steady most of the year but we increase on certain

17  months, maybe ten, 15 percent.

18  Q    How do you keep track of food and drink that's sold on

19  the premises?

20  A    Well, we have registers behind the bar and then it is

21  rung up on the register.

22  Q    Is it your practice to keep register tapes?

23  A    Yes.

24  Q    What about credit card transactions?

25  A    Credit cards, there is a credit card machine behind the

                  GR      OCR      CM      CRR      CSR

1   bar.  We use that for the -- if someone wants to -- you know,

2   drinks or alcohol on a credit card and then there is another

3   credit card on the other side for the gift certificates.

4   Q    We have heard about admission fees charged at Gallagher's

5   2000.

6            Has there always an admission fee charged?

7   A    No.

8            When we first opened in December 13, 2001, we didn't

9   have a cover, admission charge.  I thought it was a good idea

10  to like not do that right away in order to build up some

11  business.  I -- I don't know how many years we -- might have

12  been a year or six months to a year, I am not even sure

13  what -- it was quite a while before we started to charge a

14  cover.

15  Q    Is the cover always the same?

16  A    No.

17           What we did when we first started, I believe we only

18  had it on like maybe Friday and Saturday, maybe Thursday.

19  Then we added days on as we got busy those days and then the

20  last two days to be added on was Sunday and Monday.  We didn't

21  have that for -- I believe for quite a few years.

22  Q    How do you keep track of those admission fees?

23  A    Normally we have a tape on the register out there.

24  Q    Has that always been the case?

25  A    Well, we -- like when we first opened we didn't have one

1   because we didn't -- we didn't have a cover but then

2   we -- eventually we put one behind there.

3   Q    Did the tape always record the amounts that were punched

4   to the register?

5   A    At one time it was broke for quite a while.

6   Q    When was it replaced?

7   A    In the summer of 2010.

8   Q    Tell us how Gallagher's 2000 makes money on adult

9   entertainment, on the dances itself?

10  A    Okay.  We do a lot of advertising.  So we bring in new

11  people.  The cover doesn't start until 8:00 o'clock at night.

12  So depending on the night it could be $5 on a Sunday, Monday.

13  Tuesday, Wednesday, Thursday, it's $10; and Friday and

14  Saturday it's ten but then it goes to 15 after 11:30.

15        We also -- we just raised it on Wednesday and

16  Tuesday to $10.  Before we had Monday through Wednesday

17  was $5.

18  Q    Explain what is included in house fees.

19  A    Well, a house fee would be the -- the girl -- they are

20  independent contractors and they pay a fee to work at the

21  club.  They -- they use the dressing room and the facilities

22  and everything like that.

23  Q    How much is that amount?

24  A    Well, when we first started, we were charging $30.00.

25  All right.  I had set it at 60 but we let them pay half and

GR        OCR        CM        CRR        CSR

R. Potenza - direct - O'Shea                    428

1   then we progressively raised it to 40, 50.

2          Now we have a 60 -- at this present time it's $60

3   during the day.  Sunday, Monday, Tuesday, Wednesday, it's 60.

4   Thursday, it's -- it's $70 at night; and $80 on Friday and

5   Saturday at night.

6   Q    So it varies?

7   A    It varies, yes.

8   Q    Does it ever vary depending on either the season or the

9   economy?

10  A    No.

11         We -- well, we did -- we opened up on Labor Day and

12  we only charged the girls I think -- sometimes we only charge

13  them half and, you know, like -- because it's a holiday.  They

14  pay $30.00 or $40.  Something like that.

15  Q    Is there anything else included in the house fees?

16  A    We do have, what do you call that, house mom and DJ.  We

17  put that in there because -- and then -- I think that's it.

18  We stick that in to the house fees.

19  Q    What about VIP room?

20  A    The VIP rooms are called champagne rooms.  We, at one

21  time we were charging 150.  We just went up about a year ago,

22  a year-and-a-half, to 160.  We were getting 30 out of the 150.

23  The dancer was getting 120.  We raised it $10 for ourselves

24  because we -- what do you call it, we thought we weren't

25  getting enough.

GR      OCR      CM      CRR      CSR

R. Potenza - direct - O'Shea                    429

1          So we would get -- at one time my sister was putting

2     I think with the house fees, she was lumping it together, like

3     a house fee.  Eventually she separated both of those, the

4     house fees and the champagne rooms.

5     Q     Now, you mentioned the DJ and the house mom.  Do they --

6     are they independent contractors too?

7     A     Yes.

8     Q     How do they get compensated?

9     A     There is a tip-out to the DJ and house mom.  It is a

10    minimum of $10.  They can tip-out more but they -- they

11    usually just tip them ten but they can give them more than

12    ten -- 12, 15.

13    Q     Is there some sort of a schedule or regime where that DJ

14    and the house mom would pay the house?

15    A     Yes.

16          What we did is when we first started, I think it

17    was -- if it was less than 12 girls there was no tip-out.  If

18    it went from I think 12 to 20, it was $2.00; 20 to 40, it was

19    $3.00; and over 40 was $4.00.

20    Q     Did the house always get that money?

21    A     No.

22    Q     When did it not get that money?

23    A     Well, we had a general manager, Joe Johnson, and we made

24    an agreement with him that he would get the tip-out from the

25    DJ and house mom.

R. Potenza - direct - O'Shea                    430

1   Q    Was that arrangement in place with anyone else?

2   A    No.

3   Q    So would it be fair to say that there was wide variance

4   depending upon the number of dancers in terms of what the

5   compensation would be to the DJ and house mom and

6   correspondingly to -- that would be paid to the house or to

7   Mr. Johnson?

8   A    Yes.

9            MR. MORRIS:  Objection, Your Honor; leading.

10           THE COURT:  Sustained.

11  Q    Tell us, was the compensation to the house mom and the DJ

12  always the same every day?

13  A    No.

14           We would have -- some days we'd have 20 dancers and

15  some days we might have 50 dancers.  So if we had 50 dancers,

16  the house mom would get a minimum of $6 each, from each

17  dancer, and the general manager would get the $4.00 and also

18  the DJ the same thing, $6.00 for -- the DJ would get if there

19  were 50 dancers and then the general manger would get the

20  other $4.00.  He would get eight times 50.  It would be $400.

21  Q    Now, how were the partners paid?

22  A    Well, up until March of 2008, we used to pay ourselves in

23  his cash every week.

24  Q    And then it changed?

25  A    After that, my sister said that, you know, she -- I

GR       OCR       CM       CRR       CSR

R. Potenza - direct - O'Shea                    431

1    was -- actually, I was accumulating, you know, quite a bit of

2    money so -- at home and I don't spend a lot of money.  You

3    know, I don't go out too much.  I work a lot.

4            So she suggested that we take a check and I told her

5    okay.  It was fine with me.

6    Q    And the employees, the cash payroll you told us about, is

7    there anyone -- anyone paid off the books?

8    A    No.

9    Q    For any portion of their compensation?

10   A    No.

11   Q    Tell us about how your understanding of how a manager

12   closes out at night?

13   A    Well, or a person in charge or a manager.

14           What would happen is, depending on the night there

15   could be two registers, three, whatever, four.  And then they

16   would -- usually they would go down and Z out the register,

17   bring the money up to the upstairs, count it, make sure that

18   it's at the amount that's it's supposed to be that the tape

19   says and then they would put the tape on the side.

20           When they cleared all the registers, they would put

21   all the tapes together and they would make sure everything

22   balances, add it all up and then they would leave the -- the

23   amount with any expenses on a Post-it note for me and then I

24   would count it the next day when I came in.

25   Q    Let me have you look at Exhibit 24 in the book in front

GR       OCR       CM       CRR       CSR

R. Potenza - direct - O'Shea                    432

1    of you.

2              Do you have the document?

3    A    Yes, I do.

4    Q    Do you recognize the form of document?

5    A    Yes.

6              We use the form like this.

7    Q    What do you use it for?

8    A    They just -- to balance out the registers.

9    Q    Is this document kept after closing?

10   A    No.

11   Q    Are there times when you write on these documents?

12   A    I would write the dates sometimes on the top.

13   Q    What about these -- where it says dancer's name, would

14   sometimes you write on that portion?

15   A    Sometimes I would, yes.

16   Q    And after -- were there times when you acted as the night

17   person, the person --

18   A    I have come -- I have closed at night or the daytime.  I

19   have done that from time to time, yes.

20   Q    When you have closed at night, have you used a form like

21   this?

22   A    Sometimes I would just use a blank piece of paper

23   and -- or I wouldn't even use a piece of paper because I'm

24   pretty quick with numbers and what I would just do is, I would

25   just count the money and add it up on the register, singles,

GR      OCR      CM      CRR      CSR

R. Potenza - direct - O'Shea            433

1    fives, tens, twenties and fifties and then look at the tape

2    and see was it the same for the tape.  It would be fine.  I

3    wouldn't even have to write it down.

4    Q    You keep on hand a lot of cash on the premises, is that

5    fair?

6    A    Yes.

7    Q    Did you tell Agent Westrich that you were -- you only

8    kept 20,000 or so on the premises?

9    A    No.

10           I might have told them I had 20 or 30,000 upstairs

11   in the upstairs office.  That's -- that's to use on a daily

12   basis.  That would be singles, the banks, the fives and tens,

13   stuff like that.

14   Q    How much would you actually keep in the business on an

15   ongoing basis, if you can give us the range?

16   A    It could be 300, 400,000 or more.

17   Q    Was that money that you reported to your accountant?

18   A    Yes.

19   Q    Was it reported to the IRS for tax treatment?

20   A    Yes, it was.

21   Q    Where did you keep the money on the premises?

22   A    We kept it downstairs in the downstairs office.

23   Q    Was that an office that Joe Johnson was allowed into?

24   A    No.

25   Q    Who was allowed into this office?

GR      OCR      CM      CRR      CSR

R. Potenza - direct - O'Shea                      434

1  A    Only three people had keys, the three partners.

2  Q    Is there a safe on the premises?

3  A    Yes, there is.

4  Q    Is there an alarm system?

5  A    Yes.

6  Q    You heard testimony from Mr. Guerci about not having

7  insurance for the cash on the premises.

8  A    Yes.

9  Q    Why don't you have more insurance than you do?

10  A    I never even thought about it.

11  Q    The alarm system, is it connected to a central station?

12  A    Yes, it is.

13  Q    Now let me take you to the afternoon of December 10,

14  2009.

15        On that afternoon, did you receive a call from

16  Mr. Guerci and Mr. Westrich?

17  A    Yes, I did.

18  Q    How long did the call last?

19  A    Twenty minutes or half hour, around there.

20  Q    Did they tell you why they were calling?

21  A    Yes.

22        Actually, Mr. Westrich did I think most of the

23  speaking or all of the speaking, as far as I remember.  He

24  identified himself as with the IRS.  His name was Brian

25  Westrich.  He said he had a Mr. Guerci here with him.  I

R. Potenza - direct - O'Shea                    435

1    don't -- I don't know what exactly he said, whether he was an

2    agent or not.  He said he was with him listening to the

3    conversation.

4         He mentioned that he -- they levied three accounts

5    of mine.  One was my personal account for 230,000; one it was

6    PRP account for 61,000; and I think it was 500-something

7    thousand from the Merrill Lynch account, the business account.

8    Q    Did they ask you questions?

9    A    Yes.  They asked me -- the whole time they were asking me

10   questions.

11   Q    Did you try to be cooperative?

12   A    Absolutely.  I answered every question.

13   Q    You didn't refuse to answer any question?

14   A    No, I did not.

15   Q    Did they ask you for your tax returns?

16   A    Yes, they asked me about my tax returns.  I believe it

17   was 2009.

18        I explained to them my accountant, David Lane, had

19   passed away, that I was on an extension and he was supposed

20   to -- actually he said he had it done and then all of a sudden

21   I didn't hear from him for months.  I couldn't get in touch

22   with him.  I finally got a letter from his ex-wife, I think

23   Lynn Lane, and telling me that -- it might have been six

24   months later -- that he had passed away and I -- I got some

25   accountant sent me a letter also and then I finally got in

GR     OCR     CM     CRR     CSR

R. Potenza - direct - O'Shea                    436

1   touch with the second accountant named David -- you know,

2   Lipper, Nathan Lipper, and he was able to get some stuff from

3   David but he couldn't find the -- the information that I had

4   given him to do the tax return.  So I had to reconstruct it

5   again.  It took me a little while.

6           I -- but I -- I actually got a -- money back that

7   year, I believe.

8   Q     So you paid your taxes?

9   A     Yes.

10  Q     You were just a little delayed in getting it filed?

11  A     That's correct.

12  Q     Did they ask you about your knowledge of structuring?

13  A     They asked me about money laundering and structuring and

14  stuff like that.

15          And I told them what I thought money laundering was.

16  I said I thought it was if I was selling drugs and I put money

17  through a business and took it out as income or whatever.

18          And then structuring, I really didn't know.  I said

19  that I might have read things about, you know, money

20  laundering, structuring, you know, because I read the paper

21  all the time but I am not that familiar with it.

22  Q     Did you tell -- did you tell them that you had -- you had

23  an understanding that structuring was keeping your amounts

24  under $10,000?

25  A     I don't believe I said that, no.

GR        OCR        CM        CRR        CSR

R. Potenza - direct - O'Shea                    437

1   Q     Did you -- did they ask you whether you thought you were

2   structuring?

3   A     I believe they did.

4         I told them I wasn't.  They asked me about my

5   deposits, that I always deposited fifties and hundreds.  I

6   went in length to explain to them the nature of my business,

7   from everything I do there, you know, with the -- why I only

8   deposit fifties and hundreds.

9         They kept asking me, where are the twenties.  They

10  must have asked me that a dozen times.  And I told them what I

11  do with the twenties, that I -- my ATM machine, I -- they have

12  taken out over $50,000 in a week.  So it usually averages

13  about 40,000 a week in ATM.

14        And then I also use the twenties to get the singles

15  back.  I give the house mom twenties to retrieve singles from

16  the dancers.  Otherwise, I have to go to the bank maybe six

17  days a week to get twenties -- singles.

18  Q     Did they ask you about any foreign transactions that you

19  had done?

20  A     They asked -- they kept asking about wire transfers and

21  I -- for some reason I don't know, I thought they were talking

22  about wiring money out of the country.  And I -- I didn't know

23  what they were talking about because I said I don't do any

24  wire transfers.

25        But finally, into the conversation, maybe ten,

R. Potenza - direct - O'Shea                    438

1   15 minutes, I started to talk about the ATM.  Then I realized

2   that it's -- RBS stands for Royal Bank of Scotland.  Because

3   we had changed the ATM machine when we went to TD and it

4   sounds like it might be going out of the country.  So I

5   explained to them the only money that's wired anywhere is the

6   ATM money.  That's when we clear the machines in the mornings.

7   It goes into our bank at TD and then, you know, it's like a

8   way of depositing money for us.

9   Q   From the way they were asking you questions, could you

10  tell whether they knew about your ATM machine prior to the

11  call?

12  A   I don't -- I don't think they did.

13        It's just -- they -- they didn't seem like they knew

14  very much about my business.

15  Q   You said they were asking you more than once where are

16  the twenties.

17  A   Yes.

18  Q   What did you tell them?

19  A   I kept explaining to them about how I use them for the

20  ATM and then I expanded I think about the house mom, getting

21  the singles back, recycling singles and stuff like that.

22  Q   Did you tell them about your gun carry permit?

23  A   Yes.

24        I don't know how that came up, but I -- I think I

25  might have mentioned about that I was robbed once because

GR      OCR      CM      CRR      CSR

R. Potenza - direct - O'Shea                    439

1   they -- they kept -- they asked me about the deposits I make

2   and I tell them -- I told them I make deposits as I get them

3   and the money and I -- I only do the fifties and hundreds

4   because they are of no use to me.  They are absolutely of no

5   use to me.  So I deposit them and I also use fifties and

6   hundreds for the singles.  I always get rid of the fifties and

7   hundreds.

8            Then I mentioned to them that I was robbed one time

9   and I had to shoot at the person that -- he pulled a gun on

10  me.

11  Q    Exhibit 3, this September 7th letter?

12  A    Is that 1255?

13  Q    Yes.

14  A    Okay.

15  Q    Did they ask you about this letter?

16  A    I think they asked me about letters that I received.  I

17  told them I didn't think I received any letters like this.

18  Q    Did they ask you about a letter, a CTR letter?

19  A    I think they might have asked me something like that.

20  Q    I'm sorry?

21  A    I think they did ask me some kind -- about letters and

22  stuff.

23  Q    About letters?

24  A    Yes.

25  Q    Did they ask you about specifically this letter?

GR        OCR        CM        CRR        CSR

R. Potenza - direct - O'Shea          440

1   A     I am not sure if they did or not.

2   Q     Did you tell them about the conversation you related to

3   us that you had had with someone from Chase?

4   A     Yes.

5         With the lady that called me from down South, that

6   I -- like I said, she was asking me about the nature of the

7   business and I explained to her what kind of business we were.

8   I always tell them what kind of business we were right away

9   because some people can't comprehend taking out, you know,

10  like you know, large amounts of singles all the time.  They

11  don't understand that.

12  Q     Did you tell them about how your account had been closed

13  in February of 2008?

14  A     I think I mentioned that to them.

15        They asked me so many questions.  Let me think.

16  2008?

17        I think I mentioned to them that, yes.

18  Q     I'm sorry?

19  A     I think I mentioned to them about the account being

20  closed.  They asked me -- they asked me about that.  They

21  asked me about Chase Manhattan, that's right.  They asked me

22  about the Chase account, why it was closed and I told them

23  that they never gave us a reason.  They asked me about it.  I

24  didn't ask them about it.

25  Q     Okay.  Did they ask you about your income that you report

GR       OCR       CM       CRR       CSR

R. Potenza - direct - O'Shea                    441

1   for tax purposes?

2   A    Yes.  I said to them that I make between 1.4 and

3   1.6 million a year.  And he repeated the question.  He said,

4   how much?  And I said 1.4, 1.6 million.

5   Q    The documents I showed you a minute ago, Exhibit 24, you

6   heard Joe Johnson's testimony about these documents?

7   A    Yes, I did.

8   Q    Was that true?

9   A    No.

10  Q    Do you recall loaning money to Joe Johnson?

11  A    Yes, I do.

12  Q    Tell the Court the circumstances of that.

13  A    My sister Pat came up to me one day and said that Joe has

14  a little trouble.  He owes quite a bit of money to a credit

15  card company and they were going to take his house.  She told

16  me that she was going to loan him the money out of her own

17  money and I told her not to do that, that we would do it out

18  of the business.

19  Q    Did you end up loaning him the money?

20  A    Yes, we did.

21          MR. O'SHEA:  Thank you.

22          Nothing further, Your Honor.

23          THE COURT:  All right.  Let's take a ten-minute

24  break.  We will reconvene for cross-examination at 3:00

25  o'clock.          (Recess taken.)

R. Potenza - cross - Morris                    442

1          (In open court.)

2          THE COURT:  Be seated, please.

3          All right.  You may inquire.

4          MR. MORRIS:  Thank you, your Honor.

5   CROSS-EXAMINATION

6   BY MR. MORRIS:

7   Q    Good afternoon, Mr. Potenza.

8   A    Good afternoon.

9   Q    One of the areas that you were asked about in your direct

10  examination was the post-seizure interview conducted by

11  agents.

12  A    Yes.

13  Q    With respect to that interview, during the course of the

14  call, you told agents what you thought structuring was, didn't

15  you?

16  A    I don't remember telling them that, no.

17         THE COURT:  Mr. Potenza, I need you to pull the

18  microphone closer to you.

19  A    I don't remember telling them that, no.

20  Q    You testified at deposition --

21         THE COURT:  Hang on a second.

22         (Pause.)

23         THE COURT:  You may proceed.

24         MR. MORRIS:  Thank you, your Honor.

25  Q    Mr. Potenza, do you recall giving deposition testimony in

R. Potenza - cross - Morris                      443

1   connection with this case?

2   A     Yes.

3   Q     December 9, 2010?

4   A     Yes, I do.

5   Q     Let me just show you a page from your deposition, to see

6   if that refreshes your recollection in regards to the question

7   I just asked you.

8             MR. O'SHEA:  Page cite, counsel.

9             MR. MORRIS:  It's actually on the screen in front of

10  you.

11  A     I see it.

12            THE COURT:  Mr. Morris, you still have to give the

13  page and line number.

14            MR. MORRIS:  It's page 39, line number 16.

15  Q     Would you please take a moment to read that?

16  A     My answer was --  "During the course of the phone call,

17  did you tell the agents" --

18            THE COURT:  Mr. Potenza, you don't have to read it.

19  It's okay.  He just asked you if you see it.

20            What's the next question?

21  Q     Does that refresh your recollection, sir, as you read

22  from line 16 through line 21?

23  A     Yes.

24  Q     So, during the course of that call, then, you did tell

25  agents what you thought structuring was?

R. Potenza - cross - Morris                    444

1  A    I said I told them what I thought it might be, yes.

2  Q    And in the course of that conversation with the agents,

3  you might have told the agents that structuring is essentially

4  when you deposit less than $10,000 in cash in a bank account

5  in order to avoid a reporting requirement; is that correct?

6  A    Yes.

7  Q    And in connection with your deposition testimony at the

8  U.S. Attorney's Office on December 9, 2010, you had an

9  opportunity to review that testimony for its accuracy and

10 completeness and to make any corrections on an errata sheet;

11 is that correct?

12 A    Yes, I did.

13 Q    During the deposition, you testified that you had never

14 previously been arrested or charged with a crime; is that

15 correct?

16 A    Correct.

17 Q    If you could, please, sir, turn to Tab L in the small

18 binder in front of you.

19 A    Yes, sir.

20 Q    Within Tab L, if you could please turn to what's marked

21 in the bottom right-hand corner as Bates Number Claimant 5350,

22 please.

23 A    Yes.

24 Q    This is an affidavit actually bearing your notarized

25 signature at the bottom, sworn to August 30, 2007?

1  A     Yes.

2  Q     And in the affidavit, you state that you were in fact

3  charged with a violation of law, don't you?

4  A     Yes.  A violation.

5  Q     And you also mentioned that you were arrested?

6  A     And it was dismissed a couple of hours later.

7  Q     But you were arrested; correct?

8  A     Yes.

9  Q     If I could ask you, please, kindly turn to Tab 2 in one

10 of the larger binders in front of you.

11        THE COURT:  You can step down, Mr. Potenza, if you

12 need to get to that exhibit.

13        THE WITNESS:  Which one is he talking about now?

14        THE COURT:  You have to look at the side of the

15 binder.

16        MR. O'SHEA:  May I, Judge?

17        THE COURT:  You may.

18 Q     And within Tab 2, sir, could you please turn to what's

19 marked in the lower-right-hand corner as Government 1220.

20 A     I have it.  I'm there.

21 Q     And Government 1220 basically contains copies of checks

22 from your business, PRP Restaurant, Inc., among other

23 information; correct?

24 A     Yes.

25 Q     And specifically, you see down there Check Number 1513

R. Potenza - cross - Morris                    446

1   from PRP Restaurant, Inc.

2   A    Yes.

3   Q    And the signature on the face of Check Number 1513,

4   that's your signature; right?

5   A    Yes, it is.

6   Q    And to the right of what's basically Check 1513 is the

7   rear of the check, and that's your signature on the rear of

8   the check, as well?

9   A    Yes, it is.

10  Q    And the same thing holds true for Check Numbers 1514 and

11  1518 on this page, all bearing your signature, both on the

12  front and the back?

13  A    Yes.

14  Q    Isn't it a fact, Mr. Potenza, that you signed checks such

15  as these on behalf of PRP Restaurant, Inc.; is that correct?

16  A    This one time, I did, yes.

17  Q    Now, during your deposition at the U.S. Attorney's Office

18  last December, you testified that you didn't sign any checks

19  on behalf of the company; is that correct?

20  A    That's correct.

21  Q    Mr. Potenza, if you can kindly take a look at the screen

22  in front of you.  This is a copy of the federal cyber

23  squatting complaint filed by PRP against Joseph Johnson and

24  others in this very court in the Eastern District of New York?

25  A    Yes.

1          MR. O'SHEA:  Excuse me, your Honor.  I have not been
2    given a copy of this.  May I have a hard copy to follow along?
3    Q    And the date stamped in the upper right-hand looks like
4    the complaint was filed on December 7, 2010 in the Long Island
5    office of the Eastern District?
6    A    That's correct.
7    Q    Turning to the verification page at the back of the
8    complaint.
9    A    It's not clear.
10   Q    Give it a moment to focus in?
11        Now, that's your notarized signature.
12   A    Yes.
13   Q    And by signing the verification on the back of the
14   complaint, you indicated by the verification that you had read
15   it and knew the contents of the complaint to be true to the
16   best of your knowledge; correct?
17   A    To the best of my knowledge, yes.
18   Q    And you swore to the truth of that complaint on
19   December 6, 2010?
20   A    Yes.
21   Q    As you looked at on the prior page, the complaint was
22   filed approximately three days later -- excuse me, the next
23   day, on December 7, 2010?
24   A    Yes.
25   Q    Now, during your deposition at the U.S. Attorney's Office

1   approximately three to four days later, on December 10, 2010,

2   you testified that besides the lawsuit involving a fire, you

3   were involved in no other civil litigation; is that correct?

4   A    I believe I did, yes.  I probably forgot about this.

5   Q    Isn't it also true, sir, as alleged in the complaint that

6   you certified, you verified is true, that PRP discovered that

7   Mr.  Johnson allegedly had control of the Gallagher's 2000

8   domain name around the time that Mr.  Johnson left the company

9   in April 2010?

10  A    We found out about it in May 2010.  In May of 2010 we

11  found out.

12  Q    So, you found out that Mr.  Johnson allegedly had control

13  of the domain name of Gallagher's 2000 around May 2010; that's

14  your testimony?

15  A    Yes.

16  Q    However, you didn't actually file this lawsuit until

17  seven months later, in December 2010, after you learned that

18  Mr.  Johnson was a potential witness in this case; is that

19  correct, sir?

20  A    Yes, it is.

21  Q    Now, with respect to Mr.  Johnson, he was the --

22  withdrawn.

23          Among the places that you actually store cash in

24  your business, sir, is in a broken refrigerator; is that

25  correct?

R. Potenza - cross - Morris                      449

1   A     Not really, no.

2   Q     Taking a look at your prior sworn deposition testimony in

3   this case, page 218, beginning with line five:

4         "QUESTION:  The cash that you received in the

5   morning, aside from the bank cash that you used to fill the

6   register, what would you do when it was in the box and you

7   counted it?

8         "ANSWER:  I would keep it over in the drawer until I

9   needed to either -- I would deposit it in the bank.

10        "QUESTION:  What drawer?

11        "ANSWER:  There is a little -- what do they call it

12  that refrigerators -- the top drawer in the refrigerator."

13        Did I just read that correctly, sir.

14  A     Yes.  I left it there until I deposited the money, the

15  same day.  I wasn't storing it.

16  Q     Amongst the other places that you keep cash in your

17  business is on a beam in the wall in the office; is that

18  correct?

19  A     Yes.  I used to keep twenties there.

20  Q     Turning to Mr.  Johnson, your former employee, Mr.

21   Johnson, during his tenure with PRP, he was, fair to say, the

22  fourth highest employee in the hierarchy of your business?

23  A     Yes.

24  Q     In fact, Mr.  Johnson was a trusted employee of yours; is

25  that correct?

R. Potenza - cross - Morris                          450

1   A     That's correct.

2   Q     In fact, Mr.  Johnson did a good job while at Gallagher's

3   2000; correct?

4   A     For the most part, yes.

5   Q     In fact, during the first week that he was manager,

6   revenues at PRP increased twenty to thirty percent; isn't that

7   true, sir?

8   A     There was a reason for that.  The former manager was

9   closing early, 1:30 to 2:00 o'clock, instead of staying open

10  to 4:00 o'clock.  I found that out later on, Joseph Ramono.

11  Q     If you could please kindly turn in your binder, sir, to

12  Government's Exhibit 24.

13  A     I'm there.

14  Q     Within Government's Exhibit 24, if you can just kindly

15  direct your attention to Bates Stamp Government's 1718?

16          Now, this was the same type of document that you

17  were asked about on direct examination, and you also had an

18  opportunity to take a look at this document at your prior

19  deposition; correct.

20  A     Yes.

21  Q     In fact, you testified at deposition that prior to

22  viewing this type of document in your attorney's office the

23  day before your deposition, you had never, in the history of

24  your employment with PRP, seen a document of this type in

25  completed form; wasn't that correct, sir?

R. Potenza - cross - Morris                    451

1    A    They disregard these at the end of the night.

2    Q    So, that was your testimony, sir?

3    A    Yes.  Yes.

4    Q    However, you also testified, sir, at deposition that the

5    very same types of information reflected at the bottom of the

6    form -- see down there where it says, "Start, income,

7    expenses, NDB"?

8    A    Yes.

9    Q    -- you also testified, with regards to those fields, the

10   very same types of the information reflected at the bottom of

11   this form were provided to you by a manager on a Post-It note,

12   something like this?

13   A    Yes.

14   Q    And the manager provided this information to you on a

15   Post-It note in order for you to confirm the proper amount of

16   cash that you were receiving in the business; is that correct?

17   A    That's correct.

18             MR. MORRIS:  No further questions, your Honor.

19             THE COURT:  All right.

20             Any redirect?

21             MR. O'SHEA:  Nothing, your Honor.  Thank you.

22             THE COURT:  All right.

23             Any further evidence from the defendant?

24             From plaintiff?

25             MR. O'SHEA:  Other than the transcript cites we

1   talked of, that's all from the plaintiff's side.

2          THE COURT:  We'll keep the record open for me to

3   receive those tomorrow morning and for me to receive any

4   objections from the government.  What did I say?  By next

5   Wednesday or so.  All right.  Obviously, I'm going to reserve

6   decision today.

7          How do the parties want to proceed with regard to

8   post-trial argument?  Do you want to do briefing and then oral

9   argument?  Do you want to do just oral argument?

10          MR. MORRIS:  The government would like briefing,

11   sir.

12          MR. O'SHEA:  I would like to do what the Court finds

13   most useful for its decision-making.  Any of those options is

14   fine by us.

15          THE COURT:  Okay.

16          We will do two rounds of briefing.  In two weeks,

17   you'll exchange and file post-trial briefs.  Then you can have

18   a week after that to respond to your adversary's post-trial

19   brief.

20          Now, to help you out, I'm going to give you some

21   preliminary concerns I have.  You can obviously address

22   whatever you want to address, and I am not in any way saying

23   that what I'm about to express represents findings or even

24   leanings.  Rather, what I'm about to tell you is just some

25   questions that I have for each side.

1          First of all, starting with the government, I'm

2     concerned about Mr.  Johnson from a couple of perspectives.

3     Number one, I don't know how much credit I can give a witness

4     who takes the Fifth Amendment in response to things that, if

5     disclosed, could conceivably affect his credibility.  In fact,

6     it seems likely they would affect his credibility, and it may

7     be that his Fifth Amendment invocation on such clearly

8     credibility-related issues requires me to give some

9     substantial discount to the credibility of his testimony.

