```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
  UNITED STATES OF AMERICA,                                 :
                                                            :
                                    Plaintiff,              :
                                                            :
                - against -                                 :
                                                            :      MEMORANDUM
                                                            :      DECISION AND ORDER
SIXTY-ONE THOUSAND NINE HUNDRED                             :
DOLLARSAND NO CENTS ($61,900.00)                            :
SEIZED FROM ACCOUNT NUMBER                                  :      10 Civ. 1866 (BMC)
XXXXXX4429 HELD IN THE NAME OF PRP                          :
RESTAURANT, INC., AT TD BANK, N.A.                          :
LOCATED IN ASTORIA, NEW YORK, AND                           :
ALL PROCEEDS TRACEABLE THERETO,                             :
                                                            :
FIVE HUNDRED EIGHTY-SEVEN                                   :
THOUSAND FIVE HUNDRED THIRTY-SIX                            :
DOLLARS AND FORTY-FIVE CENTS                                :
($587,536.45) SEIZED FROM ACCOUNT                           :
NUMBER XXX-X7872 HELD IN THE NAME                           :
OF PRP RESTAURANT, INC., AT MERRILL                         :
LYNCH PIERCE FENNER & SMITH,                                :
LOCATED IN NEW YORK, NEW YORK                               :
AND ALL PROCEEDS TRACEABLE                                  :
THERETO,  and                                               :
                                                            :
TWO HUNDRED THIRTY THOUSAND                                 :
FOUR HUNDRED DOLLARS AND NO                                 :
CENTS ($230,400.00) SEIZED FROM                             :
ACCOUNT NUMBER XXX-X7A80                                    :
HELD IN THE NAME OF ROBERT                                  :
POTENZA, AT MERRILL LYNCH PIERCE                            :
FENNER & SMITH, LOCATED IN NEW                              :
YORK, NEW YORK AND ALL PROCEEDS                             :
TRACEABLE THERETO,                                          :
                                                            :
                                    Defendants.             :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

        This civil forfeiture case was tried before me in a two-day bench trial.  I found that the

Government had failed to prove its theory that claimant, Robert Potenza, had intentionally

structured cash deposits to avoid the reporting requirements of  31 U.S.C. § 5313(a).

Familiarity with my Findings of Fact and Conclusions of Law, dated August 15, 2011, is presumed. I am now presented with claimant's motion for attorneys' fees and expenses in the amount of $940,810.60 as a substantially prevailing party under the Civil Asset Forfeiture Reform Act ("CAFRA"), 28 U.S.C. § 2465(b)(1)(A). The Government acknowledges claimant's right to recover fees but challenges the amount, contending that the maximum reasonable award is $279,900.24.

For the reasons stated below, I find that some of the Government's objections to claimant's fee calculation are meritorious and I direct the parties to submit a revised calculation.

**I.      Allegedly Unrecoverable Items**

CAFRA provides that, "in any civil proceeding to forfeit property under any provision of Federal law in which the claimant substantially prevails, the United States shall be liable for reasonable attorney fees and other litigation costs reasonably incurred by the claimant." 28 U.S.C. § 2465(b)(1)(A). It is undisputed that claimant meets the Supreme Court's definition of a "prevailing party" under this provision of CAFRA, see Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 603, 121 S. Ct. 1835 (2001), and is therefore entitled to recover the attorneys' fees and costs that he reasonably expended in defending against the Government's lawsuit.

The key word in CAFRA's fee-shifting provision is "reasonable." Courts within the Second Circuit generally employ the "presumptively reasonable fee" method when analyzing attorneys' fees motions. See, e.g., Arbor Hill Concerned Citizens Neighborhood Ass'n v. Albany County & Albany County Bd. of Elections, 522 F.3d 182, 190 (2d Cir. 2008). Under this method, courts multiply the "amount of time reasonably spent by counsel" by a reasonable hourly rate to derive a presumptively reasonable overall fee which may be subject to an upward

or downward departure for various reasons. Cover v. Potter, No. 05-CV-7039, 2008 WL 4093043, at *5 (S.D.N.Y. Aug. 29, 2008). The Arbor Hill method requires this Court to determine in the first instance whether the hours expended by counsel were reasonable in light of the nature of this case.

**A. Champion**

Claimant seeks $40,465.46 for fees and expenses paid to Richard Champion, Esq. The basis for the claim is that Champion was both co-counsel to claimant in this proceeding (although he never appeared as counsel) and a designated, but uncalled, expert witness. Claimant asserts that Champion is "an experienced tax controversy attorney," and that he educated claimant's counsel of record, Sean O'Shea of O'Shea Partners LLP, "by a thorough review and analysis of the business structure and practices" of claimant's company and "by working as a potential expert witness and strategic advisor."