10          I frankly have never heard it before, where the

11    government propounds a witness who invokes the Fifth

12    Amendment.  I consider it highly unusual, and I think one of

13    the things the government has to start thinking about is, if I

14    did determine that I can't believe anything Mr.  Johnson says,

15    then is there still a case of intent here?

16          The problem with Mr.  Johnson is not just the

17    invocation of his Fifth Amendment on crucial credibility

18    issues, but the equally unusual, I think, acknowledgment of a

19    personal vendetta against the claimants.  So, that gives me

20    some real credibility problems with him to the extent that I

21    have to rely on his uncorroborated description of events or

22    practices.

23          Now, the other level of problem that I have with Mr.

24     Johnson is, I'm not, frankly, enthusiastic about the

25    government's decision to call him at all in this fashion, and

1   I have some systemic question, which I'm glad to have the

2   government alleviate for me, about how he got on the witness

3   stand in the condition that he did get on the witness stand.

4           You know, with all the tools the government has, I

5   don't see how the government relies so heavily on somebody who

6   invokes the Fifth Amendment.  I have government informants

7   testify in front of me all the time, in criminal cases, of

8   course, and I think it's taken as a given that you don't put a

9   witness like that on the stand unless the witness comes 100

10  percent clean.  It doesn't matter how bad the things are that

11  they have done.  I mean, it may matter, but the worst thing

12  you want to do is have the witness appear to be hiding, and

13  this witness appears to be hiding.

14          I'm not understanding why the government wouldn't

15  grant him immunity if they think his testimony is so important

16  so that he couldn't invoke the Fifth Amendment.

17          I'm not sure why the government wouldn't negotiate a

18  deal with him so that it could be disclosed and then I can

19  assess all of him, rather than just the parts of him that he

20  feels he wants to tell me.

21          I'm also uncomfortable about the government's

22  process in this in getting him a lawyer.  Now, someone

23  mentioned -- I think Mr. Guerci -- that I approved that.  Did

24  I approve that?

25          MR. O'SHEA:  No, your Honor.

1          MR. MORRIS:  I believe, your Honor, I wasn't

2     involved directly in handing the application in, but we

3     understood that it went to the Magistrate Court, Magistrate

4     Judge, in the accordance with the process for material

5     witnesses.

6          THE COURT:  I frankly am not aware of the process in

7     a civil case to get a witness appointed lawyers.  I'm sure

8     there is such a process.  I have not seen it.

9          In and of itself, it wouldn't really bother me, but

10    it bothers me when the government pays for his attorney and he

11    puts in an affidavit of poverty -- I assume which he must do

12    in order to get the government to pay for his attorney --

13    while at the same time going out and spending $10,000 on a

14    recreational water vehicle.  That gives me some concern about

15    what the government is doing here.

16         Now, of course, in some sense, these matters are

17    collateral, and I don't mean that in the technical evidentiary

18    sense, that the government does not have to prove what I think

19    Mr. Johnson's primary axe to grind was, which is that people

20    were being paid off the books to avoid taxes.  That is not an

21    element of the structuring offense.

22         But I think that by calling him, the government

23    recognized that it greatly enhances its case to show that

24    there was an intent to avoid paying taxes, because otherwise,

25    why indeed would the claimant have been engaged in

1    structuring?

2         And I remember vividly the first conference we had

3    in this case, when Mr. Morris came before me and, quite

4    frankly, stumbled in trying to -- some response to my

5    questions about why this claimant was structuring, because

6    usually, structuring, indeed as Mr. Potenza described it, is

7    an activity undertaken to cover up an underlying crime.  And I

8    kept saying, What's the underlying crime?  Finally, I got a

9    suggestion at that first conference from Mr. Morris that,

10   Well, the underlying crime is tax evasion.

11        And so, I said, Okay, fine.  That's an underlying

12   crime.  That would explain why somebody is structuring.  I'm

13   not sure I have any evidence, short of Mr.  Johnson, as to

14   that motive.

15        So, if I have a problem with him, I may have a

16   problem with motive, and if I have a problem with motive, it

17   would tend to defeat intent to structure, which is, of course,

18   an element of the claim.

19        I'm also not understanding, given the broad power of

20   the government and its investigatory techniques, why more

21   corroboration couldn't have been achieved for Mr.  Johnson.  I

22   don't mean in any way to tell the government how to prepare

23   its cases.  I simply offer this by way of explaining what I

24   think a potential shortcoming of proof may be in this case.

25        For example, and just by way of example, if the

1    contention is that the dancers are being paid off the books in

2    whole or in part, why didn't I hear from a dancer?  It seems

3    to me it would be easy enough for the government to bring in a

4    dancer who has been paid off the books and say to the dancer,

5    Look, we're going to forgive you the taxes you owe, but we

6    want to know you were paid off the books.  It seems to me it

7    wouldn't be hard to get that proof, some corroboration for

8    Mr. Johnson's disputed statement that people were paid off the

9    books.

10            Again, that's only one example.  There may be a very

11   good reason why that couldn't be done, but I would like to

12   hear from the government on that in the post-trial briefing.

13            Now, the other thing I have a concern with is the

14   Chase letter, the September 7 letter, Exhibit 3, I think it

15   is, and that is if indeed Mr. Potenza got that letter, and if

16   he's lying about the fact that he could never find out

17   precisely why Chase closed this account and he knew all along

18   that Chase closed it because the activity was suspicious, why

19   would he go to another bank and carry on exactly the same

20   conduct?  Why not start depositing 7100, 7600, 6500, 9200, if

21   he knew that he had been caught in what the government

22   contends he was doing intentionally?

23            So, that's another question that I would like the

24   government to address.

25            And then, finally, the last question that I would

1    like the government to address is the one that I raised with

2    Mr. Guerci, which is, if indeed the business is taking in far

3    more than the seven and eight thousand dollar deposits that

4    concerned the government, where is it? As I said to

5    Mr. Guerci, if the business is regularly making $12,000 a day

6    and only $800 is being deposited, the $4,000 must go

7    somewhere.

8            Now, I'm not saying the government had to go out and

9    do an Al Capone style net audit, but it shouldn't have been

10   too hard to find out where this excess cash was. And I

11   suppose in a way, this gets back to Mr. Johnson, because one

12   explanation may be it was going out in cash off the books.

13   That's where it was going. I'm not sure that's an adequate

14   explanation for it, because the place would be literally awash

15   in cash if there was no place for the cash to go.

16           So, that's another issue that I would like the

17   government to address in its briefing.

18           So, those are my main concerns with the government's

19   case. And again, I want to emphasize, I'm giving this as an

20   extraordinarily preliminary reaction to the case. I have

21   formed no conclusions whatsoever, and it happens more often

22   than not that, when I communicate with attorneys, my

23   preliminary concerns, I come out 180 degrees opposite of where

24   they thought I was going to go when I raised the concerns. It

25   happens all the time. So, no one ought to think I have made

1    up my mind.  I have absolutely not.

2          With regard to the claimant's post-trial briefings,

3    there are only two things that I think are particularly

4    important.  Number one, I would recommend -- but I could be

5    talked out of it -- that the defendant not spend -- the

6    claimant not spend too much time on the Chase branch letters.

7          Those, to me -- I kind of felt this way when I first

8    saw them, and I didn't see anything in the testimony to change

9    my mind -- serve an entirely different purpose, come from an

10   entirely different branch of Chase than the compliance letter.

11   I think the defendant's much stronger argument is, We're

12   entitled to credibility on the issue of whether we ever heard

13   this from Chase.

14         But again, I can be talked out of that.

15         Then I think the biggest problem that the claimants

16   have is that no matter what I do with Mr. Johnson's testimony,

17   if you look at the Government's Exhibit -- and, I don't know,

18   it's one of the Exhibits 29 through 33 -- but what it does is,

19   compare the Johnson scratch sheets to the register, to the

20   cash book, such as it is.  The register receipts do seem to

21   match up with the Johnson scratch sheets, and if they do, then

22   whatever I might think of Mr.  Johnson or the government's

23   process in bringing him here in the condition he was in, if

24   that's what the register tapes are saying -- and I wouldn't

25   expect 100 percent corroboration, but there was large

1   corroboration -- then that seems to me to tend to support

2   Mr. Johnson's testimony on that point, and that would in turn

3   support off-the-books payments, and that would in turn support

4   motive for structuring.

5         So, that's what I need to hear from the parties in

6   the briefing, plus whatever else you want to give me.

7         Okay.

8         MS. HILL:  Your Honor, I understand that you have

9   given us two weeks to exchange briefs.  Would this be two

10  weeks from at least next Wednesday, when the depositions will

11  be designated?

12        THE COURT:  I hadn't planned on it.  I just don't

13  think your submissions are going to change that much, based on

14  those depositions.  I could be wrong.  That means you'll only

15  have a week to work that into your briefing.

16        MR. O'SHEA:  So, if we're at the 14th today, we're

17  talking about the 28th?

18        THE COURT:  Correct.

19        MR. O'SHEA:  What day of the week is that, Judge?

20        THE COURT:  That's a Thursday.

21        MR. O'SHEA:  So, the 28th for initial briefs, and

22  seven days from there is --

23        THE COURT:  August 4.

24        MR. O'SHEA:  -- August 4 for reply?

25        THE COURT:  Yes.  Someone is going to tell me they

1    are going on vacation.

2              MR. MORRIS:  Just after that.

3              MR. O'SHEA:  I'm not allowed to go on vacation

4    anymore.

5              THE COURT:  You are, by me.  If you had a vacation

6    schedule, I would work that in.

7              MR. O'SHEA:  I can adjust.

8              MR. SOCKOL:  Your Honor, one further question.  The

9    Gleason deposition that I think the government plans to

10   introduce in whole, do we have that week, as well, to object

11   to that?

12             THE COURT:  Absolutely.  Thank you all.  I look

13   forward to your briefing.

14                        oooooo0oooooo

15

16

17

18

19

20

21

22

23

24

25

```
1   CROSS-EXAMINATION              1        268      13
2   BY MR. O'SHEA:
3   REDIRECT EXAMINATION           1        358      1
4   BY MR. MORRIS
5   r I C H A R D  G L E A S O N   1        375      4
6   DIRECT EXAMINATION             1        375      7
7   BY MR. O'SHEA:
8   D E N N I S   S C H M I D T    1        381      17
9   DIRECT EXAMINATION             1        381      24
10  BY MR. O'SHEA:
11  CROSS EXAMINATION.             1        387      23
12  BY MR. MORRIS:
13  REDIRECT EXAMINATION.          1        388      19
14  BY MR. O'SHEA:
15  R O B E R T   P O T E N Z A    1        389      8
16  DIRECT EXAMINATION             1        389      13
17  BY MR. O'SHEA:
18  CROSS-EXAMINATION              1        442      5
19
20
21  R                              1        354      23
22
23
24
25
```

## $

**$10** [4] - 427:13, 427:16, 428:23, 429:10
**$10,000** [15] - 298:6, 298:20, 298:22, 324:2, 324:16, 324:21, 329:20, 338:2, 355:13, 368:23, 369:12, 401:19, 436:24, 444:4, 455:13
**$100** [2] - 294:25, 399:21
**$115,000** [1] - 417:4
**$12,000** [1] - 458:5
**$1200** [1] - 400:3
**$15,000** [1] - 359:10
**$18,000** [1] - 410:3
**$2.00** [1] - 429:18
**$20** [3] - 307:25, 422:24, 422:25
**$20,000** [5] - 286:7, 299:9, 304:16, 358:18, 367:23
**$200** [1] - 423:1
**$2073** [1] - 407:13
**$3,000** [4] - 322:14, 322:15, 358:19, 358:20
**$3.00** [1] - 429:19
**$30,000** [3] - 361:24, 362:2, 367:19
**$30.00** [2] - 427:24, 428:14
**$3000** [1] - 320:9
**$4,000** [3] - 319:9, 319:14, 458:6
**$4.00** [3] - 429:19, 430:17, 430:20
**$40** [1] - 428:14
**$400** [1] - 430:20
**$5** [1] - 427:17
**$5,000** [2] - 322:15
**$50,000** [1] - 437:12
**$500,000** [1] - 359:1
**$5000** [2] - 320:8, 320:9
**$5160** [1] - 321:13
**$6,000** [2] - 397:8, 401:1
**$6.00** [1] - 430:18
**$60** [1] - 428:2
**$61,900.00** [1] - 267:8
**$6400** [1] - 321:13
**$7,000** [4] - 322:14, 322:16, 324:25, 405:19
**$70** [1] - 428:4
**$8,000** [12] - 297:23, 299:5, 319:11, 319:14, 319:16, 319:18, 319:22, 322:16, 324:5, 325:2, 330:2, 333:8
**$80** [1] - 428:4
**$800** [1] - 458:6
**$8000** [1] - 320:9
**$85,000** [1] - 413:20
**$9,000** [1] - 319:21

## '

**'77** [2] - 407:25, 408:1
**'78** [1] - 408:2
**'80s** [1] - 355:18

**'90s** [1] - 355:18

## /

**/PREPL** [1] - 388:22

## 0

**08** [1] - 394:16

## 1

**1** [13] - 462:1, 462:3, 462:5, 462:6, 462:8, 462:9, 462:11, 462:13, 462:15, 462:16, 462:18, 462:21
**1.4** [2] - 441:2, 441:4
**1.6** [2] - 441:3, 441:4
**10** [3] - 335:6, 434:13, 448:1
**10,000** [3] - 338:7, 366:14, 401:20
**10-CV-0186** [1] - 267:4
**10/1** [2] - 403:22, 404:9
**10/9** [2] - 403:22, 404:9
**100** [2] - 454:9, 459:25
**100s** [12] - 295:7, 299:6, 299:7, 398:22, 400:13, 400:16, 400:20, 401:1, 407:2, 410:12, 410:14
**10175** [1] - 267:19
**1063** [2] - 318:22, 319:4
**1070** [4] - 320:1, 320:2, 320:3
**1072** [2] - 318:24, 321:16
**10s** [1] - 358:20
**10th** [15] - 274:23, 289:16, 291:22, 331:19, 340:5, 356:20, 357:12, 362:18, 362:24, 363:10, 363:18, 363:20, 364:6, 364:19, 367:14
**110** [1] - 411:25
**1100** [8] - 403:14, 403:17, 403:24, 404:3, 404:4, 404:9, 404:11, 404:15
**11101** [2] - 390:2, 393:24
**112** [1] - 382:17
**11201** [1] - 267:15
**11510** [1] - 389:18
**11:20** [1] - 339:24
**11:30** [1] - 376:12, 394:18, 427:14
**11th** [1] - 322:14
**12** [7] - 277:13, 277:16, 296:23, 395:2, 429:12, 429:17, 429:18
**12,000** [2] - 417:17, 417:20
**12,13** [1] - 389:24
**120** [1] - 428:23
**1200** [1] - 400:5
**1220** [2] - 445:19, 445:21
**1255** [1] - 439:12
**1274** [1] - 353:12
**1285** [1] - 353:14
**12th** [1] - 352:18
**13** [7] - 288:20, 290:3, 393:8, 408:4, 426:8, 462:1, 462:16

**14** [3] - 267:10, 281:17, 419:4
**1429** [1] - 294:21
**14th** [10] - 278:18, 281:20, 282:24, 283:11, 283:18, 284:22, 287:21, 288:3, 304:7, 460:16
**15** [10] - 375:17, 375:19, 394:3, 394:4, 402:11, 403:6, 425:17, 427:14, 429:12, 438:1
**15-36** [1] - 390:2
**150** [2] - 428:21, 428:22
**1513** [3] - 445:25, 446:3, 446:6
**1514** [1] - 446:10
**1518** [1] - 446:11
**16** [2] - 443:14, 443:22
**160** [1] - 428:22
**1662** [1] - 385:20
**1663** [1] - 388:11
**17** [2] - 294:20, 462:8
**1718** [1] - 450:15
**17th** [1] - 322:14
**18** [2] - 269:25, 358:18
**18,000** [2] - 409:14, 410:5
**180** [1] - 458:23
**1817** [3] - 323:8, 323:14, 323:16
**18th** [1] - 322:15
**19** [1] - 462:13
**1970** [2] - 355:7, 355:24
**1976** [2] - 390:25, 392:3
**1977** [3] - 390:20, 392:21, 415:6
**1978** [1] - 392:22
**1986** [1] - 355:25
**1988** [3] - 355:19, 355:21, 408:13
**1990** [2] - 382:13, 408:3
**1991** [1] - 408:3
**1992** [1] - 408:19
**1:15** [1] - 374:9
**1:30** [1] - 450:9
**1st** [3] - 404:17, 405:16, 405:22

## 2

**2** [10] - 318:20, 320:1, 320:8, 358:19, 403:10, 407:18, 407:22, 408:2, 445:9, 445:18
**20** [6] - 422:25, 424:23, 429:18, 430:14, 433:10
**20,000** [1] - 433:8
**20,s** [1] - 399:22
**2000** [18] - 308:19, 375:10, 382:6, 382:8, 382:20, 393:2, 393:11, 393:12, 393:19, 402:16, 404:24, 405:8, 408:4, 426:5, 427:8, 448:7, 448:13, 450:3
**2001** [3] - 393:8, 407:19, 408:4, 415:24, 417:25, 426:8
**2002** [1] - 407:19
**2006** [4] - 296:24, 297:1, 356:18, 382:21
**2007** [24] - 278:12, 280:4, 280:5, 281:17, 282:24, 283:18, 287:21,

300:22, 312:23, 319:2, 364:5, 364:25, 391:10, 392:17, 403:21, 404:21, 414:6, 419:4, 419:17, 419:19, 421:18, 421:22, 444:25

**2008** [9] - 293:15, 352:19, 411:11, 422:8, 422:12, 430:22, 440:13, 440:16

**2009** [13] - 270:1, 279:6, 338:18, 340:5, 352:19, 362:18, 363:10, 363:18, 364:6, 383:20, 394:17, 434:14, 435:17

**2010** [21] - 277:15, 340:17, 362:24, 376:8, 376:9, 377:15, 378:2, 378:20, 387:4, 427:7, 443:3, 444:8, 447:4, 447:19, 447:23, 448:1, 448:9, 448:10, 448:13, 448:17

**2011** [1] - 267:10

**20K** [1] - 286:2

**20s** [16] - 303:9, 304:12, 305:14, 306:18, 307:22, 358:20, 398:22, 399:22, 399:23, 399:24, 399:25, 400:1, 400:7, 400:17

**20th** [1] - 322:15

**21** [1] - 443:22

**218** [1] - 449:3

**22** [2] - 277:16, 277:20

**225** [1] - 267:22

**23** [2] - 462:11, 462:21

**230,000** [1] - 435:5

**23rd** [1] - 322:15

**24** [13] - 300:9, 348:19, 378:4, 380:19, 385:17, 388:8, 388:22, 431:25, 441:5, 450:12, 450:14, 462:9

**240** [1] - 423:1

**25** [6] - 352:9, 352:10, 352:11, 353:5, 382:13, 395:2

**25th** [1] - 267:19

**26** [4] - 311:2, 342:2, 364:15, 419:17

**268** [1] - 462:1

**26th** [1] - 322:16

**27** [3] - 312:23, 319:2, 396:1

**27.3** [1] - 341:16

**271** [1] - 267:15

**27th** [1] - 322:16

**28th** [2] - 460:17, 460:21

**29** [2] - 403:20, 459:18

**29th** [1] - 404:20

**2:00** [1] - 450:9

---

## 3

**3** [16] - 300:20, 308:17, 310:19, 311:17, 320:9, 327:3, 327:7, 327:10, 328:23, 360:8, 364:6, 413:25, 421:18, 421:23, 439:11, 457:14

**3,000** [1] - 407:13

**30** [12] - 296:23, 297:3, 300:7, 300:8, 367:23, 376:12, 394:21, 395:2, 424:23, 428:22, 444:25

**30,000** [1] - 433:10

**30-33** [1] - 393:4

**300** [1] - 433:16

**307** [1] - 400:11

**31** [4] - 269:25, 346:12, 347:8, 403:21

**31,865** [1] - 415:25

**31st** [1] - 404:21

**32** [1] - 394:21

**327** [1] - 400:11

**33** [1] - 459:18

**35** [2] - 394:23, 396:1

**354** [1] - 462:21

**358** [1] - 462:3

**36956** [1] - 411:25

**37** [2] - 418:24, 419:7

**375** [2] - 462:5, 462:6

**37th** [3] - 309:7, 393:24, 408:5

**381** [2] - 462:8, 462:9

**387** [2] - 397:15, 462:11

**388** [1] - 462:13

**389** [2] - 462:15, 462:16

**39** [1] - 443:14

**39th** [1] - 390:2

**3:00** [3] - 324:23, 325:4, 441:24

---

## 4

**4** [12] - 310:17, 311:16, 311:19, 383:9, 394:18, 394:19, 395:24, 402:14, 414:14, 460:23, 460:24, 462:5

**4,000** [1] - 299:7

**4,0005** [1] - 407:13

**4.50** [1] - 406:10

**40** [5] - 394:23, 396:2, 428:1, 429:18, 429:19

**40,000** [1] - 437:13

**400,000** [1] - 433:16

**4040** [1] - 405:23

**43-19** [1] - 393:24

**4340** [1] - 321:17

**44** [2] - 397:7, 397:9

**442** [1] - 462:18

**45,000** [1] - 413:8

**4740** [1] - 405:22

**48** [1] - 402:19

**48th** [7] - 309:5, 390:23, 391:18, 402:21, 405:5, 409:18, 409:25

**49th** [1] - 413:5

**4:00** [3] - 324:25, 395:24, 450:10

**4:30** [1] - 376:5

---

## 5

**5** [7] - 353:13, 353:14, 396:8, 397:7, 406:10, 427:12, 462:18

**50** [6] - 294:25, 428:1, 430:15, 430:19, 430:20

**500-something** [1] - 435:6

**50s** [13] - 295:6, 299:6, 299:7, 391:15, 398:22, 400:13, 400:16, 400:19,

---

400:25, 407:2, 410:12, 410:13

**50th** [1] - 413:5

**51** [1] - 267:19

**5323** [1] - 283:3

**5347** [1] - 418:12

**5350** [1] - 444:21

**5351** [3] - 418:15, 418:17

**5353** [2] - 419:6

**5361** [1] - 419:14

**5s** [1] - 358:19

---

## 6

**6** [2] - 430:16, 447:19

**6,000** [5] - 409:15, 409:25, 410:1, 410:15, 410:18

**6/29** [1] - 319:9

**60** [3] - 427:25, 428:2, 428:3

**61,000** [1] - 435:6

**613-2369** [1] - 267:23

**613-2489** [1] - 267:23

**64** [3] - 309:5, 391:18, 405:4

**6500** [1] - 457:20

**672** [1] - 389:18

**6:30** [1] - 396:8

**6;30** [1] - 376:4

---

## 7

**7** [19] - 277:15, 278:12, 280:4, 296:20, 300:2, 300:9, 300:22, 323:7, 323:16, 376:12, 391:22, 407:6, 414:6, 415:24, 421:18, 447:4, 447:23, 457:14, 462:6

**7,000** [1] - 324:5

**70** [1] - 394:1

**70s** [4] - 407:9, 407:10, 407:15, 408:6

**7100** [1] - 457:20

**718** [2] - 267:23, 267:23

**7600** [1] - 457:20

**7:30** [6] - 376:20, 383:9, 383:14, 386:1, 393:11, 393:12

**7TH** [1] - 267:15

**7th** [14] - 284:11, 284:15, 284:19, 285:9, 314:13, 314:15, 326:17, 327:4, 327:11, 327:12, 362:24, 364:5, 364:25, 439:11

---

## 8

**8** [3] - 401:19, 401:20, 462:15

**8,000** [2] - 299:6, 407:6

**8,040** [1] - 405:22

**801** [1] - 370:19

**8:00** [1] - 427:11

---

## 9

**9** [4] - 320:9, 443:3, 444:8
**9/7** [1] - 284:2
**9/7/2007** [1] - 283:24
**9200** [1] - 457:20
**99** [1] - 402:3
**9:00** [1] - 325:1
**9:30** [1] - 267:10
**9th** [9] - 274:22, 320:12, 320:14, 320:15, 320:17, 320:19, 321:12, 323:2, 352:19

## A

**a.m** [5] - 267:10, 383:9, 394:18, 394:19
**able** [9] - 289:19, 292:17, 298:4, 320:18, 359:15, 413:18, 413:19, 422:11, 436:2
**abolished** [1] - 343:4
**absolutely** [8] - 273:23, 318:10, 339:17, 373:2, 435:12, 439:4, 459:1, 461:12
**accent** [1] - 420:4
**accept** [2] - 339:7, 372:17
**access** [2] - 281:12, 422:12
**accidental** [1] - 382:19
**accordance** [1] - 455:4
**according** [1] - 294:23
**account** [120] - 275:12, 275:14, 283:22, 289:4, 289:5, 294:24, 297:23, 300:8, 302:12, 302:18, 303:1, 303:4, 303:8, 305:10, 305:19, 306:6, 306:16, 307:6, 307:7, 307:12, 307:17, 308:1, 316:11, 316:25, 318:7, 318:18, 318:19, 318:25, 319:12, 319:19, 319:20, 321:13, 321:19, 321:24, 322:10, 322:22, 325:23, 325:24, 326:12, 327:15, 327:18, 327:20, 328:25, 330:2, 330:11, 330:13, 330:20, 331:2, 331:3, 331:12, 331:14, 332:3, 332:5, 334:20, 335:14, 335:18, 335:22, 336:1, 336:4, 336:7, 336:10, 337:8, 339:2, 339:5, 339:6, 341:2, 358:11, 358:12, 361:19, 362:2, 366:12, 367:22, 368:4, 368:11, 398:1, 403:20, 409:22, 411:8, 411:15, 411:16, 411:17, 411:19, 411:23, 411:24, 411:25, 412:2, 412:3, 413:20, 415:16, 415:24, 416:2, 416:5, 416:15, 422:8, 422:11, 422:12, 422:14, 422:23, 423:2, 423:3, 423:22, 423:24, 424:2, 424:10, 424:16, 424:19, 424:21, 424:24, 425:2, 435:5, 435:6, 435:7, 440:12, 440:19, 440:22, 444:4, 457:17
**accountant** [8] - 338:15, 338:20, 406:21, 423:3, 433:17, 435:18, 435:25, 436:1
**accounting** [1] - 405:11
**accounts** [8] - 273:6, 307:8, 307:17,

329:19, 336:15, 424:20, 424:22, 435:4
**accumulate** [2] - 298:21, 299:20
**accumulated** [2] - 335:21, 344:5
**accumulating** [1] - 431:1
**accuracy** [2] - 354:1, 444:9
**accurate** [6] - 269:18, 276:15, 285:15, 288:1, 290:25, 310:13, 313:4, 354:5, 417:19
**achieved** [1] - 456:21
**acknowledged** [1] - 373:23
**acknowledging** [1] - 418:21
**acknowledgment** [1] - 453:18
**act** [2] - 269:4, 355:25
**Act** [8] - 324:13, 355:6, 355:11, 355:16, 355:24, 356:9, 362:5, 362:9
**acted** [1] - 432:16
**activity** [38] - 275:24, 289:4, 289:5, 289:9, 289:13, 293:5, 294:18, 295:14, 298:1, 301:18, 315:1, 315:4, 315:7, 315:23, 316:11, 316:25, 317:11, 317:19, 318:7, 318:18, 318:19, 319:1, 322:22, 325:24, 326:6, 326:7, 327:19, 327:20, 330:19, 335:18, 336:1, 336:2, 417:3, 417:7, 417:10, 422:2, 456:7, 457:18
**actual** [3] - 320:24, 320:25, 321:10
**add** [6] - 370:20, 379:2, 387:14, 398:9, 431:22, 432:25
**added** [3] - 354:21, 426:19, 426:20
**adding** [1] - 354:10
**addition** [6] - 309:2, 404:16, 405:17, 416:19, 417:17
**additional** [2] - 304:18, 373:24
**additions** [2] - 319:5, 320:5
**address** [35] - 278:13, 308:25, 309:10, 309:11, 309:12, 310:8, 310:12, 310:15, 310:19, 310:20, 310:22, 310:23, 311:10, 311:13, 311:16, 311:20, 313:2, 313:4, 313:5, 393:15, 393:23, 404:23, 405:2, 405:8, 414:11, 414:12, 414:17, 414:18, 414:25, 452:21, 452:22, 457:24, 458:1, 458:17
**addressed** [8] - 278:12, 311:18, 311:20, 313:1, 314:21, 373:6, 373:7
**adds** [2] - 353:5, 353:8
**adequate** [1] - 458:13
**adjacent** [1] - 309:3
**adjust** [1] - 461:7
**admissible** [3] - 370:1, 370:2, 371:25
**admission** [7] - 370:16, 371:22, 377:11, 426:4, 426:6, 426:9, 426:22
**admissions** [5] - 364:17, 364:20, 364:23, 367:15, 387:11
**admit** [1] - 354:23
**admitted** [1] - 372:14
**ADS** [1] - 271:4
**adult** [10] - 284:7, 359:9, 392:20, 393:14, 393:15, 393:16, 394:11, 420:7, 420:18, 427:8
**advance** [1] - 353:25

**adversary** [1] - 374:4
**adversary's** [1] - 452:18
**advertising** [1] - 427:10
**advise** [1] - 331:10
**affect** [2] - 453:5, 453:6
**affected** [1] - 355:17
**affidavit** [28] - 270:1, 270:8, 270:9, 270:13, 270:19, 270:23, 271:1, 279:8, 284:24, 285:4, 285:10, 287:10, 287:15, 287:20, 288:7, 288:8, 288:10, 288:20, 288:23, 288:25, 294:15, 294:20, 307:24, 319:20, 350:16, 444:24, 445:2, 455:11
**affidavits** [1] - 271:3
**afford** [1] - 350:8
**afternoon** [6] - 387:25, 402:14, 434:13, 434:15, 442:7, 442:8
**agent** [18] - 269:15, 271:10, 309:5, 311:2, 312:9, 331:9, 335:24, 342:2, 343:7, 348:8, 348:9, 364:15, 368:10, 368:17, 370:18, 371:5, 435:2
**Agent** [17] - 270:10, 270:11, 270:14, 271:14, 301:24, 302:3, 309:11, 313:12, 332:6, 333:9, 338:23, 357:20, 358:5, 368:17, 371:9, 372:20, 433:7
**agents** [6] - 442:11, 442:14, 443:17, 443:25, 444:2, 444:3
**ago** [7] - 296:19, 313:22, 342:4, 343:3, 343:4, 353:4, 354:19, 366:8, 428:21, 441:5
**agree** [22] - 288:15, 289:14, 299:13, 299:19, 318:25, 322:6, 322:12, 323:18, 325:12, 325:21, 327:4, 335:12, 335:16, 335:20, 335:25, 336:23, 346:12, 349:4, 357:3, 367:18, 367:22, 367:25
**agreement** [2] - 374:5, 429:24
**AI** [1] - 458:9
**Alan** [1] - 394:3
**alarm** [11] - 343:11, 343:12, 396:9, 396:11, 396:15, 396:16, 396:17, 396:18, 396:20, 434:4, 434:11
**alcohol** [1] - 426:2
**Alfred** [1] - 396:4
**allegations** [7] - 296:5, 343:22, 343:23, 344:9, 344:10, 344:17, 344:18
**alleged** [5] - 273:6, 344:19, 344:21, 346:15, 448:5
**allegedly** [2] - 448:7, 448:12
**alleging** [2] - 344:3, 345:11
**alleviate** [1] - 454:2
**allow** [2] - 370:3, 372:4
**allowed** [4] - 323:3, 433:23, 433:25, 461:3
**almost** [3] - 407:2, 407:6, 424:5
**aloud** [1] - 419:7
**Amendment** [6] - 453:4, 453:7, 453:12, 453:17, 454:6, 454:16
**amendments** [1] - 355:11
**amount** [39] - 273:19, 297:23, 298:20, 298:22, 306:19, 319:21, 324:20,