O'Shea avers that he did not know anything about claimant's business when he started this case, and thus needed Champion. However, Champion presumably did not know anything about the business either. Although claimant asserts that Champion's expertise was necessary in this case, there is no showing of why it was necessary. The theory on which claimant pressed its claim, and the theory on which it prevailed, is that claimant is a simple man running a simple cash business with no nefarious intent. Claimant and his sister fully explained to the Court how they run the business, and there is no reason that they could not have explained it to claimant's counsel the same way. This is presumably why it was unnecessary to call Champion at trial.

Nevertheless, the Government brought this cost, in part, upon itself. It relied heavily, for both investigative and testimonial purposes, on a specially-retained consultant, an experienced financial investigator, who testified as an expert witness. He rendered a report and his testimony

3

contained numerous inferences based on his observations and experience. Claimant's counsel would have been remiss to not have that report thoroughly vetted by someone of comparable expertise. Thus, at the very least, preparation of a rebuttal report was warranted. In addition, Champion provided some value in assisting counsel in preparing for depositions, and undertook a number of other tasks that otherwise would have had to be performed by the O'Shea firm. If the O'Shea firm had performed these tasks, it would very likely have been at a higher rate, as Champion's rate was below that of all of the lawyers in the O'Shea firm.[1]

Having reviewed Champion's time slips, I find that Champion's charges should be reduced by 30%. Although it was reasonable for claimant to hire Champion for some purposes, it was not reasonable to expend resources having Champion explain claimant's business to the O'Shea lawyers who could have spent that time learning about the business themselves.

### B. Graf and Harrington, Ocko, and Monk LLC

Claimant seeks reimbursement for additional professionals aside from its counsel of record and Champion. It appears that claimant's accountants – Graf Repetti & Co. ("Graf") – testified at deposition for two days at the request of the Government, and billed claimant for their time. (Although claimant's moving papers did not request reimbursement for Graf's time at deposition, his reply papers note that this was omitted in error.) In addition, Graf retained its own counsel – Harrington, Ocko, & Monk LLC – which charged legal fees to Graf, and Graf passed along those charges for claimant to pay. Claimant thus seeks reimbursement for Graf's law firm's fees as well.

---

[1] The Government asserts that since Champion testified as an expert at deposition, he could not have served as both counsel and expert. However, the Government has pointed out no testimony that Champion gave that was adverse to claimant, and since he was not counsel of record at trial, I see no reason he could not fill both roles.

I agree with the Government that the pass-through of these fees would be unreasonable. I do not see why a non-party witness, let alone its lawyers, is entitled to professional fees simply for explaining its accounting work at two depositions. There is no suggestion that Graf had legal exposure as a result of its work so that it would have a need for representation, and even if it did, that would strike me as Graf's problem, not its client's. Claimant may have agreed to reimburse its accountants for these fees (although no contractual basis for doing so has been presented to me) merely as a way of maintaining its professional relationship with Graf, but that does not make it a recoverable item. Claimant spent these fees as a cost of doing future business with Graf; the fees were not a cost of defending this claim.

### C. The Motions in Limine

The Government contends that reimbursement for the legal fees incurred in two motions *in limine* filed simultaneously shortly prior to trial, which I denied, should be disallowed in their entirety. The Government relies primarily on comments I made during argument on the motions, in which I expressed skepticism as to the reasons for their filing since they seemed unlikely to be granted.

In retrospect, I see it differently. The motions had little chance of being granted, but they served quite effectively as pretrial briefs (which were not otherwise filed). They attacked the Government's two principal witnesses, and both the motions and the Government's response made the Court much more prepared than it would have been without the motions and very possibly shortened the trial. Indeed, part of the Court's decision in the case parallels the arguments made in these motions. The strategic use of motions *in limine* in this fashion is not uncommon and was a reasonable decision. Since the Government does not attack the amount of time spent on them, those charges will be allowed.

### D. Interest on Fees Incurred

The Government has objected to paying interest and claimant concedes that interest paid on fees and expenses is not recoverable under CAFRA. I agree with the Government that both sovereign immunity and CAFRA preclude the payment of interest on legal fees and disallow this item. See Library of Congress v. Shaw, 478 U.S. 310, 314, 106 S. Ct. 2957 (1986); 28 U.S.C. § 2465(b)(2)(A).