324:21, 325:16, 335:9, 336:20, 352:15, 352:20, 353:4, 353:6, 353:11, 354:20, 365:3, 366:16, 369:12, 397:6, 397:11, 397:13, 397:23, 398:11, 398:12, 398:21, 398:23, 401:8, 403:5, 407:12, 407:14, 417:4, 427:23, 431:18, 431:23, 451:15

**amounts** [21] - 316:2, 316:22, 319:17, 324:16, 330:11, 330:16, 333:17, 333:19, 333:22, 334:3, 336:19, 398:21, 405:22, 406:4, 407:5, 407:6, 407:15, 408:22, 427:3, 436:23, 440:10

**ample** [1] - 353:24

**analysis** [10] - 275:5, 275:6, 276:11, 292:14, 327:14, 341:23, 341:25, 342:9, 342:16, 349:1

**ANDREW** [1] - 267:20

**ans** [1] - 401:1

**ANSWER** [2] - 449:8, 449:11

**answer** [30] - 272:10, 272:11, 272:17, 272:24, 274:12, 276:13, 277:13, 277:23, 278:3, 283:13, 298:14, 300:17, 301:15, 303:12, 303:13, 304:13, 323:5, 332:24, 333:13, 346:8, 347:9, 348:6, 361:4, 362:19, 364:4, 365:18, 396:14, 404:13, 435:13, 443:16

**answered** [6] - 332:22, 333:5, 338:11, 339:12, 339:16, 435:12

**answers** [1] - 333:12

**anyway** [2] - 298:25, 349:18

**apologize** [1] - 346:23

**appear** [2] - 297:20, 454:12

**APPEARANCES** [1] - 267:13

**appeared** [2] - 298:2, 344:23

**applicable** [1] - 350:12

**application** [13] - 315:9, 315:13, 315:18, 315:25, 316:1, 317:1, 317:3, 350:20, 350:21, 390:21, 418:8, 419:16, 455:2

**applied** [2] - 391:5, 391:10

**apply** [2] - 325:7, 371:3

**applying** [1] - 415:5

**appointed** [2] - 350:10, 455:7

**approached** [1] - 340:11

**appropriate** [1] - 350:16

**approval** [1] - 419:16

**approve** [1] - 454:24

**approved** [4] - 281:12, 281:15, 418:10, 454:23

**April** [5] - 376:8, 376:9, 378:20, 382:13, 448:9

**area** [7] - 269:3, 269:21, 309:2, 359:19, 360:6, 361:16, 361:18

**areas** [3] - 339:21, 344:12, 442:9

**argue** [2] - 322:5, 328:3

**arguing** [1] - 328:2

**argument** [5] - 328:8, 452:8, 452:9, 459:11

**arm** [1] - 411:3

**arrange** [1] - 349:22

**arrangement** [1] - 430:1

**arrested** [3] - 444:14, 445:5, 445:7

**aside** [1] - 449:5

**aspect** [1] - 405:11

**aspects** [2] - 272:3, 308:13

**ASRC** [2] - 268:16, 271:4

**assess** [1] - 454:19

**assessed** [1] - 384:10

**asset** [2] - 269:3, 269:21

**assign** [1] - 350:17

**assigned** [1] - 273:3

**assist** [1] - 268:22

**assistance** [1] - 269:3

**Assistant** [1] - 288:25

**ASSISTANT** [1] - 267:17

**assume** [4] - 281:22, 371:9, 408:11, 455:11

**assumed** [1] - 302:8

**Astoria** [9] - 291:11, 312:24, 316:5, 316:24, 360:4, 402:20, 402:23, 409:20

**ATM** [91] - 284:6, 286:2, 302:3, 302:7, 302:8, 302:10, 302:13, 302:24, 303:3, 303:12, 303:15, 303:21, 303:23, 304:7, 304:12, 304:15, 304:25, 305:9, 305:13, 305:15, 305:22, 306:17, 306:19, 306:23, 307:1, 307:3, 307:13, 307:14, 307:18, 307:19, 307:22, 307:25, 308:1, 308:3, 330:10, 330:13, 331:1, 331:13, 334:24, 335:3, 335:7, 335:9, 335:12, 336:5, 336:6, 336:11, 336:23, 336:24, 353:5, 353:6, 353:11, 358:21, 361:17, 361:19, 362:10, 362:12, 366:9, 366:20, 366:25, 367:4, 367:16, 367:20, 367:25, 396:12, 397:4, 397:21, 398:5, 400:9, 406:1, 406:9, 406:12, 407:15, 407:16, 407:17, 413:14, 413:18, 420:24, 421:2, 422:21, 422:22, 423:22, 423:23, 424:3, 437:11, 437:13, 438:1, 438:3, 438:6, 438:10, 438:20

**ATM.1** [1] - 406:2

**attached** [1] - 315:8

**attempt** [2] - 286:19, 316:6

**attempting** [4] - 273:8, 317:9, 317:19, 351:12

**attended** [2] - 345:3, 345:6

**attention** [6] - 315:3, 315:23, 317:20, 360:6, 388:7, 450:15

**attest** [1] - 354:1

**attorney** [6] - 350:17, 350:20, 351:16, 415:9, 416:6, 416:11, 455:10, 455:12

**Attorney** [2] - 273:4, 288:25

**attorney's** [1] - 450:22

**Attorney's** [5] - 350:12, 350:14, 444:8, 446:17, 447:25

**ATTORNEYS** [2] - 267:14, 267:17

**attorneys** [2] - 350:9, 458:22

**audit** [1] - 458:9

**August** [4] - 378:2, 444:25, 460:23, 460:24

**authorities** [1] - 395:15

**authority** [3] - 271:3, 395:16, 408:17

**authorized** [1] - 371:21

**automated** [6] - 302:18, 303:7, 305:18, 307:6, 321:24, 322:4

**automatically** [1] - 397:25

**available** [14] - 274:3, 274:10, 279:1, 279:11, 282:6, 332:14, 332:15, 344:25, 350:12, 370:22, 386:8

**Avenue** [1] - 413:6

**AVENUE** [1] - 267:19

**average** [3] - 377:7, 395:22, 415:25

**averages** [1] - 437:12

**avoid** [5] - 286:19, 408:25, 444:5, 455:20, 455:24

**avoiding** [1] - 355:14

**aware** [22] - 293:14, 297:5, 302:17, 302:19, 303:9, 306:25, 311:9, 312:12, 313:9, 322:23, 335:3, 339:5, 341:25, 343:12, 343:14, 343:20, 351:3, 351:7, 356:2, 357:9, 455:6

**awash** [1] - 458:14

**axe** [1] - 455:19

# B

**background** [1] - 390:12

**backing** [1] - 276:16

**backup** [1] - 320:23

**bad** [2] - 425:14, 454:10

**bag** [7] - 410:17, 410:24, 410:25, 411:1, 411:2, 411:5

**balance** [8] - 300:11, 378:19, 379:13, 379:22, 380:8, 415:25, 416:15, 432:8

**balanced** [1] - 378:25

**balances** [1] - 431:22

**Baldwin** [1] - 389:18, 396:1

**band** [3] - 380:15, 386:22, 400:9

**bank** [100] - 269:4, 273:6, 273:15, 275:5, 275:6, 275:7, 275:14, 275:24, 276:11, 276:14, 278:13, 285:2, 286:10, 289:2, 292:9, 292:14, 293:14, 294:12, 294:23, 299:2, 300:16, 302:7, 302:12, 302:17, 302:23, 303:5, 305:18, 307:5, 309:13, 310:7, 311:15, 311:19, 311:22, 312:13, 314:23, 315:14, 317:5, 322:20, 325:12, 329:19, 330:4, 330:11, 332:9, 334:2, 335:18, 335:21, 337:16, 341:2, 341:7, 352:16, 358:7, 358:9, 360:1, 360:13, 362:2, 366:2, 366:6, 366:11, 368:10, 368:22, 398:1, 398:3, 398:25, 400:15, 400:17, 400:19, 400:25, 401:3, 401:6, 401:10, 401:12, 401:22, 402:16, 403:4, 403:11, 405:2, 405:9, 408:22, 415:14, 416:7, 417:6, 417:22, 419:8, 419:9, 420:13, 420:20, 422:2, 422:6, 424:6, 424:14, 437:16, 438:7, 444:4, 449:5, 449:9, 457:19

**Bank** [28] - 276:5, 292:21, 293:7,

293:22, 294:17, 295:11, 300:2, 300:6,
300:12, 305:20, 312:24, 316:16,
326:23, 329:3, 355:6, 355:10, 355:15,
355:24, 356:9, 362:1, 362:5, 362:9,
423:7, 423:17, 424:1, 424:8, 438:2

**banked** [2] - 291:2, 294:9

**banker** [2] - 366:4, 419:25

**Banking** [1] - 326:12

**banking** [34] - 293:4, 293:9, 293:15,
294:18, 301:18, 308:4, 308:9, 308:11,
308:12, 308:13, 308:14, 314:3, 315:1,
315:4, 315:7, 315:23, 316:19, 317:19,
318:4, 324:11, 325:9, 356:13, 369:3,
381:5, 397:23, 402:15, 402:17, 413:23,
417:24, 420:10, 423:8, 423:13, 423:25

**banks** [19] - 292:7, 324:4, 324:6,
337:14, 383:15, 386:18, 399:1, 399:2,
399:3, 399:6, 399:11, 399:12, 399:14,
399:15, 400:3, 433:12

**bar** [12] - 375:15, 376:24, 377:8,
377:11, 377:13, 377:17, 386:24, 407:4,
420:19, 422:17, 425:20, 426:1

**barbacks** [1] - 395:5

**bartender** [1] - 378:23

**bartender's** [1] - 383:15

**bartenders** [3] - 337:14, 395:6, 399:20

**based** [41] - 275:14, 285:8, 285:10,
286:19, 287:10, 288:15, 294:4, 298:8,
298:15, 298:17, 299:10, 303:9, 303:24,
307:5, 310:6, 317:23, 318:9, 321:8,
324:11, 324:12, 326:7, 326:8, 326:21,
327:4, 327:20, 329:12, 333:11, 336:4,
341:9, 341:20, 341:22, 341:23, 344:7,
346:13, 347:19, 350:7, 353:9, 354:24,
358:25, 359:15, 460:13

**basis** [9] - 303:25, 304:20, 305:5,
305:6, 319:19, 342:16, 401:18, 433:12,
433:15

**Bates** [7] - 320:3, 353:7, 353:13,
388:9, 404:7, 444:21, 450:15

**bathroom** [1] - 396:13

**beam** [1] - 449:17

**bear** [1] - 311:24

**bearing** [6] - 314:3, 317:22, 317:25,
359:12, 444:24, 446:11

**bears** [1] - 284:11

**became** [5] - 297:5, 351:3, 355:12,
355:20, 356:15

**become** [3] - 355:5, 355:23, 356:4

**becomes** [1] - 370:16

**beer** [3] - 338:6, 402:1

**BEFORE** [1] - 267:12

**began** [1] - 413:23

**beginning** [2] - 272:14, 449:3

**behalf** [2] - 446:15, 446:19

**behind** [5] - 377:8, 377:17, 425:20,
425:25, 427:2

**belief** [3] - 299:15, 324:14, 355:19

**believes** [1] - 369:10

**below** [3] - 289:6, 405:21, 406:3

**bench** [1] - 296:10

**BENCH** [1] - 267:11

**benefit** [1] - 296:4

**best** [5] - 270:16, 291:8, 300:14,
447:16, 447:17

**better** [1] - 290:23

**between** [5] - 314:4, 358:18, 358:19,
400:8, 441:2

**beyond** [3] - 269:6, 285:16, 373:5

**big** [1] - 411:1

**biggest** [1] - 459:15

**bill** [2] - 399:21, 410:22

**bills** [11] - 294:25, 295:5, 295:18,
307:25, 334:13, 335:11, 335:20, 336:8,
337:24, 397:14, 397:15

**binder** [4] - 404:5, 444:18, 445:15,
450:11

**binders** [2] - 346:23, 445:10

**binding** [1] - 300:8

**bit** [10] - 321:3, 328:8, 373:12, 404:8,
404:10, 413:9, 420:3, 425:3, 431:1,
441:14

**black** [1] - 410:17

**blank** [1] - 432:22

**blocked** [1] - 272:7

**Bob** [5] - 382:5, 392:25, 411:24,
422:12, 422:23

**body** [2] - 327:2, 327:4

**book** [17] - 296:21, 300:20, 311:25,
378:3, 385:18, 386:23, 397:18, 402:11,
402:12, 402:13, 403:11, 403:25, 404:1,
404:2, 413:25, 431:25, 459:20

**booking** [2] - 402:9, 402:10

**bookkeeper** [1] - 394:2

**bookkeeping** [2] - 381:7, 424:18

**books** [24] - 340:15, 341:6, 341:13,
341:14, 341:17, 342:15, 344:1, 348:20,
348:24, 349:1, 354:4, 384:21, 384:23,
385:1, 388:4, 395:12, 431:7, 455:20,
457:1, 457:4, 457:6, 457:9, 458:12,
460:3

**bother** [1] - 455:9

**bothered** [1] - 291:14

**bothers** [1] - 455:10

**bottom** [5] - 388:10, 444:21, 444:25,
451:5, 451:10

**Boulevard** [3] - 393:4, 393:16, 402:19

**bouncer** [3] - 382:23, 382:24, 387:12

**box** [5] - 380:14, 387:2, 399:4, 400:6,
449:6

**bracketed** [1] - 370:4

**brackets** [1] - 372:13

**branch** [29] - 291:11, 291:12, 294:9,
316:4, 316:25, 329:6, 360:3, 360:4,
360:18, 360:23, 360:24, 365:22,
365:24, 402:18, 402:19, 403:6, 403:7,
409:13, 409:18, 409:19, 410:1, 413:5,
415:13, 415:20, 416:24, 416:25, 417:7,
459:6, 459:10

**branches** [12] - 286:11, 286:12, 291:1,

291:9, 294:9, 329:9, 365:24, 402:18,
402:25, 409:11, 415:13, 415:19

**break** [5] - 317:13, 339:23, 380:6,
399:1, 441:24

**breakfast** [1] - 396:4

**breaking** [2] - 329:8, 369:11

**breasts** [2] - 402:3, 402:5

**Brian** [3] - 289:1, 338:23, 434:24

**BRIAN** [2] - 267:12, 267:16

**brief** [1] - 452:19

**briefing** [8] - 452:8, 452:10, 452:16,
457:12, 458:17, 460:6, 460:15, 461:13

**briefings** [1] - 459:2

**briefly** [1] - 376:18

**briefs** [3] - 452:17, 460:9, 460:21

**bring** [9] - 365:2, 383:14, 383:16,
383:17, 397:17, 400:13, 427:10,
431:17, 457:3

**bringing** [1] - 459:23

**broad** [1] - 456:19

**broaden** [1] - 300:7

**broader** [2] - 326:8, 327:14

**Broadway** [1] - 402:20

**broke** [1] - 427:5

**broken** [2] - 336:17, 448:24

**Brooklyn** [4] - 267:7, 267:22, 375:15,
375:20

**BROOKLYN** [1] - 267:15

**build** [1] - 426:10

**building** [2] - 309:1, 309:3

**bundled** [1] - 348:3

**busiest** [1] - 425:9

**Business** [1] - 326:12

**business** [82] - 286:19, 297:25,
299:20, 303:14, 307:16, 308:25, 309:7,
310:10, 317:5, 324:2, 324:9, 324:22,
325:3, 325:6, 325:9, 331:1, 333:18,
333:21, 334:10, 336:9, 342:24, 342:25,
343:1, 343:2, 343:4, 343:6, 343:8,
343:9, 343:25, 344:16, 345:2, 351:10,
358:15, 359:5, 359:10, 359:16, 361:24,
362:20, 363:16, 366:4, 366:15, 377:4,
390:14, 390:17, 390:24, 391:16,
391:20, 391:25, 392:13, 392:18,
393:21, 394:11, 394:20, 405:11, 407:8,
408:11, 408:13, 410:6, 410:10, 413:6,
415:7, 419:10, 420:6, 426:11, 433:14,
435:7, 436:17, 437:6, 438:14, 440:7,
440:8, 441:18, 445:22, 448:24, 449:17,
449:22, 451:16, 458:2, 458:5

**businesses** [1] - 331:11

**busy** [2] - 425:14, 426:19

**BY** [23] - 267:16, 267:20, 267:20,
268:14, 310:2, 328:17, 340:3, 358:2,
362:16, 375:8, 381:25, 387:24, 388:20,
389:14, 413:2, 442:6, 462:2, 462:4,
462:7, 462:10, 462:12, 462:14, 462:17

# C

**cabaret** [1] - 390:15
**CADMAN** [1] - 267:15
**Cadman** [1] - 267:22
**calendar** [2] - 320:24, 320:25
**cameras** [1] - 343:14
**cancellation** [3] - 384:4, 384:14, 384:15
**Capone** [1] - 458:9
**car** [2] - 390:3, 411:7
**card** [11] - 307:16, 330:14, 331:13, 331:16, 418:23, 422:22, 425:24, 425:25, 426:2, 426:3, 441:15
**cardboard** [1] - 400:8
**cards** [1] - 425:25
**care** [9] - 310:25, 311:1, 311:9, 311:19, 404:24, 405:8, 406:23, 418:3, 423:17
**careful** [2] - 295:24, 310:12
**carried** [2] - 333:17, 333:19
**carry** [14] - 316:3, 317:5, 325:5, 325:8, 325:10, 390:17, 390:19, 390:22, 391:8, 409:2, 410:19, 415:5, 438:22, 457:19
**carrying** [5] - 273:21, 316:2, 316:22, 317:2, 317:4
**cars** [1] - 390:4
**case** [56] - 269:13, 272:14, 274:13, 279:2, 279:3, 279:24, 279:25, 280:1, 280:3, 280:21, 281:3, 281:25, 282:8, 283:8, 285:19, 296:6, 326:9, 326:20, 328:11, 329:8, 330:3, 330:10, 330:16, 330:17, 330:18, 330:24, 331:5, 331:7, 331:8, 331:9, 331:10, 332:14, 340:15, 342:5, 350:6, 350:11, 355:16, 356:2, 356:3, 361:20, 362:22, 371:13, 374:10, 399:19, 414:10, 426:24, 443:1, 448:18, 449:3, 453:15, 455:7, 455:23, 456:3, 456:24, 458:19, 458:20
**cases** [12] - 268:22, 269:4, 269:9, 273:13, 311:4, 329:17, 331:9, 342:3, 348:22, 350:9, 454:7, 456:23
**cash** [137] - 284:6, 285:23, 286:7, 294:24, 295:3, 297:25, 298:5, 298:22, 298:24, 299:20, 302:11, 303:13, 305:1, 305:16, 305:19, 316:2, 316:7, 316:23, 317:2, 317:4, 317:10, 321:19, 321:21, 321:25, 322:2, 322:4, 322:7, 322:9, 326:6, 330:10, 331:4, 333:17, 333:18, 333:19, 333:22, 334:3, 334:14, 334:25, 335:13, 337:2, 337:5, 338:1, 338:5, 338:7, 338:8, 339:7, 340:14, 341:1, 341:6, 341:13, 341:14, 341:17, 342:14, 346:3, 347:23, 348:13, 348:15, 348:20, 348:23, 348:24, 349:1, 349:6, 349:14, 349:16, 358:14, 359:2, 359:5, 359:17, 361:22, 361:24, 361:25, 362:7, 362:19, 362:21, 363:10, 363:16, 366:11, 366:13, 366:14, 367:19, 367:20, 368:23, 369:12, 377:15, 377:18,
380:14, 380:18, 383:13, 383:23, 383:25, 384:8, 395:9, 397:2, 397:3, 397:11, 397:20, 398:3, 398:9, 399:7, 399:16, 400:12, 400:13, 401:17, 406:25, 407:7, 407:8, 407:11, 408:7, 417:3, 417:7, 417:10, 419:8, 419:9, 422:20, 423:19, 424:3, 424:7, 425:3, 425:4, 430:23, 431:6, 433:4, 434:7, 444:4, 448:23, 449:4, 449:5, 449:16, 451:16, 458:10, 458:12, 458:15, 459:20
**cashbox** [2] - 380:4, 380:9
**cashed** [1] - 286:18
**cashing** [2] - 298:6, 323:15
**categories** [1] - 395:4
**categorize** [3] - 321:21, 321:25, 332:21
**category** [1] - 377:6
**caught** [1] - 457:21
**caused** [1] - 345:15
**causes** [1] - 386:6
**Cavanaugh** [14] - 278:16, 278:22, 278:25, 279:9, 279:18, 280:6, 284:23, 290:21, 291:17, 291:21, 303:24, 304:15, 312:5, 373:11
**Cavanaugh's** [2] - 281:7, 312:3
**central** [1] - 434:11
**cents** [2] - 402:3, 406:11
**CENTS** [1] - 267:8
**certain** [16] - 275:21, 275:22, 294:5, 308:13, 323:4, 345:12, 345:22, 348:12, 348:23, 350:5, 351:5, 355:17, 356:6, 357:14, 363:6, 425:16
**certainly** [36] - 269:14, 270:25, 271:11, 272:3, 272:15, 274:1, 274:16, 277:11, 278:8, 278:21, 282:1, 282:23, 283:7, 283:19, 286:21, 288:24, 289:7, 300:21, 308:10, 311:12, 315:6, 316:6, 326:18, 331:10, 333:5, 333:11, 334:19, 336:8, 342:1, 347:14, 348:11, 351:3, 355:16, 359:13, 360:20, 369:25
**certificates** [4] - 422:17, 422:18, 422:23, 426:3
**certified** [1] - 448:6
**chains** [2] - 392:12
**chambers** [1] - 415:10
**champagne** [6] - 377:13, 377:14, 380:12, 422:24, 428:20, 429:4
**chance** [4] - 282:13, 290:19, 301:2, 354:15
**change** [21] - 296:5, 317:25, 337:14, 337:17, 393:13, 399:6, 399:19, 401:9, 401:21, 402:4, 409:12, 411:16, 411:17, 415:15, 416:20, 417:18, 423:8, 423:14, 459:8, 460:13
**changed** [4] - 285:14, 318:1, 430:24, 438:3
**changes** [2] - 270:15, 355:16
**changing** [1] - 357:9
**characteristic** [1] - 297:20
**characteristics** [2] - 275:11, 275:13

**charge** [19] - 269:6, 356:2, 356:3, 376:11, 376:16, 378:13, 382:5, 383:5, 385:6, 398:18, 401:8, 401:9, 406:9, 411:16, 423:1, 426:9, 426:13, 428:12, 431:13
**charged** [6] - 336:16, 426:4, 426:6, 428:12, 444:14, 445:3
**charging** [2] - 427:24, 428:21
**chart** [1] - 346:12
**charts** [3] - 341:8, 342:15, 348:12
**Chase** [52] - 277:22, 281:24, 290:9, 290:15, 300:12, 300:22, 305:10, 306:16, 309:10, 312:6, 312:13, 312:24, 314:2, 314:4, 314:8, 316:16, 319:12, 323:19, 326:12, 326:23, 329:3, 359:20, 360:9, 361:10, 363:23, 364:9, 365:6, 366:1, 402:17, 403:12, 403:20, 411:8, 415:17, 416:24, 417:24, 419:21, 419:22, 421:16, 421:21, 422:1, 423:20, 423:22, 424:7, 440:3, 440:21, 440:22, 457:14, 457:17, 457:18, 459:6, 459:10, 459:13
**Check** [4] - 445:25, 446:3, 446:6, 446:10
**check** [16] - 298:6, 310:3, 310:4, 310:5, 354:5, 354:15, 356:12, 400:21, 401:4, 411:18, 418:25, 419:1, 425:1, 431:4, 446:7, 446:8
**checked** [2] - 310:6, 411:18
**checking** [3] - 310:12, 351:24, 415:20
**checks** [8] - 286:18, 300:10, 300:11, 323:15, 330:21, 445:21, 446:14, 446:18
**chooses** [1] - 299:22
**Christmas** [1] - 392:17
**circumstances** [7] - 298:15, 299:11, 332:17, 382:18, 390:21, 415:3, 441:12
**circumstantial** [1] - 298:14
**cite** [2] - 323:7, 443:8
**cites** [1] - 451:25
**citizen** [4] - 298:21, 298:24, 299:15, 299:19
**City** [8] - 309:8, 315:18, 375:16, 375:18, 382:10, 391:22, 401:15, 409:9
**city** [2] - 393:24, 395:25
**civil** [2] - 448:3, 455:7
**claim** [2] - 297:14, 456:18
**Claimant** [1] - 444:21
**claimant** [9] - 354:8, 375:3, 381:15, 381:16, 389:6, 389:7, 455:25, 456:5, 459:6
**claimant's** [2] - 361:10, 459:2
**claimants** [2] - 453:19, 459:15
**clarified** [1] - 347:9
**clarify** [1] - 346:8
**clean** [1] - 454:10
**clear** [15] - 278:19, 278:22, 291:20, 295:11, 297:20, 301:16, 305:3, 313:10, 335:22, 336:20, 368:1, 398:6, 398:8, 438:6, 447:9
**cleared** [2] - 406:12, 431:20

**clearing** [1] - 322:7
**clearly** [5] - 325:19, 336:17, 347:25, 349:10, 453:7
**CLERK** [3] - 381:20, 381:23, 389:11
**clip** [1] - 387:1
**close** [5] - 324:7, 383:10, 383:17, 392:15, 399:2
**closed** [19] - 343:8, 393:9, 393:10, 393:12, 411:8, 411:12, 411:17, 411:19, 411:23, 412:3, 413:10, 432:18, 432:20, 440:12, 440:20, 440:22, 457:17, 457:18
**closer** [2] - 376:14, 442:18
**closes** [1] - 431:12
**closing** [5] - 289:3, 324:24, 415:6, 432:9, 450:9
**closure** [1] - 283:22
**club** [9] - 359:9, 387:1, 388:13, 392:20, 396:6, 396:7, 396:8, 427:21
**Cogan** [1] - 304:10
**COGAN** [1] - 267:12
**collateral** [1] - 455:17
**colleague** [1] - 301:24
**collect** [2] - 406:11, 420:25
**collected** [1] - 348:3
**College** [2] - 407:18, 408:3
**column** [4] - 352:19, 353:6, 353:7, 353:9
**coming** [4] - 299:12, 299:16, 344:16, 386:12
**commercial** [1] - 304:12
**commissions** [1] - 336:16
**communicate** [1] - 458:22
**communications** [1] - 351:5
**companies** [2] - 362:11, 392:10
**Company** [1] - 392:5
**company** [12] - 303:14, 362:1, 366:19, 387:18, 388:3, 388:5, 392:1, 392:4, 402:1, 441:15, 446:19, 448:8
**compare** [3] - 296:11, 341:2, 459:19
**compared** [4] - 342:13, 342:15, 349:1, 362:11
**comparing** [1] - 327:3
**comparison** [3] - 341:13, 344:24, 352:8
**compelled** [1] - 295:21
**compensate** [1] - 395:14
**compensated** [1] - 429:8
**compensation** [4] - 385:15, 430:5, 430:11, 431:9
**complaint** [9] - 293:18, 446:23, 447:4, 447:8, 447:14, 447:15, 447:18, 447:21, 448:5
**complete** [1] - 386:18
**completed** [1] - 450:25
**completely** [1] - 272:25
**completeness** [3] - 373:3, 373:5, 444:10
**compliance** [2] - 360:15, 459:10
**Compliance** [2] - 360:19, 360:25

**compliant** [2] - 293:24, 299:17
**comprehend** [1] - 440:9
**comprises** [1] - 273:11
**computer** [1] - 267:25
**conceivably** [1] - 453:5
**concern** [4] - 309:9, 332:4, 345:15, 347:7, 347:16, 350:18, 455:14, 457:13
**concerned** [8] - 350:23, 350:24, 351:2, 351:3, 365:14, 421:8, 453:2, 458:4
**concerning** [1] - 371:21
**concerns** [5] - 333:25, 452:21, 458:18, 458:23, 458:24
**conclusion** [9] - 295:15, 298:11, 298:15, 307:5, 341:19, 344:6, 344:7, 357:15
**conclusions** [6] - 274:4, 317:11, 317:22, 317:23, 341:23, 458:21
**condition** [3] - 377:16, 454:3, 459:23
**conduct** [7] - 290:23, 292:5, 356:3, 357:4, 357:5, 362:10, 457:20
**conducted** [14] - 271:7, 292:16, 301:22, 316:7, 324:24, 325:1, 325:8, 326:13, 328:25, 331:18, 358:4, 416:2, 423:19, 442:10
**conducting** [2] - 333:6, 408:7
**confer** [1] - 370:10
**conference** [3] - 368:20, 456:2, 456:9
**conferred** [2] - 374:4, 404:12
**confined** [1] - 269:16
**confirm** [1] - 451:15
**confirmed** [1] - 278:15
**conjunction** [8] - 270:11, 273:14, 332:6, 355:15, 356:8, 358:5, 359:5, 359:21
**connected** [1] - 434:11
**connection** [5] - 271:4, 342:20, 388:2, 443:1, 444:7
**consecutive** [1] - 298:9
**consider** [3] - 318:3, 424:2, 453:12
**considering** [1] - 372:1
**consisted** [1] - 294:25
**consistent** [13] - 270:24, 282:24, 283:14, 285:24, 286:15, 293:23, 293:24, 294:7, 297:21, 311:21, 317:18, 319:22, 341:7
**Constitution** [1] - 271:8
**construed** [1] - 422:2
**consult** [2] - 331:10, 408:16
**contact** [5] - 277:6, 277:7, 277:9, 277:10, 277:21, 278:1
**contacted** [2] - 350:4, 415:9
**contacts** [2] - 281:9, 292:23
**contained** [5] - 326:16, 327:7, 330:20, 380:1, 416:12
**contains** [2] - 285:8, 445:21
**contemptuous** [2] - 289:9, 289:23
**contends** [1] - 457:22
**content** [2] - 282:22, 285:8
**contention** [1] - 457:1