### II. Alleged Deficiencies in the Time Entries

Attorneys' fees may be awarded only when the attorney submits "contemporaneous time records" which "specify, for each attorney, the date, the hours expended, and the nature of the work done." N.Y. State Assoc. for Retarded Children v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). When an attorney's hours have been inadequately documented, a court may reduce the award "accordingly." Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S. Ct. 1933 (1983).

Two of the deficiencies in claimant's time records alleged by the Government have become moot. First, although claimant initially filed minimally redacted time records (based on attorney-client privilege), unredacted copies have now been filed ex parte and reviewed in camera. Second, although claimant did not initially provide primary source material for its expenses, it annexed those records to its reply papers. I find that the expenses are reasonable and no reduction is warranted.

The remaining alleged deficiencies are: (1) the O'Shea firm used "block billing; (2) time was kept in quarter-hour increments instead of tenth-hour increments; (3) lack of billing judgment; and (4) some entries are vague.

The block billing issue relates to the primary associate on the case, Andrew Sockol, who utilized this method repeatedly.[2] The case law cited by both parties is not particularly helpful, as some authorities impose fee reductions based on this practice, and others find the practice tolerable. Compare Miroglio S.P.A. v. Conway Stores, Inc., 629 F. Supp. 2d 307, 314 (S.D.N.Y. 2009), with Rodriguez ex rel. Kelly v. McLoughlin, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999). The key question is whether the court, upon review of all the time entries, can determine whether the total amount of time was reasonable considering all of the activities undertaken. Perfect efficiency in the provision of legal services is a theoretical possibility at best, and if there are inefficiencies in one activity which are offset by extra efficiency in another, which happens often, then the non-prevailing party who is called upon to pay the fee is not harmed. Having chosen to bring an action with knowledge that it was subject to a fee-switching statute if it did not prevail, I do not think that the Government has the right to insist on more than each task undertaken being reasonable and the total amount of time for all tasks also being reasonable.

Especially in an intensely litigated case like this, no lawyer is going to actually make a notation every six minutes as to what he did that last six minutes. Because many lawyers, particularly associates, are often switching back and forth between different tasks for the same client or multiple clients, stopping to record every six minutes of time would so compromise efficiency that all clients would be ill-served. If a lawyer is keeping his time with reasonable accuracy, he will write his time slips every half-day, or at the end of the day, or the next morning. Thus, some level of reconstruction and approximation is unavoidable. I see no infirmity in the practice that most lawyers follow, which goes something like this: "I was in the office for 12 and a half hours today. I took 30 minutes for lunch, I spoke to my friend on the

---

[2] No criticism for using this methodology is or could be directed at Mr. Sockol personally. Associates keep time using the method prescribed by their firm.

7

phone for 20 minutes, I skimmed the Law Journal for 10 minutes, and I worked for three clients. As to those clients, I spent 50% of my time working for Client A, 45% for Client B, and 5% for client C. I am therefore going to bill my net time worked proportionately among those three clients, and I am going to make a time entry for each that describes everything I can possibly think of that I did for that client." That is how block billings originate.

For this reason, when block billing entries contain a significant amount of detail, as they do in this case, I do not feel disadvantaged in determining whether the amount of time spent was reasonable. I am looking at each task described, to see if it should have been done, and the total amount of time spent, both each day for all the tasks described that day, and for the case as a whole. If the time entries survive that level of scrutiny, then I conclude that the client, and by extension, the adversary, is getting a fair deal, i.e., the time calculation is reasonable. Indeed, it is noteworthy that, subject to a few exceptions discussed below, the Government has no complaint about the performance of particular tasks, the total time expended on any particular day, or the total time expended on the case. The attack on block billing as a concept in such circumstances is just a tactic to limit the full effect of fee-shifting, and it fails when the time slips have as much detail as those at issue here.

I view the alleged "requirement" of 1/10 of an hour billing increments similarly. The cases are again in conflict as to whether there should be a prohibition on billing in increments larger than six minutes. Compare Trustees of Buffalo Laborers' Pension Fund v. Accent Stripe, Inc., No. 01-CV-76, 2007 WL 2743441, at *4 (W.D.N.Y. Sept. 18, 2007), with N.Y. State Teamsters Conference Pension & Retirement Fund v. United Parcel Serv., Inc., No. 5:98-CV-1902, 2004 WL 437474, at *6 (N.D.N.Y. Feb. 24, 2004). The theory of the objection seems to be that if a lawyer is keeping time in only quarterly increments, then if he spends six or seven

minutes on the case, he is likely to round the time upward in order to get some credit for the time he put in. But smaller billing increments do not reduce that possibility, because a one-minute phone call to a client can be rounded to six minutes just as easily as six minute phone call to a client could be rounded to a quarter-hour.