**contents** [7] - 280:11, 281:5, 285:2, 288:12, 358:9, 364:13, 447:15
**context** [11] - 280:23, 280:25, 281:23, 284:17, 284:22, 287:22, 306:21, 314:20, 358:9, 364:13, 365:17
**continue** [3] - 272:23, 296:16, 340:1
**continued** [6] - 289:5, 289:12, 309:14, 357:5, 412:4
**CONTINUED** [1] - 340:2
**CONTINUES** [3] - 310:1, 328:16, 413:1
**continues** [2] - 323:11, 374:12
**continuously** [2] - 389:23, 391:8
**contract** [6] - 268:18, 268:21, 268:23, 271:2, 271:5, 303:21
**contracting** [4] - 343:2, 390:24, 390:25, 392:9
**contractors** [2] - 427:20, 429:6
**contracts** [1] - 303:12
**contradict** [1] - 350:25
**contributing** [1] - 290:5
**control** [2] - 448:7, 448:12
**conundrum** [1] - 404:10
**conversation** [50] - 276:21, 278:7, 278:9, 278:11, 278:16, 278:20, 278:23, 279:2, 280:6, 280:11, 280:23, 280:24, 281:4, 281:23, 282:21, 282:23, 283:15, 284:17, 284:20, 284:23, 285:10, 285:18, 287:10, 287:18, 287:22, 287:25, 288:18, 290:22, 291:18, 297:7, 297:14, 298:12, 302:14, 303:9, 303:24, 305:5, 306:21, 307:1, 307:5, 308:20, 338:17, 349:24, 365:17, 375:24, 419:20, 421:4, 435:3, 437:25, 440:2, 444:2
**conversations** [7] - 278:4, 280:14, 288:16, 290:13, 290:17, 292:25, 361:9
**conveyed** [3] - 293:8, 327:5, 327:6
**cooks** [1] - 395:5
**cooperative** [6] - 332:20, 332:21, 339:17, 340:11, 356:20, 435:11
**copies** [5] - 340:7, 349:5, 349:14, 349:17, 445:21
**copy** [7] - 270:19, 287:25, 372:14, 418:22, 446:22, 447:2
**corner** [6] - 388:10, 403:15, 403:16, 404:19, 444:21, 445:19
**corporate** [4] - 392:23, 393:1, 393:18, 393:25
**corporation** [2] - 394:5, 394:6
**correct** [63] - 268:17, 268:19, 269:22, 270:2, 271:15, 271:16, 271:17, 271:18, 276:23, 276:24, 277:15, 283:9, 283:10, 285:9, 293:9, 293:10, 293:16, 293:20, 311:13, 312:24, 313:16, 316:8, 316:12, 317:10, 321:2, 325:14, 331:23, 341:10, 341:21, 345:11, 352:10, 363:2, 378:24, 399:8, 404:22, 415:1, 419:3, 419:18, 422:13, 436:11, 444:5, 444:11, 444:15, 444:16, 445:7, 445:23, 446:15, 446:19, 446:20, 447:6, 447:16, 448:3, 448:19,

448:25, 449:18, 449:25, 450:1, 450:3,
450:19, 450:25, 451:16, 451:17, 460:18
 **corrected** [1] - 377:24
 **corrections** [1] - 444:10
 **correctly** [2] - 320:17, 449:13
 **corresponded** [1] - 336:18
 **correspondence** [5] - 284:18, 314:9,
314:18, 351:8, 358:7
 **correspondingly** [1] - 430:6
 **corresponds** [2] - 348:22, 398:22
 **corroborate** [5] - 343:21, 344:21,
344:23, 349:12, 349:13
 **corroborated** [2] - 345:12, 349:15
 **corroboration** [6] - 348:10, 349:4,
456:21, 457:7, 459:25, 460:1
 **cost** [1] - 342:21
 **counsel** [3] - 268:6, 353:4, 443:8
 **count** [7] - 297:4, 398:15, 398:19,
400:7, 431:17, 431:24, 432:25
 **Count** [1] - 398:17
 **counted** [1] - 449:7
 **counter** [2] - 387:12, 387:14
 **country** [3] - 306:12, 437:22, 438:4
 **counts** [1] - 387:12
 **couple** [15] - 324:16, 324:17, 337:16,
339:21, 345:3, 353:4, 368:16, 372:1,
399:9, 402:5, 407:20, 419:6, 424:20,
445:6, 453:2
 **coupled** [1] - 366:15
 **course** [10] - 288:11, 288:12, 384:1,
442:13, 443:16, 443:24, 444:2, 454:8,
455:16, 456:17
 **COURT** [109] - 267:1, 268:1, 268:9,
272:2, 272:6, 272:9, 272:15, 272:22,
295:20, 296:10, 296:15, 303:11,
303:18, 303:20, 311:15, 327:23, 328:2,
328:7, 328:15, 339:18, 339:20, 339:23,
340:1, 340:9, 340:13, 352:23, 352:25,
353:11, 353:16, 353:21, 354:3, 354:7,
354:9, 354:13, 355:3, 355:12, 357:25,
361:3, 361:5, 361:8, 361:15, 361:23,
362:7, 362:14, 365:12, 365:16, 368:6,
368:9, 368:16, 368:21, 369:5, 369:17,
369:23, 369:25, 370:11, 370:15,
370:23, 371:9, 371:13, 371:17, 371:20,
372:8, 372:12, 372:21, 373:2, 373:10,
373:16, 373:23, 374:2, 374:7, 375:2,
376:13, 381:11, 381:13, 387:22,
388:16, 388:18, 389:5, 396:5, 403:24,
404:1, 404:3, 404:7, 404:14, 408:10,
408:20, 430:10, 441:23, 442:2, 442:17,
442:21, 442:23, 443:12, 443:18,
445:11, 445:14, 445:17, 451:19,
451:22, 452:2, 452:15, 455:6, 460:12,
460:18, 460:20, 460:23, 460:25, 461:5,
461:12
 **Court** [13] - 267:21, 270:21, 285:8,
287:6, 287:20, 288:21, 289:8, 289:15,
318:3, 378:18, 441:12, 452:12, 455:3
 **court** [8] - 350:10, 350:16, 354:14,

373:14, 382:2, 442:1, 446:24
 **courthouse** [3] - 270:2, 274:21,
284:25
 **Courthouse** [1] - 267:6
 **cover** [7] - 338:25, 426:9, 426:14,
426:15, 427:1, 427:11, 456:7
 **covered** [1] - 344:12
 **covers** [1] - 404:9
 **created** [1] - 342:15
 **credibility** [7] - 453:5, 453:6, 453:8,
453:9, 453:17, 453:20, 459:12
 **credibility-related** [1] - 453:8
 **credit** [23] - 303:7, 307:16, 307:19,
321:24, 322:4, 322:9, 330:14, 331:13,
331:16, 335:21, 336:4, 362:2, 366:12,
368:11, 398:9, 422:22, 425:24, 425:25,
426:2, 426:3, 441:14, 453:3
 **credited** [16] - 303:1, 303:4, 303:8,
307:17, 308:1, 321:6, 321:13, 321:19,
336:14, 336:15, 336:16, 336:17,
336:22, 367:24, 368:3, 423:24
 **credits** [21] - 302:18, 302:23, 305:18,
307:6, 307:10, 307:12, 308:3, 321:12,
330:10, 330:13, 330:14, 330:21,
331:12, 331:16, 336:7, 337:7, 361:17,
361:18, 367:1, 367:22
 **crime** [5] - 444:14, 456:7, 456:8,
456:10, 456:12
 **criminal** [3] - 273:12, 350:9, 454:7
 **Criminal** [1] - 273:13
 **cross** [20] - 268:12, 272:6, 295:21,
296:17, 358:3, 359:19, 360:7, 361:16,
369:21, 373:1, 373:3, 373:9, 373:17,
373:20, 373:21, 374:5, 381:11, 387:22,
441:24
 **CROSS** [8] - 268:13, 340:2, 362:15,
387:23, 442:5, 462:1, 462:11, 462:18
 **cross-designate** [1] - 373:1
 **cross-designated** [2] - 373:3, 373:21
 **cross-examination** [6] - 268:12,
358:3, 359:19, 360:7, 361:16, 441:24
 **CROSS-EXAMINATION** [4] - 268:13,
442:5, 462:1, 462:18
 **crucial** [1] - 453:17
 **CTR** [31] - 286:19, 289:3, 292:17,
297:11, 297:18, 298:5, 299:9, 299:17,
322:23, 322:25, 323:19, 324:7, 324:12,
324:14, 324:19, 325:2, 325:6, 325:12,
325:16, 325:20, 362:3, 365:1, 366:14,
367:4, 367:16, 369:4, 418:1, 418:3,
421:23, 423:17, 439:18
 **CTR's** [1] - 366:9
 **CTRs** [21] - 291:23, 291:24, 292:9,
292:11, 292:12, 292:13, 293:21,
293:23, 296:19, 296:23, 296:24, 298:3,
298:7, 300:1, 321:9, 323:4, 325:11,
366:21, 366:22, 369:1, 369:13
 **cumulative** [6] - 353:8, 372:1, 372:3,
372:5, 372:16, 372:22
 **Currency** [1] - 361:21

 **current** [7] - 338:21, 376:1, 383:2,
383:4, 393:20, 395:18
 **curtail** [1] - 295:20
 **curtailing** [1] - 296:15
 **customer** [2] - 322:12, 422:20
 **customers** [5] - 281:10, 305:16,
334:22, 337:2, 377:14
 **cut** [1] - 408:14
 **cyber** [1] - 446:22

---

## D

 **dad** [1] - 391:23
 **dad's** [1] - 391:16
 **daily** [4] - 397:18, 401:18, 433:11
 **dance** [1] - 384:5
 **dancer** [6] - 377:14, 428:23, 430:17,
457:2, 457:4
 **dancer's** [1] - 432:13
 **dancers** [15] - 284:8, 337:20, 344:15,
377:12, 384:5, 384:11, 400:2, 402:9,
430:4, 430:14, 430:15, 430:19, 437:16,
457:1
 **dancers'** [1] - 386:2
 **dances** [3] - 422:24, 427:9
 **dancing** [1] - 394:12
 **Dancker** [1] - 382:11
 **dangerous** [1] - 424:9
 **database** [2] - 281:10, 366:23
 **date** [14] - 274:24, 293:16, 320:22,
340:7, 356:6, 357:4, 362:25, 363:13,
365:19, 397:12, 397:13, 404:20,
415:25, 447:3
 **dated** [7] - 312:23, 319:2, 327:3,
328:22, 419:4, 419:17, 421:17
 **dates** [2] - 352:14, 432:12
 **David** [3] - 435:18, 436:1, 436:3
 **day-to-day** [1] - 360:24
 **days** [28] - 286:10, 298:9, 299:6,
299:7, 306:20, 324:15, 328:23, 335:6,
353:4, 354:19, 367:19, 376:3, 376:6,
376:10, 382:15, 383:6, 409:18, 425:10,
426:19, 426:20, 430:14, 430:15,
437:17, 447:22, 448:1, 460:22
 **daytime** [9] - 376:11, 376:12, 376:16,
376:19, 398:25, 399:11, 399:12,
399:14, 432:18
 **DBA** [3] - 393:2, 393:19, 404:24
 **dead** [1] - 327:24
 **deal** [6] - 299:12, 401:25, 415:13,
416:4, 454:18
 **debited** [1] - 336:15
 **Debra** [4] - 276:4, 301:6, 301:9, 303:25
 **December** [35] - 270:1, 274:22,
274:23, 277:15, 289:16, 291:22,
331:19, 340:5, 352:18, 356:18, 356:20,
357:12, 362:18, 362:24, 363:10,
363:18, 363:20, 364:6, 364:19, 367:14,
393:8, 407:20, 408:4, 415:24, 426:8,

434:13, 443:3, 444:8, 446:18, 447:4,
447:19, 447:23, 448:1, 448:17
    **decent** [1] - 335:9
    **decide** [1] - 299:2
    **deciding** [1] - 328:11
    **decision** [4] - 332:2, 452:6, 452:13,
453:25
    **decision-making** [1] - 452:13
    **declaring** [1] - 342:7
    **deemed** [2] - 305:19, 370:2
    **defeat** [1] - 456:17
    **defendant** [2] - 451:23, 459:5
    **Defendant** [2] - 267:9, 267:18
    **defendant's** [4] - 373:25, 374:7, 374:9,
459:11
    **defined** [1] - 271:11
    **degrees** [1] - 458:23
    **delay** [2] - 398:2, 398:5
    **delayed** [1] - 436:10
    **delivered** [1] - 311:11
    **delivery** [1] - 312:11
    **demonstrate** [7] - 290:2, 290:6, 316:2,
316:22, 317:4, 335:25, 337:8
    **demonstrated** [5] - 298:1, 298:7,
299:11, 325:10, 330:1
    **demonstrates** [1] - 337:7
    **demonstrative** [3] - 353:3, 353:17,
353:19
    **denied** [1] - 333:10
    **Dennis** [2] - 381:16, 381:22
    **denomination** [1] - 334:12
    **denominations** [3] - 380:7, 407:1,
408:21
    **denoted** [2] - 321:23, 341:6
    **department** [2] - 360:15, 382:12
    **Department** [5] - 360:19, 360:25,
382:10, 401:16, 409:9
    **deposed** [1] - 362:22
    **deposit** [76] - 294:24, 297:22, 298:1,
298:6, 298:22, 298:24, 299:16, 305:10,
305:13, 305:19, 308:1, 308:4, 317:6,
317:7, 319:1, 319:9, 319:14, 319:15,
320:8, 320:13, 320:19, 321:1, 321:5,
321:10, 321:12, 321:23, 322:2, 322:9,
322:14, 324:5, 325:15, 326:6, 329:20,
330:1, 333:23, 333:24, 334:20, 334:22,
335:1, 335:14, 335:21, 335:25, 336:2,
336:10, 336:12, 352:14, 352:15,
352:20, 353:8, 355:13, 366:11, 367:4,
369:2, 398:3, 398:9, 400:17, 401:6,
401:9, 401:13, 402:25, 403:2, 404:15,
405:16, 407:5, 407:15, 409:19, 417:3,
417:7, 417:10, 424:9, 437:8, 439:5,
444:4, 449:9
    **deposited** [14] - 295:6, 295:19,
302:12, 330:11, 330:21, 330:22, 334:8,
334:11, 336:5, 401:3, 421:8, 437:5,
449:14, 458:6
    **depositing** [13] - 304:11, 304:12,
317:2, 329:9, 331:3, 331:4, 356:14,

357:1, 401:7, 401:21, 401:22, 438:8,
457:20
    **deposition** [43] - 276:10, 276:16,
277:2, 277:5, 277:13, 278:4, 278:6,
279:15, 279:18, 281:7, 312:3, 345:18,
345:21, 350:19, 351:19, 351:23,
357:18, 363:6, 363:7, 363:25, 369:22,
370:7, 370:17, 371:7, 372:3, 372:4,
372:21, 373:1, 373:5, 373:6, 442:20,
442:25, 443:5, 444:7, 444:13, 446:17,
447:25, 449:2, 450:19, 450:21, 450:23,
451:4, 461:9
    **depositions** [4] - 345:3, 371:25,
460:10, 460:14
    **deposits** [64] - 275:11, 295:3, 295:12,
297:21, 303:1, 305:1, 316:7, 317:10,
317:12, 317:14, 319:5, 319:16, 319:21,
319:23, 320:5, 320:12, 320:15, 320:24,
321:21, 322:1, 322:2, 322:7, 323:13,
323:19, 324:15, 329:9, 330:2, 333:7,
336:13, 353:5, 353:6, 353:11, 356:14,
366:9, 367:20, 369:12, 369:13, 369:15,
401:2, 401:14, 404:16, 406:25, 407:8,
407:11, 408:7, 408:14, 415:14, 416:14,
416:19, 417:17, 419:8, 420:19, 420:21,
423:19, 423:23, 424:3, 425:2, 437:5,
439:1, 439:2, 458:3
    **Depot** [2] - 402:1, 402:4
    **described** [4] - 275:9, 365:17, 368:12,
456:6
    **description** [2] - 309:1, 453:21
    **designate** [1] - 373:1
    **designated** [5] - 373:3, 373:8, 373:13,
373:21, 460:11
    **designating** [1] - 373:20
    **designations** [3] - 373:17, 374:5
    **designed** [2] - 289:10, 290:6
    **desk** [1] - 380:24
    **despite** [3] - 273:20, 289:2, 300:14
    **detail** [4] - 287:19, 323:3, 396:6, 397:2
    **details** [1] - 365:20
    **determination** [2] - 295:22, 295:25
    **determine** [16] - 275:22, 292:10,
292:17, 295:15, 298:4, 308:24, 320:15,
320:17, 320:18, 320:23, 321:22,
328:11, 347:22, 356:13, 359:15, 453:14
    **determined** [3] - 298:10, 307:15,
358:25
    **Diamond** [1] - 267:21
    **diamond** [1] - 391:4
    **diamonds** [1] - 391:3
    **differ** [1] - 270:20
    **difference** [1] - 311:14
    **differences** [1] - 360:16
    **different** [23] - 269:15, 271:12, 305:23,
309:10, 310:24, 311:21, 324:15,
324:16, 324:17, 329:3, 329:6, 329:9,
329:19, 345:10, 345:13, 348:20, 392:8,
392:12, 409:11, 424:17, 459:9, 459:10
    **differentiation** [1] - 360:21

    **DIRECT** [6] - 375:7, 381:24, 389:13,
462:6, 462:9, 462:16
    **direct** [12] - 270:13, 276:22, 294:11,
297:10, 297:17, 363:8, 364:2, 366:12,
388:1, 442:9, 450:15, 450:17
    **directed** [3] - 275:23, 275:24, 373:14
    **directing** [1] - 388:7
    **directly** [3] - 309:2, 340:23, 455:2
    **disability** [1] - 382:19
    **disagree** [1] - 333:10
    **discarded** [2] - 379:24, 380:1
    **disclosed** [2] - 453:5, 454:18
    **disclosure** [3] - 272:18, 350:15,
353:25
    **discount** [1] - 453:9
    **discovered** [1] - 448:6
    **discovery** [3] - 340:16, 340:21, 340:24
    **discuss** [4] - 340:6, 364:2, 364:5,
421:22
    **discussed** [17] - 280:2, 280:18,
281:21, 282:17, 285:2, 287:8, 288:12,
288:13, 288:14, 350:13, 357:10, 360:7,
363:2, 363:17, 364:1, 368:24, 392:5
    **discussing** [1] - 415:6
    **discussion** [3] - 280:21, 333:16, 420:5
    **discussions** [1] - 356:20
    **dismissed** [1] - 445:6
    **dispensed** [2] - 397:11, 398:12
    **dispose** [1] - 386:16
    **disposition** [2] - 345:6, 351:11
    **disputed** [1] - 457:8
    **disregard** [1] - 451:1
    **distinction** [3] - 322:3, 366:17, 366:18
    **distributor** [1] - 338:6
    **District** [3] - 273:4, 446:24, 447:5
    **DISTRICT** [3] - 267:1, 267:1, 267:12
    **Division** [1] - 273:13
    **DJ** [14] - 346:6, 346:13, 347:1, 383:20,
384:2, 428:16, 429:5, 429:9, 429:13,
429:25, 430:5, 430:11, 430:18
    **document** [26] - 287:3, 317:24,
348:14, 348:18, 348:19, 354:12,
373:24, 385:18, 385:22, 388:7, 405:13,
414:4, 414:9, 414:11, 414:15, 414:17,
414:23, 414:25, 418:14, 432:2, 432:4,
432:9, 450:16, 450:18, 450:22, 450:24
    **documented** [1] - 368:14
    **documenting** [1] - 348:4
    **documents** [15] - 275:23, 276:7,
277:3, 297:12, 320:23, 323:1, 326:6,
326:19, 327:9, 344:8, 350:5, 354:24,
432:11, 441:5, 441:6
    **dollar** [5] - 319:21, 335:11, 335:20,
336:8, 458:3
    **dollars** [4] - 336:21, 359:16, 391:3,
402:4
    **DOLLARS** [1] - 267:8
    **Dolly** [3] - 313:6, 315:11, 365:25
    **domain** [2] - 448:8, 448:13
    **done** [20] - 296:2, 326:8, 327:21,

329:18, 329:21, 332:11, 342:2, 352:4,
379:3, 379:23, 380:1, 380:17, 402:13,
417:14, 423:20, 432:19, 435:20,
437:19, 454:11, 457:11
**Donuts** [1] - 396:4
**door** [11] - 377:10, 377:18, 383:16,
383:18, 384:8, 387:4, 387:12, 395:7,
396:24, 396:25
**double** [2] - 403:5, 403:8
**doubt** [1] - 335:19
**down** [31] - 304:2, 304:6, 317:13,
322:13, 329:8, 343:8, 354:3, 369:11,
371:17, 378:23, 379:1, 380:6, 381:14,
383:10, 383:15, 386:7, 389:5, 393:9,
393:10, 397:13, 399:1, 413:5, 420:3,
422:8, 423:22, 431:16, 433:3, 440:5,
445:11, 445:25, 451:6
**downstairs** [4] - 400:10, 400:18,
433:22
**downtown** [1] - 375:20
**dozen** [1] - 437:10
**draft** [4] - 270:9, 270:19, 270:20,
288:24
**drafting** [3] - 270:18, 270:19, 360:13
**draw** [3] - 298:15, 318:8, 372:13
**drawer** [5] - 399:7, 399:17, 449:8,
449:10, 449:12
**drawn** [1] - 361:25
**draws** [1] - 317:11
**dressed** [1] - 395:25
**dressing** [1] - 427:21
**drew** [5] - 274:4, 307:4, 341:22, 348:25
**drill** [1] - 304:2
**drink** [2] - 377:10, 425:18
**drinks** [1] - 426:2
**drive** [2] - 390:3, 395:25
**drugs** [1] - 436:16
**duffle** [1] - 410:25
**duly** [4] - 268:3, 375:5, 381:18, 389:9
**During** [1] - 443:16
**during** [26] - 276:10, 293:18, 298:4,
323:13, 343:6, 345:3, 347:25, 358:5,
363:8, 378:12, 378:13, 383:19, 383:20,
386:15, 394:16, 399:20, 402:7, 417:24,
428:3, 442:13, 443:24, 444:13, 446:17,
447:25, 449:21, 450:5
**duties** [4] - 271:4, 273:5, 273:11,
401:23

---

# E

**e-mails** [1] - 351:7
**early** [2] - 355:18, 450:9
**easier** [1] - 379:2
**easily** [3] - 368:1, 368:13, 368:14
**East** [1] - 267:22
**EAST** [1] - 267:15
**Eastern** [3] - 273:4, 446:24, 447:5
**EASTERN** [1] - 267:1

**easy** [1] - 457:3
**economy** [1] - 428:9
**educational** [1] - 390:12
**effect** [2] - 281:16, 417:12
**effective** [5] - 355:5, 355:23, 356:4,
356:15, 357:4
**effectuate** [1] - 270:2
**effort** [1] - 300:14
**efforts** [1] - 314:17
**eight** [10] - 306:20, 319:23, 320:19,
320:20, 334:7, 335:6, 410:22, 425:6,
430:20, 458:3
**Eighty** [1] - 375:20
**either** [14] - 291:11, 293:3, 331:9,
387:16, 398:2, 400:14, 407:13, 408:21,
417:6, 421:16, 421:21, 422:23, 428:8,
449:9
**element** [2] - 455:21, 456:18
**elements** [3] - 271:9, 384:7, 416:11
**elicit** [2] - 364:17, 367:8
**elicited** [2] - 362:18, 363:9
**elsewhere** [1] - 331:16
**emphasize** [1] - 458:19
**employe** [1] - 375:10
**employed** [6] - 268:15, 375:9, 375:11,
382:4, 394:20, 418:22
**employee** [11] - 271:3, 271:5, 275:16,
316:24, 370:17, 370:25, 371:1, 395:4,
449:20, 449:22, 449:24
**employees** [14] - 275:7, 275:18,
276:14, 290:17, 345:1, 345:4, 345:8,
384:19, 384:21, 385:7, 385:9, 394:20,
395:14, 431:6
**employment** [2] - 376:9, 450:24
**enabled** [2] - 275:21, 340:7
**enactment** [2] - 357:5, 357:9
**encompass** [1] - 319:3
**encountered** [1] - 294:6
**end** [8] - 299:8, 335:13, 378:21,
383:16, 386:18, 394:9, 441:19, 451:1
**ends** [1] - 325:4
**enforcement** [1] - 271:2
**engage** [1] - 331:4
**engaged** [5] - 289:9, 330:4, 331:11,
365:1, 455:25
**engaging** [2] - 321:3, 357:3
**enhances** [1] - 455:23
**entered** [1] - 281:15
**entertain** [1] - 394:12
**entertainment** [8] - 359:9, 392:20,
393:14, 393:15, 393:17, 420:7, 420:18,
427:9
**enthusiastic** [1] - 453:24
**entire** [2] - 279:9, 416:5
**entirely** [3] - 346:13, 459:9, 459:10
**entitled** [1] - 459:12
**entries** [4] - 286:25, 341:6, 354:4,
405:21
**entry** [8] - 281:17, 281:21, 283:11,

283:13, 283:24, 284:2, 285:6, 287:21
**equal** [1] - 283:22
**equally** [1] - 453:18
**equation** [2] - 297:7, 297:15, 299:24
**errata** [1] - 444:10
**errors** [1] - 354:24
**Escape** [1] - 390:5
**ESQ** [2] - 267:20, 267:20
**essence** [1] - 357:17
**essentially** [8] - 343:8, 343:23, 343:25,
344:16, 407:11, 408:7, 417:1, 444:3
**establish** [1] - 289:25
**establishing** [1] - 289:17
**establishment** [4] - 284:7, 392:24,
393:7, 394:12
**establishments** [1] - 407:21
**evade** [5] - 289:23, 297:11, 297:18,
367:16, 410:11
**evaluated** [2] - 274:9, 347:19
**evaluation** [2] - 296:11, 326:21
**evasion** [7] - 316:15, 335:17, 335:23,
341:19, 344:2, 365:1, 456:10
**evasive** [3] - 328:9, 329:16, 339:15
**evening** [2] - 383:15, 384:1
**event** [1] - 409:7
**events** [1] - 453:21
**eventually** [2] - 427:2, 429:3
**evidence** [25] - 273:24, 274:6, 274:8,
274:14, 289:15, 289:20, 289:21,
297:10, 297:17, 298:14, 298:17,
317:24, 349:15, 352:23, 353:10,
354:10, 354:17, 363:7, 364:6, 369:22,
421:18, 421:23, 451:23, 456:13
**evidentiary** [1] - 455:17
**ex** [1] - 435:22
**ex-wife** [1] - 435:22
**exact** [3] - 323:8, 333:15, 364:13
**exactly** [13] - 273:1, 290:1, 292:10,
292:18, 295:9, 352:4, 365:20, 413:22,
416:8, 420:10, 421:9, 435:1, 457:19
**EXAMINATION** [21] - 268:13, 310:1,
328:16, 340:2, 358:1, 362:15, 375:7,
381:24, 387:23, 388:19, 389:13, 413:1,
442:5, 462:1, 462:3, 462:6, 462:9,
462:11, 462:13, 462:16, 462:18
**examination** [12] - 268:12, 272:7,
342:5, 358:3, 359:19, 360:7, 361:16,
363:8, 388:1, 441:24, 442:10, 450:17
**examine** [2] - 273:15, 316:19
**examined** [5] - 354:13, 372:1, 375:5,
381:18, 389:9
**example** [12] - 271:14, 321:11, 324:6,
324:23, 362:1, 368:25, 380:19, 403:12,
403:19, 456:25, 457:10
**exceed** [1] - 324:2
**exceeded** [1] - 366:16
**except** [1] - 372:21
**exception** [1] - 298:11
**exceptions** [1] - 297:22
**excess** [5] - 359:1, 359:17, 367:23,