Finally, I believe there is value in not forcing lawyers in fee shifting cases to keep their time records differently than the industry standard. Large law firms generally keep their time records in 1/10 of an hour increments but very few small firms like the O'Shea firm do. There are other situations where it is required – some bankruptcy courts have local rules requiring it when the debtor's estate is paying the fee, see, e.g., Del. Bankr. L.R. 2016-2(d)(iv); Bankr. E.D.N.Y. R. 2016-1 (directing claimants to follow "the requirements contained in any fee guidelines promulgated by the United States trustee"); 28 C.F.R. Pt. 58, App. A(b)(4)(C)(v) (fee guidelines promulgated by the United States trustee) – but anecdotal evidence does not suggest that it has served to reduce bankruptcy fees in any meaningful way. And it is noteworthy that unlike those bankruptcy courts that have such a rule, there is no counterpart in this district or in any district court of which I am aware. If we are going to have a requirement that lawyers in fee-shifted cases must use a particular billing format if they want to collect, then we should spell it out in local rules the same way the bankruptcy courts do.

Having reviewed the fee application in detail here, I see no basis for an across-the-board reduction for block billing or quarter-hour incremental billing. With a few exceptions discussed below, the tasks undertaken were reasonable; the amount of time spent on them each day was reasonable; and the total amount of time spent on the case was reasonable.

I agree with the Government, however, that O'Shea's 95 hours of "trial preparation" with no further designation is excessive, although not because it is vague. Again, it is not the

9

methodology that troubles me; I know what lawyers do to prepare for trial and, having tried this case, I can reasonably ascertain the activities that O'Shea undertook. (O'Shea, in his reply papers, asserts that the 95 hours were spent preparing witnesses, drafting cross-examination outlines, and reviewing depositions, which is what I would have expected.) My difficulty is that 95 hours is too much. Claimant's case was reasonably straightforward and there was not much vulnerability of claimant's witnesses on cross. O'Shea had two relatively complex cross-examinations for which significant preparation time would have been required, but the activities in total should not have required 95 hours.

The remedy, however, is not disallowance of the entire amount of trial preparation time, which is the rather absurd remedy that the Government advocates. My goal is to award a reasonable fee, not to punish a lawyer in the heat of battle for being inadequately efficient. The maximum time that a lawyer of O'Shea's experience should have spent preparing for this trial was 75 hours, and thus his time charges are reduced by 20.5 hours.

Lastly, the Government challenges particular line-items in the bill. It is correct that a paralegal's charge of 7.50 hours to draft a subpoena is grossly excessive; with no information from claimant as to why this subpoena was particularly complex, the allowed time is reduced to 1 hour. Second, the Government complains that Sockol charged 45 minutes on two separate occasions, months apart, to review my decision denying claimant's motion to dismiss. I have no difficulty allowing this double review; the decision was complex and important to the case. When dealing with a significant precedent, a lawyer cannot be expected to read it once early in the case and put it down, never to be looked at again. Precedents have to be studied to be fully appreciated. This particular precedent was especially significant because it occurred in this very case. Finally, the Government complains that some of Sockol's other entries were identical,

pointing to eight entries, five of which were part of a block billing entry for that day, entitled "Research various defenses to monetary seizure and charges related to structuring monetary transactions" that occurred over a three week period. However, even attributing the entire block entry to this one item within it (which of course is an artificial construct), the total amount of research time involved was 31.75 hours. The Government does not voice any complaint to Sockol having spent this much time researching this case, and it does not strike me as unreasonable. It is clear that Sockol was researching this case over a three-week period in April and May of 2010, and there is no requirement that he rephrase that same activity in multiple permutations.