368:23, 458:10
exchange [3] - 401:7, 452:17, 460:9
exchanged [1] - 400:19
exchanging [1] - 337:24
exclusively [1] - 307:18
exculpatory [3] - 274:7, 274:14, 288:4
excuse [4] - 270:14, 384:12, 447:1, 447:22
excused [1] - 371:19
exercise [1] - 354:10
Exhibit [80] - 268:6, 270:4, 283:1, 283:3, 287:3, 288:19, 288:20, 294:21, 296:20, 300:2, 300:9, 300:20, 308:17, 310:17, 310:19, 311:16, 311:17, 311:19, 311:23, 312:21, 318:13, 318:20, 319:2, 320:1, 322:20, 323:7, 323:14, 323:16, 326:10, 327:3, 327:6, 327:7, 327:10, 328:18, 328:23, 330:5, 346:12, 347:8, 348:19, 352:5, 352:11, 352:18, 353:5, 353:12, 353:14, 354:23, 360:8, 364:6, 365:15, 365:25, 374:2, 374:3, 378:4, 380:19, 385:17, 388:8, 388:11, 388:22, 403:10, 404:5, 413:25, 414:14, 414:22, 416:23, 417:16, 418:12, 419:11, 419:14, 421:18, 421:23, 431:25, 439:11, 441:5, 450:12, 450:14, 457:14, 459:17
exhibit [9] - 318:22, 323:13, 346:16, 352:9, 352:22, 353:7, 353:13, 372:12, 445:12
Exhibits [3] - 359:21, 361:10, 459:18
exist [1] - 332:17
existed [1] - 361:20
existence [2] - 272:4, 414:8
exists [1] - 314:16
expanded [3] - 276:13, 278:3, 438:20
expect [1] - 459:25
expenditures [1] - 342:6
expenses [2] - 431:23, 451:7
experience [11] - 269:12, 298:18, 308:11, 311:2, 312:9, 315:6, 315:22, 329:15, 330:3, 330:6, 332:8
experiences [2] - 350:8, 350:9
expert [7] - 296:8, 308:8, 317:16, 317:18, 326:15, 328:6, 355:22
expertise [1] - 308:14
explain [7] - 334:12, 369:7, 380:5, 420:6, 427:18, 437:6, 456:12
explained [20] - 269:6, 292:15, 300:15, 303:23, 325:19, 325:20, 329:25, 346:16, 346:17, 346:20, 346:24, 348:1, 368:25, 369:5, 369:10, 421:6, 435:18, 438:5, 440:7
explaining [2] - 438:19, 456:23
explanation [2] - 458:12, 458:14
explanations [2] - 333:8, 357:14
express [1] - 452:23
extension [2] - 338:24, 435:19
extent [5] - 292:24, 303:22, 356:24, 360:12, 453:20

extra [5] - 400:17, 409:15, 409:16, 417:21, 417:22
extraordinarily [1] - 458:20

F

face [4] - 292:17, 314:22, 347:20, 446:3
facilities [1] - 427:21
fact [58] - 271:17, 273:18, 273:20, 278:14, 280:20, 284:19, 287:17, 287:23, 287:24, 291:23, 293:7, 297:21, 297:24, 298:1, 298:4, 298:8, 302:15, 303:4, 303:16, 307:25, 308:24, 311:21, 313:4, 316:18, 317:4, 317:14, 320:17, 321:5, 322:2, 325:2, 325:15, 329:6, 335:3, 335:7, 338:18, 340:10, 343:19, 346:7, 348:3, 350:12, 350:17, 356:8, 356:23, 357:10, 359:15, 366:13, 366:24, 369:9, 445:2, 446:14, 449:24, 450:2, 450:5, 450:21, 453:5, 457:16
factor [2] - 290:5, 316:3
factors [2] - 274:10, 274:16, 298:10, 341:15, 357:8
facts [14] - 274:3, 274:13, 296:2, 296:12, 299:10, 299:13, 308:2, 344:10, 344:19, 344:20, 344:22, 345:10, 345:14
factual [1] - 344:9
fair [88] - 269:13, 269:17, 269:18, 270:17, 270:24, 271:10, 273:10, 273:16, 273:19, 273:22, 275:4, 275:15, 277:3, 282:2, 282:4, 283:5, 283:15, 284:1, 284:3, 284:5, 284:10, 285:6, 287:21, 288:1, 288:2, 288:3, 289:8, 290:3, 290:12, 290:19, 291:1, 291:19, 294:8, 296:24, 298:13, 298:16, 298:25, 299:1, 299:25, 304:2, 307:24, 308:11, 314:18, 314:21, 315:22, 316:15, 317:8, 318:10, 319:16, 319:25, 320:12, 320:21, 321:7, 321:11, 328:20, 328:22, 331:21, 331:24, 332:19, 337:4, 341:5, 341:19, 342:5, 342:8, 342:15, 343:10, 347:21, 349:19, 352:16, 352:19, 356:10, 356:12, 365:13, 381:4, 383:10, 386:10, 394:11, 396:20, 403:19, 404:19, 405:10, 405:13, 408:8, 417:3, 418:25, 430:3, 433:5, 449:21
fairness [1] - 288:6
fall [5] - 269:21, 269:24, 419:19, 421:22, 425:13
falls [1] - 324:9
familiar [3] - 308:12, 419:9, 436:21
far [9] - 343:20, 344:1, 344:11, 365:14, 367:11, 408:12, 434:23, 458:2
farthest [1] - 408:19
fashion [2] - 291:4, 453:25
father [1] - 391:24
father's [1] - 392:3
FAX [1] - 267:23

fearful [1] - 417:13
February [6] - 293:15, 345:18, 402:16, 422:8, 422:12, 440:13
federal [2] - 395:15, 446:22
fee [7] - 377:12, 380:12, 406:10, 426:6, 427:19, 427:20, 429:3
feeds [1] - 361:24
fees [15] - 341:16, 346:9, 384:4, 384:6, 384:7, 384:14, 384:15, 384:17, 426:4, 426:22, 427:18, 428:15, 428:18, 429:2, 429:4
feet [2] - 396:24, 410:20
fell [1] - 324:22
felt [3] - 350:16, 424:5, 459:7
few [7] - 285:12, 297:22, 390:4, 391:13, 402:15, 409:4, 426:21
fields [2] - 344:14, 451:9
fifth [1] - 353:7
Fifth [3] - 345:20, 345:22, 346:2, 346:5, 347:4, 347:5, 351:20, 453:4, 453:7, 453:11, 453:17, 454:6, 454:16
FIFTH [1] - 267:19
fifties [11] - 334:6, 334:9, 334:11, 337:21, 421:8, 433:1, 437:5, 437:8, 439:3, 439:5, 439:6
fifty [4] - 406:5, 406:6, 406:11
fifty-three [1] - 406:6
figure [1] - 405:19
figures [8] - 335:8, 349:2, 353:8, 359:2, 359:18, 397:22, 406:3, 406:17
file [15] - 279:2, 279:24, 279:25, 280:1, 280:3, 280:21, 293:25, 324:7, 324:14, 324:19, 418:1, 418:3, 423:11, 448:16, 452:17
filed [34] - 291:23, 291:24, 293:21, 293:22, 296:20, 296:23, 296:24, 297:5, 298:5, 298:8, 299:9, 300:2, 300:13, 300:15, 300:16, 322:23, 323:2, 323:14, 323:19, 323:20, 323:23, 324:1, 325:16, 338:18, 366:20, 366:22, 367:12, 369:1, 369:14, 423:17, 436:10, 446:23, 447:4, 447:22
files [2] - 300:23, 325:12
filing [18] - 286:19, 289:3, 290:16, 290:18, 292:11, 292:18, 293:23, 297:11, 297:19, 324:12, 325:2, 325:6, 325:20, 351:20, 361:21, 366:13, 368:23, 369:4
fill [5] - 284:6, 302:16, 306:18, 350:15, 449:5
filled [5] - 302:11, 304:25, 306:23, 307:22, 350:21
filling [1] - 302:25
Fillipone [1] - 341:16
fills [1] - 425:2
final [2] - 270:21, 353:9
finally [5] - 435:22, 435:25, 437:25, 456:8, 457:25
financial [9] - 269:2, 269:14, 275:17, 305:20, 325:4, 326:25, 350:15, 362:11

findings [1] - 452:23
fine [6] - 328:15, 371:24, 431:5, 433:2, 452:14, 456:11
fines [2] - 384:10, 384:13
finish [1] - 402:13
finished [1] - 392:10
fire [1] - 448:2
firearms [3] - 315:18, 316:3, 317:3
firing [1] - 376:25
firm [3] - 313:19, 340:22, 351:9
firms [1] - 390:25
first [42] - 279:4, 279:5, 313:19, 320:19, 324:21, 335:17, 335:23, 343:24, 347:19, 353:23, 356:3, 370:8, 370:23, 371:14, 374:7, 375:3, 375:5, 381:18, 382:22, 389:9, 390:19, 392:23, 396:10, 396:14, 397:4, 404:15, 405:16, 407:9, 407:17, 407:24, 414:8, 426:8, 426:17, 426:25, 427:24, 429:16, 450:5, 453:1, 456:2, 456:9, 459:7
Fisherman's [1] - 389:18
fit [1] - 410:24
five [7] - 396:3, 396:24, 399:1, 399:17, 410:17, 449:3
fives [6] - 337:13, 398:22, 399:20, 399:22, 433:1, 433:12
flipping [1] - 323:10
FLOOR [2] - 267:15, 267:19
flow [1] - 273:14
flows [1] - 341:1
fly [2] - 317:9, 318:4
flying [1] - 337:10
focus [1] - 447:10
focussed [1] - 269:19
fold [1] - 387:1
follow [8] - 269:22, 279:13, 279:14, 280:14, 284:20, 301:13, 312:13, 447:2
follow-up [2] - 280:14, 301:13
followed [1] - 314:14
following [1] - 398:10
follows [4] - 268:4, 375:6, 381:19, 389:10
font [1] - 383:18
food [5] - 338:6, 338:7, 377:10, 394:14, 425:18
force [8] - 271:20, 271:22, 271:24, 272:4, 272:17, 273:2, 273:3, 382:18
forces [1] - 271:23
Ford [2] - 390:4, 390:5
forearm [1] - 411:6
foreign [5] - 306:5, 306:7, 306:9, 306:11, 437:18
Forest [1] - 382:17
forfeit [3] - 273:5, 273:7, 273:9
forfeiture [4] - 268:22, 269:1, 269:3, 269:21
forgive [1] - 457:5
forgot [1] - 448:4
form [20] - 292:18, 340:7, 378:7,

378:10, 378:12, 378:18, 381:1, 385:18, 385:22, 386:10, 386:15, 387:16, 421:24, 432:4, 432:6, 432:20, 450:25, 451:6, 451:11
formed [1] - 458:21
former [3] - 345:8, 449:20, 450:8
forms [1] - 336:13
forth [9] - 289:5, 308:3, 319:1, 319:2, 319:24, 320:8, 344:15, 373:13, 375:24
forthcoming [1] - 339:15
forward [4] - 347:18, 349:7, 417:25, 461:13
forwarded [2] - 288:25, 301:7
four [6] - 311:21, 319:24, 359:1, 417:21, 431:15, 448:1
Fourth [1] - 375:20
fourth [2] - 353:6, 449:22
frankly [5] - 296:12, 453:10, 453:24, 455:6, 456:4
fraud [2] - 311:4, 311:5
free [1] - 351:16
Friday [10] - 394:18, 402:12, 402:14, 406:1, 409:17, 417:23, 425:9, 426:18, 427:13, 428:4
friend [1] - 392:4
front [18] - 296:21, 378:3, 383:15, 383:16, 384:8, 385:17, 387:3, 388:9, 403:11, 403:13, 414:1, 431:25, 443:9, 444:18, 445:10, 446:12, 446:22, 454:7
full [5] - 390:17, 394:24, 395:1, 395:3, 415:5
full-time [3] - 394:24, 395:1, 395:3
fully [5] - 302:19, 312:12, 339:5, 340:10, 393:16
fund [1] - 335:11
funds [4] - 273:5, 273:9, 274:10, 340:14
furniture [1] - 382:11
Fusion [1] - 390:4

## G

Gallagher [1] - 404:24
Gallagher's [25] - 297:24, 308:19, 375:10, 382:6, 382:8, 382:20, 392:20, 393:2, 393:11, 393:12, 393:19, 405:7, 407:18, 407:21, 407:22, 407:24, 408:2, 408:4, 426:4, 427:8, 448:7, 448:13, 450:2
gander [1] - 370:24
garbage [2] - 380:23, 380:24
gathering [1] - 276:2
gee [1] - 367:15
general [2] - 313:11, 340:18, 375:13, 376:2, 376:22, 376:24, 378:15, 379:19, 395:18, 398:19, 429:23, 430:17, 430:19
generally [5] - 284:13, 361:18, 367:6, 396:22, 410:3
generated [3] - 303:8, 333:21, 383:23

gift [5] - 422:17, 422:18, 422:23, 426:3
girl [1] - 427:19
girls [4] - 402:12, 421:1, 428:12, 429:17
Giuliani [1] - 393:14
given [9] - 277:15, 293:5, 385:4, 406:17, 436:4, 447:2, 454:8, 456:19, 460:9
glad [1] - 454:1
Gleason [6] - 345:6, 370:22, 370:24, 371:24, 395:19, 461:9
gleason [1] - 376:13
goose [1] - 370:23
govern [1] - 269:23
Government [11] - 323:13, 352:11, 353:5, 353:12, 360:7, 388:8, 388:10, 404:5, 418:11, 445:19, 445:21
government [47] - 272:13, 288:22, 295:16, 296:9, 350:6, 351:17, 352:8, 352:22, 353:14, 353:23, 370:8, 370:13, 370:17, 370:18, 370:20, 371:5, 371:14, 372:15, 372:25, 381:12, 452:4, 452:10, 453:1, 453:11, 453:13, 454:2, 454:4, 454:5, 454:6, 454:14, 454:17, 455:10, 455:12, 455:15, 455:18, 455:22, 456:20, 456:22, 457:3, 457:12, 457:21, 457:24, 458:1, 458:4, 458:8, 458:17, 461:9
government's [5] - 354:18, 453:25, 454:21, 458:18, 459:22
Government's [4] - 450:12, 450:14, 450:15, 459:17
governs [1] - 362:10
grabbed [1] - 411:5
graduate [1] - 390:13
graduated [1] - 391:24
grant [1] - 454:15
Graph [2] - 340:20, 340:23
greatly [1] - 455:23
Greg [1] - 276:9
grind [1] - 455:19
grown [1] - 394:22
Guerci [14] - 268:15, 272:24, 296:20, 304:2, 314:1, 340:4, 352:7, 358:3, 434:6, 434:16, 434:25, 454:23, 458:2, 458:5
guess [12] - 303:20, 321:3, 338:6, 338:18, 353:16, 354:11, 370:1, 400:3, 408:12, 413:11, 418:22, 421:7
guessing [1] - 343:18
Guiterrez [5] - 276:5, 290:8, 290:21, 301:8, 301:9
Guitterrez [1] - 314:7
gun [8] - 359:21, 390:22, 409:2, 409:3, 418:8, 438:22, 439:9
guru [1] - 296:9

## H

**half** [5] - 410:20, 427:25, 428:13, 428:22, 434:19
**hand** [26] - 288:22, 334:6, 349:15, 358:14, 358:19, 359:2, 359:17, 362:19, 362:21, 363:10, 363:11, 370:18, 376:20, 379:3, 388:10, 403:14, 403:16, 404:19, 410:20, 411:5, 411:7, 433:4, 444:21, 445:19, 447:3
**handed** [1] - 268:10
**handing** [3] - 270:5, 277:19, 455:2
**handle** [2] - 377:1, 388:13
**handled** [7] - 344:5, 344:16, 346:10, 401:17, 405:10, 405:12, 415:16
**handles** [2] - 419:9, 423:25
**handling** [1] - 383:13
**hang** [1] - 442:21
**hard** [4] - 372:2, 447:2, 457:7, 458:10
**hated** [1] - 347:11
**headquarters** [1] - 413:11
**hear** [5] - 362:17, 435:21, 457:2, 457:12, 460:5
**heard** [13] - 345:18, 345:20, 346:2, 346:5, 346:8, 368:22, 421:10, 426:4, 434:6, 441:6, 453:10, 459:12
**hearing** [1] - 350:18
**heavily** [1] - 454:5
**heavy** [1] - 410:19
**held** [3] - 304:16, 391:8, 391:10
**help** [2] - 391:23, 452:20
**helped** [1] - 424:6
**helpful** [2] - 353:22, 354:14
**helps** [1] - 340:9
**hide** [4] - 315:7, 316:6, 317:19, 338:10
**hiding** [2] - 454:12, 454:13
**hierarchy** [2] - 360:1, 449:22
**high** [4] - 390:13, 391:22, 399:19, 410:23
**higher** [2] - 360:4, 365:24
**highest** [1] - 449:22
**highlighted** [1] - 373:22
**highly** [1] - 453:12
**HILL** [2] - 267:16, 460:8
**Hill** [1] - 404:12
**Hills** [1] - 382:17
**himself** [1] - 434:24
**hired** [1] - 375:23
**hiring** [1] - 376:24
**history** [3] - 375:13, 382:9, 450:23
**hold** [4] - 286:12, 332:9, 387:13, 390:14
**holds** [3] - 286:2, 286:7, 446:10
**hole** [1] - 362:8
**holiday** [1] - 428:13
**holidays** [1] - 425:14
**home** [1] - 431:2
**Honor** [27] - 271:25, 272:13, 272:21, 296:14, 328:5, 339:22, 352:21, 352:24,

355:2, 368:15, 369:19, 371:16, 373:11, 388:15, 404:4, 404:13, 430:9, 441:22, 442:4, 442:24, 447:1, 451:18, 451:21, 454:25, 455:1, 460:8, 461:8
**Honor's** [2] - 296:7, 369:20
**HONORABLE** [1] - 267:12
**hooked** [1] - 305:9
**horse** [1] - 327:24
**hour** [3] - 402:11, 434:19
**hours** [6] - 372:2, 376:9, 383:8, 394:17, 413:7, 445:6
**house** [38] - 346:6, 346:7, 346:11, 346:13, 346:14, 346:25, 347:1, 377:12, 380:12, 383:20, 384:1, 384:6, 384:7, 384:17, 396:3, 400:1, 427:18, 427:19, 428:15, 428:16, 428:18, 429:2, 429:3, 429:4, 429:5, 429:9, 429:14, 429:20, 429:25, 430:5, 430:6, 430:11, 430:16, 437:15, 438:20, 441:15
**house-mom** [3] - 383:20, 384:1, 400:1
**HUNDRED** [1] - 267:7
**hundred** [3] - 389:22, 402:5, 406:5
**hundreds** [11] - 331:9, 334:6, 334:9, 334:11, 336:20, 337:22, 391:3, 421:8, 437:5, 437:8, 439:3, 439:6, 439:7
**Hybrid** [2] - 390:4, 390:5

## I

**idea** [6] - 302:3, 395:4, 411:21, 424:13, 424:17, 426:9
**identified** [6] - 291:10, 292:16, 308:25, 310:15, 325:9, 434:24
**identifies** [1] - 354:25
**identify** [3] - 273:12, 311:14, 317:14
**illegal** [2] - 355:12, 355:20
**immediately** [1] - 409:8
**immunity** [1] - 454:15
**impact** [3] - 296:1, 357:11, 359:12
**impatience** [1] - 369:21
**impeachment** [3] - 369:25, 372:7, 372:9
**importance** [1] - 348:9
**important** [7] - 273:22, 273:24, 290:3, 296:13, 321:9, 454:15, 459:4
**importantly** [1] - 321:10
**impossible** [1] - 411:22
**improper** [2] - 347:16, 417:14
**Inc** [9] - 392:25, 393:19, 400:23, 404:24, 405:4, 445:22, 446:1, 446:15
**inches** [2] - 399:19, 410:23
**include** [1] - 288:6
**included** [4] - 288:8, 384:17, 427:18, 428:15
**income** [12] - 292:15, 344:4, 344:13, 344:15, 345:23, 345:25, 349:10, 351:20, 425:3, 436:17, 440:25, 451:6
**inconsistency** [1] - 372:7
**inconsistent** [6] - 317:8, 326:16,

326:18, 326:21, 327:6, 359:2
**Incorporated** [1] - 390:25
**incorporated** [2] - 392:21, 408:1
**increase** [1] - 425:16
**increased** [1] - 450:6
**increments** [1] - 319:18
**indeed** [4] - 455:25, 456:6, 457:15, 458:2
**independent** [2] - 427:20, 429:6
**indicate** [9] - 273:25, 274:8, 274:14, 280:17, 312:18, 312:19, 325:13, 358:22, 379:1
**indicated** [26] - 280:3, 280:4, 280:14, 284:18, 287:24, 288:13, 295:9, 304:15, 306:17, 312:16, 333:3, 339:4, 343:25, 347:14, 349:7, 349:10, 352:3, 357:6, 358:8, 358:18, 359:9, 363:15, 364:9, 365:10, 369:9, 447:14
**indicates** [2] - 312:8, 314:22
**indicating** [3] - 312:11, 333:14, 411:3
**indication** [1] - 280:21
**indicative** [1] - 315:6
**individual** [6] - 276:4, 276:6, 276:8, 292:16, 342:6, 360:23
**individuals** [4] - 290:18, 315:10, 336:14, 365:23
**industry** [1] - 393:15
**infer** [1] - 333:11
**info** [1] - 288:2
**informants** [1] - 454:6
**information** [35] - 272:19, 275:6, 275:8, 275:9, 275:10, 275:16, 275:20, 275:22, 276:13, 277:4, 277:11, 281:9, 287:14, 287:16, 288:3, 293:1, 295:16, 304:18, 320:16, 339:10, 341:9, 342:14, 347:19, 380:1, 380:10, 386:19, 397:16, 401:16, 406:21, 416:7, 436:3, 445:23, 451:5, 451:10, 451:14
**informed** [5] - 295:6, 315:10, 339:1, 350:14, 364:9
**informing** [2] - 289:3, 350:7
**inherently** [3] - 325:22, 325:23, 325:24
**initial** [2] - 355:10, 460:21
**innocently** [1] - 325:16
**inordinately** [1] - 334:3
**inquire** [3] - 342:20, 350:11, 442:3
**inquired** [4] - 295:4, 295:18, 301:13, 333:6
**inside** [3] - 302:1, 302:5, 387:13
**installer** [1] - 382:11
**instances** [1] - 359:1
**instead** [3] - 353:17, 410:13, 450:9
**instituted** [1] - 283:9
**institution** [4] - 275:17, 305:20, 326:25, 397:23
**institutions** [2] - 325:4, 362:11
**instruction** [1] - 417:6
**insurance** [4] - 342:18, 342:21, 434:7, 434:9
**intent** [7] - 289:20, 289:23, 297:18,

357:6, 453:15, 455:24, 456:17
**intentionally** [2] - 355:13, 457:22
**intents** [1] - 341:17
**interaction** [3] - 284:20, 376:17, 401:23
**interactions** [1] - 276:22
**interested** [1] - 408:13
**Internal** [1] - 268:18
**interview** [13] - 331:18, 332:6, 345:1, 345:4, 347:21, 348:6, 358:4, 358:6, 358:13, 359:6, 368:19, 442:10, 442:13
**interviewed** [4] - 285:24, 331:22, 332:3, 368:18
**introduce** [1] - 461:10
**investigation** [20] - 271:7, 273:21, 274:9, 275:4, 276:11, 292:5, 292:7, 292:12, 292:13, 292:19, 329:7, 332:10, 342:21, 343:17, 343:21, 356:12, 356:16, 356:17, 358:22, 359:11
**Investigation** [1] - 273:13
**investigations** [1] - 335:17
**investigative** [1] - 332:2
**investigator** [4] - 269:2, 269:14, 418:19, 418:20
**investigatory** [1] - 456:20
**invocation** [2] - 453:7, 453:17
**invoke** [2] - 327:24, 454:16
**invokes** [1] - 453:11, 454:6
**involve** [2] - 361:22, 401:23
**involved** [12] - 292:13, 316:22, 331:9, 350:9, 360:23, 361:1, 366:12, 366:14, 402:9, 424:18, 448:3, 455:2
**involvement** [1] - 350:6
**involving** [1] - 448:2
**ions** [1] - 268:8
**irrelevant** [1] - 372:16
**IRS** [16] - 268:25, 269:12, 271:9, 273:13, 311:2, 312:9, 335:16, 335:24, 342:2, 348:9, 364:15, 368:1, 368:5, 368:10, 433:19, 434:24
**Island** [5] - 309:8, 390:2, 391:22, 393:24, 447:4
**issuance** [1] - 360:13
**issue** [5] - 370:8, 372:16, 372:19, 458:16, 459:12
**issued** [9] - 274:24, 275:2, 315:12, 316:23, 327:17, 336:7, 360:17, 360:18, 367:2
**issues** [4] - 362:2, 370:8, 453:8, 453:18
**issuing** [2] - 316:3, 360:1
**item** [1] - 419:6
**itself** [6] - 272:4, 292:17, 318:18, 344:11, 427:9, 455:9

---

**J**

**J.P** [6] - 358:12, 359:20, 360:9, 361:10, 363:22, 364:9

**Jessica** [4] - 276:5, 290:8, 301:8, 301:9
**jewelry** [7] - 390:24, 390:25, 391:4, 391:24, 392:9, 413:6, 415:7
**Jewelry** [3] - 392:2, 400:23, 415:6
**job** [3] - 295:14, 382:14, 450:2
**Joe** [9] - 343:21, 347:23, 379:3, 395:21, 429:23, 433:23, 441:6, 441:10, 441:13
**Johnson** [53] - 341:10, 341:15, 341:18, 341:20, 341:21, 342:13, 343:19, 343:23, 344:9, 344:18, 345:11, 345:12, 345:17, 345:20, 346:13, 346:15, 347:11, 347:24, 348:23, 348:25, 349:3, 349:5, 351:4, 351:19, 352:3, 376:17, 379:3, 395:21, 429:23, 430:7, 433:23, 441:10, 446:23, 448:7, 448:8, 448:12, 448:18, 448:21, 449:20, 449:21, 449:24, 450:2, 453:2, 453:14, 453:16, 453:24, 456:13, 456:21, 458:11, 459:19, 459:21, 459:22
**Johnson's** [10] - 342:13, 343:21, 345:18, 348:19, 395:11, 441:6, 455:19, 457:8, 459:16, 460:2
**jointly** [1] - 373:16
**Joseph** [6] - 341:9, 342:13, 376:17, 446:23, 450:10
**journal** [3] - 397:5, 397:8
**JP** [13] - 276:3, 277:7, 277:22, 289:4, 290:9, 292:25, 305:19, 306:25, 307:7, 309:10, 312:24, 315:10, 319:20
**Judge** [20] - 268:5, 274:21, 276:19, 279:8, 284:25, 288:7, 290:4, 293:16, 303:2, 304:10, 304:24, 307:11, 307:20, 307:21, 313:16, 339:19, 404:10, 445:16, 455:4, 460:19
**JUDGE** [1] - 267:12
**judging** [1] - 410:20
**judgment** [2] - 324:15, 324:19
**July** [18] - 267:10, 312:23, 319:2, 320:8, 320:9, 320:12, 320:14, 320:15, 320:17, 320:19, 321:12, 322:14, 323:2, 378:2, 392:3, 419:4
**June** [1] - 392:3
**justification** [1] - 333:12

---

**K**

**Kate** [1] - 276:8
**keep** [16] - 328:12, 354:22, 386:11, 387:11, 400:13, 424:21, 425:18, 425:22, 426:22, 433:4, 433:14, 433:21, 449:8, 449:16, 449:19, 452:2
**keeping** [1] - 436:23
**kept** [17] - 281:15, 358:14, 358:18, 358:19, 358:20, 388:25, 411:19, 411:21, 413:15, 432:9, 433:8, 433:22, 437:9, 437:20, 438:19, 439:1, 456:8
**Kevin** [1] - 283:20

**keys** [2] - 411:6, 434:1
**kickback** [1] - 347:1
**kind** [15] - 287:7, 303:21, 336:19, 367:8, 378:18, 380:10, 388:22, 390:3, 408:14, 415:7, 415:20, 439:21, 440:7, 440:8, 459:7
**kindly** [4] - 445:9, 446:21, 450:11, 450:14
**kinds** [2] - 269:12, 377:6
**knowledge** [34] - 270:15, 270:16, 289:11, 289:18, 289:20, 289:21, 290:1, 290:6, 291:7, 291:8, 291:14, 291:22, 291:25, 292:8, 293:4, 294:12, 304:1, 304:20, 305:5, 305:7, 305:22, 324:11, 324:12, 359:25, 362:10, 385:4, 385:9, 385:11, 385:15, 388:25, 436:12, 447:16, 447:17

---

**L**

**Labor** [1] - 428:11
**lack** [1] - 357:6
**lady** [2] - 419:22, 440:5
**Lane** [2] - 435:18, 435:23
**language** [1] - 296:3
**large** [11] - 297:25, 316:2, 316:22, 330:10, 333:17, 333:18, 333:19, 333:21, 334:3, 440:10, 459:25
**larger** [2] - 337:24, 445:10
**last** [14] - 283:13, 289:2, 306:20, 335:6, 382:1, 389:15, 389:23, 392:16, 416:18, 417:16, 426:20, 434:18, 446:18, 457:25
**late** [3] - 355:18, 361:3, 408:6
**latter** [2] - 296:12, 374:1
**laundering** [6] - 269:5, 355:25, 356:1, 436:13, 436:15, 436:20
**law** [11] - 271:2, 298:21, 299:3, 299:15, 299:17, 357:9, 362:8, 408:23, 408:25, 410:11, 445:3
**lawsuit** [2] - 448:2, 448:16
**lawyer** [4] - 349:22, 350:1, 401:19, 454:22
**lawyers** [2] - 288:22, 455:7
**leading** [1] - 430:9
**leanings** [1] - 452:24
**learn** [1] - 414:8
**learned** [5] - 293:7, 314:10, 315:14, 322:1, 448:17
**lease** [1] - 401:20
**least** [6] - 368:3, 384:25, 416:20, 417:18, 417:20, 460:10
**leave** [6] - 337:1, 368:1, 380:21, 396:3, 398:20, 399:18, 400:1, 431:22
**leaves** [4] - 335:14, 335:22, 337:4, 368:4
**leaving** [2] - 380:17, 382:18
**led** [1] - 283:6
**ledgers** [2] - 340:18, 341:2

**left** [8] - 304:2, 348:5, 386:2, 397:14, 398:18, 413:20, 448:8, 449:14

**legible** [2] - 377:22, 387:8

**length** [1] - 437:6

**less** [6] - 355:13, 369:12, 424:16, 425:6, 429:17, 444:4

**lesser** [1] - 319:17

**letter** [133] - 275:10, 278:11, 278:14, 278:17, 279:10, 279:19, 280:1, 280:4, 280:12, 280:18, 280:22, 281:5, 282:17, 282:20, 282:22, 284:10, 284:14, 285:1, 285:3, 285:9, 287:7, 287:17, 287:23, 287:24, 288:12, 288:13, 288:14, 288:17, 290:2, 293:11, 298:12, 300:22, 301:3, 301:11, 301:17, 301:20, 308:15, 309:9, 310:16, 311:1, 311:10, 312:23, 313:15, 313:17, 313:18, 313:21, 313:23, 313:24, 314:10, 314:11, 314:15, 314:16, 314:21, 315:3, 315:8, 315:22, 315:25, 316:8, 316:15, 316:20, 316:21, 316:23, 316:25, 317:8, 317:18, 317:21, 318:2, 318:7, 318:18, 319:2, 322:20, 326:11, 326:16, 327:2, 327:3, 327:11, 327:12, 327:16, 328:22, 328:23, 332:9, 358:8, 358:10, 360:8, 360:9, 360:14, 360:17, 360:18, 363:17, 363:22, 364:5, 364:8, 364:10, 364:11, 364:12, 364:13, 364:23, 364:24, 364:25, 365:6, 365:7, 365:9, 365:18, 365:20, 415:4, 415:12, 415:17, 415:19, 415:23, 416:4, 416:10, 416:12, 416:24, 417:9, 417:11, 418:21, 419:8, 421:17, 421:23, 422:1, 435:22, 435:25, 439:11, 439:15, 439:18, 439:25, 457:14, 457:15, 459:10

**letters** [23] - 301:10, 301:14, 301:18, 312:6, 313:18, 313:23, 314:3, 315:12, 327:5, 328:3, 330:5, 359:20, 359:23, 360:2, 361:9, 361:11, 361:12, 365:21, 439:16, 439:17, 439:21, 439:23, 459:6

**letting** [1] - 415:13

**level** [5] - 359:25, 360:12, 365:22, 365:23, 453:23

**levied** [1] - 435:4

**liability** [1] - 338:25

**license** [10] - 390:15, 390:16, 390:18, 391:5, 400:22, 415:5, 415:8, 418:20

**licenses** [1] - 390:14

**lieu** [1] - 371:24

**life** [1] - 342:11

**light** [1] - 414:10

**lights** [3] - 396:10, 396:11, 396:19

**likely** [1] - 453:6

**limited** [4] - 275:5, 276:11, 326:1, 326:19

**limiting** [1] - 330:1

**line** [9] - 277:16, 277:20, 286:18, 423:14, 443:13, 443:14, 443:22, 449:3

**lines** [1] - 342:8

**link** [3] - 306:16, 406:4

**Lipper** [2] - 436:2

**liquor** [4] - 346:3, 390:16, 394:14, 401:25

**list** [6] - 352:14, 378:23, 380:7, 386:2, 418:25, 419:1

**listed** [1] - 306:18

**listen** [3] - 305:21, 305:23, 314:1

**listening** [2] - 365:16, 435:2

**literally** [1] - 458:14

**litigation** [1] - 448:3

**live** [2] - 389:17, 390:1

**lived** [2] - 389:19, 389:23

**living** [1] - 420:16

**LLP** [1] - 267:18

**load** [1] - 335:13

**loaded** [2] - 322:8, 334:16

**loan** [3] - 351:5, 351:7, 441:16

**loaning** [2] - 441:10, 441:19

**local** [1] - 360:18

**located** [6] - 308:25, 310:9, 313:5, 382:16, 391:18, 393:3

**location** [6] - 309:7, 310:23, 316:4, 393:13, 393:18, 393:20

**log** [20] - 279:3, 280:21, 281:2, 281:24, 282:4, 282:5, 282:16, 282:20, 283:5, 283:8, 285:11, 285:16, 285:20, 286:25, 287:1, 288:9, 288:13, 288:15, 304:3