### III. Hourly rates

Under <u>Simmons v. New York City Transit Authority</u>, 575 F.3d 170 (2d Cir. 2009), I cannot approve hourly billing rates in excess of those that prevail in this district absent unusual circumstances. I and other judges in this district have previously noted the artificiality of this rigid forum-based rule in the context of the Eastern District of New York and the Southern District of New York because they form a unitary market for legal services. <u>See</u> <u>Luca v. County of Nassau</u>, 698 F. Supp. 2d 296, 300-01 (E.D.N.Y. 2010); <u>Gutman v. Klein</u>, No. 03-cv-1570, 2009 WL 3296072, at *2 n.1 (E.D.N.Y. Oct. 13, 2009). Over 60% of the lawyers appearing in civil cases before me have their offices in the Southern District of New York, with the remainder split about evenly between the Eastern District of New York and other districts across the country. In addition, there are a relative handful of firms located within the Eastern District of New York with sufficient experience in financial litigation and time availability to handle a case like this and the resources that it can (and did) bring to bear. None of these firms are located in Queens, where claimant has his business. I am familiar with only one firm in Brooklyn that has

11

the potential to take on a case like this, and the few firms within the district that have the capacity and resources are a considerable distance away on Long Island – a much greater distance from the Brooklyn Courthouse where this case was tried than the O'Shea firm's Manhattan office. Indeed, even Congress and the Department of Justice have recognized the unique permeability of these adjoining districts by permitting judges and U.S. attorneys to serve in one district and reside in the other (a practice permitted in no other location except the District of Columbia, which has a similarly permeable border with its adjoining districts). See 28 U.S.C. § 545(a) (U.S. attorneys); 28 U.S.C. § 134(b) (district court judges).

Having said that, Simmons is the law in this Circuit and claimant's attorneys have given me no help in ascertaining whether one of the exceptions to the forum rule discussed in Simmons might apply here. The most obvious way of avoiding Simmons would have been to demonstrate that the few firms within this district that can handle cases like this charge rates comparable to the $800/hour partner, $475/hour associate, and $175/paralegal rates that the O'Shea firm is seeking here. This information could have been gleaned from bankruptcy fee applications from these firms (such fee applications very often include the rates of litigators, not just bankruptcy lawyers) filed in this district as well as in the Southern District, where they also frequently appear. These firms may very well charge comparable rates for this kind of work, but I do not know it and cannot guess at it. All claimant has done is to refer me to pre-Simmons authority that considered both Southern District and Eastern District rates, which may be more logical, but is no longer a legally valid means of approaching the issue.

However, the authorities cited by the Government to establish Eastern District rates in the $400 range are also not terribly helpful. Legal practice is not fungible. A lawyer who handles a case like this – essentially an action seeking to recover nearly $1 million seized by the

12

Government based on an accusation of intentional fraud – is in a very different business than a lawyer who seeks to recover unpaid overtime for an hourly worker under the Fair Labor Standards Act, or one who sues to recover damages for improper collection efforts under the Fair Debt Collection Act, or one who brings a trademark action against a fly-by-night infringer who defaults, or even a plaintiff who sues the City of New York for false arrest. These latter kinds of cases, in which Brooklyn lawyers generally specialize, are high-volume practices that bear little semblance to the practice at firms like the O'Shea firm which are based on non-repetitive fact patterns and diverse and complex fields of law. It is as if the Government is arguing that a divorce lawyer and a corporate transaction litigator should receive the same hourly rate, a position that ignores the utterly distinct marketplaces for particular kinds of legal services as well as the very different skills and knowledge that must be brought to bear in different fields of practice.

That is why numerous cases refuse to shift commercial litigation rates to defendants when those large firms take on quasi-*pro bono* efforts under statutes like those referred to above. See Cho v. Koam Med. Servs., P.C., 524 F. Supp. 2d 202, 207 (E.D.N.Y. 2007); Morris v. Eversley, 343 F. Supp. 2d 234, 237 (S.D.N.Y. 2004); Pastre v. Weber, 800 F. Supp. 1120, 1125 (S.D.N.Y. 1991). The reverse is also true. That is, if commercial rates are too high for an F.L.S.A. case, then F.L.S.A. rates may be too low for commercial litigation.

I recognize that this was not the most complex case, or even the most complex forfeiture case, that has ever been brought. But it had fairly intricate facts and nuances, and it was further complicated by the Government's decision to bring what otherwise would have been a tax fraud case in the guise of a structuring case. Under these circumstances, I find that attorneys able and willing to bring a case like this who have offices within the Eastern District of New York would

charge in excess of the amounts allowed in high-volume practices, and that reasonable hourly rates for such attorneys to charge are $600/hour partner, $400/hour for an associate of Mr. Sockol's experience, and $150 for paralegal services.

## **CONCLUSION**

Claimant's motion for attorneys' fees and expenses is granted in part and denied in part. Claimant is directed to confer with the Government and submit a revised calculation based on the rulings set forth above.

**SO ORDERED.**

                                                      s/ BMC
                                                     U.S.D.J.

Dated:   Brooklyn, New York
          April 5, 2012