**logged** [1] - 285:6

**logs** [1] - 281:14

**Look** [1] - 457:5

**look** [62] - 270:4, 273:24, 274:6, 274:12, 282:13, 283:1, 283:3, 294:15, 294:20, 296:20, 300:20, 310:17, 311:23, 312:21, 314:15, 316:18, 316:19, 318:2, 318:13, 318:19, 318:22, 319:4, 320:1, 321:8, 321:16, 322:13, 323:1, 326:4, 326:5, 326:6, 328:18, 335:17, 335:24, 343:10, 352:18, 357:8, 368:10, 371:2, 371:3, 379:6, 385:17, 403:14, 404:9, 405:16, 413:25, 414:14, 414:22, 415:23, 417:10, 418:11, 418:14, 419:6, 419:14, 421:19, 431:25, 433:1, 445:14, 446:21, 449:2, 450:18, 459:17, 461:12

**looked** [13] - 274:3, 274:10, 274:16, 274:17, 281:24, 282:15, 286:25, 287:3, 309:1, 325:22, 342:17, 447:21

**looking** [19] - 275:22, 279:23, 281:3, 285:6, 288:15, 320:14, 326:1, 326:5, 327:2, 327:8, 335:23, 364:20, 364:22, 365:25, 367:14, 404:4, 404:11, 405:14

**looks** [2] - 418:24, 447:3

**loose** [1] - 411:4

**low** [2] - 365:22, 365:23

**lower** [3] - 403:14, 403:16, 445:19

**lower-right-hand** [1] - 445:19

**lumping** [1] - 429:2

**lunch** [1] - 374:8

**luncheon** [1] - 374:11

**lying** [1] - 457:16

**Lynch** [12] - 276:7, 307:15, 331:17, 339:2, 339:3, 339:5, 339:6, 424:10, 424:19, 424:20, 424:21, 435:7

**Lynk** [3] - 321:12, 321:24, 366:19

**Lynn** [1] - 435:23

---

# M

**machine** [50] - 284:7, 286:7, 302:4, 302:9, 302:11, 302:13, 302:15, 302:16, 304:13, 304:25, 305:9, 305:13, 305:15, 305:22, 306:17, 306:19, 306:23, 307:1, 307:3, 307:13, 322:7, 322:8, 334:14, 334:24, 335:4, 335:7, 336:5, 336:6, 336:11, 336:23, 336:24, 337:5, 361:25, 367:16, 367:20, 367:25, 397:2, 397:3, 397:14, 397:20, 397:21, 397:25, 400:10, 422:21, 422:22, 424:7, 425:25, 437:11, 438:3, 438:10

**machines** [2] - 285:23, 438:6

**magistrate** [2] - 310:5, 314:2

**Magistrate** [17] - 274:21, 276:12, 276:18, 279:8, 288:7, 290:4, 293:16, 303:2, 304:22, 304:24, 305:12, 307:11, 307:21, 313:16, 455:3

**mail** [3] - 311:3, 311:5, 405:6

**mailed** [2] - 310:8, 405:7

**mailing** [4] - 310:22, 311:16, 414:12, 414:17

**mailings** [2] - 311:3, 311:7

**mails** [1] - 351:7

**main** [2] - 396:12, 458:18

**maintained** [1] - 363:16

**maintains** [1] - 424:10

**majority** [1] - 273:10

**manager** [18] - 348:1, 360:5, 365:24, 376:2, 376:22, 378:16, 379:19, 395:18, 398:19, 429:23, 430:17, 431:11, 431:13, 450:5, 450:8, 451:11, 451:14

**managers** [1] - 388:12

**manger** [1] - 430:19

**Manhattan** [4] - 390:23, 391:23, 402:17, 440:21

**manner** [7] - 326:13, 327:21, 329:1, 407:11, 408:8, 416:3, 423:20

**manufactured** [1] - 392:11

**manufacturing** [2] - 391:2, 392:6

**March** [2] - 392:22, 430:22

**margins** [1] - 372:14

**mark** [1] - 373:15

**marked** [7] - 352:5, 355:1, 388:9, 421:18, 421:23, 444:20, 445:19

**Marsha** [1] - 267:21

**match** [1] - 459:21

**matched** [1] - 341:5

**material** [1] - 455:4

**math** [2] - 354:15, 354:23

**matter** [9] - 268:5, 272:5, 272:12, 366:25, 406:15, 418:6, 454:10, 454:11,

459:16
**matters** [1] - 455:16
**mattress** [1] - 299:21
**Mayor** [1] - 393:14
**MC** [1] - 289:4
**mean** [16] - 287:13, 293:24, 296:1,
302:5, 302:8, 306:11, 328:3, 333:11,
333:13, 336:5, 380:20, 399:6, 399:13,
454:11, 455:17, 456:22
**means** [2] - 312:10, 460:14
**meantime** [1] - 413:14
**mechanical** [1] - 267:25
**medium** [2] - 305:1, 305:13
**meet** [1] - 374:9
**memorized** [1] - 412:1
**mention** [4] - 307:25, 363:4, 363:8,
363:24
**mentioned** [14] - 318:17, 352:22,
363:17, 380:10, 422:11, 429:5, 435:4,
438:25, 439:8, 440:14, 440:17, 440:19,
445:5, 454:23
**mere** [1] - 373:5
**Merns** [3] - 313:6, 326:11, 365:25
**Merns-Ross** [2] - 313:6, 326:11
**Merrill** [12] - 276:7, 307:15, 331:17,
339:2, 339:3, 339:5, 339:6, 424:10,
424:19, 424:20, 424:21, 435:7
**message** [4] - 326:16, 327:5, 327:6
**met** [1] - 343:24
**method** [5] - 300:16, 304:11, 305:10,
336:7
**microphone** [2] - 376:13, 442:18
**middle** [2] - 354:25, 381:22
**might** [30] - 272:4, 273:25, 274:6,
274:8, 274:14, 318:8, 338:25, 347:7,
347:16, 350:19, 350:23, 350:25, 365:6,
370:10, 371:6, 396:9, 407:20, 416:7,
426:11, 430:15, 433:10, 435:23,
436:19, 438:4, 438:25, 439:19, 444:1,
444:3, 459:22
**miles** [1] - 396:1
**million** [2] - 441:3, 441:4
**mind** [3] - 373:20, 459:1, 459:9
**mine** [3] - 403:23, 403:24, 435:5
**minimum** [3] - 410:5, 429:10, 430:16
**minute** [7] - 277:16, 288:19, 296:19,
318:15, 366:8, 441:5, 441:23
**minutes** [8] - 339:24, 391:14, 396:2,
402:11, 402:16, 403:6, 434:19, 438:1
**Miranda** [40] - 276:4, 276:19, 276:21,
277:3, 277:6, 277:21, 278:1, 278:7,
278:10, 279:4, 279:21, 281:1, 281:2,
281:21, 282:25, 283:14, 284:17,
285:11, 285:16, 285:19, 286:5, 286:22,
287:11, 287:14, 288:17, 297:8, 297:14,
297:15, 298:11, 301:7, 301:9, 302:15,
303:10, 303:25, 304:3, 305:6, 305:8,
307:2, 313:21, 314:7
**missing** [2] - 311:1, 311:9
**mitigating** [1] - 332:17

**mom** [15] - 346:6, 347:1, 383:20,
384:1, 400:1, 428:16, 429:5, 429:9,
429:14, 429:25, 430:5, 430:11, 430:16,
437:15, 438:20
**moment** [5] - 355:2, 370:10, 370:11,
443:15, 447:10
**Monday** [17] - 320:18, 321:6, 321:7,
324:23, 325:10, 369:3, 383:7, 385:7,
394:18, 398:7, 398:10, 398:13, 425:5,
426:20, 427:12, 427:16, 428:3
**Mondays** [1] - 369:15
**money** [86] - 269:4, 282:3, 285:25,
286:16, 290:20, 291:17, 299:12,
299:16, 305:17, 306:19, 322:11,
331:21, 332:1, 332:4, 332:10, 334:23,
336:4, 336:10, 336:14, 342:7, 344:14,
346:6, 346:10, 346:25, 347:3, 351:14,
355:25, 356:1, 364:19, 366:25, 367:1,
367:24, 377:1, 377:3, 377:7, 377:8,
380:6, 380:8, 380:12, 380:13, 383:16,
386:11, 386:22, 387:14, 397:10,
397:23, 398:1, 398:12, 398:16, 398:17,
398:18, 398:19, 400:6, 401:3, 401:8,
413:9, 413:13, 413:16, 413:21, 417:22,
427:8, 429:20, 429:22, 431:2, 431:17,
432:25, 433:17, 433:21, 436:6, 436:13,
436:15, 436:16, 436:19, 437:22, 438:5,
438:6, 438:8, 439:3, 441:10, 441:14,
441:16, 441:17, 441:19, 449:14
**monies** [3] - 378:23, 380:14, 395:14
**month** [9] - 279:7, 315:1, 325:23,
338:2, 338:7, 382:15, 382:25, 415:15,
415:21
**month's** [1] - 326:7
**months** [7] - 279:9, 382:25, 425:17,
426:12, 435:21, 435:24, 448:17
**moreover** [1] - 353:25
**Morgan** [17] - 276:4, 277:8, 277:22,
290:9, 292:25, 305:19, 306:25, 309:10,
312:24, 315:10, 319:20, 358:12,
359:20, 360:9, 361:10, 363:23, 364:9
**morning** [14] - 268:1, 268:7, 325:1,
339:23, 350:4, 376:5, 396:2, 396:16,
396:22, 397:7, 397:15, 397:24, 449:5,
452:3
**mornings** [1] - 438:6
**Morris** [11] - 289:1, 347:10, 354:3,
354:25, 363:19, 366:9, 371:8, 404:12,
443:12, 456:3, 456:9
**MORRIS** [37] - 267:16, 268:5, 271:25,
272:3, 272:8, 272:11, 272:20, 352:21,
353:23, 354:6, 354:8, 354:11, 358:2,
362:13, 369:19, 370:10, 370:13,
371:11, 371:16, 372:25, 373:21, 374:1,
381:12, 387:24, 388:15, 430:9, 442:4,
442:6, 442:24, 443:9, 443:14, 451:18,
452:10, 455:1, 461:2, 462:4, 462:12
**most** [12] - 270:25, 273:15, 274:1,
278:21, 299:16, 325:4, 334:19, 360:20,
425:16, 434:22, 450:4, 452:13

**motive** [9] - 289:15, 289:17, 347:17,
347:18, 347:20, 456:14, 456:16, 460:4
**mouth** [1] - 333:15
**move** [3] - 328:14, 361:7, 371:6
**moved** [1] - 332:4
**moving** [1] - 371:4
**MR** [109] - 268:5, 268:14, 271:25,
272:3, 272:8, 272:20, 296:7, 296:14,
296:18, 310:2, 327:25, 328:5, 328:13,
328:17, 339:19, 339:21, 340:3, 340:12,
352:10, 352:21, 352:24, 353:2, 353:13,
353:19, 353:23, 354:6, 354:8, 354:11,
355:2, 357:24, 358:2, 361:2, 361:4,
361:7, 361:14, 362:13, 362:16, 368:8,
368:15, 369:18, 369:19, 369:20,
369:24, 370:10, 370:13, 370:20, 371:3,
371:11, 371:12, 371:16, 372:6, 372:11,
372:18, 372:24, 372:25, 373:9, 373:19,
373:21, 374:1, 374:4, 375:8, 381:9,
381:12, 381:16, 381:25, 387:20,
387:24, 388:15, 388:17, 388:20, 389:3,
389:7, 389:14, 404:4, 404:10, 408:16,
413:2, 430:9, 441:21, 442:4, 442:6,
442:24, 443:8, 443:9, 443:14, 445:16,
447:1, 451:18, 451:21, 451:25, 452:10,
452:12, 454:25, 455:1, 460:16, 460:19,
460:21, 460:24, 461:2, 461:3, 461:7,
461:8, 462:2, 462:4, 462:7, 462:10,
462:12, 462:14, 462:17
**MS** [1] - 460:8
**multiple** [8] - 291:24, 292:11, 298:3,
321:9, 322:25, 323:4, 325:11, 326:3
**must** [4] - 342:2, 437:10, 455:11,
458:6

## N

**nail** [1] - 304:6
**name** [18] - 276:4, 276:6, 276:9,
282:18, 331:7, 331:8, 381:20, 382:2,
389:11, 389:15, 392:23, 393:1, 393:18,
421:14, 432:13, 434:24, 448:8, 448:13
**named** [1] - 436:1
**names** [2] - 276:1, 386:3
**Nancy** [1] - 270:4
**Nathan** [1] - 436:2
**nature** [7] - 274:7, 292:23, 295:5,
295:18, 333:7, 437:6, 440:6
**NDB** [1] - 451:7
**near** [3] - 339:18, 339:20, 396:24
**necessarily** [2] - 325:13, 359:22
**need** [15] - 286:19, 289:18, 289:25,
322:3, 328:12, 354:9, 366:16, 386:16,
386:17, 399:19, 400:18, 419:8, 442:17,
445:12, 460:5
**needed** [12] - 292:19, 399:3, 400:6,
400:14, 400:15, 402:13, 409:14,
416:10, 416:11, 418:22, 418:23, 449:9
**needs** [2] - 353:25, 373:6

**negotiate** [1] - 454:17
**negotiated** [1] - 307:16
**net** [3] - 341:25; 342:5; 458:9
**never** [28] - 276:25; 278:25; 282:2, 282:4; 291:16, 293:7; 298:20, 300:12, 305:8; 311:5, 346:15, 354:11, 367:3, 367:8; 381:1, 385:24, 388:12, 406:18, 407:13, 419:24, 421:10, 434:10, 440:23, 444:13, 450:23, 453:10, 457:16
**new** [5] - 351:10, 377:19, 393:18, 427:10
**NEW** [3] - 267:1, 267:15, 267:19
**New** [16] - 267:7, 267:22, 273:4, 309:6, 315:18, 375:16, 375:18, 382:10, 389:18, 390:2, 393:24, 395:15, 401:15, 409:9, 420:2, 446:24
**newspaper** [1] - 369:10
**next** [19] - 286:2, 286:18, 309:14, 324:25, 325:5, 354:25, 374:12, 380:24, 381:15, 389:6, 406:4, 412:4, 413:4, 417:23, 431:24, 443:20, 447:22, 452:4, 460:10
**Nicholas** [5] - 390:24, 391:12, 391:13, 392:8, 392:9
**night** [21] - 348:1, 348:2, 383:17, 393:11, 395:7, 399:12, 399:13, 399:15, 406:1, 406:2, 427:11, 427:12, 428:4, 428:5, 431:12, 431:14, 432:16, 432:18, 432:20, 451:1
**nights** [1] - 383:10
**nighttime** [2] - 399:14, 399:15
**nine** [2] - 319:23, 425:6
**NINE** [1] - 267:7
**ninety** [1] - 389:22
**NO** [1] - 267:8
**nobody** [1] - 365:16
**nomenclature** [1] - 322:5
**non** [2] - 372:5, 399:25
**non-cumulative** [1] - 372:5
**non-tattered** [1] - 399:25
**none** [2] - 288:2, 329:24
**noon** [1] - 394:19
**normally** [2] - 426:23
**notarized** [2] - 444:24, 447:11
**note** [5] - 295:22, 398:20, 431:23, 451:11, 451:15
**notes** [9] - 279:23, 280:5, 280:7, 280:10, 280:17, 281:3, 380:3, 380:10, 380:11
**nothing** [20] - 284:10, 284:14, 285:8, 287:9, 288:13, 318:2, 318:5, 318:8, 347:21, 357:24, 362:13, 367:10, 369:19, 381:10, 381:12, 387:8, 387:21, 389:4, 441:22, 451:21
**notice** [2] - 292:2, 419:16
**notified** [1] - 289:12
**November** [11] - 279:6, 279:7, 279:22, 283:15, 286:23, 296:23, 352:19, 383:20, 394:17, 419:17, 421:17
**nowhere** [1] - 307:24

**number** [30] - 271:23, 276:20, 308:24, 320:3, 334:5, 334:6, 334:7, 348:22, 353:7, 353:13, 355:11, 370:8, 388:10, 394:22, 397:22, 400:10, 403:13, 404:7, 411:15, 411:16, 411:24, 411:25, 412:2, 412:3, 418:24, 430:4, 443:13, 443:14, 453:3, 459:4
**Number** [4] - 391:22, 444:21, 445:25, 446:3
**numbers** [6] - 348:13, 348:19, 356:14, 378:7, 379:1, 432:24
**Numbers** [1] - 446:10
**numerous** [1] - 269:20
**NY** [1] - 267:19
**NYPD** [2] - 391:5, 401:1

# O

**o'clock** [11] - 267:10, 324:23, 324:25, 325:1, 325:5, 395:24, 402:14, 427:11, 441:25, 450:9, 450:10
**o'Neil** [1] - 292:21
**O'Neil** [2] - 276:6, 293:3
**O'Shea** [9] - 283:20, 295:20, 327:23, 339:18, 365:12, 368:6, 404:3, 404:12, 408:11
**O'SHEA** [74] - 267:18, 267:20, 268:14, 296:7, 296:14, 296:18, 310:2, 327:25, 328:5, 328:13, 328:17, 339:19, 339:21, 340:3, 340:12, 352:24, 353:2, 353:13, 353:19, 355:2, 357:24, 361:2, 361:4, 361:7, 361:14, 362:16, 368:8, 368:15, 369:18, 369:20, 369:24, 370:20, 371:3, 371:12, 372:6, 372:11, 372:18, 372:24, 373:9, 373:19, 374:4, 375:8, 381:9, 381:16, 381:25, 387:20, 388:17, 388:20, 389:3, 389:7, 389:14, 404:4, 404:10, 408:16, 413:2, 441:21, 443:8, 445:16, 447:1, 451:21, 451:25, 452:12, 454:25, 460:16, 460:19, 460:21, 460:24, 461:3, 461:7, 462:2, 462:7, 462:10, 462:14, 462:17
**oath** [6] - 271:5, 271:8, 271:9, 271:14, 271:17, 273:20
**object** [4] - 268:8, 272:1, 372:15, 461:10
**objecting** [1] - 370:9
**objection** [9] - 272:2, 272:23, 352:21, 352:22, 361:2, 361:5, 361:6, 361:14, 430:9
**objections** [2] - 354:24, 452:4
**objective** [1] - 318:10
**objects** [1] - 370:13
**obligation** [1] - 293:25
**obscured** [1] - 404:8
**observed** [1] - 388:12
**obtain** [7] - 275:21, 282:5, 292:25, 300:25, 305:16, 337:2, 340:20
**obtained** [12] - 275:7, 275:16, 276:7,

276:14, 277:10, 300:24, 309:10, 310:16, 313:17, 314:12, 340:18, 341:14
**obtaining** [3] - 273:8, 276:3, 415:3
**obvious** [2] - 328:10, 336:2
**obviously** [6] - 339:5, 354:14, 354:15, 396:11, 452:5, 452:21
**occasion** [15] - 286:12, 293:21, 294:3, 294:4, 341:1, 369:16, 377:1, 377:3, 379:6, 384:19, 385:7, 387:17, 388:4, 388:21, 409:3
**occasions** [1] - 276:20
**occurred** [12] - 273:25, 274:15, 274:17, 274:18, 275:13, 295:23, 295:25, 325:13, 325:17, 330:12, 330:14, 336:13
**occurs** [1] - 273:16
**October** [11] - 279:6, 279:7, 279:22, 283:15, 286:5, 286:23, 403:21, 404:17, 404:21, 405:16, 405:22
**October-November** [2] - 279:22, 283:15
**OF** [2] - 267:1, 267:11
**off-the-books** [1] - 460:3
**offense** [1] - 455:21
**offer** [7] - 353:19, 363:7, 369:21, 371:4, 373:4, 373:25, 456:23
**offered** [3] - 341:9, 370:20, 373:16
**offering** [2] - 347:8, 353:17
**offers** [1] - 268:9
**OFFICE** [1] - 267:14
**Office** [6] - 273:4, 350:12, 350:14, 444:8, 446:17, 447:25
**office** [14] - 279:15, 300:15, 383:18, 391:2, 397:17, 399:5, 400:18, 433:11, 433:22, 433:23, 433:25, 447:5, 449:17, 450:22
**officer** [2] - 326:23, 366:6
**Officer** [2] - 375:17, 375:18
**often** [2] - 324:6, 458:21
**old** [2] - 356:23, 377:20
**Omar** [1] - 418:19
**once** [8] - 343:7, 373:8, 409:21, 416:20, 417:18, 423:22, 438:15, 438:25
**ONE** [1] - 267:7
**one** [120] - 268:5, 269:19, 269:20, 269:22, 269:25, 271:24, 272:22, 278:18, 290:15, 290:20, 290:21, 290:25, 295:11, 296:22, 298:5, 300:6, 300:17, 300:24, 301:8, 301:17, 308:4, 308:24, 311:24, 314:12, 314:13, 317:24, 319:11, 321:5, 321:6, 321:16, 323:2, 323:12, 323:14, 323:15, 324:5, 324:20, 325:22, 326:3, 326:7, 329:22, 330:15, 335:17, 335:23, 336:13, 348:12, 348:14, 352:23, 354:4, 359:19, 361:16, 368:8, 370:8, 373:16, 382:15, 385:24, 388:7, 389:22, 391:11, 391:12, 397:1, 400:4, 400:5, 400:6, 402:23, 403:2, 403:5, 403:6, 403:9, 403:19, 403:22, 404:5, 404:6, 405:22, 406:5,

407:25, 409:4, 409:6, 409:13, 409:18,
409:20, 410:18, 410:23, 411:4, 413:12,
415:12, 415:20, 415:22, 416:23,
421:11, 422:1, 426:25, 427:2, 427:5,
428:20, 429:1, 435:5, 439:8, 441:13,
442:9, 445:9, 445:13, 446:16, 453:3,
453:12, 457:10, 458:1, 458:11, 458:25,
459:4, 459:18, 461:8
  **ones** [3] - 294:13, 297:5, 395:3
  **ongoing** [1] - 433:15
  **oooooOoooooo** [1] - 461:14
  **open** [10] - 352:11, 378:3, 378:4,
386:1, 388:9, 393:8, 422:14, 442:1,
450:9, 452:2
  **opened** [21] - 391:14, 392:7, 392:19,
392:21, 393:7, 393:11, 393:12, 394:18,
407:9, 407:19, 407:25, 408:1, 408:3,
408:4, 415:24, 416:5, 426:8, 426:25,
428:11
  **opening** [1] - 383:14
  **operate** [1] - 390:16
  **operated** [3] - 310:10, 343:6, 347:23
  **operation** [1] - 394:17
  **operational** [2] - 387:5, 387:7
  **operations** [2] - 347:22, 360:24
  **opinion** [7] - 295:17, 296:11, 317:18,
317:25, 318:1, 318:11, 326:22
  **opinions** [3] - 317:23, 318:8, 318:9
  **opportunities** [1] - 311:3
  **opportunity** [3] - 279:11, 444:9,
450:18
  **opposed** [1] - 424:3
  **opposing** [1] - 268:6
  **opposite** [1] - 458:23
  **option** [1] - 422:21
  **options** [1] - 452:13
  **oral** [2] - 452:8, 452:9
  **order** [11] - 268:7, 292:10, 299:16,
392:16, 400:1, 409:11, 409:24, 426:10,
444:5, 451:15, 455:12
  **original** [3] - 301:12, 314:9, 407:25
  **otherwise** [2] - 437:16, 455:24
  **ought** [1] - 458:25
  **ourselves** [2] - 428:23, 430:22
  **outside** [3] - 306:11, 311:6, 345:4
  **overnight** [1] - 396:20
  **overruled** [1] - 272:23
  **oversee** [1] - 383:15
  **overseeing** [1] - 376:24
  **owe** [1] - 457:5
  **owes** [1] - 441:14
  **own** [8] - 295:24, 296:11, 304:25,
351:20, 392:11, 394:1, 441:16
  **owned** [1] - 310:10
  **owner** [1] - 361:24
  **owners** [1] - 348:5
  **ownership** [1] - 393:25
  **owns** [2] - 394:3, 394:4

## P

  **p-O-T-E-N-Z-A** [1] - 389:16
  **p.m** [1] - 383:9
  **page** [34] - 277:13, 277:16, 283:3,
294:21, 309:14, 318:22, 319:4, 319:7,
320:1, 321:16, 322:13, 323:8, 323:16,
325:25, 353:15, 374:12, 378:4, 385:20,
403:14, 403:17, 403:24, 404:15, 412:4,
418:12, 418:17, 419:6, 443:5, 443:8,
443:13, 443:14, 446:11, 447:7, 447:21,
449:3
  **pages** [1] - 419:6
  **paid** [23] - 337:25, 338:5, 338:7, 344:1,
344:15, 384:5, 384:21, 384:23, 384:25,
394:10, 395:8, 395:9, 395:11, 423:5,
430:6, 430:21, 431:7, 436:8, 455:20,
457:1, 457:4, 457:6, 457:8
  **paper** [15] - 335:14, 336:20, 336:22,
337:1, 337:4, 368:1, 368:3, 368:4,
386:11, 387:1, 387:17, 397:25, 432:22,
432:23, 436:20
  **papers** [2] - 380:4, 386:8
  **paragraph** [7] - 288:20, 290:3, 294:20,
326:11, 415:23, 416:19, 417:16
  **parameters** [1] - 401:18
  **pardon** [4] - 280:25, 377:18, 419:4,
421:17
  **parking** [1] - 309:2
  **part** [25] - 268:23, 273:5, 273:15,
273:17, 273:18, 284:2, 299:24, 301:12,
315:12, 315:17, 315:25, 317:1, 333:24,
338:17, 341:11, 348:13, 355:10,
355:24, 357:7, 366:14, 395:1, 395:3,
401:23, 450:4, 457:2
  **part-time** [2] - 395:1, 395:3
  **partially** [1] - 384:25
  **participate** [2] - 273:7, 273:8
  **particular** [13] - 269:19, 269:22, 292:3,
315:1, 317:15, 317:21, 323:3, 329:20,
358:11, 361:19, 363:13, 378:6, 379:9
  **particularly** [1] - 459:3
  **parties** [3] - 371:21, 452:7, 460:5
  **partner** [2] - 390:10, 396:9
  **PARTNERS** [1] - 267:18
  **partners** [2] - 430:21, 434:1
  **partnership** [1] - 392:6
  **parts** [1] - 454:19
  **party** [9] - 370:2, 370:7, 370:16,
370:21, 370:22, 371:25, 373:17,
373:18, 373:19
  **passed** [6] - 338:15, 338:21, 355:6,
355:25, 435:19, 435:24
  **passing** [1] - 356:8
  **past** [1] - 298:19
  **pat** [1] - 390:6
  **Pat** [2] - 411:22, 441:13
  **Pathmark** [1] - 402:2
  **Patricia** [2] - 385:5, 394:2

  **pattern** [9] - 289:12, 297:20, 298:2,
317:14, 319:22, 330:1, 333:8, 333:23,
333:24
  **Pause** [5] - 346:19, 355:4, 370:12,
408:18, 442:22
  **pause** [2] - 323:9, 323:11
  **pay** [15] - 377:11, 377:12, 377:14,
384:19, 385:7, 389:21, 402:3, 424:14,
427:20, 427:25, 428:14, 429:14,
430:22, 455:12
  **paycheck** [1] - 424:24
  **paying** [3] - 342:22, 342:23, 455:24
  **payments** [3] - 338:22, 338:25, 460:3
  **payroll** [9] - 338:8, 343:24, 344:11,
349:8, 388:2, 388:4, 395:15, 395:16,
431:6
  **payrolls** [1] - 419:9
  **pays** [2] - 299:23, 455:10
  **pending** [1] - 332:10
  **people** [23] - 276:1, 290:19, 292:8,
294:13, 303:5, 303:7, 329:19, 340:11,
344:1, 367:24, 377:11, 395:6, 397:6,
397:7, 397:9, 397:22, 398:12, 399:13,
427:11, 434:1, 440:9, 455:19, 457:8
  **per** [6] - 359:10, 359:16, 385:13,
415:14, 416:20, 417:18
  **percent** [10] - 341:16, 394:1, 394:3,
394:4, 395:2, 422:25, 425:17, 450:6,
454:10, 459:25
  **percentage** [2] - 393:25, 394:10
  **perfectly** [3] - 295:21, 296:16, 354:16
  **perhaps** [1] - 293:2
  **period** [21] - 279:22, 298:4, 316:8,
316:11, 317:13, 319:1, 319:3, 322:19,
322:21, 322:24, 323:13, 326:19,
327:13, 347:25, 352:18, 382:25,
383:20, 387:4, 394:16, 403:20, 414:20
  **periods** [2] - 324:17, 345:3
  **permit** [11] - 315:13, 316:3, 317:1,
317:3, 359:21, 390:19, 391:8, 391:10,
409:2, 419:2, 438:22
  **person** [30] - 277:6, 277:22, 278:2,
325:15, 329:3, 348:8, 357:3, 359:25,
360:12, 371:20, 376:11, 376:16,
378:13, 382:5, 383:5, 385:6, 387:13,
395:6, 398:18, 399:12, 399:15, 399:21,
406:9, 421:12, 421:21, 422:5, 431:13,
432:17, 439:9
  **person's** [1] - 397:9
  **personal** [4] - 293:4, 424:21, 435:5,
453:19
  **personally** [7] - 273:7, 277:1, 291:3,
291:5, 291:13, 313:7, 352:2
  **personnel** [6] - 268:22, 285:2, 294:11,
294:24, 295:2, 365:22
  **persons** [2] - 360:17, 360:18
  **perspectives** [1] - 453:2
  **pertained** [1] - 275:10
  **ph** [3] - 375:16, 391:1, 392:5
  **phase** [2] - 340:17, 355:10

**Phelan** [3] - 276:7, 292:20, 293:3
**phone** [4] - 368:20, 375:24, 418:21, 443:16
**photocopies** [1] - 341:21
**physical** [17] - 309:1, 309:11, 310:20, 310:23, 311:13, 311:20, 313:2, 320:23, 367:20, 393:23, 398:3, 406:25, 407:8, 407:10, 408:7, 414:25, 424:3
**pick** [15] - 391:4, 400:15, 401:4, 401:21, 402:2, 402:4, 403:3, 403:7, 403:8, 409:15, 409:17, 409:23, 410:18, 411:13, 411:16
**picked** [2] - 403:5, 403:6
**picking** [2] - 400:24, 401:21
**piece** [6] - 317:24, 386:11, 387:16, 397:25, 432:22, 432:23
**pieces** [1] - 400:8
**pistol** [8] - 390:18, 390:19, 391:5, 391:8, 400:22, 415:8, 418:20, 419:2
**place** [18] - 275:12, 280:6, 280:24, 282:24, 284:19, 284:22, 284:23, 292:10, 298:9, 320:24, 325:3, 347:19, 404:23, 407:9, 407:18, 430:1, 458:14, 458:15
**places** [3] - 319:11, 448:23, 449:16
**plain** [1] - 408:2
**plaintiff** [1] - 451:24
**Plaintiff** [2] - 267:4, 267:14
**plaintiff's** [1] - 452:1
**Plaintiff's** [2] - 352:5, 372:13
**planned** [1] - 460:12
**planning** [1] - 371:11
**plans** [1] - 461:9
**PLAZA** [1] - 267:15
**Plaza** [1] - 267:22
**plus** [2] - 336:15, 460:6
**pocketing** [1] - 346:3
**point** [21] - 269:10, 277:7, 277:9, 277:10, 282:7, 287:6, 296:7, 296:14, 304:1, 304:18, 304:19, 304:21, 305:6, 327:23, 328:5, 328:8, 340:6, 340:13, 361:21, 372:25, 460:2
**Point** [2] - 407:18, 408:3
**points** [1] - 302:25
**police** [1] - 382:12
**Police** [5] - 375:17, 375:18, 382:10, 401:16, 409:9
**policies** [1] - 342:18
**Pollak** [8] - 274:21, 276:19, 284:25, 288:7, 290:4, 303:2, 307:11, 307:21
**Porella** [1] - 392:5
**portion** [6] - 310:24, 311:21, 373:25, 385:14, 431:9, 432:14
**portions** [7] - 370:4, 372:3, 372:4, 372:14, 372:15, 372:17, 373:13
**position** [11] - 269:2, 272:9, 272:17, 328:10, 354:18, 371:7, 376:1, 382:22, 383:2, 383:4, 385:6
**possibility** [1] - 311:12
**possibly** [1] - 366:13

**Post** [3] - 431:23, 451:11, 451:15
**post** [15] - 358:4, 359:6, 380:3, 380:10, 380:11, 386:21, 386:22, 391:2, 398:20, 442:10, 452:8, 452:17, 452:18, 457:12, 459:2
**post-it** [4] - 380:3, 380:10, 380:11, 398:20
**Post-it** [3] - 431:23, 451:11, 451:15
**post-its** [1] - 386:22
**post-seizure** [3] - 358:4, 359:6, 442:10
**post-tis** [1] - 386:21
**post-trial** [5] - 452:8, 452:17, 452:18, 457:12, 459:2
**posted** [2] - 320:15, 320:22
**potential** [2] - 448:18, 456:24
**Potenza** [109] - 276:23, 276:25, 278:16, 279:19, 280:2, 280:11, 280:14, 280:18, 280:22, 281:4, 282:3, 282:17, 282:21, 284:20, 285:3, 285:24, 286:15, 287:8, 287:19, 288:1, 289:9, 290:22, 291:2, 291:19, 293:8, 293:12, 293:14, 293:19, 294:9, 294:12, 297:10, 297:18, 302:16, 302:25, 303:6, 304:14, 306:3, 306:22, 310:11, 313:1, 314:22, 315:9, 315:13, 315:18, 316:18, 316:21, 318:3, 322:8, 322:19, 327:18, 329:8, 331:19, 332:3, 332:7, 332:19, 333:9, 333:16, 335:6, 336:10, 337:13, 339:11, 339:14, 340:4, 340:10, 342:22, 347:11, 356:13, 356:19, 356:25, 357:21, 358:4, 358:6, 358:13, 359:3, 359:4, 359:12, 359:20, 362:17, 363:18, 364:7, 364:20, 365:14, 367:3, 367:12, 367:13, 368:18, 368:20, 375:25, 385:5, 389:7, 389:12, 389:17, 390:6, 390:24, 391:12, 391:13, 392:8, 392:9, 404:15, 442:7, 442:17, 442:25, 443:18, 445:11, 446:14, 446:21, 456:6, 457:15
**Potenza's** [6] - 293:4, 294:18, 300:14, 315:23, 342:11, 358:23
**pounds** [1] - 402:5
**poverty** [1] - 455:11
**power** [1] - 456:19
**practice** [8] - 312:5, 324:4, 324:6, 348:2, 388:2, 420:13, 423:8, 425:22
**practices** [10] - 294:5, 324:11, 343:25, 345:2, 349:8, 349:9, 402:15, 420:10, 423:14, 453:22
**practicing** [1] - 407:10
**pre** [1] - 408:13
**preceded** [1] - 407:21
**precinct** [1] - 382:16
**Precinct** [2] - 375:20, 382:17
**precise** [1] - 296:3
**precisely** [1] - 457:17
**predominant** [1] - 273:18
**preliminary** [4] - 268:5, 452:21, 458:20, 458:23
**premise** [1] - 308:19
**premises** [27] - 286:8, 301:21, 302:7,

302:13, 303:4, 303:23, 304:7, 304:15, 305:13, 331:1, 331:13, 334:14, 335:12, 343:10, 343:16, 343:20, 388:23, 396:16, 397:4, 420:24, 421:2, 425:19, 433:4, 433:8, 433:21, 434:2, 434:7
**preparation** [1] - 270:13
**prepare** [2] - 270:10, 456:22
**prepared** [11] - 270:8, 270:9, 270:11, 270:23, 284:24, 288:21, 294:8, 294:21, 340:9, 348:4, 419:12
**preparing** [1] - 288:22
**present** [1] - 428:2
**preserve** [1] - 268:8
**President** [2] - 285:3, 326:12
**president** [5] - 366:1, 366:4, 366:7, 394:1, 394:3
**pretending** [2] - 308:6, 308:7
**pretrial** [2] - 268:7, 353:24
**pretty** [6] - 326:25, 384:8, 423:19, 425:14, 425:16, 432:24
**prevent** [1] - 300:14
**prevents** [1] - 299:3
**previous** [1] - 269:11
**previously** [2] - 268:3, 444:14
**primarily** [4] - 294:25, 295:6, 307:18, 407:1
**primary** [3] - 270:12, 270:17, 455:19
**prime** [3] - 289:14, 289:20, 289:21
**Primus** [2] - 268:16, 271:4
**principals** [2] - 346:11, 349:12
**principle** [1] - 327:24
**print** [1] - 377:20
**printed** [1] - 377:21
**privilege** [2] - 272:7, 272:13
**privileged** [4] - 272:4, 272:10, 272:12, 272:18
**problem** [9] - 372:22, 405:5, 409:22, 453:16, 453:23, 456:15, 456:16, 459:15
**problems** [2] - 294:6, 453:20
**procedure** [1] - 400:24
**procedures** [1] - 308:13
**proceed** [2] - 442:23, 452:7
**Proceedings** [1] - 267:25
**proceeds** [1] - 423:2
**process** [13] - 346:17, 346:20, 346:24, 346:25, 351:12, 351:24, 380:5, 398:2, 454:22, 455:4, 455:6, 455:8, 459:23
**processor** [1] - 406:11
**produced** [4] - 267:25, 313:19, 340:21, 351:8
**production** [2] - 301:12, 340:22
**proffer** [1] - 353:2
**proffered** [2] - 296:8, 328:6
**proffering** [1] - 308:8
**profit** [1] - 394:9
**progressively** [2] - 425:7, 428:1
**prohibiting** [1] - 355:8
**prohibition** [2] - 357:5, 357:6
**proof** [2] - 456:24, 457:7

**proper** [4] - 354:16, 414:11, 414:17,
451:15
**proponent** [1] - 373:24
**propose** [1] - 365:8
**propounds** [1] - 453:11
**prove** [3] - 311:3, 311:7, 455:18
**provide** [4] - 268:21, 269:2, 282:7
**provided** [6] - 341:9, 349:18, 359:18,
359:20, 451:11, 451:14
**provider** [3] - 361:17, 361:19, 413:19
**providing** [1] - 288:24
**provisions** [2] - 268:23, 362:5
**PRP** [74] - 278:12, 282:3, 282:22,
284:21, 285:3, 289:3, 293:15, 297:24,
300:23, 301:10, 301:19, 301:21,
301:23, 302:16, 303:6, 304:12, 304:25,
305:16, 306:24, 308:20, 309:7, 313:2,
313:5, 314:4, 316:7, 322:8, 329:8,
331:15, 336:16, 336:25, 340:14,
340:23, 340:25, 342:18, 342:22,
344:25, 345:1, 346:11, 347:22, 351:5,
352:20, 363:10, 370:25, 375:10,
375:11, 375:14, 375:15, 375:23,
384:21, 388:23, 390:15, 391:11,
391:12, 393:19, 394:11, 400:23,
401:24, 402:16, 403:20, 404:23,
414:12, 414:18, 415:9, 424:10, 425:3,
435:6, 445:22, 446:1, 446:15, 446:23,
448:6, 449:21, 450:6, 450:24
**PRP's** [2] - 302:11, 388:2
**PSP** [10] - 310:9, 392:2, 392:8, 392:11,
392:13, 400:23, 404:24, 405:4, 405:8,
415:6
**Pub** [3] - 382:5, 392:25, 422:12
**pull** [7] - 318:20, 366:2, 376:13,
399:21, 409:4, 411:3, 442:17
**pulled** [2] - 410:17, 439:9
**punched** [1] - 427:3
**purchased** [1] - 422:19
**purpose** [9] - 290:7, 292:12, 317:15,
317:21, 327:18, 349:8, 355:13, 420:9,
459:9
**purposes** [4] - 289:25, 341:17, 373:3,
441:1
**pursue** [1] - 282:7
**pushed** [1] - 324:21
**put** [44] - 281:6, 285:10, 287:10, 288:9,
303:6, 303:9, 308:1, 330:24, 332:9,
342:14, 366:24, 370:3, 372:4, 380:4,
380:9, 380:11, 380:12, 380:13, 380:14,
386:19, 386:22, 386:23, 387:1, 387:2,
397:12, 397:13, 399:1, 399:4, 399:18,
400:8, 400:9, 400:10, 400:18, 407:13,
410:23, 411:2, 416:8, 427:2, 428:17,
431:19, 431:20, 436:16, 454:8
**puts** [1] - 455:11
**putting** [2] - 285:4, 429:1

### Q

**qualified** [1] - 303:13
**qualify** [1] - 371:22
**quarter** [1] - 395:24
**Queens** [5] - 312:24, 382:17, 393:4,
393:16, 402:19
**QUESTION** [2] - 449:4, 449:10
**questioned** [1] - 280:13
**questioning** [1] - 351:4
**questions** [30] - 275:21, 275:23,
285:12, 332:22, 332:24, 333:6, 333:22,
338:11, 339:12, 339:13, 339:14,
339:16, 344:13, 345:22, 345:23,
345:25, 362:18, 363:1, 363:24, 368:16,
388:11, 388:15, 435:8, 435:10, 438:9,
440:15, 451:18, 452:25, 456:5
**quick** [1] - 432:24
**quickly** [1] - 403:10
**quite** [15] - 271:13, 274:5, 280:16,
282:19, 285:12, 287:12, 328:8, 337:3,
413:9, 426:13, 426:21, 427:5, 431:1,
441:14, 456:3

### R

**radar** [3] - 317:9, 318:4, 337:10
**raised** [5] - 427:15, 428:1, 428:23,
458:1, 458:24
**ramifications** [1] - 394:7
**Ramono** [1] - 450:10
**ran** [2] - 343:9, 359:9
**range** [1] - 433:15
**rather** [2] - 452:24, 454:19
**RBS** [6] - 306:16, 321:12, 321:24,
366:19, 438:2
**RE** [1] - 362:15
**RE-CROSS** [1] - 362:15
**reached** [1] - 277:2
**reaching** [1] - 295:24
**reaction** [1] - 458:20
**read** [15] - 280:7, 280:8, 281:21,
283:17, 285:23, 304:3, 369:10, 419:7,
436:19, 436:20, 443:15, 443:18,
443:21, 447:14, 449:13
**readily** [1] - 386:8
**reading** [1] - 284:2
**ready** [2] - 374:7, 400:9
**real** [1] - 453:20
**Reale** [1] - 394:3
**realized** [1] - 438:1
**really** [15] - 271:13, 296:5, 297:25,
311:5, 334:10, 344:12, 362:10, 365:12,
373:18, 373:19, 380:3, 408:13, 436:18,
449:1, 455:9
**realm** [1] - 372:6
**rear** [2] - 446:7
**reason** [17] - 354:21, 368:21, 393:10,

403:4, 407:12, 410:8, 410:11, 410:18,
413:8, 413:10, 413:12, 415:20, 419:11,
437:21, 440:23, 450:8, 457:11
**reasonable** [1] - 354:20
**reasoning** [1] - 421:9
**reasons** [4] - 274:17, 274:18, 333:3,
333:14
**rebuttal** [2] - 373:7, 373:10
**recalled** [2] - 363:22, 364:12
**receipt** [5] - 312:6, 312:8, 312:10,
312:13, 418:21
**receipts** [8] - 348:3, 348:13, 348:15,
348:23, 349:6, 380:8, 459:20
**receive** [10] - 353:21, 377:7, 390:19,
391:6, 397:10, 414:6, 424:24, 434:15,
452:3
**received** [13] - 268:6, 278:13, 309:12,
340:14, 341:1, 345:23, 345:25, 353:24,
365:6, 391:11, 439:16, 439:17, 449:4
**receives** [1] - 298:24
**receiving** [3] - 358:6, 358:8, 451:16
**recently** [1] - 405:15
**recess** [3] - 339:25, 374:11, 441:25
**recirculate** [1] - 336:9
**recitation** [2] - 314:25, 350:22
**reckless** [1] - 296:4
**recognize** [10] - 366:24, 367:1, 378:6,
378:7, 414:4, 414:15, 414:23, 416:23,
418:17, 432:4
**recognized** [1] - 455:23
**recognizing** [1] - 328:9
**recollect** [1] - 320:19
**recollection** [6] - 270:24, 272:15,
279:19, 321:8, 443:6, 443:21
**recommend** [1] - 459:4
**reconstruct** [1] - 436:4
**reconvene** [2] - 339:24, 441:24
**record** [16] - 268:8, 268:10, 275:5,
275:6, 276:11, 290:11, 292:14, 366:23,
370:3, 370:5, 381:1, 381:21, 387:18,
397:17, 427:3, 452:2
**recordation** [2] - 287:7, 334:25
**recorded** [3] - 267:25, 400:12, 406:13
**recording** [1] - 396:13
**records** [36] - 273:15, 275:14, 275:19,
276:2, 290:14, 292:9, 293:14, 294:24,
295:17, 302:7, 302:17, 305:4, 305:18,
307:6, 307:15, 310:6, 310:7, 336:19,
341:13, 341:14, 341:18, 341:20,
341:22, 344:23, 344:24, 349:2, 352:8,
352:16, 353:9, 354:17, 356:18, 358:25,
367:18, 388:5, 408:11, 408:13
**recreational** [1] - 455:14
**recross** [1] - 368:6
**recycling** [1] - 438:21
**redirect** [3] - 357:25, 388:16, 451:20
**REDIRECT** [4] - 358:1, 388:19, 462:3,
462:13
**redouble** [1] - 314:17
**reduced** [1] - 409:25

refer [4] - 319:18, 323:3, 359:22, 363:5
reference [1] - 381:2
references [2] - 288:16, 353:4
referred [3] - 279:25, 294:14, 314:13
referring [10] - 279:24, 281:22, 283:25, 285:1, 285:19, 285:20, 295:4, 295:10, 348:18, 365:18
reflect [2] - 336:11, 405:25
reflected [9] - 280:10, 281:3, 316:8, 322:9, 349:2, 352:20, 353:12, 451:5, 451:10
reflects [3] - 316:6, 405:19, 419:15
refresh [1] - 443:21
refreshes [1] - 443:6
refrigerator [2] - 448:24, 449:12
refrigerators [1] - 449:12
refuse [2] - 332:24, 435:13
regard [9] - 278:17, 288:16, 339:17, 358:17, 358:23, 358:24, 367:10, 452:7, 459:2
regardless [1] - 297:23
regards [3] - 344:17, 443:6, 451:9
regime [1] - 429:13
register [38] - 348:13, 348:15, 348:23, 349:1, 349:6, 349:14, 349:16, 349:17, 377:10, 377:15, 377:18, 377:19, 377:20, 378:2, 378:24, 380:6, 380:7, 380:8, 380:18, 385:20, 386:25, 387:1, 387:3, 387:5, 387:13, 399:7, 425:21, 425:22, 426:23, 427:4, 431:16, 432:25, 449:6, 459:19, 459:20, 459:24
registers [12] - 377:9, 378:22, 379:13, 379:22, 383:17, 383:25, 384:8, 386:24, 425:20, 431:15, 431:20, 432:8
regular [2] - 401:14, 411:13
regularly [1] - 458:5
regulation [4] - 355:8, 408:23, 408:25, 410:11
regulations [1] - 369:3
reiterate [1] - 285:18
reiterated [3] - 281:23, 302:14, 303:25
relate [3] - 361:12, 361:13, 366:10
related [9] - 279:2, 330:2, 335:10, 341:15, 345:4, 346:10, 361:17, 440:2, 453:8
relates [7] - 269:4, 272:12, 297:12, 297:13, 321:23, 323:12, 323:14
relating [2] - 272:3, 319:12
relationship [2] - 314:4, 413:23
relative [3] - 280:5, 288:17, 317:13
relayed [2] - 339:11, 416:7
release [1] - 413:14
relevance [1] - 370:6
relevant [2] - 371:25, 394:16
reliable [1] - 344:24
relied [3] - 298:1, 298:18, 347:23
relies [1] - 454:5
rely [1] - 453:21
remember [16] - 277:11, 281:10, 281:15, 281:18, 301:7, 306:2, 306:5,

320:17, 331:8, 358:9, 364:12, 373:12, 434:23, 442:16, 442:19, 456:2
removal [1] - 322:11
repeat [1] - 272:25
repeated [1] - 441:3
repetitive [1] - 372:9
Repetti [2] - 340:20, 340:24
rephrase [1] - 384:12
replaced [1] - 427:6
reply [1] - 460:24
Report [1] - 361:21
report [4] - 368:23, 397:21, 409:7, 440:25
reported [5] - 343:24, 395:15, 423:3, 433:17, 433:19
Reporter [1] - 267:21
reporter [2] - 382:2, 389:11
reporting [8] - 289:11, 289:18, 289:21, 290:1, 290:6, 324:2, 355:14, 444:5
represent [3] - 350:10, 353:3, 359:3
representation [1] - 290:4
representations [1] - 350:25
representative [2] - 360:3, 366:2
represented [2] - 307:10, 344:14
represents [2] - 368:4, 452:23
request [10] - 301:6, 301:13, 314:9, 314:23, 314:25, 316:16, 316:23, 340:21, 340:23, 340:25
requested [7] - 312:6, 312:8, 316:1, 316:4, 316:21, 316:24
requesting [1] - 350:5
requests [1] - 315:11
requirement [12] - 289:3, 289:11, 289:18, 289:22, 290:1, 290:6, 297:11, 297:19, 324:2, 355:14, 367:16, 444:5
requirements [4] - 324:13, 369:6, 369:8, 419:2
requires [1] - 453:8
reserve [1] - 452:5
residence [1] - 389:21
resigned [1] - 375:22
resolve [2] - 296:6, 421:4
respect [28] - 275:17, 278:11, 294:6, 303:5, 303:6, 316:16, 317:9, 318:4, 337:11, 342:10, 344:11, 345:22, 346:9, 347:5, 348:7, 349:8, 349:10, 358:11, 358:12, 358:13, 361:11, 361:18, 362:12, 366:20, 380:17, 408:21, 442:13, 448:21
respecting [1] - 300:23
respective [2] - 348:4, 348:5
respond [1] - 452:18
responded [2] - 350:1, 369:1
responding [2] - 373:24, 374:1
response [9] - 339:4, 339:12, 363:9, 363:15, 365:10, 366:8, 367:9, 453:4, 456:4
responses [1] - 338:12
responsibilities [6] - 376:23, 381:4, 383:13, 388:3, 395:22, 398:14

responsibility [1] - 360:17
responsible [3] - 352:3, 360:1, 360:13
responsive [2] - 333:5, 344:13
rest [4] - 322:6, 322:13, 347:23, 399:16
restaurant [5] - 282:3, 383:11, 383:23, 390:17, 392:19
Restaurant [18] - 278:13, 301:23, 308:20, 375:10, 390:15, 391:11, 393:19, 400:23, 402:1, 402:4, 402:16, 404:24, 414:12, 414:18, 415:9, 445:22, 446:1, 446:15
resting [1] - 371:15
result [25] - 273:13, 289:4, 292:11, 301:6, 302:25, 305:17, 307:14, 307:19, 311:10, 322:11, 331:12, 334:22, 336:14, 336:23, 340:21, 340:24, 343:17, 347:9, 350:6, 350:7, 361:20, 367:4, 367:24, 368:12, 418:8
resulted [4] - 334:20, 334:25, 349:23, 367:20
resumed [1] - 268:4
retired [2] - 343:7, 375:21
retrieve [2] - 400:2, 437:15
return [4] - 312:6, 312:8, 338:19, 436:4
returns [5] - 340:5, 340:8, 351:21, 435:15, 435:16
reveal [5] - 272:4, 272:12, 358:22, 417:7, 417:13
Revenue [1] - 268:18
revenue [4] - 337:8, 337:9, 346:13, 346:14
revenues [1] - 450:6
review [15] - 285:11, 292:9, 301:2, 302:6, 307:5, 310:6, 316:25, 317:23, 322:1, 326:18, 329:12, 344:7, 358:25, 359:15, 444:9
reviewed [11] - 294:4, 298:3, 298:17, 302:17, 305:4, 305:17, 307:15, 326:22, 327:21, 366:23, 388:4
rezoned [1] - 393:15
Richard [1] - 395:19
rid [1] - 439:6
right-hand [6] - 388:10, 403:14, 403:16, 404:19, 444:21, 447:3
ring [1] - 392:4
Ring [1] - 392:5
rings [3] - 391:4, 392:10, 392:11
Rite [1] - 402:2
Road [1] - 389:18
robbed [3] - 411:4, 438:25, 439:8
Robert [9] - 276:6, 285:3, 290:22, 364:20, 375:24, 389:7, 389:12, 391:1, 392:4
role [11] - 269:14, 269:15, 269:16, 270:12, 270:17, 271:11, 273:17, 273:18, 273:21, 397:11
roll [1] - 397:11
Ron [5] - 382:5, 392:25, 411:23, 422:12, 422:23

room [11] - 341:16, 368:20, 377:13, 377:14, 380:12, 384:1, 384:8, 396:12, 422:25, 427:21, 428:19
rooms [3] - 428:20, 429:4
Rosa [2] - 315:11, 327:20
Rose [1] - 276:9
Ross [3] - 313:6, 326:11, 365:25
roughly [1] - 300:8
round [1] - 356:14
rounds [1] - 452:16
Royal [1] - 438:2
RPS [1] - 406:4
rubber [3] - 380:15, 386:22, 400:8
rule [2] - 370:24, 373:3
rules [1] - 370:1, 371:2
ruling [1] - 372:16
run [2] - 342:24, 399:20
rundown [1] - 420:12
rung [1] - 425:21
running [1] - 376:24

S

S-C-H-M-I-D-T [1] - 382:3
safe [5] - 324:8, 343:15, 343:16, 343:19, 434:2
salary [1] - 385:4
sale [1] - 402:3
sat [1] - 395:10
satisfactory [5] - 326:13, 327:21, 329:1, 416:3, 416:16
Saturday [15] - 320:20, 325:7, 325:8, 325:9, 348:2, 350:4, 369:2, 376:4, 394:19, 398:6, 406:1, 425:9, 426:18, 427:14, 428:5
Saturdays [1] - 369:15
saw [14] - 293:21, 302:17, 302:23, 305:18, 307:6, 310:6, 313:19, 315:17, 329:24, 329:25, 342:22, 351:4, 378:12, 459:8
schedule [2] - 429:13, 461:6
Schmidt [6] - 345:6, 370:21, 381:16, 381:22, 382:1, 387:25
school [4] - 390:13, 391:21, 391:22, 391:23
scope [4] - 311:6, 345:5, 360:17, 361:12
Scotland [2] - 362:1, 438:2
scratch [14] - 379:12, 379:20, 380:18, 380:21, 385:23, 386:8, 386:14, 386:20, 386:21, 387:16, 388:21, 388:25, 459:19, 459:21
screen [2] - 443:9, 446:21
scrutinize [3] - 316:20, 322:20, 322:21
seal [1] - 272:14
SEAN [1] - 267:20
search [1] - 291:17
searching [2] - 363:1, 363:24
season [1] - 428:8

seasonal [1] - 425:11
seated [1] - 268:1, 375:2, 381:23, 442:2
second [8] - 296:22, 311:24, 324:20, 326:11, 415:22, 415:23, 436:1, 442:21
Secrecy [8] - 324:13, 355:6, 355:11, 355:16, 355:24, 356:9, 362:5, 362:9
secrecy [1] - 269:4
secretary [1] - 394:2
section [6] - 308:4, 319:5, 320:6, 335:21, 373:1, 404:16
security [2] - 333:25, 395:6
Security [1] - 418:23
see [71] - 268:10, 273:16, 274:20, 276:12, 277:20, 283:18, 283:25, 284:8, 286:2, 286:13, 286:20, 289:6, 291:18, 294:23, 294:25, 298:15, 304:2, 305:21, 305:23, 312:23, 312:25, 314:3, 319:5, 319:9, 320:5, 320:8, 320:10, 322:17, 323:10, 324:4, 325:25, 326:10, 327:25, 329:7, 329:10, 342:6, 351:7, 352:14, 354:21, 361:18, 366:4, 368:11, 369:23, 373:8, 379:4, 385:18, 388:21, 398:9, 401:2, 401:17, 403:16, 404:15, 404:23, 404:24, 405:19, 405:23, 406:6, 406:18, 411:24, 415:25, 416:21, 433:2, 443:5, 443:11, 443:19, 445:25, 451:6, 454:5, 459:8
seem [2] - 438:13, 459:20
Seigel [1] - 392:4
seize [2] - 285:25, 332:3
seized [6] - 286:16, 290:20, 331:21, 332:5, 340:14, 364:19
seizing [2] - 282:3, 291:17
seizure [13] - 270:2, 274:10, 274:20, 276:3, 300:25, 301:2, 301:22, 302:10, 306:2, 306:23, 358:4, 359:6, 442:10
self [1] - 418:22
self-employed [1] - 418:22
sell [1] - 422:23
selling [2] - 346:2, 436:16
send [4] - 312:6, 405:2, 405:4, 405:9
sending [2] - 278:17, 288:17
sense [3] - 313:11, 455:16, 455:18
sensing [1] - 369:20
sent [19] - 275:10, 278:12, 278:14, 280:2, 280:4, 281:5, 282:17, 284:15, 284:18, 285:2, 287:17, 287:24, 293:7, 293:11, 301:10, 301:14, 311:15, 326:16, 435:25
sentence [4] - 289:2, 295:8, 416:18, 417:16
separate [5] - 384:18, 399:23, 399:24, 424:2, 424:14
separated [1] - 429:3
September [36] - 272:18, 278:18, 280:4, 280:5, 281:17, 281:20, 282:24, 283:11, 283:18, 284:11, 284:15, 284:19, 284:22, 285:9, 287:21, 288:3, 300:22, 304:7, 314:13, 314:15, 326:17,

327:4, 327:11, 327:12, 340:17, 360:9, 364:5, 364:25, 394:16, 403:20, 404:20, 414:6, 419:4, 421:18, 439:11, 457:14
serve [3] - 317:15, 394:14, 459:9
served [3] - 317:21, 327:18, 350:5
Service [1] - 268:19
service [1] - 366:20
serving [1] - 305:1
set [11] - 289:5, 299:10, 299:13, 308:3, 319:1, 331:15, 385:4, 424:15, 424:16, 427:25
sets [1] - 320:8
settlement [1] - 362:11
settling [1] - 362:1
seven [5] - 319:23, 425:6, 448:17, 458:3, 460:22
several [2] - 325:15, 356:14
Sewle [1] - 382:11
shall [1] - 373:15
shape [1] - 421:23
shares [1] - 374:10
Shay [16] - 278:16, 278:22, 278:25, 279:1, 279:14, 280:6, 284:23, 291:17, 291:20, 303:24, 304:15, 312:2, 312:5, 312:16, 312:18, 373:11
sheet [19] - 348:24, 378:7, 378:8, 378:19, 379:7, 379:12, 380:7, 380:22, 385:20, 385:23, 386:4, 386:14, 386:20, 386:21, 387:16, 388:12, 388:13, 388:21, 444:10
sheets [6] - 348:3, 379:20, 380:18, 388:25, 459:19, 459:21
shift [5] - 376:18, 378:21, 379:17, 383:19, 389:1
shipped [1] - 392:16
shoot [1] - 439:9
Shop [1] - 402:2
Shop-Rite [1] - 402:2
shopping [3] - 402:6, 411:1
short [5] - 382:25, 397:5, 397:25, 398:11, 456:13
shortcoming [1] - 456:24
shortcut [1] - 321:3
shorten [1] - 369:21
show [13] - 289:10, 289:19, 352:5, 367:18, 397:10, 398:13, 401:6, 401:9, 401:11, 401:20, 418:11, 443:5, 455:23
showed [4] - 349:16, 397:14, 421:17, 441:5
shower [1] - 395:25
showing [2] - 370:4, 408:14
shows [2] - 316:15, 316:18
shut [2] - 422:8, 423:22
sic [2] - 315:11, 327:20
side [12] - 282:10, 331:25, 398:21, 399:4, 410:18, 410:23, 422:2, 426:3, 431:19, 445:14, 452:1, 452:25
sides [1] - 373:13
Siegel [1] - 391:1
sign [4] - 271:1, 271:3, 340:7, 446:18

**signature** [7] - 312:10, 444:25, 446:3, 446:4, 446:7, 446:11, 447:11
**signed** [1] - 446:14
**signing** [1] - 447:13
**signs** [2] - 316:15, 425:2
**similar** [2] - 330:17
**simply** [5] - 272:16, 373:1, 373:24, 374:1, 456:23
**single** [4] - 367:19, 403:1, 403:8, 406:13
**singles** [48] - 284:7, 285:23, 286:12, 286:13, 337:18, 337:21, 337:24, 358:19, 398:21, 399:1, 400:2, 400:5, 400:16, 400:20, 400:21, 400:24, 401:1, 401:4, 403:3, 403:4, 403:6, 409:14, 409:16, 409:21, 409:25, 410:2, 410:3, 410:9, 410:12, 410:13, 410:15, 411:2, 411:14, 412:2, 416:16, 420:14, 420:19, 420:25, 421:7, 432:25, 433:12, 437:14, 437:15, 437:17, 438:21, 439:6, 440:10
**sister** [14] - 390:6, 394:2, 405:4, 405:10, 406:17, 411:22, 413:4, 415:8, 423:25, 425:1, 429:1, 430:25, 441:13
**sister's** [1] - 424:13
**sit** [2] - 297:4, 354:3
**sitting** [1] - 367:11
**situation** [1] - 332:4
**six** [16] - 293:22, 300:4, 300:5, 300:9, 319:24, 375:12, 382:15, 404:6, 406:5, 407:13, 410:22, 416:19, 417:21, 426:12, 435:23, 437:16
**Sixth** [1] - 413:6
**sixty** [1] - 406:5
**SIXTY** [1] - 267:7
**SIXTY-ONE** [1] - 267:7
**sixty-six** [1] - 406:5
**size** [1] - 410:22
**slip** [3] - 321:1, 398:11
**slow** [1] - 415:7
**small** [5] - 342:25, 343:6, 343:9, 410:25, 444:17
**smaller** [2] - 311:25, 406:4
**snowstorm** [1] - 425:15
**Social** [1] - 418:23
**SOCKOL** [2] - 267:20, 461:8
**Sockol** [2] - 270:5, 277:19
**SOKOL** [1] - 352:10
**sold** [2] - 392:11, 425:18
**someone** [19] - 284:21, 290:11, 302:16, 303:6, 315:7, 315:11, 317:9, 317:19, 322:9, 330:4, 360:4, 360:15, 360:24, 360:25, 419:21, 426:1, 440:3, 454:22, 460:25
**someplace** [1] - 387:18
**something's** [1] - 411:23
**sometime** [1] - 391:15
**sometimes** [17] - 367:23, 384:5, 384:10, 386:2, 391:4, 396:9, 402:1, 405:6, 409:11, 409:15, 417:20, 428:12, 432:12, 432:14, 432:15, 432:22

**somewhat** [2] - 345:13, 369:21
**somewhere** [2] - 280:1, 458:7
**soon** [1] - 407:19
**sophisticated** [1] - 326:25
**sorry** [9] - 287:2, 297:12, 336:11, 338:4, 339:19, 346:22, 376:15, 439:20, 440:18
**sort** [3] - 341:24, 394:5, 429:13
**sorts** [1] - 384:10
**sought** [3] - 275:2, 277:4, 297:10
**sounds** [1] - 438:4
**sources** [1] - 348:5
**South** [2] - 420:3, 440:5
**sox** [1] - 300:7
**space** [1] - 410:15
**span** [2] - 326:8, 327:14
**speaking** [4] - 359:23, 361:18, 434:23
**Special** [4] - 288:25, 332:6, 338:23, 358:5
**special** [4] - 269:15, 343:7, 410:17
**specific** [24] - 275:11, 280:19, 287:19, 299:10, 310:8, 313:24, 314:11, 316:11, 317:11, 319:19, 330:25, 333:7, 333:22, 337:23, 339:14, 342:23, 355:8, 355:25, 356:6, 364:25, 365:19, 365:24, 372:15, 378:6
**specifically** [37] - 269:3, 280:1, 280:18, 281:1, 281:4, 282:9, 282:16, 282:17, 284:12, 299:4, 301:7, 301:11, 301:20, 302:6, 304:10, 308:12, 311:5, 313:20, 314:19, 327:13, 333:4, 333:19, 335:8, 337:18, 337:21, 341:13, 342:22, 344:3, 357:2, 363:5, 363:11, 364:1, 367:5, 367:17, 418:14, 439:25, 445:25
**specificity** [4] - 305:11, 307:4, 335:2, 365:3
**spell** [3] - 381:20, 382:1, 389:15
**spend** [4] - 273:19, 431:2, 459:5, 459:6
**spending** [2] - 342:7, 455:13
**spent** [5] - 311:2, 335:8, 342:2, 348:8, 364:15
**spoken** [1] - 315:10
**squared** [1] - 374:6
**squatting** [1] - 446:23
**stack** [1] - 399:18
**stairs** [1] - 386:8
**Stamp** [1] - 450:15
**stamped** [2] - 404:8, 447:3
**stand** [6] - 268:2, 268:4, 372:10, 454:3, 454:9
**standing** [1] - 409:24
**stands** [1] - 438:2
**Start** [1] - 451:6
**start** [9] - 318:22, 382:12, 392:6, 402:10, 407:7, 412:2, 427:11, 453:13, 457:20
**started** [10] - 340:17, 391:1, 391:24, 392:1, 420:11, 426:13, 426:17, 427:24, 429:16, 438:1

**starting** [2] - 351:10, 453:1
**State** [1] - 395:15
**state** [4] - 334:4, 381:20, 389:11, 445:2
**statement** [22] - 279:20, 284:11, 285:7, 285:22, 286:2, 289:10, 319:1, 320:14, 320:22, 321:22, 325:23, 326:1, 326:5, 358:23, 359:12, 369:24, 371:21, 401:7, 401:10, 403:12, 457:8
**statements** [20] - 278:14, 302:24, 307:13, 308:4, 309:13, 310:8, 311:15, 311:19, 311:22, 327:19, 335:22, 336:18, 341:2, 341:7, 370:16, 403:20, 404:20, 405:3, 405:4, 405:8
**STATES** [4] - 267:1, 267:3, 267:12, 267:14
**States** [1] - 267:6
**station** [1] - 434:11
**stationed** [1] - 375:19
**status** [1] - 338:13
**statute** [7] - 269:5, 269:25, 355:5, 355:6, 356:4, 356:15, 357:4
**statutes** [3] - 269:23, 269:24, 356:1
**stay** [2] - 318:15, 393:7
**stayed** [1] - 393:8
**staying** [1] - 450:9
**steady** [1] - 425:16
**Steinway** [2] - 402:20, 409:19
**stenography** [1] - 267:25
**step** [4] - 371:17, 381:14, 389:5, 445:11
**stick** [2] - 299:20, 428:18
**sticking** [1] - 288:19
**still** [7] - 388:9, 392:13, 400:23, 407:15, 422:14, 443:12, 453:15
**stock** [2] - 358:20, 394:1
**stop** [2] - 290:24, 396:14
**store** [2] - 387:18, 448:23
**stored** [1] - 388:22
**stores** [1] - 392:12
**storing** [1] - 449:15
**story** [3] - 285:13, 285:14, 332:1
**stream** [1] - 337:8
**streams** [3] - 344:4, 344:13, 344:15
**Street** [14] - 309:5, 309:8, 390:2, 390:23, 391:18, 393:24, 402:19, 402:21, 405:5, 408:5, 409:18, 410:1, 413:5
**stressed** [1] - 281:14
**stricken** [1] - 361:8
**strictly** [1] - 417:19
**strike** [1] - 361:7
**stronger** [1] - 459:11
**structure** [3] - 393:25, 394:8, 456:17
**structured** [5] - 273:6, 294:24, 295:3, 295:12, 323:24
**structuring** [61] - 271:19, 271:22, 271:24, 272:17, 273:2, 273:16, 273:25, 274:8, 274:15, 274:17, 289:4, 289:5, 289:13, 290:23, 294:18, 295:14, 295:23, 296:9, 297:21, 298:2, 314:10,

325:13, 325:16, 329:15, 329:16, 329:21, 330:4, 330:12, 330:13, 330:20, 331:4, 331:11, 333:1, 333:4, 333:10, 333:14, 355:5, 355:6, 355:8, 355:20, 357:13, 357:16, 357:21, 368:24, 369:9, 422:3, 436:12, 436:13, 436:18, 436:20, 436:23, 437:2, 442:14, 443:25, 444:3, 455:21, 456:1, 456:5, 456:6, 456:12, 460:4

**student** [1] - 418:22

**stuff** [11] - 356:23, 391:4, 402:2, 402:6, 424:14, 433:13, 436:2, 436:14, 438:21, 439:22

**stumbled** [1] - 456:4

**style** [2] - 342:11, 458:9

**subject** [4] - 354:23, 371:22, 372:19, 385:10

**submission** [1] - 373:14

**submissions** [1] - 460:13

**submit** [1] - 370:4

**submitted** [5] - 270:1, 270:21, 284:25, 288:21, 289:15

**subpoena** [2] - 282:8, 350:5

**subpoenaed** [3] - 279:16, 282:10, 315:14

**subsequent** [9] - 287:25, 288:18, 289:4, 290:16, 332:5, 340:6, 340:16, 358:22, 359:11

**subsequently** [4] - 287:18, 307:7, 315:9, 350:13

**substance** [11] - 275:24, 278:15, 290:24, 300:13, 305:9, 306:15, 314:4, 314:18, 349:25, 357:22, 357:23, 365:1, 365:9

**substantial** [2] - 297:25, 453:9

**substantially** [2] - 270:20, 270:22

**substantiate** [2] - 336:19, 401:13

**substantive** [7] - 278:7, 278:9, 290:13, 292:23, 292:24, 293:1, 293:2

**subterfuge** [1] - 316:16

**subtract** [1] - 387:14

**sudden** [1] - 435:20

**suggest** [1] - 287:9

**suggested** [3] - 295:3, 295:12, 431:4

**suggesting** [1] - 289:8

**suggestion** [1] - 456:9

**sum** [1] - 317:13

**summarize** [1] - 287:22

**summarized** [4] - 280:8, 287:17, 287:23, 326:22

**summarizes** [3] - 316:10, 318:7, 327:19

**summary** [10] - 282:23, 287:21, 322:22, 327:17, 353:18, 353:20, 353:25, 354:10, 354:16, 364:14

**summer** [3] - 377:15, 387:4, 427:7

**Sunday** [9] - 383:7, 385:6, 394:19, 398:6, 406:2, 425:5, 426:20, 427:12, 428:3

**Sunnyside** [7] - 291:12, 360:4, 393:5,

402:21, 408:5, 416:24, 416:25

**supervising** [1] - 376:25

**supplement** [1] - 369:22

**supplied** [3] - 295:16, 303:14

**supplies** [1] - 303:15

**support** [3] - 460:1, 460:3

**supported** [1] - 295:17

**supporting** [1] - 419:8

**suppose** [3] - 373:4, 374:8, 458:11

**supposed** [3] - 398:23, 431:18, 435:19

**supposedly** [2] - 284:15, 285:2

**surcharge** [2] - 406:10, 422:25

**surprise** [1] - 422:9

**suspicious** [3] - 325:24, 457:18

**sustain** [1] - 361:6

**sustained** [2] - 361:15, 430:10

**swear** [1] - 271:5

**swears** [1] - 271:15

**switch** [1] - 413:18

**switched** [1] - 424:1

**switching** [1] - 400:22

**swore** [1] - 291:18, 447:18

**sworn** [13] - 268:4, 271:2, 271:8, 271:14, 271:17, 273:20, 285:7, 369:24, 375:5, 381:18, 389:9, 444:25, 449:2

**system** [2] - 434:4, 434:11

**systemic** [1] - 454:1


## T

**Tab** [4] - 444:17, 444:20, 445:9, 445:18

**tackle** [1] - 399:4

**tactic** [3] - 329:16, 332:8

**talks** [2] - 317:12, 417:3

**TANYA** [1] - 267:16

**tape** [9] - 349:16, 387:5, 387:8, 426:23, 427:3, 431:18, 431:19, 433:1, 433:2

**tapes** [11] - 349:1, 349:14, 349:18, 377:20, 377:21, 380:18, 386:25, 387:1, 425:22, 431:21, 459:24

**target** [1] - 342:6

**targeted** [1] - 342:6

**task** [8] - 271:20, 271:22, 271:23, 271:24, 272:3, 272:17, 273:2, 273:3

**tattered** [4] - 399:23, 399:24, 399:25, 400:1

**tax** [15] - 335:16, 338:13, 338:22, 338:24, 340:4, 340:8, 351:21, 385:5, 423:5, 433:19, 435:15, 435:16, 436:4, 441:1, 456:10

**taxation** [1] - 385:10

**taxed** [2] - 385:4, 385:15

**taxes** [8] - 299:23, 338:17, 338:21, 344:2, 436:8, 455:20, 455:24, 457:5

**TD** [31] - 276:5, 289:5, 292:21, 293:7, 293:11, 293:14, 293:15, 293:22, 294:8, 294:17, 294:24, 295:11, 297:22, 300:2, 300:6, 300:9, 300:12, 305:20, 307:7, 319:19, 330:2, 413:23, 423:7, 423:9,

423:11, 423:13, 423:17, 424:1, 424:8, 438:3, 438:7

**TDs** [1] - 294:5

**team** [3] - 291:14, 313:8, 313:12

**technical** [1] - 455:17

**technique** [1] - 332:14

**techniques** [1] - 456:20

**TEL** [1] - 267:23

**telephone** [1] - 419:20

**telephonic** [1] - 368:19

**teller** [3] - 409:16, 409:21, 411:13

**ten** [10] - 306:20, 339:24, 396:3, 403:6, 425:17, 427:14, 429:11, 429:12, 437:25, 441:23

**ten-minute** [1] - 441:23

**tend** [2] - 456:17, 460:1

**tends** [1] - 290:2

**tens** [9] - 337:13, 359:16, 398:22, 399:1, 399:17, 399:20, 399:22, 433:1, 433:12

**tenure** [2] - 343:6, 449:21

**terms** [6] - 274:13, 344:14, 347:22, 371:4, 375:14, 430:4

**testified** [23] - 268:4, 277:2, 281:9, 281:17, 319:20, 333:9, 342:17, 345:17, 357:20, 357:21, 365:21, 366:8, 375:6, 381:19, 388:1, 389:10, 442:20, 444:13, 446:18, 448:2, 450:21, 451:4, 451:9

**testify** [3] - 278:6, 372:23, 454:7

**testifying** [2] - 277:5, 317:16

**testimony** [38] - 276:10, 276:16, 281:20, 282:15, 282:18, 285:15, 287:1, 287:4, 307:2, 307:8, 318:6, 341:20, 350:18, 357:10, 357:18, 364:22, 365:5, 369:22, 370:21, 371:6, 371:7, 371:24, 373:11, 395:10, 395:11, 434:6, 441:6, 442:25, 444:7, 444:9, 448:14, 449:2, 451:2, 453:9, 454:15, 459:8, 459:16, 460:2

**THE** [130] - 267:12, 268:1, 268:9, 272:2, 272:6, 272:9, 272:15, 272:22, 295:20, 296:10, 296:15, 303:11, 303:16, 303:18, 303:19, 303:20, 303:22, 311:15, 311:18, 327:23, 328:2, 328:7, 328:15, 339:18, 339:20, 339:23, 340:1, 340:9, 340:13, 352:23, 352:25, 353:11, 353:16, 353:21, 354:3, 354:7, 354:9, 354:13, 355:3, 355:12, 355:15, 357:25, 361:3, 361:5, 361:8, 361:15, 361:23, 362:4, 362:7, 362:14, 365:12, 365:16, 368:6, 368:16, 368:19, 368:21, 368:24, 369:5, 369:7, 369:17, 369:23, 369:25, 370:11, 370:15, 370:23, 371:9, 371:13, 371:17, 371:18, 371:20, 372:8, 372:12, 372:21, 373:2, 373:10, 373:16, 373:23, 374:2, 374:7, 375:2, 376:13, 376:15, 381:11, 381:13, 381:20, 381:22, 381:23, 387:22, 388:16, 388:18, 389:5, 389:11, 389:12, 396:5, 396:7, 403:24, 403:25, 404:1,

404:2, 404:3, 404:5, 404:7, 404:14,
408:10, 408:20, 430:10, 441:23, 442:2,
442:17, 442:21, 442:23, 443:12,
443:18, 445:11, 445:13, 445:14,
445:17, 451:19, 451:22, 452:2, 452:15,
455:6, 460:12, 460:18, 460:20, 460:23,
460:25, 461:5, 461:12
  **themselves** [3] - 321:10, 336:9, 361:9
  **they've** [1] - 352:4
  **thinking** [1] - 453:13
  **third** [4] - 352:19, 400:6, 416:18,
417:16
  **thirteen** [2] - 389:20, 389:25
  **thirty** [1] - 450:6
  **THOUSAND** [1] - 267:7
  **thousand** [14] - 319:23, 320:20, 334:7,
389:22, 416:19, 417:21, 425:6, 435:7,
458:3
  **thousands** [3] - 336:21, 359:16, 391:3
  **three** [24] - 299:2, 299:6, 299:7,
324:24, 337:17, 359:1, 392:6, 399:3,
399:19, 405:21, 406:3, 406:4, 406:6,
409:18, 411:18, 412:1, 413:21, 420:15,
431:15, 434:1, 435:4, 447:22, 448:1
  **three-way** [1] - 392:6
  **throw** [2] - 380:23, 380:24
  **Thursday** [9] - 286:11, 393:8, 400:15,
402:12, 403:4, 426:18, 427:13, 428:4,
460:20
  **Thursdays** [2] - 400:25, 425:9
  **tickets** [2] - 321:10, 322:2
  **tip** [6] - 284:8, 429:9, 429:10, 429:11,
429:17, 429:24
  **tip-out** [4] - 429:9, 429:10, 429:17,
429:24
  **tipping** [2] - 337:20, 345:25
  **tips** [1] - 422:24
  **tis** [1] - 386:21
  **Tish** [1] - 276:6
  **title** [1] - 366:7
  **Title** [2] - 269:24, 269:25
  **today** [15] - 269:16, 271:7, 277:25,
282:15, 287:1, 287:4, 295:11, 297:4,
318:1, 367:11, 377:16, 379:19, 400:10,
452:6, 460:16
  **together** [5] - 283:17, 342:14, 397:12,
429:2, 431:21
  **tomorrow** [1] - 452:3
  **took** [28] - 275:11, 280:6, 280:24,
282:24, 284:19, 284:21, 284:23, 292:9,
292:10, 298:9, 303:7, 320:24, 322:9,
325:3, 334:22, 336:14, 344:23, 345:22,
347:3, 359:5, 359:10, 378:25, 383:19,
392:10, 397:23, 408:21, 436:5, 436:17
  **tools** [1] - 454:4
  **top** [8] - 283:22, 310:24, 311:14,
311:20, 319:7, 321:17, 432:12, 449:12
  **topless** [1] - 394:12
  **total** [7] - 317:23, 362:19, 385:12,
385:13, 386:18, 397:23, 422:9

  **totality** [1] - 326:20
  **totalling** [1] - 324:16
  **totals** [1] - 380:4
  **touch** [3] - 425:1, 435:21, 436:1
  **towards** [1] - 367:23
  **trace** [1] - 368:2
  **traced** [1] - 368:13
  **track** [6] - 377:3, 377:7, 386:11,
387:11, 425:18, 426:22
  **tracked** [1] - 383:24
  **trade** [2] - 337:21, 410:12
  **traffic** [1] - 396:2
  **trail** [9] - 335:14, 335:22, 336:20,
336:22, 337:1, 337:4, 368:1, 368:3,
368:4
  **train** [1] - 391:23
  **transaction** [13] - 291:24, 292:11,
292:16, 294:7, 298:5, 321:9, 323:4,
324:25, 325:1, 325:8, 325:11, 326:4,
366:16
  **Transaction** [1] - 361:21
  **transactions** [18] - 292:10, 298:3,
298:8, 304:19, 307:14, 307:16, 307:18,
307:19, 322:25, 331:13, 337:11,
366:10, 367:19, 368:12, 368:23,
419:10, 425:24, 437:18
  **TRANSCRIPT** [1] - 267:11
  **transcript** [3] - 267:25, 373:14, 451:25
  **transferred** [2] - 386:21, 415:8
  **transfers** [7] - 306:5, 306:7, 306:9,
306:16, 398:1, 437:20, 437:24
  **transparent** [1] - 424:16
  **transpired** [1] - 292:18
  **treasurer** [1] - 394:2
  **treat** [1] - 330:15
  **treatment** [1] - 433:19
  **TRIAL** [1] - 267:11
  **trial** [6] - 296:10, 452:8, 452:17,
452:18, 457:12, 459:2
  **tried** [3] - 282:2, 282:4, 413:13
  **trigger** [5] - 292:18, 325:2, 362:3,
366:13, 369:4
  **triple** [1] - 410:17
  **trouble** [1] - 441:14
  **true** [12] - 287:13, 295:2, 303:17,
308:3, 339:10, 349:13, 441:8, 446:10,
447:15, 448:5, 448:6, 450:7
  **trusted** [1] - 449:24
  **truth** [2] - 347:8, 447:18
  **truthful** [2] - 350:20, 350:24
  **truthfulness** [1] - 354:2
  **try** [3] - 305:8, 338:10, 435:11
  **trying** [7] - 304:6, 315:7, 318:4, 331:4,
331:24, 367:15, 456:4
  **Tuesday** [11] - 286:10, 348:2, 376:4,
400:14, 400:24, 403:3, 403:5, 425:7,
427:13, 427:16, 428:3
  **Turkey** [2] - 402:3, 402:5
  **turn** [17] - 314:16, 360:8, 391:12,

396:8, 396:10, 396:11, 396:22, 403:10,
408:10, 444:17, 444:20, 445:9, 445:18,
450:11, 460:2, 460:3
  **turned** [2] - 349:11, 376:18, 396:15,
396:18
  **turning** [3] - 360:6, 447:7, 449:20
  **twelve** [2] - 382:15, 394:19
  **twenties** [12] - 334:16, 334:18, 420:24,
420:25, 433:1, 437:9, 437:11, 437:14,
437:15, 437:17, 438:16, 449:19
  **twenty** [5] - 335:11, 335:20, 336:8,
434:19, 450:6
  **twenty-dollar** [3] - 335:11, 335:20,
336:8
  **two** [34] - 279:7, 279:9, 290:18, 301:8,
320:15, 321:12, 328:2, 328:22, 336:13,
336:17, 343:4, 353:8, 354:19, 358:19,
370:7, 380:3, 380:4, 382:25, 399:3,
400:2, 400:8, 402:4, 403:13, 410:20,
411:18, 413:21, 426:20, 431:15,
452:16, 459:3, 460:9
  **two/three** [1] - 286:11
  **type** [14] - 269:22, 272:13, 306:23,
307:3, 321:22, 330:19, 336:24, 388:13,
394:12, 395:4, 420:6, 450:16, 450:22,
450:24
  **typed** [1] - 281:10
  **types** [5] - 269:9, 305:23, 366:10,
451:5, 451:10
  **typically** [4] - 325:4, 326:7, 332:16,
363:15

## U

  **U.S** [8] - 267:17, 273:4, 288:25,
350:11, 350:14, 444:8, 446:17, 447:25
  **ultimately** [2] - 295:22, 334:22, 413:16
  **unartful** [1] - 293:3
  **unavailable** [2] - 279:9, 370:14
  **uncomfortable** [1] - 454:21
  **uncorroborated** [1] - 453:21
  **under** [8] - 269:24, 272:14, 299:20,
317:9, 318:4, 319:5, 320:5, 337:10,
370:1, 370:19, 436:24
  **underlying** [6] - 349:5, 354:24, 456:7,
456:8, 456:10, 456:11
  **understood** [5] - 282:10, 305:4,
343:16, 360:5, 455:3
  **undertaken** [1] - 456:7
  **underway** [2] - 281:25, 282:8
  **unemployed** [2] - 349:20, 350:1
  **unfamiliar** [1] - 405:14
  **UNITED** [2] - 267:1, 267:12
  **uNITED** [2] - 267:3, 267:14
  **United** [1] - 267:6
  **unless** [4] - 324:9, 324:22, 425:14,
454:9
  **unmistakable** [1] - 337:4
  **unreported** [2] - 346:14, 346:15

**unsolicited** [2] - 339:4, 339:9
**unusual** [2] - 453:12, 453:18
**up** [83] - 274:9, 279:13, 279:14, 280:14, 283:6, 284:20, 293:15, 301:13, 304:16, 305:6, 312:13, 314:14, 319:21, 331:15, 335:13, 337:14, 339:18, 339:20, 348:3, 359:10, 365:2, 366:11, 372:12, 379:2, 380:6, 380:13, 380:15, 383:20, 386:1, 387:15, 391:4, 392:7, 392:21, 392:22, 395:24, 397:12, 397:17, 398:13, 399:3, 399:9, 399:10, 399:11, 399:14, 399:15, 399:21, 400:2, 400:16, 400:24, 401:4, 401:21, 402:2, 402:4, 403:3, 403:5, 403:6, 403:7, 403:8, 409:15, 409:17, 409:23, 410:16, 410:18, 411:13, 411:16, 411:22, 419:22, 424:15, 424:16, 425:21, 426:10, 428:11, 428:21, 430:22, 431:17, 431:22, 432:25, 438:24, 441:13, 441:19, 456:7, 459:1, 459:21
**uphold** [1] - 271:8
**upper** [2] - 404:19, 447:3
**upstairs** [7] - 383:18, 386:2, 396:10, 398:15, 431:17, 433:10, 433:11
**upwards** [2] - 367:18, 367:23
**URL** [1] - 404:8
**usable** [1] - 369:25
**useful** [1] - 452:13
**users** [2] - 281:12, 281:15
**usual** [1] - 419:25

## V

**vacation** [3] - 461:1, 461:3, 461:5
**vacuum** [2] - 299:4, 299:13
**valid** [2] - 295:21, 296:16
**Valleau** [1] - 276:8
**value** [1] - 347:20
**variables** [1] - 341:16
**variance** [1] - 430:3
**variation** [1] - 425:11
**varies** [3] - 425:5, 428:6, 428:7
**variety** [1] - 329:21
**various** [2] - 269:23, 384:10
**vary** [1] - 428:8
**varying** [1] - 405:22
**vehicle** [3] - 305:15, 337:2, 455:14
**vendetta** [1] - 453:19
**vendors** [6] - 337:25, 338:5, 401:24, 401:25, 424:14
**ventures** [1] - 392:18
**verbatim** [2] - 280:8, 364:14
**verification** [3] - 447:7, 447:13, 447:14
**verified** [1] - 448:6
**version** [4] - 270:21, 345:10, 345:13, 370:4
**versus** [1] - 360:18
**vice** [4] - 366:1, 366:4, 366:7, 394:3
**Vice** [1] - 326:12

**vice-president** [3] - 366:1, 366:4, 366:7
**video** [2] - 343:13, 343:14
**viewed** [1] - 288:4
**viewing** [1] - 450:22
**vigor** [2] - 274:7, 274:13
**violation** [5] - 269:19, 269:20, 269:22, 445:3, 445:4
**violations** [3] - 269:4, 269:20, 273:12
**VIP** [4] - 383:25, 384:8, 428:19, 428:20
**visit** [2] - 291:1, 308:20
**visited** [2] - 308:19, 309:11
**vividly** [1] - 456:2
**voice** [1] - 293:18
**voluminous** [1] - 354:17
**volunteer** [1] - 340:4
**volunteered** [1] - 339:11

## W

**wages** [1] - 385:10
**wait** [5] - 268:9, 272:22, 299:5, 299:8, 404:7, 415:21
**waiting** [1] - 361:5
**Waldbaums** [1] - 402:2
**walk** [1] - 366:11
**wall** [1] - 443:17
**wants** [5] - 299:21, 373:18, 422:22, 426:1, 454:20
**warn** [1] - 423:13
**warned** [1] - 364:25
**warning** [3] - 293:5, 293:8
**warrant** [3] - 274:24, 275:5, 276:3
**warrants** [2] - 273:9, 274:20
**water** [1] - 455:14
**Wawa** [1] - 375:16
**ways** [2] - 329:21, 336:17
**Wednesday** [13] - 286:11, 400:15, 402:10, 403:3, 409:23, 409:24, 425:8, 427:13, 427:15, 427:16, 428:3, 452:5, 460:10
**Wednesdays** [1] - 400:25
**week** [29] - 278:18, 297:24, 299:3, 299:8, 320:13, 337:17, 354:25, 356:15, 401:17, 401:21, 409:15, 409:18, 409:21, 410:4, 412:1, 416:17, 416:20, 417:18, 420:15, 430:23, 437:12, 437:13, 437:17, 450:5, 452:18, 460:15, 460:19, 461:10
**weekend** [2] - 321:6, 398:8
**weekly** [1] - 401:18
**weeks** [5] - 407:20, 413:21, 452:16, 460:9, 460:10
**West** [4] - 309:5, 375:16, 391:18, 405:5
**Westrich** [31] - 270:10, 270:11, 270:12, 270:14, 270:23, 271:15, 288:21, 291:7, 301:24, 302:3, 302:5, 308:19, 309:5, 309:11, 313:12, 332:6,

333:9, 338:24, 357:20, 358:5, 368:17, 371:10, 372:20, 373:4, 373:6, 373:7, 433:7, 434:16, 434:22, 434:25
**Westrich's** [3] - 357:18, 371:5, 374:2
**whatsoever** [2] - 317:25, 458:21
**whole** [7] - 285:13, 370:3, 371:23, 397:18, 435:9, 457:2, 461:10
**wide** [1] - 430:3
**wife** [1] - 435:22
**wildly** [1] - 296:4
**willing** [1] - 371:4
**wire** [5] - 306:5, 306:7, 306:9, 437:20, 437:24
**wired** [3] - 331:2, 423:23, 438:5
**wiring** [1] - 437:22
**withdrawal** [2] - 401:10, 401:14
**withdrawals** [3] - 335:7, 335:13, 401:14
**withdrawn** [14] - 302:22, 306:1, 308:6, 308:7, 309:4, 324:10, 324:18, 341:24, 345:17, 415:15, 416:20, 417:17, 418:12, 448:22
**witness** [33] - 268:2, 270:5, 272:6, 277:19, 295:23, 295:24, 296:8, 328:1, 328:4, 350:7, 354:1, 354:8, 354:9, 354:11, 370:13, 371:17, 371:20, 373:7, 373:10, 374:8, 375:3, 381:15, 389:6, 448:18, 453:3, 453:11, 454:2, 454:3, 454:9, 454:12, 454:13, 455:7
**WITNESS** [18] - 303:16, 303:19, 303:22, 311:18, 355:15, 362:4, 368:19, 368:24, 369:7, 371:18, 376:15, 381:22, 389:12, 396:7, 403:25, 404:2, 404:5, 445:13
**Witness** [1] - 371:19
**witnesses** [3] - 350:10, 373:2, 455:5
**words** [20] - 275:18, 290:24, 300:13, 304:11, 305:9, 306:15, 314:4, 314:18, 333:15, 346:25, 347:2, 349:25, 357:21, 364:14, 365:1, 365:11, 365:13, 385:14, 398:8
**workday** [1] - 395:23
**world** [1] - 306:16
**worry** [2] - 268:11, 354:20
**worst** [1] - 454:11
**worth** [5] - 326:7, 335:7, 341:25, 342:5, 358:18, 358:19, 358:20, 391:3
**wrap** [1] - 386:22
**wrapped** [2] - 380:13, 380:15
**wrapping** [2] - 339:18, 339:20
**write** [5] - 332:9, 432:11, 432:12, 432:14, 433:3
**writing** [1] - 400:20
**written** [3] - 329:3, 365:21, 380:3
**wrote** [1] - 401:3

## Y

**year** [11] - 356:7, 394:9, 397:19,



415:24, 425:16, 426:12, 428:21,
428:22, 436:7, 441:3

**year-and-a-half** [1] - 428:22

**years** [16] - 311:2, 342:2, 342:4, 343:4,
364:15, 375:12, 375:17, 375:19,
382:15, 389:20, 389:24, 389:25,
424:22, 424:23, 426:11, 426:21

**yellow** [1] - 380:4

**yesterday** [19] - 268:6, 268:15, 269:11,
275:9, 277:25, 292:15, 300:17, 319:20,
329:25, 341:8, 342:17, 345:17, 346:2,
346:3, 347:3, 350:19, 351:4, 353:24,
354:19

**yesterday's** [1] - 397:13

**YORK** [3] - 267:1, 267:15, 267:19

**York** [16] - 267:7, 267:22, 273:4, 309:6,
315:18, 375:16, 375:18, 382:10,
389:18, 390:2, 393:24, 395:15, 401:15,
409:9, 420:2, 446:24

**yourself** [7] - 282:2, 282:4, 308:8,
335:13, 342:24, 354:16, 424:19

---

## Z

**zoned** [1] - 393:16